File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _1_

EXHIBIT _F_

TAB (DESCRIPTION) _____

```
1    STATE OF ILLINOIS )
                       )  ss
2    COUNTY OF C O O K )

3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                       )  Case No. 92 CR 25135
6       Vs.            )
                       )  Charge: MURDER
7    JERRI LINDSEY     )

8              REPORT  OF  PROCEEDINGS

9            BE IT REMEMBERED that on the 17th day of

10   February, 1994, this cause came on for hearing

11   before the Honorable SHELVIN SINGER, Judge of said

12   Court, upon the indictment herein, the defendant

13   having entered a plea of not guilty.

14      APPEARANCES:
                HON. JACK O'MALLEY,
15              State's Attorney of Cook County, by
                MS. LYNDA PETERS,
16              MS. PATRICIA SHEA,
                Assistant State's Attorneys,
17              Appeared on behalf of the People;

18              MR. SHELDON SOROSKY,
                Appeared on behalf of the Defendant.
19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.
```

1          THE CLERK:  Jerri Lindsey.

2          THE COURT:  Okay.  Could we have Miss

3    Lindsey seated at the counsel table with her

4    lawyer.  All right.  The officer who has been

5    testifying, is that officer here.  Is the witness

6    who was testifying when we recessed here, Miss

7    Peters?

8          MS. PETERS:  Yes, he is.

9          THE COURT:  Would you ask him to join us.

10         MS. PETERS:  He's in the back, we were to

11   the point of cross examination.

12         THE COURT:  Let me point out the defendant

13   is present in her own person through counsel,

14   state is present through its counsel.

15         MS. PETERS:  If there hasn't been previously

16   made, I would make a motion to exclude witnesses.

17         THE COURT:  All right.  Motion to exclude

18   witnesses is granted and I'll ask however each

19   side to police their own witnesses since you are

20   acquainted with who the witnesses are and I am

21   not.

22              Let's have you sworn in again.

23         THE CLERK:  Raise your right hand.

24                        (Witness sworn.)

1          THE COURT:  This is cross examination now.

2    Miss Peters, are you prepared to proceed?

3          MS. PETERS:  Thank you.

4                  RAYMOND SCHALK,

5    called as a witness on behalf of the Motion to

6    Suppess, having been first duly sworn, was

7    examined and testified as follows:

8                CROSS EXAMINATION

9                      BY

10              MS. PETERS:

11       Q   Detective Schalk, could you please tell

12    us your first and last name?

13       A   Raymond Schalk.

14       Q   Can you spell your last name?

15       A   S-c-h-a-l-k.

16       Q   Are you the same Detective Schalk that

17    testified 3 days ago on this case?

18       A   Yes, I am.

19       Q   Now, let's start from the beginning of

20    your involvement in this case.  I would like to

21    direct your attention to the date of October 12,

22    of 1992, were you working for Area 5 as a Violent

23    Crimes detective on that date?

24       A   Yes, I was.

1          Q   And what shift did you work on that date?

2          A   The third watch from 4:30 pm to 1:00 am.

3          Q   And on October 12, 19292, I would like to

4     direct your attention to approximately 6:15 to

5     6:30 pm that evening, did you receive an

6     assignment at that time?

7          A   Yes, I did.

8          Q   And was that for a homicide investigation

9     at O'Hare Airport?

10         A   That is correct.

11         Q   And after receiving that assignment, did

12    you in fact go to O'Hare Airport?

13         A   Yes, I did.

14         Q   And about what time was it when you got

15    there?

16         A   I arrived there at approximately 7:00 pm.

17         Q   Did you meet with other officers from the

18    Chicago Police Department at the airport?

19         A   Yes, I went there with my partner,

20    Detective Bogucki and also met Detective Halvorsen

21    there.

22         Q   Was your attention directed to any place

23    in particular at the airport?

24         A   In the main parking garage.

1    Q    And in that main parking garage, did you

2    find the scene of this homicide investigation?

3    A    Yes.

4    Q    Could you describe that to us?

5    A    Yes. There was a circle cab parked in the

6    main parking garage.  There was a male black

7    slumped over the driver's seat who had apparently

8    been there for several days and he had apparent

9    gunshot wounds.

10    Q    Where on the body were the gunshot

11    wounds?

12    A    In the chest.

13    Q    And that person was deceased at the time

14    that you saw him?

15    A    Yes.

16    Q    Now, the cab, you said it was a Circle

17    Cab, company cab, is that a city cab or a suburban

18    cab?

19    A    A Joliet cab.

20    Q    And could you describe the color and the

21    outside appearance of that cab?

22    A    It's maroon color, has white lettering.

23    Q    Now, in looking at the person -- was it a

24    male or female found in the cab?

F  6

1        A   A male, male black.

2        Q   Approximate age?

3        A   Approximately 50 years old.

4        Q   And --

5        THE COURT:  Approximately how old?

6        A   50 years old.

7        MS. PETERS:

8        Q   And were you able to learn the identity

9    of that person at that time?

10       A   At that time, no.

11       Q   Did you recover a parking ticket stub

12   that had a stamped date and time on it for the

13   O'Hare parking garage that this cab was in?

14       A   Yes.

15       Q   And was that stub recovered from the cab

16   itself?

17       A   It was inside the cab, yes.

18       Q   And what was the stamped date and time on

19   that parking stub?

20       A   It was stamped October 9th at 1659 hours.

21       Q   That would be 4:59 pm?

22       A   Yes.

23       Q   Did you --

24       THE COURT:  October 9th?

1        A    October 9th at 1659 hours.

2        MS. PETERS:

3        Q    After looking at the individual in the

4    cab, in the cab itself, did you have a chance to

5    speak with a security officer by the name of Larry

6    Green from the Andy-Frain Security Company at

7    O'Hare Airport?

8        A    Yes, I did.

9        Q    And in the course of your conversation

10   with Mr. Green that evening, did you learn that

11   there are log books that show what vehicles were

12   in that particular garage on each and every

13   night?

14       A    Yes.

15       Q    And regarding that particular Circle Cab

16   Company cab that you just described, did you learn

17   that nights that vehicle had been in the parking

18   garage at O'Hare?

19       A    It had been logged on there on the night

20   of October 9th, October 10th and October 11th.

21       Q    Of 1992?

22       A    1992, yes.

23       Q    Did you also, while you were at the

24   airport, learn of a missing person report from

1    Area One here in the City of Chicago?

2          A   Yes.

3          Q   And who was the subject of that missing

4    person report?

5          A   Rudolph Bennett.

6          Q   Did you learn that that missing person

7    report regarding Rudolph Bennett had been made on

8    October 10th of 1992?

9          A   Yes.

10         Q   And the missing person report regarding

11   adults, is there a waiting period from the time of

12   this disappearance before the complaint can be

13   filed?

14         A   Generally, we like to wait 24 hours

15   before taking a report on an adult.

16         THE COURT:   How long?

17         A   Generally we wait 24 hours before taking

18   a report on an adult missing.

19         MS. PETERS:

20         Q   Did you obtain that missing person report

21   that same evening of October 12, 1992?

22         A   Yes.

23         Q   And did you review that report?

24         A   Yes.

1        Q   And in reviewing that report, did you

2    learn that it was made by his wife, Ruby Bennett?

3        A   Reba Bennett.

4        Q   I'm sorry Reba Bennett?

5        A   Yes.

6        Q   What did that report indicate about the

7    circumstances surrounding the last time that

8    Rudolph Bennett had been seen?

9        A   It indicated that Reba Bennett had last

10   heard from him on October 9th at approximately

11   2:30 to 2:45 pm when she spoke with him over the

12   taxicab radio and it indicated that he was on his

13   way to O'Hare with a cab fare.

14       Q   Did you verify that the taxicab that was

15   listed in that missing person report was the same

16    -- in fact the same taxicab that you were

17   observing that night at O'Hare Airport?

18       A   Yes, it was the same cab.

19       Q   And did you meet with any members of the

20   Bennett family at the Area 5 police station at

21   5555 West Grand Avenue, in Chicago?

22       A   Yes, I did.

23       Q   And after that occurred, was there an

24   identification made of the person's body that you

1    found at O'Hare Airport?

2         A   Yes.   The victim was identified as

3    Rudolph Bennett.

4         Q   Approximately what time at night did that

5    occur?

6         A   Approximately 10 pm at night.

7         Q   Did you interview --

8         THE COURT:   Excuse me, what time?

9         A   10 pm.

10        THE COURT:   What date?

11        A   That would have been on the night of the

12   12th of October.

13        MS. PETERS:

14        Q   Did you interview Ruby Bennett at Area 5

15   Violent Crimes that same night of October 12th?

16        A   Yes.

17        Q   And approximately what time did you speak

18   with Ruby Bennett?

19        A   It would have been about that time of 10

20   pm.

21        Q   Who was present when you spoke with her?

22        A   My partner, Detective Bogucki.

23        Q   Did you learn where in particular Rudolph

24   Bennett had picked up the cab fare before going to

1    O'Hare Airport?

2         A   Yes.  She told us that he had gone to the

3    Empress Riverboat Casino in Joliet to pick up 2

4    fares, one fare was a regular couple that calls

5    him frequently to pick them up there.  They were

6    scheduled to be picked up at 2:30 pm and the other

7    fare, she didn't know who it was.  The Empress

8    Casino called saying there was another fare to be

9    picked up also.

10        Q   And as to the couple that was the

11   pre-arranged fare, was there a destination in mind

12   for that couple?

13        A   Yes, they were to be taken from the

14   Empress Casino to the Red Roof Inn in Joliet.

15        Q   And the last contact that Miss Bennett

16   had with her husband was when he radioed and said

17   he had both fares and was on his way eventually to

18   O'Hare Airport?

19        A   Correct.

20        Q   I would like to direct your attention now

21   to the next day which would be October 13, of

22   1992, did you return to work at about 4:30 pm on

23   that day?

24        A   Yes, I did.

1      Q   And when you returned to work, did you

2   learn the cause of death of Rudolph Bennett?

3      A   Yes, the cause of death was multiple

4   gunshot wounds.

5      Q   Did you learn the name and the

6   whereabouts of the couple that had the

7   pre-arranged taxicab ride?

8      A   Yes, I did.

9      Q   And did you then contact those people?

10     A   Yes.

11     Q   And would that be a Miss Hess and Mr.

12   Eiselt which is E-i-s-e-l-t?

13     A   That is correct.

14     Q   About what time at night on the 13th of

15   October was it that you contacted that couple?

16     A   That was approximately 7:30 pm on that

17   night.

18     Q   And did you go to where they were or did

19   they come into the station?

20     A   I went to their residence.

21     Q   And do you recall where that is?

22     A   I believe it was at 820 Park Terrace in

23   Chicago.

24     Q   And when you went and spoke with them,

1    were you alone or with anyone else?

2           A   I was with Detective Bogucki.

3           Q   Did you know -- did Miss Hess and Mr.

4    Eiselt tell you what had occurred on October 9,

5    1992 when they rode in the cab?

