File Date: _Feb 29, 2008_

Case No: _07cv 6658_

ATTACHMENT # _2_

EXHIBIT _6 to 2_

TAB (DESCRIPTION) _____

```
1    STATE OF ILLINOIS )
                       )   ss
2    COUNTY OF C O O K )

3             IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                       )   No. 92 CR 25135
6       vs.            )   Charge:  MURDER
                       )
7    JERRI LINDSEY     )

8               REPORT   OF   PROCEEDINGS

9           BE IT REMEMBERED that on the 18th day of

10   February, 1994, this cause came on for hearing

11   before the Honorable SHELVIN SINGER, Judge of said

12   Court, upon the indictment herein, the defendant

13   having entered a plea of not guilty.

14       APPEARANCES:
                 HON. JACK O'MALLEY,
15               State's Attorney of Cook County, by
                 MS. LYNDA PETERS,
16               Assistant State's Attorney,
                 Appeared on behalf of the People;
17
                 MR. SHELDON SOROSKY,
18               Appeared on behalf of the Defendant.

19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.
```

1          THE CLERK:  People versus Jerri Lindsey.

2          MR. SOROSKY:  Your Honor, Sheldon Sorosky,

3     S-o-r-o-s-k-y, representing Jerri Lindsey.

4          THE COURT:  All right.

5               Ready to argue.

6          MS. PETERS:  Yes, your Honor.

7          THE COURT:  Mr. Sorosky.

8          MR. SOROSKY:  You waive opening?

9          MS. PETERS:  It's your burden.

10         MR. SOROSKY:  I apologize.  Your Honor, Miss

11    Lindsey, Miss State's Attorney.

12               I don't think the facts in this case

13    concerning the motion to suppress are in great

14    dispute.  I think the facts clearly reflect that

15    the police discovered a body in a taxicab at

16    O'Hare on Sunday, October 11, 1992 around 6 pm.

17    This body was the subject of a murder.  The body

18    in fact was the body of the deceased in this

19    case.

20               Through police investigation

21    concerning this murder, the police discovered that

22    the deceased was last heard from on Friday October

23    9, 1992, he was picking up some passengers in a

24    taxicab and there was some statement given to the

1    police that the deceased said he was going to

2    O'Hare Airport.

3                    Through further police

4    investigation, the police found out the names of 2

5    witnesses who were passengers in the cab.  These 2

6    witnesses told the police that on Friday, October

7    9th, around 2:30 in the afternoon, when they were

8    riding in the taxicab from one destination to

9    another within the City of Joliet, also in the cab

10   sitting in front with the deceased was a black

11   woman and the 2 passengers gave the police a very

12   general description of this black woman.  She was

13   in her twenties, a certain height, certain weight,

14   that type of description; very general

15   description.  It could fit hundreds of thousands

16   of women.

17                    This is the only information -- also

18   the police knew -- excuse me, that the body had

19   been at O'Hare for perhaps -- dead, that is, for a

20   few days.  This is the only information the police

21   had concerning the homicide.  They had no other

22   information concerning the homicide.

23                    The police also had information that

24   Jerri Lindsey had made a complaint about being

G 3

1   raped, about being held captive for some 40 hours

2   when she was picked up in a cab for a fare within

3   the City of Chicago and the cab driver supposedly

4   according to the rape complaint by Miss Lindsey

5   didn't proceed in the direction Miss Lindsey

6   wanted that cab driver to proceed and took her

7   elsewhere and raped her in the process.

8           The police also knew that when Miss

9   Lindsey was in the hospital, or she was examined,

10  the hospital found no medical or physical evidence

11  of vaginal trauma to corroborate that rape.   There

12  was some testimony by Officer Schalk, who

13  testified that he had received information that

14  the defendant in the rape complaint had said that

15  she was in a suburban cab that was red in color.

16  The officer did not say from whom he received this

17  information.

18           When this officer was shown Miss

19  Lindsey's original rape complaint or the police

20  report which constituted Miss Lindsey's rape

21  complaint, the officer acknowledged that Miss

22  Lindsey stated she was picked up in Chicago and

23  that there was nothing in Miss Lindsey's original

24  allegation or complaint concerning the fact that

G 4

1    she was in a red cab or a suburban cab, but in

2    fact Miss Lindsey's original complaint indicated

3    she was in a yellow or white cab and she stated

4    she was picked up in the City of Chicago which

5    would indicate to a reasonable man that perhaps it

6    would be a city cab as distinguished from a

7    suburban cab based on the officer's testimony that

8    he knew that suburban cabs could not pick up fares

9    in the City of Chicago.

10              Notwithstanding that inconsistency,

11   the State never rehabilitated the officer to show

12   how the officer somehow knew or had information

13   that Miss Lindsey supposedly said she was in a

14   suburban or red cab.

15              The facts of this case further

16   indicate that the police went to Miss Lindsey's

17   house on October 14, 1992 around 11:00 am in the

18   morning and brought Miss Lindsey to the police

19   station.

20              Now, if I could digress from the

21   facts for one minute and turn to the law, I would

22   argue, your Honor, that based on all those facts

23   which I have just related in my argument, which

24   were all within the officer's knowledge when they

1    brought Miss Lindsey to the police station, the

2    police did not have probable cause to arrest Miss

3    Lindsey.  The police did not have plain

4    old-fashioned traditional probable cause.

5         THE COURT:  All right.  What about if I say,

6    so what?

7         MR. SOROSKY:  I would also add if one

8    accepts Miss Lindsey's version of events which is

9    in this narrow case, distinguished from the

10   officer's version of events, the police went

11   inside the house and that could be a violation of

12   the Payton case where one enters a home without

13   probable cause.

14        THE COURT:  Again I would ask you, so what?

15        MR. SOROSKY:  I agree.

16            So then if we don't have probable

17   cause and I'm not accepting the fact that your

18   Honor has so ruled, but I'm saying if we do not

19   have probable cause, the question then turns on

20   was Miss Lindsey in custody when she was brought

21   or when she traveled, if I could use that generic

22   phrase, from her home to the police station.

23            Now, let's look at the

24   facts that zero in on that issue as distinguished

G  6

1    from the probable cause issue, if we may.  In a

2    sense, we have at one time 2 cases from the police

3    prospective.  We have case number one in time

4    where the police find a body at O'Hare, on Sunday,

5    October 11, around 6 pm.

6                          We have a case number 2 in

7    time when later that same Sunday, around 11:30 at

8    night, Jerri Lindsey makes her complaint to the

9    police that she has been the subject of a rape.

10   In fact, the corroboration or proof that we have 2

11   separate cases was clearly shown by Detective

12   Hines who testified that on Monday night, October

13   12, he went to Miss Lindsey's house, brought Miss

14   Lindsey to the police station for some

15   investigatory work and photo identification on the

16   rape allegation and that this police detective had

17   absolutely no knowledge, had absolutely no

18   knowledge of the murder.

19                          So we do have at one time

20   in this police investigation 2 cases.  I believe

21   Detective Schalk testified that in his police

22   work, he noticed some similarities between these 2

23   cases and this is why he, Detective Schalk and his

24   fellow officers went to Miss Lindsey's house on

1    the morning of October 14, 1992.  And I believe

2    Detective Schalk's terminology that he noticed

3    some similarities between the 2 cases is a

4    sanitized version of the officers saying we

5    believe that Miss Lindsey might have committed

6    this murder.  It's nothing else but that.

7                      It's like a man saying about a

8    woman, she is -- or a woman saying about a man,

9    they have a good personality but they're not my

10   type, isn't that a sanitized version of saying

11   maybe they don't like the person.

12                      And now, here we have a

13   skilled, trained Chicago police detective who

14   investigates homicides and rape cases.  A woman

15   says that she has been raped, been taken in a cab

16   and held captive for 40 hours, beaten up, yet the

17   hospital finds no evidence, no physical evidence

18   of vaginal trauma.  You and I both know this

19   officer knows there is nothing to investigate in

20   this rape allegation.  This rape allegation is not

21   true.  And I believe the officer even alluded to

22   that.  Although he wouldn't quite come out and say

23   that 1 hundred percent.  But he alluded to that.

24        MS. PETERS:  Objection.

G 8

1    THE COURT:  Well, counsel, I don't know

2  where you're going in light of the fact that your

3  client said she went to the police station with

4  the officers voluntarily.

5    MR. SOROSKY:  That was a statement she made,

6  your Honor. That was a statement she made.

7    THE COURT:  Indeed.

8    MR. SOROSKY:  That was a statement she

9  made.

10    THE COURT:  I should not believe her, I

11  guess you're saying.

12    MR. SOROSKY:  Well, depends upon one's

13  definition of voluntarily.  If the policeman says

14  come on, we have to go to the police station and

15  you go, are you voluntary going or are you going

16  because the policemen tell you to go.

17    THE COURT:  Well, how do I judge that?

18    MR. SOROSKY:  By all of the facts of what

19  was in the police --

20    THE COURT:  What facts.

21    MR. SOROSKY:  This woman is taken to the

22  police station, she's immediately photographed and

23  fingerprinted and she's photographed and

24  fingerprinted solely for the purpose of the police

G 9

1    gaining the evidence that she has committed the

2    murder.

3          THE COURT:  All right.  So what?

4          MR. SOROSKY:  That shows that the police

5    brought her to the station and kept her in custody

6    because they wanted to see if these folks --

7          THE COURT:  How do you figure.  Counsel,

8    suppose the officer testified, by golly if Miss

9    Lindsey said I wanted to leave, I would not have

10   let her go.

11         MR. SOROSKY:  He only would have been honest

12   by saying that.

13         THE COURT:  Suppose that's the fact I find.

14   Suppose I even conclude that if she wanted to

15   leave the station, that would have been -- that is

16   what he would have done.

17         MR. SOROSKY:  If you had said --

18         THE COURT:  How would that be controlling?

19         MR. SOROSKY:  Then I believe humbly that

20   that would be controlling because you have a woman

21   who is in custody and arrested by the police

22   without probable cause.

