File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _3_

EXHIBIT _M1 to M125_

TAB (DESCRIPTION) _____



05-1458

CCCR-310



Transcript of Record

Appeal

Court of Illinois
District

FIRST

Circuit Court No. ____ 92 CR 25135 ____

Trial Judge ____ SHELVIN SINGER ____

Reviewing Court No. ____ 95 1535 ____

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

JERI LINDSEY   (01)

92 cr 25135

URT

ILLINOIS

IMINAL   DIVISION

FILED
APPELLATE COURT 1st DIST
NOV 07 2002
STEVEN M. RAVIE
CLERK

05-1458

VOLUME THREE OF NINE

REPORT OF PROCEEDINGS

AURELIA PUCINSKI

Clerk of Court

Per AP./SIR ____

Deputy

STATE OF ILLINOIS      )
                       )  SS:
COUNTY OF COOK         )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,      )
                                      )
                   Plaintiff,         )
                                      )
         vs.                          )  No. 92 CR 25135
                                      )
JERI R. LINDSEY,                      )
                                      )
                   Defendant.         )

MOTION TO SUPPRESS

REPORT OF PROCEEDINGS had at the hearing

of the above-entitled cause, before the Honorable SHELVIN

SINGER, one of the judges of said court, on Monday, the

12th day of September, A.D. 1994.

                   PRESENT:    HON. JACK O'MALLEY, State's
                               Attorney of Cook County, by
                               MR. NICK FORD and
                               MR. TIMOTHY TOMASIK,
                               Assistant State's Attorneys,
                               on behalf of the People;

                               MR. SHELDON SOROSKY,
                               on behalf of the Defendant.

Pamela M. Terry, CSR
Official Court Reporter
Circuit Court of Cook County
Criminal Division

M 1

1        THE CLERK:  People versus Jeri Lindsey.

2        MR. SOROSKY:  Sheldon Sorosky representing Jeri Lindsey.

3    I guess we are ready if the State is ready.

4        MR. TOMASIK:  We are ready, Judge.

5        THE COURT:  Which motion are we proceeding on?

6        MR. SOROSKY:  This is a Motion to Suppress Statements

7    because of a violation of the 5th Amendment.  Previously

8    there was a Motion to Suppress Statements because of a

9    violation of the 4th Amendment, which was denied.

10                    Just to refresh the Court's memory,

11   previously there was a Motion to Suppress Statements based on

12   the 4th Amendment, and the Court agreed with the Defense that

13   the Defendant was in fact in custody.  However, the Court

14   agreed with the State that the Defendant was a volunteer,

15   that she originally began as a volunteer and, in the process,

16   it changed.  This is completely unrelated.  Although it is

17   the same incident, this is based on the 4th Amendment right.

18       THE COURT:  Are you ready?

19       MR. FORD:  I am waiting for one person.  If I could just

20   have five minutes.

21       MR. SOROSKY:  Sure.

22       THE COURT:  All right.  Pass it.

23

24

M 3

1           (Whereupon the case was passed, after

2               which having been recalled, the

3               following proceedings were had:)

4       THE COURT: All right. In the preliminary discussion on

5   the motion, it has been indicated to me that it is the

6   Defendant's burden if there was no fundamental 5th Amendment

7   violation. I have now reviewed the motion, and I beg to

8   differ with counsels. It is my opinion that there is a

9   fundamental 5th Amendment violation, so, in my view, it is

10  the State's burden, at least as to those paragraphs that

11  relate to the alleged misrepresentation and implied threats.

12  It is the State's burden. More specifically, paragraph

13  five -- I'm sorry -- paragraph six, paragraph eight,

14  paragraph nine, paragraph ten, paragraph eleven, paragraph

15  fourteen.

16      MR. FORD: Judge, I am going to make a motion to strike

17  certain statements within the Motion to Suppress the

18  Defendant's statements based on the fact that they don't

19  allege any claim which could be found by this Court to be

20  coercive or fraudulent in any way. I will begin with

21  sub-paragraph eleven, which indicates in part, "Defendant

22  believed that the police were urging her to say the deceased

23  raped her. Thereafter, the Defendant gave various stories to

24  the police saying she was raped by the deceased. The

                        A 4

1  Defendant made these stories because the Defendant the police

2  were signaling her to say she was raped, and if you say the

3  Defendant raped you and you shot him because of this rape, we

4  will let you go."

5      THE COURT:  Well, as to eleven, I don't see paragraph

6  eleven as being anything more than a summary or explanation.

7      MR. FORD:  I make the same motion with reference to the

8  allegation in paragraph thirteen, that she was not allowed to

9  make a telephone call to her friends and family.

10     THE COURT:  Why?

11     MR. FORD:  I don't believe, Judge, -- and I could be

12  wrong -- I know this may be found by this Court to be one of

13  the factors, but there is no allegation that --

14     THE COURT:  I would strike thirteen from this portion of

15  the motion to be re-alleged later.  You are right that

16  paragraph thirteen is a Miranda versus Arizona violation, so

17  that is not an issue here.  If Mr. Sorosky wants to redraft

18  that and put it in another motion, that is fine.  It is two

19  different versions.  If it is Miranda versus Arizona, the

20  Defendant has the obligation to go forward.  If it is a

21  fundamental 5th Amendment kind of motion, the State has the

22  burden of going forward.  So, I would strike paragraph

23  thirteen from this motion.

24     MR. FORD:  I make the same motion with reference to

M 5

1   paragraph fourteen, Judge, for the same reasons.

2        THE COURT: Mr. Sorosky.

3        MR. SOROSKY: If I may respond. I think fourteen as

4   well as the substance of paragraph thirteen are facts. We

5   are alleging those facts. We intend to prove those facts,

6   and we feel those facts --

7        THE COURT: Mr. Sorosky, I am not saying they aren't.

8   Please listen to me. You have two different kinds of motions

9   wrapped up in one pleading. That is, first, there is the

10  fundamental 5th Amendment violation where the will of the

11  Defendant is overcome by these coercive tactics or

12  misrepresentations, fraud. That is a motion that is separate

13  and distinct from a Miranda versus Arizona violation. The

14  burdens are different, for example. That is, the State has

15  the burden of going forward if it is a fundamental 5th

16  Amendment violation, coercion, fraud, overcoming the will.

17  If it is a Miranda versus Arizona violation, the Defense has

18  the burden of going forward. I am not suggesting that you

19  haven't stated facts which give rise to a right to a hearing.

20       MR. SOROSKY: Very well.

21       THE COURT: Not at all. I am telling you you have the

22  two mixed up in one motion.

23       MR. SOROSKY: I understand.

24       THE COURT: All right. Anything else, Mr. Ford?

                        $\mathcal{M}$ 6

1      MR. FORD:  If I could have one moment, Judge.  Nothing

2   further, Judge.

3      THE COURT:  All right.  Which are we proceeding on

4   first, the Miranda versus Arizona violation or the coercion

5   violation?

6      MR. SOROSKY:  The coercion violation.

7      THE COURT:  All right.  Opening statements.  State.

8

9      MR. FORD:  Judge, I will make a brief opening statement

10  in this case.

11                      This is People versus Jeri Lindsey,

12  Judge.  What the Court is going to hear about this case --

13  and this Court may be partially familiar with this case

14  because it has already entertained a couple of motions on

15  it -- are that on October 14, 1992 the Defendant was picked

16  up at 8931 South Houston here in the City of Chicago and was

17  asked whether or not she would be willing to come into the

18  police station to talk about a rape allegation that she made

19  a couple of days before and about the death of the victim in

20  this case, whose body had been found at O'Hare Airport in the

21  cab that he owned.  Subsequent to her being picked up, it

22  became clear and the Defendant was confronted with some

23  glaring inconsistencies with the way she explained the death

24  of the victim in this case, and the reason there is no

M 7

1  coercion in this case is no more clearly reflected than in

2  the number of statements the Defendant herself came up with

3  as it relates to this statement.

4                    She described this incident -- the Court

5  will hear that there were many conversations here.  This is

6  an ongoing series of conversations with the Defendant.  There

7  is no allegation in the motion of any physical coercion.  The

8  only thing that is here, Judge, are these accusations of -- I

9  don't know -- these accusations that certain things that were

10  said to her overcame her will, and the Court will see that it

11  is not supported by the facts.  This woman's rights were

12  meticulously maintained.  There is no allegation of Miranda

13  here.  It is a separate motion.

14                    The only thing that is here, Judge, are

15  these accusations about what happened.  For example,

16  subsequent to the polygraph test, the police told the

17  Defendant that the polygraph test indicated -- the Court will

18  hear that she was confronted with the fact that she failed a

19  polygraph examination.  That is not coercive.  There are many

20  allegations here that simply do not amount to a

21  constitutional violation, even close to a constitutional

22  violation.

23                    The Court will see at the conclusion of

24  this motion by the totality of the circumstances -- and I

M 8

1   want to make it clear, Judge, that I am talking about the

2   things asserted within the motion itself.  The Court will

3   hear nothing to support the claims as they are made other

4   than perhaps the Defendant's own testimony.  Judge, the

5   Officers ate pizza with Ms. Lindsey.  They had prolonged

6   contact with her.  There isn't a motion here, Judge, and, at

7   the end, I will ask you to deny the Defense's motion.  She

8   was with the police from October 14, 1992 continuously until

9   the time of her handwritten statement of October 16, 1992,

10  the early morning hours, but during that time she was fed,

11  allowed to use the bathroom, and the course of elements that

12  are asserted, Judge, are just -- even if the Court accepted

13  them -- and I am not urging that the Court do so -- but even

14  if the Court accepted them, they don't amount to what would

15  be necessary for the Defendant to show that her will was

16  overcome, that she was coerced in any way, and I will ask the

17  Court to deny the motion accordingly.

18          THE COURT:  Mr. Sorosky.

19

20          MR. SOROSKY:  Your Honor, certain facts in this case are

21  not in dispute.  On Sunday, October 12, 1992, around 6 P.M.

22  at night, the police found the deceased's body in a taxicab

23  at O'Hare.  Later that same night, around 11:30 on Sunday

24  night, October 11, 1992, Jeri Lindsey appeared at a hospital

                        $M$ 9

1    on the South Side of the City of Chicago and appeared there

2    in the nature of the victim of an alleged rape.  The hospital

3    authorities called the police, and Jeri Lindsey made various

4    statements to the police, how she was raped and accosted by a

5    cab driver.  Sometime thereafter, certain policemen put

6    together these two incidents, the discovery of the deceased's

7    body and Jeri Lindsey's complaint of being raped by a cab

8    driver, and these police or police officers connected these

9    two incidents, and on Wednesday, October 14, 1992, around

10   11 A.M. in the morning, the police came to Jeri Lindsey's

11   home and escorted Ms. Lindsey to the police station and

12   confronted Ms. Lindsey with the similarity between these two

13   incidents, and they asked Ms. Lindsey to come clean and

14   explain this all.  In summary, Jeri Lindsey told the police

15   that the rape allegation she had made was false, that it was

16   not true, that she had never been kidnapped and raped, and

17   she said this for various reasons, and that she is completely

18   innocent of this murder and had nothing to do with this

19   murder.

20        MR. FORD:  Judge, I object to the content of the

21   statement.

22        THE COURT:  Overruled.

23        MR. SOROSKY:  It is thereafter at this point that the

24   Defense is alleging that all the improprieties occurred, that

1  the police in the various ways in which you will hear in

2  testimony signaled the Defendant, induced the Defendant, told

3  the Defendant that she is not saying the smart thing, that

4  she is not saying the right thing, that she should say the

5  right things to help herself, and hence Jeri Lindsey

6  thereafter gave various versions as to what occurred, and we

7  are saying that after the Court hears all the evidence, the

8  Court will see and hear that the Defendant was induced by the

9  police to make these statements, that the Defendant was told

10  certain information that was not true by the police, and,

11  after you hear the evidence, we hope this Court will suppress

12  the various statements made by Jeri Lindsey subsequent to her

13  original, truthful statement that she had nothing to do with

14  this incident.

15      THE COURT:  Call your first witness, Mr. Ford.

16      MR. FORD:  We would ask leave to call Detective Schalk.

17

18

19

20

21

22

23

24

1                              (Witness duly sworn.)

2                              RAYMOND SCHALK,

3    called as a witness, having been first duly sworn, was

4    examined and testified as follows:

5

6                              DIRECT EXAMINATION

7                              BY

8                              MR. FORD:

9        Q     Detective, would you please state your name

10   spelling your last name for the court reporter, and speak

11   loudly so everyone can hear you?

12       A     Raymond Schalk, S-c-h-a-l-k.

13       Q     By whom are you employed, sir?

14       A     By the Chicago Police Department.

15       Q     In what capacity do you work with the Chicago

16   Police Department?

17       A     Detective assigned with Area 5, Violent Crimes.

18       Q     How long have you been a Detective?

19       A     Thirteen (13) years.

20       Q     How long have you been with the Chicago Police

21   Department?

22       A     Seventeen (17) years.

23       Q     I would like to direct your attention to the case

24   involving Jeri Lindsey.  Were you assigned to work on that

                              𝓜 12

1   case in the month of October of 1992?

2        A    Yes.

3        Q    Do you see the person you now know as Jeri Lindsey

4   here in court today?

5        A    She is sitting at the table wearing the blue

6   outfit.

7        MR. FORD:  Indicating the Defendant, Jeri Lindsey.

8        THE COURT:  The record may so reflect.

9        MR. FORD:  Q  Was this in connection with a murder

10  investigation involving the victim, Rudolph Bennett?

11       A    Yes.

12       Q    I would like to direct your attention to October

13  14, 1992.  Do you remember that date?

14       A    Yes.

15       Q    Were you working alone or with a partner on October

16  14, 1992?

17       A    I was with Detective Bogucki and Detective

18  Halvorsen.

19       Q    Now, you said you worked in Area 5; is that

20  correct?

21       A    Yes.

22       Q    Did you travel outside of Area 5, which is on the

23  Northwest Side of the City, on October 14, 1992?

24       A    Yes, I did.

$\mathcal{M}_j$ 13

1    Q    Did you go to the area of 8931 South Houston?

2    A    Yes.

3    Q    For what reason did you go there?

4    A    To interview Jeri Lindsey.

5    Q    Did you come into contact with Ms. Lindsey at that

6    address?

7    A    Yes, I did.

8    Q    After you came into contact with her, did you and

9    she and the other two Detectives go anywhere?

10   A    Yes.  We went to the police station at 11th and

11   State.

12   Q    And when you arrived at 11th and State, did

13   anything occur?

14   A    At 11th and State, they took a Polaroid photo of

15   Ms. Lindsey, and she was also fingerprinted.

16   Q    And after you had gone to 11th and State, where did

17   you and Ms. Lindsey and the two other Detectives go at that

18   time?

19   A    We then went to Area 5 with Ms. Lindsey.

20   Q    What time did you arrive there?

21   A    At approximately 1:30 P.M.

22   Q    Now, after you arrived at Area 5, Violent Crimes,

23   can you explain to his Honor Judge Singer whether or not you

24   did anything?

$\wedge'_i$ 14

1    A    At that time, I read Jeri Lindsey her Miranda

2  rights.

3    Q    And where was this done?

4    A    This was in an interview room at Area 5.

5    Q    And during the course of the time that you gave

6  Ms. Lindsey her Miranda rights, did she indicate to you

7  whether or not she understood those rights?

8    A    She indicated she did understand them.

9    Q    Did she indicate whether or not she wished to talk

10  about this incident?

11    A    She said she would talk to us.

12    Q    Who was present at the time you gave the Defendant

13  her Miranda rights other than the Defendant and yourself?

14    A    Detective Bogucki was there.

15    Q    After you gave her her Miranda rights, did you have

16  a conversation with her?

17    A    Yes.

18    Q    How long did that conversation last?

19    A    That conversation lasted for approximately a half

20  hour.

21    Q    And, after that conversation, did you and

22  Ms. Lindsey and Detective Bogucki go anywhere at that time?

23    A    Later that evening we went to the Polygraph Unit at

24  11th and State.

