File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _4_

EXHIBIT _M126 to O_

TAB (DESCRIPTION) _____

1    A    Maybe six months or so, maybe more.

2    Q    He pulled out the coke?

3    A    Yes.

4    Q    What happened then?

5    A    Then we got high.

6    Q    Were you snorting it or smoking it?

7    A    Smoking it.

8    Q    After you got high, -- this was on the 10th, and

9    was it still dark out, the night of the 10th?

10    MR. SOROSKY:  Objection.

11    THE COURT:  Overruled.

12    THE WITNESS:  A  All the way into the wee hours of the

13    morning.

14    MR. FORD:  Q  You were still at Jerry's house when it

15    turned daylight on October 10th?

16    A    Yes.

17    Q    What were you doing then?

18    A    Getting high.

19    Q    You were still smoking cocaine?

20    A    Yes.

21    Q    Now, how much cocaine did he have?  Do you know?

22    A    To start out, I don't know, but I know I had ninety

23    dollars, so I spent my money, and then he kept on spending

24    money, but I had an opportunity to go home before Irene got

M126

1  home --

2      Q    Wait a second.  You said you spent your money.  Did

3  you buy the cocaine off of this guy?

4      A    No.

5      Q    You would go out and buy it off of people on the

6  street?

7      A    Yes.

8      Q    Where had you got the $90.00?

9      A    From my check.

10     Q    What check was that?

11     A    My unemployment check.

12     Q    So, when had you cashed that?

13     A    I cashed that Thursday.

14     Q    That Thursday?

15     A    Right, October 8th.

16     Q    Where had you cashed it?

17     A    At the bank around my house.

18     MR. SOROSKY:  Objection to this, your Honor.

19     THE COURT:  Overruled.

20     MR. FORD:  Q  Where had you cashed it, Ms. Lindsey?

21     A    At the bank around my house, but I can't remember

22  the name of it.

23     Q    That was your unemployment check?

24     A    Yes.

1    Q    How long had you been on unemployment at that time?

2    MR. SOROSKY:  Objection.

3    THE COURT:  Overruled.

4    THE WITNESS:  A  Since April 4th of 1992 I had been

5    unemployed.

6    MR. FORD:  Q  Now, you said you went out and bought

7    $90.00 worth of coke at the time you and Jerry were smoking?

8    A    I gave him ten dollars because he put his money on

9    it, too, or I gave him twenty dollars.

10   Q    Who would leave his home to go buy the cocaine?

11   A    I think me and him went the first couple of times

12   and then he went by himself.

13   Q    The first couple of times he went by himself?

14   A    I know I went with him a couple of times during the

15   night.

16   Q    And how about into the daylight hours of the 10th?

17   A    I remember going with him in the morning, but later

18   on he went a couple of times by himself.

19   Q    You got high all that day, October 10th?

20   A    All that day.

21   Q    How many pipes do you think you smoked, how many

22   rocks?

23   A    I can't say.

24   Q    Was it more than ten?

*12133*

1    A    Yes.

2    Q    Was anything else happening?

3    A    No.

4    Q    Just smoking, and that was it?

5    A    Just smoking, and I think we had something to drink

6  because a friend of ours that we used to work with named

7  Derrick, he came over there, and he spent money, and we kept

8  getting high.

9    Q    What is Derrick's last name?

10   A    Tillman.

11   Q    Where had you worked that you knew these people

12 from?

13   A    Polycon.  It is a factory.

14   Q    Now, after Derrick came over and during the

15 daylight hours, did you keep smoking into the night of the

16 10th?

17   A    Yes, but Derrick didn't come until the nighttime,

18 until the evening time.

19   Q    That would have been the night of the 10th then?

20   A    Yes.

21   Q    What happened that night?

22   A    We kept on getting high, me and Derrick and Jerry.

23   Q    This was in Jerry's home?

24   A    Yes.

K134

1    Q    How many more rocks did you smoke that night?

2    A    I have no idea.

3    Q    You went through the whole $90.00 though?

4    A    Yes.

5    Q    Ninety dollars gets you nine dime bags?

6    A    But they had money also.

7    Q    How much money did they spend?

8    A    I don't know.

9    Q    You are there the night of the 10th and early

10   morning hours of the 11th.  Did anyone else come other than

11   Derrick?

12   A    No.

13   Q    What time did you leave to return to the home that

14   you and Ms. Quiros shared?

15   A    I think around seven or eight.  I thought of this

16   lie I was going to tell.

17   THE COURT:  A.M. or P.M.?

18   THE WITNESS:  P.M. on October 11th.

19   MR. FORD:  Q  You thought -- you said you thought of a

20   lie you were going to tell?

21   A    Yes.

22   Q    When were you going to tell the lie?

23   A    Once I got to the hospital because I wanted to get

24   in the house.

1     Q    Who was going to stop you from going to the house?

2     A    That wasn't the point.

3     Q    Why did you go to the hospital and tell them you

4   were raped?

5     A    Because I promised Irene and my daughter I wasn't

6   going to get high anymore.  She told me if I got high again,

7   she was going to leave me, and I didn't want to be the cause

8   of our relationship --

9     Q    Who was going to leave you?

10    A    My girlfriend.

11    Q    You two were romantically involved?

12    A    Yes.

13    Q    Now, what hospital did you go to?

14    A    South Chicago.

15    Q    And that was the first place you went to to

16   complain of the rape?

17    A    Yes.

18    Q    Did you go straight there from Jerry's house?

19    A    Yes.

20    Q    What time did you arrive at South Chicago Hospital?

21    A    I would say around maybe -- maybe between 9:00 and

22   9:30.

23    Q    Between 9:00 and 9:30 at night?

24    A    It could have been around ten because I think I

*M131*

1    left Jerry's house around nine o'clock, so it had to be 9:30

2    or a quarter to 10, something like that.

3         Q    How did you get from Jerry's house to the hospital?

4         A    I caught the bus.

5         Q    And when you went to South Chicago Hospital, you

6    went in and told them you had been raped?

7         A    Yes.

8         Q    Then, the police came, or what happened then?

9         A    Yes, the police came, and I talked to them.

10        Q    How did you decide to tell them that you had been

11   raped by a cab driver?

12        A    While I was at Jerry's house, I thought of the lie.

13   While we were getting high, I kept thinking what am I going

14   to tell Irene to myself.  All this time I am forming in my

15   mind what I am going to say, but I am not sure I am going to

16   go through with it, so then that evening I told Jerry I got

17   to go because time was of the essence, so he was like -- he

18   had asked me before why don't I let Derrick take me home, and

19   I said no because I was too geeked.  I was high, eyes big,

20   and I didn't want --

21        Q    You didn't want to be like that in front of Irene?

22        A    No.  I told Jerry the lie I was going to make up.

23        Q    You bounced it off of him to see if it would sell?

24        A    I was going to tell him.  He kept telling me not to

                              M1132

1   lie.

2      Q    You told him you were?

3      A    Yes.

4      Q    Why did he tell you not to lie?

5      A    He said you hadn't did it in a while, and she will

6   understand, and I said, "No, she won't." I wouldn't listen

7   to reason. I said no, she wasn't going to listen.

8      Q    As you are walking to South Chicago Hospital, did

9   you continue to think about the lie?

10     A    Yes.

11     MR. SOROSKY: Your Honor, I object. I don't know what

12   relevance this has to the motion, thinking up a lie.

13     THE COURT: Counsel, you set up a scenario, which

14   included the time before her contact with the police, and

15   apparently your theory is that she was somehow under the

16   influence of narcotics and/or lack of sleep for two days

17   prior to the events which led to the statement, so apparently

18   your theory is that this contributed to the Defendant making

19   whatever statement she made. If that is the case, I think

20   counsel then has a right to inquiry. I point out to you that

21   you introduced evidence of time at the hospital, too, because

22   of the Tetracycline she received at the hospital, so now

23   counsel has a right to inquire as to what went on at the

24   hospital and why things happened at the hospital. Overruled.

M/133

1       MR. FORD:  Q  Ms. Lindsey, as you were going to the

2   hospital, did you continue to think about the lie?

3       A    Yes.

4       Q    When you got to the hospital, how did you decide to

5   tell them that it was a cab driver that had raped you?

6       A    Okay.  I had already thought about that before I

7   left Jerry's house.

8       Q    How did you decide to choose a cab driver?  Why not

9   a bus driver?

10      A    I don't know.  It just came up.  I said I wanted to

11  make it seem like it was real because if I said anything, she

12  wasn't going to believe me.  In reality, I hadn't been in a

13  cab in over a year because I have my own car, and she has

14  hers.

15      Q    You told the people at the hospital that you had

16  stabbed the person that had raped you?

17      A    Yes.

18      Q    And how did you decide to tell them that you had

19  stabbed the person?  What was necessary about that to tell

20  them?

21      A    Okay.  Because -- this is really messed up.  I had

22  to have some kind of way that I got away, to get away from

23  this person, right, so I made up something where they was

24  asking me how did I get away, and I said, "He grabbed me by

2  M7134

1    my neck, and I stabbed him."  I remember I said I stabbed

2    him.

3        Q    Who asked you how you got away?

4        A    The police.

5        Q    This was at the hospital?

6        A    Yes, and I said I ran into the woods.  That was my

7    way of getting away.  I had to get away some kind of way.

8    That is the only way I could think of.

9        Q    You told them that, in order to get away, you

10   stabbed the cab driver?

11       A    Yes.

12       Q    That was the uniformed police officers you saw at

13   the hospital?

14       A    Yes.

15       Q    You had them also conduct a series of physical

16   things to you about the rape?

17       A    Yes.

18       Q    They took specimens from your vagina?

19       A    Yes.

20       Q    And combings and did other tests on you at the

21   hospital?

22       A    Yes.  I remember a pap smear.

23       Q    They examined your genital area?

24       A    Yes.

M/135

1     Q    When the police were there, did you tell them the

2  name of the person that you said had done this to you?

3     A    No.  I didn't know the man, the cab driver.  I made

4  up this tall tale.  I didn't know the man.  I didn't know his

5  name.  This was a lie that I told, that I made up out of my

6  head.

7     Q    About this whole incident?

8     A    Yes.

9     Q    Because you wanted to get back in the house with

10  Irene?

11     A    Yes.

12     Q    Did you contact Irene at the hospital?

13     A    Yes.

14     Q    Who contacted her?

15     A    I did.

16     Q    Did she come to the hospital?

17     A    Yes.

18     Q    Were the police there when Irene came to the

19  hospital?

20     A    I can't remember if they were already there or they

21  came after she came because it was her and her sister.  I

22  know they were all in the room together with the police, but

23  I can't remember if they were there before her or they came

24  while she was there.

P1136

1    Q    And they came to the hospital?

2    A    Yes.

3    Q    Now, you said the doctors there prescribed some

4 Tetracycline; is that correct?

5    A    Yes.

6    Q    Did they give you the Tylenol?

7    A    That was my own.

8    Q    That was the only two medications you were on?

9    A    Besides the four horse pills they gave me I had to

10 take all at once.

