File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _5_

EXHIBIT _P to Q_

TAB (DESCRIPTION) _____

```
1   STATE OF ILLINOIS )
                      )  ss
2   COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE )
5   STATE OF ILLINOIS )
                      )  Case No. 92 CR 25135
6      vs.            )
                      )  Charge: MURDER
7   JERRI LINDSEY     )

8             REPORT  OF  PROCEEDINGS

9          BE IT REMEMBERED that on the 4th day of

10  January, 1995, this cause came on for hearing

11  before the Honorable SHELVIN SINGER, Judge of said

12  Court, upon the information herein, the defendant

13  having entered a plea of not guilty.

14        APPEARANCES:
              HON. JACK O'MALLEY,
15            State's Attorney of Cook County, by
              MR. NICK FORD,
16            Assistant State's Attorney,
              Appeared on behalf of the People;
17
              MR. SHELDON SOROSKY,
18            Appeared on behalf of the Defendant.

19

20

21

22
    Kenneth Madoch
23  Official Court Reporter
    Circuit Court of Cook County
24  County Department-Criminal Division.
```

P 1

```
 1            THE COURT:  All right.  People versus
 2   Jerri Lindsey.
 3            Could I have the charging document?
 4         THE CLERK:  Sure, Judge.
 5         THE COURT:  All right.  Could the defendant
 6   please be seated at counsel table with her
 7   lawyer.  The record should reflect that the
 8   defendant is present in her own person through
 9   counsel.  State is present through its counsel.
10   We are in the process, the motion is have been
11   concluded and both sides are now ready for trial.
12         MR. FORD:  Yes.
13         MR. SOROSKY:  Yes.
14         MR. FORD:  I understand there has been an
15   executed jury waiver?
16         THE COURT:  Yes.  All right opening
17   statement, state.
18         MR. FORD:  I have a motion to exclude.
19         MR. SOROSKY:  Defense will join in that
20   motion.
21         THE COURT:  Motion to exclude witnesses will
22   be granted on behalf of both sides.  However I'll
23   ask each side to police their own witnesses since
24   you are acquainted with who they are and I'm not.
```

1   Okay, opening statement, state.

2         MR. FORD:  Thank you, Judge.  I have a brief

3   opening statement.  The facts and evidence in this

4   case --

5         MR. SOROSKY: Excuse me your Honor, the

6   defendant may have some family members outside, if

7   I can call them.

8         MR. FORD:  I have some family members too.

9         May I proceed, Judge?

10        THE COURT:  Please.

11        MR. FORD:  Judge, the facts in this case are

12  as follows.  On October 9, 1992, at around 5:00

13  o'clock in the afternoon, a cab pulled into the

14  parking garage at O'Hare Airport.  The cab

15  contained the defendant, Jerri Lindsey, and the

16  victim in this case.  They were going to to O'Hare

17  as a result of Miss Lindsey's request.

18              The series of events actually began,

19  Judge, on the October 9, earlier that day, about

20  2:30.  2 people, June Hess and John Eiselt were

21  waiting for the cab at the Empress River Casino in

22  Joliet, Illinois.  As they had a pre-arrangement

23  with the Circle Cab Company at that address for

24  the cab copy to come and pick them up.

1          As they were waiting for the cab to

2    pick them up, the defendant whom they will

3    identify in open Court left the wooded area near

4    the a casino and entered into the cab ahead of

5    them farther down the drive.  The cab then

6    approached, the 2 people waved down the cab, asked

7    him to stop.

8          At that time, the defendant was in

9    the back seat of the cab, they told the cab driver

10   they wanted to go to the Red Roof Inn in Joliet.

11   And at that time, the defendant, Miss Lindsey got

12   out of the back seat and entered the front seat

13   with the cab driver who would go on to be the

14   victim in this case and they drove away.

15         As they were driving, Miss Hess, Mr.

16   Eiselt had a brief conversation with Miss

17   Lindsey.  During the course of that conversation,

18   they had mentioned that they had gone or traveled

19   to Joliet from here in the City of Chicago on a

20   Greyhound bus.  Miss Lindsey gave them a schedule,

21   a train schedule and indicated to them they could

22   also travel to Joliet via Metra.

23         They had an ample opportunity to see

24   the defendant during the period of time they were

1   in the cab if roughly 15 minutes they were in the

2   cab with the defendant at 2:30 in the afternoon,

3   broad daylight.

4          They also learned during the period

5   of time they were in the cab with the defendant

6   and the victim in this case that the defendant was

7   asking the victim to take her to O'Hare Airport.

8   They asked the cab driver to stop so they could by

9   a 6 pack of beer on the way home.  The cab driver

10   did that and then he dropped them off at the Red

11                 Roof Inn.

12          When no what happens from this point

13   on, Judge, based on Miss Lindsey's own statement

14   in this case which indicates she continued in her

15   request that the victim drive her to O'Hare

16   Airport and we end up back at the 4th floor in the

17   parking garage that I spoke to you about earlier.

18   When they arrived there, she decided she wasn't

19   going to pay the cab driver and she attempted to

20   exit the front seat of the cab, the cab driver

21   grabbed her by the arm.  We know this because

22   these are Miss Lindsey's own words, Judge.

23          We also know that as -- after she

24   grabbed him by the arm, -- after he grabbed her by

1   the arm, he let go of her.  We know that she saw a

2   gun that he had in the front seat of the car, she

3   picked up the gun, fired several times at the

4   victim causing him to die.  She then went through

5   the victim's personal effects, his clothing and

6   took his wallet from him and left the area of

7   O'Hare Field.

8          Several days later, your Honor, I

9   believe it was on a Sunday night following this

10  which had occurred on a Friday, Miss Lindsey went

11  to the hospital and indicated she had been

12  attacked.  She indicated that she -- there had

13  been a rape attempt on her and the facts that she

14  told the police initially and medical personnel

15  that treated her initially were -- beared a great

16  deal of similarity between the facts of the case

17  and the victim in our case, described a red and

18  white cab, an African American cab driver,

19  described having had to kill the cab driver to the

20  police initially, stating that she had use a knife

21  to do that.

22          A detective on the south side in

23  Area 2 saw the similarity between the 2 cases,

24  contacted detectives on the north side.  Miss

1    Lindsey was brought in for purposes of

2    investigating her initial complaint of sex assault

3    because of the similarity of the 2 cases they took

4    a Polaroid photograph of Miss Lindsey, they took

5    that photograph and placed it with 5 other

6    photographs, took them to Miss Hess and Mr.

7    Eiselt's home, they then identified Miss Lindsey

8    as the woman that had in fact been in the cab with

9    them with the victim immediately prior to his

10   death.

11            The time of death is roughly 5:30, I

12   believe in the afternoon on the 9th of October,

13   1992.

14            After that had occurred they went

15   and confronted Miss Lindsey with this

16   identification.  It was at that time Miss Lindsey

17   indicated that the cab story she had killed a cab

18   driver to escape a sexual assault was a complete

19   lie and over the course of the next period of

20   time, she went on to change her story many times

21   indicating initially she had no idea what was

22   going on and finally described the events as I did

23   so before the Court today.

24            Judge at the close of the case, the

1    Court will find that Miss Lindsey's statement

2    paired with the testimony of June Hess and John

3    Eiselt and paired with the testimony of detectives

4    that interacted with the defendant as well the

5    Assistant State's Attorney from whom -- to whom

6    she gave the handwritten admission of this

7    incident, will be sufficient to find the defendant

8    guilty of the offenses of armed robbery and first

9    degree murder and at the conclusion of this trial

10   I'll ask you to return a verdict or finding of the

11   same, thank you.

12        THE COURT:  Mr. Sorosky.

13        MR. SOROSKY:  Judge Singer, gentlemen of the

14   prosecution, Miss Lindsey, the facts in this case

15   clearly indicate that a good and decent man was

16   tragically murdered and he was found dead in a cab

17   at O'Hare Field, that is not in dispute.

18             The issue that this Court has to

19   decide is as the Court well knows, will the State

20   be able to prove beyond a reasonable doubt that

21   Jerri Lindsey is the person who committed that

22   murder.  And Mr. Ford has given your Honor a

23   reasonable summary of the State's presentation of

24   evidence, and my knowledge of the State's case, I

1    would say that is a reasonable summary.

2                    However, when one looks at that

3    summary, there is only one piece of evidence that

4    the State has which establishes Miss Lindsey's

5    guilt.  If we eliminate that one piece of

6    evidence, even if the Court accepted everything

7    else the State presented as gospel, this Court or

8    any other Court would have no alternative but to

9    discharge the defendant.  And that piece of

10   evidence is the defendant's statement, admission,

11   confession, call it whatever you want.  We

12   eliminate that aspect of the State's case and the

13   Court could accept everything else the State says

14   as the holy grail and there is insufficient

15   evidence to convict the defendant.