6           A   Yes, they did.

7           Q   What did they tell you?

8           A   They said they had been at the Empress

9    Casino in Joliet.  They had made arrangements with

10   the Circle Cab Company to pick them up at 2:30 pm

11   on the 9th of October.  At that time, they were

12   waiting in front of the main entrance to the

13   Empress Casino and they could see a Circle cab

14   driving towards them.  About a block away they saw

15   that cab stop and pick up a female black who was

16   on the road.  They said the cab continued towards

17   them and they waved the cab driver down and asked

18   him if he was there to pick them up.  The cab.

19          Q   Did the cab driver tell them that he was

20   in fact there?

21          A   He was in fact there to pick them up.

22          Q   Did they tell you anything else then

23   regarding their cab ride?

24          A   Yes.  They said the cab driver asked the

1    female black -- said something to the female black

2    who was in the back seat, she then got into the

3    front seat and the couple got into the back seat

4    of the cab.  They then drove off and were

5    eventually dropped off at the Red Roof Inn.

6        Q  Now, did Miss Hess and Mr. Eiselt tell

7    you whether or not anybody was in the cab with the

8    driver after they were dropped off at the Red Roof

9    Inn?

10       A  After they were dropped off, the same

11   female black was still sitting in the front seat

12   with the driver.

13       Q  And did Miss Hess and Mr. Eiselt tell you

14   if they overheard the destination of that cab or

15   any conversations to that effect while they were

16   in it?

17       A  While they were in the cab they overheard

18   some conversation, they heard the female black say

19   she had to be at O'Hare by 4:30.

20       Q  Did they give you a description of this

21   female black that was in the cab with the driver?

22       A  Yes.

23       Q  And did they -- how did they describe

24   her?

F  15

1          A    Described her as a female black, I

2    believe she was in her twenties, approximately 5-2

3    to 5-4, 130, 140 pounds with a chunky --

4          THE COURT:  Wait, wait, slower. How many

5    pounds?

6          A    Approximately 130 to 140 with a chunky

7    build.

8          THE COURT:  Okay.

9          MS. PETERS:

10         Q    Did you now return back to the station at

11   Area 5 Violent Crimes?

12         A    Yes, I did.

13         Q    And while you were back at the station on

14   the evening of October 13, 1992, were you

15   contacted by a sergeant from Area 2 Violent Crimes

16   also in the City of Chicago?

17         A    Yes, I was.

18         Q    Who was it that contacted you?

19         A    Sergeant Augustine.

20         Q    About what time was it that he contacted

21   you?

22         A    I believe that was sometime around 10 pm.

23         Q    And during the course of the conversation

24   with Sergeant Augustine, did you learn at that

1    point about a second offense that had been

2    reported with a victim by the name of Jerri

3    Lindsey?

4         A  Yes, I did.

5         THE COURT:  Excuse me one moment, what time

6    was the contact from Augustine?

7         A  Approximately 10 pm.

8         THE COURT:  10 pm what date?

9         A  October 13th.

10        THE COURT:  All right.

11        MS. PETERS:

12        Q  Did you obtain a copy of the sexual

13   assault case report with the victim by the name of

14   Jerri Lindsey?

15        A  Yes, I did.

16        Q  And did you review that that evening?

17        A  Yes, I did.

18        Q  And that sex offense case report was made

19   by Jerri Lindsey on October 11, 1992 at about

20   11:25 pm, is that correct?

21        A  That is correct.

22        Q  And in that complaint to the police,

23   Jerri Lindsey told the police that she was the

24   victim of a sex offense, a rape?

1         A    Yes.

2         Q    What did she describe to the police in

3    that complaint?

4         A    The report indicated that a Miss Lindsey

5    claimed that she was picked up by a cab driver on

6    the south side, a male black cab driver.

7         Q    Did she describe the cab?

8         A    Yes, she described it as a red and white

9    suburban cab.

10         Q    What else did she say in that complaint?

11         A    She said that the cab driver had taken

12    her to some unknown location at gun point,

13    repeatedly sexually assaulted her over a period of

14    some 40 hours and then took her to an unknown

15    wooded location and at that location, she was able

16    to stab him in the chest leaving the knife in his

17    chest and then get away from him.  She was -- she

18    claimed to have been picked up by some unknown

19    person who told her that she was in Joliet and

20    that this person then took her to the hospital.

21         Q    Now, the driver of the cab she described

22    as a male black, is that correct?

23         A    Yes.

24         Q    And did she give an approximate age on

1    him?

2         A    35 to 40 years old.

3         Q    I would like to direct your attention now

4    to the next morning of October 14, 1992, did you

5    return to work that morning at about 8:30 am?

6         A    Yes, I did.

7         Q    And directing your attention now to

8    approximately 11 am, on October 14, 1992, is that

9    when you went to the home of Jerri Lindsey?

10        A    Yes, it is.

11        Q    And that is at 8931 South Houston?

12        A    Correct.

13        Q    That's in the City of Chicago?

14        A    Yes.

15        Q    And at the time that you went to Miss

16   Lindsey's apartment or the location, who was with

17   you?

18        A    Detective Bogucki and Detective

19   Halvorsen.

20        Q    Counsel asked you if you were armed when

21   you went to that location and you said that you

22   were, did you have your guns drawn when you went

23   to that location?

24        A    No, we didn't.

1          Q    What happened when you went to 8931 South
2     Houston?
3          A    I rang the front door bell, a female came
4     to the door and I identified us as detectives with
5     the Chicago Police Department.
6          Q    Now, the female that came to the door,
7     could you as best you can recall describe her
8     physically?
9          A    I believe it was a female Hispanic,
10    perhaps in her thirties, dark hair, average height
11    and weight.
12         Q    Did you learn her name at that time?
13         A    At that time, no.
14         Q    Did you later on learn the name of that
15    person?
16         A    Yes, it was Irene Quiros.
17         Q    And when you had your conversation with
18    Irene Quiros, was she the only one inside the
19    house that was there besides you and the other 2
20    officers?
21         A    At that time, it's the only one I could
22    see in the house.
23         Q    And at the time that you had this
24    conversation, where were you standing and where

1     was she standing?

2          A    I was standing in the outside, just

3     outside the door with the other detectives, she

4     was inside the door.

5          Q    And what happened then?

6          A    I asked her if Jerri Lindsey was home.

7     She said she was and asked her if we could talk to

8     her. She said she would get her.

9          Q    Did she then leave?

10         A    Yes, she did.

11         Q    And did anybody else then come to the

12    front door?

13         A    Jerri Lindsey then came to the front

14    door.

15         Q    Did you at any time go inside the house?

16         A    No, I didn't.

17         Q    Now when you say Jerri Lindsey came to

18    the front door, do you see that person in Court

19    today?

20         A    Yes, I do.

21         Q    Could you please point to her and tell us

22    something she's wearing today in Court?

23         A    Sitting at the table with the blue

24    outfit.

1          MS. PETERS:  May the record reflect an in

2     Court identification of the defendant, Jerri

3     Lindsey.

4          THE COURT:  The record may so reflect.

5          MS. PETERS:

6          Q   When you first saw Jerri Lindsey, what

7     was she wearing?

8          A   She was wearing a bath robe.

9          Q   And did you then have a conversation with

10    her?

11         A   Yes, I did.

12         Q   What did you tell her?

13         A   I told her we were detectives with the

14    Chicago Police Department, we would like to talk

15    to her regarding her sexual assault and homicide

16    investigation that we were working on and we would

17    like her to come with us to the police station to

18    talk about it.

19         Q   And did she say anything to you?

20         A   She said she would, she had to get

21    dressed first but she would come with us.

22         Q   Did you then wait for her?

23         A   I waited outside for her.

24         Q   For how long?

1        A   For about 20 minutes.

2        Q   After that 20 minutes, did Jerri Lindsey

3    then come out of the house?

4        A   Yes, she did.

5        Q   And at the point in time that you went

6    from the house to your vehicle, that you had come

7    there in, did you put your hands on and physically

8    escort Jerri Lindsey to the car?

9        A   No, I didn't.

10       Q   Was she handcuffed at any time?

11       A   No, she wasn't.

12       Q   Was she advised of her Miranda rights?

13       A   Not at that time, no.

14       Q   Did you have your guns drawn at that

15   point?

16       A   No.

17       Q   What type of a vehicle did you have with

18   you that day?

19       A   It was an unmarked police car.

20       Q   And how were you and the other detectives

21   dressed?

22       A   In our civilian clothes.

23       Q   Where did you then go?

24       A   We, from that location we drove to the

1    First District at 11th and State.

2         Q   Let me back you up just one last

3    question.  Did you ever force entry or do any kind

4    of damage to the door at 8931 South Houston?

5         A   No, I didn't.

6         Q   When you went to the police station, at

7    11th and State, about what time was it that you

8    got to that station?

9         A   Approximately noon.

10        Q   And you told us the other day when you

11   testified that it was as you were pulling up in

12   the squadcar or the unmarked squadcar up to the

13   police station that you mentioned something to

14   Jerri Lindsey about fingerprints and photographs.

15   Could you tell us how that conversation came

16   about?

17        A   I asked her that if she could -- if we

18   could take a photograph of her and have her

19   printed, obtain her fingerprints to help us in our

20   investigation.

21        Q   And what if anything did she say to you?

22        A   She said yes, that would be all right.

23        Q   Now, when you got to the station at 11th

24   and State, just so that we're all clear, that's

1       the main headquarters of the Chicago Police

2       Department, is that correct?

3              A   That is correct.

4              Q   But it also houses the First District

5       station of the Chicago Police Department?

6              A   Yes.

7              Q   Now, within the building, approximately

8       how many stories is it, if you know?

9              A   There are, I believe there are 7 floors,

10      as high as it goes on one side of the building.

11             Q   Now the First District police station is

12      located on the first floor then?

13             A   That is correct.

14             Q   And is that -- did you bring her into the

15      First District station?

16             A   Yes.

17             Q   And you said you brought her into an

18      interview room, is that correct?

19             A   Yes.

20             Q   Was that interview room locked?

21             A   No.

22             Q   And when she was in that interview room,

23      was Jerri Lindsey handcuffed?

24             A   No, she wasn't.

1      Q   Was she advised of her rights at that
2  time?
3      A   No, she wasn't.
4      Q   Did all 3 of you detectives go with her
5  into that room at that point when you first got
6  there?
7      A   Yes, we did.
8      Q   And when you first got there, what
9  happened?
10     A   I took a Polaroid photograph of Miss
11 Lindsey.
12     Q   And after taking the Polaroid photograph,
13 did you know leave the First District station?
14     A   Myself and Detective Bogucki left the
15 station, yes.
16     Q   It was at that point you went to Miss
17 Hess and Mr. Eiselt's, correct?
18     A   Yes.
19     Q   About how far away from the First
20 District station did that couple live?
21     A   They only lived a couple of blocks away.
22     Q   And this is at approximately noon on
23 October 14?
24     A   Yes.

1        Q   When you went over to their home, is that

2   when you showed them the photo array?