23         THE COURT:  How do you interpret Berkemer

24   versus McCarty, B-e-r-k-e-m-e-r, versus McCarty,

```
 1    M-c  C-a-r-t-y, and Pennsylvania versus Bruder,
 2    B-r-u-d-e-r, 109 Supreme Court 205, cases like
 3    I.N.S. Versus Delgado, a whole host of other
 4    cases, Mendenhall, where it's not the secret
 5    subjective state of mind of the officers that is
 6    that's controlling.
 7          MR. SOROSKY:  I understand, I understand
 8    we're looking at the objective facts, but even if
 9    you look at the Illinois cases which are not that
10     -- we're not in any great conflict with the cases
11    you cited.
12          THE COURT:  Are they in conflict?
13          MR. SOROSKY:  Are not, I said, are not, are
14    not.  I mean these cases, even then I will
15    acknowledges the component of arrest which the
16    component of an arrest -- which the Courts have
17    labeled the arrestees' understanding is not
18    identical to the arrestees's subjective beliefs.
19          THE COURT:  Arrestees or arrestors.
20          MR. SOROSKY:  Arrestees, the accepted test
21    of understanding is not what the arrestee thought
22    but what a reasonable man.
23          THE COURT:  A, reasonable man.  Okay. I can
24    cite some more cases.
```

1          MR. SOROSKY:  Absolutely.

2          THE COURT:  A station house of

3     interrogation, Mathason, M-a-t-h-a-s-o-n, 429

4     U.S., 4292.  Not station house but probation

5     officer's office.  Minnesota versus Murphy, 465

6     U.S. 420.

7          MR. SOROSKY:  Well, if we look at it, the

8     elements of a valid arrest are present when the

9     police officer informs the defendant of a

10    violation, the defendant submits to the police

11    control, the evidence clearly shows the officers

12    intended to effect the arrest and the defendant so

13    understood.  I mean, every case.

14         THE COURT:  And the defendant so understood.

15         MR. SOROSKY:  Every case might say something

16    a little different.

17         THE COURT:  Certainly in this case, the

18    defendant didn't so understand.

19         MR. SOROSKY:  I don't know that's so, quite

20    the contrary.  The defendant made a statement she

21    voluntarily went to the police station. The

22    defendant also said that when she was being

23    fingerprinted, she had asked to leave and the

24    police would not allow her to leave.

1          THE COURT:  Now we're getting somewhere.

2          MR. SOROSKY:  So even if this Court wants to

3     accept the fact that based on what the officer

4     said at the house of Jerri Lindsey, whether they

5     entered or didn't enter, and Jerri Lindsey

6     voluntarily went to the police station, after she

7     was photographed and after she was fingerprinted,

8     the defendant testified that she asked to leave

9     and she said when am I getting out of here, when

10    am I getting out of here and the police said

11    nothing to her.  This is what she testified.

12    Which was not contradicted by the police.

13         THE COURT:  All right.  So what happened, so

14     --

15         MR. SOROSKY:  At that period of time, the

16    police had no greater knowledge or probable cause

17    than they did when they first went to her house.

18         THE COURT:  I'm not sure about that.  Go

19    ahead.

20         MR. SOROSKY:  Right, because they had not

21    yet gone out and gotten the corroboration of the

22    citizen and you will remember, I said did you

23    allow Miss Lindsey to go to lunch around the lunch

24    time hour when you, Officer Schalk, were leaving

G 13

1   the police station to the talk to the 2 passengers

2   in the cab and he said no, they didn't allow her

3   to go to lunch.  So at that particular period of

4   time, you have Jerri Lindsey saying I want to go,

5   when can I could home.  You have the police not

6   allowing her to leave, you have the officers

7   leaving the station or at least any officer

8   involved in this case is leaving the station to

9   find out if there is a photo identification and

10  Miss Lindsey is held captive and or prisoner in

11  that police station.

12                    At that period of time, she

13  is in custody and there is no probable cause.  So

14  even if you accept the fact that the police, the

15  policemen came to Jerri Lindsey's house, told

16  Jerri Lindsey his story as to why he wanted Jerri

17  Lindsey to go to the police station and Jerri

18  Lindsey in good faith believed that officer and

19  voluntarily went with him, which we are saying is

20  not the case, we're saying that she was ordered to

21  go by the police and she merely submitted to

22  authority, but even if you accept that she

23  voluntarily -- strike that, that she voluntarily

24  went with to the police station, the facts

1    changed, the facts changed and events occurred at

2    the police station.

3                          Miss Lindsey was

4    photographed, Miss Lindsey was fingerprinted,,

5    Miss Lindsey was in some small box of a room which

6    would corroborate what the officer said, she was

7    in an investigation room, she was left there

8    alone.  It makes a person begin to think, maybe,

9    hey, maybe I'm in jail, I don't like being here

10   and Miss Lindsey asked when am I getting out of

11   here, can I go home, and she said the police did

12   not respond to her.

13                          There has been no testimony

14   to the contrary by the police.  So this is that

15   period in time where Miss Lindsey was in custody

16   without probable cause.

17        THE COURT:  Again I have to tell you, so

18   what.

19        MR. SOROSKY:  Had the police released her,

20   had the police released her, she would not have

21   been in the police station and made the

22   confession.

23        THE COURT:  But as soon as the police had

24   the identification of the defendant from the 2

G 15

1    passengers, there is probable cause.

2        MR. SOROSKY:  I don't even think that that's

3    probable cause.

4        THE COURT:  Okay.  Tell me why not.  If you

5    wish.

6        MR. SOROSKY:  These folks testified -- not

7    testified, these folks told the policemen that on

8    October 9th at 2:30 in the afternoon, they were in

9    a cab in Joliet and a black woman was in the cab

10   and they saw a picture of Jerri Lindsey and Jerri

11   Lindsey says -- and these witnesses said Jerri

12   Lindsey was in fact the woman that was in the

13   cab.  So just because Jerri Lindsey is in a cab in

14   Joliet at 2:30, they were only in the cab for a

15   relatively short period of time.  It's a cab ride

16   within Joliet from the Empress River Casino Boat

17   to Red Roof Inn.  This Court can use its own every

18   day common sense and living experience around 2:30

19   and there is some talk of a cab going to O'Hare,

20   how is that probable cause that Jerri Lindsey

21   committed the murder?

22                    That might be probable

23   cause to believe that Jerri Lindsey is a witness

24   who could give the police information or she's

1    someone the police want to talk to.  But how is

2    that probable cause to believe she committed the

3    murder?

4                        That would be no different

5    than I have God forbid after this hearing is over,

6    you know, I stay here and talk to you for 2

7    minutes about normal colloquy and then leave and

8    God forbid I'm murdered or something and someone

9    tells the police Judge Singer was the last person

10   to talk to Sorosky so the police arrest Judge

11   Singer because you were the last person to talk to

12   me and that is a stronger case than -- that

13   frankly is a stronger case than the police have

14   here.

15        THE COURT:  In appropriate context, perhaps

16   -- no, no.

17        MR. SOROSKY:  The scenario I gave would be a

18   stronger factual setting than the State has

19   presented here.  Because at least --

20        THE COURT:  Off the record.

21                 (Off-the-record.)

22        THE COURT:  Back on the record.

23        MR. SOROSKY:  Let me say something else

24   also.  I don't know, there has been absolutely no

1    evidence that Hess and Eiselt identified the cab

2    or the cab driver so in the example that I gave,

3    everyone would know I was -- I was in your

4    courtroom talking to you and you were the last

5    person to see me, so they know at least it was you

6    and me.

7                    In this situation, even if

8    you accept as gospel that Hess and Eiselt have

9    identified Jerri Lindsey as being the passenger in

10    their cab, how do we know that the cab driver was

11    Bennett and it was the very cab Bennett was in.

12    The only thing they said, it was I guess a black

13    cab driver and once again, you got a lot of those.

14    You know, they couldn't say what cab they were

15    in.  And there has been no connection that Hess

16    and Eiselt, the 2 witnesses were in fact in the

17    deceased's cab.  When you ask the question, so

18    what, when Jerri Lindsey asks to go, if the police

19    would let her go, there wouldn't be a statement.

20                    The police have profited

21    and the State has profited from the illegal

22    incarceration of Jerri Lindsey.  They have

23    obtained evidence that they want to use against

24    her and this is the essence of a 4th Amendment

1    violation.  And the law is very clear that the

2    police cannot illegally hold someone even if it's

3    not in a harsh or brutal setting to find out if

4    someone committed a crime and then if they have

5    evidence, arrest them and if they don't have

6    evidence, let them go.

7                        That's basically what you

8    have here.  When the police -- we would state 2

9    points on probable cause.  We would state one, the

10   police didn't have probable cause to arrest Jerri

11   Lindsey when they brought her to the police

12   station.

13                        2, we would say they still

14   didn't have probable cause to arrest Jerri

15   Lindsey.

16                        Now, let me ask your Honor

17   a question, if I may.  Suppose the police officers

18   had spoken to Hess and Eiselt before they went to

19   Jerri Lindsey's house, somehow they had a

20   photograph of Jerri Lindsey and Hess and Eiselt

21   identified Jerri Lindsey as being in the cab.  And

22   the police arrested Jerri Lindsey based on the

23   probable cause that they allegedly had cause Hess

24   and Eiselt identified her and the police officers

G  19

1    said we've done such a good job of arresting this

2    woman, we worked hard all day, we're not going to

3    bother to question this woman, the State's

4    Attorney's Office has great lawyers, they'll get a

5    conviction, where would this case be.

6         MS. PETERS:  Judge, objection.

7         MR. SOROSKY:  Where would this case be?

8         THE COURT:  I haven't the foggiest notion.

9         MR. SOROSKY:  It would be laughed out of

10   Court, that's where it would be.  We would also

11   submit, your Honor, if the Court would look at one

12   of the landmark cases in Illinois concerning this

13   point, it's People versus Wipfler, W-i-p-f-l-e-r.

14        THE COURT:  What date.

15        MR. SOROSKY:  68 Illinois 2d, 158, a 1977

16   Illinois Supreme Court case.

17        THE COURT:  What does that say.

18        MR. SOROSKY:  Wipfler was quoted in many

19   other cases.  Wipfler is the case wherein a young

20   man is arrested and brought to the police station

21    -- excuse me, a young man, what happened in that

22   case, if I can give you the facts are --

23        THE COURT:  Sure.

24        MR. SOROSKY:  Police received some evidence

1    that the defendant was either involved with or

2    knew something about some burglaries.  The police

3    went to the defendant's house and his mother was

4    there and the mother said, oh, he's in school and

5    it would be so embarrassing, can I send him in

6    after school.  The police said sure.