$\mathcal{M}$ 15

1    Q    What time would that have been?

2    A    We left Area 5 at approximately 6:45 P.M., arriving

3    there at something after seven o'clock.

4    Q    Did you come into contact with any other Chicago

5    Police Department personnel at 11th and State?

6    A    Yes; the polygraph examiner, Tovar, was there.

7    Q    After you came into contact with polygraph

8    examiner, Tovar, what happened next?

9    A    We spoke with examiner, Tovar, explained the case

10   to him, and he then conducted a polygraph examination on Jeri

11   Lindsey.

12   Q    Were you present in the room at the time the

13   polygraph examination was conducted?

14   A    No, I wasn't.

15   Q    Now, when did you next come into contact with

16   Ms. Lindsey, approximately?

17   A    At approximately 10:50 P.M., examiner, Tovar,

18   brought us back into the room where Ms. Lindsey was at.

19   Q    At that time, did you have an additional

20   conversation with Ms. Lindsey?

21   A    Yes, I did.

22   Q    Did you ask her any other questions relative to her

23   Miranda rights?

24   A    At that time, I asked her if she recalled the

1   Miranda rights that she previously had been given.

2       Q    Did she indicate whether or not she understood

3   those rights?

4       A    She indicated she recalled her rights and would

5   still talk to us.

6       Q    At that point, did you have another conversation

7   with Ms. Lindsey?

8       A    At that point, I had a brief conversation.

9       Q    After that, where did you go next?

10      A    We then returned to Area 5.

11      Q    Did you arrive there at about midnight or in the

12   early morning hours of October 15, 1992?

13      A    Yes, that's correct.

14      Q    Where did you and Ms. Lindsey and Detective Bogucki

15   go at that time?

16      A    We entered an interview room on the second floor in

17   the Detective Division.

18      Q    Did you have a conversation with Ms. Lindsey at

19   that time?

20      A    Yes.

21      Q    After that conversation, did you do anything?

22      A    After that conversation, we contacted an Assistant

23   State's attorney.

24      Q    And did an Assistant State's attorney arrive at

                            M 17

1   Area 5, Violent Crimes, in the early morning hours of October

2   15, 1992?

3       A    Yes, he did.

4       Q    What Assistant State's attorney arrived initially?

5       A    That was Assistant State's Attorney Rosenbloom.

6       Q    After Assistant State's Attorney Rosenbloom had

7   arrived, did you and Assistant State's Attorney Rosenbloom

8   and Detective Bogucki ever have any additional contact with

9   Ms. Lindsey?

10      A    Yes, we did.

11      Q    Did this occur at about three in the morning?

12      A    That's correct.

13      Q    During the course of this conversation, what

14  happened initially upon the entry of you three gentlemen into

15  the room?

16      A    Assistant State's Attorney Rosenbloom advised

17  Ms. Lindsey of her Miranda rights and questioned her

18  regarding the homicide.

19      Q    About how long did this conversation last?

20      A    It was a conversation which lasted approximately

21  two hours with a couple of brief intermissions where myself,

22  Detective Bogucki, and Assistant State's Attorney Rosenbloom

23  left the interview room to confer and then returned to talk

24  to

ᴹ18

1   Ms. Lindsey.

2       Q      Okay.  Did anything occur in the early morning

3   hours at around 5:15 in the morning on that date, October 15,

4   1992?

5       A      Yes.  Myself and Detective Bogucki placed

6   Ms. Lindsey in the lockup at the 25th District.

7       Q      What time did that occur?

8       A      At about 5:15 A.M.

9       Q      Did you have any further contact with Ms. Lindsey

10  later in the day of October 15, 1992?

11      A      At 3 P.M. on the 15th, we then conducted a lineup

12  at Area 5.

13      Q      And did people view that lineup?

14      A      Yes.

15      Q      And was the Defendant identified in that lineup?

16      A      Yes, she was.

17      Q      Did you have a conversation with her about the

18  incident itself during the time she was in the lineup, before

19  or after?

20      A      No.

21      Q      Did any other police personnel do so in your

22  presence?

23      A      No.

24      Q      Did an Assistant State's attorney speak to her at

Ⓜ19

1  any time during the course of that lineup either?

2      A    No.

3      Q    Now, Detective, after the lineup, did you have any

4  further contact with Ms. Lindsey?

5      A    Yes, I did.

6      Q    What was the nature of that contact?

7      A    Later that evening, Assistant State's Attorney

8  Nelson came into Area 5, and her, myself and Detective

9  Bogucki had another conversation with Ms. Lindsey.

10     Q    Would that have occurred in the early morning hours

11 of the 16th of October, 1992?

12     A    That's correct.

13     Q    And where did that conversation take place?

14     A    In an interview room at Area 5.

15     Q    At the beginning of the time that Ms. Nelson came

16 into contact with the Defendant in this case, Ms. Lindsey,

17 what, if anything, did Ms. Nelson do?

18     A    Assistant State's Attorney Nelson advised Jeri

19 Lindsey of her Miranda rights.

20     Q    And after that had occurred, was there a

21 conversation which you witnessed between Assistant State's

22 Attorney Nelson and the Defendant present in court today?

23     A    Yes.

24     Q    Did anything happen at around 4:10 in the morning?

M 20

1      A     At that time, Assistant State's Attorney Nelson,

2  myself, and Detective Bogucki went over a statement with

3  Ms. Lindsey that had been prepared by Assistant State's

4  Attorney Nelson regarding the homicide of Rudolph Bennett.

5      Q     At the time you went over that statement with the

6  Defendant, you were present in the interview room; is that

7  correct?

8      A     That's correct.

9      Q     After Assistant State's Attorney Nelson had gone

10  over that statement with the Defendant, were any corrections

11  made to the statement?

12      A     Yes, there were.

13      Q     And did anyone sign the statement?

14      A     Yes.  I signed it, my partner, Detective Bogucki,

15  Assistant State's Attorney Nelson, and Jeri Lindsey signed

16  the statement.

17      Q     What part of the statement did you and the other

18  people sign?

19      A     We signed at the end of each page.

20      Q     Did Ms. Lindsey sign in any additional location?

21      A     She also signed after the Miranda rights at the top

22  of the statement.

23      Q     Detective Schalk, I would like to show you

24  Respondent's Exhibit No. 1 for identification.  It is a four-

                              $M$ 21

1   page document.  Take a moment and examine it, if you would.

2                       Detective, have you had an opportunity to

3   examine Respondent's Exhibit No. 1?

4       A    Yes, I have.

5       Q    What is that?

6       A    This is a copy of the statement which was prepared

7   on October 16th of 1992 at 4:10 A.M. and signed by Jeri

8   Lindsey, myself, Detective Bogucki, and Assistant State's

9   Attorney Nelson.

10      Q    Now, is that document in the same or substantially

11  the same condition as it was at the time it was drafted by

12  Assistant State's Attorney Nelson and at the time you went

13  over it with Ms. Lindsey on October 16, 1992?

14      A    Yes, it is.

15      Q    After that statement had been made, were there any

16  further conversations between yourself, Assistant State's

17  Attorney Nelson, and Ms. Lindsey?

18      A    After this statement, no.

19      Q    Detective, at any time during the several

20  interactions you had with the Defendant beginning on October

21  14, 1992 and going through to four o'clock in the morning on

22  October 16, 1992, did you ever tell the Defendant to, "Tell

23  us the truth and you can go home?"

24      A    I told her that we wanted to know the truth.  I

$\mathcal{H}$ 22

1   never told her to tell us the truth and she can go home.

2        Q    At any time during the time you were with the

3   Defendant, that whole period of time, did you ever tell the

4   Defendant that she made up the rape allegation and that she

5   was never in the cab with the deceased?

6        A    No, I didn't.

7        Q    Did any Chicago police officer or Assistant State's

8   attorney say either of these things in your presence?

9        A    No.

10       Q    Detective, at any time that you had contact with

11  the Defendant on the 14th, 15th, or 16th of October, 1992,

12  did you ever tell the Defendant subsequent to the polygraph

13  that, "Your fingerprints are in the cab?"

14       A    No, I didn't.

15       Q    Did you ever tell her, the Defendant, that, "You

16  had a gun?"

17       A    No, I didn't.

18       Q    Did you ever tell the Defendant, "You were there;

19  you know who did it?"

20       A    Not specifically those words, no.

21       Q    You confronted her with the fact that based on your

22  view of the case you felt she was at that location; is that

23  correct?

24       A    That's correct.

$M$23

1      Q     Did you ever tell the Defendant, "You are going to

2   get the death penalty?"

3      A     No, I didn't.

4      Q     Were any of those four statements I just made ever

5   made to the Defendant in your presence?

6      A     No.

7      Q     Was the Defendant, to your knowledge, ever in the

8   presence of Detectives other than yourself and Detective

9   Bogucki during the period of time from the 14th to the 16th?

10     A     Repeat the question, please.

11     Q     Were you and Detective Bogucki the main Detectives

12   on this case?

13     A     Yes.

14     Q     You were in charge of Ms. Lindsey during the period

15   of time she was at Area 5 and down at 11th and State; is that

16   correct?

17     A     That's correct.

18     Q     Detective, at any time that you were having contact

19   with Ms. Lindsey, did you ever tell her that, "Videocameras

20   had shown us that you were in Joliet and at O'Hare?"

21     A     No, I didn't.

22     Q     Did any other Chicago police officer or Assistant

23   State's attorney make such a statement to the Defendant?

24     A     No, they didn't.

M 24

1    Q    After the polygraph, Detective, did you ever tell

2  the Defendant that the deceased had raped a woman a few years

3  ago and it is good that he is dead?

4    A    No, I didn't.

5    Q    Did you ever tell the Defendant that if she told

6  you what you wanted to hear, she could go home?

7    A    No, I didn't.

8    Q    Did any other Chicago police officer or Assistant

9  State's attorney make such a statement in your presence to

10  the Defendant?

11    A    No, they didn't.

12    Q    Did you ever tell the Defendant, "You are up here

13  now, and you could be down there?"

14    A    I don't even understand what that means, but no, I

15  didn't.

16    Q    Did any other person, either a Detective or

17  Assistant State's attorney, make such a statement to the

18  Defendant during the course of time you were with her on the

19  14th, 15th, of 16th?

20    A    No, they didn't.

21    Q    Did you ever tell the Defendant, "If you say the

22  deceased raped you and you shot him because of this rape, we

23  will let you go?"

24    A    No, I didn't.

$\mathcal{M}$ 25

1       Q     Did an Assistant State's attorney or a Chicago

2   police officer ever make such a statement to the Defendant in

3   your presence?

4       A     No, they didn't.

5       Q     Did the Defendant, Ms. Lindsey, ever request at any

6   time during the course of your contact with her to have an

7   attorney present?

8       A     No, she didn't.

9       MR. FORD:   No further questions, Judge.

10      THE COURT:   Cross.

11

12                          CROSS EXAMINATION

13                          BY

14                          MR. SOROSKY:

15      Q     Now, Officer, you arrived at Ms. Lindsey's house on

16  October 14, 1992 around 11 A.M.; is that correct?

17      A     That's correct.

18      Q     And I believe you told Judge Singer that the

19  purpose of you going there was to interview her; is that

20  correct?

21      A     Not at that location but to request her to come

22  into my office to interview her.

23      Q     You wanted to interview her at the police station;

24  is that correct?

1      A     At my office, yes.

2      Q     And your office is at Area 5 at Grand and Central;

3   is that correct?

4      A     Yes.

5      Q     But, nevertheless, the first stop you made was at

6   the main police station at 11th and State; is that correct?

7      A     That's correct.

8      Q     Now, when you went to Ms. Lindsey's house, you were

9   aware of the fact that she had made these complaints or

10  allegations that she had been raped and abducted by a cab

11  driver; is that correct?

12     MR. FORD:  Objection.

13     THE COURT:  Overruled.

14     THE WITNESS:  A  I was aware that there was a report on

15  that, yes.

16     MR. SOROSKY:  Q  And you had occasion to review those

17  reports, did you not, or police reports or allegations by

18  Ms. Lindsey prior to you arriving at Ms. Lindsey's house?

19     A     Yes.

20     Q     And you also were aware of the fact that

21  Mr. Bennett had been found murdered in a cab a few days prior

22  to your arrival at Ms. Lindsey's house; is that correct?

23     A     Two days, yes.

24     Q     Now, would it be fair to say that you didn't put

$M$ 27

1  much stock or belief at that time in Ms. Lindsey's rape

2  allegation?

3       MR. FORD:  Objection, Judge.

4       THE COURT:  Overruled.

5       MR. FORD:  Judge, I would be making an inquiry as to

6  what is the relevance here.  It sounds like a discovery

7  deposition, Judge.  In terms of the allegations made by the

8  Defendant in this motion, what the Officers believe and the

9  veracity of her initial statement, what that has to do with

10  anything, Judge, that is the basis of my objection,

11  relevance, in light of the allegations made in the statement

12  itself.

13       THE COURT:  Mr. Sorosky.

14       MR. SOROSKY:  I would submit, your Honor, that this goes

15  to show that the police believed that Ms. Lindsey was in fact

16  the murderer.  They believed she was the murderer --

17       THE COURT:  Overrule the objection.

18       THE WITNESS:  A  I wished to speak with her to make my

19  own determination as to whether I had a legitimate rape

20  victim here or a possible suspect in this homicide

21  investigation.

22       MR. SOROSKY:  Q  Well, the deceased was found at

23  O'Hare Airport; is that correct?

24       A    Yes.

                               M 28

1      Q      That would be geographically part of your

2   jurisdiction; is that correct?

3      A      That's correct.

4      Q      Ms. Lindsey's rape allegation did not come within

5   the confines of Area 5, did it?

6      MR. FORD:  Objection.

7      THE COURT:  Sustained.

8      MR. SOROSKY:  Q  So, you were assigned a murder

9   investigation concerning the murder of the deceased,

10  Mr. Bennett, were you not?

11     A      Yes.

12     Q      You were not assigned the Lindsey case to

13  investigate who was the man who possibly raped her, were you?

14     MR. FORD:  Objection.

15     THE COURT:  Sustained.

16     MR. SOROSKY:  Q  So, your purpose in going to Jeri

17  Lindsey's house was to see if she was involved at all in the

18  murder of the deceased; is that correct?

19     MR. FORD:  Objection.

20     THE COURT:  Overruled.

21     THE WITNESS:  A  That was part of my reason to interview

22  Ms. Lindsey.

23     MR. SOROSKY:  Q  Wasn't that your primary reason?

24     MR. FORD:  Objection.

H 29

1      THE COURT:  Overruled.

2      THE WITNESS:  A  Again, I wished to determine whether

3  this rape allegation she was making was in fact true or

4  whether, because of the circumstances that were alleged in

5  this allegation, she was involved in my homicide.

6      MR. SOROSKY:  Q  But you were only interested in the

7  rape allegation as it related to "your homicide?"

8      MR. FORD:  Objection.

9      THE COURT:  Sustained.

10      MR. SOROSKY:  Q  You were not assigned this rape case,

11  were you?

12      MR. FORD:  Objection.

13      THE COURT:  Sustained.

14      MR. SOROSKY:  Q  Now, when you arrived at Ms. Lindsey's

15  house, you asked her to accompany you to the police station;

16  is that correct?

17      A    Yes.

18      Q    And you said you wanted to interview her at your

19  office; is that correct?

20      A    Yes.

21      Q    What caused you to detour and make a stop at 11th

22  and State?

23      MR. FORD:  Objection.

24      THE COURT:  Overruled.

$\mu$ 30

1       THE WITNESS:  A  I asked her if she wouldn't mind

2  stopping and letting us take pictures of her and her

3  fingerprints to help us in our investigation.

4       MR. SOROSKY:  Q  And did you explain to her why you

5  wanted to take these fingerprints and photographs?

6       A    Not specifically --

7       MR. FORD:  Objection.

8       THE COURT:  Sustained.

9       MR. SOROSKY:  Q  Did you ever tell Ms. Lindsey that you

10  wanted to take her fingerprints and photographs because these

11  would be tools or weapons that you could use in her rape

12  investigation?