11    Q    This was all on the 11th or the 10th?

12    A    The 11th.  This is Sunday, the 11th.

13    Q    And this was in the evening hours you said?

14    A    Yes, at night.

15    MR. SOROSKY:  I believe Sunday would be the 12th.

16    MR. FORD:  Q  This was on the 11th?

17    A    Yes.

18    Q    And when this happened on the 11th when you were at

19 the hospital and the police came, how long were you at the

20 hospital?

21    A    Maybe two hours.

22    Q    And they didn't admit you or anything?

23    A    No.

24    Q    You didn't spend overnight or anything?

*M1 37*

1      A     No.

2      Q     After you left the hospital, who did you leave

3   with?

4      A     Irene.

5      Q     And her sister or just Irene?

6      A     Irene.   She took her sister home and came back and

7   got me.

8      Q     You went home to which address?

9      A     8931 South Houston.

10     Q     That is where you were living at that time?

11     A     Yes.

12     Q     You didn't tell Irene in the car on the way home

13   that you had made this story up?  You stuck with the story?

14     A     I wanted to, but I couldn't.  I wanted to, but I

15   couldn't.

16     Q     You went home on the night of the 11th, and what

17   did you do when you got home?

18     A     I don't know.  I can't even remember; probably went

19   to bed.  We probably watched T.V. for a few minutes.  I don't

20   know.

21     Q     You went to bed on the night of the 11th?

22     A     Yes, but I talked to the Detectives on the phone.

23     Q     Was that on the 11th?

24     A     Yes.  By this time, it is the 12th because it is

H138

1   after midnight.

2      Q      Do you remember what Detective called you after

3   midnight on the night of the 12th?

4      A      I don't know his name, but he was a black

5   Detective.

6      Q      Is his name Jack Hines?

7      A      Yes.

8      Q      He testified in another motion?

9      A      Yes.

10      Q      It is the only black Detective that you had any

11   contact with on this case?

12      A      Yes.

13      Q      And he was talking to you about the rape incident,

14   is that right, on the 12th?

15      A      Yes.

16      Q      And when he was talking to you about this rape

17   incident, did you ever make it clear with him -- did you ever

18   decide then that you were going to come off of the story and

19   tell the truth, or no?

20      A      No, because I had no idea it was going to go like

21   this.  No, I was going to stick to it.

22      Q      And when you talked to him on the 12th, that was

23   over the phone; is that right?

24      A      Yes.

M139

1       Q     Now, what happened on the day of the 12th?  What

2  did you do that day?  Do you remember?

3            MR. SOROSKY:  Objection.

4            THE COURT:  Sustained.

5            MR. FORD:  Q  The police came by your home at 11 o'clock

6  on the 14th, right?

7       A     Yes.

8       Q     October 14th?

9       A     Yes.

10      Q     Had they called you before they came over?

11      A     No.

12      Q     They came over.  When they came over, were you in

13  bed?

14      A     Yes.

15      Q     You were sleeping?

16      A     Yes.

17      Q     And had you slept the night of the 12th?

18      A     Yes, I slept, but I barely got any sleep because

19  the medicine had me going to the washroom like every five

20  minutes.  I would go to the washroom, walk back to the bed,

21  lay down, and I would have to go back to the washroom again,

22  and this took place all the way until they picked me up, all

23  the way, so I barely got any sleep.

24      Q     How about on the night of the 13th?  Did you sleep?

                        <i>K)/4C</i>

1    A    Barely, because we were up watching T.V. all night,
2    barely.
3    Q    Now, this bathroom thing, did this continue all the
4    way to when you were in police custody?
5    A    Because the medicine had me dehydrated, so I drank
6    a lot of water and juices, so it made me run to the washroom
7    a lot, and plus I already have a weak bladder.
8    Q    When the police picked you up, you went to 11th and
9    State?
10   A    Yes.
11   Q    What happened at 11th and State?
12   A    I was photographed, and I was fingerprinted.
13   Q    And when they took the photograph of you, Detective
14   Schalk and Detective Bogucki left you for a while after they
15   took the photo?
16   A    Yes.
17   Q    When they came back, they told you someone had
18   identified your photograph?
19   A    No.
20   Q    When did they tell you that, at Area 5?
21   A    Yes.
22   Q    When did you get the pizza?
23   A    It was after the polygraph test.
24   Q    What kind of pizza did you have?

M1141

1    MR. SOROSKY:  Objection.

2    THE COURT:  Sustained.

3    MR. FORD:  Q  You did have pizza?

4    A    Yes.

5    Q    You ate with them?

6    A    I didn't eat with them.

7    Q    They gave you a couple of pieces?

8    A    Yes.

9    Q    Now, after you left the police station, did you and

10   the Detectives talk about anything as you were going to

11   Area 5, Violent Crimes?

12   A    After the polygraph or after the fingerprints?

13   Q    After the photograph at 11th and State.

14   A    No.  On the way to Grand and Central, no, we didn't

15   talk about anything.

16   Q    Now, when you got to Grand and Central, did you go

17   to the interview room?

18   A    Yes.

19   Q    And when you got to the interview room at Grand and

20   Central, was that when they first read you your rights?

21   A    I hadn't heard my rights yet.

22   Q    They talked to you at Grand and Central?

23   A    Yes.

24   Q    You stuck with the story about being raped by the

*M114.2*

1  cab driver at Grand and Central; is that correct?

2      A     No.  After they told me I was accused of this

3  murder, I told them the truth.

4      Q     At Grand and Central, you came off of the rape

5  story?

6      A     Yes.

7      Q     What was the next thing that happened?

8      A     What do you mean?

9      Q     What was the next thing that happened after you

10 told them that you hadn't been raped?

11     A     Okay.  I told them I wasn't raped, that I made up

12 the lie because he told me -- he said something about, "You

13 really don't think we believe that cockamamie (phonetic)

14 story about you being raped?"  I was sitting there thinking

15 at first, and then I told him I wasn't raped.  I told them

16 the story I told you about Jerry, and then he told me that if

17 I didn't do it, I knew who did it and that I was going to get

18 the death penalty and I better tell them right now.

19     Q     He told you you could get the death penalty?

20     A     Yes, he told me that.

21     Q     And when you were there after you had told them --

22 by the way, you took all the medicine they gave you at the

23 hospital; is that correct?

24     A     No, because I still had -- I took the four pills at

M?/4 3

1   the hospital, but they gave me the bottle of Tetracycline,

2   and I didn't have a chance to finish taking it.

3        Q    You took the medication the way they told you to

4   take it?

5        A    Yes.

6        Q    Why did you take the medication if you knew you

7   hadn't been raped?

8        A    I was lying to Irene.

9        Q    You wanted to be consistent with the lie you told

10  Irene?

11       A    Yes.

12       Q    How about when you got with the Detectives?  Did

13  you stop taking the medication then?

14       A    Yes.  I thought I was going back home, but I never

15  did.

16       Q    Okay.  What happened after they told you -- after

17  you told them that the rape hadn't occurred?  What happened

18  then?

19       MR. SOROSKY:  Objection.  I believe what the State's

20  attorney means is what happened after she said the rape

21  hadn't occurred.

22       THE COURT:  Sustained.

23       MR. FORD:  Q  What happened after you told the police

24  that you hadn't been raped, that you made up the story?

                         M1144

1      A      I told them the truth.  I told them about Jerry,

2    the lie I made up, and I told you what he said.  He said that

3    they had videocameras of me at O'Hare Field and at Joliet at

4    the gambling casino and that two old people had pointed me

5    out and my fingerprints was in the cab and that I was lying,

6    and I am telling him I wasn't lying, that I am telling him

7    the truth now about Jerry, about me making up the lie.  He

8    was telling me I was lying.  He said I was going to get the

9    death penalty, that I could get the death penalty, that if I

10   didn't do it, I knew who did.  I kept on saying I didn't do

11   it, I didn't do it, and I gave them Jerry's phone number and

12   address, and they said they would check it out, and I can't

13   remember who made the initiative for me to take the polygraph

14   test, but I agreed.

15     Q      You wanted to take the polygraph test?

16     A      Yes.

17     Q      You told them you wanted to go down to 11th and

18   State to prove yourself innocent?

19     A      No.

20     Q      To take the polygraph test?

21     A      Yes, right.

22     Q      So, you went down to 11th and State with the

23   Detectives; is that right?

24     A      Yes, to take the polygraph test.

M1145

1    Q    When you took the polygraph test, the examiner,

2    Mr. Tovar, told you that he thought you were lying?

3    A    Yes, after I took the test.

4    Q    After you took the test, he told you that it

5    indicated that you were lying?

6    A    Right.  He said the test put me in the cab and that

7    it had me with a gun, that I had a gun.

8    Q    Okay.  After he told you that, then did you tell

9    the police that you had in fact been in the cab and you had a

10   gun, or what story did you tell then?

11   A    After he told me about the man had raped this girl

12   five years ago --

13   Q    That was Tovar who told you that?

14   A    Yes.  That is how it started.  First I was fine,

15   and then he started with this.  He said this man had raped a

16   girl five years ago.  He said he got away with it.  He said,

17   "It's good he's dead.  I hate to say that, but he got away

18   with it, so all you got to do is tell me the truth."  He

19   said, "Remember.  You are up here now, but you could be down

20   here."  I asked him to explain himself.  He said that I could

21   get the death penalty, go to jail.  I said, "So, you are

22   telling me I could go home?"  He said, "If you tell me the

23   truth, you can go home."  He said, "Remember this man raped

24   this girl before, and he got away with it."  So, I am taking

P1146

1  it as though he don't want this man to get away with this.

2      Q     You knew this man was already dead?

3      A     Right, but, in other words, I am saying -- I am

4  thinking I can go home, right.  If I tell him that I was in

5  the cab or if I was raped -- I didn't say I was raped first.

6  I am thinking -- I kept telling him I didn't do it, I didn't

7  do it.

8      Q     You had already told them you hadn't been raped,

9  right?

10     A     Yes.

11     Q     But was it at that time that you decided that you

12 would tell them you were with him in the garage at O'Hare?

13     A     After Detective Tovar told me about this five years

14 and all of this and he said I failed the polygraph test and

15 that it puts me in the cab and that I had a gun.  Now, he

16 wasn't saying I actually did it, right, so I was like I

17 wasn't in the cab, I am being framed, "I know you are framing

18 me."  I told him this.  He said, "No."  I said, "You got to

19 be."

20     Q     What did he say when you told him you were being

21 framed?

22     A     He said no, and I said yes, because I couldn't

23 believe this polygraph test put me in the cab with the gun.

24 So then, he was like well, maybe -- he start telling me about

M147

1    the story of being up here and down there and then about the

2    rape part, but I didn't say at this time that I was raped

3    because I didn't want to say I did it because I didn't do it.

4         Q    Did you tell Officer Tovar that you had been in the

5    cab with the guy at O'Hare? Did you tell Officer Tovar that?