16                    I believe the evidence will clearly

17   show that the police officers, particularly the

18   homicide investigators who investigated this case

19   are very skilled, adroit policemen.  They have

20   been involved in hundreds of cases involving

21   murder.  They knew the evidence will show that

22   they needed a confession, they needed a statement

23   because absent this confession or statement, the

24   State would have insufficient evidence to proceed

1    with the case and that these men used their skills
2    to obtain a statement from Miss Lindsey.
3                Now, Miss Lindsey made multiple
4    conflicting statements.  Many of those statements
5    incriminate her, incriminate her differently, and
6    I would submit that the State will do a very good
7    job of proving that Jerri Lindsey lied, that she
8    lied many many times.  I suppose it might be a
9    reasonable conclusion at the close of all the
10   evidence for anyone to conclude that this woman
11   has lied a lot.
12               But it is interesting that the very
13   woman that the State would call a liar is the
14   woman the State is asking you to believe to prove
15   their case beyond a reasonable doubt.  In other
16   words, if Jerri Lindsey makes a statement to a
17   police officer, on one occasion, where in she says
18   I was raped, the State's Attorney says Judge, that
19   is a lie, this woman is a liar.  Do not believe
20   that.
21               She then makes multiple other
22   statements and once again the State says, she's a
23   liar.  But on the statement she makes that the
24   State likes best to suit their case, the State is

```
 1    acting as Got and saying, we know this statement
 2    is the true truth, and therefore we want you to
 3    believe that statement.  So I would submit, your
 4    Honor, there is not proof beyond a reasonable
 5    doubt to convict Jerri Lindsey because the State's
 6    case is based upon the statement of a person who
 7    the State says is untruthful.  And therefore we
 8    ask you to find the defendant not guilty.
 9          THE COURT:  Would the State please call
10    their first witness.
11          MR. FORD:  Thank you Judge, I ask leave of
12    Court to call Mrs. June Hess.
13          THE COURT:  Please remain standing, face the
14    clerk and raise your right hand.
15                      (Witness sworn.)
16          THE COURT:  Press be seated.
17    A    Thank you.
18          MR. FORD:  May I proceed.
19          THE COURT:  Counsel.
20
21
22
23
24
```

P 12

```
 1                    JUNE HESS,

 2    called as a witness on behalf of the People of the

 3    State of Illinois, having been first duly sworn,

 4    was examined and testified as follows:

 5                 DIRECT EXAMINATION

 6                         BY

 7                   MR. FORD:

 8         Q   Ma'am, would you please state your name,

 9    spelling your last name for the Court Reporter and

10    speaking loudly so that everyone can hear you?

11         A   It's June Hess, H like in Henry, e-

12    double s as in Sam.

13         Q   Miss Hess, you live here in the City of

14    Chicago, is that correct?

15         A   That is correct.

16         Q   You're currently retired, is that right?

17         A   That's right.

18         Q   What did you do for a living prior to

19    your retirement?

20         A   I worked with, I was a switchboard

21    operator, the head switchboard operator.

22         Q   And that was with a company here in

23    Chicago?

24         A   Right.
```

1    Q   Now Miss Hess I would like to direct your

2    attention to the date of October 7, 1992, do you

3    recall that date?

4    A   Yes, I do.

5    Q   Were you with anyone on the date of

6    October 7, 1992?

7    A   Yes, I was with John Eiselt.

8    Q   And where did you and Mr. Eiselt travel

9    on October 7, 1992?

10   A   We went to Joliet on the riverboat.

11   Q   Now, when you say you went to Joliet, how

12   did you get from Chicago to Joliet on the

13   riverboat?

14   A   We took the Greyhound.

15   Q   And --?

16   A   And then when we got to the Greyhound we

17   stayed at the Red Roof Inn and then we all caught

18   a cab company to pick us up in the morning and we

19   also had to call back to take us back to the

20   hotel.

21   Q   Now, had you traveled to Joliet and gone

22   to the river boats prior to this time?

23   A   No, that was not the first time, we went

24   2 days in a row.

1       Q   Now, Miss Hess I would like to direct

2   your attention to the date of October 9th, 1992,

3   do you recall that date?

4       A   Yes.

5       Q   Did you in fact go to the Empress River

6   Casino on the day of October 9, 1992?

7       A   I think it was the night we went in, we

8   called a cab to pick us up over there and we also

9   told the cab driver to pick us up and bring us

10  back to the hotel.

11      Q   And what time did you request that the

12  cab pick you up at the riverboat?

13      A   At 2:30.

14      Q   That would have been 2:30 in the

15  afternoon.

16      A   Right.

17      Q   Now, did you have a regular cab company

18  that you used?

19      A   Yes, the only cab there, we had a regular

20  driver. The.

21      Q   What was the name of your regular

22  driver?

23      A   Leroy.

24      Q   Now, did you in fact go to the Empress

1    River Casino on October 9, 1992?

2         A    October 9, right, I think it was the

3    night we went 2 days in a row, Friday and

4    Saturday.

5         Q    And on the 9th of October, 1992, were you

6    waiting outside for the cab?

7         A    Right, we were waiting for the cab,

8    should have been there at 2:30.  We waited about

9    approximately 10 minutes and I says there must be

10   something wrong because Leroy was always there.

11        Q    When you say we waited, who were you

12   waiting with?

13        A    With John, because I was with him on the

14   riverboat.

15        Q    Did a cab eventually arrive?

16        A    The cab was making a turn kind of slowed

17   down, and a woman jumped from the woods into the

18   back seat.

19        Q    Initially could you see whether the woman

20   was an African American or white lady?

21        A    African American.

22        Q    You said she came from the woods, would

23   you describe how the entry way of the riverboat is

24   at that point?

1          A   Well the pavilion was there and Leroy

2     would come right over there to pick us up.   This

3     cab driver, when she jumped into the back seat,

4     then it hesitated real slow so when it came into

5     the main entrance where we waited, the doors were

6     shut and I banged at the door and I says where is

7     Leroy.   And he didn't say.

8          Q   Did you -- could you see the woman in the

9     back of the cab when you banged on the door?

10         A   Yes because I looked.

11         Q   Do you see that woman here in Court

12    today?

13         A   Yes.

14         Q   Would you please point to her and

15    describe an article of clothing she's wearing?

16         A   She's right there.

17         Q   What is she wearing today?

18         A   What was she wearing that day.

19         Q   What is she wearing today?

20         A   Wearing a blue outfit.

21         MR. FORD: For the record indicating the

22    defendant, Jerri Lindsey?

23         A   Pardon.

24         MR. FORD: I was indicating something to his

1    Honor.

2        THE COURT:  The record may so reflect.

3        MR. FORD: Thank you, your Honor.

4        Q   Where was the defendant when the cab

5    first pulled up, where was she within the cab?

6        A   She was in the back seat.

7        Q   And what did you do again?

8        A   Pardon?

9        Q   What did you do?

10       A   I tried to open the door to get in the

11   cab because he was late and I was a little tired

12   and I says, Leroy, and I looked and it wasn't

13   Leroy, the doors were shut so eventually I guess

14   he had talked to her within a minute or so and she

15   got into the front.

16       Q   What side of the front seat did she get

17   in?

18       A   The passenger side, the right.

19       Q   What happened after that?

20       A   Well John and I got in back.

21       Q   When he you and John got in the back

22   seat, did you say anything to anyone at that time?

23       A   I told John, I says I don't like this,

24   something looked funny, she sat very close to him,

1    the cab driver was very very frightened.

2           Q   Then -- Miss Hess?

3           MR. SOROSKY: Objection.

4           THE COURT:  Sustained as to the cab driver

5    was very frightened.

6           MR. FORD:

7           Q   How was the cab driver acting?

8           A   "Very frightened, very nervous.

9           Q   Okay.  What was he doing to tell you that

10   he was nervous?

11          MR. SOROSKY: Objection, Judge.

12          THE COURT:  Sustained.

13          MR. FORD:

14          Q   What were you looking at to let you know

15   he was nervous?

16          A   She sat real close to him, the right hand

17   this way.

18          MR. FORD: For the record indicating the

19   witness is indicating cross her body from right to

20   left.

21          THE COURT:  The record may so reflect.

22          MR. FORD:

23               When you say very close to the cab

24   driver, how far was the defendant from the cab

P 19

1    driver?

2        A   Very close, there was no -- just real

3    close to the cab driver.

4        Q   As they were sitting there like that, did

5    you say anything to the cab driver?

6        A   Well no, then somebody came into the

7    dispatcher and said did you pick up that couple.

8        Q   And that came in through the radio in the

9    car?

10       A   Right and the dispatcher came into the

11   cab driver.  Oh.  When I got in I said where is

12   Leroy and he says Leroy went to Romeoville and

13   that was it, he was frightened, he didn't say any

14   more.

15       MR. SOROSKY: Objection to he was frightened.

16       THE COURT:  Sustained.

17       MR. FORD:

18       Q   Now Miss Hess, did the cab driver in the

19   cab you were in respond to the radio dispatch, did

20   he say anything?

21       A   Yes, did you pick up the couple, he said

22   yes I have and I have another passenger, she said

23   who is it, he says I'll tell you when I get back.

24       Q   What happened?

1      A   Pardon?

2      Q   And what happened at that time?

3      A   Well then the party says I have to be at

4   O'Hare at 4:30.

5      Q   Who said that?

6      A   (Indicating).

7      MR. FORD: For the record your Honor

8   indicating the defendant Jerri Lindsey.

9      THE COURT:  The record may so reflect.

10     MR. FORD:

11     Q   Did the cab travel anywhere at that time?

12     A   Well then it was quiet because it was

13   frightening to me, I just -- it was just very

14   frightening and he was so nervous, then John says,

15   we were tired too so John says can you stop, to

16   the gas station and get a 6 pack because we were

17   tired and we were going to get a sandwich and

18   something to eat and he turned to her very nervous

19   and he says is it all right.

20     Q   Okay.  Then what happened next?

21     A   Well then John went in for the 6 pack, I

22   stayed in the cab, and John came out and drove us

23   right to the Red Roof.

24     Q   Now is that Red Roof Inn?

1        A   Right.

2        Q   Is the motel where you had been staying?

3        A   That's where we had been staying.

4        Q   That is at the same motel you had been

5    staying in the night before, is that correct?

6        A   Right.

7        Q   That was where you stayed as you -- and

8    in the day you would visit the casino?

9        A   Right.  And then Leroy took us to the

10   Greyhound station Sunday.

11       Q   That was the next day?

12       A   That was, right, we took the 10:30.

13       Q   Now Miss Hess, did you return to Chicago?

14       A   Right.

15       MR. FORD:  May I have a moment, your Honor.

16       THE COURT:  Yes.

17       MR. FORD:

18       Q   Now Miss Hess I would like to direct your

19   attention to the date of October 13, 1992, that

20   would have been the early morning hours at 7

21   o'clock, were you watching television?

22       A   Right, it was Monday morning watching the

23   television and that's when I heard the

24   announcement, John came over and he brought some

1    sweet rolls, we were going to have coffee.  I was

2    in the kitchen making the coffee, he says my God

3    did you hear that, he says the Circle Cab driver

4    was murdered and they found him at O'Hare in a

5    designated area where no cabs were allowed.

6         Q   Now, late the next day?

7         A   That was Sunday.

8         Q   The next day?

9         A   Monday morning, that's when it was on

10   television.

11        Q   Now the next day, this would have been

12   October 14, 1992, after 11 o'clock in the morning,

13   did the police come to your home?