3        A   Yes.

4        Q   And the photo array, how many photos were

5   in that beside Miss Lindsey's photo?

6        A   5 other photos and photo of Miss Lindsey.

7        Q   When Miss Hess and Mr. Eiselt viewed the

8   photo array, did they view that together or

9   separately?

10        A   Separately.

11        Q   And each one independently identified

12   Jerri Lindsey as being the female black who was in

13   the front seat of the cab when they exited at the

14   Red Roof Inn?

15        MR. SOROSKY:   Objection, I think she's

16   leading the witness.

17        THE COURT:   Well, if my recollection is

18   correct, this is cross examination.

19        MR. SOROSKY:   Okay.

20        THE COURT:   And on cross examination, the

21   cross examiner may lead. I will overrule the

22   objection.

23        MS. PETERS:

24        Q   Did each of Miss Hess and Mr. Eiselt

1    independently identify Jerri Lindsey's photo as

2    being the female black who was in the cab when

3    they exited at the Red Roof Inn on October 9, of

4    1992?

5         A   Yes, they did.

6         Q   And did they tell you at about what time

7    it was that they got out of the cab at the Red

8    Roof Inn?

9         A   At approximately 3:15 pm.

10        Q   After the positive identifications

11   occurred, you returned back to the police station

12   at 11th and State, is that correct?

13        A   Yes.

14        Q   And while you had been gone is when

15   Detective Halvorsen had Jerri Lindsey

16   fingerprinted, is that correct?

17        A   Yes.

18        Q   And you told us that that occurred on the

19   4th District -- excuse me, the 4th floor

20   identification section, is that correct?

21        A   Yes.

22        Q   Now that's not the lock up portion of the

23   First District police station, correct?

24        A   Right, correct.

F 28

1        Q   And when you returned, was Miss Lindsey

2    back in that same interview room?

3        A   Yes, she was.

4        Q   And was the interview room still

5    unlocked?

6        A   Yes.

7        Q   Was she handcuffed?

8        A   No, she wasn't.

9        Q   About how long did it take you from the

10   point that you took the photo over and left the

11   First District until you returned after the

12   identifications had been made?

13       A   It was about a half an hour.

14       Q   So at that time, it would be

15   approximately 12:30 pm?

16       A   Yes.

17       Q   And she had been with you -- let me back

18   it up.  You had first come into contact with her

19   shortly after 11 am?

20       A   Yes.

21       Q   But you had not left her home until about

22   11:20 am?

23       A   That is correct.

24       Q   And she was actually at the police

1    station for 30 minutes though?

2        A  Yes.

3        Q  What was the tone of the conversations,

4    the mood of the questioning, if you will, the tone

5    of the conversations between yourself and Miss

6    Lindsey on October 14, 1992?

7        A  We just talked normally to her.

8        Q  Was there any yelling?

9        A  No, there wasn't.

10       Q  Was she questioned by you regarding the

11   specifics of her rape allegation up until 12:30

12   pm?

13       A  No, she wasn't.

14       Q  Was she questioned by you regarding

15   anything involving the homicide investigation up

16   until 12:30, pm?

17       A  No, she wasn't.

18       Q  Detective, if you know, approximately

19   what is the distance between Joliet and O'Hare

20   Airport?

21       A  The mileage, I couldn't don't know

22   off-hand. I believe in normal hours you could

23   probably make it in about an hour, longer of

24   course in rush hour time.

F 30

1        MS. PETERS:  If I could have just a moment,

2   please.

3        Q   Up until the 12:30 pm time when you

4   returned after the photo array identification, to

5   your knowledge, had you --

6        THE COURT:  Just one moment, please.

7              Miss Peters, continue please,.

8        MS. PETERS:

9        Q   Up until the time of 12:30 pm during the

10  half hour that Jerri Lindsey was physically

11  present at the First District police station, to

12  your knowledge was she ever processed for arrest?

13       A   No, she wasn't.

14       Q   Was she ever fingerprinted in conjunction

15  with that processing in the lock up section?

16       A   No, she wasn't.

17       Q   Was she ever searched as a prisoner would

18  be?

19       A   No, she wasn't.

20       Q   Was she ever informed by you that she was

21  under arrest?

22       A   No, she wasn't.

23       MS. PETERS:  I have no further questions.

24       THE COURT:  Redirect.

1     MR. SOROSKY: Yes.

2      REDIRECT EXAMINATION

3        BY

4     MR. SOROSKY:

5   Q  Now, Officer, I show you what I marked as

6 Defendant's Exhibit number 2 for identification.

7     THE COURT: Didn't we call it Petitioner's

8 exhibit.

9     MR. SOROSKY:

10   Q  Petitioner's exhibit 2 for identification

11 which would purport to be a police report that

12 consists of 4 pages and I would ask you to examine

13 those 4 pages and is that in fact the Chicago

14 Police report concerning the original rape report

15 that Jerri Lindsey made?

16   A  Yes, it is.

17   Q  And just so we're clear, this report was

18 first taken on October 11, 1992 at -- which would

19 be a Sunday, about 11:35 pm in the evening, is

20 that correct?

21   A  Yes.

22   Q  And in this report, Jerri Lindsey states

23 that she was picked up in a cab and that she asked

24 to go to a certain location and the cab driver

1    began driving in the opposite location, is that

2    correct?

3         A   Yes.

4         Q   Now, this report indicates that Jerri

5    Lindsey hailed the cab at 79th and Ridgeland

6    within the City of Chicago, is that correct?

7         A   Yes.

8         Q   Now, only Chicago cabs are supposed to

9    pick up people within the City of Chicago, isn't

10   that the law?

11        MS. PETERS:  Objection.

12        THE COURT:  Yeah, I'm going to sustain it.

13        MR. SOROSKY:  If he knows.

14        THE COURT:  Well go ahead, overruled.

15        MR. SOROSKY:

16        Q   Are you familiar with the city ordinance

17   which says only Chicago cabs are supposed to pick

18   up people seeking cabs within the City of Chicago?

19        A   I'm not really familiar with all the

20   ordinances in Chicago.

21        Q   Are you familiar with that particular

22   ordinance or law?

23        A   I believe that only cabs are supposed to

24   be in the city.

1          MS. PETERS:  Judge, well I object.

2          THE COURT:  Sustained.  You know--

3          MR. SOROSKY:  I asked him if he was familiar

4     with it.  He said he was and he knew he said he

5     believed that was it.

6          THE COURT:  He said he believed.

7          MR. SOROSKY:  I'll accept even believe.

8          THE COURT:  Well the question is, will I.

9     All right, I'll accept what he believes.  All

10    right.

11         MR. SOROSKY:

12    Q    Now then, there is nothing in these

13    reports which indicates that Miss Lindsey said

14    anything about a suburban cab, is there?

15    A    I was informed that by the Area 2

16    investigators.

17    Q    But there is nothing in these reports

18    which we would call Petitioner's exhibit 2 for

19    identification wherein any police officer jotted

20    down in the report that Jerri Lindsey said she was

21    raped and accosted by a man driving a suburban

22    cab, is there?

23    A    I don't see the word suburban

24    specifically written here.

1      Q   And I -- as you look at this report

2   towards the bottom of page 2 of this police

3   report, is there some indication within this

4   report concerning the type of cab that is

5   mentioned?

6      A   Yes.

7      Q   And what type of cab, what description is

8   given?

9      A   This initial report made out by the beat

10   officers states vehicle of offender believed to be

11   white and red or white and yellow cab with smoked

12   windows.

13      Q   And there is nothing concerning any

14   suburban or geographical depiction of a cab, is

15   there?

16      A   Not on this report.

17      Q   Now, when Miss Lindsey was brought by you

18   and your fellow officers to the police station, on

19   October 14, 1992, you told her that you wanted her

20   to come to the station to investigate both her

21   rape allegation and the homicide, is that correct?

22      A   I told her that we would like to speak

23   with her regarding the both of those, yes.

24      Q   How far, after you arrived at the police

1  station, photographs of her were taken and

2  fingerprints of her were taken, is that correct?

3       A  Yes.

4       Q  And the purpose of taking the photograph

5  was to show the photographs to the 2

6  aforementioned witnesses to see if these witnesses

7  could identify Miss Lindsey as being the person

8  who was in the cab, right?

9       A  Yes.

10      Q  And the purpose of taking the

11 fingerprints of Miss Lindsey was to get a sample

12 of Miss Lindsey's fingerprints to see if Miss

13 Lindsey's fingerprints were either in Mr.

14 Bennett's cab or on some train schedule that Miss

15 Lindsey had given to these 2 witnesses, is that

16 correct?

17      A  Yes.

18      Q  So the purpose of taking the photographs

19 and taking the fingerprints was really to aid the

20 police in the homicide investigation of Mr.

21 Bennett as distinguished from doing any police

22 work on Miss Lindsey's rape allegation?

23      MS. PETERS:  Objection.

24      THE COURT:  Overruled.

1    MS. PETERS:  To the leading form of the

2    question.

3         A  It was to help us determine whether or

4    not she was in fact involved in the homicide or

5    whether in fact there was a legitimate sexual

6    assault incident.

7         MR. SOROSKY:

8         Q  Well, how, could you tell his Honor Judge

9    Singer how showing a picture of Miss Lindsey's

10   photographs to the 2 aforementioned witnesses

11   would in any way provide any evidence concerning

12   Miss Lindsey's rape allegation?

13        MS. PETERS:  Objection, calls for

14   speculation.

15        THE COURT:  Sustained.

16        MR. SOROSKY:

17        Q  Now you say that one of your purposes in

18   doing these things was to assist in Miss Lindsey's

19   rape allegation, is that correct?

20        A  We wanted to speak with her regarding

21   that too.

22        Q  But prior to giving Miss Lindsey her

23   Miranda rights, you never spoke to her about her

24   rape allegation, did you?

1          MS. PETERS:  Objection, foundation, point in

2     time.

3          THE COURT:  Sustained.

4          MR. SOROSKY:

5          Q  Since she was -- since you met her that

6     day?

7          A  I don't believe I understand the

8     question.

9          MR. SOROSKY:

10         Q  Okay.  At 10:00 or 11 o'clock that

11    morning you met Miss Lindsey, did you not?

12         MS. PETERS:  Judge, objection at the

13    evidence, not 10 o'clock.

14         THE COURT:  I'm sorry.

15         MS. PETERS:  Objection, mis-statement of the

16    evidence, it's not 10 am that they went to the

17    home.

18         THE COURT:  Sustained.

19         MR. SOROSKY:

20         Q  Well, what time did you meet Miss Lindsey

21    that day?

22         A  Approximately 11 am.

23         Q  I said 10 or 11 am.  You met Miss Lindsey

24    that day.

1      THE COURT:  He said approximately 11 am.

2      MR. SOROSKY:  I said what?

3      THE COURT:  He said 11 am.

4      MR. SOROSKY:  Pardon me, what?

5      THE COURT:  Your question makes it appear

6  that it could have been at 10 am.