7                        The defendant goes down to

8    the police station after school himself pursuant

9    to his mother telling him the police were here

10   wanting to look for you.  He sees the police

11   chief, it's a small town who happened to have been

12   his little league coach and although the police

13   chief knew nothing about the facts of the case

14   said, son, a man is a man who admits what he did,

15   he would admit it and go on from there and then

16   the 2 detectives begin to question him and give

17   him his Miranda warnings and so forth and so on

18   and first the defendant says he had no involvement

19   in it and eventually he confessed.

20                        The Illinois Supreme Court

21   found that this young man was not in custody

22   although Justices Dooley and Goldenhurst

23   dissented.  In this case, it's not in disagreement

24   with many of the cases your Honor has decided,

1    many of the United States Supreme Court cases.

2                          But one of the things that

3    the Wipfler case holds is there were none of the

4    procedures which the public associates with arrest

5    such as searching, booking, fingerprinting. Which

6    might to an innocent man have negated the

7    statement of the police that he was simply being

8    interrogated as a witness.

9                          Now here, as distinguished

10   from Wipfler, the defendant was immediately

11   photographed and fingerprinted.  Here as

12   distinguished from Wipfler, the defendant said she

13   wanted to go and the police would not let her go.

14   Here as in Wipfler, the State conceded there was

15   no probable cause for the -- to sustain the

16   arrest.  And I think your Honor has somewhat

17   acknowledged that there would not be probable

18   cause to arrest the defendant based on the

19   information the police had when they arrived at

20   the defendant's house and went with the defendant

21   to the police station.

22           THE COURT:  I would agree there would be no

23   probable cause.

24           MR. SOROSKY:  So there are certain

1   similarities between this case and Wipfler.  There

2   was no probable cause when the defendant was

3   brought to the police station, the police have

4   some information that the person at the police

5   station is involved in the commission of a crime,

6   although that information is short of probable

7   cause and the police have certain beliefs, but in

8   Wipfler, they just brought the young man into a

9   room and began to question him.  And even though

10  he was questioned and given his Miranda warnings,

11  the Illinois Supreme Court said he was not in

12  custody.

13                    What I am saying here is

14  there are factors that that did not exist in

15  Wipfler which Wipfler acknowledged might have made

16  a difference or at least the majority in Wipfler

17  acknowledged might have made a difference for

18  custody, specifically photographing and

19  fingerprinting which is the indicia of arrest.

20                    Here, there is the

21  statement, testimony by the defendant after she

22  was fingerprinted and alone in a room, when can I

23  go home, I want to go home.  Did the police

24  acknowledge that? They said nothing.  And we know

1    the police are on assignment to find out if the

2    defendant can be identified.  There is none of

3    that in Wipfler, Wipfler is just police

4    interrogating the defendant and interrogation, she

5    was not allowed to make any phone calls.

6                        Now, the State always has a

7    response.  She didn't ask, she didn't ask, she

8    didn't ask.  I mean when people are in custody

9    they're afraid.  Police are not trained the way

10   clerks in retail shops are trained to be polite to

11   people.  Can I get you this, can I get you this,

12   do you want to see the other one, do you want to

13   see the other one.  Police are not that way,

14   Judge.  Police just give orders.

15                        You sit down, you stand up,

16   you go over here.  People are afraid.  People

17   don't say anything. So I would submit we don't

18   have probable cause, we have a woman in custody

19   and as a result of that custody, the police

20   obtained evidence which they plan to use against

21   her.

22        THE COURT:  Miss Peters.

23        MS. PETERS:  Judge, I believe the easiest

24   way to look at this is chronologically, what was

G 24

1    known to Detective Schalk at the time he was on

2    the door step of Jerri Lindsey on October 14th,

3    and very briefly I don't want to belabor the facts

4    that have been presented here, it's easiest to

5    look at this chronologically.

6                         What happened.  It comes to

7    light to the police or at least to Detective

8    Schalk on the evening of October 12, that's when

9    the body is found at O'Hare and it's a male black

10   about 50 years old in a maroon cab, Circle Cab

11   Company cab with white lettering on the side, a

12   suburban cab from Joliet, Illinois.  Other

13   investigation reveals that cab has been in the

14   parking lot since 5 pm on October 9, that it was

15   there each of the subsequent nights until it was

16   found.

17                         In the interview with the

18   wife of the victim, contrary to what counsels

19   says, reveals that the cab driver himself told his

20   wife I picked up a double load in front of the

21   Empress Gambling Casino, one is going to the Red

22   Roof Inn, the other one is going to O'Hare

23   Airport.

24                         In an interview with the

1    couple from the cab revealed and this was also

2    done by Detective Schalk before he went to Jerri

3    Lindsey's home, was that the elderly couple, Hess,

4    H-e-s-s and Eiselt, E-i-s-e-l-t, were in that cab,

5    they were picked up about 2:30 pm, they were

6    dropped off at 3:15 pm.

7                    During the time that they

8    were in the cab, they overheard a female black

9    that they described to the officer as being in her

10   twenties, 5 foot 2 to 5 foot 4, 130 to 140 pounds,

11   chunky. And I would ask you to take a look at the

12   defendant as she sits before you now, even though

13   this is not how she appeared on the day this

14   allegedly occurred, they described a woman, that I

15   disagree with counsel does not fit a number of

16   hundreds of thousands of women in the world as

17   sitting in the front seat with the male black cab

18   driver in a Circle Cab Company cab stating to the

19   officer or -- excuse me, to the driver she had to

20   be to O'Hare Airport by 4:30 pm.  That's how Jerri

21   Lindsey was described as being last seen in the

22   cab.

23                    Now when the officer,

24   Detective Schalk was at the door step of Jerri

1    Lindsey, he told her I'm here to investigate your

2    rape allegation or your sexual assault allegation

3    as well as a homicide allegation.  He told her up

4    front both purposes he was there for, there was no

5    misrepresentation and even taking Jerri Lindsey's

6    testimony as true, what show of authority or force

7    was there by Detective Schalk to make her go with

8    him?  He displayed a badge, it is an

9    identification thing, that's to verify he's a

10   police officer.  There were no guns drawn, she

11   wasn't physically held in any way and taken from

12   her home. There was no forced entry to the

13   home.

14                    The detective told you he

15   didn't even enter the home, it's 11 am in the

16   morning. Now, we would submit that Jerri Lindsey

17   and her roommate have confused what had occurred.

18   There were 2 times that the police came over in

19   conjunction with an investigation within a period

20   of days to Jerri Lindsey's home. The first time

21   was when Detective Hines came with his male white

22   partner a night earlier or day and a half earlier

23   to have Jerri Lindsey come down to the police

24   station to try to view a photo array, not as she

1   described one Polaroid photo of 6 men but rather 5

2   or 6 individual photos, one of which was Rudolph

3   Bennett's photo, the cab driver and at that time

4   Detective Hines only knew him to be a missing

5   person.

6                         Her sexual assault

7   allegation is an interwoven thing with the

8   homicide investigation at the point that Detective

9   Schalk is on her door step.  She described that

10  she was attacked by a male black cab driver about

11  50 years old in a red and white suburban cab,

12  according to Detective Schalk or according to the

13  case report, a red and white or yellow and white

14  cab.  She described that she was attacked and then

15  she attacked that person by stabbing him in the

16  chest and leaving a knife in his chest.

17                        She said that at the

18  conclusion of everything, she was in Joliet.

19  Judge, the facts of that intermingled with the

20  facts known about the homicide investigation is

21  true enough the detective was there to question

22  her about that to find out what she knew and in an

23  investigatory capacity.  The situation had not

24  been narrowed so that Jerri Lindsey was the only

1    suspect.  She was a possible witness on this.  The

2    detective showed up and asked her if she would

3    accompany them to the station to further their

4    investigation of both matters and she willingly

5    agreed.  She was not taken to the police station

6    lock up.

7                      When counsel says she was

8    photographed and fingerprinted, in such a way it

9    indicates an arrest, he's confusing the booking

10   procedure with what occurred here. The photograph

11   of her occurred in an interview room with a

12   Polaroid camera, not in the district lock up like

13   an arrestee would be processed.  The

14   fingerprinting of her occurred on the 4th floor

15   identification section of the Chicago Police

16   Department crime lab, not in the First District

17   lock up where an arrestee would be processed.

18                      She was in an interview

19   room with an open unlocked door, guns were not

20   drawn at any time, she was not searched like an

21   arrestee would be, she was not informed she was

22   under arrest, she was never taken to the lock up,

23   she was never handcuffed, she was not advised of

24   her rights until almost 1:00 or 1:30 pm, well

1    after the photo identification had been made by

2    Hess and Eiselt.

3                    The police arrived at her

4    door step at 11:00 am and they waited almost 20

5    minutes before she was dressed and got into the

6    car with them.  They then traveled to the police

7    station at 11th and State and got there at

8    approximately noon. She was basically inside the

9    police station for no more than 30 minutes and

10   that was the time when Detective Schalk returned

11   to tell her the photo identification had been

12   made.  She was in the police station maybe 15

13   minutes before that photo identification actually

14   occurred.

15                    So all together, her time

16   with the police was an hour or less before that

17   photo array identification occurred and I would

18   argue at the time of the photo array

19   identification, clearly there was probable cause

20   to arrest Jerri Lindsey because she had just been

21   identified as the last person seen with a homicide

22   victim who was stating to that detective that she

23   had gone to go to a particular location and lo and

24   behold that's where his body was found.

1                        Also, Judge, Jerri Lindsey

2     is the one that initially contacted the police

3     before the body was ever found, before the

4     homicide investigation even began and when she

5     contacted the police, she admitted to stabbign the

6     man.  At the time that the police were

7     interviewing her about her rape allegation, an

8     allegation that was not backed up by any physical

9     evidence or medical evidence known at that time to

10    the police, they didn't know she was an offender

11    on a stabbing or legitimate rape victim, they were

12    investigating that as well as had a homicide

13    investigation that appeared to maybe be related.

14                        Judge, the test is whether

15    a reasonable person in the same circumstances

16    innocent of any crime would have concluded that he

17    was not free to leave.  Jerri Lindsey even

18    testified that it wasn't until the point she was

19    being fingerprinted, the same time that the photo

20    array was being conducted a few blocks away that

21    she started wining she wanted to go home, so

22    taking her testimony as true even though the test

23    under the cases is not the subjective belief of

24    the arrestee, even taking her testimony as true,

1    she did not feel that the tone had changed from

2    her being a witness that was being questioned by

3    the police to her being in custody.