13      MR. FORD:  Objection.

14      THE COURT:  Sustained.  That is outside the scope.

15      MR. SOROSKY:  Q  Now then, after you arrived at 11th and

16  State, did you have any conversation with Ms. Lindsey?

17      A    Nothing regarding the incidents, just took her

18  picture, Detective Halvorsen then had her fingerprinted.

19      Q    Well, didn't she ask you why you wanted her

20  photograph and fingerprints, and didn't you give her any

21  reasons as to why you wanted it?  Did that conversation ever

22  come up?

23      MR. FORD:  Objection.

24      THE COURT:  Sustained.

M 31

1       MR. SOROSKY:  Q  Now then, once -- how long did you stay

2   at 11th and State the first time, approximately?

3       A     Approximately a half hour.

4       Q     And then you drove to Area 5 Headquarters, your

5   Headquarters; is that correct?

6       A     After myself and Detective Bogucki had shown her

7   photograph to witnesses and come back to 11th and State, then

8   all four of us drove to Area 5.

9       Q     Now, when you showed these photographs to witnesses

10  at 11th and State, Ms. Lindsey was also within the building

11  at 11th and State, was she not?

12      MR. FORD:  Objection.

13      THE COURT:  I will sustain that.  It may be relevant to

14  a different motion, but I am sustaining the objection because

15  this is a 5th Amendment motion, motion to suppress the

16  Defendant's statements.

17      MR. SOROSKY:  Q  Once you arrived at 11th and State,

18  these two witnesses identified Ms. Lindsey, did they not?

19      MR. FORD:  Objection.

20      THE COURT:  Sustained.

21      MR. SOROSKY:  Well, that could be a factor in the police

22  method of interrogating Ms. Lindsey, knowing that there was

23  an identification.

24      MR. FORD:  It is not a deceptive factor.

                              H 32

1        THE COURT:  I will overrule it.  Go ahead.

2        MR. SOROSKY:  Q  Did these two witnesses identify

3   Ms. Lindsey?

4        A    Not at 11th and State, but they did identify her.

5   I took the photographs to their home, which is a couple of

6   blocks away from 11th and State.

7        Q    So, before you began questioning the Defendant at

8   Area 5, you knew that two witnesses had identified

9   Ms. Lindsey; is that correct?

10        A    Yes.

11        Q    And tell his Honor Judge Singer what occurred once

12   you and the Defendant arrived at Area 5 Headquarters.

13        A    At that time, myself, Detective Bogucki, and Jeri

14   Lindsey went into an interview room.  I read her her Miranda,

15   which she indicated she understood each one, and asked her if

16   she would be willing to talk to us regarding her rape

17   allegation and the homicide we were investigating that

18   occurred of a cab driver at O'Hare Airport.

19        Q    And what did she say?

20        A    She indicated she would talk to us about that.

21        Q    And did she make a statement?

22        A    Yes.

23        Q    What did she say?

24        MR. FORD:  Objection.

M 33

1      THE COURT:  Overruled.

2      THE WITNESS:  A  At that time, after confronting her

3  with the fact that witnesses had identified her with the cab

4  driver going to O'Hare, she told us that her rape allegation

5  was false, that she had made that up, but at that time she

6  still denied having anything to do with the murder.  We then

7  asked her if she would be willing to take a polygraph

8  examination, and she said she would.

9      MR. SOROSKY:  Q  And approximately what time did this,

10  if I could use the phrase, first interview of Ms. Lindsey,

11  terminate at Area 5 Headquarters, approximately?

12      A    Approximately 2 P.M.

13      Q    And approximately what time was Ms. Lindsey taken

14  to 11th and State for the polygraph test?

15      A    We were unable to arrange a polygraph examination

16  until later that evening, so we didn't leave Area 5 until

17  approximately quarter to seven that night.

18      Q    Then, Ms. Lindsey submitted to a polygraph test at

19  11th and State; is that correct?

20      A    Yes.

21      Q    And you, of course, did not participate in the

22  administering of that test, did you?

23      A    No, I didn't.

24      Q    And at that polygraph test, to the best of your

/√ 34

1    knowledge, Ms. Lindsey again stated that her rape allegation

2    was false and that she was not involved in this homicide; is

3    that correct?

4        MR. FORD:  Objection.

5        THE COURT:  Overruled.

6        THE WITNESS:  A  When the examiner, Tovar, was through

7    with the examination, he came in to us and told us the test

8    indicated she was lying and she was now telling him another

9    story regarding what had occurred.

10       MR. SOROSKY:  Q  But when Tovar told you the test

11   indicated she was lying, this statement that she had given

12   was that she was not involved in the homicide; is that

13   correct?

14       A    The statement she gave to Investigator Tovar after

15   the polygraph examination was something to the effect that

16   she was there --

17       Q    No, no, wait.  You previously stated that

18   Investigator Tovar or Test Operator Tovar told you the test

19   indicated she was lying; is that correct?

20       A    Yes.

21       Q    What was the statement that she gave to Tovar?

22       MR. FORD:  Objection.

23       THE COURT:  Sustained.  Sustain the objection.  No

24   evidence he was there.

                        H 35

1      MR. SOROSKY:  Q  Did Tovar tell you what she said?

2      MR. FORD:  Objection.

3      THE COURT:  Overruled.

4      THE WITNESS:  A  He told us what she said after he had

5  spoken with her after the test.

6      MR. SOROSKY:  Q  Did he tell you what she said the first

7  time she made a statement, which resulted in Tovar's

8  determination that she was untruthful?

9      MR. FORD:  Objection.

10     THE COURT:  Why?

11     MR. FORD:  Judge, what Examiner Tovar told Detective

12 Schalk doesn't bear any evidence, plus or minus, on any

13 communication he might have had with the Defendant relative

14 to the polygraph examination.  It is about a conversation he

15 had with another person about a test.  It is one thing for

16 the Detective to testify that he told the Defendant she had

17 failed it and then confronted her with this fact, but for

18 Mr. Sorosky to explore some conversation that was -- I don't

19 have enough of a foundation here to even admit that this

20 conversation occurred on hearsay grounds, but even after that

21 foundation is met, it is still irrelevant.

22     THE COURT:  Overruled.  Counsel has a right to identify

23 the statements to be suppressed.  Secondly, the allegation is

24 clear that this Officer allegedly advised or gave some

1   information to the Defendant based upon the polygraph

2   examiner, Tovar.   Therefore, I am overruling you.

3        THE WITNESS:  Would you repeat the question?

4        MR. SOROSKY:  Q  You said a number of times that Test

5   Operator Tovar told you that the test indicated that

6   Ms. Lindsey was not telling the truth.

7        A    Yes.

8        Q    Did Tovar tell you what Ms. Lindsey said which

9   resulted in the test indicating that Ms. Lindsey was not

10  telling the truth?

11       A    Whatever questions Examiner Tovar had prepared and

12  asked Ms. Lindsey during the test, the results of that

13  indicated that she was lying.

14       Q    Do you know what questions he may have asked her?

15       A    Specifically, no.  I explained to Investigator

16  Tovar the circumstances of the case and what she had told us

17  up to that point before he went in to give the examination,

18  and he prepared questions from that.

19       Q    When Officer Tovar told you that she was not

20  telling the truth, were you at 11th and State or Area 5?

21       A    At 11th and State.

22       Q    And I believe you said that Tovar told you that

23  Ms. Lindsey was now speaking to him; is that correct?

24       A    Yes.

$M$ 37

1     Q     And you were not present when those conversations

2  occurred between Tovar and Ms. Lindsey?

3     A     He then brought us back into the room where

4  Ms. Lindsey was and had a conversation in his presence.

5     Q     But there were some conversations between

6  Ms. Lindsey and Tovar that occurred prior to your entry into

7  the room; is that correct?

8     A     Yes.

9     Q     Now then, how much longer did you and Ms. Lindsey

10 stay at 11th and State after Tovar told you she wasn't

11 telling the truth and she is talking?

12    A     We went back in the room for a few minutes with

13 Examiner Tovar.  He then left the room leaving myself,

14 Detective Bogucki, and Ms. Lindsey in the room, and we had a

15 conversation, which only lasted for a matter of ten minutes

16 more, with Ms. Lindsey before we left to go to Area 5.

17    Q     And then at Area 5, did you begin to further

18 question Ms. Lindsey about this incident?

19    A     Yes.

20    Q     And about what time would this have been now?

21    A     We would have arrived back at Area 5 around

22 midnight or shortly after midnight, what would then be the

23 15th of October.

24    Q     And then you began to question and interrogate

M 38

1   Ms. Lindsey for a few hours?

2       A     We had a conversation with her, which lasted

3   approximately a half hour, 45 minutes.

4       Q     And it was at this time that Ms. Lindsey gave a

5   statement which contradicted her first statement to you

6   wherein at first she said that she had nothing to do with

7   this homicide; is that correct?

8       A     No.  Her first contradiction was at the Polygraph

9   Unit at 11th and State.

10      Q     And how many different statements did Ms. Lindsey

11  give at Area 5, or approximately how many?

12      MR. FORD:  Objection.

13      THE COURT:  Sustained.

14      MR. SOROSKY:  Q  Did Ms. Lindsey give a number of

15  different statements?

16      A     Yes.

17      Q     And were many of these statements contradictory to

18  each other?

19      A     There was different accounts in each of the

20  statements.

21      Q     And after Ms. Lindsey gave a statement, you and

22  your partner would speak to her about the statement; is that

23  correct?

24      A     Yes.

$M$ 39

1       Q    And then after you and your partner spoke to her

2    about the statement, she would give a different statement; is

3    that correct?

4       A    Yes, or also at times there was an Assistant

5    State's attorney present with us for some of the statements.

6       Q    So, would it be fairly accurate to say that

7    Ms. Lindsey gave about five or six different statements?

8       MR. FORD:  Objection.

9       THE COURT:  Sustained.

10      MR. SOROSKY:  Q  And she never changed her statement

11   prior to a conversation occurring between the police and the

12   State's attorney and her; is that correct?

13      MR. FORD:  Objection.

14      THE COURT:  Overruled.

15      THE WITNESS:  A  I don't believe I understand that

16   question.

17      MR. SOROSKY:  Q  In other words, Ms. Lindsey would give

18   a statement; is that correct?

19      A    Yes.

20      Q    Then, the police and/or State's attorney would

21   speak to Ms. Lindsey about the substance of that statement;

22   is that correct?

23      A    We would question her, yes.

24      Q    And then Ms. Lindsey would alter her statement; is

                         M 40

1   that correct?

2        A    At times.

3        Q    And this occurred about five or six times, this

4   scenario where Ms. Lindsey would give a statement and the

5   police or Assistant State's attorney would speak to

6   Ms. Lindsey about the substance of the statement, and then

7   Ms. Lindsey would change her statement; is that correct?

8        MR. FORD:   Objection.

9        THE COURT:   Overruled.

10       THE WITNESS:   A   It wasn't a continuous five or six

11  times, but there were about five or six different stories,

12  yes.

13       MR. SOROSKY:   Q   But prior to Ms. Lindsey giving a

14  different story, the police and/or Assistant State's attorney

15  would speak to Ms. Lindsey; is that correct?

16       A    That is obviously who she was speaking with.

17       Q    So, the answer to that is yes; is that correct?

18       A    Yes.

19       Q    Now, after the polygraph test, you were not present

20  when Operator Tovar told Ms. Lindsey the results of the

21  polygraph test, were you?

22       A    No, I wasn't.

23       Q    And you don't know what Operator Tovar may have

24  told Ms. Lindsey concerning the facts of the case in relation

                              Μ 41

1   to the polygraph test, do you?

2        MR. FORD:  Objection.

3        THE COURT:  Sustained.

4        MR. SOROSKY:  Q  Now, during the course of your

5   conversations with Ms. Lindsey, did you ever tell her that,

6   "If you shot this man and just killed this man, you could get

7   the electric chair, but if you shot this man while he was

8   trying to rape you, then it would be a whole different type

9   of case and you wouldn't receive that severe a punishment?"

10  Did you ever tell her anything like that?

11       A    No, I didn't.

12       MR. SOROSKY:  Nothing further.

13       THE COURT:  Redirect?

14       MR. FORD:  Nothing by way of redirect.

15       THE COURT:  Thank you.  Call your next witness.

16

17

18

19

20

21

22

23

24

M 42

1

2                           (Witness duly sworn.)

3

4                           JEROME BOGUCKI,

5   called as a witness, having been first duly sworn, was

6   examined and testified as follows:

7

8                           DIRECT EXAMINATION

9                           BY

10                          MR. FORD:

11      Q     Sir, would you please state your name spelling your

12  last name for the court reporter and speaking loudly so

13  everyone can hear you?

14      A     Detective Jerome Bogucki, B-o-g-u-c-k-i.

15      Q     And by whom are you employed?

16      A     Chicago Police Department, Area 5, Detective

17  Division.

18      Q     How long have you been a Detective?

19      A     About fourteen (14) years.

20      Q     And how long have you been assigned to Area 5?

21      A     That long.

22      Q     And how long have you been a Chicago police

23  officer?

24      A     About eighteen (18) years.

                        μ̣ 43

1    Q    Detective, I would like to direct your attention to

2    the case involving the victim, Rudolph Bennett.  Were you

3    assigned to that case in the month of October of 1992?

4    A    Yes.

5    Q    In that month, October of 1992, who was the regular

6    partner that you worked with?

7    A    Detective Raymond Schalk.

8    Q    And, Detective, specifically, did you travel to

9    8931 South Houston on October 14, 1992 in connection with

10   your investigation of this case?

11   A    Yes, I did.

12   Q    Did you see anyone there at that address, 8931

13   South Houston, that you see in court today?

14   A    Yes.

15   Q    Point to that person and describe an article of

16   clothing she is wearing.

17   A    The black lady with the blue jumpsuit on

18   (Indicating).

19   MR. FORD:  For the record, indicating the Defendant,

20   Jeri Lindsey.

21   THE COURT:  The record may so reflect.

22   MR. FORD:  Q  Who did you travel to 8931 South Houston

23   with?

24   A    Detective Schalk and Detective Halvorsen.

M 44

1    Q    After you arrived, did Ms. Lindsey say she was

2   willing to accompany you to 11th and State?

3    A    Yes.

4    Q    At that time, did you and Detective Schalk and

5   Detective Halvorsen and Ms. Lindsey actually travel to 11th

6   and State, Police Headquarters?

7    A    Yes.

8    Q    During the time you traveled from her home to 11th

9   and State, did you have any conversation about the incident

10  with the Defendant?

11   A    Not in particular, no.

12   Q    After you arrived at 11th and State, how long did

13  you remain there, approximately?

14   A    Myself and my partner left there for a time to show

15  some photos, so we were there for oh, I would say probably a

16  half hour.

17   Q    And at the conclusion of your time there, where did

18  you go next?

19   A    To the Area 5 office.

20   Q    Where is that located?

21   A    5555 West Grand Avenue.

22   Q    And who traveled to the Area 5 office with you and

23  the Defendant?

24   A    Detective Schalk and Detective Halvorsen.

M 45

1      Q      And you arrived at Area 5 Violent Crimes at about
2    1:30 in the afternoon on October 14, 1992?

3      A      That's correct.

4      Q      When you arrived there, where did you and
5    Ms. Lindsey and Detective Schalk go?

6      A      Into the Area 5 office.  Ms. Lindsey was placed in
7    an interview room and was talked to at that point by myself
8    and Detective Schalk.

9      Q      What was the first thing that was done relative to
10   Ms. Lindsey when you went into the interview room initially?

11     A      She was advised of her rights per Miranda by
12   Detective Schalk.

13     Q      That was done in your presence?

14     A      Yes.

15     Q      Did the Defendant indicate to Detective Schalk
16   whether or not she understood those rights?

17     A      Yes.

18     Q      Did she indicate to you at that time whether or not
19   she wished to talk about the incident involving the victim,
20   Rudolph Bennett?