6         A    Yes.

7         Q    How long did this conversation with Officer Tovar

8    last, Ms. Lindsey?

9         A    I have no idea.  It seemed like a long time.

10        Q    You told him the story in which you described how

11   you had been carrying your clothing -- who did you tell this

12   story to? You were carrying your clothing and your trench

13   coat as you were walking down the street --

14        A    That was the first lie that I told at the hospital.

15        Q    You told them at the hospital that you were just

16   wearing a trench coat, and you were carrying your clothing?

17        A    Yes.

18        Q    You chose that story because it was believable?

19        A    Yes.  I wanted to get in the house.  That is all I

20   wanted to do.

21        Q    Now, we are back at the police station.  Did you

22   tell Officer Tovar --

23        A    I wasn't wearing a trench coat when I was picked

24   up.  You understand what I am saying?

*M143*

1    Q    No.

2    A    See, the lie I told was this man took me somewhere

3    and raped me.  He told me that we was going somewhere else.

4    He told me to put on the coat and I had to carry my clothes.

5    This is the lie I told.

6    Q    You told them that he dumped you out in the street

7    wearing only your trench coat with your clothes in your hand?

8    A    No.

9    Q    You tell me, Ms. Lindsey.

10   A    I said that this man picked me up in the cab,

11   right, and he took me somewhere, and I didn't know where, and

12   I was in this house, and I said that he raped me.

13   Q    Orally and vaginally.

14   A    Right, and then I said he blind-folded me -- I made

15   up some tall tale about I am through with you now or

16   something like that, and then I said that he took me

17   somewhere, that we were driving a long time or whatever, and

18   then he wanted to rape me again or something, and he put his

19   hand around my neck, so that is when I said I had stabbed

20   him, so I said that when he was bringing me out the house, I

21   just put my coat on, and he told me to carry my clothes, so

22   that is where that comes in at, so when I called myself

23   getting away -- this is the lie I told --

24   Q    Were you in Joliet at all?

N:149

1      A      No.  That was my lie I told.

2      Q      The lie that you were in Joliet, but you were never

3    there?

4      A      No, I was not.

5      Q      Now, had you ever been to Joliet that month in

6    October?

7      A      No.  The last time was when I was in grammar school

8    visiting my uncle at Statesville.

9      Q      You were never in the cab with this elderly couple

10   and the cab driver?

11     A      No.

12     Q      Let's talk about this conversation with Tovar where

13   you said somebody else came while you were with the cabbie

14   and shot the cab driver.  Did you ever tell that story?

15     A      Yes.  That was the first tale I told Tovar because

16   he was saying that I was up here and I was down there.

17     Q      I remember you said that.  Let me ask you this,

18   Ms. Lindsey.  You told the police that some other person had

19   come up to the cab driver as you were sitting with him in the

20   garage at O'Hare and shot him; is that correct?

21     A      Yes, but I didn't say the garage at O'Hare.

22     Q      Where did you say this had occurred?

23     A      I just said that --

24     Q      I am just asking you that now.

M150

1    A    I said at O'Hare Field.  I didn't say it was in the

2  garage because I didn't know.

3    Q    When did you switch to this whole thing happening

4  at the garage?

5    A    I didn't say that.

6    Q    You never at any time said that?

7    A    No.

8    Q    Now, you go and you told the police that this third

9  party had shot the cab driver but you were sitting there.

10    A    I made up some tale about this man came up and shot

11  the man and I ran.  I said I ran because they was like,

12  "Well, where did you run to," and I said I ran on the

13  expressway.  I was making up anything.  I didn't know what to

14  say because I wasn't there.

15    Q    And then where did you go?  What was the next lie?

16    A    I don't know.  Some kind of way that wasn't good

17  enough for them.

18    Q    When you say it wasn't good enough, don't you mean

19  that they kept telling you that doesn't make sense?

20    A    They was like, "It's something just not right, so

21  what about this gun?"  In other words, what I was saying,

22  they didn't believe it, or they didn't want to believe it.

23    Q    They would say they didn't believe what you said,

24  right?

M151

1    A    Okay, whatever.

2    Q    Is that what they would say?

3    A    I guess.  They kept on pushing me.  They wanted me
4  to say that I did it, and I refused to do that, so I was
5  making up all kinds of tales to come around instead of me
6  saying I did it, so when that wasn't right, when I tried to
7  use a defense --

8    Q    You were making up the stories so you could say --
9  come up with an excuse for failing the polygraph test?

10   A    So I could go home.  I was asking all this time if
11 I could go home, and they kept saying something isn't right,
12 what about this and that.  They kept bringing up the gun.  I
13 am thinking I am framed from this polygraph test because I
14 wasn't in the cab.  I am thinking this man framed me.  This
15 is what I am thinking.

16   Q    Why did you think he framed you?

17   A    Because I wasn't in the cab.

18   Q    He didn't tell you he was framing you.

19   A    No.  I told him that.

20   Q    Why did you think he was framing you?

21   A    Because I was not in the cab.  I hadn't been in a
22 cab in over a year, and I could not believe -- he was telling
23 me that the polygraph test placed me in the cab and that I
24 had a gun.  Now, I know this is not true.  I hadn't been in a

M152

1  cab in over a year, and I never held a gun in my life, so I

2  knew he was framing me or lying, one.

3       Q    Then, the Detective came in the room where you and

4  Tovar were; is that right?

5       A    Yes.

6       Q    Then, you told them the same story about a third

7  party coming and shooting the victim?

8       A    Yes.

9       Q    And then you and Detective Schalk and Detective

10  Bogucki drove to Area 5 again?

11      A    Yes.

12      Q    Did you stop for the pizza on the way, or was it

13  delivered to Area 5?

14      A    It was delivered.  I don't remember stopping for

15  the pizza.

16      Q    You went back to an interview room at Area 5,

17  right?

18      A    Yes.

19      Q    Now, this was now -- this would have been in the

20  early morning hours of October 15, 1992, right?

21      A    Yes.

22      Q    It was at that time that you told them kind of a

23  different story; is that right?

24      A    Yes.

5   M153

1    Q    And you went back to the rape story again.  You
2    said yes, he had tried to rape you -- you tell me.  What was
3    the next story you told?
4    A    When we got back to Area 5, that is when they start
5    telling -- I guess that story about somebody came in shooting
6    wasn't good enough, so that is when they start telling me
7    about the two old people.
8    Q    That had identified your photo?
9    A    Now they are telling me that I was there.  Now,
10   they was saying, "What about the two old people you were
11   with?"  I said, "I wasn't with two old people."  They start
12   telling me about I came from the gambling casino and either I
13   was already in the cab or either they got in the cab a half
14   block after me, and somebody asked to go to the liquor story,
15   and he said that the woman -- how did he put it?  He said
16   something about that the man was acting scared of the woman,
17   this lady that was suppose to be in the cab, but, see, I was
18   finding this hard to swallow because I am like, "A cab driver
19   afraid of a passenger?"  Why?  I know this is not me.  He was
20   like telling me this story going on and on.  He is saying,
21   "So, you got in the cab with the two old people," and I am
22   telling him no, because I don't know two old people, and he
23   was like -- he is going on and telling me this story.  Then,
24   he goes on and is saying, "So, where did you drop the two old

M154

1   people at," and I said, "I don't know because I wasn't

2   there," and then he says after that -- then he goes on to

3   say, "Why would you go to O'Hare Field?"  I said, "I don't

4   know.  You tell me why because I wasn't there."  This is how

5   we are playing this.  This is how the thing is going.  So, he

6   is saying -- he was coming up with all kinds of stuff.  They

7   kept on badgering me and badgering me, and I kept saying I

8   didn't do it.

9       Q    When you say "badger," do you mean they kept saying

10  it didn't make sense?

11      A    They kept telling me I did it.

12      Q    That you had done it?

13      A    That I killed this man.

14      Q    They told you that you had been identified?

15      A    Right.

16      Q    Now, let's talk about the story you told the male

17  Assistant State's attorney.  You had been given your rights

18  when you got back to Area 5, right?

19      A    I can't remember that.

20      Q    I thought you got your rights at Area 5.

21      A    I was photographed at 11th and State, was

22  photographed and fingerprinted.  We went to Area 5, and he

23  took me in another room and gave me my rights.  I don't

24  remember my rights again until the lady State's attorney.

*P1155*

1    Q    Tovar gave you your rights, that form you signed?

2    A    You know what?  I didn't remember signing that.  I

3  don't even remember signing it, but that is my signature, so

4  I guess I did.

5    Q    Ms. Lindsey, I will show you Respondent's Exhibit

6  No. 2 for identification.  Now, you recognize that, don't

7  you?

8    A    No, but that is my signature, so I had to sign it.

9    Q    And it is dated October 14, 1992; is that correct?

10    A    Yes.

11    Q    Officer Tovar, the man who testified earlier, he

12  signed that also?

13    A    I guess he did, but I didn't remember.

14    Q    You don't remember anything about that form?  You

15  do recognize that that is your signature?

16    A    Yes, that is my signature.

17    Q    Now, you said the next thing you remember reading

18  your rights or hearing your rights was from the female

19  Assistant State's attorney, Ms. Nelson?

20    A    Yes.

21    Q    Now, she read you your rights; is that correct?

22    A    Yes.

23    Q    And then you described this event to her; is that

24  right?

*M156*

1       A    Yes.

2       Q    How did you decide on this story?  I will show you

3  what has been marked as Respondent's Exhibit No. 1 for

4  identification.  That is your handwritten statement --

5       A    I didn't write that.

6       Q    The Assistant State's attorney prepared that?

7       A    Yes.

8       Q    The words she wrote in there were words you said to

9  her?

10       A    Yes, because when I asked her --

11       Q    She read that statement out loud to you after it

12  was prepared?

13       A    Yes.

14       Q    And after you had prepared this statement, you

15  signed the bottom of the statement on each page, right?

16       A    Yes.

17       Q    You even corrected a couple of things.  You told

18  her you didn't smoke, right?

19       A    Right.  Now, I do.

20       Q    Back then, you didn't smoke?

21       A    No.

22       Q    You made that correction because it said you

23  smoked, and you didn't smoke?

24       A    Yes.

P?157

1    Q    Now, your rights appear on that form on the first
2    page, is that right, in this typewritten area?

3    A    Yes.

4    Q    You read those, and she read them out loud to you;
5    is that correct?

6    A    Yes.

7    Q    Now, how did you decide this story, the story that
8    is written in those pages?  How did you decide on that?

9    A    Okay.  Taking their story with the two old people,
10   right?  Now, the point where they said I killed this man -- I
11   am thinking back.  I didn't want to say I killed this man
12   because I didn't.  So, --

13   Q    You have read that statement though?

14   A    Yes.

15   Q    In that statement, it says you killed the man.

16   A    I read the statement.  When she comes along, right,
17   and she talks to me.  I asked her first, I asked her, I said,
18   "Would you believe me if I told you that I didn't do it," and
19   she said, "No, because you have already changed your story,
20   and you have told a lot of lies, so the Judge won't even
21   believe you."  So, when I asked her that, I knew it was no
22   hope, so I took their story that they told me about the old
23   people and just fed off into it, made up anything.  They told
24   me that.