14        A   Well I got a phone call some detectives

15   called up and asked information about where we

16   were and I says yes, we were and they said

17   somebody will come into the home and ask you

18   questions and I gave the same information.

19        Q   Now, was Mr. Eiselt at your home when the

20   detectives came over?

21        A   Yes I told him, right, he was there.

22        Q   Okay.  And when the detectives came over,

23   did they show you anything?

24        A   Yes.

1    Q   What did they show you?

2    A   She showed me picture.

3    Q   Was it a group of pictures?

4    A   A group of pictures and can I identify

5    them.  The party that was in the cab.

6    Q   They asked you if you could identify

7    anyone, is that correct?

8    A   Right. A  From the pictures, uh-hum.

9    Q   Miss Eiselt, I would like to show you

10   what I'm marking People's One A through F?

11   THE COURT:  Mr. Sorosky, if you want to come

12   forward to observe please feel free to do so.

13   MR. SOROSKY: I've seen those.

14   MR. FORD:

15   Q   Miss Hess, I would like to show you what

16   I've just marked People's Exhibit number one for

17   identification, number -- letter A through F.

18   Have you ever seen this group of photographs

19   before?

20   A   Yes, I have.

21   Q   Would that have been on the date that the

22   detectives came to your home to show them to you?

23   A   That's right.

24   Q   At the time the detectives showed you

1    these photographs, was John in the room with you?

2        A   Yes -- no he was not, he was in a

3    separate room, he was watching television.

4        Q   And what did the detectives say to you

5    when they showed you this group of photographs?

6        A   They asked me if I could identify them,

7    any of them as the woman that was in the cab and I

8    looked and I says yes, I can.

9        Q   Which photograph did you identify?

10       MR. FORD: For the record, your Honor, she's

11   indicated People's Exhibit number 1-D for

12   identification.

13       Q   Miss Hess, I'm going to give you my pen

14   and ask you to place an "X" on the left portion of

15   that -- the back of that photograph indicating

16   that's the one you identified.  Now do you see the

17   person depicted in that photograph here in Court

18   today?

19       A   Yes, I do.

20       Q   Is that the same woman you already

21   identified, Jerri Lindsey?

22       A   Yes.

23       Q   Now, after you had identified that

24   photograph, did John then view the photographs

1    separate from you?

2         A   Yes, he did.

3         Q   And is this group of photographs that I

4    just showed you one A through F are they in the

5    same or substantially the same condition as they

6    were on the day you saw them?

7         A   Oh, yes.

8         Q   Now, Miss Hess, I would like to direct

9    your attention to the next day, October 15, 1992,

10   did you ever go to the area of Grand and Central

11   here in the City of Chicago?

12        A   Grand and Central.

13        Q   To the police station?

14        A   Oh, oh, yes, that's when they picked me

15   up to identify the line-up.

16        Q   And did you go to view the line up with

17   John Eiselt?

18        A   Right.

19        Q   I want to direct your attention now to

20   roughly 3 o'clock in the afternoon on that date.

21        A   Right.

22        Q   Miss Hess, did you have occasion to view

23   a line-up?

24        A   Yes.

1      Q   When you viewed the line-up, were you

2   alone or with Mr. Eiselt out of the room?

3      A   He was out of the room, I was alone.

4      Q   And this would have been about 3 o'clock

5   in the afternoon on that date, is that correct?

6      A   That's right.

7      Q   At the time you viewed the line-up, what

8   did the police detectives say to you prior, when

9   they showed you the line-up itself?

10      A   They asked to pick the party that was --

11   could I pick up the party that was in the cab.

12      Q   And did you see anyone in the line up

13   that you recognized?

14      A   Yes, I did.

15      Q   Do you see the person that you saw in the

16   line up here in Court today?

17      A   Yes, I do.

18      Q   Could you please point to that person

19   here in Court today?

20      MR. FORD: For the record Jerri Lindsey,

21   Judge.

22      THE COURT:  The record may so reflect.

23      MR. FORD:

24      Q   Now had you ever had any contact with

1    Miss Lindsey prior to this time?

2        A   No, no, I haven't.

3        Q   Now Miss Hess, I would like to show you

4    what I'm marking People's Exhibit Number Two for

5    identification.  I'll ask you if you recognize

6    anyone depicted in a that photograph, if you

7    recognize what is depicted in that photograph?

8        A   This one.

9        Q   You're indicating the second person in

10   the photo from the left, is that correct?

11       A   Right.

12       Q   Now, have you ever seen the group of

13   people that are depicted in that photograph

14   together before I mean have you ever seen that

15   group of people before?

16       A   I've seen them at the line up.

17       Q   Those are the same people you saw in the

18   line up?

19       A   Yes.

20       Q   Does that photograph fairly and

21   accurately depict the line-up that you saw on the

22   date of October 15, 1992?

23       A   That's right.

24       Q   And is the person that you picked in that

1    line up also shown in that photograph?

2         A   Right.

3         Q   I'm going to give you a pen, Miss Hess

4    and ask you to place an "X" below the feet of the

5    person you picked and identified in that line up.

6    Okay.  Now, I'll ask you to place an arrow to

7    point to the person from the "X" to the person you

8    identified in the line up.

9              Thank you, Miss Hess.

10              Now does this photograph fairly and

11   accurately depict the line-up that you saw on

12   October 15, 1992?

13        A   Exactly right.

14        Q   I'm going to now show you what I'm

15   marking People's Exhibit number 3 for

16   identification and I'm asking you if you recognize

17   the person depicted in that photograph?

18        A   Yes.

19        Q   Is that the person you identified in the

20   line up?

21        A   That's the one.

22        Q   And now I'm going to show you People's

23   Number 4 for identification and I'll ask you if

24   you recognize the person depicted in that

1     photograph?

2            A   Right.

3            Q   Who do you recognize that person to be?

4            A   Jerri Lindsey.

5            Q   That's the woman that was in the cab with

6     you on October 9, 1992?

7            A   That's right, uh-hum.

8            Q   Now, Miss Hess, were you able to get a

9     look at the cab driver that was driving the cab on

10    October 9, '92?

11           A   Oh, yes, he was so frightened, so

12    frightened.

13           MR. SOROSKY: Objection.

14           A   I didn't know he was the owner.

15           THE COURT:   Sustained.

16           A   Pardon?

17           MR. FORD:

18           Q   I'm just asking whether or not you saw

19    him Miss Hess, did you see him?

20           A   Yes, I did.

21           Q   I'm going to show you now what I'm

22    marking People's Exhibit number 5 for

23    identification, I'm ask you if you recognize the

24    person identified within this photograph?

1      A   Yes.

2      Q   Who do you recognize that photograph to

3   be a photograph of?

4      A   The cab driver.

5      Q   Now that photograph, in that photograph

6   is he different than he was at the time you saw

7   him?

8      A   Oh -- well no, if you see his hair and

9   everything.

10     Q   That photograph was taken though after he

11  had died, is that correct?

12     A   Yes, I know.

13     Q   What was his condition at the time you

14  where dropped off at the Red Roof Inn and the

15  things you mentioned earlier, was he from a health

16  standpoint, did he seem as though he was fine?

17     A   Oh, yes.

18     Q   And he operated the cab as it drove away,

19  is that correct?

20     A   Right, he did, uh-hum.

21     Q   Does this photograph that I just showed

22  you People's Exhibit number 5 for identification

23  fairly and accurately depict the cab driver that

24  was driving the cab when it picked you up at

1    Empress River Casino and took you to Red Roof Inn?

2         A    That's right.

3         MR. FORD: Now, your Honor, I believe there

4    will be a stipulation if I were to show Miss Hess

5    People's Exhibit number 6 for identification, she

6    would identify it as a photograph again also of

7    the cab driver Rudolph Bennett, the same cab

8    driver that picked her up at the Empress Riverboat

9    Casino on October 9, 1992, so stipulated.

10        MR. SOROSKY: We'll stipulate she would

11   identify it.

12        MR. FORD: If I could have a moment, your

13   Honor.

14        THE COURT:  Yes.

15        MR. FORD: If I could have one moment, Judge.

16        THE COURT:  Yes.

17        MR. FORD: I have no further questions at

18   this time.

19        THE COURT:  Cross.

20              CROSS EXAMINATION

21                  BY

22            MR. SOROSKY:

23        Q    Now Ma'am, I believe you testified that

24   you live in Chicago, is that correct?

1        A   That is correct.

2        Q   And during this period of time that the

3   State's Attorney referred to, you were in Joliet

4   to visit the riverboat gambling casino, is that

5   correct?

6        A   That is correct.

7        Q   And I believe your testimony was that you

8   returned to Chicago on Sunday, is that right?

9        A   That's right, uh-hum.

10        Q   Or on a Sunday, right?

11        A   That's right.

12        Q   And your testimony also is that you saw

13   the woman you identified as Miss Lindsey the day

14   before you returned, is that correct?

15        A   That's right.

16        Q   Now, the riverboat casino, for how long a

17   period of time -- the riverboat casino is a boat

18   that rides in the river for a period of time, is

19   that correct?

20        A   Correct.

21        Q   About 2 hours, would that be a fair

22   estimate?

23        A   We always stayed for 2 cruises, the last

24   cruise was 2:30 and that's when we had a call in

1    for the cab to pick us up at 2:30.

2         Q   So, what time did you get to the

3    riverboat in the morning, approximately?

4         A   Well he picked us up, Leroy picked us up

5    at 7 o'clock, I believe 8:30, really a 3 hour

6    cruise.

7         Q   Could see say then every day you were in

8    Joliet you went to 2, 3 hour cruises, is that

9    correct?

10        A   For the 2 days, right.

11        Q   And certainly the date or the period of

12   time prior to you allegedly seeing Jerri Lindsey,

13   you were on a -- this cruise for about 6 hours, is

14   that correct?

15        A   Well it was 2:30 when we left for the cab

16   driver to pick us up.  It's approximately 6 hours,

17   2 cruises.

18        Q   Now this riverboat, does it serve

19   alcoholic beverages?

20        A   For people that want it, yes.

21        Q   Did you consume any alcoholic beverages

22   on the riverboat?