7      MR. SOROSKY:  Okay.

8      THE COURT:  Length of time.

9      MR. SOROSKY:  What difference does it make

10  what time it is, you met --

11      THE COURT:  Excuse me.  Excuse me, counsel,

12  it may make a difference.

13      MR. SOROSKY:  I apologize.

14      Q  You met Miss Lindsey that morning, didn't

15  you?

16      THE COURT:  Excuse me, excuse me.

17      MR. SOROSKY:  You met --

18      THE COURT:  We can reasonably argue that

19  length of time the defendant was in the police

20  station might be an element to consider in her

21  situation or custodial situation.

22      MR. SOROSKY:

23      Q  You met Miss Lindsey that morning, did

24  you not?

1           A   Yes.

2           Q   And you say you met her at 11 o'clock,

3      right?

4           A   Correct.

5           Q   What time did you inform her of her

6      Miranda rights, approximately?

7           A   Approximately 1:30 pm.

8           Q   Okay.  So during that 2 and a half hours,

9      you and Miss Lindsey never discussed her rape

10     allegation, did you?

11          A   No.

12          Q   During that 2 and a half hours, her

13     photograph and fingerprints were taken, right?

14          A   Yes.

15          Q   During that 2 and a half hours, you had

16     the aforementioned witnesses view a photo show up,

17     correct?

18          A   Correct.

19          Q   And during that 2 and a half hours, her

20     fingerprints were sent on to the crime laboratory,

21     correct?

22          A   Correct.

23          Q   And during -- and just before you

24     informed Miss Lindsey of her Miranda rights, you

1    told her of the identification made by the 2

2    aforementioned witnesses in the photo show up, did

3    you not?

4         A   I advised her of her rights prior to

5    telling that.

6         Q   Right. But either -- if I misspoke before

7    I don't mean to use the word before, but were

8    informing Miss Lindsey of her Miranda rights,

9    whether it was right before or right after, during

10   that session when you first informed Miss Lindsey

11   of her Miranda rights, you also informed Miss

12   Lindsey that she had been identified in the photo

13   show up by the 2 aforementioned witnesses, did you

14   not?

15        A   Yes.

16        MS. PETERS:  Objection -- withdraw it.

17        MR. SOROSKY:

18        Q   Now, you did not say to Miss Lindsey,

19   well, Miss Lindsey, you've made this rape

20   complaint, the hospital report comes out negative,

21   and it looks like this rape complaint is false and

22   to make out a false police report is a crime, so,

23   Miss Lindsey, I'm going to advise you of your

24   Miranda rights and I want to question you, Miss

F 41

1    Lindsey, and ask you, weren't you really lying

2    when you made that false police report, you did

3    not say that to Miss Lindsey before you informed

4    her of her Miranda rights, did you?

5            MS. PETERS:  Objection.

6            THE COURT:  Sustained.

7            MR. SOROSKY:

8        Q  And you've told Judge Singer already that

9    when you gave Miss Lindsey her Miranda rights, you

10   told her of the identification by the 2

11   aforementioned witnesses, did you not?

12           MS. PETERS:  Objection, asked and answered.

13           THE COURT:  Sustained.

14           MR. SOROSKY:

15       Q  Now, so now when you brought Miss Lindsey

16   to the police station, you knew that on Sunday,

17   October 11, 1992, or Saturday, whatever day it

18   was, Miss Lindsey had made a complaint of rape, is

19   that correct?

20       A  Yes.

21       Q  And you also knew from the hospital

22   examination of Miss Lindsey, that the hospital

23   examination related that there was no medical

24   evidence of vaginal trauma, is that correct?

1          A   That is correct.

2          Q   And when you brought Miss Lindsey to the

3    police station, you also knew that Mr. Bennett had

4    been discovered murdered in a taxicab at O'Hare

5    and that this body was found on Sunday, October

6    12, 1992 around 6:12 pm, is that correct?

7          A   Yes.

8          Q   And you also knew that Mr. Bennett's wife

9    had said that on Friday, October 9, 1992, around

10   2:30 in the afternoon, the deceased had picked up

11   2 passengers and that these 2 passengers had said

12   that there was a black woman as you had previously

13   described in the cab when they left Bennett, is

14   that correct?

15         A   Yes.

16         Q   You thought that Jerri Lindsey might very

17   well perhaps be the person that these 2 witnesses

18   were talking about, is that correct?

19         MS. PETERS:   Objection.

20         THE COURT:   Overruled.

21         A   I thought there was that possibility.

22         MR. SOROSKY:

23         Q   And so the only way that possibility

24   could be resolved would be to have these witnesses

F 43

1    see either Miss Lindsey or a photograph of her and

2    they could tell you or other police officers

3    whether in fact Miss Lindsey was the person who

4    was in the cab, is that correct?

5         MS. PETERS:  Objection.

6         MR. SOROSKY:  Is that correct.

7         MS. PETERS:  Judge, I objected to the form

8    of the question.  The only way he could tell.

9         THE COURT:  Yeah, well, I'm going to

10   overrule it.  I tell you that's probably

11   irrelevant, but overruled.

12        MR. SOROSKY:

13        Q   Is that correct?

14        A   That would be one way to determine if she

15   was the woman in the cab.

16        Q   Can you think of another way, can you

17   think of another way other than these people

18   looking at her or seeing a photograph of her and

19   saying whether she was or wasn't in the cab?

20        MS. PETERS:  Objection.

21        THE COURT:  All right.  Sustain the

22   objection to that, that's not a specific

23   question.  You suggest another way and ask him to

24   respond to that in relation to the previously

1    asked question.

2           MR. SOROSKY:

3           Q   And another way to say if Miss Lindsey

4    would be in the cab to get her fingerprints, is

5    that correct, to see if her fingerprints were in

6    the cab, right?

7           A   Yes.

8           Q   Now, so you as a police officer to

9    complete your investigation and do a thorough job

10   of this murder, needed Miss Lindsey's photograph

11   and fingerprints, correct?

12          MS. PETERS:   Objection.

13          THE COURT:   Sustained.

14          MR. SOROSKY:

15          Q   If you did not have Miss Lindsey's

16   photograph and fingerprints, you could not go on

17    -- your investigation would be significantly

18   hampered, would it not?

19          MS. PETERS:   Objection.

20          THE COURT:   Sustained.

21          MR. SOROSKY:

22          Q   You couldn't go on investigating this

23   case in any meaningful way if you didn't have Miss

24   Lindsey's photograph or fingerprints, could you?

1          MS. PETERS:  Objection.

2          THE COURT:  Sustained.

3          MR. SOROSKY:

4          Q   What could you have done to investigate

5     this murder without having Miss Lindsey's

6     photograph and fingerprints?

7          MS. PETERS:  Objection.

8          THE COURT:  Sustained.

9          MR. SOROSKY:

10         Q   You wanted Miss Lindsey's photograph and

11    fingerprints so that you could conduct this

12    investigation, didn't you?

13         A   To continue the investigation, we thought

14    that was our next step.

15         Q   Now, one way to get Miss Lindsey's

16    photograph and fingerprints would be to physically

17    by force and threat of force, the use of police

18    power bring her into the station and get that

19    photograph and fingerprints, correct?

20         MS. PETERS:  Objection.

21         THE COURT:  Sustained.

22         MR. SOROSKY:  I'm merely asking the officer

23    if that would be one way of doing, I'm not

24    implying he did do it.  I'm asking if that would

1    be one way to do it.

2           THE COURT:  I heard the question.

3           MR. SOROSKY:  Very well.

4           THE COURT:  And sustain the objection,

5    despite your comments with crystal clarity.

6           MR. SOROSKY:

7           Q   Sometimes in conducting a police

8    investigation, it's a common and wise police

9    procedure not to tell the suspect what your plans

10   are, isn't it?

11          MS. PETERS:  Objection.

12          THE COURT:  Sustained.

13          MR. SOROSKY:

14          Q   Was it your police plan in this specific

15   case not to tell Miss Lindsey what your true plans

16   were?

17          MS. PETERS:  Objection, relevance.

18          THE COURT:  Sustained.

19          MR. SOROSKY:

20          Q   Now, did you --

21          THE COURT:  Counsel, you know this is

22   redirect examination and redirect examination of

23   course supposedly is within the bounds of the

24   cross examination.

1          MR. SOROSKY:  Did you --

2          THE COURT:  Remember, you did have a

3     substantial period of time in direct examination

4     and I simply want you to recall, albeit it was

5     several days ago, and I just simply want you to

6     recall the points that you made in that direct

7     examination only so that we don't unduly, I

8     underline unduly lengthen this questioning her.

9          MR. SOROSKY:

10         Q  Did you ever --

11         THE COURT:  Furthermore, I understand your

12    point with crystal clarity, I mean I want you to

13    appreciate that even I, even I.

14         MR. SOROSKY:  Did you ever he --

15         THE COURT:  -- have some understanding of

16    that point.

17         MR. SOROSKY:

18         Q  Did you ever do anything with the

19    fingerprints of Miss Lindsey and the photographs

20    of Miss Lindsey that were taken at the police

21    station concerning any police investigation of

22    Miss Lindsey's rape allegation?

23         MS. PETERS:  Objection.

24         THE COURT:  I don't know if that could be

1    answered.  But overruled.

2          A   There was, as far as the rape allegation,

3    there was no one to show her photo to and nothing

4    to compare her fingerprints to so there was

5    nothing we could do with either one.

6          Q   The answer would be no, there is nothing

7    you did with those 2 pieces of evidence concerning

8    the rape allegation?

9          A   If there would have been something we

10   could have done, we would have but there wasn't.

11         MR. SOROSKY:  I move to strike that answer,

12   I think it's non-responsive.

13         THE COURT:  Sustained.

14         MR. SOROSKY:

15         Q   Let me just ask you, is there anything

16   you did with those 2 pieces of evidence, the

17   photographs and the fingerprints of Miss Lindsey

18   concerning her rape allegation?  That calls for a

19   yes or no answer, officer I believe?

20         MS. PETERS:  Objection, Judge, this is

21   redirect examination.

22         THE COURT:  Sustained.

23         MR. SOROSKY:

24         Q   Is there anything you did with the

1    fingerprints or the photographs concerning the

2    rape allegation?

3         MS. PETERS:  Objection, asked and answered.

4         THE COURT:  Overruled.

5         A  As I said, no, because there was nothing

6    I could do.

7         MR. SOROSKY:  No.

8              Q  Now, when you went over to the

9    apartment of the 2 aforementioned witnesses to

10   show them the photograph of Miss Lindsey, this was

11   generally around lunch time, was it not?

12        A  Yes.

13        Q  Did you say to Miss Lindsey you're free

14   to go now, why don't you come back in a half hour

15   or hour?

16        MS. PETERS:  Objection.

17        THE COURT:  Overruled.

18        A  I didn't specifically say that, no.

19        Q  Did any police officer tell her that --

20   to the best of your knowledge, did any police

21   officer tell her that she could leave and come

22   back in a half hour or hour?