4                      The time that she changed

5    her mind about how she was being treated coincides

6    at the time the probable cause for the arrest

7    existed.  So I would ask the motion to be denied.

8         THE COURT:  Mr. Sorosky.

9         MR. SOROSKY:  Just in brief response to a

10   few of the points.

11                     First point the State's

12   Attorney made was that she argued how very strong

13   a case for probable cause the State presented

14   concerning the fact that the deceased's cab was

15   going to O'Hare to pick up some passengers and

16   then was going to O'Hare, we don't dispute that

17   for a minute, we acknowledge that.

18                     However, that is not the

19   same thing as the second fact the State's Attorney

20   is attempting to swallow with the first.  And that

21   is the elderly couple were in fact in the same cab

22   that the deceased was in that was going to O'Hare.

23                     Now, this may be a subtle

24   point but it's most meaningful.  There is no

1    question but that the police had evidence from the

2    deceased's widow that he called on his cab radio

3    and said I got a fare, I'm dropping them off and

4    then I'm going on to O'Hare.  The officer

5    testified that the 2 witnesses said they were in a

6    cab and this woman was a passenger in that cab.

7    And there was some talk of going to O'Hare.

8                        But that doesn't mean that

9    that was the defendant, that was the same cab the

10   deceased was in.  So the State has never tied up

11   that Jerri Lindsey was in fact in the deceased's

12   cab.  They merely have established that Jerri

13   Lindsey was identified as being a person in that

14   cab on Friday at 2:30 in the afternoon, for a

15   short period of time that they were in the cab.

16                        Now, they have not shown

17   that Jerri Lindsey was in fact in the deceased's

18   cab or with the deceased.  The State's Attorney

19   said the rape and homicide were interwoven, they

20   never were interwoven. When Detective Hines, on

21   Monday, October 12, 1992 went to Jerri Lindsey's

22   house to do police work on the case, he didn't

23   even know about the homicide.

24                        The only time that these 2

1    cases were interwoven if one wants to use that

2    phrase was when Detective Schalk said he went to

3    Lindsey's house after looking at both reports and

4    saw some similarities.  Or connection.  But in

5    fact, all his actions indicate that he just wanted

6    to get this woman into the police station, to

7    gather evidence to see if she in fact had

8    committed the homicide.  He didn't do anything

9    concerning the rape allegation.

10                        These 2 cases are not

11   interwoven in any way.  And if the policemen

12   successfully persuaded this woman that he was

13   there to investigate her rape allegation, and as a

14   result of his prowess at being able to fool Miss

15   Lindsey into believing she was going to the police

16   station because of her rape complaint, in that

17   sense, the Court concludes Miss Lindsey went there

18   voluntarily, based upon what was done at the

19   police station concerning the photograph,

20   concerning the fingerprinting, being left alone in

21   a room, coupled with Miss Lindsey's statements

22   which were unrebutted she wanted to go and the

23   police wouldn't respond to that nor would they

24   leave her go.

1              At that time, we have a

2    woman in custody without probable cause.  And at

3    that time, the police had not yet had the

4    identification made by the 2 people in the cab.

5              So the State's Attorney is

6    incorrect when it State's Attorney said the only

7    time Miss Lindsey wanted to go was after the

8    police had probable cause.  If we accept the

9    identification by these 2 witnesses of Miss

10   Lindsey as being probable cause, Miss Lindsey said

11   she wanted to go, when the officer was gone,

12   attempting to secure the I.D..  So the 2 were not

13   simultaneous, that is Miss Lindsey wanting to go

14   once the police had probable cause.  Miss Lindsey

15   wanted to leave the police station and asked to

16   leave the police station before the police had

17   probable cause.  They would not let her go because

18   they wanted to see the results of Detective

19   Schalk's mission, if you will, to find out if

20   these people could identify her.

21              And at that time, we have a

22   woman in custody without probable cause who is

23   being held.  If the police were to have done it

24   right Miss Lindsey should have been released and

1    if the identification of Miss Lindsey by the

2    passengers in the cab constitutes probable cause,

3    they either should have got a warrant, that seems

4    to be their only alternative then, they should

5    have got a warrant for her arrest or they don't go

6    into her house and arrest her without a warrant or

7    if they saw her on the street, perhaps they could

8    arrest her.  If the Court concludes that was

9    probable cause, then the police had the advantage

10   of having Miss Lindsey in custody and photographed

11   and fingerprinted, although the State's Attorney

12   makes reference to the fact that well, this isn't

13   where the regular arrestees are photographed or

14   the regular arrestees are fingerprinted.

15                        An individual is not

16   supposed to know that.  It's inconceivable to me

17   that any Court would ever conclude that this

18   photographing and fingerprinting doesn't count as

19   a real photographing and fingerprinting because

20   it's not where the police regularly do it.  It's

21   inconceivable to me that the most conservative law

22   and order Court would make such a ruling. I don't

23   think that holds any water at all.

24                        If there is some variation

G 36

1    between this and other police procedures. She was

2    photographed and fingerprinted.  She was in a room

3    alone.  I mean, that begins to smell of custody.

4    And the police then have the advantage, it's like

5    someone having a head start in a race and they

6    have all that cooking before, if you will.

7                   When they Mirandize her and

8    began to question her.  And there was that period

9    of time when she was in custody, asked to leave,

10   the police wouldn't let her go, and as a result of

11   that, of that custody, she confessed.  If the

12   police illegally enter a house, no question that

13   it's illegal, for let's say pornography purposes

14   or something of that nature, they're trying to

15   seize that and then unmistakeably stumble on

16   drugs, that evidence ought to be suppressed.

17                   So here we have Miss

18   Lindsey in custody illegally without probable

19   cause, she's been photographed, she's been

20   fingerprinted, she's asked to leave. The police

21   won't let her go and while she's in custody

22   analogous to my example the police found drugs,

23   the police get this new probable cause or new

24   information, they have to go out and get a new

G 37

1    warrant.  They didn't do that.

2         THE COURT:  Could they hold her pending the

3    getting of the new warrant?

4         MR. SOROSKY:  Maybe.  Maybe.  Maybe.  But

5    you have the situation here that I don't think is

6    undisputed that you have a woman in custody

7    without probable cause whose circumstances have

8    changed, if one wants to accept that she went to

9    the station voluntarily since her voluntarily --

10   since her voluntary arrival at the police station,

11   they have substantially changed, she's been

12   photographed, she's been fingerprinted, she's left

13   in a room alone.

14                          And there is no doubt she's

15   left in this room while the police are attempting

16   to gain evidence against her.  And she's been

17   brought to the police station as far as she's

18   concerned because of her rape allegation but we

19   know in reality the police are only conducting a

20   homicide investigation against her as opposed to

21   aiding her in her rape allegation.

22                          And she asked to go, she's

23   not allowed to leave.  As a result of that illegal

24   incarceration, the police gained evidence which

1    all ought to be suppressed.

2         THE COURT:  Have you completed?

3         MR. SOROSKY:  Yes.

4         THE COURT:  As I understand the issues, they

5    are, first, whether or not the defendant was in

6    custody or otherwise compelled by the police to

7    accompany them to the police station.

8                        2, if not, was there any

9    time in the sequence of events as related in the

10   evidence did the custody status arise prior to the

11   officers returning to the station with the

12   identification of the 2 cab driver passengers.

13                        In this connection, I

14   believe the evidence sought to be suppressed are,

15   include, one, the photograph taken by the officer,

16   and shown to the 2 witnesses, the two cab

17   passengers.  2, the defendant's fingerprints taken

18   at the police station, and 3, the identification

19   of the defendant from the photograph.  4, the

20   statements to the authorities by the defendant.

21   After the officer obtained the identification.

22                        To some extent my task has

23   been made infinitely easier by the fact that the

24   defendant testified that she accompanied the

G 39

1    police to the station house voluntarily. And that

2    the belief arose in her for the first time that

3    she was quote, not going to go home, unquote, when

4    the police were in the fingerprinting process of

5    her.

6                    Now, at this juncture, I

7    would point out that there was never made precise

8    in the evidence at what stage in the

9    fingerprinting process, if we are to concede that

10   the defendant made the statement, and indeed there

11   is no counter-evidence that she did not make the

12   statement, there is no evidence as to what stage

13   in the fingerprint process she made that

14   statement, that is, asked to go home.

15                    If she had made the

16   statement before the fingerprints were taken, that

17   would be quite a different matter than if she had

18   made the statement after the fingerprints were

19   taken.  I don't know what is meant by fingerprint

20   process, but from my observation, fingerprint

21   process includes the inking, the gathering of

22   cards to which the fingerprints are to be

23   imprinted upon, the inking of the person's

24   fingerprints, fingerprints itself and embedment

1    -- the placing of the fingerprints, the in

2    fingerprints on the card itself.  Then the

3    cleaning off of the fingerprints, the cleaning off

4    of the fingers, the washing of the fingers, taking

5    ink off the finger.

6                I don't know when all this

7    -- I don't know at what time, what stage this all

8    happened, that is that she said she wanted to go

9    home.  If it happened while they were inking her

10    fingers, if it happened while the ink was being

11    put on the paper, did it happen after the imprints

12    were taken and she was washing her hands?  I don't

13    know and by golly that was the defendant's burden,

14    not my burden to find out, the defendant's burden

15    so I will not address that portion first.

16                I would say that if the

17    defendant had said in fact she wanted to go home

18    and the police officer said no, she can't, by

19    golly that was custody.  But again in the sequence

20    of events, I don't know when that occurred.

21                Now, the defendant said she

22    was voluntarily, she went, accompanied the police

23    voluntarily to the police station.  Then I suppose

24    that is consistent as well with the objective

facts. I will point out that the issue of custody

does not rest with the secret subjective state of

mind of the defendant or the police officers.

Instead it is based upon those objective facts

which a reasonable person would interpret as

creating an objective -- a custodial status.

I do call your attention to

Berkemer versus McCarty 468 U.S. 420, I.N.S.