21     A      Yes, she did.

22     Q      At that point, did you have a conversation with the
23   Defendant?

24     A      Yes.

$M$ 46

1    Q    About how long did that conversation last?

2    A    Approximately twenty minutes.

3    Q    And at the conclusion of that conversation, was

4 there a decision made about what step you would next take in

5 this investigation?

6    A    Yes.

7    Q    What was that decision?

8    A    We asked Ms. Lindsey if she would be willing to

9 take a polygraph examination.

10    Q    Did she indicate whether or not she would be

11 willing to do that?

12    A    Yes.

13    Q    What did she say?

14    A    She said yes, she would.

15    Q    Did you discontinue your conversation with her at

16 that time?

17    A    Yes.

18    Q    And did you leave eventually to go to 11th and

19 State in order to further your investigation in this case?

20    A    Yes.

21    Q    About what time did you leave Area 5?

22    A    Approximately 6:45 P.M.

23    Q    Who was with you when you left Area 5?

24    A    Detective Raymond Schalk.

$M$ 47

1     Q     Did you and the Defendant and Detective Schalk have

2   any conversation about the incident as you were driving from

3   Area 5 to 11th and State?

4     A     No.

5     Q     When you arrived at 11th and State, what did you

6   do?

7     A     We introduced Jeri Lindsey to the polygraph

8   examiner, Tovar, and we did preliminary -- we gave a rundown

9   to the polygraph examiner about the case.

10     Q     And, eventually, did Ms. Lindsey and the polygraph

11   examiner speak privately between themselves for purposes of

12   conducting the polygraph examination?

13     A     Yes.

14     Q     You were out of the room at that time; is that

15   correct?

16     A     Yes.

17     Q     After the polygraph examination had occurred, did

18   you have a conversation with the polygraph examiner, Tovar?

19     A     Yes.

20     Q     And did he indicate to you whether or not there had

21   been an indication of truthfulness or deceptiveness in the

22   examination?

23     A     Yes.

24     Q     What did he indicate?

$\mathcal{M}$ 48

1    A    He indicated that the test indicated that there was

2    deception.

3    Q    And after that had occurred, did you and Detective

4    Schalk and the Defendant have any additional conversations?

5    A    Yes.

6    Q    And that was at 11th and State; is that correct?

7    A    Yes.

8    Q    Was that a short conversation or a long

9    conversation?

10   A    Short.

11   Q    Did the Defendant at that time make a change in her

12   original statement?

13   A    Yes.

14   Q    Did you leave 11th and State and return to Area 5

15   that evening?

16   A    Yes.

17   Q    What time did you leave 11th and State?

18   A    Approximately 11:00, 11:15 P.M.

19   Q    And at around midnight, had you already returned

20   and re-established yourself at Area 5, Violent Crimes?

21   A    Yes.

22   Q    Where did the Defendant go when she returned to

23   Area 5, Violent Crimes?

24   A    Back to an interview room.

$M$ 49

1      Q     Did you go anywhere when you arrived with the

2   Defendant?

3      A     Yes.  Myself and my partner both went into the

4   interview room again with Jeri Lindsey.

5      Q     At that time, did you have a conversation with the

6   Defendant?

7      A     Yes.

8      Q     Approximately how long did this conversation last?

9      A     I would say about a half hour.

10     Q     And, at the conclusion of this conversation, did

11  you conduct any further steps in this investigation?

12     A     Yes.

13     Q     What did you do?

14     A     Contacted the State's Attorney's office and had an

15  Assistant State's attorney come out to review the case.

16     Q     Do you recall now the name of the Assistant State's

17  attorney that came out to review the case?

18     A     Steve Rosenbloom.

19     Q     Did he arrive at Area 5, Violent Crimes at about

20  1:15 in the morning on October 15, 1992?

21     A     Yes.

22     Q     After he arrived, did you re-enter the room where

23  Jeri Lindsey was located?

24     A     Yes.

$\mathcal{M}_i$ 50

1      Q      Who re-entered the room?

2      A      Myself, my partner, Detective Schalk, and Assistant

3   State's Attorney Rosenbloom.

4      Q      You re-entered the room at about what time?

5      A      That was approximately 1:00 A.M.

6      Q      And after you re-entered the room, Detective, was

7   the Defendant given her rights?

8      A      Yes.

9      Q      Who gave her her rights at that time?

10     A      Assistant State's Attorney Rosenbloom.

11     Q      Was that done in your presence?

12     A      Yes.

13     Q      Did the Defendant indicate whether or not she

14   understood the rights as they were given to her?

15     A      Yes.

16     Q      What did she indicate?

17     A      She stated she did understand.

18     Q      Did she indicate at that point whether or not she

19   wished to waive her Miranda rights and make a statement

20   relative to the incident?

21     A      She did waive her rights.

22     Q      Now, at that point, did you have a series of

23   conversations with the Defendant?

24     A      Yes.

$\mathcal{M}_i'$ 51

1       Q      This was in the early morning hours of October 15,

2  1992; is that correct?

3       A      Yes, it was.

4       Q      At some point, was Ms. Lindsey returned to the 25th

5  District lockup in the early morning hours of October 15,

6  1992?

7       A      Yes.

8       Q      What time did that occur?

9       A      Approximately 5:15 in the morning.

10      Q      Did you have any further contact with the Defendant

11 later in the day on October 15, 1992?

12      A      Yes.

13      Q      What time did that occur?

14      A      That was approximately three in the afternoon.

15      Q      For what purpose did you have contact with

16 Ms. Lindsey at that time?

17      A      For purposes of organizing and having her

18 participate in a lineup.

19      Q      Was she in fact identified in the lineup?

20      A      Yes.

21      Q      By how many people?

22      A      Two people.

23      Q      Was she made aware of the fact that she had been

24 identified in the lineup?

μ' 52

1    A    Yes.

2    Q    That lineup occurred at about what time?

3    A    About three in the afternoon.

4    Q    Did you have any conversation with her other than
5    to inform her that she had been identified in the lineup
6    about the incident?

7    A    At that time, no.

8    Q    Detective, did you continue to do additional work
9    in this case in the afternoon hours of October 15, 1992?

10   A    Yes.

11   Q    At around 6:30 or 7:00 in the evening, did you
12   contact anyone else in connection with this investigation?

13   A    Once again, we contacted the Assistant State's
14   Attorney's office, and Assistant State's Attorney Julie
15   Nelson then arrived.

16   Q    Would that have been at around 7:10 in the evening
17   hours of October 15, 1992?

18   A    Yes.

19   Q    After the Assistant State's attorney arrived,
20   Detective, did she conduct some witness interviews and go
21   over the paper that had been generated in connection with
22   this case?

23   A    Yes.

24   Q    And at approximately in the early morning hours of

$M$ 53

1  October 16, 1992, did you have occasion to return to the

2  interview room at Area 5, Violent Crimes?

3      A    Yes.

4      Q    And at the time you returned to the interview room

5  at that time, who was present with you?

6      A    Myself and Detective Schalk and Assistant State's

7  Attorney Julie Nelson.

8      Q    At that time, were the Defendant's Miranda rights

9  read to her?

10     A    Yes.

11     Q    Who did that at that time?

12     A    Julie Nelson.

13     Q    And did the Defendant indicate to you whether or

14 not she wished to waive her Miranda rights at that time?

15     A    Yes, she did indicate that.

16     Q    And what did she indicate?

17     A    That she was willing to waive her Miranda rights.

18     Q    Did you have a further conversation with

19 Ms. Lindsey about the original incident at that time?

20     A    Yes.

21     Q    Who was present for that conversation other than

22 yourself?

23     A    Detective Schalk and Assistant State's Attorney

24 Julie Nelson.

$M$ 54

1    Q    Now, Detective, in the early morning hours now, at

2    about four in the morning, did the Defendant ever make a

3    handwritten statement regarding this incident?

4    A    A handwritten statement was prepared by the

5    Assistant State's attorney.

6    Q    And was that done there at Area 5, Violent Crimes?

7    A    Yes, it was.

8    Q    Detective, I would like to show you Respondent's

9    Exhibit No. 1 for identification.  I will ask you to take a

10   moment and examine it.  Do you recognize that, Detective?

11   A    This would be a xerox copy of the handwritten

12   statement given by Jeri Lindsey on that date.

13   Q    Is that statement in the same or substantially the

14   same condition as it was at the time you took it at Area 5,

15   Violent Crimes on October 16, 1992 at around 4:10 in the

16   morning?

17   A    Yes, it is.

18   Q    Can you describe how Assistant State's Attorney

19   Julie Nelson went over that statement with the Defendant

20   after it had been prepared?

21   A    It had been prepared, and myself and Detective

22   Schalk and the Assistant State's attorney went into the room.

23   Julie Nelson had the Defendant read the pre-printed part,

24   which would be the Miranda rights, of the handwritten

1  statement; had her read those out loud, then sign.

2      Q    Excuse me.  Did the Defendant sign that document in

3  your presence at the end of the Miranda rights?

4      A    The Defendant did sign the document.

5      Q    What happened after that?

6      A    After that, Assistant State's Attorney Nelson had

7  her read the first several lines of the handwritten portion

8  of the statement.

9      Q    And did the Defendant in fact read those aloud?

10     A    Yes.

11     Q    Did you follow along as they were read?

12     A    Yes.

13     Q    Was the Defendant's reading of that aspect of the

14  statement consistent with what had been written on the page?

15     A    Yes.

16     Q    After that had occurred, what did Assistant State's

17  Attorney Nelson do at that time?

18     A    Assistant State's Attorney Nelson then continued to

19  read aloud the statement.

20     Q    Did she read the statement in its entirety to the

21  Defendant?

22     A    Yes.

23     Q    At the conclusion of the statement, what happened

24  next?

$M$ 56

1    A    At the conclusion, myself, my partner, Detective

2  Schalk, the Assistant State's attorney, and Jeri Lindsey all

3  signed the statement.

4    Q    Now, the Defendant, Ms. Lindsey, was told she

5  could make corrections to the statement if that became

6  necessary; is that correct?

7    A    Yes.

8    Q    Do any of those corrections appear within the body

9  of Respondent's Exhibit No. 1 for identification, the

10 statement?

11   A    Yes, there are several.

12   Q    Detective, after the statement had been completed

13 and after the Defendant had signed it, did you and she or

14 Detective Schalk and the Defendant ever have any additional

15 conversations about this incident?

16   A    No.

17   Q    Detective, at any time when you were with the

18 Defendant, did you ever tell her that she should tell the

19 truth and that if she did so, she could go home?

20   A    No.

21   Q    Did any other Chicago police officer or Assistant

22 State's attorney say that to the Defendant in your presence?

23   A    No.

24   Q    At any time when you were in contact with the

*M* 57

1   Defendant on October 14th, 15th or 16th, 1992, did you ever

2   tell the Defendant she made up the rape allegation and she

3   was never in a cab with the deceased?

4        A    Did I ever tell her that?

5        Q    Yes.

6        A    No.

7        Q    Did the Assistant State's attorney ever say such a

8   thing to the Defendant?

9        A    No.

10       Q    Did any other Chicago police officer make such a

11  statement in your presence to the Defendant?

12       A    No.

13       Q    At any time after the polygraph examination had

14  occurred, Detective, did you ever tell the Defendant that,

15  "Your fingerprints are in the cab?"

16       A    No.

17       Q    Did you ever tell her that, "You had a gun?"

18       A    No.

19       Q    Did you ever tell her, "You were there; you know

20  who did it?"

21       A    No.

22       Q    Did you ever tell her, "You are going to get the

23  death penalty?"

24       A    No.

M 58

1       Q       Detective, did any other Chicago police officer or
2    Assistant State's attorney make such a statement to the
3    Defendant in your presence following the polygraph
4    examination?
5       A       No.
6       Q       Did you ever tell the Defendant subsequent to the
7    polygraph examination that there were videocameras and they
8    had shown the Defendant both at Joliet and at O'Hare?
9       A       No.
10      Q       Did you ever tell the Defendant such a thing, or
11   did any other Chicago police officer ever tell the Defendant
12   that?
13      A       No.
14      Q       And did any Assistant State's attorney ever tell
15   the Defendant that?
16      A       No.
17      Q       Did you ever tell the Defendant, Detective, that
18   the deceased had raped a woman a few years ago and that it
19   was good that he was dead?
20      A       No.
21      Q       Did you ever tell the Defendant, Detective, that,
22   "If you tell us what we want to hear, you can go home?"
23      A       No.
24      Q       Did you ever tell the Defendant, "You are up here

M 59

1    now, and you can go down there?"

2         A    No.

3         Q    Did you ever tell the Defendant, "Let us know if

4    the man raped you?"

5         A    No.

6         Q    Did any other Chicago police officer or Assistant

7    State's attorney ever make such a statement to the Defendant

8    during the course of your assignment to this investigation?

9         A    No.

10        Q    Detective, did you ever tell the Defendant that if

11   you say the deceased raped you and you shot him because of

12   this rape, you would let her go?

13        A    No.

14        Q    Did any other Chicago police officer or Assistant

15   State's attorney make such a statement to the Defendant in

16   your presence?

17        A    No.

18        Q    Did you ever refuse the Defendant the right to have

19   a lawyer assigned to her in this case?

20        A    No.

21        Q    Did she ever request a lawyer in your presence?

22        A    No, she did not.

23        MR. FORD:  No further questions, Judge.

24        THE COURT:  Cross.

$M$ 60

1                          CROSS EXAMINATION

2                          BY

3                          MR. SOROSKY:

4      Q    Detective, on October 14, 1992 around 11 A.M. in

5    the morning, you and your fellow officers arrived at Jeri

6    Lindsey's house?

7      A    Yes.

8      Q    You arrived there pursuant to your assignment

9    concerning the murder of one, Rudolph Bennett; is that

10   correct?

11     A    Correct.

12     Q    And prior to arriving at Ms. Lindsey's house, you

13   and other police officers who were in the car with you were

14   aware of the fact that Jeri Lindsey had made statements,

15   complaints to the police, that she had been raped and

16   assaulted by a cab driver; is that correct?

17     A    That's correct.

18     Q    And you were going to Jeri Lindsey's house because

19   you and your fellow police officers believed there possibly

20   could be some connection between the dead cab driver, Rudolph

21   Bennett, and Jeri Lindsey's allegations that she had been

22   raped and assaulted by a cab driver; is that correct?

23         MR. FORD:  Objection.

24         THE COURT:  Overruled.

                         61

1      MR. FORD:  What the other police officers believed?

2      THE COURT:  Overruled.

3      THE WITNESS:  A  The facts of both cases were similar.

4      MR. SOROSKY:  Q  You believed there could be some

5  connection?

6      A      That's correct.

7      Q      And your purpose was to take Ms. Lindsey back to

8  Area 5 and question her concerning this; is that correct?

9      MR. FORD:  Objection.

10      THE COURT:  Sustained.

11      MR. SOROSKY:  Q  Well, you did in fact do that, did you

12  not, take Ms. Lindsey back to Area 5 and question her?

13      A      Yes.

14      Q      And in route to Area 5, you stopped off at 11th and

15  State, and Ms. Lindsey was photographed and fingerprinted; is

16  that correct?

17      A      That's correct.

18      Q      And before you arrived at Area 5, you knew and were

19  aware of the fact that certain witnesses had identified

20  Ms. Lindsey?

21      A      That's correct.

22      Q      And when you and your partner first confronted

23  Ms. Lindsey with this murder allegation, she denied that she

24  was involved with the murder, did she not?

M 62

1      A      That's correct.

2      Q      And she further said that she lied about the rape

3   allegations, did she not?

4      A      Yes.

5      Q      And it was sometime thereafter, a little later in

6   the evening, maybe three or four hours later, that

7   Ms. Lindsey submitted to a polygraph test at 11th and State;

8   is that correct?

9      A      That's correct.

10     Q      And you and your fellow Detectives gave Polygraph

11  Operator Tovar the information and facts concerning this

12  entire case, did you not?

13     A      Yes.

14     Q      And you told Tovar about the dead cab driver found

15  at O'Hare; is that correct?