*m168*

1    Q    What was the story they had told you about the old
2  people?

3    A    They told me it was two old people in this cab,
4  that I was suppose to be at a gambling casino, and I was
5  gambling or something, and I kept telling them I didn't
6  because I don't gamble.  I guess they left that alone, but
7  they did say that my videocamera was at the gambling casino,
8  also along with O'Hare Field.  Then, they said I came out
9  either -- either I was already in the cab or the two old
10 people were already in the cab.  I can't remember which way
11 they said it, but whoever got in first, somebody got in a
12 half a block later.  So, they was saying -- asking me --
13 this is how they was presenting it to me, "Did you sit in the
14 front or back?"  So, I was like, "I don't know because I
15 wasn't in the cab."

16   Q    How did you decide on the facts in this statement?
17 How does the fact --

18      MR. SOROSKY:  Objection.  This has been asked a number
19 of times.

20      THE COURT:  Overruled.

21      MR. FORD:  Q  Ms. Lindsey, how did you decide on the
22 story in the statement, Respondent's Exhibit No. 1 for
23 identification, your handwritten statement?

24      A    In other words, how did I decide that I killed this

C02164

1   man?

2       Q    How did you decide -- you have read this statement?

3       A    Yes.

4       Q    How did you decide on the facts in this

5   statement -- and there is a lot of facts here -- the killing

6   and the incident?

7       A    That is their story.  I just made up -- the things

8   I made up in that was she kept -- okay, the old people,

9   period.  That was their story.  All this scene about killing

10  this man is their story.

11      Q    This is the old people's story?

12      A    Right.

13      Q    How do you know that?

14      A    Because that is what they told me.  They are saying

15  there is two old people that are saying I killed this man,

16  but what I said in there is -- like they asked -- I just got

17  tired.  I kept saying I didn't do it, but when I talked to

18  the State's attorney, it was already understood that I did do

19  it.

20      Q    Did you, prior to the time you talked to the

21  Assistant State's attorney, did you ever say you did it?

22      A    Yes.

23      Q    You told the Detectives in several different

24  stories, all including the fact that you had killed the

1  victim, before the Assistant State's attorney got there,

2  right?  It was just different ways.  One was that he had

3  raped you and you shot him, and you had come up with

4  different stories in which you had killed him; is that right?

5       A    It was like self-defense.

6       Q    You were coming up with those yourself, making

7  those up?

8       A    I was making those up because they already told me

9  about the two old people, so I am taking that story and just

10  making up anything because they are saying I did it, right?

11  I am telling them I didn't, so I am trying to say anything to

12  go home.

13       Q    Did you think you were going to go home if you said

14  you shot the man?

15       A    With the self-defense, yes.  In my frame of mind,

16  yes, I thought I was going home.

17       Q    But you changed your story.  The story in this

18  Respondent's Exhibit No. 1 for identification, in this one

19  you shoot the victim in the cab, just shoot him, and then you

20  take his money.  You remember that?

21       A    Right.

22       Q    This is the last story you told, right; is that

23  right, Ms. Lindsey?

24       A    Yes, but I didn't tell them --

*C 161*

1    Q    Why did you come off of the story where he raped
2    you and that is why you tell them you shot him?
3    A    I don't even know no better way to explain it, that
4    that wasn't good enough and, for some reason, it came up that
5    I did it.  I was talking to her -- when I came up with the
6    part where I just killed him, I was talking to her, and, at
7    that point, I was tired.  I saw I wasn't going home, and they
8    wasn't going to leave me alone.
9    Q    So, you would admit to murdering someone and call
10    it a day?
11    A    I gave up.
12    Q    How about the fact that you had been picked up,
13    what the cab driver said, what you said, what they did?  How
14    did you decide on that?
15    A    I just made it up.
16    Q    The whole thing?
17    A    The whole thing except the two old people and all
18    that part about O'Hare Field.  They told me that story.  I
19    said this lady picked me up, I walked home, went to the
20    Chinese place, I walked home.  I said stupid stuff because I
21    was tired of them in my face.
22    Q    So, at the beginning when you are talking about
23    O'Hare and the casino and the liquor store, you say the only
24    reason you said that is because they told you that; is that

1  right?  Is the only reason you said the business about the

2  old people and the liquor story and the Red Roof Inn --

3      A    I didn't say anything about the Red Roof Inn.  I

4  didn't know anything about that until I read the reports.

5  They was asking me where were they dropped off at.

6      Q    You didn't know where they dropped you off?

7      A    I wasn't there.

8      Q    When did you stop telling them you weren't there?

9      A    When the State's attorney wasn't in the room, I

10  would tell them I am not going down for something somebody

11  else did.  When she came back in the room, I knew she wasn't

12  going to help me, so I went back to the lie, and I knew I

13  wasn't going home.  She said she decided whether I go home or

14  not.

15      Q    So, you made this up.  You read this statement.

16  You made this up because you wanted to be done with the whole

17  thing; is that correct?

18      A    In between that, I made it up.  I made up the part

19  where I walked home.  I just got tired.

20      Q    How about the incident about the shooting itself?

21  You made it up?

22      A    Yes, because I didn't do it.

23      MR. FORD:  No further questions.

24      THE COURT:  Redirect.

1    MR. SOROSKY:  No redirect.

2    THE COURT:  Call your next witness.

3    MR. SOROSKY:  No further witnesses.

4    THE COURT:  You are resting?

5    MR. SOROSKY:  Yes.

6    THE COURT:  Rebuttal?

7    MR. FORD:  Judge, I will re-call both of my witnesses

8  for brief rebuttal.

9    THE COURT:  If it is for the same testimony, I will not

10  sit and listen to that.

11    MR. FORD:  There are additional things that arose in the

12  Defendant's testimony that I think I should rebut.

13    THE COURT:  Then, I will hold it on call until tomorrow.

14    MR. FORD:  Well, that would be fine, Judge.

15    MR. SOROSKY:  Could you put it in the afternoon?

16    THE COURT:  Sure; 1:30.

17    MR. SOROSKY:  Sure.

18

19

20

21

22

23

24

1  STATE OF ILLINOIS

2  COUNTY OF COOK

3

4                    I, PAMELA M. TERRY, Official Shorthand

5  Reporter of the Circuit Court of Cook County, County

6  Department-Criminal Division, do hereby certify that I

7  reported in shorthand the evidence had in the above-entitled

8  cause and that the foregoing represents a true and correct

9  transcript of all the evidence heard.

10

11

12  _____

13  Official Shorthand Reporter

14  Circuit Court of Cook County

15  Criminal Division

16  CSR #084-001170

17

18

19

20

21

22

23

24

— (Rev. 2/18/93) CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK  } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME . THREE . OF . A . NINE . VOLUME . . . .

. RECORD . CONSISTING . OF . THE . REPORT . OF . PROCEEDINGS . . . NO . PRAECIPE . HAVING . BEEN . FILED . IN . . .

. THE . APPELLATE . COURT . UNDER . APPELLATE . COURT . NO . . 95 . 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . . . . . . . . . . . JERI . LINDSEY . . . . . . . (01) . . . . . . . . . . . . . . WAS . . ., Defendant . . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . . SEPTEMBER . . . . . . 20 . . . , 19 . . 95

*Aurelia . . . Pucinski* (SEAL)

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

05-1458

# 92 CR 25135



92 CR 25135

SHELVIN SINGER

Reviewing Court No. 95 15?6

**FILED**

APPELLATE COURT 1st DIST.

THE PEOPLE OF THE STATE OF ILLINOIS

NOV 07 2002

STEVEN M. RAVID
CLERK

**VS.**

JERI LINDSEY   (01)

# 92cr25135

DIS

DIVISION

VOLUME FOUR OF NINE

REPORT OF PROCEEDINGS

**AURELIA PUCINSKI**

**Clerk of Court**

Per AP./SIR

**Deputy**

1 STATE OF ILLINOIS )
                    )  ss
2 COUNTY OF C O O K  )

3           IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
4

  THE PEOPLE OF THE )
5 STATE OF ILLINOIS )
                    )  Case No. 92 CR 25135
6    vs.            )
                    )  Charge: MURDER
7 JERI LINDSEY      )

8           REPORT   OF   PROCEEDINGS

9           BE IT REMEMBERED that on the 13TH day of

10 September, 1994, this cause came on for hearing

11 before the Honorable SHELVIN SINGER, Judge of said

12 Court, upon the information herein, the defendant

13 having entered a plea of not guilty.

14      APPEARANCES:
                HON. JACK O'MALLEY,
15              State's Attorney of Cook County, by
                MR. NICK FORD,
16              Assistant State's Attorney,
                Appeared on behalf of the People;
17
                MR. SHELDON SOROSKY,
18              Appeared on behalf of the Defendant.

19

20

21

22

   Kenneth Madoch
23 Official Court Reporter
   Circuit Court of Cook County
24 County Department-Criminal Division.

N 1

1      THE CLERK:  People of the State of Illinois

2  versus Jeri Lindsey.

3      THE COURT:  All right.  The record she

4  reflect the defendant Jeri Lindsey is present in

5  her own person through counsel, state is present

6  through its counsel.

7      MR. FORD:  At this time, Judge, we would be

8  resting, not introducing any rebuttal evidence.

9      THE COURT:  All right.

10      MR. FORD:  Judge, may I check, I thought I

11  had the file out here and it's not.  I'll be right

12  back.

13          Thanks, Judge, sorry.

14      THE COURT:  All right.

15      Before you have argument on the motion, do

16  you want to go into the Miranda issue and have

17  argument on both together or shall we just argue

18  this.

19      MR. SOROSKY:  Well, the defendant has

20  acknowledged in this motion, your Honor, that she

21  was advised of her Miranda rights.

22      THE COURT:  Yes.

23      MR. SOROSKY:  After she made her original

24  statement wherein she denied any involvement in

N 2

1    this homicide, if you remember the facts from the

2    defendant's version.

3         THE COURT:  Yes.  I have a memory of the

4    facts, I have some memory of the defendant's

5    testimony.

6         MR. SOROSKY:  So that while the defense

7    position is when she gave her first statement

8    denying any involvement in this crime and saying

9    her allegations of, her first allegations of rape

10   were false, while the defendant's position is she

11   was not warned of her Miranda rights prior to

12   that, the defense nevertheless wants that admitted

13   into evidence.

14              So therefore, we would say whether

15   she was or was not warned of her Miranda rights,

16   we certainly want that admitted into evidence.

17   The defendant's motion is thereafter, after she

18   denied involvement in this crime, the officers

19   then advised her of her rights and this is when

20   they began talking to her.

21        THE COURT:  But there are 2 other

22   allegations.

23        MR. SOROSKY:  I'm aware of that.

24        THE COURT:  That I haven't -- I don't have

N  3

1    in front of me but number one, there is an

2    allegation that she requested counsel.