23        A   No.

24        Q   Did Mr. Eiselt?

1          A   No.

2          Q   Now, I believe your testimony was that on

3    the day you allegedly saw Miss Lindsey, you and

4    Mr. Eiselt were waiting at the entrance or exit to

5    this riverboat casino for a cab, is that correct?

6          A   Correct.

7          Q   And since you were waiting for a cab you

8    were looking for a cab, is that correct?

9          A   Well yes, that's the only cab there.  He

10   was 10 minutes late any way.

11         Q   And as you were looking for a cab, you

12   saw a cab, is that correct?

13         A   Yes, assuming it's our cab because that's

14   the only cab in Joliet.

15         Q   And as you were looking at this cab, you

16   saw a black woman enter the cab, is that correct?

17         A   Right.

18         Q   And this black woman got in the back seat

19   of the cab, is that correct?

20         A   Correct.

21         Q   And then this cab drove from wherever you

22   saw it to the entrance of the casino where you

23   were, is that correct?

24         A   The one we were waiting for, yes.

1      Q   And you saw this woman in the back seat,
2   did you not?
3      A   Yes, because I looked right in the back
4   seat.
5      Q   And then this woman, black woman got out
6   of the back seat and got in the front seat of the
7   cab, is that correct?
8      A   After the cab driver opened up the door,
9   both of the doors were locked.
10      Q   And this woman wasn't wearing any gloves,
11   was she?
12      A   No.
13      Q   Now, while you were -- once you got into
14   the cab, you and Mr. Eiselt sat in the back, is
15   that correct?
16      A   That's right.
17      Q   And the cab driver and this woman were in
18   the front seat, is that correct?
19      A   Right.
20      Q   So during the period of time of the ride
21   in the cab, this woman's back was facing your
22   face, would that be correct?
23      A   Not all the time, it was a profile.
24      Q   And you 2 engaged in conversation, did

1    you not?

2         A   Well we talked about taking -- she says

3    why don't you take the Metra, the Metra will take

4    you right to the boat.

5         Q   And this woman gave you a train schedule,

6    was that correct?

7         A   With the left hand, I didn't see the

8    right hand.

9         Q   Whatever, she gave you a train schedule?

10        A   With the left hand, right.

11        Q   And she gave you a train schedule with

12   one of her hands, is that correct?

13        A   That's right.

14        Q   And she certainly used her fingers in

15   getting the train schedule and giving it to you,

16   did she not?

17        A   Reached in the bag and just reached over

18   like this, right.

19        Q   With her fingers, correct?

20        A   Finger and thumb, right.

21        Q   And you kept that train schedule, did you

22   not?

23        A   Yes, I did.

24        Q   Because you thought you might use it the

1      next time you go to Joliet, correct?

2              A    That's right.

3              Q    And a few days later when the police

4      began to question you about this incident, you

5      informed the police that the woman who was in the

6      cab gave you a train schedule, is that correct?

7              A    Correct.

8              Q    And this is when you had no idea who the

9      woman was, is that correct?  I mean the first time

10     the police came up to you and questioned you about

11     this incident, you just told the police that there

12     was some woman in the front seat of the cab,

13     correct?

14             A    Right.

15             Q    At that time you didn't know her name, is

16     that correct?

17             A    No, I didn't know her name.

18             Q    That's what I mean, at this time you

19     didn't know who she was?

20             A    No, I did not.

21             Q    But nevertheless you tried to aid the

22     police as best you could and you informed the

23     police officers investigating this case about this

24     train schedule the woman had given you, did you

1    not?

2         A    Right, uh-hum.

3         Q    And the police asked you if you had that

4    train schedule, did they not?

5         A    That's right, uh-hum.

6         Q    And you did, did you not?

7         A    I did.

8         Q    And you gave that train schedule to the

9    police, did you not?

10        A    I did.

11        Q    And you in fact told the police that this

12   woman picked up the train schedule from wherever

13   she got it and handed it to you, did you not?

14        A    That's right, she handed me with her left

15   hand.

16        Q    Now, the first time you spoke to the

17   police, the police asked you for a description of

18   this woman, did you not?

19        A    Right.

20        Q    And you gave as best and as accurate a

21   description as you could give, did you not?

22        A    That's right.

23        Q    And you told the police she was a female

24   black in her twenties, right?

```
 1              A   Latter twenties, right.

 2              Q   And you said she was 5-2 to 5-4 and

 3      weighed 130 to 140 pounds, did you not?

 4              A   Right.

 5              Q   And I believe your testimony was that as

 6      you were sitting in the back seat, you noticed

 7      that this woman was sitting awful close to the cab

 8      driver, is that correct?

 9              A   Correct.

10              Q   I believe you testified that you said you

11      didn't like this, is that correct?

12              A   I'm sorry, I didn't hear you.

13              Q   I believe you testified that you said

14      when you were in the cab, you said to your

15      companion you didn't like this?

16              A   Right, yes I said I didn't like it,

17      didn't like what was going on, uh-hum.

18              Q   And after you said that you didn't like

19      this, though, your companion wanted to stop to get

20      some beer, right?

21              A   Right.

22              Q   And he went out to get some beer, right?

23              A   That's right.

24              Q   And he left you alone in the cab in the
```

1    very situation you said you didn't like, correct?

2         A    Right.

3         Q    You didn't leave the cab and say oh my

4    God, I'm not staying here with these people,?

5         A    I wanted to get home.

6         Q    This is too dangerous?

7         A    In wasn't another cab, the only cab was

8    there.

9         Q    You did not get out of the cab and go

10   with your companion to get the beer and tell the

11   cab driver wait here I'm going with him, we'll be

12   back?

13        A    No, I sat in the cab.

14        Q    In 5 seconds or whatever?

15        A    No.

16        Q    Now, I believe exhibit 3 which was a

17   picture of the -- I believe exhibit 3 was a

18   picture of the deceased man and you earlier today,

19   your testimony, identified that picture as being

20   the picture of the cab driver, did you not?

21        A    That's right.

22        Q    Now, during the police investigation,

23   when the police talked to you and interviewed you

24   and showed you photographs of Jerri Lindsey, and

1    so forth, and other ones, the police never showed

2    you a picture of the deceased, did they?

3        A  No, I didn't see the picture of the

4    deceased.

5        Q  So you didn't see a picture of the

6    deceased until the State's Attorney began to

7    prepare you for trial about a week ago or so or 2

8    weeks ago?

9        A  Well he resembled the same cab driver

10   that picked us up, the resemblance was there.

11       Q  You didn't see a picture of the deceased

12   until about a week ago or 2 weeks ago, is that

13   correct, until the State's Attorney began to

14   prepare you for trial, is that correct?

15       A  That's right, uh-hum.

16       Q  And when you saw that picture, the

17   State's Attorney told you that in fact was the

18   murdered man in this case, is that correct?

19       MR. FORD: Objection.

20       THE COURT:  Overruled.

21       MR. SOROSKY:

22       Q  Did he not tell you that?

23       A  I recognized him as the cab driver, the

24   murdered man.

1       Q   And he resembled the deceased, did he

2  not?

3       A   Yes.

4       Q   And because he resembled the deceased,

5  you, to the best of your knowledge, you believed

6  that's the deceased, is that correct?

7       A   That's right.

8       Q   And the best you can say is though he

9  resembled the deceased?

10      MR. FORD: Objection, Judge?

11      A   No.  He was the cabbie.

12      THE COURT:  Overruled.

13      MR. FORD: I didn't hear the answer, Judge.

14                (Record read.)

15      MR. SOROSKY:

16      Q   He was the cab driver.  And the State's

17  Attorney told you before that it is ^ very ^ have

18  important you say this is the cab driver, did he

19  not?

20      MR. FORD: Objection.

21      THE COURT:  Overruled.

22      MR. SOROSKY:

23      Q   Didn't he tell you that?

24      A   Would you repeat?

1        MR. SOROSKY:

2        Q  Before you testified, the State's

3  Attorney prepared you for trial, did he not?

4        A  Right.

5        Q  And he showed you a picture of the

6  murdered man, did he not?

7        MR. FORD: Objection, asked and answered.

8        A  Yes.

9        MR. SOROSKY:

10       Q  And he said this in fact is the deceased

11  did he not?

12       THE COURT:  Overruled.

13       MR. FORD: Objection.

14       THE COURT:  Overruled.

15       MR. SOROSKY:

16       Q  And didn't the State's Attorney say --?

17       A  He showed me.

18       Q  Didn't the State's Attorney say listen

19  I'm going to ask you is this the deceased and I

20  want you to testify yes in fact this is the

21  deceased, didn't you have that conversation with

22  the State's Attorney?

23       A  I said that the deceased man resembled

24  the cab driver.

1    Q  Very well.  I'll accept that.  That's

2    what you told the State's Attorney, right, the

3    deceased?

4    A  Right.

5    Q  Man resembled the cab driver?

6    A  He was the cab driver.

7    Q  Now, --

8    THE COURT: Can I have Deputy Longmeyer come

9    out, please.

10    MR. SOROSKY:

11    Q  Now, let me return a little bit to the

12    description that you first gave the police of this

13    woman --

14    THE COURT:  Excuse me, is the gentleman

15    there one of the prospective jurors.

16    A VOICE:  I'm not a juror.

17    THE COURT:  Okay.

18    MR. SOROSKY:

19    Q  Let me return a little bit, Ma'am, to the

20    description of this woman you first gave the

21    police, is that correct?

22    A  Right.

23    Q  And can I do that.  Now one of the things

24    you told the police were the clothes --

P 45

1          THE COURT:  Please wait outside.

2          MR. SOROSKY:

3      Q   One of the things you told the police

4  about the clothes the woman wore, is that correct?

5      A   Well I remember the cap that she had on.

6      Q   But let's leave aside the clothes that

7  she wore for a moment because anyone could wear

8  any clothes, let's leave that aside.  Forgetting

9  about the clothing she wore, just to go over this,

10 you said she was a female black in her twenties,

11 5-2 to 5-4, 130 to 140 pounds, is that correct?

12     A   Approximately.

13     Q   We have gone over that, 5-2 to 5-4,

14 female black in twenties, 130 to 140 pounds, is

15 that correct?

16     A   Right.

17     Q   And you said she had black straight hair

18 combed to the left side?