23        A  No, we didn't.

24        MR. SOROSKY:  Nothing else of this witness.

```
 1          THE COURT:  Redirect -- recross, I should
 2     say.
 3          MS. PETERS:  I have no further questions.
 4          THE COURT:  Thank you, you're excused.
 5                              (Witness excused.)
 6        THE COURT:  Call your next witness, Mr.
 7     Sorosky.
 8          MR. SOROSKY:  Your Honor, at this time, I
 9     don't -- we're not going to call any more please
10     witnesses but there is one witness we need to talk
11     to for 2 minutes who is not a police officer we
12     might call.
13          MS. PETERS:  Judge, I would object -- well,
14     never mind.
15          THE COURT:  All right.
16          MR. SOROSKY:  2 minute recess, about 5
17     minutes.
18          THE COURT:  You want a 5 minute recess.
19          MR. SOROSKY:  5 minutes recess.
20          THE COURT:  By golly, you got it, 5 minute
21     recess.
22                              (Recess taken.)
23          MR. SOROSKY:  Miss, would you please --
24     sorry about that.
```

1    THE CLERK:  Stand up, please.  Raise your

2  right hand.

3                              (Witness sworn.)

4    THE CLERK:  Be seated.

5              IRENE QUIROZ,

6  called as a witness on behalf of the Motion to

7  Suppress, having been first duly sworn, was

8  examined and testified as follows:

9              DIRECT EXAMINATION

10                  BY

11    MR. SOROSKY:

12    Q  Miss, would you please state your name in

13  full and spell your last name?

14    A  Irene Quiroz, Q-u-i-r-o-z.

15    Q  And how old are you?

16    A  33.

17    Q  And where do you live?

18    A  8931 South Houston.

19    Q  Is that in the City of Chicago?

20    A  Yes.

21    Q  Illinois?

22    A  Yes.

23    Q  And calling your attention to the month

24  of October, 1992, specifically October 14, 1992,

1    where did you live?

2         A   8931 South Houston.

3         Q   The same place?

4         A   Yes.

5         Q   Calling your attention to the morning of

6    October 14, 1992, around 11 o'clock in the

7    morning, were you home?

8         A   Yes, I was.

9         Q   Was the defendant, Jerri Lindsey, home?

10        A   Yes, she was.

11        Q   Do you see her here in Court?

12        A   Yes, I do.

13        Q   Could you point her out?

14        A   (Indicating).

15        MR. SOROSKY:  We ask the record to indicate

16   the witness has identified the defendant.

17        THE COURT:  The record may so reflect.

18        MR. SOROSKY:

19        Q   And were you and Jerri Lindsey living

20   together on October 14, 1992?

21        A   Yes, we were.

22        Q   And for how long a period of time had you

23   been living together, approximately?

24        A   Since July 17.

1        Q   Of that year?

2        A   Of that year.

3        Q   And you were living at that same

4    location?

5        A   Yes.

6        Q   Now, on October 14, 1992 around 11

7    o'clock in the morning, did certain police

8    officers come to the door?

9        A   Yes, they did.

10       Q   Did they answer the door?

11       A   Pardon?

12       Q   Did you answer the door?

13       A   I answered the door.

14       Q   Why don't you tell his Honor, Judge

15   Singer, what happened at that time when the police

16   came to the door, what you said to the police,

17   what they said to you, tell the Judge what

18   occurred?

19       A   Well, I heard a knock, I went to the

20   door.  There was 3 officers at the door.

21       Q   Were they in uniform or not in uniform?

22       A   No, they weren't, they were in plain

23   clothes.

24       Q   Had you ever seen any of those men

1      before?

2          A   No, I never did.

3          Q   What occurred. What was said and what

4      happened?

5          A   They asked if Jerri Lindsey was home.   I

6      go yes, she is.  And I was standing at the door

7      and I didn't know who they were, you know, so one

8      of the officers goes, oh, okay, so he pulled out

9      his badge.  The other one pulled out his badge but

10     the third one didn't.

11                          So I opened the door, let

12     them in, I went in the bedroom and I called Jerri

13     and I said there's, you know, police officers in

14     the frontroom, they want to talk to you.

15         Q   What was Jerri doing when you told her

16     that?

17         A   We were sleeping, so, you know, when I

18     heard the knock we had got up.  So she came to the

19     frontroom and they told her to get dressed because

20     they want to take her to the station.

21         Q   By she and her you mean Jerri Lindsey?

22         A   Yes, sir.  Yes.

23         Q   Now, when you said you let the police in,

24     would you tell his Honor, Judge Singer, where the

1    police walked within the apartment?

2         A    They walked in my frontroom.

3         Q    And when the police were in your

4    frontroom, did you leave your frontroom to go to

5    the bedroom to get Jerri Lindsey?

6         A    Yes, I did.

7         Q    Did the police go into the bedroom with

8    you?

9         A    No, this, no, they didn't, they stood in

10   the frontroom.

11        Q    And how long would you stay you were in

12   the bedroom with Lindsey before Jerri Lindsey came

13   out to the frontroom to meet the police?

14        A    A couple of seconds.

15        Q    And what happened once Lindsey came into

16   the frontroom?

17        A    They told her, you know, to get dressed,

18   they wanted to take her down to the station, so

19   she went back in the bedroom, threw some clothes

20   on and went with them.

21        Q    When you say they said that, you mean --

22        A    The police officers.

23        Q    And how much longer were the police and

24   Jerri Lindsey in the house before they left?

1        A   They weren't in the house long, maybe,
2    all she did was, when the police officers came,
3    they asked her to get dressed, she went in the
4    bedroom, she got dressed and she left with them
5    right away. They didn't stay to talk or they
6    didn't say anything, they just left.
7        Q   So the police would have been in the
8    house maybe a couple of minutes, that's all, 5
9    minutes tops?
10       A   5 minutes.
11       MS. PETERS:  Objection.
12       THE COURT:  Sustained, leading, I sustained
13   your objection.
14       MR. SOROSKY:  Very well.
15       Q   How long would you say the police were in
16   the house?
17       A   Around 5 minutes.
18       MR. SOROSKY:  Nothing further of this
19   witness.
20       THE COURT:  Cross.
21               CROSS EXAMINATION
22                    BY
23               MS. PETERS:
24       Q   Miss Quiroz, you not only were living

1    with Jerri Lindsey, you were having a relationship

2    with her, is that correct?

3         A  Yes, it is.

4         Q  And the house at 8931 South Houston,

5    there is a front door to that house, is that

6    correct?

7         A  Yes.

8         Q  And when you refer to the frontroom, that

9    would be the first room that you enter from the

10   front door?

11        A  No, I have a hallway and then the

12   frontroom.

13        Q  And then the bedrooms are in the back

14   portion of the house?

15        A  Yes.

16        Q  And when Jerri Lindsey was sleeping on

17   this day, she was not wearing street clothes,

18   regular clothes that you wear out on the street,

19   was she?

20        A  No, we sleep in a T-shirt and shorts.

21        Q  So, when the police first got there she

22   was wearing just T-shirt and shorts?

23        A  Yes.

24        Q  And she had to get dressed before she

1    left the house?

2          A    Right.

3          Q    And the police officers waited for her

4    while she got dressed, isn't that correct?

5          A    Yes.

6          Q    Now, you're the one that first opened the

7    door or answered the door when the police came?

8          A    Yes, I was.

9          Q    You said they showed you badges so you

10   knew they were police officers?

11         A    Right.

12         Q    And once they showed you the badges, you

13   opened the door and said come on in?

14         A    Right.

15         Q    And they told you or they first asked you

16   if Jerri Lindsey was there, correct?

17         A    Yes.

18         Q    And you told them that she was?

19         A    Right.

20         Q    And they said that they wanted to talk

21   with her?

22         A    Right.

23         Q    And you went at that point and got Jerri

24   Lindsey?

1         A   When they came in, yes.

2         MS. PETERS:  If I could have a moment,

3    please.

4         THE COURT:  Yes.

5         MS. PETERS:  I have no further questions.

6         THE COURT:  Redirect.

7         MR. SOROSKY:  No further questions.

8         THE COURT:  Thank you, you're excused.

9                          (Witness excused.)

10        THE COURT:  Call your next witness.

11        MR. SOROSKY:  Our next witness is going to

12   be Miss Lindsey.  Would you have any objection if

13   the last witness remains in the courtroom.

14        THE COURT:  Unless there is going to be --

15   she's going to be recalled again.

16        MR. SOROSKY:  Do you have any objection of

17   the last witnesses remains in the courtroom.

18        MS. PETERS:  I don't plan to call her.

19        MR. SOROSKY:  All her knowledge has been

20   related.  She's not involved in any other way,

21   there is no other point.

22        THE COURT:  Well I have said to you, if

23   she's not going to testify again.

24        MR. SOROSKY:  No, no, she's not.

1          THE COURT:  No reason she can't stay.  Miss

2     Lindsey, would you please come forward.

3               Remain standing, face the clerk,

4     raise your right hand.

5                              (Witness sworn.)

6          THE COURT:  Please be seated.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              JERRI ROBIN LINDSEY,

2     called as a witness on behalf of the Motion to

3     Suppress, having been first duly sworn, was

4     examined and testified as follows:

5                  DIRECT EXAMINATION

6                       BY

7                  MR. SOROSKY:

8          Q   Ma'am, would you please state your name

9     in full and spell your last name?

10         A   Jerri Robin Lindsey, L-i-n-d-s-e-y.

11         Q   And how old are you?

12         A   32.

13         Q   And on October 14, 1992, where did you

14    live?

15         A   At 8931 South Houston.

16         Q   Is that in the City of Chicago?

17         A   Yes.

18         Q   And around 11 o'clock in the morning, on

19    that day, October 14, 1992, were you sleeping and

20    awakened?

21         A   Yes.

22         Q   Tell his Honor, Judge Singer, what

23    happened at that time and place as best you can

24    recall and remember?

1      A   Okay.  We was asleep and it was a knock

2   at the door.

3      Q   Let me ask you one question.  Were you

4   and Irene the only 2 people in the apartment?

5      A   Yes.

6      Q   What occurred?

7      A   Okay. We were asleep and there was a

8   knock at the door, Irene went to the door and she

9   came back into the room and she told me that the

10  detectives was at the door and they wanted me to

11  give -- they wanted to see me right, wanted me to

12  great dressed or something.  So I went in the room

13  and they told me hurry up and get dressed, they

14  wanted me to go down to the station.  Right.  And

15  I said okay, because they said to look at some

16  photos, right.  So I said okay. So I get dressed,

17  he said hurry up so I got dressed and it didn't

18  take nothing but a minute, washed my face and

19  hurried up and got dressed and we went down, we

20  got in the car, and they told me that --.

21     Q   Excuse me, before you got in the car, did

22  these men identify themselves as policemen?

23     A   Yeah -- I don't remember that, all I

24  remember them saying is to get dressed, hurry up

F  63

1    and get dressed, I remember going in the living

2    room and they told me to hurry up and get dressed.

3         Q   You knew, you knew -- you knew them to be

4    police?

5         A   Yes, I knew because Irene had already

6    told me when she came in the room.

7         Q   But you believed, you certainly believed

8    they were policemen?