Versus Delgago, 466 U.S. 210, 466 and cases such

as Mendenhall, M-e-n-d-e-n-h-a-l-l versus United

States, 446 U.S. 2318.  The fact that the

defendant was in the police station at the time

the photograph and fingerprints were taken again

is not dispositive of the issue of custodial

status; or Dwan (Phonetic) versus Matteson, 429

U.S. 432 and Minnesota versus Murphy, 465 U.S.

430.

Now, I do conclude that the

defendant has not established that she was in

custodial status when she was at the police

station, nor that she was compelled to go to the

police station by the police.  I do conclude the

objective facts were such that indeed the

defendant as she stated she did, went to the

1    police station voluntarily.  I point out the

2    defendant said she went to the police station

3    voluntarily.  That's consistent with the facts too

4    because based upon the objective facts, there was

5    an investigation of the defendant's rape

6    allegation.  The defendant did not deny making the

7    rape allegation, indeed if I recall, she conceded

8    she make the rape allegation and I must agree with

9    the state, that the rape allegation in the context

10    of this case was linked to the killing or finding

11    of the cab driver dead in his cab.

12                      Based on the objective

13    facts, why wouldn't she go to the police station

14    since this was an investigation of her rape

15    allegation?  I would point out that if the

16    defendant was taken to the police station for the

17    purposes of having fingerprints, her prints, her

18    hands fingerprinted, fingers fingerprinted and she

19    did not want to go, that of course would have been

20    unlawful, absent probable cause.

21                      Look at Davis versus

22    Mississippi, 394 U.S. 721 and Hayes versus

23    Florida, 470 U.S. 811.  Hayes versus Florida.  A

24    critical point was that the defendant was

1    reluctant to go to the police station with the

2    officers for the purposes of fingerprinting but

3    the officers then said to the defendant, if you

4    don't go, we'll get a warrant for your arrest and

5    take you to the police station.  Of course at that

6    time there was no probable cause to get the

7    warrant.

8                        Now, I do find that at the

9    point the officers obtained an identification of

10   the defendant as being the one in the taxicab,

11   that that was a situation where in the context of

12   all of the evidence, there was probable cause.  Of

13   course today, we test probable cause on the

14   totality of the circumstances.  Of course in that

15   context, we refer to Illinois versus Gates.  462

16   U.S. 213.

17                        Now, what did the police

18   have at that time? They had the defendant making a

19   rape allegation that at best was bizarre.  The cab

20   driver was the rapist.  Te testimony of Detective

21   Jack Hines makes it clear that the description

22   provided by the defendant was that of a Joliet cab

23   driver.  They have a dead cab driver found in a

24   cab at O'Hare Airport 2 or 3 days after -- having

1    gone to O'Hare Airport -- the cab driver is found

2    2 or 3 days after the alleged rape.  But there is

3    other evidence, the cab was in the O'Hare garage

4    on the day of the alleged rape.

5                          So I have to point out the

6    story of of the rape was indeed bizarre. It did

7    involve serious wounding, if not the killing of

8    the cab driver, albeit by a knife rather than a

9    gun.

10                          They have now the defendant

11    placed in a Joliet cab that the police knew was

12    heading towards O'Hare, that is, he gave the

13    information and said he was on his way to O'Hare,

14    to his wife, the 2 passengers said there was

15    conversation where he indicated they were going to

16    O'Hare, the defendant said she had to be at O'Hare

17    Airport by 4:30 and now the defendant identified

18    as the person in the cab.  Albeit a Joliet cab and

19    the Joliet cab found in the O'Hare Airport with

20    the dead driver.

21                          At that time the defendant

22    had arrived in the cab at O'Hare Airport.  In my

23    view, if that is proof beyond a reasonable doubt

24    is irrelevant, but that sure is probable cause.

1                          Now, let us assume for a

2      moment that the defendant did say at sometime

3      during the fingerprint process I want to go home.

4      And she wasn't allowed to go home.  And that the

5      defendant then during that period of time, I guess

6      because she didn't say what happened during that

7      period of time, she was held unlawfully until of

8      course the identification by the 2 passengers was

9      obtained.  I point out in Segura, S-e-g-u-r-a,

10     versus the United States, 468 U.S. 796, the police

11     detain people in a premises, seal off the premises

12     unlawfully because they did so without a warrant

13     while they were getting a warrant.  The warrant

14     arrived and the premises were searched and

15     narcotics found.

16                          United States Supreme Court

17     conceded that the unlawful detention was there but

18     nevertheless held that arrival of the warrant,

19     after that everything that occurred thereafter was

20     lawful.

21                          In Murray versus the United

22     States, 487 U.S., 533, the police unlawfully broke

23     into a warehouse without a warrant.  Saw the

24     narcotics, then left.  And got a warrant using

G 46

1    information independent of the break into the

2    warehouse, but concededly they wouldn't have gone

3    to get the warrant if after breaking in they saw

4    there was no narcotics in the warehouse.

5                        The United States Supreme

6    Court upheld that search of the warehouse with the

7    warrant even though they wouldn't have gotten the

8    warrant had they not seen the narcotics in there.

9    That is the magistrate that issued the warrant

10   would not have had information the narcotics were

11   in the warehouse.  In Nix versus William, 467 U.S.

12   431, the police questioned the defendant in

13   violation of his 6th Amendment right to counsel

14   because of that violation, the defendant told him

15   where the decedent's body could be found and the

16   decedent's body was found right where he said it

17   would be found.  The evidence of the body was

18   used.  After first reversing the conviction,

19   sending it back, to the Iowa Courts, the Iowa

20   Courts thereafter concluded that the body would

21   have been found anyway. So the second trial,

22   second review, the conviction was affirmed, it was

23   the second trial, the conviction was affirmed.

24   So-called inevitable discovery dostrine,

1    intervening, intervening discovery or intervening

2    event that breaks the chain of illegal causation.

3                         Even if I were to concede

4    that during -- that the defendant had said I want

5    to go home, she wasn't allowed to go home, once

6    the police had the identification, the detention

7    was lawful, quite simply, if they let her go, they

8    would have gone out to arrest her, bring her back,

9    and then the subsequent questioning would have

10   resulted in the statement by the defendant would

11   have been lawful.

12                        In summary, motion to

13   suppress evidence is denied.  Have I been crystal

14   clear in my explanation, Mr. Sorosky?

15        MR. SOROSKY:  Yes.

16        THE COURT:  Miss Peters?

17        MS. PETERS:  Yes, your Honor.

18        THE COURT:  Well, shall we set it for trial

19   now.

20        MS. PETERS:  Judge, I think counsel has

21   indicated --

22        MR. SOROSKY:  Set it for one short date just

23   to see where we're going.

24                        I understand your Honor will not be

```
1      here next week?

2            THE COURT:  I will be here.

3            MS. PETERS:  He will be here next week but

4      not the following week.

5            THE COURT:  I'm not tied into a 9:30 time,

6      Mr. Sorosky if you would like to make it in the

7      afternoon, however I do note you said you wanted

8      9:30 today and didn't come until late afternoon.

9            MR. SOROSKY:  Can we set it for -- let's set

10     it for the 17th, St. Patrick's Day, or I will be

11     in the building the 18th, let's set it for the

12     18th.

13           THE COURT:  I didn't hear anything after the

14     "or".

15           MR. SOROSKY:  The 18th, okay.

16           MS. PETERS:  Judge, either the 17th or 18th

17     as status date, either one is fine by agreement.

18           THE COURT:  All right.  I prefer the 17th

19     rather than the 18th.  The 17th.

20           MR. SOROSKY:  Okay.

21           THE COURT:  9:30 am.

22           MR. SOROSKY:  9:30.

23           THE COURT:  By agreement.

24           MR. SOROSKY:  By agreement.
```

1          MS. PETERS:  By agreement.

2          THE COURT:  March 17, 1994, 9:30 am, that

3    will be status.

4                    (Whereupon, the further hearing

5               of the above-entitled cause

6               was continued to 3-17-94, at

7               9:30 o'clock a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                      )  SS.
2    COUNTY OF C O O K )

3       THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
                    I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15   _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 4th day of June, 1995.


G 51

1    STATE OF ILLINOIS )
                       )  ss
2    COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                       )  Case No. 92 CR 25135
6       vs.           )
                       )  Charge: MURDER
7    JERRI LINDSEY     )

8              REPORT   OF   PROCEEDINGS

9          BE IT REMEMBERED that on the 14th day of

10   April, 1994. This cause came on for hearing before

11   the Honorable SHELVIN SINGER, Judge of said Court,

12   upon the information herein, the defendant having

13   entered a plea of not guilty.

14       APPEARANCES:
              HON. JACK O'MALLEY,
15            State's Attorney of Cook County, by
              MR. NICK FORD,
16            Assistant State's Attorney,
              Appeared on behalf of the People;
17
              MR. SHELDON SOROSKY,
18            Appeared on behalf of the Defendant.

19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.


                         H  1

1    THE CLERK: People of the State of Illinois

2    versus Jerri Lindsey, custody.

3    MR. SOROSKY: Sheldon Sorosky, S-o-r-o-s-k-y,

4    representing Jerri Lindsey.  I believe we have to

5    set this case for a motion to suppress a

6    statement.

7    THE COURT:  Mr. Sarosky you know, --

8    MR. SOROSKY: I apologize your Honor, for

9    these delays, I apologize, we're here, ready to

10    go, we're not demanding trial, but I'm just saying

11    we're ready to go which is our intent to agree to

12    a date.

13    THE COURT:  We need a trial date.

14    MR. SOROSKY: I recognize, your Honor, that I

15    have been absent on some of the Court dates, but

16    the delays in the case have not been due to my

17    absence, you have been busy with other trials.

18    THE COURT:  Well counsel,.

19    MR. SOROSKY: I apologize.

20    THE COURT:  I'll give you these rules, old

21    rules of Court but now we're enforcing this rule.

22    You must, you must indeed pay attention to the

23    rules.  What page is this?

24    THE CLERK:  On the write in sheet, Judge.

H 2

1        MR. SOROSKY: Whatever the Court's schedule.

2        THE COURT:  May 19th.

3        MR. SOROSKY: Could we make it the 20th --

4    no, 20th is bad.

5        THE COURT:  May 25th.

6        MR. SOROSKY: The 18th is possible.  I may

7    begin a jury the 23rd, the 18th.