16     A      Yes.

17     Q      And you told Tovar about the fact that Jeri Lindsey

18  had first said that she was raped and then denied that she

19  was raped, did you not?

20     MR. FORD:   Objection.

21     THE COURT:   Overruled.

22     THE WITNESS:   A   Yes.

23     MR. SOROSKY:   Q   And you also told Tovar that Jeri

24  Lindsey was now maintaining that she had nothing to do with

1   this homicide; is that correct?

2       A    Yes.

3       Q    And then Tovar began to question Ms. Lindsey

4   pursuant to the polygraph test; is that correct?

5       A    He administered the test.

6       Q    You were not present when that occurred?

7       A    No, I was not.

8       Q    So, you don't know what Tovar said to

9   Ms. Lindsey and what Ms. Lindsey said to Tovar?

10      A    No, I don't.

11      Q    Now, Tovar indicated to you or told you that the

12  results of Ms. Lindsey's polygraph test were not favorable to

13  her.  Would that be an accurate statement?

14      A    Well, he indicated that she wasn't telling the

15  truth.

16      Q    Now, did Tovar ever tell you what Ms. Lindsey said

17  which resulted in the untruthful indication?

18      A    I only got the results of the test, which as to

19  knowledge and participation, she showed being untruthful.

20      Q    Now then, did you explain the circumstances of how

21  you first discovered the results of Ms. Lindsey's polygraph

22  and where you were and what you did?

23      MR. FORD:  Objection.

24      THE COURT:  Sustained.

$M$ 64

1        MR. SOROSKY:  Q  Now, after you discovered the results

2    of Ms. Lindsey's polygraph test, did Officer Tovar tell you

3    anything else?

4        MR. FORD:  Objection.

5        THE COURT:  Sustained.

6        MR. SOROSKY:  Q  After you discovered the results of

7    Ms. Lindsey's polygraph test, what did you do?

8        A    We talked to Jeri Lindsey in one of the polygraph

9    rooms.

10       Q    You and Detective Schalk; is that correct?

11       A    Yes.

12       Q    And you and Detective Schalk then discussed the

13   original rape allegation, did you not?

14       MR. FORD:  Objection.

15       THE COURT:  Sustained.

16       MR. SOROSKY:  Q  Did you and Detective Schalk and

17   Ms. Lindsey ever talk about the fact that she may in fact

18   have been raped or attacked by the cab driver?

19       MR. FORD:  Objection.

20       THE COURT:  Sustained.

21       MR. SOROSKY:  Q  Did Ms. Lindsey then make any statement

22   about being raped or attacked by the cab driver?

23       MR. FORD:  Objection.

24       THE COURT:  Overruled.

$\mathcal{M}$ 65

1       THE WITNESS:   A  Ms. Lindsey -- repeat the question,
2  counsel.

3       MR. SOROSKY:  Q  Did Ms. Lindsey say anything about
4  being raped or attacked by the cab driver?

5       THE COURT:  Give a time, counsel.

6       MR. SOROSKY:  Q  This is in the interview rooms of the
7  polygraph.

8       A     No, not at that point.

9       Q     What, if anything, was said right after the results
10  of the polygraph test by Ms. Lindsey?  I believe your
11  testimony was that you returned to where the tests were
12  administered.   What was said by Ms. Lindsey at this time?

13       MR. FORD:  Objection.

14       THE COURT:  Overruled.

15       MR. SOROSKY:  Q  If you remember.

16       A     We were brought into the interview room by Officer
17  Tovar, and he informed us of what Ms. Lindsey had just told
18  him, and she repeated that, which was that a stranger -- that
19  she had been in the cab with the victim and that in the
20  parking garage at O'Hare Airport that an unknown person
21  walked up to the cab while they were both in the cab and shot
22  the victim, Mr. Bennett.  At that point, Mr. Tovar walked out
23  of the room and we talked to her again.

24       Q     And in this conversation when you spoke to her

$\mathcal{M}$ 66

1  again, did the topic of her being raped by the cab driver

2  come up?

3      A    No.

4      Q    What was said?

5      MR. FORD:  Objection.

6      THE COURT:  Overruled.

7      THE WITNESS:  A  The question again, counsel?

8      MR. SOROSKY:  Q  What was said?

9      A    To my recollection, it was a very short

10  conversation, and she said that there was some type of an

11  attack.  The word, "rape," I am not sure what details at that

12  point she was giving, but it was some type of an attack by

13  the cab driver and that she took his gun and shot him.  At

14  that point, we ended the conversation and told her we would

15  talk to her more in the Area office.

16      Q    Then, you returned to Area 5 Headquarters; is that

17  correct?

18      A    Yes.

19      Q    And then Ms. Lindsey gave a series of different

20  statements, did she not?

21      A    Yes, she did.

22      Q    And after every statement, the substance of that

23  statement was discussed with Ms. Lindsey by the police, was

24  it not?

$M$ 67

```
1      A    Yes.

2      Q    And after the substance of the statement was

3  discussed with Ms. Lindsey, with Ms. Lindsey and the police,

4  Ms. Lindsey gave a different statement, didn't she?

5      A    Yes.

6      MR. SOROSKY:  Nothing further of this witness.

7      THE COURT:  Redirect?

8      MR. FORD:  Nothing.

9      THE COURT:  Call your next witness.

10

11                          (Witness duly sworn.)

12

13                          ROBERT M. TOVAR,

14  called as a witness, having been first duly sworn, was

15  examined and testified as follows:

16

17                          DIRECT EXAMINATION

18                          BY

19                          MR. FORD:

20      Q    Sir, would you please state your name spelling your

21  last name for the court reporter?

22      A    Robert M. Tovar, T-o-v-a-r.

23      Q    Mr. Tovar, by whom are you employed?

24      A    The Chicago Police Department.
```

M 68

1    Q    In what capacity do you work for the Chicago
2 Police Department?

3    A    I conduct polygraph examinations.

4    Q    You are a Chicago police officer; is that correct?

5    A    Yes.

6    Q    Officer Tovar, I would like to direct your
7 attention to the date of October 14, 1992.  Do you recall
8 that date?

9    A    Yes.

10    Q    Were you working as a Chicago police officer on
11 that date?

12    A    Yes.

13    Q    Were you working as an officer assigned to the
14 Polygraph Examination Unit of the Police Department on that
15 date?

16    A    Yes.

17    Q    Now, Officer Tovar, I would like to direct your
18 attention to the time period around 7:15 at night.  Did you
19 become involved in a case involving the victim, Rudolph
20 Bennett?

21    A    Yes.

22    Q    Can you describe how you were notified that you
23 were going to become involved in that case?

24    A    I was requested to conduct a polygraph examination

$\mathcal{M}$ 69

1   by the Area 5 Detective Division.

2        Q    What Detectives in particular contacted you?

3        A    Investigators Schalk and Bogucki, I believe.

4        Q    Would that be Detectives Schalk and Bogucki; is

5   that correct?

6        A    Yes.

7        Q    And when you were contacted, where were you

8   working?

9        A    At the Crime Laboratory.

10       Q    Which is located where?

11       A    Located at 11th and State.  It is what they call

12  the Annex of the 11th and State, and that is in the Crime

13  Laboratory on the 5th floor.

14       Q    Now, at that time, did Detective Bogucki and

15  Detective Schalk and a third person arrive at 11th and State

16  in your offices?

17       A    Yes.

18       Q    Do you see the third person who was with them in

19  court today?

20       A    Yes.

21       Q    Would you point to that person and describe an

22  article of clothing she is wearing?

23       A    The lady at the table right there next to the

24  gentleman.  She is wearing a blue shirt.

M 70

1      MR. FORD:  For the record, indicating the Defendant,

2   Jeri Lindsey.

3      THE COURT:  The record may so reflect.

4      MR. FORD:  Q  Officer Tovar, when the group first

5   arrived at 11th and State, what was the first thing you did?

6      A    I had them place her in our Laboratory room and

7   then I went into our office with the Detectives and went over

8   the case facts of the case.

9      Q    Is that what you normally do, familiarize yourself

10  with the case completely prior to discussing the case with

11  the individual you are about to examine?

12     A    I do as much as I can.

13     Q    Is that what you did in this case?

14     A    Yes.

15     Q    After you did that, Officer Tovar, did you ever

16  meet with the woman, Ms. Lindsey, that you have already

17  identified outside the presence of Detectives Bogucki and

18  Schalk?

19     A    Yes.

20     Q    Where did that meeting occur?

21     A    In our Laboratory.

22     Q    What was the first thing you did when you walked

23  into the room independent of Detectives Schalk and Bogucki?

24     A    I identified myself and went over a form we have

$\mathcal{M}$ 71

1  with regards to the conducting of a polygraph examination.

2      Q    Officer Tovar, I will now give you what I have

3  marked Respondent's Exhibit No. 2 for identification.  I will

4  ask you if you recognize what that is.

5      A    Yes.  This is a form that we have in our Unit.  It

6  is a special form that we give all individuals who are going

7  to take a polygraph examination.

8      Q    Did you give that form to the Defendant,

9  Ms. Lindsey, prior to the time you interviewed her at 11th

10  and State?

11     A    Yes.  In fact, I read it to her entirely and then I

12  gave it to her to have her sign it and look it over.

13     Q    Now, is that a mimeographed copy of the original

14  form you used on October 14, 1992?

15     A    Yes.

16     Q    Does that copy have a portion which reinitiates or

17  initiates the Defendant's rights pursuant to Miranda versus

18  Arizona?

19     A    Yes.

20     Q    It also gives her consent to the examination

21  itself, the polygraph examination itself; is that correct?

22     A    Yes.

23     Q    For what purpose do you attempt to get the consent

24  or make the participation in the polygraph examination

$\mu$ 72

1    process voluntary?

2        A    Actually, that is probably the whole issue of a

3    polygraph examination.  You want a subject that wants to take

4    the test.  If you have someone that doesn't volunteer to take

5    the test or finds -- or you have a conflict with that

6    individual, your test might not be the most efficient test,

7    and you want someone who has understanding and volunteers and

8    isn't going to try to defeat the test in some shape or

9    fashion.

10       Q    Officer Tovar, did you make such an inquiry with

11   Ms. Lindsey about the nature of her -- how she felt about the

12   polygraph examination?

13       A    Yes, I did.

14       Q    And what was her response to your inquiries along

15   those lines?

16       A    She wanted to take the test she told me.

17       Q    At that point, did you then conduct the polygraph

18   examination itself?

19       A    Yes.

20       Q    Did you ask the Defendant, Ms. Lindsey, a series of

21   questions?

22       A    Yes.

23       Q    After you had gone through the examination process,

24   did you examine your notes and other materials in connection

                              $M$ 73

1   with the examination that you had just done?

2        A    Yes.

3        Q    What did you examine?

4        A    The charts and the responses that she made as I

5   asked the questions on the charts and, based on the charts,

6   rendered a conclusion.

7        Q    When you say "charts," what are you talking about?

8        A    It is a graph that is on the actual instrument, and

9   I will first -- maybe I should explain that first I will go

10  over all the questions that will be on the test with the

11  subject.  Once she knows what the questions are, then I will

12  put the attachments on her that will record various

13  physiological reactions.  Then, those attachments are hooked

14  up to an instrument that records the reactions on a chart

15  that is rolling as I ask the questions, and I have the chart

16  right there in my presence during the test, and I can render

17  a conclusion at that point.

18       Q    Did you in fact conduct an examination of the

19  charts relative to the questions that you posed to

20  Ms. Lindsey?

21       A    I did.

22       Q    Did you reach an opinion as to the veracity of

23  Ms. Lindsey?

24       A    Yes.

M 74

1    Q    What was the opinion?

2    A    I felt there was deception on her test.

3    Q    Did you indicate to her that you felt there had

4  been an indication of deception?

5    A    Yes.

6    Q    After you had indicated that to the Defendant, did

7  you have a conversation with her?

8    A    I did, yes.

9    Q    And who was present for that conversation other

10 than you and the Defendant?

11   A    Just her and myself.

12   Q    What happened after that?

13   A    After she told me that she wasn't telling the

14 truth, after she told me that she was in the cab, I went out

15 and got the Detectives and brought them in and had her tell

16 them the same thing she told me.

17   Q    And what did you do at that time?

18   A    After that, I walked out.

19   Q    Was that the extent of your work as a polygraph

20 examiner in this case?

21   A    Yes.

22   Q    Officer Tovar, at any time that you were with the

23 Defendant, Ms. Lindsey, whom you have identified here in open

24 court, did you ever tell her that if she told you the truth,

                            M 75

1    she could go home?

2        A    No.

3        Q    At any time that you were with the Defendant, did

4    you ever tell her that she had made up the rape allegation

5    and that she was never in a cab with the deceased?

6        A    No.

7        Q    Officer Tovar, at any time after you administered

8    the polygraph, did you ever indicate to the Defendant and her

9    fingerprints were in the cab?

10       A    No.

11       Q    Did you ever indicate to her that she had had a

12   gun?

13       A    No.

14       Q    Did you ever indicate to her the following

15   statement:  "You were there; you know who did it?"

16       A    I felt -- based on the charts, I felt that she was

17   there.

18       MR. SOROSKY:  Could you repeat that?

19       THE WITNESS:  I felt that based on the charts that she

20   was there.

21       MR. FORD:  Q  And that was based on your examination of

22   the charts as they related to that question when you posed it

23   to her during the polygraph examination?

24       A    The overall test and that question, yes.

$A$ 76

1     Q    You made that specific inquiry during the course of

2  the polygraph examination, didn't you, as to whether or not

3  she was there?

4     A    Yes, I did.

5     Q    When you posed that question during the course of

6  the polygraph examination, the corresponding chart for that

7  question had indicated deception?

8     A    Yes.

9     Q    Is it true, Officer Tovar, -- did you ever tell

10  her, "You are going to get the death penalty?"

11     A    No.

12     Q    Did you ever mention the death penalty at any time

13  during your contact with the Defendant?

14     A    Never.

15     Q    At any time when you were with the Defendant,

16  Officer, did you ever tell the Defendant that the

17  videocameras had shown that she was at Joliet and at

18  O'Hare?

19     A    No.

20     Q    Did you ever indicate to the Defendant after the

21  polygraph examination that the deceased in this case, the

22  victim, had raped a woman a few years ago and that it was

23  good that he was dead?

24     A    No.

1    Q    Did you ever indicate to the Defendant in this case

2    that if she told you what you wanted to hear, that she could

3    go home?

4    A    No.

5    Q    Did you ever indicate to her during the time that

6    you were with her that, "You are up here now, and you can go

7    down there?"  Did you ever say that to the Defendant?

8    A    No.  I don't understand.

9    Q    Did you ever indicate to the Defendant, "Tell us if

10   this man raped you?"

11   A    No.

12   Q    Did you ever indicate to the Defendant that, "If

13   you say the deceased raped you, the victim in this case raped

14   you and you shot him because of this rape, we will let you

15   go?"  Did you ever say anything like that to the Defendant?

16   A    No.

17   Q    Did any Officer or Assistant State's attorney ever

18   make any of those statements to the Defendant in your

19   presence?

20   A    No.

21   Q    Officer or Assistant State's attorney?

22   A    No, nobody.

23   Q    Did she ever request that you provide her with an

24   attorney?

M 78

1      A    No.

2      Q    It is correct, isn't it, that the paper I showed

3  you, Respondent's Exhibit No. 2 for identification, that is a

4  form that you went over with her; is that correct?

5      A    Yes.

6      Q    After you had gone over it with her, did you have

7  her do anything with that form?

8      A    Yes.

9      Q    What did you have her do?

10     A    I had her -- in fact, she informed me that her name

11 was misspelled, and I had her correct her name and initial

12 it, and she signed her name next to mine at the bottom.