3        MR. SOROSKY:  Yes.

4        THE COURT:  And that request was ignored and

5    the questioning continued.  And number 2, there is

6    the question of the alleged drug condition,

7    medicated condition, lack of sleep that operates

8    in 2 ways.  One, potential coercive -- it raises a

9    potential of coercion in the incident which you

10    can raise, but 2 it also raises an issue of waiver

11    under Miranda which is in my way, somewhat

12    different from the coercive issue.

13        MR. SOROSKY:  Yes, they are.  A good deal of

14    those facts came out in the -- a good deal if I

15    could use the word, Miranda facts came out in the

16    coercion motion or some of them.

17        THE COURT:  I heard nothing, not a thing

18    relative to Miranda.

19        MR. SOROSKY:  No, not Miranda per se.

20        MR. FORD:  No, Judge, for sure I would just

21    assert this:  The Court has enough evidence before

22    it right now and Miranda I understand is Mr.

23    Sorosky's burden.  The Court has enough evidence

24    before it on the issue of intoxication on the time

N 4

1    and date.

2          THE COURT:  Oh, no, there are 2 separate

3    issues of the case.  The first issue deals with

4    coercion.  That is if the officers were aware of

5    the drug or intoxicated condition and then took

6    advantage of that.

7          MR. FORD:  Course 6f ethics, I understand.

8          MR. FORD:  The second, was there a knowing

9    and intelligent waiver under Miranda.

10          THE COURT:  There are 2 separate issues.

11          MR. FORD:  But the officers, their testimony

12    up to now will be relevant towards both ends.  In

13    other words they indicated the statement was made

14    after you know, "X" number of hours of their

15    contact with her during which she couldn't have

16    ingested any drugs.  The Court has information

17    about what she said she ingested and when she

18    ingested it and the Court has information about

19    her own description about the way you know, what

20    she was doing at the time she was doing it.  I'm

21    just asserting at least as far as that aspect --

22          THE COURT:  Counsel, I'm telling you that

23    there are 2 separate issues, regarding Miranda,

24    Miranda itself, there is no evidence at all.

1        MR. SOROSKY: Right. Let's just argue this

2   motion and then we'll file another motion

3   concerning Miranda.

4        THE COURT: The may not be necessary. I may

5   sustain your motion, I don't know what I'm going

6   to do.

7        All right, let's then, let us see how far

8   we get with the case on trial, and perhaps we can

9   argue this.

10       MR. FORD: Definitely argue it today, I'm

11   ready to argue.

12       THE COURT: What.

13       MR. FORD: I'm ready to argue.

14       THE COURT: Fine, but I want to finish one,

15   I started -- we've delayed it.

16       MR. FORD: Mr. Bryant Adams.

17       THE COURT: Mr. Bryant Adams. All right,

18   we'll pass this for perhaps an hour or two, okay.

19       MR. SOROSKY: Yes, thank you, your Honor.

20       THE COURT: Stick around, first I have a

21   question to ask Miss Lambert before. Okay. You

22   can take her back.

23                        (Case passed.)

24       THE CLERK: Recalling People versus Jeri

N 6

1    Lindsey.

2         THE COURT:  The record should reflect Miss

3    Lindsey is present in her own person through

4    counsel, state is present through counsel.  Both

5    sides having rested.  I bade the State to go

6    forward with their opening statement -- final

7    argument.

8         MR. FORD:  Waive my opening argument,

9    reserve rebuttal.

10        THE COURT:  Mr. Sorosky.

11        MR. SOROSKY:  In response, your Honor, the

12   facts of the case indicated that the defendant was

13   brought to a police station on October 14, 1992,

14   around 11 AM and she remained continuously within

15   police custody over a period of 24 hours wherein

16   the police interrogated the defendant and obtained

17   certain statements.

18             When the defendant was first in

19   custody of the police, the police told her that

20   she is in the nature of a complainant, that they

21   were taking her to the police station for purposes

22   of trying to solve a rape case or her rape

23   allegation or more specifically to see if she had

24   in fact been accosted by a person who the police

N 7

1  believed was a known rapist and they wanted

2  her photographed.  The police were well aware of

3  the fact that the deceased in this case might very

4  well be connected with the accused, Jeri Lindsey's

5  rape allegation.

6            After 2 people identified the

7  defendant's photograph as being the person who was

8  in fact in a taxicab with them, the police

9  confronted the defendant with the fact that she

10  was involved in the homicide of the deceased, and

11  that they did not believe her rape allegation.  At

12  this time, the defendant told your Honor that she

13  told the police the truth, that she had lied, she

14  lied about the rape allegation, she lied, she

15  testified for various personal reasons but that

16  she was not at all involved in the homicide.

17            The police then gave the defendant

18  what we commonly call her Miranda rights,

19  thereafter.  Thereafter related a series of

20  stories to the defendant, or series of facts to

21  the defendant.  Excuse me.  Prior to that, or

22  prior to speaking to the defendant, they asked the

23  defendant to take a polygraph test, the defendant

24  appears to have readily agreed to take the

1    polygraph test.  The defendant is told somehow she

2    didn't turn up roses or she turned up deceptive on

3    that polygraph test by the police.  We don't know

4    the actual result or the actual results are

5    perhaps immaterial, at least for purposes of this

6    motion, but at least she's told that.

7              The police then begin to tell the

8    defendant that you could get the death penalty.

9    The Court remembers the testimony very well, it

10   happened recently, the testimony was recently,

11   that the defendant should relate to the police

12   that she was raped and if she was raped, things

13   would go better for her, that there was more to

14   her story if she related she was raped, that there

15   was more in it for her if she related she was

16   raped.

17             The defendant said that she believed

18   based upon what the police were saying that the

19   police were indicating to hear that her statement

20   that I didn't do it wasn't good, it was not true,

21   but that she, the defendant, could better help

22   herself by stating that she was raped, that she

23   was attacked by this man and that she shot him in

24   response to this.

1          Now maybe the defendant didn't quite
2     use the concise words that I have just stated to
3     your Honor, but this is in summary what the
4     defendant has testified to as she told you, why
5     she was induced by the police to make the
6     statements that she did.
7          The defendant further indicated that
8     she had been in custody over a long period of
9     time, that she did not have an opportunity to
10    sleep very well because of the medication she had
11    been taking and this is corroborated by the fact
12    she had made a rape allegation, the hospital
13    believed her allegation, and that therefore the
14    hospital gave her medication because the hospital
15    believed she was a woman who had been attacked.
16          And this is further corroborated by
17    the fact that the police did not excuse that she
18    was at the hospital because the police first met
19    up with Jeri Lindsey at the hospital when she made
20    this rape allegation.
21          THE COURT:  Why would she continue to take
22    the medication after she left the hospital because
23    she knew she wasn't raped.
24          MR. SOROSKY:  That was a question either

1    asked by you or the State's Attorney during the

2    hearing.

3         THE COURT:  It was a question I asked you.

4    It's up to her to explain it.  The only person

5    would could explain it is her, only she would

6    know.

7         MR. SOROSKY:  And she did testify and she

8    said that the reason why she made up this rape

9    story was because she had gone off on a week end

10   thing to do cocaine and she did not want her

11   roommate who was her lover to know she had done

12   this week-end cocaine thing, therefore to explain

13   her absence, she said she was raped when she was

14   at the hospital.

15              It's normal procedure in addition to

16   calling the police or for the hospital to call

17   someone's family or loved one who are near and

18   dear to the hospitalized victim.  In this case,

19   the hospital contacted Irene who was the

20   defendant's roommate.

21        THE COURT:  What evidence was there of

22   that?

23        MR. SOROSKY:  Pardon me?

24        THE COURT:  What evidence was there of

1    that?

2         MR. SOROSKY:  The fact the defendant

3    testified she didn't remember whether Irene came

4    to the hospital first or the police came to the

5    hospital first.  That was her testimony.

6         THE COURT:  Where did you get the hospital

7    notified this Irene person?

8         MR. SOROSKY:  I don't know if it came out in

9    testimony that the hospital contacted Irene, I

10   don't know if that came out, but it came out in

11   cross examination, it came out in testimony that

12   Irene was at the hospital and the police were at

13   the hospital and Mr. Ford went through a very

14   extensive cross examination and very specific

15   cross examination of Jeri Lindsey on these points

16   and it was brought out that Irene was at the

17   hospital and the defendant specifically testified

18   that the reason why she kept taking these pills

19   even though she in fact was not raped was because

20   she wanted Irene to believe that she was in fact

21   assaulted and raped and because she was living

22   with Irene and Irene being a good friend

23   apparently was saying well you have to take your

24   pills so Jeri Lindsey was taking her pills.  This

N 12

1    came out in testimony.

2              That is the reason why Jeri Lindsey

3    kept taking the pills and these pills did have

4    some effect on her and she was in custody.  She

5    didn't have an opportunity to sleep and she kept

6    altering her story because as both she and the

7    police do acknowledge, whenever she gave a version

8    of events, and there were 5 or 6 different

9    versions of events, there was conversation between

10   her and the police and the police would say, well

11   that can't be right because of this and that can't

12   be right because of this so Jeri Lindsey would

13   give a different version of events and Jeri

14   Lindsey believed that the police were telling her

15   to say something different and that something

16   different would be something that would be better

17   for her so that she could go home and get out of

18   this.

19             And this is why she kept telling the

20   different stories that she did.

21             And you will remember the defendant

22   first said, well I was with this man in the cab

23   and someone else shot him and she said she said

24   that because she didn't do it and she didn't want

N 13

1   to admit to something she didn't do but somehow

2   the police felt it would be better for her to say

3   she was in the cab because they supposedly had her

4   fingerprints in the cab, they said and they had

5   videos of her and so forth and so on and they said

6   you could go home if you say these things.

7           So she said something and then when

8   she said something and the police said that can't

9   be right because of this and this, she said

10  something else.  And she felt that the police were

11  signaling her to say these things so she could

12  give the proper statement to get out of this and

13  go home and this was the inducement that the

14  police used.  It was a fraudulent inducement to

15  get her to make certain admissions.

16          In addition thereto, the police lied

17  to her and told her certain things which were not

18  true, her fingerprints were in the cab, she was

19  seen at video tapes at O'Hare, seen on video tapes

20  at the Joliet casino and it would be better for

21  her to acknowledge these things.  And she said

22  those things.

23          These were the inducements that

24  caused her to say what she did and like every

**N 14**

1    arrestee she wanted to go home, the police told

2    her she could go home.  You have to remember that

3    this woman was originally taken into custody by

4    police, she was not told she was an arrestee, she

5    was told that she was being brought to the police

6    station for purposes of taking her photograph and

7    fingerprints so the police could apprehend a

8    rapist.

9                Now, really, really within the

10   police heart and mind she certainly was an

11   arrestee but the police told her that she was

12   not.  So from the inception, you have a certain,

13   if you will, lack of rankness by the police.