19     A   (No audible response.)

20     Q   That was the description you gave the

21 police?

22     A   Right, uh-hum.

23     Q   Is that correct?

24     A   Right, uh-hum.

P 46

1          Q   Now, let me show you what the State has

2     marked People's Exhibit 3 for identification.

3          A   Okay.

4          Q   That is a photograph of Jerri Lindsey who

5     is sitting right over there?

6          A   Right.

7          Q   At the defendant's table, is it not?

8          A   Right.

9          Q   And as you look at this woman, does this

10    -- how much would you say this woman weighs just

11    by looking at this photograph?

12          MR. FORD: Objection.

13          THE COURT:  Sustained.

14             Sustain the objection.

15          MR. SOROSKY: I understand.

16          Q   Would you estimate the weight of this

17    woman to be in excess of 130 or 140 pounds?

18          MR. FORD: Objection.

19          THE COURT:  Sustained.

20          MR. SOROSKY:

21          Q   Do you have any ability in judging

22    people's weights?

23          MR. FORD: Objection.

24          THE COURT:  Overruled.

1        MR. SOROSKY:

2        Q   Have you ever had any experience or

3    opportunity to determine people's weights in the

4    course of your lifetime?

5        MR. FORD: Objection.

6        THE COURT:   Overruled.

7        A   (No response).

8        MR. FORD:   Judge would you indicate for the

9    witness to answer the question?

10       A   I'm sorry I didn't hear him.

11       MR. SOROSKY:

12       Q   Have you ever had any opportunities

13   throughout your life time to determine people's

14   weights?

15       A   No, just assuming when you look at them.

16       Q   Just when you look at them?

17       A   Some people only think I weigh about 115

18   and I carry myself tall and a lot of people think

19   I'm 130 and I'm only 119.   It's just the way you

20   look at people.

21       Q   But would you say you have some ability

22   to determine people's weight?

23       MR. FORD: Objection.

24       A   No.

1          THE COURT:  Sustained.

2          MR. SOROSKY:

3          Q  And how long is the ride from the

4     riverboat to the hotel?

5          A  About 15 minutes.

6          Q  So you arrived at the hotel around 3

7     o'clock, approximately?

8          A  Approximately, because the cab was late.

9          Q  But around that time?

10         A  Right.

11         Q  And you don't know what happened to the

12    cab driver or Miss Lindsey after 3 o'clock, do

13    you?

14         A  No, John paid him the fare and he took

15    off and that was it.

16         Q  And there really wasn't anything else

17    that you noticed about the woman in the front seat

18    of the cab other than what you've said, right?

19         MR. FORD: Objection.

20         THE COURT:  Overruled.

21         MR. SOROSKY:

22         Q  Other than what you've already testified

23    to that you told the officers, there was nothing

24    else you noticed about the woman in the front

1    seat, right?

2         A  Everything I noticed I already said.

3         MR. SOROSKY: Thank you, nothing else.

4         THE COURT:  Redirect.

5                   REDIRECT EXAMINATION

6                        BY

7                   MR. FORD:

8         Q  Miss Hess, after you received the train

9    schedule from the defendant, Miss Lindsey, did you

10   handle it yourself and put it in your pocketbook?

11        A  Yes.

12        Q  And you handled it again when you gave it

13   to the police officer?

14        A  I handled it again when I gave it to the

15   officer, right.

16        Q  You see the person you saw in the cab

17   here in Court today?

18        A  Pardon?

19        Q  Do you see the person you saw in the cab

20   here in Court today?

21        A  That's the person who was in the cab.

22        MR. FORD: No further questions, Judge.

23        THE COURT:  Recross.

24        MR. SOROSKY: No.

1    THE COURT:  All right.  Thank you, you're

2    excused.  We're going to recess until about 4:30

3    when we finish with the jury selection.  Stand in

4    recess.  Miss Deputy Russell, when you bring the

5    defendant to the back you can ask the ladies and

6    gentlemen of the jury to come into the courtroom.

7         Could the defendant be seated at counsel

8    table.

9         The record should reflect that this is

10   People versus Jerri Lindsey.  The record should

11   reflect the defendant is present in her own person

12   through counsel, state is present through its

13   counsel.  Mr. Ford, call your next witness.

14        MR. FORD:  Thank you Judge, I ask leave of

15   Court to call John Eiselt.

16        THE CLERK:  Raise your right hand.

17                      (Witness sworn.)

18        THE CLERK:  Be seated sir.

19

20

21

22

23

24

1                    JOHN EISELT,

2     called as a witness on behalf of the People of the

3     State of Illinois, having been first duly sworn,

4     was examined and testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MR. FORD:

8          Q  Sir, would you please state your name,,

9     spell your last name for the Court Reporter and

10    speaking loudly so everyone can hear you?

11         A  John Eiselt, E-i-s-e-l-t.

12         Q  Mr. Eiselt, are you currently retired?

13         A  Yes, sir.

14         Q  When you were working, where did you

15    work?

16         A  CTA.

17         Q  For how many years with the City of

18    Chicago Transit Authority?

19         A  30 years.

20         Q  Mr. Eiselt, I direct your attention now

21    to the date of October 9th, 1992, do you recall

22    that date?

23         A  Yes, sir, I do.

24         Q  Did you have occasion on October 9, 1992

1       to go to the Empress River Casino in Joliet,

2       Illinois?

3               A   Yes.

4               Q   You live here in Chicago, don't you?

5               A   Right.

6               Q   There was prior to October 9th you went

7       down there, is that right?

8               A   Right.

9               Q   How did you get here from Chicago down to

10      Joliet?

11              A   Took an a Greyhound bus.

12              Q   And who did you go with?

13              A   My girlfriend, June Hess.

14              Q   Now, directing your attention now in

15      particular to around 2:30 on October 9, 1992, when

16      you were leaving the Empress Casino, did you leave

17      alone or with anyone?

18              A   With my girlfriend.

19              Q   And that was at 2:30 in the afternoon?

20              A   We had a cab at 2:30 but he got there

21      about 2:39 or 2:40.

22              Q   When you say you had a cab, was there a

23      cab company you normally use when you went there?

24              A   Circle Cab.

1      Q   When you walked out of the entry way

2   there at the Empress Casino, did you see the cab

3   right away?

4      A   We seen the cab coming, right.

5      Q   Was that you said at about what time?

6      A   About 2:39.

7      Q   When you saw the cab, did anything

8   happen?

9      A   Yes, sir.  A girl jumped from the other

10   side from the bushes and jumped in the back seat

11   of the cab because he had to slow down about 5

12   miles an hour there.

13      Q   Was this like a cul du sac area there?

14      A   Right.

15      Q   What area did she leave, the girl that

16   you saw?

17      A   I don't know, some bushes or trees on the

18   left there where we were standing waiting for the

19   cab, you know, at the entrance.

20      Q   Was the person you saw get into the cab a

21   female black or white person?

22      A   Female black.

23      Q   Now, what did the cab do after the woman

24   got into it?

1           A   Well he pulled up to where we were

2     standing waiting for, we waved him down, then he

3     stopped and we knocked on the door and said is

4     this our cab.  And he says, he told the girl in

5     the back seat to move up in the front.

6           Q   Then now --?

7           A   And we got in the back.

8           Q   Do you see the woman you saw in the back

9     seat when the cab stopped here in Court today?

10          A   Right.

11          Q   Do you?

12          A   Yes, sir.

13          Q   Would you please point to her and

14    identify her?

15          A   Right there.

16          MR. FORD: For the record your Honor

17    indicating the defendant, Jerri Lindsey.

18          THE COURT:  The record may so reflect.

19          MR. FORD:

20          Q   Now, Mr. Eiselt, after the defendant

21    moved from the back seat to the front seat, what

22    was the next thing that happened?

23          A   Well, dispatcher called and said did you

24    pick up your party from the recover beat.

1        Q   Did you hear that when you were in the

2   cab or outside the cab?

3        A   Inside the cab after we got in.

4        Q   When you say we who got in with you?

5        A   June Hess.

6        Q   You said you heard something over a

7   radio?

8        A   The dispatcher from the cab company.

9        Q   What did you hear the dispatcher say?

10       A   Called the driver and said did you pick

11  up your party from the riverboat casino and he

12  says yes and I have another passenger and the

13  dispatcher said who is it, he said I'll let you

14  know later.

15       Q   How did the two of them, the defendant

16  and the cab driver, how were they positioned in

17  relation to one another?

18       A   She was right next to him.

19       Q   And how was the cab driver behaved at

20  this time?

21       A   Very nervous.

22       Q   When you say he was nervous, what about

23  him made you think he was nervous?

24       A   The way he would talk, he would talk a

1    little bit about the Greyhound and now you know,

2    the other passenger, the defendant says how come

3    you don't take Metra and she handed us a schedule

4    for the Metra train.

5         Q   Now, did the cab that you and Miss Hess

6    and Miss Lindsey were in and the cab driver, did

7    that leave the area of the Empress Casino?

8         A   It left there.

9         Q   Where did you tell the cab driver you

10   wanted to go?

11        A   Red Roof Inn.

12        Q   Now, did the defendant, Miss Lindsey ever

13   indicate where she was going?

14        A   She said --, I asked the cab driver if he

15   could stop at the liquor store about 2 blocks from

16   the motel to get a 6 back of beer and he turned

17   around and asked the girl if it's all right with

18   her.  And he was the cab driver.

19        Q   When you say he, do you mean the cab

20   driver?

21        A   He asked her if it was all right to stop

22   for a 6 pack of beer.

23        Q   What do you mean by her?

24        A   The girl sitting in the front seat.

1       Q    The defendant you already identified?

2       A    Right.

3       Q    What did the defendant say?

4       A    It's okay, as long as I'm at O'Hare by

5    4:30.

6       Q    What was the next thing that happened?

7       A    I got the beer and I got back in the cab

8    and he drove us to the Red Roof and dropped us

9    off, I paid the fare. He got out of the cab and

10    gave him the money and that was it.

11       Q    How much money did you give him?

12       A    Ten dollars.

13       Q    How long total were you with the

14    defendant and the cab driver in the cab?