9         A   Yes.

10        Q   And what happened -- how long would you

11   say -- when you first saw these men, were they,

12   these policemen, where were they?

13        A   They were in my house in the living room.

14        Q   And what's -- did they -- did they ask

15   you if you wanted to go or did they tell you to

16   go?

17        MS. PETERS:  Objection.

18        THE COURT:  Sustained.  You're leading

19   counsel.

20        MR. SOROSKY:

21        Q   What did they say, tell us?

22        A   They told me to hurry up and get dressed,

23   they wanted to take me down to the station to look

24   at some photos.

1      Q   What did you do in response to that

2  statement?

3      A   I hurried up.  I asked them I think I

4  said something about could I wash my face or wash

5  up right quick or something and I remember going

6  in the washroom and they was like hurry up and

7  Irene was saying hurry up so I washed my face and

8  brushed my teeth and threw on my clothes and we

9  left.

10     Q   And how did you arrive at the police

11 station?

12     A   In a detective car.

13     Q   Where did you sit?

14     A   In the back seat with one of the -- let

15 me see, in the back seat, I sat in the back seat.

16     Q   And how many police officers were in the

17 car with you?

18     A   3.

19     Q   And did 2 police sit in front and one

20 officer sit in back next to you?

21     A   If I recall, that's how it happened, I

22 think it was one in the back with me and 2 in the

23 front.

24     Q   Is there any -- did any conversation take

1    place?

2        A   Yes.

3        Q   In the squadcar en route to the police

4    station from your house?

5        A   Yes.

6        Q   Would you tell his Honor, Judge Singer,

7    what the police said to you and what you said to

8    them in the car?

9        A   Okay.  One of the detectives told me that

10   they had a man in custody that had raped the

11   victims, right, and that they wanted me to go down

12   and take photo pictures to see if the man could

13   identify me as one of his victims.  And they

14   wanted me to take fingerprints to they could place

15   me in the cab.  That was it.

16       THE COURT:  Could I have the answer read

17   back.

18                        (Record read.)

19       MR. SOROSKY:

20       Q   Did the police officers tell you anything

21   about a murder investigation?

22       A   No.

23       Q   What happened, what happened once you got

24   to the police station?

1        A    They took me into a room and they took a

2    photograph picture of me, a Polaroid picture,

3    right.  And okay, they left out and I remember I

4    was in there for a long time, you know.  And he

5    came back and I remember asking him, well what

6    happened, you know, what did he say.  And I don't

7    remember what he said, it wasn't a direct answer.

8        Q    Excuse me.  When you said what happened,

9    what did he say, were you referring to the

10   so-called rapist that they told you they caught?

11       A    Exactly, exactly, yes.

12       Q    Now what did the police officer say to

13   you in response to your request, when you said

14   what did he say, what did he say?

15       A    I can't recall.  I can't remember what he

16   said.

17       Q    What happened next?

18       A    Okay.  They went out the room and I

19   stayed and I sat and waited and waited and they

20   came back and then they told me that I was going

21   to take some fingerprints, right.  So I had to go

22   upstairs and take fingerprints and I remember you

23   know, wining and telling him I was ready to go,

24   when am I going home, I'm ready to go.

1      Q   What did they say in response to your

2   statements when am I going home, when am I going

3   home?

4         A   (No audible response.)

5         Q   You have to answer?

6         A   Nothing.

7         Q   What did they say?

8         A   Nothing.

9         THE COURT:   Could I have that answer before

10   read back?

11                        (Record read.)

12         THE COURT:   Okay.

13              Go ahead.

14      MR. SOROSKY:

15      Q   You say the police did not say anything

16   in response to your requests when am I going, I'm

17   ready to go?

18         A   Right.

19         Q   Do you remember what type of room you

20   were in when the police first took your

21   photograph?

22         A   Yeah, just a little box room like you

23   know, little square room, small.

24         Q   And after they took your photograph, did

1    you continue to remain in this small box room?

2        A   Yes.

3        Q   And did you remain in this small box room

4    and -- and did you remain in this small box room

5    until the police escorted you to the place where

6    you were to take your fingerprints?

7        A   Yes.

8        Q   And after you took your fingerprints or

9    after the police took your fingerprints, where did

10   you go, if you remember?

11       A   Grand and Central, into another little

12   room.

13       Q   And what happened at the police station

14   at Grand and Central, tell his Honor, Judge

15   Singer, what occurred there?

16       A   Okay.  I went in the room and the

17   detective, the tall one that testified, he said I

18    --.

19       Q   Detective Schalk?

20       A   Right. He said that Miss Lindsey, we

21   didn't bring you in here for what we said we

22   brought you here for, we brought you here for the

23   murder of, you know, the man.  And I was like, no,

24   what are you talking about, you know.  And then I

1    knew that I had lied about the rape, so I was

2    contemplating whether I should --.

3         Q   Just answer, just answer my question.

4    Okay.  I move to strike that.

5         THE COURT:  You move to strike it?  No, she

6    was answering the question.

7         MR. SOROSKY:  Okay.  Very well.

8         Q   Now, what, what did the police say to you

9    and what did you say to the police?

10        A   Okay.  Anyway then I told them no, you

11   know, that's not possible, you know, I wasn't

12   there, I didn't do it like that.  So I started

13   telling him --.

14        Q   Okay, did they give you your rights at

15   this time?

16        A   No.

17        MS. PETERS:  Judge, I'm going to object,

18   this isn't a motion to suppress statements.

19        THE COURT:  Is a motion to suppress

20   statements, the fruits of the alleged illegal

21   arrest.  There is a motion to suppress

22   statements.  I suppose I have to know what is to

23   be suppressed.

24        MR. SOROSKY:

1      Q   And.

2      THE COURT:   Would you like a Kleenex?

3      A   Thank you.

4      MR. SOROSKY:

5      Q   Is this when the police told you your

6   rights?

7      A   No.

8      Q   When did they give you your rights?

9      A   After we talked, after they kept telling

10   me that they didn't believe that I was raped and

11   that I was going to the death penalty and I better

12   tell the truth and, you know, all this kind of

13   stuff and I was telling them I didn't do it and

14   you know, then I told them what you know, how I

15   got caught up you know, and then --.

16      Q   Now, then they gave you your rights, is

17   that correct?

18      A   Yeah, after along while, yeah, seemed

19   like I was taken out of that room to another room

20   and that's when they -- right from the frontroom

21   they took me out there and put me in another room

22   and they read me my rights and handcuffed me.

23      Q   Did the police tell you that these 2

24   witnesses identified you?

1        A   Right, yes, they did, they told me that,

2    okay, they told me --.

3        Q   Just --

4        MS. PETERS:   Judge, objection, she's trying

5    to answer the question.

6        THE COURT:   Yeah, sustained.

7        MS. PETERS:   I would ask she been allowed to

8    answer the question.

9        THE COURT:   What?

10        MR. SOROSKY:   I asked her if the police told

11    her these 2 witnesses identified her and she said

12    yes.

13        THE COURT:   The objection is sustained.

14        MR. SOROSKY:

15        Q   Without getting into the statements you

16    subsequently made --

17        A   Okay.

18        Q   We're not interested in the statements

19    you subsequently made, just tell the Judge what

20    the police told you before they gave you your

21    rights?

22        A   Okay.

23        Q   Just what the police told you?

24        A   They told me that I was brought in there

F 72

1    for the murder of the man.  He said that after I

2    told him no, no --.

3         Q   Just say what the police told you?

4         A   Okay.  He said that it was 2 people, 2

5    old people identified me, placed me in his cab

6    with this man, right.  And that my fingerprints,

7    they found my fingerprints in the cab.

8         Q   The police tell you anything about your

9    rape allegation?

10        A   No.  What he told me that he thought that

11   I was lying, he said won't nobody believe that

12   cocka  -- whatever story, right, and that I was

13   lying and that's about it, you know, said that

14   they didn't believe that.

15        Q   And then did the police officers give you

16   your rights?

17        A   After a long while, not then, that was

18   like one of the first things they said.  After he

19   told me they didn't bring me in there for what

20   they told me, I remember asking him why ddin't you

21   tell me that at first and he said because we

22   didn't want to.

23        Q   And then the police gave you your rights,

24   correct?

1          A   At the end, yes.   They took me in a room

2     after all that and took me in the room and gave me

3     my rights and handcuffed me.

4          MR. SOROSKY:   Nothing further from this

5     witness.

6          THE COURT:   Cross.

7                    CROSS EXAMINATION

8                         BY

9                    MS. PETERS:

10         Q   Now Miss Lindsey, you made that rape

11    report on the night of October 11, 1992?

12         A   Yes.

13         Q   And that was about the 11:30 at night.

14         MR. SOROSKY:   Your Honor, I didn't ask her

15    any questions about the rape allegation.

16         THE COURT:   Are you making an objection?

17         MR. SOROSKY:   Yes.

18         THE COURT:   Sustained.

19         MS. PETERS:   Judge, if I may, it's

20    foundation for the question trying to impeach the

21    witness about her recollection of what day it was

22    that the police came to her house.

23         THE COURT:   This is -- I'll let you ask a

24    question to that.   Overrule the objection.

F 74

1          MS. PETERS:

2          Q  After you made your report at the

3     hospital, do you remember being contacted at your

4     home by telephone by a Detective Hines from the

5     Chicago Police Department?

6          A  I remember, yes.

7          Q  And later on, about a day later, it would

8     be about midnight on the night of October 12th,

9     going into the early morning hours of October

10    13th, Detective Hines came to your home, isn't

11    that correct?

12         MR. SOROSKY:  Objection, your Honor, to all

13    this, outside the scope of the direct examination

14    and the motion itself.

15         THE COURT:  Well, it is outside the scope.

16    If you're telling me you're leading up to

17    something impeaching in the testimony?

18         MS. PETERS:  Judge, there is no sense in

19    having the witness step down since she's here.

20         THE COURT:  Do you want to go to side bar?

21         MS. PETERS:  Yes, please.

22         THE COURT:  Excuse us a moment, please.

23                    (Whereupon, the following

24                 proceedings were had in open

1              Court, outside the presence

2              and hearing of the witness,

3              to-wit:)

4      MS. PETERS:  Miss Lindsey has testified that

5  on October 13th, detectives came to her home and

6  told her they wanted her to come to the station to

7  be photographed.  What I'm attempting to elicit

8  are questions I can prove up later by calling

9  Detective Hines in my case is that 2 days prior

10  around midnight on October 12th, Detective Hines

11  came to her home, he told her that he had some

12  photos he wished her to view of a possible

13  offender, would she come to the station.  She

14  agreed, she was also asleep and undressed at that

15  time.  She got dressed, accompanied him to a

16  police station for purposes of having the photo

17  array.

18      THE COURT:  Okay, overrule the objection.

19  Assuming that you're going to connect everything

20  up today.

21      MR. SOROSKY:  For the record we'll object.

22      THE COURT:  I beg your pardon?

23      MR. SOROSKY:  I would state the fact the

24  defendant may have viewed photographs of potential

1    rapists on a prior date has no effect on whether

2    there is or is not probable cause in this motion

3    to arrest her or when the police obtained probable

4    cause and is completely outside the scope of the

5    motion.