8        THE COURT:  Bad day.

9        MR. SOROSKY: Do you want to be a back up.

10       THE COURT:  No.

11       THE COURT:  25th or 26th.

12       MR. SOROSKY: I'll do it the 25th.  25th is

13   fine.

14       THE COURT:  25th.

15       MR. SOROSKY: 25th.

16       THE COURT:  9:30, motion defendant to

17   suppress statements by agreement May 25th, 1994,

18   with for hearing.  9:30 am.

19                (Whereupon, the further hearing

20                of the above-entitled cause

21                was continued to 5-25-95, at

22                9:30 o'clock a.m.)

23

24

H  3

1  STATE OF ILLINOIS )
                    )  SS.
2  COUNTY OF C O O K )

3            THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT   -    CRIMINAL DIVISION
4
                 I, Kenneth Madoch, Official
5
   Shorthand Reporter of the Circuit Court of Cook
6
   County Department-Criminal Division do hereby
7
   certify that I reported in shorthand the
8
   proceedings had at the hearing in the
9
   above-entitled cause; and that I thereafter
10
   caused to be transcribed into typewriting the
11
   foregoing transcript, which I certify is a
12
   true and correct transcript of said
13
   proceedings.
14

15  _____
16  Official Shorthand Reporter
    Circuit Court of Cook County.
17

18

19

20

21

22

23

24  Dated this 16th day of June, 1995.

H 4

```
 1    STATE OF ILLINOIS )
                        )   ss
 2    COUNTY OF C O O K )

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE )
 5    STATE OF ILLINOIS )
                        )   Case No. 92 CR 25135
 6       vs.            )
                        )   Charge: MURDER
 7    JERRI LINDSEY     )

 8                REPORT   OF   PROCEEDINGS

 9            BE IT REMEMBERED that on the 25TH day of

10    May, 1994, this cause came on for hearing before

11    the Honorable SHELVIN SOROSKY, Judge of said

12    Court, upon the information herein, the defendant

13    having entered a plea of not guilty.

14
          APPEARANCES:
15            HON. JACK O'MALLEY,
              State's Attorney of Cook County, by
16            MR. NICK FORD,
              Assistant State's Attorney,
17            Appeared on behalf of the People;

18            MR. SHELDON SOROSKY,
              Appeared on behalf of the Defendant.

19

20

21

22
      Kenneth Madoch
23    Official Court Reporter
      Circuit Court of Cook County
24    County Department-Criminal Division.
```

I 1

1          THE CLERK:  Jerri Lindsey.

2          MR. FORD:  My partner Linda had indicated to

3     you the 2 officers in this case were tied up in a

4     homicide investigation.

5          THE COURT:  Let's call the case.

6          THE CLERK:  People of the State of Illinois

7     versus Jerry Lindsey.

8          MR. SOROSKY:  Your Honor, Sheldon Sosorky,

9     S-o-r-o-s-k-y representing Jerry Lindsey,

10    L-i-n-d-s-e-y.

11         THE COURT:  What page is this on?

12         THE CLERK:  Sheet one.

13         THE COURT:  Do you have sheet one there?

14         MR. SOROSKY:  Your Honor, this case was

15    scheduled for a motion to suppress statements

16    today.

17         THE COURT:  And this is the case that must

18    go.

19         MR. SOROSKY:  Your Honor, apparently the

20    officers cannot be here.  The State's Attorney has

21    looked at the Court's schedule and he's looked at

22    it quite extensively, he's more familiar with the

23    call than I am.

24         THE COURT:  How about May 8 -- I'm sorry,

I 2

1    May 28 -- I'm sorry, June 8.

2        MR. FORD:  I show that we have on that day,

3    I don't know if this is inconsistent with the

4    Court, a motion on a sex case, a bench trial which

5    is an armed robbery, a bench trial which is a drug

6    case and a bench trial which is motion state which

7    is another robbery case.

8        THE COURT:  I have an armed robbery demand

9    case, I have an armed robbery bench trial, and I

10   have a delivery of a controlled substance bench

11   trial.  Let's put that there.

12       MR. FORD:  It is a criminal sexual assault

13   motion, 94, 5821.

14       THE COURT:  Who is the defendant.

15       MR. FORD:  Kevin Boyd.

16       MR. SOROSKY:  We would agree to that date to

17   be a back up and the State's Attorney suggested --

18       THE COURT:  This is way overbooked.

19       MR. SOROSKY:  The State's Attorney suggested

20   June 22.

21       MR. FORD:  I picked that date because there

22   is a bench on that case, a theft case a quick

23   matter and another theft case which is a burglary.

24       THE COURT:  That's a pretty good day.

I 3

1          THE COURT:  I want you here at 9"30.

2          MR. SOROSKY:  Oh, Yes.

3          THE COURT:  9:30.

4          MR. SOROSKY:  There is another matter which

5    we would like to present to the Court.  And I

6    thought if we could do this after the motion,

7    after hearing the substance of the motion, the

8    Court would understand our request a little bit

9    more, but let me ask for it now and let me explain

10   some of the facts and I don't mean to get into the

11   facts of the motion but to some extent I do.

12          This is a case where the defendant

13   made multiple statements to the police subsequent

14   to her arrest.  There isn't any dispute as to that

15   and that, after she gave one statement, the police

16   asked her to take a lie detector test and without

17   getting into whether the police asked, used the

18   generic phrase, a lie detector test was taken and

19   according to the results, the results, she failed

20   the test.

21          I recognize according to law that

22   may not have any meaningful significant to a Court

23   or jury or anything of that nature.

24          THE COURT:  Well it's not admissible as

I 4

1    evidence.

2         MR. FORD:  I would agree with that, Judge.

3         MR. SOROSKY:  However, that test was

4    administered by someone from the police

5    department.  The defendant will be asking the

6    Court if she could take a lie detector test

7    administered by some independent source other than

8    the police department, someone that your Honor

9    would choose from your experience as knowing to be

10   a qualified person to give such a test and she

11   would just like that benefit and conceivably,

12   conceivably, the defense might as an option want

13   to mention to your Honor or to a jury that she did

14   take a test and she passed and when the police

15   said that she flunked the test, that was a biased

16   police test.

17        THE COURT:  It may be, but I don't

18   understand why you want to do that because it's

19   inadmissible evidence.  I assume that the State --

20   I don't think the terms pass or fail are proper in

21   the use of those terms of a polygraph but for

22   simplicy sake, I'll use the term fail.  I assume

23   the State would object most vigorously to the

24   introduction of any evidence that the defendant

1    passed the polygraph.

2         MR. SOROSKY: I don't know we would

3    necessarily seek to introduce IT should she pass,

4    but we at least would like the option of taking

5    the test and then hopefully and I'm just being

6    quite frank in the defense strategy, let's assume

7    she were to take the test, let's assume to use the

8    cliche, but incorrectly we'll use it for

9    simplicity, she passes the test, then at least the

10   defense would have an option to at least make that

11   argument to a Court that we want it only in

12   relation to the fact that the police said that she

13   flunked the test and because she flunked the test,

14   she gave a different story. And this is why I

15   hesitated to present this motion until after the

16   Court heard the motion to suppress the statements

17   because based on hearing all the facts, it would

18   be more meaningful.

19         What occurred was the defendant gave

20   a statement, regardless of who asked or what not,

21   let's just say subsequently she took a lie test.

22   Once again to use the incorrect phrase, the police

23   tell her you failed.  You better tell us something

24   else because this ain't working and this is why

I 6

1    the defense would like that independent detector

2    test given and have the option available.

3              I recognize the she may not pass the

4    test, we may not seek to introduce the test, even

5    if we pass the test and desire to introduce it, it

6    may not be admissible.  I'm aware of all those

7    pitfalls, but notwithstanding all of those

8    pitfalls, we are just asking for the option and

9    we're not -- we would never seek to introduced it

10   for the sole purpose of saying, Judge, she took a

11   lie detector test and she passed it and we would

12   like your Honor or a jury to hear that to believe

13   Jerry Lindsey.  We certainly would not be seeking

14   the lie detector test for that naked acceptedly

15   inadmissible purpose.

16             Where it could conceivably come into

17   play is we get into the reasons why she changed

18   her statement.  She changed her statement because

19   the police told her she flunked the lie detector

20   test.  Now if we have to tell your Honor or a jury

21   that she changed her statement because the police

22   told her she flunked a lie detector test, one

23   could instruct the jury, we don't know that she

24   really flunked, just a statement the police made

I 7

1    and disregard the substance of it, you can see it

2    is potentially damaging evidence so the defense

3    would have to make a difficult practical decision

4    do we want that statement introduced or not

5    introduced.

6           At least if the defense would also

7    have the benefit of a lie detector test that the

8    defendant took that the defendant if I could use

9    the phrase passed, at least she would have some

10   parody of weapons, if I could borrow that

11   expression, she would have a lie detector test in

12   her arsenal that she could say she passed and like

13   I said none of this may be admissible any way and

14   this is the type of case that Supreme Court

15   decisions are made of and I recognize that.

16          But before the defense can even

17   begin to get into that, we would at least have to

18   have the benefit of the test that they she passed

19   to at least have some parody and this is why we're

20   asking for it.  Should the situation arise.

21   That's all.

22          I recognize she may not pass the

23   test, we may not seek to introduce the test even

24   if she does pass and thirdly it may not be

I 8

1    admissible but I repeat again, we're not asking

2    for a test, just to have her take it and hopefully

3    she passes the test and then argue to your Honor

4    or the jury, look, here is a lie detector test and

5    she was passed and we want a jury or Judge to

6    consider that.

7          I will say that up front right now,

8    we do not who request the test for that reason, we

9    would not seek to introduce a test for that

10   reason.  The reason we're asking for the test and

11   I don't think the State's Attorney disputes these

12   facts, upon the defendant's arrest, and once

13   again, she went to the station voluntarily or

14   arrested, I'm not getting into that, upon her

15   first statement, let me use that phrase, upon her

16   first statement she gave a version of events, she

17   was then given a lie test.  She was told by the

18   police, you didn't pass this test, this story

19   isn't working.  The defendant then gave a

20   different version of events.

21          The defendant may want to explain

22   why she gave inconsistent stories, if she wants to

23   explain why she gave inconsistent stories based on

24   the police reasons she has, to have the tryer of

I 9

1  facts be it you or a jury at least be aware of the

2  fact that the police said Miss Defendant, you

3  failed a lie detector test.