13     Q    Does a copy of the signature appear on Respondent's

14 Exhibit No. 2 for identification?

15     A    Yes.

16     Q    Is that item, Respondent's Exhibit No. 2 for

17 identification, in the same or substantially the same

18 condition as it was in except for the fact that it is a

19 mimeograph copy as when you gave it to the Defendant in

20 October of 1992?

21     A    Yes.

22     MR. FORD:  No further questions.

23     THE COURT:  Cross.

24

1                              CROSS EXAMINATION

2                              BY

3                              MR. SOROSKY:

4        Q    Officer Tovar, are you a Chicago police officer?

5        A    Yes.

6        Q    For how long have you been so employed,

7    approximately?

8        A    Over twenty years.

9        Q    For how long have you been assigned to the Crime

10   Laboratory for the purposes of administering polygraph tests?

11       A    Seven to eight years, I guess.

12       Q    And what training, if any, have you had in the

13   administration of polygraph tests?

14       MR. FORD:   Objection.

15       THE COURT:   Sustained.

16       MR. SOROSKY:   Q   Now then, you were told by the

17   Detectives, that is Schalk and his partner, the fact that

18   they knew or were investigating a homicide, specifically the

19   death of a taxicab driver, were you not?

20       A    That they were investigating.

21       Q    And did Detective Schalk and/or his partner tell

22   you that Jeri Lindsey had made some complaints to the Police

23   Department that she had been raped and accosted by a cab

24   driver prior to her arrest and that subsequent to her arrest

                              $N_i$ 80

1  said those complaints by her were false and she denied any

2  involvement in this murder?  Did they tell you that?

3      MR. FORD:  Objection.

4      THE COURT:  Sustained.

5      MR. SOROSKY:  Q  Did these Detectives ask you to find

6  out through your polygraph test whether her statement that

7  she didn't do it was really true or whether her complaints

8  about rape were really true?  Did they ask you that?

9      MR. FORD:  Objection.

10     THE COURT:  Sustained.

11     MR. SOROSKY:  Q  What, if any, assignment did the

12  Detectives give you?

13     A    They didn't give me an assignment.  If I could

14  clarify.  The issue was regarding a cab driver, if the

15  subject was in the car and did the shooting, and that is what

16  the test was about.

17     Q    And did you run a sample test on an unrelated

18  incident where one, Ms. Lindsey, was found to be truthful?

19     A    I run a series of tests, and I look at the number

20  of tests.  The first test I run, if you want to call it a

21  test, is an adjustment test to make sure that all the charts

22  and all the perimeters are functioning properly.   Then, the

23  next series of tests deal with the issue and how we can

24  differentiate between this instead of running a sample test

                          81

1   because I don't know if that would be appropriate, but we run

2   what we call control questions that are devoid of the issue,

3   and that is what I did.  I look at the reactions, and the

4   reactions were much stronger to the relevant issues as

5   opposed to the controlled question issues.

6        Q    Do you remember what controlled questions you may

7   have asked?

8        A    If I could refer to the sheet, I can show you that,

9   yes.  There were four of them.  Yes, these would be the

10  control questions.  If you want, I will read them.

11       Q    What were the four control questions?

12       A    One, "Besides personal relationships, has anyone

13  else ever lied to keep you out of trouble?"

14                      Two, "Besides defending yourself, have

15  you ever intentionally wanted to harm anybody else with a

16  weapon?"

17                      Three, "Have you ever committed any type

18  of serious crime?"

19                      Four, "Are you afraid something could

20  affect the test we haven't discussed before?"

21                      One of the things I do is I try to give a

22  variety of control questions.  I think it is important for

23  the validity of the test.  By giving a variety of control

24  questions, I find my tests have more valid results.

$H$ 82

1    Q    Those were the four control questions you asked; is
2  that correct?

3    A    Yes.

4    Q    How did Ms. Lindsey answer those questions?

5    MR. FORD:  Objection, Judge.

6    THE COURT:  Sustained.

7    MR. SOROSKY:  Q  And was Ms. Lindsey found to be
8  truthful in her responses to those questions?

9    MR. FORD:  Objection.

10    THE COURT:  Sustained.

11    MR. SOROSKY:  Q  What questions did you ask Ms. Lindsey
12  which caused you to believe the test indicated deception?

13    MR. FORD:  Objection.

14    THE COURT:  Sustained.

15    MR. SOROSKY:  Q  How many questions did you ask
16  Ms. Lindsey which caused you to believe the test indicated
17  deception?

18    A    If you look on the sheet again, I think there were
19  nine questions.  I have nine questions here that would give
20  me the indication that there was deception indicated on the
21  relevant issues.

22    Q    And did you make that determination after all
23  questions, or did you grade each question individually?

24    A    We look at the entire test.

*M̧* 83

1    Q    So, there may have been some of those nine

2  questions that the test indicated that Ms. Lindsey answered

3  truthfully?

4    MR. FORD:  Objection.

5    THE COURT:  Sustained.

6    MR. SOROSKY:  Q  Was there any score derived by

7  you -- if I could use the phrase -- to show how deceptive the

8  results were, whether it was close or not close?  Was there

9  any type of grading system used by you in the determination

10  of Ms. Lindsey's results?

11    MR. FORD:  Objection, Judge.

12    THE COURT:  Sustained.

13    MR. SOROSKY:  Q  What did you tell Ms. Lindsey after you

14  became aware of the results?

15    A    I told her she didn't pass the test.

16    Q    What, if anything, occurred next, or what was said

17  next?

18    A    She began to tell me a number of things and then

19  eventually told me she was in the cab.

20    Q    Could you repeat that?

21    A    She began to say a number of things and then told

22  me she was in the cab at the time of the shooting.

23    Q    And what occurred next?

24    A    After she told me those things, I went out and got

ん 84

1    the Detectives and brought them in and let her tell them the

2    same thing she told me.

3        Q    And then what occurred, if you know?

4        A    I left.

5        Q    Now, I believe you testified that before you

6    administered the test you and Ms. Lindsey spoke to each

7    other; is that correct?

8        A    Yes.

9        Q    And you wanted to familiarize yourself with her and

10   make her feel comfortable; is that correct?

11       A    Well, I went over the questions that would be on

12   the test, and I got some other data, I guess, but that would

13   be more accurate, counsel.

14       MR. SOROSKY:  Nothing further from this Officer.

15       THE COURT:  Redirect.

16       MR. FORD:  Nothing, Judge.

17       THE COURT:  Thank you.  You are excused, Officer.  Call

18   your next witness.

19       MR. FORD:  At this time, we ask leave to call Assistant

20   State's Attorney Julie Nelson.

21

22

23

24

```
 1                           (Witness duly sworn.)
 2
 3                           JULIE NELSON,
 4  called as a witness, having been first duly sworn, was
 5  examined and testified as follows:
 6
 7                           DIRECT EXAMINATION
 8                           BY
 9                           MR. FORD:
10      Q    Ma'am, please state your name spelling your last
11  name for the court reporter.
12      A    Yes.  My name is Julie Nelson, N-e-l-s-o-n.
13      Q    By whom are you employed?
14      A    By the Cook County State's Attorney's office.
15      Q    In what capacity do you work for the Cook County
16  State's Attorney's office?
17      A    Right now, I am an attorney assigned to the Night
18  Narcotics Unit.
19      Q    How long have you been with the State's Attorney's
20  office?
21      A    Just over five years.
22      Q    And are you an attorney licensed to practice law in
23  the State of Illinois?
24      A    Yes, I am.
```

1      Q    Assistant State's Attorney Nelson, I would like to
2   direct your attention to October 16, 1992, actually October
3   15, 1992.  Did you become assigned to a case involving a
4   Defendant known as Jeri Lindsey?

5      A    Yes, I did.

6      Q    Do you see that individual here in court today?

7      A    She is sitting over there with the blue outfit with
8   the white shirt underneath (Indicating).

9      MR. FORD:  For the record, indicating the Defendant.

10     THE COURT:  The record may so reflect.

11     MR. FORD:  Q  Ms. Nelson, about what time did you
12  receive the call on the 15th of October, 1992?

13     A    I received it right at the beginning of my
14  assignment, about 6:30.  Might have been a little bit
15  earlier than that.

16     THE COURT:  A.M. or P.M.?

17     THE WITNESS:  P.M.

18     MR. FORD:  Q  After you received the call, did you have
19  occasion to travel to Area 5, Violent Crimes?

20     A    Yes, I did.

21     Q    What time did you first walk into the room or meet
22  Ms. Lindsey either on the 15th or the early morning hours of
23  the 16th?

24     A    I first met Ms. Lindsey at about one o'clock in the

$M$ 87

1   morning on the 16th after I had been working on the case
2   already from the previous night.

3       Q      When you first walked into the room and met
4   Ms. Lindsey, what was the first thing you did?

5       A      I introduced myself to her.  I said, "My name is
6   Julie Nelson, Assistant State's Attorney.  I am a lawyer and
7   not your lawyer.  Do you understand that?"  She said, "Yes."

8       Q      At that point, what happened next?

9       A      At that point, I told her, "I want to tell you what
10  your rights are.  I know you have heard them already, but I
11  want you to tell me you understand them again to make sure
12  you understand them," and, at that point, I went through her
13  rights.

14      Q      Did she indicate she understood the rights?

15      A      I went through each of the rights, and I also
16  explained a little bit about the rights to her when I went
17  through them and asked if she had any questions about
18  anything that I explained to her, and she said no.

19      Q      At that point, did you and she have a conversation?

20      A      Yes.  At that point, I told her I wanted to talk to
21  her about why she was here and about the killing of the cab
22  driver, and she said she wanted to talk to me at that point.

23      Q      Would that individual have been Rudolph Bennett?

24      A      Yes.

$\mathcal{M}$ 88

1    Q    You had an initial conversation with her; is that
2  correct?

3    A    That's correct.

4    Q    About how long did that last?

5    A    I talked to her for about two hours the first time
6  I talked to her.

7    Q    Did you break off that conversation?

8    A    Yes.

9    Q    Did you reinitiate a second conversation?

10    A    Yes, I did.  I went back in after the Detectives
11  left after the first conversation with her, and I went in to
12  talk to her about the types of statements that were her
13  options, and also I went in to talk to her about how she had
14  been treated by the police and if she had any problems or
15  needed anything at that point.

16    Q    What did you tell her relative to the statements at
17  that time?

18    A    I told her the conversation we had previously was
19  an oral statement and that if she wanted to leave the
20  statement like it was, I would write down a summary of what
21  she said in my Felony Review file and she would never get to
22  see it.

23                I said that the next statement is a
24  handwritten statement where I would write down a summary of

$\mu$ 89

1    what she told me, and her and I would have a chance to go
2    through the entire statement word for word and page by page,
3    and she can make any type of changes in that statement she
4    wanted.

5                    The third was a court-reported statement
6    where she would have someone come in and actually type up a
7    question and answer statement where I ask the questions to
8    her and she give the answers to me.

9        Q    Did she indicate to you at that time which way she
10   wished to proceed?

11       A    She said she wanted to do a handwritten statement.

12       Q    You said you also made an additional inquiry,
13   Ms. Nelson, relative to her treatment by the police.   What
14   was her response to that question?   What was the inquiry, and
15   what was the response?

16       A    I asked her if she had any problems with the police
17   or anyone who she had come into contact with up until this
18   point at the police station, and she said no, she didn't
19   have any problems with anyone at that point in time.

20       Q    At that point, did you begin to prepare a
21   handwritten statement?

22       A    I also at that point asked her if she needed to use
23   the washroom or have anything to eat or drink.   I don't think
24   she needed anything at that point, and then I went outside

                    $\Lambda$ 90

1    and prepared the statement.

2        Q    Did you return into the room at about 4:10 in the

3    morning?

4        A    Yes.

5        Q    At that time, did you and she go through a

6    handwritten statement?

7        A    Yes, along with the Detectives.

8        Q    That would have been Detectives Bogucki and Schalk?

9        A    Yes.

10       Q    This was in an interview room at Area 5, Violent

11   Crimes?

12       A    Yes.

13       Q    Ms. Nelson, I would like to show you Respondent's

14   Exhibit No. 1 for identification.  I ask you to take a moment

15   and examine it.  Have you had an opportunity to examine it?

16       A    Yes.

17       Q    What is Respondent's Exhibit No. 1 for

18   identification?

19       A    This is a copy of the handwritten statement taken

20   of Jeri Lindsey.

21       Q    Is that in fact the statement you wrote out that

22   she had given you on October 16, 1992?

23       A    Yes.  It is a copy of it.  It looks like it is in

24   the exact same condition.

$M$ 91

1     Q    Now, can you describe what you did at the
2   completion of that statement after you finished writing it
3   up?

4     A    After I finished writing up the statement, I went
5   in with the Detectives to talk to Ms. Lindsey and have her go
6   through the statement with me and the Detectives and make
7   whatever changes that she wanted to make at that point in
8   time.  I told her that anything she wanted to be changed to
9   just stop and we could make the changes at that point. I also
10  had her read the typed portion of the rights out loud.  I
11  told her, "This will be your rights again.  I want you to
12  read them out loud and tell me if you understand everything."
13  When she finished reading the rights, I told her if she
14  understood those rights and didn't have any questions, to
15  sign the first line under the rights waiving her rights, and
16  she did that at that point.

17    Q    At that point, what did you do?

18    A    At that point, I had her read the first two or
19  three lines out loud of the statement, and she read the
20  statement to herself while I stood next to her and read
21  through the statement out loud to her.

22    Q    Did you encounter any points in which
23  Ms. Lindsey asked to make corrections?

24    A    There were two different points where she made

*M* 92

1    corrections.  One was to change a street, and one was at the

2    conclusion of the statement where I had included that she had

3    the opportunity to smoke a cigarette, and she stated she did

4    not smoke, and she wanted that X'd out of her statement.

5        Q    Ms. Nelson, I will ask you to turn to the last page

6    of the document, Respondent's Exhibit No. 1 for

7    identification.  Within the statement itself, did you include

8    any references to your inquiries as to her treatment by the

9    police and the Assistant State's attorney?

10       A    Yes.

11       Q    Would you please indicate for the record what you

12   wrote down to reflect that part of your conversation with

13   Ms. Lindsey?

14       A    I put that, "Jeri Lindsey stated she was treated

15   well by the police and the Assistant State's attorney.  Jeri

16   stated she was not threatened or promised anything in

17   exchange for this statement."

18       Q    At any time when you were with Ms. Lindsey, did she

19   ever indicate that any promises had been made to her in

20   connection with her making an oral statement in this case?

21       A    No, she did not.

22       Q    Did she ever indicate to you during the course of

23   the time you spent with her that she had been treated in any

24   way improperly by the police?

                              M 93

1       A     Not at all.

2       Q     At any time when you were with the Defendant,

3   Ms. Lindsey, the woman you have already identified, did she

4   ever indicate to you that the police had told her, "Tell us

5   the truth and you can go home?"

6       A     No, she did not.

7       Q     Did Ms. Lindsey ever indicate to you that the

8   police had told her that she had made up the rape allegation

9   and that she was never in the cab with the deceased?

10      A     I didn't hear the first part of the question.

11      Q     Did Ms. Lindsey ever indicate to you that she was

12  told by the police the following:  That she had made up the

13  rape allegation and that she was never in the cab with the

14  deceased?

15      A     No, she did not.

16      Q     Did she, Ms. Lindsey, ever indicate to you that the

17  police had told her that her fingerprints were in the cab,

18  that she had a gun, that, "You were there; you know who did

19  it," or, "You are going to get the death penalty?"  Did she

20  ever indicate any of those statements were made to her by the

21  police?

22      A     No.

23      Q     Did the Defendant, Ms. Lindsey, -- was she ever

24  told by the police in your presence or did she ever complain

                            ʃ⁄ 94

1  to you about the police telling her the following:  That

2  videocameras had shown the police that she was in Joliet and

3  at O'Hare?

4      A    No.

5      Q    Did Ms. Lindsey ever indicate to you that she had

6  been told by the police that the victim had raped a woman a

7  few years ago and that it was good that he was dead?

8      A    No.

9      Q    Did Ms. Lindsey ever indicate to you that the

10  police told her all she had to do was tell us what she knew

11  and she could go home?