14               Now maybe it's good police work,

15   maybe it's wise police procedure but being

16   realistic we all know, although the police said

17   we're taking you with us so we can take your

18   photograph and fingerprints, to better investigate

19   the rape allegation, we all know that was not

20   really why she was with the police.  If for no

21   other reason, the police acknowledge they are from

22   Area 5 which is on the northwest side of the city

23   which encompasses O'Hare Airport.  The deceased

24   was found at O'Hare Airport, the police

1    acknowledge they were there for investigating the

2    murder of Rudolfo Bennett, and the rape that the

3    defendant refers to occurred on the south side of

4    the city.  It would not have been an Area 5 case.

5              There isn't any doubt the police

6    were there investigating a homicide, yet they told

7    the defendant they were escorting her if you will

8    or aiding her in the effort to apprehend the

9    rapist.  That wasn't frank, so from the intention,

10   there is a certain police inducement to come with

11   the defendant.  There is a certain police

12   inducement thereafter to get the defendant to say

13   certain things and frankly, Miss Lindsey said many

14   things that polygraph operator Tovar which never

15   been rebutted by the State.  If you remember, it

16   was after she took the polygraph test and Tovar

17   supposedly says, well we don't buy your story and

18   I may not be using these exact words, you had a

19   you gun, you were in the cab, it might be better

20   for you to say that, and then she said okay, I was

21   in the cab, and then Tovar said he called the

22   detectives in.  And the detectives then said they

23   took her to Area 5 and began to question her

24   again.

1              And it certainly is an inducement

2       when she says Tovar says look, you could be up

3       here now, meaning you could be in a good position

4       and go home but you could be down here if you say

5       it wrong.

6              And therefore we would say based on

7       the totality of all the evidence, there was this

8       fraudulent inducement by the police, a certain

9       deceit by the police, a certain maybe dishonesty

10      would not be the right work but lack of frankness

11      by the police, a certain coaxing by the police and

12      therefore the defendant made all the statements

13      that she did.  Considering the Assistant State's

14      Attorney, I don't think her testimony is very

15      relevant to this proceeding.

16         THE COURT:  Could I have the exhibits, the

17      State's exhibits.

18         MR. SOROSKY:  Because once the defendant had

19      made the eventual -- once the defendant had made

20      her statement, the police just called the State's

21      Attorney, the State's Attorney gave her her

22      Miranda rights and the State's Attorney just wrote

23      up the statement and the defendant signed it, but

24      the proper inducement had already been made.  The

1    Assistant State's Attorney who testified, was not

2    a party to any of that, that occurred before

3    before.

4                    Also it's interesting the State did

5    not call Assistant State's Attorney Rosenblum who

6    was there at the earlier stage when a good deal of

7    this inducement was taking place. They merely

8    called the Assistant State's Attorney Nelson and

9    at that time, if you will, the cat was out of the

10   bag. I mean the defendant had already made her

11   statement, she didn't say anything different to

12   Assistant State's Attorney Nelson that she hadn't

13   already said orally to the police and that was

14   what the police were telling her to say.

15           THE COURT: Where do you get that, all I

16   heard, I didn't hear what she told the police and

17   also I didn't hear any testimony she told Nelson

18   what she told because she had already told the

19   police that, that is not testimony. I call your

20   attention to, well specific cat out of the bag

21   cases, which in effect hold that this so-called

22   cat out of the bag theory, unless there is

23   evidence that indeed one made a second statement

24   because of the first statement. All I have is the

N  18

1    contrary, she made different statements to

2    different people at different times, sometimes a

3    different statement to the same people.

4        MR. SOROSKY:  Right, and the only thing

5    we're saying is the statement she gave to the

6    State's Attorney was the statement she had earlier

7    said to the police, that's all we're saying.

8        THE COURT:  That's -- it doesn't make out

9    the so-called cat out of the bag theory.

10       MR. SOROSKY:  Well what I mean by that is,

11   the statement, by the time State's Attorney Nelson

12   arrived, all the police inducements had already

13   been made, by the time State's Attorney Nelson had

14   then arrived, the defendant had talked to

15   polygraph operator Tovar, the defendant had talked

16   to police, they had told her all these statements

17   the defendant had made.  I don't have to reiterate

18   them, I know the Court knows them.  Has heard them

19   just yesterday.

20             And when the State's Attorney Nelson

21   came, the defendant just repeated the story she

22   had told the police.  That's what I mean by cat

23   out of the bag, I'm just saying that, that's all.

24   The State's Attorney Nelson might be a relative

N 19

1   witness if there was an allegation that she wasn't

2   given her Miranda rights, State's Attorney Nelson

3   would say I gave her her Miranda rights and then

4   she made the statement but that's not what this

5   motion is about as your Honor has very astutely

6   pointed out.  We're not saying any impropriety

7   occurred when Assistant State's Attorney Nelson

8   was present, we're saying they occurred prior to

9   her arrival.

10          THE COURT:  Mr. Ford.

11          MR. FORD:  Judge I'm going to be brief.  I'm

12   looking through the defendant's -- the actual

13   allegations in the motion, I'm just going to

14   address them one at a time.

15               She alleges in subparagraph 6 tell

16   us the truth and you can go home.  The defendant

17   made the statement to the police, the defendant

18   states she made up the rape allegation, she was

19   never in the cab, with the deceased.  She

20   indicated herself that she made up that allegation

21   well before the police ever got involved in this

22   case and she only came off of that allegation when

23   she seen it kind of caused her to become embroiled

24   in this murder.

1            In any event, even if the Court

2      accepts allegation 6 and actually I want to back

3      track for a moment, Judge.  What you heard her say

4      and actually some reality slipped into some of the

5      stuff she was saying, she kept saying can I go

6      home now, can I go home now, I don't doubt that's

7      something Miss Lindsey said, I think that's

8      probably the reality, she herself felt once she

9      admitted to something that happened she could go

10     home.

11            She even said that when she

12     testified, Judge, but I'll add the next

13     accusation, subsequent to the polygraph test the

14     police told the defendant that the polygraph test

15     indicated and there is a series of things, these

16     inquiries were made of her during the course of

17     the polygraph examination.  And the examiner Tovar

18     indicated that his examination indicated when she

19     was asked about whether or not she was in the car

20     she said no, his examination had indicated that

21     that was indicated deception on that answer.

22            A polygraph examination such as the

23     one that was conducted of Miss Lindsey and made

24     voluntarily and I don't think there is any issue

1    about that, she indicated she wanted to get

2    involved in that, is an investigative tool.  And

3    why is it an investigative tool?  Because it's

4    useful because the individuals that are involved

5    feel that like Miss Lindsey feel what they're

6    telling is the truth.  When it indicates

7    deception, Judge, the officer's reacted to that

8    deception by inquiring further of Miss Lindsey and

9    if Court wishes --

10            THE COURT:  Excuse me.

11            MR. FORD:  If the Court wishes, I mean, I

12   heard Mr. Sorosky used the word coax, I think

13   there is a lot of coaxing that goes on when you

14   have an individual like Miss Lindsey and is

15   vacillating about stories.  I don't think I ever

16   heard a motion to suppress statements where we

17   have been taken more to the front line of how

18   someone's mind works when they have committed a

19   crime and the vacillations they go through in an

20   effort to absolve or get themselves out of that

21   situation.

22            She indicated herself she told a

23   series of tall tales, that's her words, tall tales

24   and it's interesting, she's asking the motion to

1    suppress statements be allowed because her will

2    was overcome but I think it's clear from the way

3    she described the incident, she was always a free

4    acting individual coming up with these stories

5    with a motivated end in mind.  I mean that's the

6    way the stories changed in this case, from the

7    story she first told her lover to the story that

8    she told the police when she first came in contact

9    with them to the end of this whole incident.

10                   These are all stories told by Miss

11   Lindsey in order to take her from point A to point

12   B.  The problem is she felt I think the way things

13   broke for her when she finally did kick out

14   reality, she had this really outrageous notion

15   that somehow the statement, and I often myself

16   wondered having taken these statements myself

17   whether it's the cathartic value of having

18   admitted to the crime, the circumstances

19   surrounding it, whether it's some recollection on

20   the part of a child to some childhood moment where

21   some parent told them if they have tell the truth

22   it will resolve an incident.  They came around to

23   tell the truth, the allegations they make to try

24   to get out from under this case, Judge, are just

N 23

1    not even enough to suppress the statement in the

2    first place and when you parrot it with the nature

3    of Miss Lindsey's testimony which I think the

4    Court has an ample opportunity to view yesterday,

5    really indicate there was nothing at all

6    whatsoever in the nature of the misconduct in this

7    case to overcome her will.  Not at all.  Judge,

8    this is totally without merit and I would be

9    asking the Court deny the motion to suppress

10   statements.

11        THE COURT:  Okay.  Thank you.  I am in a

12   posture where I can rule now.

13             First let me point out to you not

14   all misrepresentations of fraud by the police

15   constitute overcoming the will of the, to overcome

16   the will of the suspect.  I would concede that if

17   a statement was made, if you tell the truth we'll

18   let you go home, that that would be kind of fraud

19   that maybe will overcome the will, but the other

20   side of that coin is so absurd, if you admit to

21   the crime, I'll let you go home, that really seems

22   to be absurdity.  But I find no evidence of that.

23             Of course, if the defendant had been

24   under arrest for a period of time in which it took

1   for the police to come, for the State's Attorney

2   rather to come up with the statement that was

3   People's Exhibit Number Two, I think for

4   identification, I think the defense would be in an

5   excellent position.

6                    The problem is that that's not the

7   situation.  The situation is that the defendant

8   was at the outset, at the outset was a

9   complainant, that is she was an alleged rape

10  victim.  Now, at somewhere along the line, the

11  police did become aware that there was no

12  foundation she was a rape victim, but you look at

13  the status of the defendant in terms of evaluating

14  custodial situations, as you would based upon the

15  objective facts as known to a reasonable person

16  who is innocent.  So, initially when she's with

17  the police and at the police station, objectively

18  stated, she's a complainant who is a rape victim

19  and therefore she's really not in custody, she's

20  there to assist the police in getting her rapist.

21  That somewhere along the line the police become

22  aware she was not a rape victim is really

23  irrelevant, certainly it's irrelevant in the light

24  of no evidence that she -- a reasonable person

1    would believe she was in custody.

2              Secondly, after she came off the

3    rape victim story, she told them evidence which

4    would make her a witness to a murder, not a

5    participant in a murder.  So once again, a

6    reasonable person who is innocent and is at the

7    police station and gives the police information

8    about a murder they witnessed but are not a party

9    to, that person would not believe they're in

10   custody.

11             So we've got to discount that.  I

12   still will tell you that the time between, the

13   time she was in custody is still disturbing but

14   it's lessened in large measure at least for me by

15   the defendant's own testimony.  She rambled, she

16   went on and on and on, much of it sounded to me to

17   be nonsense.  Inherently contradictory, and I have

18   no doubt that it took the police a good deal of

19   time so they can get something they could

20   comprehend.  Again, that's not for the purposes of

21   wearing down her will but simply to try to

22   understand what was going on, was she a rape

23   victim, was she a witness to a murder, in which

24   she had no part to?