15       A    Must have been 12 to 15 minutes.

16      MR. FORD:  If I could have a moment, your

17    Honor?

18      THE COURT:  Yes.

19      MR. FORD:

20       Q    Mr. Eiselt, I would like to direct your

21    attention to a period of time about -- on October

22    14, 1992, were you contacted by the Chicago Police

23    Department?

24       A    Right.

1          Q   Were you with Miss Hess when that

2     happened?

3          A   Yes.

4          Q   And you were at her home, is that right?

5          A   Right.

6          Q   On the 14th of October, 1992, at around

7     after 11 in the morning, did some detectives come

8     to that home?

9          A   Yes.

10         Q   And were you there when they got there?

11         A   Right.

12         Q   Did they show you anything?

13         A   Pictures.

14         Q   Was that in a group of 6 photographs?

15         A   Photographs.   Yes.

16         Q   Mr. Eiselt, I would like to show you now

17    what I previously marked People's Exhibit number

18    one A through F.  I'll ask you if you have ever

19    seen this group of photographs before?

20         A   Yes.

21         Q   When have you seen that group of

22    photographs before?

23         A   In the line up at Area 5 headquarters.

24         Q   I'm talking now about on the date of

1    October 14, when you saw the group -- when you say

2    you saw the group of pictures, have you ever seen

3    a -- did you see this group of pictures on October

4    14?

5              A   Yes.

6              Q   Yes?

7              A   Yes.

8              Q   And what did the detective say to you

9    when they showed you this group of pictures?

10             A   You have to go to a line up and pick them

11   out.

12             Q   I'm talking about now before you saw the

13   line-up, Mr. Eiselt, did you see a group of

14   pictures?

15             A   Yes.

16             Q   And did you identify one of the pictures

17   as being an individual?

18             A   Yes.

19             Q   Do you see the picture that you

20   identified in that group of pictures that I'm now

21   showing you People's Group Exhibit one for

22   identification?

23             MR. FORD: For the record, he's indicated

24   People's Exhibit number 1-D for identification.

1        Q  Mr. Eiselt, I would ask you to place a

2   circle on the back of the photograph, on the right

3   side of that photograph.  Now is that the

4   photograph that you identified when you saw the

5   group of photos on October 14, 1992?

6        A  Yes.

7        Q  And is that the same group of photos that

8   you saw on the 14th of October, 1992?

9        A  Yes.

10       Q  Are they in the same or substantially the

11  same condition as they were at the time you saw

12  them?

13       A  Yes.

14       Q  You mentioned a line up, Mr. Eiselt, I

15  would like to direct your attention now to the

16  next day, October 15, 1992?

17       A  Okay.

18       Q  Did you go to the police station on that

19  date?

20       A  Right.

21       Q  And was that on Grand and Central Avenue

22  here in Chicago?

23       A  Right.

24       Q  What happened when you went to the police

1    station on Grand and Central on that date?

2         A    Then we had the line-up there.

3         Q    And when you say we had the line-up, did

4    you view a group of people?

5         A    Yes.

6         Q    Were they men or women?

7         A    Women.

8         Q    And were they black women or white women?

9         A    Black.

10        Q    When you viewed the group in the line up

11   of women, did you see that line up alone?

12        A    Yes.

13        Q    And did the detectives say anything to

14   you prior to the time you viewed the line-up?

15        A    No.

16        Q    Did they ask you to -- whether or not you

17   could make an identification?

18        A    Yes.

19        Q    And did you identify anyone in the line

20   up?

21        A    Yes.

22        Q    Do you see the person you identified in

23   the line up here in Court today?

24        A    Yes.

1        Q   Would you please identify that person?

2        A   Sitting right there.

3        MR. FORD: For the record, your Honor,

4    indicating the defendant, Jerri Lindsey.

5        THE COURT:   The record may so reflect.

6        MR. FORD:

7        Q   Who did you identify this woman as being?

8        A   The woman that was in the cab.

9        Q   That was the one that was in the cab with

10   you on October 9, 1992?

11       A   Right.

12       Q   Now, Mr. Eiselt, I would like to show you

13   what I previously marked People's Exhibit number 7

14   for identification.  I'll ask you if you recognize

15   the person depicted in that photograph?

16       A   Right here.

17       Q   Have you ever seen that group of people

18   before?

19       A   The line-up.

20       Q   Is that the line-up that you saw at about

21   3 o'clock in the afternoon?

22       A   Yes.

23       Q   On October 15, 1992?

24       A   Right.   Right.

1          Q   And does that line up fairly and

2     accurately depict the line-up as you saw it on

3     that date?

4          A   Right.

5          Q   Do you see the person you identified

6     within that line up, in that photograph?

7          A   Do I see her?

8          Q   You're indicating the second person?

9          A   Yes.

10         Q   From the left, is that correct?

11         A   Right.

12         Q   Mr. Eiselt, I'll ask you to place a

13    circle at the feet of the person you identified in

14    that line up that appears within that photograph.

15    Now, this photograph fairly and accurately depicts

16    the line up you saw on October 15, 1992, is that

17    right?

18         A   Yes.

19         Q   Miss Hess wasn't in the room when you

20    viewed the line up, was she?

21         A   No, they took us separate, she went first

22    and I went next.

23         Q   You didn't speak to her at the time you

24    went in prior to the time you went in and saw the

1    line-up, did you?

2          A   No, sir.

3          Q   And that was also true of the photos,

4    wasn't it, the group of photos they showed you?

5          A   Right.

6          Q   You viewed those separately also?

7          A   Yes.

8          MR. FORD:   If I could have a moment, your

9    Honor.

10         MR. FORD:

11         Q   Mr. Eiselt, at the time you were in the

12   cab, did you have an opportunity to see the cab

13   driver?

14         A   Yes.

15         Q   Also?

16         A   Yes.

17         Q   I'm going to show you now what has been

18   marked People's Exhibit number 5 for

19   identification.   I'll ask you if you recognize the

20   person depicted in that photograph?

21         A   Yes, sir, that's him.

22         Q   That's the cab driver?

23         A   That's the cab driver.

24         Q   And does that photograph fairly and

1    accurately depict the cab driver the way he looked

2    other than the fact he's dead in that photograph?

3        A    That looks like him, that's him.

4        Q    Now, Mr. Eiselt, can you describe, I know

5    you indicated earlier the cab driver was nervous,

6    but can you describe how he was from a health

7    standpoint, did he have any trouble driving the

8    cab away when he dropped you off?

9        A    No, he got out the door and opened the

10   back door for me.  He was healthy.

11       Q    He seemed in good shape at that time?

12       A    Yeah.

13       Q    And that was at the time after he had

14   picked you up at the casino and dropped you off at

15   at hotel, right?

16       A    Yes.

17       Q    Yes?

18       A    Yes.

19       MR. FORD:  One moment, Judge.

20       THE COURT:  Please.

21       MR. FORD:  No further questions.

22                CROSS EXAMINATION

23                     BY

24            MR. SOROSKY:

1          Q    Mr. Eiselt, you and June Hess traveled to

2     the Joliet riverboat by Greyhound bus, is that

3     correct?

4          A    That is correct.

5          Q    You arrived there on a Wednesday, would

6     that be correct?

7          A    Wednesday, yeah I'm sure it was

8     Wednesday.

9          Q    And you came back on a Sunday?

10         A    Right.

11         Q    The Sunday after the Wednesday?

12         A    Right, yes, sir.

13         Q    And this encounter in the cab that you

14    had with the woman who you say is Jerri Lindsey,

15    that happened the day before you returned to

16    Chicago, right?

17         MR. FORD: Objection.

18         THE COURT:  Overruled.

19         A    No, the day before? Let's see, Thursday,

20    Friday, Friday,.

21         Q    You don't really know what day it

22    happened, do you?

23         A    It was on a Friday.  I don't know exactly

24    what date it was, it was then.

1      Q    Now, on this day, that you had this

2   encounter in the cab with the woman that you now

3   say is Jerri Lindsey, you had been on this Empress

4   River Casino gambling boat for about 6 hours,

5   prior to the cab encounter you described, isn't

6   that correct?

7      A    Correct.

8      Q    And did you have any alcoholic beverages?

9      A    No, sir.

10     Q    On that boat?

11     A    No, sir.

12     Q    And the cab pulled up to the place or the

13  driveway where a cab would normally pick up

14  people, did it not, in front of the Empress

15  Riverboat Casino?

16     A    Yes.

17     Q    And a black woman was sitting in the back

18  seat, is that correct?

19     A    I seen her jump in the back seat from

20  where we were standing.

21     Q    Right?

22     A    Right.

23     Q    But the first time you really got a look

24  at the woman's face would be when the cab pulled

1    up in front of you, right?

2         A   Correct, right.

3         Q   And this black woman was sitting in the

4    back seat, is that correct?

5         A   Right.

6         Q   And the black woman got out of the back

7    seat, and sat in what would be the front passenger

8    seat, would that be an accurate statement?

9         A   Correct.

10        Q   And you and Miss Hess got in the back

11   seat?

12        A   Right.

13        Q   And this woman was not wearing gloves,

14   was she?

15        A   No.

16        Q   And once the cab began to drive, you and

17   this woman, this black woman began to discuss

18   where you were from and what you were doing in

19   Joliet, is that correct?

20        A   We told her we took the Greyhound to

21   Joliet, right.

22        Q   And this black woman gave a train

23   schedule to Miss Hess, did she not?

24        A   Correct.

1        Q  And she used her hand and fingers to hand

2  the train schedule to Miss Hess, did she not?

3        A  Yes, she did. Her left hand because her

4  right hand was under her left hand, her left arm.

5        MR. FORD: For the record indicating across

6  the -- the witness indicating across his body and

7  would have been towards the person's left.

8        THE COURT:  The record may so indicate.

9        MR. SOROSKY:

10       Q  Where did you say her right arm was?

11       A  It was here, her left hand was here, she

12  grabbed the train schedule out of here purse with

13  her left hand.

14       MR. SOROSKY:

15       Q  Well you said this woman was sitting very

16  close to the driver, right?

17       A  Correct.

18       Q  So the woman's left hand would be closer

19  to the driver, wouldn't it?