6         THE COURT:  All right. Well, as I see the

7    issue coming down, the issue is one really of

8    consent not probable cause, at least as to I might

9    say to you that once there was an identification

10   of the defendant's photograph by the 2 passengers

11   of the cab, where the murdered victim was found.

12   I'll tell you my opinion now probable cause so

13   that everything that happened after that would be

14   justified as probable cause.

15                        Now, I'm not saying that

16   the evidence should not be suppressed, that is the

17   evidence relative to the taking of the photograph

18   should not be suppressed at this time because

19   those events occurred prior to that identification

20   and as I understand the case, the State's theory

21   would be that and if I'm wrong, correct me, that

22   Miss Lindsey went with the police voluntarily to

23   the police station. Miss Lindsey's testimony could

24   argueably make a case that she did not go

1  voluntarily, she was -- she went because of the

2  authority of the police officers to take her.

3          MS. PETERS:  Judge, also to clarify it

4  appears from her testimony Miss Lindsey is

5  confusing 2 events and molding them into one

6  event.

7          THE COURT:  It may well be, too, but I think

8  now the State has a right to go into what happened

9  before to illustrate that this is a pattern of

10  conduct involving that relation -- Miss Lindsey's

11  relationship to the police relative to her

12  complaint.

13          MR. SOROSKY:  Okay.

14          MR. SOROSKY:  For the record we object.

15          THE COURT:  I bade the State to go forward.

16                  (Whereupon, the following

17                  proceedings were had in open

18                  Court, within the presence

19                  and hearing of the witness,

20                  to-wit:)

21          MS. PETERS:

22      Q  Miss Lindsey, I started to ask you on one

23  day about 24 hours after you reported the rape at

24  the hospital, do you recall being contacted at

1    your home by telephone by a Chicago police

2    detective by the name of Hines?

3        A   I don't remember his name but I remember

4    being contacted.

5        Q   And he also came over to your home, isn't

6    that correct?

7        A   Yes.

8        Q   And when he came over to your home, you

9    were sleeping at that time?

10       A   I can't recall.

11       Q   Do you recall that he came over at

12   sometime around midnight on the night of October

13   12th into the early morning of October 13th of

14   1992?

15       A   No, I don't remember it being that late.

16       Q   Do you remember Detective Hines coming to

17   your home and telling you that he wanted to know

18   if you would come to the police station to view

19   some photos of the possible man that had attacked

20   you?

21       A   Yes.

22       Q   And you in fact went with him to the

23   police station?

24       A   Yes, I did.

1          Q   And you had to get dressed before you

2     went to the police station?

3          A   Yes, I -- yes.

4          Q   Now the police station that you went to

5     on that particular occasion was down by 111th and

6     Ellis on the south side of Chicago?

7          A   Yes.

8          Q   And when you went down to that location,

9     you actually went into the station with Detective

10    Hines, isn't that correct?

11         A   Yes.

12         Q   But you never did view a photo array or

13    any pictures, did you?

14         A   He showed me a photo with I think it was

15    about 5 -- excuse me, about 5 or 6 guys on it,

16    right, and he asked me to pick somebody out, you

17    know.  No, he asked me was one of those mens the

18    ones who raped me, right.  And I said no.

19         Q   And you told him that you wanted to go

20    home?

21         A   Yeah.

22         Q   And he took you home?

23         A   Right, but you know, I don't think I

24    asked you know, to go home because they were

1    walking around, I was standing there. I remember

2    standing at the counter and then he told the

3    other, the other detective that accompanied him

4    that she's not going to be any good or something

5    like that, so I'm going to take her on back and

6    then they had something to do, they left and he

7    took me back.

8        Q   So Ma'am, well, you're saying that you

9    viewed the photo array?

10        A   Pardon?

11        Q   You viewed the photo that the detective

12    had at the station, is that what you're telling us

13    today?

14        A   He showed me a Polaroid picture of 5 or 6

15    guys in this picture and asked me to pick, you

16    know, was one of those guys the ones who raped me

17    and I said no.

18        Q   Isn't it a fact, Ma'am, you refused to

19    look at the photo?

20        A   No. I didn't refuse.

21        Q   On October 14, 1992, at 11 o'clock in the

22    morning, when the 3 detectives came to your home,

23    you were sleeping, correct?

24        A   Yes.

1    Q  So Irene is the one that went to the

2    door, correct?

3        A  Yes.

4        Q  And you didn't see what happened at the

5    door, did you?

6        A  No.

7        Q  And you said that you asked the officers

8    if you could wash your face and brush your teeth

9    and get dressed before you went to the station,

10   correct?

11       A  Uh-hum.

12       THE COURT:  You have to say yes or no,

13   Ma'am?

14       A  Yes, I'm sorry.

15       MS. PETERS:

16       Q  And you washed your face?

17       A  Yes.

18       Q  And you brushed your teeth?

19       A  Yes.

20       Q  And you put on some make up?

21       A  No, I didn't put no make up on.

22       Q  And you got dressed?

23       A  Yes, I got dressed.

24       Q  It was after you did all those things

1    that you went with the police down to the station?

2          A   Yes.

3          Q   And on that day, the police station you

4    went to was at 11th and State?

5          A   Yes.

6          Q   You said that the photograph that the

7    police took of you at the station was taken before

8    you had your fingerprints taken from you, correct?

9          A   Yes.

10         Q   And you said after they took the

11   photograph, the police left and you stayed in the

12   room for a while?

13         A   Yes.

14         Q   And then the police came back?

15         A   Yes.

16         Q   And then the photograph -- excuse me, the

17   fingerprints were taken from you, correct?

18         A   Yes.

19         Q   And it was after that, that you started

20   wining that you wanted to go home?

21         A   No, while they were taking the

22   fingerprints, while he was fingerprinting me, I

23   was wining you know, at that time then.  I was

24   telling them I was ready to go home.  When am I

1    going home, I'm ready to go home.

2         Q  But the detectives that had taken the

3    picture of you had already left?

4         A  No.  No.  Somebody -- you know I can't

5    remember which one took me upstairs to get the

6    fingerprinted, I can't recall but it was one of

7    them, they took me up there.

8         MS. PETERS:  If I could have just a moment.

9         THE COURT:  Yes.

10        MS. PETERS:

11        Q  Now you said during your testimony when

12   your attorney was asking you questions that at

13   some point in time you were handcuffed, correct?

14        A  Yes.

15        Q  And that was when you were being advised

16   of your rights?

17        A  Yes.

18        MS. PETERS:  I have no further questions.

19        THE COURT:  Redirect.

20

21

22

23

24

1                    REDIRECT EXAMINATION

2                         BY

3                    MR. SOROSKY:

4          Q   Now, calling your attention to this

5     evening that Detective Hines came to your house

6     and asked you to come to the police station to

7     look at photos, about what time did he come to

8     your house, if you know, approximately?

9          A   Okay.  I can't really remember the exact

10    time, but I think it was around between 8:00 and

11    -- between 8:00 and 8:30, something like that.

12         Q   And this would have been on Monday night?

13         A   Yes.

14         Q   So that would be October 12, 1992?

15         A   Yes.

16         Q   And how many policemen came to your

17    house?

18         A   2.

19         Q   And did you drive to a police station?

20         A   Yes.

21         Q   Do you remember which police station you

22    drove to?

23         A   Yes, 111th and Ellis.

24         Q   And did Detective Hines show you books or

1      -- books or photographs of men or what did he

2      show you?

3           A  He showed me one Polaroid picture of

4      about 5 or 6 guys and he asked me to identify the

5      one, anyone in the picture you know, is the man

6      that raped me and I told him, no, I didn't

7      recognize neither one of those mens.

8           Q  Did you refuse to look at photographs for

9      Detective Hines?

10          A  No.

11          Q  After you looked at that photograph, what

12     happened?

13          A  I stood there for a minute, a little

14     while and they you know, a couple of other

15     detectives running around, they had to go

16     somewhere and then I heard him say she's not going

17     to do any good, I'll take her back and then --.

18          Q  Who said that?

19          A  The black detective, I don't know his

20     name, the black detective said that and he took me

21     home.

22          Q  Now, on this evening of Monday night,

23     October 12, 1992, was there -- strike that.  Did

24     you ask -- did you ever ask to go home after you

1    couldn't identify anyone in that one photograph?

2        A   I didn't have to, he took me, I didn't

3    have to, I waited patiently until he got through

4    with what he had to do and he took me home.

5        Q   Now, when you were at the police station,

6    on -- with Detective Hines that Monday night,

7    October 12, 1992, did you always feel you were

8    free to leave whenever you wanted?

9            MS. PETERS:  Objection.

10           THE COURT:  Sustained.

11           MR. SOROSKY:

12       Q   When you were at the police station on

13   October 14, 1992, did you feel you were free to

14   leave when you wanted?

15           MS. PETERS:  Objection.

16       A   No.

17           THE COURT:  Counsel, I agree with you that's

18   not relevant, that's not the issue, not even the

19   subject for redirect examination but I'm going to

20   let Mr. Sorosky ask that, I'll let the answer

21   stand.

22               Proceed.

23           MR. SOROSKY:

24       Q   When did you not feel you were free to

1    leave?

2        A   Well, I got the feeling when, you could

3    say when I went into the police station but I got

4    the feeling that I wasn't going home when they

5    were fingerprinting me, that's why I started

6    wining and asking to go home, you know, but I knew

7    I wasn't able to get up and walk when I got

8    ready.  I knew that when I walked in there.

9        Q   Did you voluntarily go with the police to

10   the police station on October 14, 1992?

11       A   Yes.

12       Q   Did you go because they told you to?

13       A   Yes.

14       Q   Would you have gone with them if they

15   didn't tell you to?

16       MS. PETERS:  Objection.

17       THE COURT:  Sustained.  Sustained.  Why

18   would you do something one does not ask you to?

19       MR. SOROSKY:  Nothing further from this

20   witness.

21       MS. PETERS:  I have no further questions.

22       THE COURT:  Thank you, you can return to

23   counsel table.

24                              (Witness excused.)

1    THE COURT:  Call your next witness, please.

2    MR. SOROSKY:  We have no further witnesses

3    on this motion.

4    THE COURT:  You're resting.

5    MR. SOROSKY:  Yes.

6    THE COURT:  I guests surrebuttal.

7    MS. PETERS:  I think it's my case, I think.

8    And I'll call Detective Hines.

9    THE COURT:  Is this going to be long?

10   MS. PETERS:  No Judge, just to perfect

11   impeachment.

12   THE CLERK:  Raise your right hand.

13                          (Witness sworn.)