4          Now even though the lie detector

5  test is not admissible, even though a Court might

6  conceivably instruct the jury, just accept that as

7  a reason for her statement and we don't know that

8    she flunked the test or didn't flunk the test,

9  forget all of that and couldn't carry it.

10 Obviously it's a very damming piece of evidence

11 and I don't know that the defense would want that

12 to go to a jury.

13          However, if the defense had within

14 it's arsenal the fact the defendant had taken a

15 test and had in fact passed the test, the defense

16 could then say, sure, this is what the police told

17 her but the police gave a biased test or bogus

18 test or maybe they didn't give a test at all, but

19 just said that and here the one time she did have

20 a test, Mr. Independent lie detector tester said

21 she did pass and then the defense would at least

22 have a whole panorama or whole menu of evidence to

23 present and once again, this would open up all

24 types of issues as to whether it is or is not

1    admissible and the defense, I recognize may not

2    even seek the admission, she may not pass the

3    test, but at least for want of a better term, we

4    would have that weapon in our arsenal and for that

5    reason, we're asking if the Court would allow the

6    defendant to take a lie detector test.

7              The reason why we're asking is the

8    defendant doesn't have any funds to take a lie

9    detector test, if she did we would do it ourselves

10   and that hurdle would be crossed but then again,

11   maybe it is a blessing she doesn't have any funds

12   because the thought would be that would paid for

13   by us.  Maybe it's a blessing for the defendant

14   that she doesn't have any funds so an independent

15   test, there won't be this onus that this was our

16   lie detector person and therefore we would ask the

17   Court do that.

18        THE COURT:  All right.  Mr. Ford, I'm not

19   cutting you off without a chance to argue.

20        MR. FORD:  I appreciate if you would, Judge.

21        THE COURT:  But I have nothing in writing as

22   to anything like that.  Any suggestion of that

23   which you're asking I would have to see a written

24   motion.

1          MR. SOROSKY: I will spell the out.

2          THE COURT:  And you might have a easy road

3     to hoe up to the point you said you wanted the

4     State to pay for it.  The problem is that you're a

5     private lawyer, privately retained,.

6          MR. SOROSKY:  If I --

7          THE COURT:  Counsel I don't want you to

8     argue with me, I have been patient with you but

9     without a written motion, we have to have a

10    written motion, I'm going along with the June 22nd

11    date.

12         MR. FORD:  June 22nd, see everybody then.

13         THE COURT:  Mr. Sorosky, you're at fault

14    most of the times in the delay, but I tell the

15    defense and tell the State, June 22, that is the

16    date.

17         MR. SOROSKY:  Yes.

18         THE COURT:  And Mr. Sorosky, 9:30 AM.

19         MR. SOROSKY:  Yes.

20         THE COURT:  Courtroom 704, 2600 South

21    California, Chicago, Illinois.  By agreement,

22    6-22-94, with for hearing.

23

24

                        I 12

1                    (Whereupon, the further hearing

2              of the above-entitled cause

3              was continued to 6-24-94, at

4              9:30 o'clock a.m.)

5

6

7

8

9

10

11

12

13

14                        .

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )

3            THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT    -    CRIMINAL DIVISION
4
                 I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15
     _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 6th day of June, 1995.


I  14

```
1   STATE OF ILLINOIS  )
                       )   ss
2   COUNTY OF C O O K  )

3          IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE  )
5   STATE OF ILLINOIS  )
                       )   Case No. 92 CR 25135
6      vs.             )
                       )   Charge: MURDER
7   JERRI LINDSEY      )

8               REPORT   OF   PROCEEDINGS

9          BE  IT  REMEMBERED  that  on  the  22nd  day  of

10  June, 1994, this cause came on for hearing before

11  the Honorable SHELVIN SINGER, Judge of said Court,

12  upon the information herein, the defendant having

13  entered a plea of not guilty.

14       APPEARANCES:
              HON. JACK O'MALLEY,
15            State's Attorney of Cook County, by
              MS. LYNDA PETERS,
16            Assistant State's Attorney,
              Appeared on behalf of the People;
17
              No one appearing in open Court
18            on behalf of the Defendant.

19

20

21

22
    Kenneth Madoch
23  Official Court Reporter
    Circuit Court of Cook County
24  County Department-Criminal Division.
```

J 1

1        THE CLERK: People versus Samantha Brown.

2        MS. PETERS:  I know this is Jerry Lindsey

3    and Katrina Martin.

4        THE COURT:  Are they --

5        MS. PETERS:  This would be a different

6    case.  Jerry Lindsey is on your sheet.  Judge,

7    Jerry Lindsey is a write in.

8        THE COURT:  Who is Miss Lindsey?

9        THE DEFENDANT: Right here.

10       THE COURT:  This is a Violation of Probation

11   matter.

12       MS. PETERS:  She has a pending murder case,

13   my partner talked to her lawyer and asked him to

14   be here at 9:30.  It's now 10:35.  He filed a

15   motion to withdraw as counsel and a motion to have

16   funds granted for a lie detector test and

17   investigator.  We need to have both of these

18   motions addressed but we need Mr. Sorosky here.

19   Judge, perhaps a day next week I can contact his

20   office and ask him to be here.

21       THE COURT:  You know, it is frustration, not

22   frustration with you, with Mr. Sorosky.

23       MS. PETERS:  Absolutely Judge.

24       THE COURT:  Every time he's been here, I'm

1    holding this day to day.  Hold it until Monday.

2    Motion defendant 6-27-94. If you talk to him tell

3    him he must be here at 9:30.  All right.

4                    {Whereupon, the further hearing

5                    of the above-entitled cause

6                    was continued to 6-27-94, at

7                    9:30 o clock a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

J  3

```
1   STATE OF ILLINOIS )
                      )  SS.
2   COUNTY OF C O O K )

3           THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
                I, Kenneth Madoch, Official
5
    Shorthand Reporter of the Circuit Court of Cook
6
    County Department-Criminal Division do hereby
7
    certify that I reported in shorthand the
8
    proceedings had at the hearing in the
9
    above-entitled cause; and that I thereafter
10
    caused to be transcribed into typewriting the
11
    foregoing transcript, which I certify is a
12
    true and correct transcript of said
13
    proceedings.
14
15
    _____
16  Official Shorthand Reporter
    Circuit Court of Cook County.
17
18
19
20
21
22
23
24  Dated this 6th day of June, 1995.
```

J 4

1    STATE OF ILLINOIS )
                       )    ss
2    COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                        )    Case No. 92 CR 25135
6        vs.           )
                       )    Charge: MURDER
7    JERRI LINDSEY     )

8                 REPORT   OF   PROCEEDINGS

9          BE IT REMEMBERED that on the 28th day of

10   June, 1994. This cause came on for hearing before

11   the Honorable SHELVIN SINGER, Judge of said Court,

12   upon the information herein, the defendant having

13   entered a plea of not guilty.

14        APPEARANCES:
               HON. JACK O'MALLEY,
15             State's Attorney of Cook County, by
               MS. LYNDA PETERS,
16             Assistant State's Attorney,
               Appeared on behalf of the People;
17
               MR. SHELDON SOROSKY,
18             Appeared on behalf of the Defendant.

19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.

                              L  1

1        THE CLERK: People of the State of Illinois

2    versus Jerri Lindsey, custody.

3        THE CLERK:  People of the State of Illinois

4    versus Jerri Lindsey.

5        MR. SOROSKY: Sheldon Sorosky, S-o-r-o-s-k-y.

6    I represent the defendant Jerri Lindsey,

7    L-i-n-d-s-e-y.

8        THE COURT:  The first motion you've given

9    me.  You have to sign the motion.  Sign the

10   affidavit at the back of the motion.

11       MR. SOROSKY: We would also ask, your Honor,

12   if the Court would -- the Court clerk would

13   notarize Jerry Lindsey's affidavit, she has read

14   the affidavit.

15       THE COURT:  Would you swear the witness.

16               (Defendant sworn.)

17       THE COURT:  Please note that it was sworn

18   to.

19               All right, this motion also has to be

20   signed.

21       MR. SOROSKY: I apologize.

22       THE COURT:  All right.  First I'll address

23   the motion of Sheldon Sorosky to withdraw as

24   counsel.  Any argument, Mr. Sorosky?

L 2

1       MR. SOROSKY: No.  The only thing I would

2   state, your Honor, is that I think the defense and

3   I personally view both of these motions as

4   somewhat companion to each other, one was not

5   meant to be filed distinct and separate from

6   another.

7            The purpose of both motions is to

8   provide the defendant defendant with an adequate

9   defense.  That's the philosophy of both motions.

10  This is not a motion to withdraw per se, to

11  withdraw because the attorney wants to withdraw or

12  the attorney feels he's not being adequately paid

13  or there is a personality conflict between the

14  accused and the attorney.  As is traditionally the

15  case in most motions to withdraw.  That is not the

16  case at all.

17           The problem is merely to provide the

18  accused with an adequate defense and this a

19  serious case and the facts in the motions are

20  somewhat specific and this is why we had filed the

21  alternative either a motion to withdraw as counsel

22  or in the alternative to have the Court provide

23  the defendant with those benefits that she seeks.

24           THE COURT:  Miss Peters.

1          MS. PETERS: Well Judge.

2          THE COURT: Good morning Mr. Sorosky, good

3     morning Miss Peters.

4          MS. PETERS: Thank you. First as to the

5     issue of a Court appointed polygraph examination

6     or lie detector test as counsel refers to it in

7     the motion, there is absolutely no purpose to be

8     served for having the Court appoint a polygraph

9     examiner at this juncture or to provide counsel

10    leave to withdraw and a public defender to come in

11    and have the county officials pay for such an

12    examination.

13                    As I'm sure counsel well knows and

14    as this Court well knows the results of polygraph

15    examinations are inadmissible as substantive

16    evidence at trial. The only limited exception to

17    that complete rule is that under cases like People

18    versus Tommy Lee Jackson and it's progeny that

19    polygraph examination results can be admissible as

20    rebuttal evidence to inform the Court or the tryer

21    of fact as to the motivation for someone's

22    subsequent confession. But that's a very limited

23    exception.