12      A    No.

13      Q    Did Ms. Lindsey ever indicate to you that the

14  police had told her, "You are here now; you can be down

15  there?"

16      A    No.

17      Q    Did she ever indicate that?

18      A    No.

19      Q    Did Ms. Lindsey ever indicate that the police had

20  told her that she should let them know if she had been raped?

21      A    Repeat that.

22      Q    Did Ms. Lindsey ever say to you that the police had

23  told her that she should let them know if she had been raped?

24      A    No, she didn't.

ル 95

1    Q    Did she ever indicate to you, Ms. Lindsey, that she

2  had somehow made the statement because of some signaling by

3  the police?

4    A    Yes.

5    Q    You were present when the handwritten and oral

6  statements were made?

7    A    Yes.

8    Q    At any time during the course of the making of

9  those documents, did you witness anything that you would

10 describe as signaling?

11   A    No.

12   Q    At any time that you were with the Defendant on

13 that date at the time these statements were made, did the

14 Defendant ever indicate to you that she had been told by the

15 police that, "If you say the deceased raped you and you shot

16 him because of this rape, we will let you go?"

17   A    No.

18   Q    Did the Defendant ever appear to you to be under

19 the influence of drugs or alcohol?

20   A    Not at all.  I asked her that also.

21   Q    And does that aspect of your conversation also

22 appear in the body of Respondent's Exhibit No. 1 for

23 identification?

24   A    Yes.

$M$ 96

1       Q     Please describe what part of that statement

2   indicates the presence or absence of drugs or alcohol in

3   Ms. Lindsey's system at the time she made the statement.

4       A     It says, "Jeri stated she was free from the effects

5   of drugs and alcohol and appears to be free of their

6   effects."

7       Q     That was her own statement; is that correct?

8       A     That's correct.

9       Q     You also noticed how she was behaving and acting at

10  that time.  Did she to your mind evidence anything indicative

11  of drug or alcohol use?

12      A     Not at all.

13      Q     At the time you came in contact with her, she had

14  been with the police continuously for about a day; is that

15  correct?

16      A     That's correct.

17      MR. FORD:  No further questions.

18      THE COURT:  Cross.

19

20                      CROSS EXAMINATION

21                            BY

22                      MR. SOROSKY:

23      Q     Now, Ms. Nelson, when you first received this

24  assignment, you spoke to the police; is that correct?

                          ʌʃ 97

1    A    That's correct.

2    Q    And the police told you the facts of the case as

3    they knew it at that time?

4    A    That's correct.

5    Q    And when you got this assignment, you were aware of

6    the fact that Jeri Lindsey had originally complained about

7    being raped and assaulted by a cab driver, that she

8    subsequently was arrested for this offense, and denied being

9    involved in the homicide, and then took a lie detector test

10   wherein she allegedly flunked it, and then she began to make

11   various statements saying she was in the cab and had

12   committed the homicide.  You were aware of that, were you

13   not?

14       MR. FORD:  Objection.

15       THE COURT:  Sustained.

16       MR. SOROSKY:  Q  Were you aware of the fact that Jeri

17   Lindsey had made previous oral statements to the police that

18   she had been in the cab with the Officers and had committed

19   the homicide?

20       A    Yes.

21       MR. FORD:  Objection.  I think Mr. Sorosky misspoke.  He

22   indicated "with the Officers."

23       THE COURT:  Read that question back, please,

24   Ms. Reporter.

$\mathcal{M}$ 98

1                              (Whereupon the question was read

2                               back by the court reporter as

3                               requested.)

4        MR. SOROSKY:   Q   In the cab with the deceased and

5    committed the homicide.   Were you aware of that fact?

6        A    Yes.

7        Q    So, the police were just asking you to take another

8    statement to corroborate the statements that had already been

9    given; is that correct?

10       MR. FORD:   Objection.

11       THE COURT:   Sustained.

12       MR. SOROSKY:   Q   The statement Jeri Lindsey had told you

13   orally was in accord with what the police had told you she

14   had told them; is that correct?

15       MR. FORD:   Objection.

16       THE COURT:   Sustained.

17       MR. SOROSKY:   Q   Now, after you spoke to Ms. Lindsey for

18   about two hours, you then took a break; is that correct?

19       A    No.   I left the room, and I went back to talk to

20   her by myself to make sure she didn't have any problems with

21   anything that had happened at that point.

22       Q    You spoke to her for two hours and then you left

23   the room?

24       A    That's correct.

M 99

1    Q    And you took a break, if I could use that word; is

2    that correct?

3    A    I guess we took a break for a few minutes; left the

4    room, and I came back.

5    Q    And when you spoke to her for two hours the first

6    time, were there police officers with you?

7    A    Yes.

8    Q    Those were the same police officers who, to the

9    best of your knowledge, had previously questioned

10   Ms. Lindsey?

11   A    They were the ones working on the case.

12   Q    And then after that little break, you said you

13   spoke to her again; is that correct?

14   A    Yes, by myself.

15   Q    And you were alone at this time; is that correct?

16   A    That's correct.

17   Q    Didn't Jeri Lindsey ask you for a lawyer?

18   A    No, she did not, and I specifically asked her at

19   the beginning of the first conversation if she wanted one,

20   and she said no.

21   Q    Didn't Jeri Lindsey ask you if you would believe

22   her, and you said, "No, I won't believe you because you have

23   lied too many times, and the Judge won't believe you also?"

24   Did Jeri Lindsey ever ask you that question, and did you ever

M 100

1  give that response?

2       A    Could you repeat that?

3       Q    Did Jeri Lindsey ever ask you, "Would you believe

4  me," or words to that effect, and did you ever say to her,

5  "No, I won't believe you because you have lied too many

6  times, and the Judge won't believe you also?"

7       A    No.

8       Q    Did you ever say to Jeri Lindsey, "Don't look so

9  sad.   That sad look won't help you with me?"

10      A    No.

11      Q    Now, you informed the Defendant of the different

12  variety of statements that she could give, and she chose the

13  written statement; is that correct?

14      A    That's correct.

15      Q    And the written statement was not written by the

16  Defendant, was it?

17      A    No.

18      Q    Who wrote it, if you know?

19      A    I did.

20      Q    And you wrote this up from your memory of what the

21  Defendant had previously told you; is that correct?

22      A    That's correct.

23      Q    And you had written this statement -- you presented

24  this written statement to the Defendant?

$M$ 101

1      A      That's correct.

2      Q      And the Defendant signed that statement, did she

3    not?

4      A      Yes.  She signed each of the four pages as well as

5    after the rights portion, so five times.

6           MR. SOROSKY:  Nothing further.

7           THE COURT:  Redirect.

8           MR. FORD:  Nothing, Judge.

9           THE COURT:  Thank you.  You may step down.  Call your

10   next witness.

11          MR. FORD:  No further witnesses, Judge.

12          THE COURT:  Are you resting, introducing anything into

13   evidence?

14          MR. FORD:  I would ask that the identification marks be

15   stricken from Respondent's Exhibit Nos. 1 and 2 and that they

16   be admitted into evidence.

17          THE COURT:  Any objection?

18          MR. SOROSKY:  No.

19          THE COURT:  Respondent's Exhibit No. 1 and No. 2 will be

20   admitted into evidence.

21                         Defense, call your first witness.

22          MR. SOROSKY:  Judge, I call Jeri Lindsey.

23

24

                              102

1

2

3                              JERI R. LINDSEY,

4    the Defendant herein, called as a witness on her own behalf,

5    having been first duly sworn, was examined and testified as

6    follows:

7

8                         DIRECT EXAMINATION

9                              BY

10                         MR. SOROSKY:

11       Q    Ma'am, would you please state your name and spell

12   your last name?

13       A    Jeri Robin Lindsey, L-i-n-d-s-e-y.

14       Q    And how old are you?

15       A    Thirty-two (32).

16       Q    And you are the Defendant in this case, are you

17   not?

18       A    Yes, I am.

19       Q    Now, calling your attention to October 14, 1992 at

20   about 11 A.M. in the morning, did the police come to your

21   house?

22       A    Yes, they did.

23       Q    And would that be Detective Schalk and his partner

M.03

1    as they have indicated?

2        A    Yes.

3        Q    And did you leave the house with them?

4        A    Yes.

5        Q    And did you ride in a police car to the police

6    station at 11th and State?

7        A    Yes.

8        Q    And as you were riding in the police car to 11th

9    and State, did any conversation take place between you and

10    the police officers, and I am talking about conversation

11    which would be relevant to this case?

12        A    Yes.

13        Q    Tell Judge Singer what was said.

14        A    They told me that they had a man in custody and he

15    had raped some women, right, so they wanted to know if I

16    would be willing to take a photograph picture and

17    fingerprints to prove -- that maybe that I was one of the

18    victims in the cab that he raped.  You know what I am saying?

19    I am nervous.  Excuse me.

20        THE COURT:  May I have that read back, please?

21                        (Whereupon the answer was read back by

22                        the court reporter as requested.)

23        MR. SOROSKY:  Q  And after the police told you that, did

24    you agree to submit to a photograph and fingerprints?

                            M104

1    A    Yes.

2    Q    And did your police car stop at the police station

3    at 11th and State, and were you in fact photographed and

4    fingerprinted?

5    A    Yes.

6    MR. FORD:  Objection to the leading.

7    THE COURT:  Sustained.  No, overruled.

8    MR. SOROSKY:  Q  And, after that, did you ride in the

9    police car to the Detective's Headquarters at the Area 5

10   police building?

11   A    Yes.

12   Q    When was the next time after you were photographed

13   and fingerprinted that conversation took place meaningful to

14   this case, at 11th and State, in the car to Area 5, or at

15   Area 5?

16   A    At Area 5.

17   Q    And you heard the police officers say that you

18   arrived at Area 5 early in the afternoon.  Would that be

19   correct pretty much?

20   A    Well, I am not aware of the time really, but to me

21   it was a little later than what they said.

22   Q    Tell Judge Singer what occurred or what occurred

23   once you arrived at Area 5 Headquarters.

24   A    They took me to this little room, and they told

M105

1    me --

2        Q    By "they" --

3        A    Detective Schalk and the other one.

4        Q    Who testified today?

5        A    Yes.  They took me in this room, and they told me,

6    "Ms. Lindsey, we didn't bring you in here for what we said we

7    was bringing you in here.  We brought you in here for the

8    murder of Rudolph Bennett," and they said -- you want me to

9    say what I said?

10       Q    Yes.

11       A    Then I told them, "No, I didn't do it," and I start

12   telling them that I had lied.

13       Q    Did you tell them that you lied about your original

14   rape allegation?

15       A    Right.  I told them the truth.

16       Q    Right.  Now, you said that --

17   THE COURT:  Wait.  Two different things were said.

18   MR. SOROSKY:  Q  You told the police that you lied; is

19   that correct?

20       A    Yes.

21       Q    Tell Judge Singer what it was that you lied about.

22       A    I lied about that I was raped by a cab driver.

23       Q    And was this the fact that you told the police you

24   lied about?

M106

1    A    Yes.

2    Q    And what happened -- why don't you tell Judge
3  Singer specifically what you may have told the police about
4  the lie.  What did you say?

5    A    I told them that I was lying, that I just wanted to
6  get back in the house, and I was over a friend's house, and I
7  gave them the friend's address.  They told me that my
8  fingerprints was found in the cab, that they had two old
9  people that identified me in this cab.  They said that -- and
10 I kept saying, "No, no, that is not true.  It is not me."  He
11 said, "Yes.  If it is not you, you know who did it.  You will
12 get the death penalty, so you better tell me the truth."  I
13 kept telling them no.  I said, "Call my friend."  I gave them
14 the phone number and address.

15    Q    Did the police ever confront you with the
16 allegation that you had a gun?

17    A    At that point, I can't remember them saying that.
18 They was just saying that either I killed him or I knew who
19 did it, and if I didn't tell the truth, I would be in a lot
20 of trouble, that I could face the death penalty, and he kept
21 telling me that I was lying.  First, he said that, "We know
22 you didn't get raped," and all that kind of stuff.  He said,
23 "Nobody doesn't believe that story," and I kept telling them
24 no, I didn't, and I started telling the truth, and I gave

M107

1   them my friend's address and the phone number.

2        Q    Whose address and phone number did you give?

3        A    A friend of mine.

4        Q    Do you remember the name?

5        A    Yes.

6        Q    What name was that?

7        A    Jerry St. Clair.

8        Q    And did the police -- now, what did you tell the

9   police concerning your commission of a homicide or the murder

10  when the police said that you committed this murder or you

11  know who committed the murder?  What did you tell the police

12  concerning your involvement in it?  What did you first tell

13  the police?

14       A    I told them that I lied.  I told them the whole

15  story, that I lied --

16       Q    That was what you lied about, the original rape

17  allegation?

18       MR. FORD:  Objection.

19       THE COURT:  Sustained.  Don't lead.

20       THE WITNESS:  A  You want to know what I told the

21  police, period?

22       MR. SOROSKY:  Q  Yes.

23       A    I told them that I lied and that I didn't want

24  Irene to know that I was out getting high, so I went to the

⸫ M1C8

1    hospital and told the lie, and I was with a friend named

2    Jerry, and then I gave them the phone number and the address.

3        Q    And what did you tell the police, if anything,

4    about your commission of the murder?

5        A    I don't understand.

6        Q    Well, did you tell the police at first that you

7    shot and killed this guy, Bennett, or did you say you didn't?

8        MR. FORD:   Objection.

9        THE COURT:   Counsel, don't lead.

10       MR. SOROSKY:   Q   What did you tell the police about the

11   murder?

12       A    Are you saying the very statements?

13       Q    The first thing about the murder.

14       A    I told them I did not do it.

15       Q    Now, then --

16       A    And that I didn't know anything about the murder,

17   period.   I don't even know the man.

18       Q    What did they say to you after you said all of

19   that?

20       A    That is when he was telling me then I know who did

21   it and I was going to -- I could face the death penalty.   I

22   kept telling them no, and I can't remember if I asked to take

23   a polygraph or if they initiated it.   I can't remember how it

24   went, but I was willing to take a polygraph, anything to

                          " M/C7

1   prove I didn't do it, and I wasn't even in a cab, period.

2        Q    Now, were you told anything about going home?

3        MR. FORD:  Objection to the leading, Judge.

4        THE COURT:  Sustained.

5        THE WITNESS:  A  Yes, but not at that point.

6        MR. SOROSKY:  Q  What happened later on that day or that

7   evening?  Did you take a polygraph test?

8        A    Yes.

9        Q    And did the man who previously testified here, a

10  Mr. Tovar, was that the man who administered the test to you?

11       A    Yes.

12       Q    And, as best you can recall and remember, could you

13  tell his Honor Judge Singer what he said to you and what you

14  said to Mr. Tovar when you first me?

15       A    Okay.  I can't remember everything exactly, but I

16  remember he introduced himself, and I introduced myself, and

17  we were talking, and he was saying he was going to give me

18  the polygraph test, and I didn't really remember signing that

19  paper, but my signature was there, and we were talking, and

20  he was asking me some questions --

21       Q    For the record, I think --

22       THE COURT:  Counsel, if you want to testify, you better

23  get another lawyer and get on the stand and testify.

24       THE WITNESS:  I meant the paper, my consent.

M110

1      MR. SOROSKY:   Q  What happened after that?

2      A      Okay.  He said he was going to ask me some

3   questions but he was going to make it easy for me, so I guess

4   he called himself reversing the questions a little bit, but I

5   can't really recall what he said.  So, he asked me questions,

6   and I took the polygraph test.  Then, he told me that I

7   failed the polygraph test.

8      Q      Do you remember any specific questions he asked

9   you?

10     A      I remember him saying something about -- the four

11  questions that he did say up here, I remember those, and he

12  asked me some other questions that really wasn't really

13  pertaining to the case.  He asked me had I ever been in a cab

14  before, stuff like that, little questions.