1              I heard her testimony.  It would
2    take a long time to determine that.  There is also
3    all sorts of inherent contradictions too.  I
4    cannot believe that there is medication that would
5    cause a person over a period of 3 days to go to
6    the bathroom every 5 minutes.  That a hospital
7    would give that kind of medicine, that isn't that
8    kind of medicine.  Her testimony about being under
9    the influence of the narcotics and the drugs just
10   simply does not hold true because there was a 3
11   day hiatus between the time she took the
12   medication to the time she met with the police and
13   probably even a 4 day hiatus between the time she
14   ingested the drugs to the time the police came to
15   talk to her about the alleged rape.  So it doesn't
16   seem reasonable to me she would still then under
17   the influence of the drugs or the medication.
18              The statement that is both the
19   Petitioner's --  Respondent's Exhibit Number one
20   and number 2 are the evidence -- the evidence is
21   the defendant participated in the statement, for
22   example, in the polygraph consent, she corrected
23   her name on 2 occasions, in the statement itself,
24   Respondent's Exhibit Number 2, she again made

N 27

1    corrections.  Signed each page.  The statement she

2    said she had not been mistreated by the police in

3    the statement.  There is a disturbing lack of time

4    for which, under which Miss Lindsey was being

5    questioned by the police before the final

6    statement, Respondent's Exhibit Number 2 was

7    produced but it becomes less disturbing, the

8    amount of time when you consider that first, the

9    defendant was a complainant in a rape case,

10   secondly, the defendant was a witness, an innocent

11   witness to the murder and the police in the

12   interim were investigating these facts.  And

13   third, when you consider that the defendant was

14   extremely difficult to understand.

15             So many contradictions in what she

16   says.

17             As to Mr. Tovar not returning to the

18   stand, Mr. Tovar in his testimony said what he --

19   he gave the conversation between himself and Miss

20   Lindsey.  What more could he do.  If he would

21   return to the stand, the defense would object I

22   would sustain the objection as simply a

23   repudiation and not really rebuttal.

24             In conclusion, I do hold that the

1    police did not impermissibly overcome the will of

2    the defendant to make the statement and the motion

3    to suppress is denied.

4            All right.  I'm anxious to get the

5    case to trial, it's an old case and in my view,

6    there has been daliation with the case.

7        MR. FORD:  Your Honor can I confer with Mr.

8    Sorosky very briefly.

9        THE COURT:  You've got to do it quickly.

10   Please take custody of your exhibits.

11           All right, can we set the matter for

12   trial.

13       MR. SOROSKY:  Yes, your Honor.

14       THE COURT:  Bench or jury -- now you're not

15   going to go ahead with your Miranda motion.

16       MR. SOROSKY:  The defendant does not want to

17   go ahead with the Miranda motion, this is what she

18   tells me.  But like I said --

19       THE COURT:  Is that correct, Miss Lindsey.

20       THE DEFENDANT:  Yes.

21       THE COURT:  All right.  Bench or jury.

22       MR. SOROSKY:  The defendant indicates that

23   she wants a bench trial, your Honor, this is her

24   -- I have had great discussions with the

1    defendant about it and this is what she said she

2    wants.  So let's just set a trial date and it may

3    change, I don't know.

4            THE COURT:  Well if it changes, I'll not be

5    able to go forward on the date.

6            MR. SOROSKY:  Do you want to set a jury date

7    then and if that's what I'm saying.

8            MR. FORD:  It's a big difference in the way

9    things go.

10           MR. SOROSKY:  I would contact the State's

11   Attorney before but I'm just saying let's set a

12   jury date so we won't inconvenience the Court.

13           THE COURT:  October 24th.  Monday October

14   24.

15           MR. FORD:  We have something set that day

16   and I know the Court is anxious for it to go and

17   I'm going to to be trying the case

18                   (Off-the-record.)

19           THE COURT:  All right Monday November 14th.

20           Counsels, that is the day we're going to

21   trial, 9:30 AM, I want counsels here at 9:30 AM so

22   they can announce they are ready and get the jury

23   and proceed to select.  If your client doesn't

24   wish a jury trial, you could advance it.

1          MR. FORD:  I think she's indicated bench.

2          MR. SOROSKY:  She's indicating bench but we

3     have a jury date and we can advance it.

4          THE COURT:  You can advance it but confer

5     with the State before you advance it and with me

6     before you advance it.

7          MR. SOROSKY:  Of course.

8          THE COURT:  By agreement 11-14-94 with for

9     jury.  I didn't mean to discourage you from

10    waiving a jury, I want her to be certain that's

11    what she wants to do.  Court is adjourned.

12               You have to execute a civilian

13    clothing order.

14                    (Whereupon, the further hearing

15                    of the above-entitled cause

16                    was continued to 11-14-94,

17                    at 9:30 o'clock a.m.)

18

19

20

21

22

23

24

N 31

1    STATE OF ILLINOIS )
                      )  SS.
2    COUNTY OF C O O K )

3       THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
                   I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15
     _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 6th day of June, 1995.


N 32

1

2   STATE OF ILLINOIS)
                     )   SS
3   COUNTY OF C O O K)

4            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
5

6   THE PEOPLE OF THE        )
    STATE OF ILLINOIS,       )
7                            )
         vs.                 )        Case No. 92-25135
8                            )
    JERI LINDSEY.            )
9

10                  REPORT OF PROCEEDINGS

11           BE IT REMEMBERED that the above-entitled

12  cause came on for hearing before the Honorable SHELVIN

13  SINGER, Judge of said Court, on the 14th day of

14  November, 1994.

15
         PRESENT:
16       HON. JACK O'MALLEY,  State's
         Attorney of Cook County, by:
17       MR. NICHOLAS FORD,
         MR. MICHAEL MONACO,
18       Assistant State's Attorney,
         on behalf of the People;
19
         MR. SHELDON SOROSKY,
20       on behalf of the Defendant.

21
    Brenda J. Bowers
22  Official Court Reporter
    Criminal Division.
23

24

                            -0

1        THE CLERK:  People versus Jeri Lindsey.

2        THE COURT:  You are not civilian dressed, today's

3   matter is set for trial.

4        THE DEFENDANT:  They said I couldn't have the

5   clothes, because I was taking a bench trial.

6        THE COURT:  That's not what I understand.

7        MR. MONACO:  It is set for bench on our records,

8   judge?

9        THE DEFENDANT:  I'm going to ask for a bench.

10       THE COURT:  Where is your lawyer?

11       THE DEFENDANT:  I don't know.

12       THE COURT:  Pass it. ≡

13                              (Whereupon, the matter was

14                              recalled at a later time the

15                              same day, and the proceedings

16                              were had as follows:)

17       THE CLERK:  Jeri Lindsey.

18       THE COURT:  Mr. Sorosky, I was told some very

19   disturbing news, that you filed a motion for

20   continuance.

21       MR. FORD:  He didn't file a motion for

22   continuance, what he's filing is a new answer with a

23   different defense, new witnesses.

24       MR. SOROSKY:  No, we're filing our answer.

3-O

1        THE COURT:  You haven't filed an answer?

2        MR. SOROSKY:  I have always told the State's

3   Attorneys in the case that the defendant wanted to

4   assert the defense of alibi, is that correct, that she

5   was not there, and that is --.

6        THE COURT:  But I had entered a discovery order.

7   I assume when I set it for trial, all discovery was

8   complied with.

9        MR. SOROSKY:  I explained to the State I had

10   trouble locating the witnesses.

11        THE COURT:  I'll hold a hearing on this.  This

12   matter is the oldest matter on our call.

13        MR. SOROSKY:  Fine, we're ready for trial.

14        THE COURT:  Now you are ready for trial?  You

15   cannot be in violation of my discovery order, say you

16   are ready for trial.  I entered the discovery order in

17   the case.

18              A discovery order means that there was

19   something to be complied with.  You cannot tell me that

20   you are ready for trial when -- well, you you can tell

21   me, but I assure you that when you are in violation of

22   a discovery order, you are not ready for trial.

23        MR. SOROSKY:  Well, Your Honor, as the court well

24   knows, and I explained to Your Honor in written

4-O

1  motions, we had difficulty locating many of these

2  witnesses.

3             We talked to them, located them, now

4  we're ready.

5     THE COURT:  Why did you let me set it for trial

6  today if you weren't ready for trial?  It was a little

7  while, I set this 9-13-94 for trial.

8     MR. SOROSKY:  I don't know if I had any choice in

9  letting you set the case for trial.

10    THE COURT:  I can't hear you.

11    MR. SOROSKY:  I don't know that I had any choice

12  in allowing you to set the case for trial.

13    THE COURT:  I don't understand that.  The case is

14  only two years old.  You mean in two years you haven't

15  been able to prepare the case for trial.

16            Where is the extraordinary circumstances

17  that prevented you from preparing the case in two

18  years?

19    MR. SOROSKY:  As I told Your Honor in written

20  motions, and affidavits, and going over old matters, we

21  needed the investigators to go out and contact some of

22  these people, and the funds weren't there for that, but

23  we did it.

24    THE COURT:  Counsel, you undertook the

5-O

1   representation of this defendant in a very serious

2   case.  Nobody confused you as to what the charges were.

3              Is there any confusion at any time what

4   the charge was?

5              Counsel, was there any confusion --.

6       MR. SOROSKY:  No, Your Honor.

7       THE COURT:  Counsel --

8       MR. SOROSKY:  Please, Your Honor.

9       THE COURT:  Counsel, is there not investigation in

10  any case?

11      MR. SOROSKY:  Yes.

12      THE COURT:  Be it a burlgary case, be it a

13  possession of stolen motor vehicle case, and surely in

14  a murder case there would be an investigation.

15      MR. SOROSKY:  Your Honor, I went over this with

16  you before, and I expressly told Your Honor, orally.

17  Your Honor asked me to put this in affidavits, and in

18  writing, and we did it, and I expressly told Your Honor

19  that when I got into this case, I, me personally, got

20  into this case, the defendant's family was extremely

21  supportive of -- the defendant, and they were

22  constantly calling me, and they wanted to know what

23  they can do to help, and do whatever they could.

24              Once we received the police reports, and

6-O

1    they were dispensed to everyone, the defendant's family

2    looked them over, and so forth, the defendant's family

3    frankly said to me, you know, well, things look bleak,

4    the things look bad, how are you going to win the case,

5    and I went over the things with them, you know, I don't

6    lie to people, I told them the facts.

7               The family then said, what's the sense

8    in paying you then, and they didn't -- they said we

9    don't want you to represent her any more.  He related

10   this to Your Honor --.

11        THE COURT:  You have an agreement.

12        MR. SOROSKY:  Fine.

13        THE COURT:  You have an agreement of

14   representation, I assume, since you are a lawyer,

15   that's an enforceable agreement.