20       A  When she reached in her purse with her

21  left hand to get the train schedule her right arm

22  was still down below her.

23       Q  Okay.

24       Q  Now, in this woman's conversation, she

1    indicated she had to be at O'Hare, is that

2    correct?

3           A   Correct.

4           Q   She had to be at O'Hare at 4:30?

5           A   Correct.

6           Q   This woman say they had to catch a plane

7    or something of that nature?

8           A   She just told the cab driver to be at

9    O'Hare at 4:30.

10          Q   And this is what the cab driver appeared

11   nervous about, if he could make it there by 4:30?

12          MR. FORD: Objection.

13          A   No.  He appeared nervous before she even

14   told him the time.

15          MR. FORD: Withdraw it.

16          MR. SOROSKY:

17          Q   And you had never seen this cab driver

18   before, did you?

19          A   No, not this cab driver.

20          Q   So, you don't know how he regularly acts,

21   do you?

22          A   Well he seemed awful nervous to me for

23   being a cab driver.

24          Q   You don't know if he regularly acts that

1    way, do you?

2         A   No, first time I seen the man.

3         Q   Now, you returned to Chicago on Sunday,

4    is that correct?

5         A   Correct.

6         Q   And the ride that you had in the cab at

7    the time was certainly not an eventful or

8    meaningful incident in your life, was it?

9         MR. FORD: Objection.

10        THE COURT:  Overruled.

11        MR. SOROSKY:

12        Q   At the time?

13        A   I didn't get to hear the question.

14        Q   Well for example, you rode in a cab from

15   the gambling casino to the hotel?

16        A   Right.

17        Q   On Thursday, did you not?

18        A   Yes.

19        Q   Correct?

20        A   Correct.

21        Q   And that was not a meaningful incident in

22   your life, was it?

23        A   No.

24        Q   You don't remember what occurred in that

1  cab right, do you?

2      A   Yes, there was only June Hess and myself

3  in the cab.

4      Q   But you don't remember anything

5  particular going on about that cab right, do you?

6      A   No,.

7      Q   Saturday, October on 10, you rode from

8  the Empress Riverboat Casino to the Red Roof Inn,

9  did you not?

10     A   Yeah.

11     Q   And there is nothing you remember

12 particular about that ride, do you?

13     A   No.

14     Q   Did you go to the riverboat on Sunday?

15     A   No.

16     Q   So there were -- did you go to the

17 riverboat on Wednesday,, the first day you arrived

18 at Joliet?

19     A   Thursday.

20     MR. FORD: Objection.

21     THE COURT:  Overruled.

22     MR. SOROSKY:

23     Q   I'm just asking did you go to the

24 riverboat casino on Wednesday?

1        A    Thursday and Friday.

2        Q    Thursday and Friday?

3        A    Right.

4        Q    So, now at the time the cab ride that

5    occurred that you took on Friday, from the

6    riverboat to the Red Roof Inn was not any more

7    eventful than the other cab rides, correct?

8        A    Correct.

9        Q    Can you describe the cab driver who drove

10    you on Thursday, what was his description?

11        A    Leroy, I don't know his last name, he

12    drove us a couple of times there.

13        Q    And that's the cab driver you know,

14    right?

15        A    Right.

16        Q    Describe him?

17        A    He's thin, tall, black.

18        Q    That's all you can say about him he's

19    thin and tall and black?

20        A    A real personality, we had a lot of fun

21    with him, that's why we knew him.

22        Q    Thin tall black and personable, right, is

23    that your description of him?

24        A    And his personality, yes.

1            MR. FORD: Objection.

2                  Objection, Judge.

3            THE COURT:  Overruled.

4            MR. SOROSKY:

5       Q  Wouldn't you say that describes at a

6  minimum thousands of men?

7            MR. FORD: Objection.

8            MR. SOROSKY: Thin tall black and

9  personable?

10           THE COURT:  Sustained.  Sustain the

11  objection.

12           MR. SOROSKY:

13      Q  There is nothing else you can say about

14  him, right?

15           MR. FORD: Objection.

16      A  We had him twice before.

17           THE COURT:  Overruled.

18      A  When we were in Joliet so we knew Leroy,

19  right.

20           MR. SOROSKY:

21      Q  How would you describe the cab driver

22  whose cab you rode in on Friday, the day that you

23  allegedly saw Miss Lindsey, how would you describe

24  that cab driver?

1          A   He was heavier and we never seen him

2     before, so he was a different person that was

3     driving the cab than our regular cab driver.

4          Q   The only thing you can say about him is

5     he was a heavier black man, right?

6          MR. FORD: Objection.

7          THE COURT:  Sustained.

8          MR. SOROSKY:

9          Q   Can you say anything else about him other

10    than he was a heavy black man?

11         MR. FORD: Objection.

12         THE COURT:  Sustained -- overruled.

13         MR. SOROSKY:

14         Q   Is there any other description you can

15    give me?

16         A   Well just a different cab driver than we

17    had our regular cab driver.

18         Q   Now, when did you first speak to the

19    police concerning this matter, if you don't know

20    the date at least the day of the week?

21         A   Monday.

22         Q   So it would have been the Monday after

23    you returned from Joliet?

24         A   Right.

1           Q   And did the police come to your house?

2           A   Yes.

3           Q   Did you go to the police station on

4    Monday or did you just talk to them?

5           A   Just talked to them Monday.

6           Q   So it was just at your house, right?

7           A   Right.

8           Q   And they didn't have any photographs on

9    Monday, did they?

10          A   No.

11          Q   They asked you for a description of the

12   woman in the cab, is that correct?

13          A   Correct.

14          Q   And without getting into the clothes the

15   woman wore, let's eliminate that, you gave the

16   police a description that she was a female black

17   in her twenties, 5-2 to 5-4, 130 to 140 pounds,

18   right?

19          A   Right.

20          Q   And that was a description given by both

21   you and Miss Hess jointly, is that correct?

22          MR. FORD: Objection.

23          A   No.  No.

24          MR. SOROSKY:

1          Q    That's your own personal description?

2          MR. FORD: Objection.

3          A    Yes.

4          THE COURT:    Overruled.

5          A    They asked her and then they asked me.

6          MR. SOROSKY:

7          Q    They asked her and then they asked you?

8          A    Right.

9          Q    And that would be your description,

10    right?

11         A    Right.

12         Q    You don't remember what clothes the woman

13    was wearing, do you?

14         A    By that time I knew she had a hat on.

15         Q    So the only thing in clothing you

16    remember is she had a hat on, right?

17         A    Kind of a bluejeans.

18         Q    Now, there isn't anything else that you

19    can remember about her, is there -- strike that.

20    Would you say the description you just stated,

21    female black in her twenties, 5-2 to 5-4, 130 to

22    140 pounds would be you know, an accurate

23    description of the woman that was in the cab?

24         A    Yes.

1              MR. FORD: Objection.

2              THE COURT:  Sustained.

3              MR. SOROSKY:

4         Q   That was the description you gave the

5    police, correct?

6         A   Right.

7         Q   Now, during this cab drive from the Red

8    Roof Inn, to -- strike that, from the casino to

9    the Red Roof Inn, you asked the cab driver to stop

10   so that you could get some beer, is that correct?

11        A   That is correct.

12        Q   And the cab driver did that, right?

13        A   Yes.

14        Q   And you said he asked the woman if it's

15   okay to stop, right?

16        A   That is correct.

17        Q   And the woman said yes, if we could still

18   get to O'Hare by 4:30, correct?

19        A   That is correct.

20        Q   And you said you would only be in there a

21   minute or so, right?

22        A   Yes, just went in for a 6 pack of beer.

23        Q   And once you said you would only be there

24   for a minute or so there was no problem with

1    stopping, right?

2         A   Well he asked her if it was all right to

3    stop, the cab driver asked her.

4         Q   But from what you know about it, the

5    problem or concern about stopping was making it to

6    O'Hare by 4:30 PM, right?

7         MR. FORD: Objection.

8         THE COURT:  Sustained.

9         MR. SOROSKY:

10        Q   To the best of your knowledge, was that

11   the concern that the cab driver seemed to have in

12   stopping?

13        MR. FORD: Objection.

14        THE COURT:  Sustained.

15        MR. SOROSKY:

16        Q   What did the cab driver say when you

17   asked to stop?

18        A   He turned around and asked her if I could

19   -- if it's all right to stop for a 6 pack of

20   beer.

21        Q   And what had this woman said?

22        A   She said it would be all right but I have

23   to be at O'Hare by 4:30.

24        Q   To the best of your knowledge nothing out

1    of the ordinary about that conversation, is it?

2         A    Sure there is.

3         MR. FORD: Objection.

4         THE COURT:    Sustained.

5         A    He's a cab driver it's his cab, why

6    should he ask somebody else if he could stop?

7         MR. FORD: Withdraw the objection.

8         MR. SOROSKY:

9         Q    Can't you see it being normal if you got

10   to be another O'Hare by 4:30, asking someone how

11   long it would be and if the stop would give them

12   enough to time to get to O'Hare?

13        MR. FORD: Objection.

14        THE COURT:    Sustained.

15        MR. SOROSKY:

16        Q    The cab driver is supposed to accommodate

17   the passenger is he not?

18        MR. FORD: Objection.

19        THE COURT:    Sustain the objection.

20        Q    You have no idea of this cab driver's

21   relationship with that woman in the car, do you?

22        MR. FORD: Objection.

23        THE COURT:    Overruled.

24        MR. SOROSKY:

1        Q   For all you know she could have been a

2    paying passenger, correct?

3        A   How come when the dispatcher said who is

4    your other passenger he said I'll let you know

5    later, he didn't even give the dispatcher because

6    we had the cab, we were the ones.

7        Q   But the cab driver can take 2 people in a

8    cab, can't he?

9        A   Well --

10       MR. FORD: Objection.

11       THE COURT:  Sustained.

12       A   If they jump in there I guess you have

13   to.

14       THE COURT:  If I sustain an objection you

15   don't answer.

16       A   Okay.

17       MR. SOROSKY:

18       Q   Now, you have no knowledge concerning the

19   relationship between the cab driver and this woman

20   in the cab, do you?