14   THE CLERK:  Be seated.

15   THE COURT:  Be seated.

16                  JACK HINES,

17   called as a witness on behalf of the Motion to

18   Suppress, having been first duly sworn, was

19   examined and testified as follows:

20              DIRECT EXAMINATION

21                      BY

22              MS. PETERS:

23   Q  Could you please tell us your name?

24   A  Jack Hines.

1          Q   And H-i-n-e-s?

2          A   Yes.

3          Q   By whom are you employed?

4          A   Chicago Police Department.

5          Q   And in what capacity?

6          A   Detective.

7          Q   Area?

8          A   Area 2 Violent Crimes.

9          Q   Where is that located?

10         A   727 East 111th Street.

11         Q   Is that by Ellis Street where Ellis

12   intersects 111th?

13         A   Yes, it is.

14         Q   And that's in Chicago?

15         A   Yes.

16         Q   Directing your attention to the evening

17   of October 11, 1992, were you assigned to an

18   aggravated sexual assault case with a victim by

19   the name of Jerri Lindsey?

20         A   Yes, I was.

21         Q   And later on, I would like to direct your

22   attention now to the evening of October 12, 1992,

23   were you still working on that investigation?

24         A   Yes, I was.

1          Q   And in that regard, I direct your

2     attention to later that evening, did you have

3     contact with Jerri Lindsey?

4          A   Yes, I did.

5          Q   About what time was it that you had

6     contact with her?

7          A   Somewhere around midnight.

8          Q   Where was it that you had contact with

9     her?

10         A   At her home.

11         Q   And would -- where was that located, if

12    you recall?

13         A   I think it's 8931 Houston, I believe.

14         Q   And that's on the south side of Chicago?

15         A   Yes, it is.

16         Q   When you went to her home, were you alone

17    or with anyone?

18         A   I was with a partner.

19         Q   And do you recall if that was a male

20    white or male black partner?

21         A   A male white.

22         Q   And when you went to her home, could you

23    tell us what happened?

24         A   Knocked on the door, explained to her why

1    we were there, we were allowed to come inside

2    while she got dressed.

3         Q   What did you tell Jerri Lindsey?

4         A   I told her I would like her to come into

5    the area with me to view some photos and see if

6    she can identify the person involved in the

7    criminal sexual assault.

8         Q   And did she agree to do that?

9         A   Yes, she did.

10        Q   Was she dressed while you were having

11   that conversation?

12        A   She was getting dressed.

13        Q   And did you then go with her anywhere?

14        A   Yes.

15        Q   Where did you go?

16        A   Area 2.

17        Q   That's at 111th and Ellis?

18        A   Yes.

19        Q   And when you went to that location, what

20   happened?

21        A   We went upstairs to our office and I laid

22   out a photo array for her to look at.

23        Q   Now, could you describe to us whose

24   pictures were contained in that photo array?

1         A   Well, I only recall one person's actual

2    name who was in the photo array and that was

3    Robert Bennett.

4         Q   Would that be Randolph Bennett?

5         A   Yes, I'm sorry.

6         Q   And about how many photos was it that

7    were shown to Jerri Lindsey?

8         A   There were 5 photos in the array.

9         Q   And where was it that this was being

10   done?

11        A   Upstairs in our office.

12        Q   Is that --

13        A   On the second floor.

14        Q   In your office, about what is the size of

15   your office?

16        A   It's actually it is more the size of an

17   auditorium than it is a small office.

18        Q   It was not a small room?

19        A   No.

20        Q   When you laid the photos down and asked

21   Jerri Lindsey -- excuse me.  When you laid the

22   photos down what happened?

23        A   She refused to look at them.

24        Q   Did she tell that to you?

1          A   Yes.

2          Q   What happened then?

3          A   She said she didn't want to look, she

4    wanted to go home.

5          Q   So what happened?

6          A   We took her home.

7          Q   About how long was she in the police

8    station that night?

9          A   Approximately 10 minutes.

10         MS. PETERS:   I have no further questions.

11         THE COURT:   Cross.

12                  CROSS EXAMINATION

13                       BY

14              MR. SOROSKY:

15         Q   Detective Hines, --

16         A   Yes, sir.

17         Q   -- when whe you showed Miss Lindsey this

18    photo array, the photo array included the

19    deceased?

20         A   Yes.

21         Q   And this was assumed -- this was a photo

22    that you or some other police officer had received

23    from the family of the deceased, is that correct?

24         A   Yes.

1          Q   Not a regular photograph that you had in

2     police files of known rape suspects?

3          A   No, sir.

4          Q   And when you showed this photo array to

5     Miss Lindsey, you were aware of the fact that Mr.

6     Bennett who was in the photograph was murdered?

7          A   I don't believe so.

8          Q   You showed Miss Lindsey this photograph

9     on Monday night, October 12th, is that correct?

10         A   I believe so.

11         Q   And were you aware of the fact that on

12    Sunday, the day before, October 12 -- October 11,

13    around 6 pm, Mr. Bennett's body was found murdered

14    in a cab at O'Hare?

15         A   No, sir.

16         Q   You were not aware of that?

17         A   No, sir.

18         Q   Were other -- any other police officers

19    tell you to show Miss Lindsey this photograph?

20         A   Did any other police officer tell me

21    that?

22         Q   Yes?

23         A   No, sir.

24         Q   Well, why did you show Miss Lindsey this

1    photograph.

2         MS. PETERS:  Objection.

3         THE COURT:  Overruled.

4         A   Because Miss Lindsey had stated that she

5    had been assaulted by a cab driver, that the cab

6    driver had driven her to an unknown location, that

7    he had assaulted her over a period of

8    approximately 40 hours at that location.  That

9    upon leaving that location, he had brought her a

10   short distance, he had attempted to assault her

11   again, she stabbed him leaving the knife in his

12   chest, she jumped out of the car and she hid in

13   some woods until darkness.  She came out of the

14   woods when it got dark, a white female picked her

15   up, she asked the white female where they were.

16   The female said they were in Joliet.  She then

17   drove her to Trinity -- well at the time it was

18   South Chicago Hospital.

19                           I wanted to know if there

20   was somebody out there on the side of the road

21   between Chicago and Joliet with a knife in his

22   chest so I contacted the Joliet Police

23   Department.  The Joliet Police Department told me

24   they had a missing case of a cab driver with --

1    driving the same type cab, same color cab that

2    Miss Lindsey reported her offender was in.  This

3    is why we got the photo.  This is why I showed her

4    the photo.

5        Q  So, when you showed Miss Lindsey this

6    photograph, you as a police officer were working

7    on the rape allegation that Miss Lindsey had made,

8    is that correct?

9        A  Yes, sir.

10       Q  You were not at all working on the murder

11   allegation?

12       A  I didn't know about the murder at the

13   time.

14       Q  And you say Miss Lindsey stood at the

15   police station approximately 10 minutes and left,

16   is that correct?

17       A  Yes, sir, I took her home.

18       Q  And you were not with the group of

19   officers that came to Miss Lindsey's house on

20   October 14, 1992, were you?

21       A  No, sir.

22       MR. SOROSKY:  Nothing further from this

23   officer.

24       THE COURT:  Redirect.

1          MS. PETERS:  I have no further questions.

2          THE COURT:  Thank you.

3          THE COURT:  Counsels, my problem is this,

4     you know we do not have our regular clerk and our

5     present substitute clerk is an outstanding clerk

6     and I had promised her that I would conclude by

7     5:00 o'clock because she has small children she

8     must attend to.

9                         So in that context I must

10    end the Court day.  It is 10 minutes after 5:00, a

11    certainly reasonable time as I have been told on

12    prior occasions to end the Court day.

13    Accordingly, when shall we next meet again to

14    allow the State to either present more evidence or

15    to rest and final argument or if Mr. Sorosky wants

16    to present surrebuttal -- no, not surrebuttal.

17         MR. SOROSKY:  Not to hold anyone to this but

18    assuming we are in an argument stage, when do you

19    want to set this for?

20         MS. PETERS:  For scheduling purposes, I know

21    we are extremely loaded up next week in this

22    courtroom.

23         THE COURT:  What about Monday -- I'm sorry,

24    Tuesday.  Monday would be perfect, we have nothing

1    else on the call on Monday.

2          MS. PETERS:  Tuesday we have a murder bench,

3    Derrick Hillyard, I have approximately 6 to 8

4    witnesses.

5          THE COURT:  But then I will be out of town

6    the following week so I would like to do it this

7    week and seems to me perhaps Tuesday would be an

8    excellent day.

9          MR. SOROSKY:  I'll come in Tuesday and wait

10    until whatever time.

11          THE COURT:  You know we don't have many

12    cases on the call Tuesday in anticipation of going

13    to the jury.

14          MS. PETERS:  Is it possible to do it

15    tomorrow Judge, instead.

16          THE COURT:  I have a heavy day, if you would

17    like to I would love to, let's do it tomorrow.

18    I'm with you.  Tomorrow, 9:30.

19          MR. SOROSKY:  You want to do it tomorrow.

20          MS. PETERS:  I prefer that over Tuesday

21    because I will be in the middle of a murder bench.

22          THE COURT:  Hold on call until tomorrow.

23    Very good.

24          MR. SOROSKY:  In the morning.

1           THE COURT:   Morning, 9:30.

2           MS. PETERS:   9:30 sharp, that's fine with

3    me.

4                    (Whereupon, the further hearing

5                of the above-entitled cause

6                was continued to 2-18-94, at

7                9:30 o'clock a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )

3       THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT   -   CRIMINAL DIVISION

4                I, Kenneth Madoch, Official

5    Shorthand Reporter of the Circuit Court of Cook

6    County Department-Criminal Division do hereby

7    certify that I reported in shorthand the

8    proceedings had at the hearing in the

9    above-entitled cause; and that I thereafter

10   caused to be transcribed into typewriting the

11   foregoing transcript, which I certify is a

12   true and correct transcript of said

13   proceedings.

14

15   _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 4th day of June, 1995.

F 101

STATE OF ILLINOIS } ss
COUNTY OF COOK

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of VOLUME ONE OF A NINE VOLUME ........ RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, NO PRAECIPE HAVING BEEN FILED IN ... THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 ...........................

..................................................................................

..................................................................................

..................................................................................

in a certain cause ........ LATELY ................................. pending in said Court, between The People of the State of Illinois...... WERE ......................................., Plaintiffs and ............................. JERI LINDSEY     (01) .............. WAS ...., Defendant. ....

Witness: AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . SEPTEMBER ..... 20...., 19 . 95

_Aurelia Pucinski_

Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

05-1458

Crim. Div. No. 94-B

CCCR-310



## Transcript of Record

### Appeal

### to

APPELLATE **Court of Illinois**

FIRST **District**

**Circuit Court No.** 92 CR 25135

**Trial Judge** SHELVIN SINGER

**Reviewing Court No.** 95 1535

THE PEOPLE OF THE STATE OF ILLINOIS

### vs.

JERI LINDSEY (01)

**from**

FILED
APPELLATE COURT 1st DIST

NOV 0 7 2002

STEVEN M. RAVID
CLERK

**COURT**

92cr25135

, ILLINOIS

CRIMINAL DIVISION

VOLUME TWO OF NINE

REPORT OF PROCEEDINGS

**AURELIA PUCINSKI**

**Clerk of Court**

**Per** AP./SIR

**Deputy**