24                    Certainly also at this late date,

L  4

1    some several years after the statement was

2    initially given to the police, it would be

3    ridiculous to assume that this individual, Jerry

4    Lindsey could submit to an examination and that

5    the results of that would be at all conclusive or

6    relevant to what was done at a prior examination a

7    couple of years ago.

8              So because it's inadmissible

9    evidence and because the veracity of the testing

10   procedures cannot even be insured, I would argue

11   that that is -- that is a request that should not

12   even be entertained by this Court.

13             As to whether or not counsel needs

14   an investigator, I certainly can't speak for him.

15   The only thing that concerns me in these two

16   motions is the affidavit of Jerri Lindsey stating

17   she does not want counsel to be her attorney and

18   the representation that the funds for his

19   employment are coming through the family and the

20   family has basically said we don't want you to

21   represent her either and we're not going to pay.

22   So to the extent there is an issue of Mr. Sorosky

23   getting paid and how that may impact on his

24   ability to competently represent Miss Lindsey,

1    there may be an issue that needs to be addressed

2    by the Court, that would be all I have to say at

3    this point.

4          THE COURT: Mr. Sorosky.

5          MR. SOROSKY: If I may respond, my payment

6    has no effect on my ability to represent her and

7    that is not the basis of this motion.    I

8    distinguished in this motion activities which are

9    perhaps essential to a defendant's defense that

10    are just beyond the scope and ability of the

11    lawyer to do.  No matter how much a lawyer is

12    paid, a lawyer per se himself cannot administer a

13    lie detector test, no matter how much a lawyer is

14    paid, he himself cannot interview a witness for

15    the purpose of a statement or something of that

16    nature because then he can't be a lawyer and this

17    has nothing to do with the lawyer going out in the

18    field and doing investigative work, there are

19    certain paths essential to a defense that are

20    beyond the scope of poor lawyering which are

21    unrelated to pay, per se, it's because of the

22    reasons stated within the motion, the defendant's

23    family no longer wants to support the defendant in

24    her defense, she lacks the funds to do these

1    non-poor lawyering things.

2                This is not a situation of my

3    personal making, not a situation of Miss Lindsey's

4    personal making but it is a situation that

5    nevertheless exists.  It may be sticky and may be

6    unpleasant but it's a fact of life that exists so

7    either the Court allows me to withdraw and a

8    public defender can provide Miss Lindsey with all

9    these things or the Court provides Miss Lindsey

10   with these things and I remain in the case.

11         THE COURT:  All right.  I will take both

12   motions since counsels for both sides have argued

13   both motions together, I'll address both motions

14   together.  I need the half sheet.

15         THE CLERK:  It's in there, Judge.

16         THE COURT: I would first point out of course

17   that a lie detector test, polygraph examination

18   does not result in admissible evidence if the

19   defendant wished to pay for a lie detector test, I

20   would certainly sign whatever orders were

21   necessary to have that administered to her.  I

22   don't know if the State would object or if they

23   wouldn't object but I can tell you now that even

24   if the State were to object, and I doubt they

L 7

1    would -- I can't say absolutely not but I doubt

2    that they would persuade me not to have the lie

3    detector test administered to the defendant.

4           For what end, for what purpose, I

5    know not, but I probably would go along with a lie

6    detector test or polygraph examination if the

7    defense would pay for the.

8           In the context of the law as it is

9    in the State of Illinois, and the fact that she

10   has a lawyer, a privately retained lawyer, that's

11   I see no reason, no known fact to not commit

12   county money where a privately administered

13   polygraph examination is requested.  As to the

14   motion for an investigator and motion to withdraw,

15   apparently premised on the fact that there is --

16   there aren't funds for an investigator, for an

17   investigation, so far as I know, this has been a

18   murder case, the charge has been first degree

19   murder ever since the case has been in this

20   Court.  I don't see any -- I don't know of any --

21   I don't know of any lesser charge that was ever

22   filed in the case.  It's a first degree murder

23   case, always has been a first degree murder case,

24   and I suppose until it's disposed of, it will

1  remain a first degree murder case.

2         Accordingly, while counsel gets into

3  a case cannot know all that arises, all that will

4  have to be done, the moment a lawyer gets in the

5  case, I can't imagine a lawyer getting into a

6  first degree murder case not being aware of that,

7  that there will be investigation, indeed I can't

8  imagine a lawyer getting into any case without

9  being aware there would be investigation in the

10  case.

11         Furthermore, most lawyers do not

12  have investigators on their staff to go out and

13  retain a private investigate investigator or

14  someone else to do the investigation.  That's the

15  history of the practice.  Many of that rugged

16  indivualist of the law remaining more so in the

17  criminal defense bar than in any other aspect of

18  the law then I'm aware of. The characteristic of

19  that rugged most admirable lawyer, sole

20  practitioner fights diligently for his or her

21  client, you'll find represented in the private bar

22  where criminal defense work is most of the work

23  that the lawyer does.  They don't have

24  investigators, lawyers do their own investigating

1    and they need the so-called prover or whatever you

2    want to call that person, they retain someone.  So

3    that's contemplated in any criminal case and

4    probably more so in a first degree murder case.

5              I will point out that from the half

6    sheet alone there were at least 10 Court

7    appearances where defense counsel has not be

8    present.  I'm only doing that from the half

9    sheet.  If I get the transcripts and I may have to

10   get the transcripts, I believe I'll find more than

11   10 appearances.  So you know, that the defendant

12   might be somewhat unhappy with the defense lawyer

13   is understandable.  If there would have been

14   another lawyer to come in and file an appearance,

15   I would have probably done so, allowed that other

16   lawyer to come in and file an appearance but there

17   has been none so far as I'm aware of who offered

18   to represent the defendant.

19              Having a lawyer who has been in the

20   case and indeed disposed of some pre-trial motions

21   already in the case and presumably paid the fee, I

22   think I cannot appoint a public defender in the

23   case, that is I cannot encumber county funds for

24   the representation of defendant where there is a

1    lawyer providing representation.

2              I must tell you and I will say this

3    with great reluctance but with all the certainty

4    that I can muster. In my opinion, this has been a

5    continuing effort to delay the trial in the case.

6    I rely on part on the numerous times the

7    defendant, defense counsel has not appeared in

8    Court. Numerous times and indeed, I'm going to

9    now insist that each time the case is here on the

10   call, counsel appear at 9:30 AM when Court opens

11   and when I take my preliminary motions and we'll

12   at that time as soon as both sides will announce

13   their readiness to proceed, we'll then set the

14   case for the hearing on motions that are pending,

15   evidentiary motions that are now pending.

16        MR. SOROSKY: Your Honor, if I may --

17        THE COURT: Excuse me. I'm willing to

18   assist counsel in any way I can to get the

19   investigation done but I do not believe in the

20   context of a case where there is a private lawyer,

21   I can't encumber county funds. If there is an

22   appointed lawyer, an Assistant Public Defender,

23   that would be another matter. Now, there is such

24   things as furloughs for the defendant, that is

1  where I can, if you state a case on an affidavit

2  where you need the defendant to assist you in

3  getting alibi witnesses, I can order the defendant

4  in custody taken to some location to get those

5  alibi witnesses.  And I would do so if you make a

6  case there is a need for it.  There are other

7  family members who could assist this ferreting out

8  those alibi witnesses.  There are all sorts of

9  remedies that are available and of course, you can

10 hire your own investigator as so many other

11 lawyers have done in the case.

12            Again, I'll repeat.  I believe based

13 upon the history of this case, totality and

14 history of the case, this is simply an effort to

15 impede the conclusion of the case.  Impede us

16 coming to a conclusion.  Motion is then of counsel

17 for leave to withdraw at this point are denied.

18 Motion for me to authorize county funds for the

19 payment of an investigator and expenses of a

20 polygraph examination are also denied.

21            Again I will repeat, if the

22 defendant wants to pay for a polygraph examination

23 to what point or what purpose, I don't know, I

24 still nevertheless would be probably -- I would

1    probably execute the necessary orders to have that

2    completed.  If the defendant feels he needs his

3    client to assist him in locating some alibi

4    witnesses, you make the case that, give me an

5    affidavit you need the assistance of the defendant

6    for that purpose, I'll execute the appropriate

7    orders to have her accompany under guard the

8    defense lawyer to locate the alibi witnesses.

9                I would also include in that order

10   that the guards that accompany her do not

11   communicate with anyone as to where they went with

12   the defendant, and what they did with the

13   defendant and her lawyer did unless of course

14   there comes, something arises because of some

15   impropriety or impeachment or whatever, but I

16   would include in the order confidentiality

17   requirements.

18        MR. SOROSKY: Thank you.

19        THE COURT:  I do point out also that there

20   is the family available.  Accordingly, I will bade

21   the case to go forward.  We have a pending motion,

22   I guess a motion to suppress statements of the

23   defendant, is that correct.

24        MS. PETERS:  That is correct.

L 13

1          THE COURT:  I'm setting this down for a

2    hearing.

3          MR. SOROSKY: Fine, whenever. August 3.

4          MS. PETERS:  That should be fine Judge.

5          THE COURT:  I'm making this motion

6    defendant, August 3rd. Mr. Sorosky, you're free

7    that day?

8          MR. SOROSKY: Yes.  Yes.

9          THE COURT:  9:30 AM.  Motion defendant

10   8-3-94, 9:30 a.m..  The procedure we'll follow I

11   assume both sides will answer ready to proceed at

12   9:30 AM and we'll probably begin with the trial

13   call for that day.  I expect you to be here at

14   9:30 AM, Mr. Sorosky.

15                    (Whereupon, the further hearing

16                    of the above-entitled cause

17                    was continued to 8-3-84, at

18                    9:30 o'clock a.m.)

19

20

21

22

23

24

L 14

1    STATE OF ILLINOIS )
                       )   SS.
2    COUNTY OF C O O K )

3         THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
               I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15   _____

16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 6th day of June, 1995.


                        L 15

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

           **I, AURELIA PUCINSKI,** Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME . TWO . OF . A . NINE . VOLUME . . . . . . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . . . . . . . . . . . . . JERI LINDSEY    (01)        WAS . . . . . . . . . . . . . ., Defendant. . . .

         Witness: **AURELIA PUCINSKI,**

       Clerk of the court, and the Seal thereof, at Chicago in said County, . . . . . . SEPTEMBER . . . . . . . . 20 . . , 19 . . . . 95

                     *Aurelia Pucinski*

                     Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**