15     Q      Did he ever ask you any questions about the case?

16     A      No.

17     Q      So, you are saying --

18     A      I don't remember him asking me anything about the

19  case like, "Did you kill him?"  I don't remember him asking

20  me any direct questions like that because he said he was

21  going to make it easy for me, but he said I failed it, and,

22  after that, he said, "Well, the polygraph test puts you in

23  the cab.  It places you with the gun."  He told me that five

24  years ago this man raped a lady, right.  He said that he got

M{ | | |

1   away with it or something.  He said he got away with it.  He
2   said, "Good he is dead."  He said, "I don't mean to really
3   say that," but he said he got away with it.  He said, "So, if
4   you tell me the truth, right now you are up here, and you
5   could be down here," and then I said -- I was asking him to
6   explain himself clearly.  He said, "You could get the death
7   penalty, but if you tell me the truth -- then, I said, "What?
8   I can go home?"  He said, "Yes.  If you tell me the truth."
9   In other words, I am taking it as though if you tell me what
10  I want to hear, so I am steady telling him I didn't do it, I
11  didn't do it.  I said, "I can't believe I failed this test.
12  You are framing me."  He said he wouldn't do that, and I
13  said, "I won't admit to something I didn't do," and I kept
14  sitting there.  And he said, "Remember.  You are up here, and
15  you could be down here.  Now, this man raped some girls
16  before, raped this girl before, and he got away with it."  He
17  said it again.  I said, "What you want me to say?  I already
18  told you I wasn't raped."  He was like -- he kept going up
19  and down again.

20      MR. SOROSKY:  Indicating for the record, you are up
21  here, meaning Mr. Tovar put his hand up high, and you could
22  be down here there --

23      THE COURT:  The witness put her hand over her head first
24  and then put her hand below.

                        ℃ M/12

```
 1        THE WITNESS:  He said I could get the death penalty or I
 2   could go home, and I kept thinking, "Well, I can't say I did
 3   it.  I know I didn't do it."  So, I am thinking, and I am
 4   thinking, and I am scared, and I didn't know what to do.  He
 5   said, "You know you are in a lot of trouble," and I was like,
 6   "Well, I wasn't in the cab.  How can you tell me this
 7   polygraph test puts me in the cab?"  He said, "And it also
 8   says you had the gun."  I said, "I never shot a gun in my
 9   life."  He said, "This test puts you there."  I am thinking,
10   "Well, I am framed now.  What am I going to do?"  So, I am
11   sitting there and thinking, so I make up a tale.  I said,
12   "This man came up, and I was in the cab, and the man came up,
13   and he shot him, and I ran."  I didn't want to say I did it
14   because I didn't, and that was one of the statements that I
15   did make.  He was like -- then I kept shaking my head, and he
16   asked why was I shaking my head, and I said, "I can't go down
17   for something I didn't do.  I didn't do it, and I wasn't in
18   the cab."  He said, "Remember.  You are up here, and you
19   could be down there."  I said, "So, I could go home?"  He
20   said, "If you tell me the truth."  So, he calls Detectives
21   Schalk and Bogucki, he calls them in, and I am shaking my
22   head.  He said something about Ms. Lindsey said something.
23   So, then he said, "So, what did you tell me, Ms. Lindsey?"
24   So, I am shaking my head, and I didn't want to say it because
```

M113

1    I wasn't in the cab, so I had to repeat this again.  I said,
2    "Can I go home" to Detectives Schalk and Bogucki.  They said,
3    "Well, something just isn't right."  So, now they are trying
4    to find out about the gun.  They are trying to come up with
5    like I had the gun.  "The polygraph test said you had the
6    gun."  That is what he said, so I had to think of something
7    else to say.  It got to be like a web of lies.  So, they were
8    satisfied at that point, and then that is when they said
9    something about a pizza.  They were satisfied that I was in
10   the cab all of a sudden.  So, we get back to the station, and
11   that is when they start telling me -- first, I saw this first
12   State's attorney, and it was a man.  Now, we are back to this
13   rape thing, and I told them I was not raped.  So, he is
14   telling me, he is saying, "If you say you was raped, if you
15   say you was raped and I have you tested and there is no semen
16   in you, you can get in some trouble."  I am scratching my
17   head and thinking I already told them I wasn't raped.  I am
18   thinking up another lie.  So, I am thinking.  I didn't know
19   what to do.  So, I looked at him.  I told him, "Look.  I am
20   not going down for something somebody else did.  I didn't do
21   it."  He got mad.  He said, "The Judge is not going to
22   believe you because you already told too many lies already."
23   I said, "Well, I have to take my chances."  Then, he was
24   like -- so I am huffing and puffing and didn't know what to

                         K1114

 1   do, so I made up another tale.  Okay.  Wait a minute.  Before
 2   I saw him, I told the tale about the rape again.  We was
 3   talking about the rape.  I made up so many different stories
 4   because I didn't want to say I did it, so when it came to the
 5   point where they was trying to say I did it, I came up with
 6   the rape because if I did it, I had a reason to do it.  You
 7   know what I am saying?  After that -- this is when they told
 8   me about the two old people.  I didn't know nothing about
 9   that.  That is why I was making up everything else because I
10   didn't know about the two old people except that the two old
11   people identified me.  I didn't know the story.  After he
12   leaves, they tell me it was two old people.  We were in
13   Joliet at a gambling casino.  I said I didn't know Joliet had
14   a gambling casino.  He said, "Yes.  You were there."  He told
15   me they had video cameras of me at the gambling casino.  I
16   said, "I don't play the lottery.  I never been to Las Vegas."
17   He was like, "Well, you were in the gambling casino."  So, I
18   kept saying, "No, I wasn't in the gambling casino."  So, he
19   said I came out some kind of way, and it was a cab, and I
20   don't remember him saying the two old people was there first
21   or I was there first.  One of us got in a half a block.  I
22   can't remember which one.  He said, "Do you remember when you
23   all went and stopped at the liquor store?  Do you remember
24   which one asked to go to the liquor store?"  I said, "I

M115

1   wasn't there." He was like, "Okay. Where did you sit, in
2   the front or the back?" I was like, "I wasn't in the cab."
3   Then, he was like, "Okay." Then, he says, "You dropped the
4   two old people off. Do you remember where?" I said, "No."
5   He said, "Okay. So then, what happened on the way to O'Hare
6   Field." I said, "Well, I haven't been to O'Hare Field since
7   eighth grade since I went to Florida. I haven't been since.
8   I don't know." Then, he goes back, and he says, "So, when
9   you got to O'Hare Field, how did it look?" The State's
10  attorney was asking me was it lights up there. I said, "I
11  don't know. I haven't been since eighth grade. I don't
12  remember." This is back and forth, everything they was
13  saying and what I was saying.

14      Q   Let me ask you this question. You gave various
15  statements to the police, did you not?

16      A   Yes.

17      Q   Before each statement, did the police talk to you?
18      A   Yes.

19      Q   What did they tell you?

20      A   They was too busy telling me about the two old
21  people, about what occurred then, about the two old people in
22  this cab with this man, and they was saying I was in the cab,
23  and it was back and forth, and I was saying I wasn't, and
24  they was saying I was.

                        MILL

1    Q    When Officer Tovar kept telling you to tell the

2    truth, what did you believe he wanted you to say?

3          MR. FORD:   Objection.

4          THE COURT:   Overruled.

5          THE WITNESS:   A   I was thinking that he wanted me to say

6    that I did it or that I was raped because he kept coming back

7    to this rape thing.  He was saying the man had raped a girl

8    five years ago, so I am taking it that he wanted me to say I

9    was raped, and that is when I first asked if I could go home,

10   and he was like, "Yes, you can go home if you tell me the

11   truth," but he had already told me about this five years ago

12   where this man raped this girl and he got away with it.

13         MR. SOROSKY:   Q   Is that why you believed that he wanted

14   you to say that you were raped?

15         MR. FORD:   Objection to the leading.

16         THE COURT:   Sustained.

17         MR. SOROSKY:   Q   Now then, what benefit did you think

18   you would get by saying that you were raped and did it?

19   A    That I would go home.

20   Q    Why did you believe you would go home?

21   A    Because that is what they told me, that I could go

22   home, until it got further and further down the line where I

23   knew I wasn't going home.  I was mentally and emotionally

24   drained because I know I didn't do it.

1    Q    Now, you saw Assistant State's Attorney Nelson

2   testify today; is that correct?

3    A    Yes.

4    Q    Now, you heard her testify that she asked you what

5   type of statement you preferred to give, and you said you

6   wanted to give a written statement?  You heard her say that;

7   is that correct?

8    A    Yes.

9    Q    Is that basically accurate?

10   A    Yes.  I remember that.

11   Q    Did she ask you that, and did you say that?

12   A    Yes.

13   Q    And were you presented with a written statement by

14  Assistant State's Attorney Nelson?

15   A    Yes.

16   Q    And did you read that statement over?

17   A    Yes.

18   Q    Or did she read it to you?

19   A    She read it, but I read it to myself.

20   Q    And was that statement also a general summary of

21  many of the other oral statements you had given the police?

22       MR. FORD:  Objection to the leading.

23       THE COURT:  Sustained.

24       MR. SOROSKY:  Q  Did that statement say that you did it?

M113

1       A       Yes.

2       Q       Did you do it?

3       A       No.

4       Q       Why did you sign that statement?

5       A       Because at the time I was mentally and emotionally

6   drained, and I was tired of them telling me I did something

7   and I know I didn't do it, so I gave up.

8       Q       How long had you been up at that time and in

9   continuous police custody, approximately?

10      A       Since they brought me in on October 14th, but I was

11  like dozing off, off and on.

12      Q       Did you get any sleep while you were in police

13  custody?

14      A       Yes, a little bit, but barely, but laying on the

15  table for a while waiting for them for hours and hours to

16  come back and interrogate me again.

17      Q       When you originally made your complaint to the

18  hospital about the rape, were you given any medication by the

19  hospital?

20      A       Yes.

21      Q       Do you know what medication you were given?

22      A       I think it was -- I can't say the name --

23  Tetracycline or something.  They gave me four big pills to

24  take while I was there, and then they gave me a bottle, blue

M114

1  pills, to take.

2      Q    Were you taking that medication on a regular basis

3  when the police came to your home on October 14, 1992 about

4  11 A.M.?

5      A    Yes.

6      Q    And what effect, if any, did that medication have

7  upon you?

8      A    Well, to tell you the truth, when they came and got

9  me, I couldn't hardly see because I had been up from the

10  time -- from that Saturday until they picked me up Wednesday

11  because I barely got any sleep because I was constantly going

12  to the washroom every two seconds because of the medicine

13  they gave me, and I was dropping Tylenols a lot because I had

14  a real bad toothache in my front tooth, so by the time they

15  came and got me, I couldn't even see, so when they was

16  fingerprinting me, I was whining saying I wanted to go home.

17  I couldn't hardly stand up, and I couldn't see.  That was it.

18  Like I say, I didn't get that much sleep, and I had been

19  getting high for about two days, so I didn't really get any

20  sleep, period, for a week, barely.

21      Q    When you first got to Area 5 on October 14, 1992

22  and the police confronted you with the murder allegation, did

23  they inform you of your rights after that?

24      A    Repeat that, please.

                    3  M/RC

1      Q    When you first got to Area 5 right after the police

2   photographed you and fingerprinted you at 11th State, after

3   that when you returned to or when you arrived at Area 5 for

4   the first time and the police confronted you with the murder

5   allegation, did they inform you of your rights?

6      A    Not at that time.  After they got through telling

7   me that my fingerprints was in the cab, that these two old

8   people picked me out and they said my video camera was at

9   O'Hare Field and Joliet and after I got through saying what I

10  had to say and they said what they had to say, they took me

11  to another room, handcuffed me, and gave me my rights.

12     Q    So, after you had denied committing this offense,

13  this is when the police advised you of your rights; is that

14  correct?

15     A    Yes.

16     Q    Did you ever ask for an attorney?

17     MR. FORD:  Objection to the leading.

18     THE COURT:  Sustained.

19     THE WITNESS:  A  Yes.

20     THE COURT:  Counsel, this is not the subject matter.  I

21  told you.  There are different burdens, and this is a hearing

22  on compulsion.

23     MR. SOROSKY:  Nothing further from this witness.

24     THE COURT:  Cross.

                    M121

1

2                          CROSS EXAMINATION

3                               BY

4                               MR. FORD:

5        Q    How long had you been up, Ms. Lindsey, prior to the

6   time or at the time the police arrived at your home?

7        A    Okay.  I was up for two days, right?  I went

8   home --

9        Q    You were up and awake for two days?

10       A    Yes.

11       Q    What had you been doing for those two days?

12       A    I was getting high.

13       Q    Were you using cocaine?

14       A    Yes.  I was smoking cocaine.

15       Q    Were you getting high alone or with someone?

16       A    With someone.

17       Q    Who were you getting high with?

18       A    A friend of mine I used to work with.

19       Q    What is that person's name?

20       A    Jerry St. Clair.

21       Q    That is the same person you told them you were with

22   at the time this murder occurred; is that right?

23       A    Yes.

24       Q    What is his address?

A122

1       A       8801 South Bishop.

2       Q       That is here in Chicago, right?

3       A       Yes.

4       Q       What was his phone number back then in 1992, if you

5   can remember?

6       A       I can't really remember right now.  Yes, I do;

7   779-2351, if I am not mistaken.

8       Q       Was he the only person you had been with for those

9   two preceding days?

10      A       No.

11      Q       Who else had you been with?

12      A       His brother picked me up from my house.

13      Q       His brother's name is what?

14      A       Jack St. Clair.

15          MR. SOROSKY:  Your Honor, we would object to this.  I

16  don't know the relevance to the motion.

17          THE COURT:  Overruled.  If it wasn't relevant, why did

18  you go into it?

19          MR. SOROSKY:  She said she used cocaine, but the people

20  she used it with, I don't know how that is relevant.

21          THE COURT:  Any potential witnesses are relevant.

22  Overruled.

23          MR. FORD:  Q  You said Jack St. Clair picked you up; is

24  that correct?

M123

```
 1      A    Yes.

 2      Q    When did he pick you up?

 3      A    I said around a quarter to two, after midnight

 4 Friday, so that would be Saturday morning.  My daughter said

 5 between -- she looked at the clock when I closed the door.

 6 It was 1:20, so I would say 1:20, quarter to two, in the

 7 morning.

 8      Q    This would be October 9, 1992?

 9      A    No, the 10th, Saturday morning.  It was after

10 midnight.

11      Q    When Jack St. Clair picked you up, where did you

12 go?

13      A    I went directly to his house.

14      Q    That was that home on Bishop?

15      A    Yes.

16      Q    After you went there, you started smoking cocaine?

17      A    Not right away.

18      Q    What did you do when you first got there?

19      A    I went upstairs in Jack's room.  We were talking,

20 and we drank some beer.  I think we drank one can.  I had to

21 drink it with a straw because I had a toothache.  My tooth

22 was hurting bad, so I wasn't saying too much.

23      Q    Who were you living with at that time?

24      A    89th and Houston.  I lived with my girlfriend and
```

1    my daughter.

2        Q    Your girlfriend's name is what?

3        A    Irene Quiros.

4        Q    And you said that Jack picked you up in the early

5    morning hours of the 10th?

6        A    Yes.

7        Q    About what time?

8        MR. SOROSKY:    Objection.

9        THE WITNESS:    A  Between 1:20 to a quarter to two.

10       THE COURT:    Sustained.

11       MR. FORD:    Q  You and Jack were sipping beers at Jack's

12    house?

13       A    The two I brought out the house.

14       Q    Then, what happened?

15       A    And then he went downstairs and got Jerry and told

16    him that I wanted to see him, and he said okay.  He wanted to

17    see if Jerry had company first.  So, he came back up and he

18    told me Jerry didn't have any company and that if I stayed a

19    long time, I would have to try to find my own way home, so I

20    said okay, that I would be a few minutes.  I go down there,

21    and Jerry and I was talking because I hadn't seen Jerry in

22    three years, and then he pulled out the coke -- I hadn't did

23    it in a good while.  He pulled out the coke --

24       Q    You hadn't done cocaine in a long time?

M125