16               It is entirely your responsibility when

17   you file an appearance in a case, and when you proceed

18   up to a certain point in the case, to be ready,

19   willing, and able to represent your client.

20        MR. SOROSKY:  Fine.

21        THE COURT:  That is your responsibility.

22        MR. SOROSKY:  Your Honor --

23        THE COURT:  No one else's.

24        MR. SOROSKY:  Your Honor --

1      THE COURT:  Excuse me.  To now have this case more

2    than two years after the inception of this case, still

3    not ready for trial, it is outrageous.  It's a

4    dereliction of your responsibility to your client.

5      MR. SOROSKY:  Well, Your Honor, first of all, I'm

6    not raising these points.  You are asking me questions

7    as to why this was not done sooner, and I am merely

8    answering your question.

9              I didn't come in here --.

10     THE COURT:  It is not an adequate answer.

11     MR. SOROSKY:  Well, you may not feel it's an

12   adequate answer, but I am telling you that is, in fact,

13   the only reason why it took so long to do these things.

14              So, it took a long time to do them, that

15   was a handycap we labored under, but it is now done,

16   and we say now we are ready.  You say that we're not

17   ready.

18     THE COURT:  Of course not.  You are in violation

19   of my discovery order.

20     MR. SOROSKY:  I accept that fact.

21     THE COURT:  Sir, I will continue the case.

22              It's going to be a motion defendant

23   continuance, and I'm telling you now, you had better be

24   here at 9:30 on the date I set it for trial, because I

8-O

1    want you here.

2              Your history of being here -- the other

3    problem is, your history of being in court when the

4    case is -- has been scheduled, is a sorry history.  You

5    are frequently not in court when the case is called.

6        MR. SOROSKY:  That may be true, but my tardiness

7    has not had any affect --.

8        THE COURT:  I didn't say tardiness, I said you

9    have frequently not been in court when the case is

10   scheduled.

11       MR. SOROSKY:  There were some days --.

12       THE COURT:  How that can be interpreted as

13   tardiness, is a mystery to me.

14       MR. SOROSKY:  There were one or two, or three

15   times, not many, Your Honor, early on in the case, when

16   the case was just going to be continued, when I was in

17   another court, I said I was coming, I'll be late, the

18   case was continued, however.

19              That had absolutely zero affect on the

20   progression of this case.

21              I also would add, Your Honor, frankly

22   Your Honor does have the very crowded court calendar,

23   and you do try a lot of cases.

24              There have been a number of times where

9-0

1  hearings were continued just because other proceedings

2  were taking place in this courtroom, so --.

3      THE COURT:  Counsel, that's because you were not

4  in a trial posture.  Whether I have a trial -- crowded

5  trial calendar or not is not pertinent, because I do

6  have the ability to send the case out to other judges

7  for trial.

8           We have extra judges here for that

9  purpose, and we have a team approach.

10     MR. SOROSKY:  I'll do whatever anyone wants.

11     THE COURT:  I can tell you this.

12     MR. SOROSKY:  Yes.

13     THE COURT:  There have been nine dates when you

14 have not been here.  That's considerably more than one

15 or two times, that's at least nine days.

16     MR. SOROSKY:  I would say on every one of those

17 times I was in another court, and I called, and nothing

18 was going to happen on this case.

19     THE COURT:  Counsel, nothing can happen if you are

20 not going to be here.

21     MR. SOROSKY:  Even if I was here, the case was

22 going to be continued.

23     THE COURT:  At least I would not have continued it

24 until the next date, at least I would have inquired as

1    to how we were progressing in discovery.

2              The fact that maybe nothing would have

3    been done -- that's not a fact, perhaps nothing would

4    have been done, does not excuse your appearance.

5              Mr. Sorosky, I'll tell you now, I'm

6    setting this case motion defendant for trial.  Court

7    begins at 9:30.  I want you here at 9:30, and I tell

8    you now, I don't need any missing of court dates, and

9    it will be viewed by me as a serious violation.

10   MR. SOROSKY:  Are we setting this for trial?

11   THE COURT:  Yes, we are setting this for trial.

12   MR. SOROSKY:  The defendant would like to know if

13   she can have a contact visit with her aunt.

14   THE COURT:  I'm not going to do it at this time.

15             Mr. Sorosky, consider this as to any

16   other case that that you might undertake in this

17   courtroom, if you don't appear, you had better be here

18   each day in court that the matter is set.

19   MR. SOROSKY:  Can I suggest setting this for maybe

20   mid December, or like the second week in December,

21   since this is a bench trial, juries tend to be a little

22   less common during that period of time.

23             I don't know what else --.

24   THE COURT:  This is a bench trial?

11-O

1      MR. SOROSKY:  That is correct, that's what the

2  defendant wants.  That's the only reason I say that.  I

3  have gone over that --.

4      THE COURT:  I want to take the waiver now.

5      MR. SOROSKY:  Let me say this concerning that

6  point.

7                   I have discussed the differences between

8  a bench trial and a jury trial with the defendant

9  extensively, she's gone over that with her family

10  members.  The defendant has been to court many many

11  times, as Your Honor has related.

12      THE COURT:  Noted.

13      MR. SOROSKY:  So, therefore, she had had ample

14  opportunity to see both bench trials, and jury trials,

15  just during the pendency of this case.

16                   The defendant has even gone through two

17  lengthy to suppress evidence in front of Your Honor.

18  We did not prevail on either of those, although on one

19  motion we did prevail on one point.

20                   Your Honor did agree with us that the

21  defendant was, in fact, in custody, whereas the State

22  argued, she was not in custody, but Your Honor felt for

23  other reasons the evidence was admissible, so you did

24  give me one point on that; but the in the bottom line

12-O

1   is we lost both motions.

2              I'm trying to lay everything

3   notwithstanding all that.  It is the defendant's desire

4   to be tried by Your Honor, judge Singer, is that

5   correct?

6        THE DEFENDANT:  Yes, that's right.

7        MR. SOROSKY:  Is there anything else you want to

8   say concerning that?

9        THE DEFENDANT:  No.

10       THE COURT:  I will inquire.

11             Miss Lindsey, your lawyer advises me

12   that you wish to be tried by myself without a jury, is

13   that correct?

14       THE DEFENDANT:  That's correct.

15       THE COURT:  You had the conversation that your

16   lawyer has described with you relative to a jury trial,

17   and a bench trial?

18       THE DEFENDANT:  Yes.

19       THE COURT:  Probably just as he has told you, I,

20   too, would like to tell you.

21             You do have a right to trial by jury in

22   this case.  That means you have a right to select 12

23   people.  Those people will all be citizens of this

24   county, Cook County, Illinois.

13-O

1            The State's Attorney will participate in

2   the selection, and you will be assisted in that

3   selection by your lawyer.

4            Once those people were selected, they

5   would listen to the evidence, and they would decide

6   whether you were guilty or innocent.

7            When you give up that right to trial by

8   jury, that means I alone will decide whether you are

9   guilty or innocent.

10           Now, do you understand you do have a

11  right to trial by jury in this case?

12           Say yes or no.

13      THE DEFENDANT:  Yes.  I'm sorry.

14      THE COURT:  Do you understand what a jury does at

15  trial?

16      THE DEFENDANT:  Yes.

17      THE COURT:  You understand how a jury is selected?

18      THE DEFENDANT:  Yes.

19      THE COURT:  You understand what happens when you

20  give up that right?

21      THE DEFENDANT:  Yes.

22      THE COURT:  Understanding those things, how do you

23  wish to be tried, by a jury, or without a jury?

24      THE DEFENDANT:  Without a jury.

14-O

1      THE COURT:  Miss Lindsey, your lawyer has given me

2   what appears to be your written jury waiver.  I ask you

3   to look at this document.

4            Do you understand by signing this you

5   are giving up your right to trial by jury?

6      THE DEFENDANT:  Yes.

7      THE COURT:  Is that your signature at the bottom?

8      THE DEFENDANT:  Yes.

9      THE COURT:  Has anyone threatened you or your

10   family in order to give up your right to trial by jury

11   against your will?

12      THE DEFENDANT:  No.

13      THE COURT:  Let the record reflect the court finds

14   the defendant understands her rights to trial by jury.

15   While she understands her rights to trial by jury, the

16   defendant persists in giving up her right to trial by

17   jury.

18            As evidence of her intent to give up her

19   right to trial by jury, the defendant has asked me to

20   file a written jury waiver.  Leave is given to the

21   defendant to file her written jury waiver.

22            The court finds that the defendant

23   knowingly, intelligently, voluntarily wishes to give up

24   her right to trial by jury, and leave is given to the

15-O

1   defendant to give up that right to trial by jury.

2       MR. SOROSKY:  I would just like to add one thing.

3               Miss Lindsey, you are taking a jury

4   trial because -- excuse me -- I apologize, you are

5   taking a bench trial, because you want to take a bench

6   trial, is that correct?

7       THE DEFENDANT:  Yes.

8       MR. SOROSKY:  I have never encouraged you, or told

9   you you should take a bench trial, have I?

10      THE DEFENDANT:  No.

11      THE COURT:  All right, gentleman, what date?

12      MR. GRAPSAS:  I was going to suggest December 15,

13  judge.

14      MR. FORD:  I would ask this supersede the other

15  trials.

16              The one thing that would be essential

17  for us to complete the work we have before us on that

18  date, Mr. Sorosky be here early, and I'm saying this

19  with apologies to Mr. Sorosky, but if we are here at

20  9:30, we'll get this going right as soon as we're here,

21  because as the court knows, perhaps Mr. Sorosky knows,

22  after that this court is heavily occupied throughout

23  the new year, and in miss Lindsey's interest, in the

24  interest of judicial economy we need to go early that

16-O

1    morning.

2        THE COURT:  9:30 a.m., motion defendant.

3        MR. SOROSKY:  We also are filing our answer to

4    discovery.

5            I also -- Your Honor, here is our answer

6    to discovery.  I, also, if you want to make this a part

7    of the file, I have this for my file, I'm showing it to

8    the State's Attorney, I just want to relate on the

9    record that I have covered all the basis with the

10   defendant.

11           I have told her that one defense

12   available is a self-defense defense, but the defendant

13   says she can not assert a self-defense because she was

14   not in the area.

15                           (Whereupon, the matter was

16                           continued to the 15th day of

17                           December, 1994.)

18

19

20

21

22

23

24

1   STATE OF ILLINOIS)

2                    ) SS

3   COUNTY OF C O O K)

4

5

6            I, BRENDA J. BOWERS, an Official Court

7   Reporter of the Circuit Court of Cook County, County

8   Department, Criminal Division, do hereby certify that I

9   reported in shorthand the above-entitled proceedings

10  had in the cause pending before the court on this date;

11   and that I thereafter caused it to be transcribed into

12  typewriting the foregoing transcript, which I hereby

13  certify is a true and correct transcript of such

14  proceedings had before this court.

15

16

17  _____
    Brenda J. Bowers
18  Official Court Reporter of the
    Circuit Court of Cook County,
19  Criminal Division.

20

21

22

23

24

18-O