21       MR. FORD: Objection.  Asked and answered.

22       THE COURT:  Sustained.

23       MR. SOROSKY:

24       Q   Now, how long were the police at your

1    apartment on Monday evening, approximately?

2         A   Maybe 15 minutes.

3         Q   And they came during the early evening

4    hours?

5         A   Yes.

6         Q   7:00, 8 o'clock, something like that?

7         A   Yes.

8         Q   And other than asking you for a

9    description of the woman in the cab, did they ask

10   you anything else?

11        A   No, just asked for a description.

12        Q   Did they tell you what had occurred, did

13   they tell you why they wanted to know this

14   description?

15        MR. FORD: Objection.

16        THE COURT:  Overruled.

17        A   I knew why he wanted it, because we heard

18   it on the news and the detectives from Joliet

19   called us in the morning and then the Chicago

20   detectives.

21        Q   So at the time the police came, you knew

22   there had been a murder or a shooting?

23        A   Yes.  Yes, sir.

24        Q   Now, when was the next time you saw the

1    police after this Monday as best you can recall?

2        A    Tuesday.

3        Q    And did you see them at the police

4    station or at your house?

5        A    They picked us up and took us there to

6    the police station.

7        Q    And which police station were you taken

8    to?

9        A    Area 5 wherever that is, Grand and

10    something, Grand and something.

11        Q    And what happened there?

12        A    We went through -- to the line up.

13        Q    And they showed you a group of women in a

14    line up?

15        A    Yes.

16        Q    And that -- that's the next thing you

17    remember, is that correct?

18        A    That's it.

19        Q    And you identified a woman in a line up

20    as the woman who was in the cab, is that correct?

21        A    Correct.

22        Q    And the police, they never showed you any

23    pictures that night, did they, you just saw the

24    line-up, right?

1        A   The line-up.

2        Q   And were those your only 2 involvements

3   with the police as best you can recall and

4   remember?

5        A   Yes, sir, that's it.

6        Q   And before the police -- before you had

7   occasion to view the line up, did you police tell

8   you that they had the offender in custody?

9        A   No, sir.

10       Q   Did they tell you that they had a woman

11   who they believed was in the cab?

12       A   No, sir.

13       Q   What did they tell you?

14       A   They just wanted to see if we could

15   identify the person that was in the cab.

16       Q   Now you were in the cab with this woman

17   for about 10 minutes, is that correct?

18       A   Correct.

19       Q   15 minutes, whatever?

20       A   Correct.

21       Q   Was there ever any conversation about

22   O'Hare other than that she had to be at O'Hare at

23   4:30?

24       A   That's all.

1          Q   Nothing else?

2          A   Just about the train, the Metra train.

3          MR. SOROSKY: Nothing further, Judge.

4          THE COURT:   Redirect.

5          MR. FORD: Just briefly, Judge.

6                    REDIRECT EXAMINATION

7                         BY

8                    MR. FORD:

9          Q   Mr. Eiselt, you saw -- the police came to

10    your house and they asked you for a description

11    first, is that correct?

12         A   Correct.

13         Q   The next day, did they show you a series

14    OF photographs?

15         A   Yes.

16         Q   And then it was the third day, this would

17    have been now Wednesday that you went to a line

18    up?

19         A   Right.

20         Q   At Grand and Central, is that correct?

21         A   Correct.

22         MR. SOROSKY: Objection, your Honor, leading

23    the witness.

24         THE COURT:   Sustained.

1    MR. FORD: Just one moment, Judge.

2    Q  When you last -- the photograph that you

3    identified of the cab driver, the cab DRIVER that

4    night, when you last saw him alive, what person

5    was he with in the cab?

6    A  The person sitting there.

7    Q  The defendant that you already

8    identified?

9    A  Right.

10   Q  Was there anyone else in the cab other

11   than those 2 people?

12   A  No.

13   Q  And that was at approximately what time

14   on the 9th of October, 1992?

15   A  Must have been about 3 o'clock.

16   MR. FORD: No further questions, Judge.

17   THE COURT:  Recross.

18   MR. SOROSKY: No cross, your Honor.

19   THE COURT:  Thank you, you're excused.

20   A  Thank you, your Honor.

21                    (Witness excused.)

22   THE COURT:  Call your next witness.

23   MR. FORD: Judge, at this time we would be

24   asking to continue it over until Friday.

```
1              Mr. Eiselt, you can step in the jury
2    room, I'll be right there.
3         THE COURT:  Mr. Sorosky.
4         MR. SOROSKY: Fine.
5         THE COURT:  All right.  I want you here on
6    time.  I really don't know whether we can proceed.
7         MR. SOROSKY: 10:30 on Friday.
8         THE COURT:  Be here at 10:30 on Friday.
9         MR. SOROSKY: Fine, whatever time you want.
10        THE COURT:  By agreement hold on call until
11   Friday January 6th.
12                 (Whereupon, the further hearing
13                  of the above-entitled cause
14                  was continued to 1-6-95, at
15                  10:30 o'clock a.m.)
16
17
18
19
20
21
22
23
24
```

```
1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )
```

3          THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT    -    CRIMINAL DIVISION

4              I, Kenneth Madoch, Official

5    Shorthand Reporter of the Circuit Court of Cook

6    County Department-Criminal Division do hereby

7    certify that I reported in shorthand the

8    proceedings had at the hearing in the

9    above-entitled cause; and that I thereafter

10   caused to be transcribed into typewriting the

11   foregoing transcript, which I certify is a

12   true and correct transcript of said

13   proceedings.

14

15   _____

16   Official Shorthand Reporter
     Circuit Court of Cook County.

17

18

19

20

21

22

23

24   Dated this 12th day of June, 1995.

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of
Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the
above and foregoing to be a true, perfect and complete copy of . . VOLUME FOUR OF A NINE VOLUME . . . . .
. RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED IN . . .
. THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between
The People of the State of Illinois. . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and
. . . . . . . . . . . . . . . . . . . . JERI LINDSEY     (01) . . . . . . . . . . . . . . . . . . WAS . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . . SEPTEMBER . . . . . . 20 . . . , 19 . . 95

_Aurelia Pucinski_
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

05-1458

APPELLATE COURT 1st DIST.

FEB 0 8 2006

STEVEN M. RAVID
CLERK

Crim. Div. No. 94-B

CCR-310



Transcript of Record

Appeal

to

APPELLATE        Court of Illinois

FIRST       District

05-1458

**Circuit Court No.**    92 CR 25135

**Trial Judge**    SHELVIN SINGER

**Reviewing Court No.**    95 1535    **FILED**

APPELLATE COURT 1st DIST.

THE PEOPLE OF THE STATE OF ILLINOIS NOV 0 7 2002

**VS.**

STEVEN M. RAVID
CLERK

JERI LINDSEY    (01)

92cr25/35 RT

LINOIS

NAL DIVISION

VOLUME FIVE OF NINE

REPORT OF PROCEEDINGS

APPELLATE COURT 1st DIST.

FEB 2 8 2006

STEVEN M. RAVID
CLERK

**AURELIA PUCINSKI**

**Clerk of Court**

Per   AP./SIR

**Deputy**

```
 1    STATE OF ILLINOIS )
                        )   ss
 2    COUNTY OF C O O K )

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE )
 5    STATE OF ILLINOIS )
                        )   Case No. 92 CR 25135
 6       vs.            )
                        )   Charge: MURDER
 7    JERRI LINDSEY     )

 8                 REPORT  OF  PROCEEDINGS

 9            BE IT REMEMBERED that on the 6th day of

10    January, 1995, this cause came on for hearing

11    before the Honorable SHELVIN SINGER, Judge of said

12    Court, upon the information herein, the defendant

13    having entered a plea of not guilty.

14          APPEARANCES:
                HON. JACK O'MALLEY,
15              State's Attorney of Cook County, by
                MR. NICK FORD,
16              Assistant State's Attorney,
                Appeared on behalf of the People;
17
                No one appearing in open Court
18              on behalf of the Defendant.

19

20

21

22
      Kenneth Madoch
23    Official Court Reporter
      Circuit Court of Cook County
24    County Department-Criminal Division.
```

1        THE CLERK:  People of the State of Illinois

2   versus Jerri Lindsey.

3        MR. FORD:  What I'm going to ask is this,

4   ask it be set over to Monday, we have another jury

5   set for Monday.  But I would ask it be set Monday

6   just for Mr. Sorosky's presence so we can pick the

7   date the following Monday, so I don't have the

8   witnesses here Monday, they were here earlier this

9   week.

10        THE COURT:  If we do it Monday, I would

11   rather do this case than the jury that you have

12   set.  This is an old case and I want to get it

13   over with.

14        MR. FORD:  Hi, Jerri.

15            My suggestion is this, Judge, we can

16   set this, if the Court -- if it's possible, we can

17   work around it so that week do it on Tuesday but

18   unless Mr. Sorosky has indicated he will be

19   available.  The thing is he could be here for a

20   status date on Monday and we can pick the next day

21   or day after that to do it but --

22        THE COURT:  I'm really going to forego this,

23   if I have to I'll forego the jury, the case has to

24   be done.

Q 2

1        MR. FORD:  I have no problem with that.

2        THE COURT:  Motion defendant and if Mr.

3   Sorosky comes in later, tell him I want to see

4   him.  If he leaves this courtroom without me

5   seeing him there will be sanctions.  He's supposed

6   to be here at 10:30.  For continuation of the same

7   strategy or what I perceive to be the same

8   strategy of delaying the matter, discouraging

9   witnesses and I do insist upon seeing him, please

10  tell him that.

11       MR. FORD:  I'll relay that information.

12       THE COURT:  Motion defendant 1-9-95.

13       MR. FORD:  Do you want my witnesses here on

14  Monday, Judge.

15       THE COURT:  No, Tuesday.

16       MR. FORD:  Tuesday, all right.  Thank you,

17  Judge.

18              (Whereupon, the further hearing

19              of the above-entitled cause

20              was continued to 1-9-95, at

21              9:30 o'clock a.m.)

22

23

24

Q 3

```
1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )

3         THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT    -    CRIMINAL DIVISION
4
              I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14
15
     _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17
18
19
20
21
22
23
24   Dated this 12th day of June, 1995.
```

Q 4