File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _6_

EXHIBIT _B to 595_

TAB (DESCRIPTION) _____

```
1    STATE OF ILLINOIS )
                       )  ss
2    COUNTY OF C O O K )

3            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                       )  Case No. 92 CR 25135
6       vs.            )
                       )  Charge: MURDER
7    JERI LINDSEY      )

8              REPORT   OF   PROCEEDINGS

9            BE IT REMEMBERED that on the 9th day of

10   January, 1995, this cause came on for hearing

11   before the Honorable SHELVIN SINGER, Judge of said

12   Court, upon the indictment herein, the defendant

13   having entered a plea of not guilty.

14      APPEARANCES:
                HON. JACK O'MALLEY,
15              State's Attorney of Cook County, by
                MR. NICK FORD,
16              Assistant State's Attorney,
                Appeared on behalf of the People;
17
                MR. SHELDON SOROSKY,
18              Appeared on behalf of the Defendant.

19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.
```

R  1

1      THE CLERK:  People of the State of Illinois

2  versus Jeri Lindsey.

3      THE COURT:  Where is your lawyer?

4      THE DEFENDANT: On the phone.

5      THE COURT:  All right pass it.

6                          (Case passed.)

7      THE CLERK: People of the State of Illinois

8  recall Jeri Lindsey.

9      THE COURT:  The record should reflect the

10  defendant, Jeri Lindsey is present in her own

11  person through counsel, state is present through

12  its counsel.  Call your next witness, Mr. Ford.

13      MR. FORD:  Thank you Judge, I ask leave of

14  Court to call Chicago Police Officer Jack Hines.

15      THE COURT:  Remain standing, face the clerk

16  and raise your right hand.

17                          (Witness sworn.)

18     MR. FORD:  Sir, would you please --

19      THE COURT:  Wait a minute.

20      MR. FORD:  Sorry, Judge.

21      THE COURT:  What was the last day we took

22  evidence on the case.

23      MR. FORD:  January 4.

24      THE COURT:  January 4.

1          MR. SOROSKY:  Yes.

2          THE COURT:  January 4.

3          MR. SOROSKY:  Yes, Judge.

4          THE COURT:  Okay.  Thank you.  Please

5    proceed, counsel.

6                    JACK HINES,

7    called as a witness on behalf of the People of the

8    State of Illinois, having been first duly sworn,

9    was examined and testified as follows:

10                  DIRECT EXAMINATION

11                         BY

12                  MR. FORD:

13        Q  Officer, would you please state your

14   name?

15        A  Jack Hines.

16        Q  By whom are you employed, Mr. Hines?

17        A  City of Chicago, Chicago Police

18   Department.

19        Q  And in what capacity do you work at the

20   Chicago Police Department?

21        A  Detective out of Area 2 Violent Crimes.

22        Q  How long have you been a detective?

23        A  Approximately 18 years.

24        Q  And how long have you been with the

```
 1      Chicago Police Department?
 2          A   29 years.
 3          Q   Detective Hines, I would like to direct
 4      your attention to October 11, 1992 around 11:30 at
 5      night, do you recall that period of time?
 6          A   Yes, sir.
 7          Q   Were you working at 11:30 PM on October
 8      11, 1992?
 9          A   Yes, sir.
10          Q   And did you receive an assignment?
11          A   Yes, sir.
12          Q   What was the nature of that assignment?
13          A   I believe it was an aggravated criminal
14      sexual assault.
15          Q   And did you come to know the name of the
16      victim in this alleged aggravated criminal sexual
17      assault?
18          A   Yes, sir.
19          Q   And what was the victim's name?
20          A   Jeri Lindsey.
21          Q   Now, did you later met a person who
22      described herself as Jeri Lindsey?
23          A   Yes, sir.
24          Q   Do you see that person here in Court
```

1    date?

2         A    Yes, sir.

3         Q    Would you please point to her and

4    describe an article of clothing she's wearing

5    today?

6         A    She's sitting next to attorney Sorosky

7    with the blue -- the blue uniform on with white

8    sleeves.

9         MR. FORD:  For the record your Honor

10   indicating the defendant, Jeri Lindsey.

11        THE COURT:  The record may so reflect.

12        MR. FORD:

13        Q    What initial investigative steps did you

14   take upon being assigned to the case involving the

15   alleged victim, Jeri Lindsey?

16        A    The initial steps I took was to go to the

17   hospital and attempt to interview Miss Lindsey

18   concerning this incident.

19        Q    What hospital did you go to?

20        A    I believe it was Trinity, now known as

21   Trinity Hospital. South Chicago Hospital.

22        Q    Were you able to locate Miss Lindsey

23   there at that time?

24        A    No, I was not.

1      Q   Were you able to locate any information

2   about Miss Lindsey at the hospital?

3      A   Yes.

4      Q   What information did you locate?

5      A   I talked to the beat officer who had made

6   the original case report and I obtained a copy of

7   his case report.

8      Q   And as a result of obtaining a copy of

9   his case report, were you able to contact Miss

10  Lindsey?

11     A   Yes, I did.

12     Q   How did you do that?

13     A   By telephone.

14     Q   Where were you when you made the call?

15     A   I was still in the hospital.

16     Q   And when you called the number, was the

17  telephone answered by a male or female?

18     A   By a female.

19     Q   And can you describe for his Honor, Judge

20  Singer what you said to the person that answered

21  the phone?

22     A   I told them who I was, Detective Hines, I

23  would like to talk to Jeri Lindsey concerning an

24  incident that she reported at the hospital.

R 7

1      Q   And did you in fact locate an individual

2   who identified themself as Jeri Lindsey?

3      A   Yes.

4      Q   Now, after that, did you later have

5   conversations with Jeri Lindsey who you already

6   identified in open Court?

7      A   Yes.

8      Q   And was the voice of the person that

9   identified herself as Jeri Lindsey to you that day

10  the same voice as the voice you had come to

11  associate with Jeri Lindsey that you see here in

12  Court today?

13     A   Yes.

14     Q   During that initial phone call, Detective

15  Hines, what did you say to Miss Lindsey and what

16  did she say to you?

17     A   During the initial phone call, I asked

18  her what had happened to her.

19     Q   And when you were asking her, were you

20  making inquiries about the claim of aggravated

21  criminal sexual assault that she made?

22     A   Yes, sir.

23     MR. SOROSKY:   Could we have a date and time

24  of this phone call, Judge.

R 8

1          THE COURT:  Sustained.

2          MR. FORD:

3          Q  Would this have been right after your

4     arrival at the hospital on October 11, 1992?

5          A  Yes, sir.

6          Q  And that would have been in the late

7     evening hours on that date?

8          A  Yes, sir.

9          Q  Did you ask her how she originally came

10    into contact with the person she said had

11    assaulted her?

12         A  Yes, sir.

13         Q  What did she indicate to you?

14         A  She indicated that she was I believe at

15    79th and Ridgeland and she wanted to go home to

16    89th and Houston.

17         Q  And did she indicate to you what she did

18    in order to get there?

19         A  She hailed a cab and -- she hailed a cab

20    and she got in it and she asked to take her to

21    8931, I believe Houston.

22         Q  Did she tell you when she originally came

23    in contact with the cab driver, what date?

24         A  She stated that it was I believe the 10th

R 9

1    of --

2          Q    -- October, 1992?

3          A    Yes, sir.

4          Q    And would that have been at roughly what

5    time?

6          A    Around I think she said around 7 PM, I'm

7    not certain about the time.

8          Q    Would anything refresh your recollection

9    as to the time?

10         A    The report, case report.

11         MR. SOROSKY:    I have no objection to using

12    that.

13         MR. FORD:

14         Q    Detective Hines, I'm going to give you

15    what I'm marking State's exhibit number 8 for

16    identification.    I'll ask you if you --

17         THE COURT:    State's exhibit 8 for

18    identification?

19         MR. FORD:    Yes, Judge.

20              People's Exhibit 8.

21         THE COURT:    You said State's exhibit.

22         MR. FORD:    Yes, State's exhibit 8 for

23    identification.

24         MR. FORD:    Have you had -- State or People?

R 10

1        MR. FORD:  Well Judge the State and the

2   People are the same.

3        THE COURT:  Aha.

4        MR. FORD:  In this case I'll say State's

5   exhibit number 8 for identification.

6        Q   Now, detective, have you refreshed your

7   recollection as to what time Miss Lindsey had

8   indicated to you she originally came in contact

9   with the cab driver?

10        A   Yes.

11        Q   What time?

12        A   About 0100 hours.

13        Q   About 1:00 in the morning on October 10,

14   1992?

15        A   Yes, sir.

16        Q   Did Miss Lindsey indicate to you what the

17   nationality of the cab driver that had stopped to

18   pick her up was?

19        A   She said he was a male black.

20        Q   And did she indicate to you whether or

21   not she got in the cab after the cab stopped?

22        A   Yes, sir, she did.

23        Q   What did she state?

24        A   She stated that she got in the cab, she

1   asked him to take her to 8931 South Houston, but

2   instead he got on the expressway and took the

3   Memphis exit.

4       Q   And did she indicate what happened after

5   he pulled on to the expressway?

6       A   She asked him why was he going the way he

7   was going in the direction he was going, and she

8   stated that he pulled a gun, pointed at her and

9   tolf her to shut up.

10      Q   Did she indicate to you then what

11  happened after the cab driver pulled the gun?

12      A   She stated he stopped the cab on the

13  expressway and reached in the glove box, I think

14  she said he reached in the glove box, got a

15  blindfold, came to the rear seat where she was,

16  placed the blindfold over her face, then took her

17  and put her in the front seat of the car and then

18  he drove away a long, long, long distance with

19  her.

20      Q   Now, are those her words, a long, long,

21  long distance?

22      A   Yes, sir.

23      Q   Did she indicate to you what had happened

24  after the cab eventually came to a stop at some

1    other location?

2         A  She stated that the cab stopped at

3    another location, he forced her into a building,

4    that inside the building, he tied her hands behind

5    her back, then forced her to undress, then placed

6    her on a bed and had sexual intercourse with her

7    against her will.

8         Q  Did she indicate to you how many times

9    this occurred?

10        A  She said numerous times.

11        Q  And did she indicate to you over what

12   period of time this alleged sexual assault

13   occurred?

14        A  She said a period of about 40 hours.

15        Q  After she told you she had been held in

16   this building for 40 hours against her will, did

17   she say to you what had happened to her next?

18        A  She stated that he told her that he was

19   finished with her and that he was going to take

20   her back, that he then placed her in the cab and

21   started driving.  He then stopped the cab beside a

22   wooded area, told her that he was going to have

23   one more and she then stabbed him in the chest

24   with a knife that she kept.

1          Q   Did she indicate to you why she had a

2   knife with her?

3          A   She said for her personal protection.

4          Q   Did she indicate to you what she did --

5   what she did with the knife?

6          A   She left it in his chest.

7          Q   And did she indicate to you what she did

8   herself after she stabbed the victim in the chest?

9          A   She stated she jumped from the cab, she

10  ran in some woods, she stayed in the woods until

11  dark.

12         Q   What did she say she did at sundown?

13         A   After sundown, she came out of the woods,

14  I think she said she flagged down a car, a passing

15  car, the car had -- was driven by a white lady.

16  She asked the lady where she was.  The lady said

17  she was in Joliet and then the lady then drove her

18  to South Chicago Hospital.

19         MR. FORD:  If I could have a moment, your

20  Honor.

21         THE COURT:  Yes.

22         MR. FORD:

23         Q   Did she indicate to you what the

24  coloration of the cab was this had allegedly

R 14

1    occurred in?

2         A   She said it was 4 door red and white cab.

3         Q   After you received all this information,

4    Detective Hines, the defendant's claim regarding

5    this alleged sexual assault, what did you do

6    additional in connection with this investigation?

7         A   Because of her statement she had

8    established the guy, I called the State police and

9    Joliet where she said the lady had told her she

10   was, I called the Joliet police and state police

11   and asked them to back track and see if they could

12   find a cab on the highways with an injured person

13   in it.

14        Q   Did the State police give you any

15   information relative to a cab driver?

16        A   The State police did not.

17        Q   Now, did you have a conversation with the

18   Joliet police relative to a cab driver?

19        A   Yes.

20        Q   What was the nature of that conversation?

21        A   The nature of that conversation --

22        MR. SOROSKY:   Objection, Objection, Judge.

23        THE COURT:   What is this about, Mr. Ford?

24        MR. FORD:   Just introducing this to show why

1    the detective went through certain --

2         THE COURT:  I'm going to sustain the

3    objection.

4         MR. FORD:

5         Q  Did you have a conversation with members

6    of the Joliet Police Department?

7         A  Yes, sir.

8         Q  And as a result of that conversation, did

9    you come to have knowledge of a specific

10   individual?

11        A  Yes, sir.

12        MR. SOROSKY:  Objection.

13        MR. FORD:

14        Q  What was that individual's name?

15        MR. SOROSKY:  Objection.

16        THE COURT:  Sustained.

17        MR. FORD:

18        Q  Were you ever able to locate a cab

19   driver?

20        A  No, sir.

21        Q  Were you ever able to locate -- you had a

22   conversation with the Joliet police department, is

23   that correct?

24        A  Yes, sir.

1          Q   And during the course of your

2    conversation with the Joliet police department,

3    did they give you anything?

4          MR. SOROSKY:  Objection.

5          THE COURT:  Overruled.

6          A   Yes, sir.

7          MR. FORD:

8          Q   What did they give you?

9          A   They gave me information that a cab

10   driver --

11         MR. SOROSKY:  Objection.

12         THE COURT:  Sustained.

13         MR. FORD:

14         Q   Physically what did they give you?

15         A   They gave me a photo.

16         Q   And did they indicate indicate who the

17   photograph was of?

18         A   Yes.

19         MR. SOROSKY:  Objection.

20         THE COURT:  Overruled.

21         A   Yes, sir.

22         MR. FORD:

23         Q   What --

24         THE COURT:  Wait a minute, I'm going to

1    sustain.

2        MR. FORD:

3        Q   Was the photograph marked in any way?

4        A   No, sir.

5        Q   Was the photograph of -- can you describe

6    the person depicted in the photograph?

7        A   The photograph was a male black,

8    approximately 50 years old, maybe.

9        Q   What was that person's name?

10       MR. SOROSKY:  Objection.

11       THE COURT:  Sustained.

12       MR. FORD: If I could have a moment, Judge?

13       Q   What did you do with the photograph you

14   received from the Joliet police department?

15       A   I attempted to show it to Jeri Lindsey.

16       Q   How did you go about doing that?

17       A   I went to Jeri Lindsey's house and asked

18   her to come into the area to view some photos.

19       Q   Would this have been then on October 11,

20   1992, the next day?

21       A   It was the 11th or 12th, I'm not certain.

22       Q   And when you say you went to pick Miss

23   Lindsey up, where did you locate her?

24       A   At her home, 8931 South Houston.

R 18

1          Q   After you located her at that address,

2     did you and she go anywhere?

3          A   Yes.

4          Q   Where did you go?

5          A   Went into Area 2 Violent Crimes.

6          Q   Now at that time, did she indicate to you

7     that -- did you have a conversation with her about

8     what you were about to do?

9          A   Yes.

10         Q   Who was present for that conversation?

11         A   That was myself, my partner, Jeri

12    Lindsey, and a female Hispanic.

13         Q   Would her last name have been Kires

14    (Phonetic)?

15         A   I believe so, I'm not certain.

16         Q   And who was the partner you were working

17    with that day?

18         A   Detective Eddy Lorez.

19         Q   During the course of that conversation,

20    what did you say to Miss Lindsey and what did she

21    say to you?

22         A   I told her that we had a photo of a

23    person that we would like her to come into see if

24    this was the guy that had assaulted her in the

1    cab.

2          Q   And did you indicate to her what the name

3    of that person was?

4          A   I don't recall.

5          Q   Now, at that time, what did you do next?

6          A   We -- she then accompanied us into the

7    area.

8          Q   And by the area, what area do you mean?

9          A   Area 2 Violent Crimes.

10         Q   And that is located where?

11         A   727 East 111th Street.

12         Q   When she accompanied you, did she come

13   alone or with anyone?

14         A   She came with a female Hispanic.

15         Q   And when you arrived at the area, where

16   did you go?

17         A   We went to the second floor, our office.

18         Q   And for what purpose did you go to the

19   second floor?

20         A   To view the photos.

21         Q   And did you have occasion to show Miss

22   Lindsey the group of photos?

23         A   No, sir.

24         Q   What happened when you attempted to show

1    her -- what did you do when you got upstairs?

2         A  We got upstairs, I laid the photos out on

3    the desk and I asked her to look at them.

4         Q  Where did you obtain the photographs

5    other than what you obtained in Joliet?

6         A  From our office file.

7         Q  And were they also African American men?

8         A  Yes, sir.

9         Q  Was the name of the person picked in the

10   photograph you got from Joliet?

11        A  Rudolph Bennett.

12        Q  What happened when you attempted to show

13   her the photograph?

14        A  She refused to look at them.

15        Q  What was the next thing that happened?

16        A  She asked to go home.

17        Q  Did she indicate to you the reason that

18   she refused to look at the photos?

19        A  She never gave us a reason.

20        Q  What happened after she refused to look

21   at the photographs?

22        A  We took her home.

23        Q  By we, who do you mean?

24        A  Me and Detective Lorez.

1          Q   Now Detective, I would like to direct

2     your attention to the date of -- did you later

3     come to find out -- did you continue your

4     investigation in this case?

5          A   Sometime later.

6          Q   And did you ever get into contact with

7     any other unit of the Chicago Police Department to

8     further your investigation in this case?

9          A   Yes, sir.

10         Q   What unit did you get in contact with?

11         A   Area 5 Violent Crimes.

12         Q   And for what purpose did you get in

13    contact with them?

14         A   Because I later learned that the cab

15    driver from a Joliet cab company had been found

16    murdered at --

17         MR. SOROSKY:  Objection, your Honor.

18         THE COURT:  Overruled.

19         A   Had been found murdered at O'Hare

20    Airport.  I called Joliet -- I'm sorry, called

21    Area 5 to give them the information I had.

22         MR. FORD:

23         Q   Did they then become involved in this

24    investigation also?

```
1            A   Yes, sir.

2            Q   What area of the city is O'Hare Airport

3     located in?

4            A   It's in Area 5.

5            MR. FORD:  If I could have a moment, Judge.

6            THE COURT:  Yes.

7            MR. FORD:  No further questions at this

8     time.

9            THE COURT:  Cross.

10                   CROSS EXAMINATION

11                         BY

12                   MR. SOROSKY:

13           Q   Now Detective Hines --?

14           A   Yes, sir.

15           Q   You were assigned to investigate this

16    allegation that you referred to in your testimony

17    involving an aggravated criminal sexual assault,

18    were you not?

19           A   Yes, sir.

20           Q   And this complaint came in Sunday night,

21    October 11, 1992, around 11:00 or 11:30, would

22    that be accurate?

23           A   Yes, sir.  I can hardly hear you.

24           Q   Would that be accurate?
```

1          A   Yes, sir.

2          Q   And you were the primary detective

3     investigating this, were you not?

4          A   It was my case, yes, sir.

5          Q   And as a result of being the primary

6     detective investigating this, you learned that

7     Jeri Lindsey first came to the hospital that was

8     then called South Chicago Hospital on October 11,

9     1992 and made this complaint about being raped to

10    hospital personnel, is that correct?

11         A   Yes.

12         Q   And the hospital personnel then called

13    the police department and certain officers in

14    uniform came to the police station, is that

15    correct?

16         A   Yes, sir.

17         Q   And those officers in uniform questioned

18    Jeri Lindsey, did they not?

19         A   I -- she was gone when I went there, I

20    don't know, I'm assuming they did.

21         Q   You had occasion to see those officers or

22    the beat report, did you not?

23         A   Yes, sir.

24         Q   And in reading the beat report, does not

1      the beat report relate that Jeri Lindsey told the

2      beat officers or officers in uniform that she in

3      fact was accosted and raped?

4              MR. FORD:  Objection.

5              THE COURT:  Sustained.

6              MR. SOROSKY:

7         Q   Have you had occasion to see the report?

8         A   Yes, sir.

9         Q   In fact, that was one of the reports that

10     -- that report was one of the reports that the

11     State's Attorney showed you, did he not, when you

12     first testified, is that right?

13        A   I believe it was.

14        Q   I would ask you to look at this report

15     and we would ask it to have the same marking that

16     the State's Attorney referred to.  Is that in fact

17     the same report that the State's Attorney showed

18     you?

19        A   That's not the report I referred to.

20        Q   I ask you to look at this, we'll mark

21     this Defendant's Exhibit I believe it's number one

22     for identification and is this in fact what we

23     commonly call the beat report?

24        A   Yes, sir.

1          Q   And have you ever had occasion to see

2     this report?

3          A   Yes, sir.

4          Q   I would ask you to look it over now just

5     to refresh your memory. ?

6          A   No, sir, this is not the report.

7          Q   This is the not the report that you've

8     ever seen?

9          A   This is not the beat report.

10         Q   You have in fact seen the beat report,

11    have you not?

12         A   Yes, sir.  If you're alluding to the

13    criminal sexual assault, yes, sir.

14         Q   My mistake, this is the beat report that

15    you have seen, have you not?

16         A   Yes, sir.

17         Q   And you've read that before today, have

18    you not?

19         A   Yes, sir.

20         Q   And you certainly read that report in

21    preparing for your interviews with Jeri Lindsey,

22    did you not, when you -- when you were

23    investigating this aggravated criminal sexual

24    assault allegation?

1           A   Yes, sir.

2           Q   And so you were aware when you

3    interviewed Miss Lindsey that she had also told

4    the beat officers who came to the station that she

5    had been the victim of a rape, did she not?

6           MR. FORD:  Objection.

7           THE COURT:  Sustained.

8           MR. SOROSKY:

9           Q   Now, you referred to a telephone

10   conversatino you had with Miss Lindsey, did you

11   not?

12          A   Yes, sir.

13          Q   And we did this telephone conversation

14   take place, if you know and if you don't know the

15   exact date at least in relation to your activities

16   were going to the hospital?

17          A   Shortly after my arrival at the hospital.

18          Q   And where was Miss Lindsey if you know?

19          A   She was at her home.

20          Q   She was at her home.  And in that

21   telephone conversation, she told you that you had

22   been -- strike that.  Miss Lindsey told you that

23   she had been the subject of a rape and kidnapping,

24   did she not?

1           A    Well she said rape, she didn't use the

2     term kidnapping.

3           Q    She said she had been raped, is that

4     correct?

5           A    Yes, sir, criminally sexually assaulted.

6           Q    She said she had been taken in a cab as

7     you described in your direct examination

8     testimony, did she not?

9           A    Yes, sir.

10          Q    The next time you had any contact with

11    Miss Lindsey would have been the next day, Monday

12    night, right?

13          A    I believe so.

14          Q    That would be October 12, 1992, is that

15    correct?

16          A    Yes, sir.

17          Q    And that was when you called Miss Lindsey

18    up at her house and she spoke to you on the

19    telephone and Miss Lindsey and you went to the

20    police station, is that correct?

21          A    Yes, sir.

22          Q    And did you have any conversations with

23    Miss Lindsey that evening concerning the alleged

24    rape if you know?

R 28

1       A   Just that I wanted her to look at the

2    photo to see if this was the person who had

3    committed the offense.

4       Q   But you didn't get into the substance of

5    the charge, did you?

6       A   I don't -- I don't believe so.  I don't

7    recall.

8       Q   Now, Miss Lindsey laid out some -- Miss

9    Lindsey was asked to view the photographs, was she

10   not?

11      A   Yes, sir.

12      Q   And she was asked whether she could

13   identify any of those men as her attacker, isn't

14   that correct?

15      A   She was asked to view the photos.

16      Q   And didn't she say that none of those men

17   were the person who accosted her?

18      A   She never even looked at them.

19      Q   But she did say none of those men were

20   the person who accosted her, did she not?

21      A   I don't -- I don't -- I don't think she

22   did.

23      Q   You don't really remember what she said?

24      A   She said she didn't want to look at the

R 29

1    photos, I remember she said that.

2        Q   But did she also say none of those men

3    were --?

4        A   I don't recall that conversation.

5        MR. FORD:  Objection.

6        THE COURT:  Sustained.

7        MR. SOROSKY:

8        Q   So you don't actually recall what she

9    said, do you?

10       MR. FORD:  Objection.

11       THE COURT:  Sustained.

12       MR. SOROSKY:

13       Q   Now, did you ever have any contact with

14   Miss Lindsey after that evening?

15       A   I'm sorry?

16       Q   Did you ever have any contact with Miss

17   Lindsey after that evening of Monday night?

18       A   No.

19       Q   October 12?

20       A   No.

21       Q   Now, when you brought Miss Lindsey into

22   the police station, on October 12, Monday night,

23   1992, did you in fact believe that she was a true

24   rape victim or did you bring her to the station

```
 1    for other reasons?

 2         MR. FORD:  Objection.

 3         THE COURT:  Sustained.

 4         MR. SOROSKY:

 5         Q  Did you believe Miss Lindsey's story she

 6    was the victim of a rape when you brought her into

 7    the place station Monday night?

 8         MR. FORD:  Objection.

 9         THE COURT:  Sustained.

10         MR. SOROSKY:

11         Q  What was the purpose of you having Miss

12    Lindsey look at the photographs, why did you want

13    Miss Lindsey to look at those photographs?

14         A  To see if she could identify the person

15    who she stated had committed a criminal sexual

16    assault.

17         Q  So did you believe in fact on that night

18    that she was a true rape victim?

19         MR. FORD:  Objection.

20         THE COURT:  Sustained.

21         MR. SOROSKY:

22         Q  Now, you don't really remember what

23    description Miss Lindsey gave concerning the

24    taxicab, do you?
```

```
1              A   I'm sorry?

2              Q   As you testified today, you don't really

3      remember what description Miss Lindsey gave

4      concerning the taxicab, do you?

5              A   She just said that it was a 4 door red

6      and white cab.

7              Q   You don't remember anything other than

8      that?

9              A   That's as far as I can remember, that's

10     all she told me about the cab.

11             MR. SOROSKY:  Nothing further of this

12     witness.

13             THE COURT:  Redirect.

14             MR. FORD:  Nothing by way of redirect,

15     Judge.

16             THE COURT:  Thank you. You're excused.

17             MR. FORD:  I would ask the trial be

18     commenced and continued to tomorrow, Judge.

19             THE COURT:  Finish it tomorrow.

20             MR. FORD:  My case, I anticipate  will

21     finish will tomorrow.

22             THE COURT:  Mr. Sorosky, ready to go forward

23     with your case.

24             MR. SOROSKY:  Tomorrow or Wednesday.
```

R 32

1           THE COURT:   Tomorrow.

2           MR. SOROSKY:   Will we need the whole day to

3     finish?

4           MR. FORD:   I don't know who I'm going to

5     call.

6           THE COURT:   Have your witnesses here, this

7     is my priority case, we have to get this out of

8     the way.  Yea or nay, up or down.  All right.

9     Now, you weren't here at 10:30 today.

10          MR. SOROSKY:   I was here at 9:30, I was here

11    before you were on the bench.  Today I'm an

12    innocent man.

13          THE COURT:   Innocent of what.

14          MR. SOROSKY:   Being tardy. I contacted your

15    courtroom all day, I was here all day, I will be

16    that way tomorrow.

17          THE COURT:   Tomorrow at 9:30.

18               Hold on call until tomorrow, 9:30.

19                    (Whereupon, the further hearin

20                    of the above-entitled cause

21                    was continued to 1-10-95, at

22                    9:30 o'clock a.m.)

23

24

R 33

1  STATE OF ILLINOIS )
          ) SS.
2  COUNTY OF C O O K )

3    THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
      COUNTY DEPARTMENT  -  CRIMINAL DIVISION

4

5       I, Kenneth Madoch, Official

  Shorthand Reporter of the Circuit Court of Cook

6

  County Department-Criminal Division do hereby

7

  certify that I reported in shorthand the

8

  proceedings had at the hearing in the

9

  above-entitled cause; and that I thereafter

10

  caused to be transcribed into typewriting the

11

  foregoing transcript, which I certify is a

12

  true and correct transcript of said

13

  proceedings.

14

15

16  Official Shorthand Reporter
  Circuit Court of Cook County.

17

18

19

20

21

22

23

24  Dated this 12TH day of June, 1995.

R 34

1    STATE OF ILLINOIS )
                       )   ss
2    COUNTY OF C O O K )

3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                        )   Case No. 92 cr 25135
6        vs.           )
                        )   Charge: Murder
7    JERRI LINDSEY     )

8                 REPORT  OF  PROCEEDINGS

9            BE IT REMEMBERED that on the 10th day of

10   January, 1995, this cause came on for hearing

11   before the Honorable SHELVIN SINGER, Judge of said

12   Court, upon the information herein, the defendant

13   having entered a plea of not guilty.

14        APPEARANCES:
               HON. JACK O'MALLEY,
15             State's Attorney of Cook County, by
               MR. NICK FORD,
16             Assistant State's Attorney,
               Appeared on behalf of the People;
17
               MR. SHELDON SOROSKY,
18             Appeared on behalf of the Defendant.

19

20

21

22
     Kenneth Madoch
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department-Criminal Division.

                          S  1

1          THE CLERK: People versus Jeri Lindsey.

2          THE COURT:  The record should reflect the

3     defendant is present in her own person through

4     counsel.  State is present through its counsel.

5          THE COURT:  Call your next witness, Mr.

6     Ford.

7          MR. FORD:  I ask leave of Court to call Miss

8     Julie Nelson, Judge.

9                    JULIE NELSON,

10    called as a witness on behalf of the People of the

11    State of Illinois, having been first duly sworn,

12    was examined and testified as follows:

13                 DIRECT EXAMINATION

14                        BY

15                   MR. FORD:

16         Q   Would you please state your name, spell

17    your last name Court Reporter?

18         A   My name is Julie Nelson, N-e-l-s-o-n.

19         Q   And what do you do for a living, Miss

20    Nelson?

21         A   I am an Assistant State's Attorney at

22    Cook County.

23         Q   And are you an attorney licensed to

24    practice here in the State of Illinois?

1           A   Yes, I am.

2           Q   How long have you been an attorney here

3      in the State?

4           A   I have been licensed to practice in

5      Illinois since 1988, and I have been with the

6      State's Attorney's Office since August of '89.

7           Q   What is your current assignment within

8      the State's Attorney's office?

9           A   I'm currently assigned to the trial

10     division in Judge Kelly's courtroom.

11          Q   Now, Miss Nelson, I would like to direct

12     your attention to the month of October, 1992,

13     where were you assigned at that time?

14          A   I was assigned to the felony review unit

15     of our office.

16          Q   And that would be the State's Attorney's

17     Office?

18          A   Yes.

19          Q   And in particular now on the date of

20     October 15, 1992, were you working as an Assistant

21     State's Attorney assigned to the Felony Review

22     Unit of the State's Attorney's Office?

23          A   Yes, I was.

24          Q   And on that date, were you working in the

S 4

1    morning or in the -- the day or the evening part

2    of your job?

3        A   I was working nights that shift.

4        Q   Do you recall then in the evening hours

5    of October 15, 1992 receiving an assignment?

6        A   Yes, I did, right when I first got on

7    that afternoon, I received a call to go out to

8    Area 5.

9        Q   And Area 5 is located where?

10       A   It's at 5555 West Grand, Grand and

11   Central, in Chicago.

12       Q   And did you in fact go out to Area 5

13   Violent Crimes?

14       A   Yes, I did.

15       Q   What time on October 15, 1992 did you

16   arrive at Area 5 Violent Crimes?

17       A   I arrived a short time after 7 o'clock,

18   probably between 7 and 7:15.

19       Q   What did you do when you first arrived

20   there?

21       A   I spoke to the detectives that were

22   handling the case, Detective Bogucki and Detective

23   Schalk.

24       Q   And what did you do after that?

S 5

1          A    After I spoke to them, I looked at the

2     police reports that they had and went over all the

3     documentation that they had acquired from their

4     investigation.

5          Q    After you had talked to the detectives

6     and looked through the reports, did you have any

7     further communication with anyone else?

8          A    Yes, I did, I spoke to the Assistant

9     State's Attorney who was working in the day shift

10    on that case.  I spoke with Mr. Rosenblum, I paged

11    him and eventually spoke to him on the telephone.

12         Q    After your conversation with Mr.

13    Rosenblum, did you have an additional conversation

14    with any other people?

15         A    At that time, I wanted to speak to the

16    witnesses who were in the police station earlier

17    that day.  There were three of them.  The victim's

18    wife and the 2 people who were also in the cab

19    with the victim and the detective called those 3

20    people on the phone for me.

21         Q    Now, did you speak with them?

22         A    Yes, I did.

23         Q    Did you review any additional materials

24    or have any further conversation with anyone?

S  6

1           A   Yes, there was a witness who was in the

2      police station, it was a friend of Miss Lindsey's

3      and I spoke to her at that time.  After I spoke --

4           Q   Do you recall -- I'm sorry?

5           A   After I spoke to the other witnesses on

6      the phone.

7           Q   Do you recall that woman's name?

8           A   Not off the top of my head.

9           Q   Would that have been Irene Quiros?

10          A   That sounds right.

11          Q   Now, Miss Nelson, did you ever have

12     occasion to meet with anyone you see here in Court

13     today?

14          A   Yes, I did.

15          Q   Would you please identify that person by

16     an article of clothing they are wearing?

17          A   I spoke to Miss Lindsey the woman in the

18     blue outfit the white shirt under it.

19          MR. FORD: For the record indicating the

20     defendant Jeri Lindsey.

21          THE COURT:  The record may so reflect.

22          MR. FORD:

23          Q   About what time did you first come in

24     contact with Jeri Lindsey?

S  7

1        A   I first spoke to Miss Lindsey at

2    approximately 1 o'clock in the morning on the 16th

3    of October.

4        Q   And where did you first come into contact

5    with her?

6        A   I spoke to her in one of the conference

7    rooms at Area 5.

8        Q   And at the time you entered into that

9    conference room -- would you describe the

10   conference room?

11       A   It's actually one of the larger rooms in

12   Area 5.  It had a large table, a number of chairs,

13   also had a number of desks and I believe there

14   were computers in that room also but I'm not

15   positive.

16       Q   And when you first entered into the room

17   at that time, did you enter alone or with anyone?

18       A   I entered with the 2 detectives that were

19   working on the case.

20       Q   Do you recall the names of those 2

21   detectives?

22       A   It was Detective Schalk and Detective

23   Bogucki.

24       Q   What happened when you and Detective

S 8

1   Schalk and Detective Bogucki entered into the

2   interview room?

3       A  Miss Lindsey was already sitting at the

4   table, I sat down and introduced myself, I told

5   her that my name was Julie Nelson, I was an

6   Assistant State's Attorney, I was a lawyer but I

7   was not her lawyer and I asked her if she

8   understood that I wasn't her lawyer.  She said

9   yes, she did.

10          After I explained that to her and

11  introduced myself, I told her also that I wanted

12  to make sure that she understood her Miranda

13  warnings, I told her that I'm sure she's heard

14  them before but just for my own information, I

15  wanted to make sure she had no questions about

16  it.  And after I told her that, I went through

17  each of the Miranda warnings with her.

18      Q  Did you do that from memory or from a

19  pre-printed source?

20      A  From memory.

21      Q  Would you today as you did then back on

22  October 16, 1992 indicate what rights Miss Lindsey

23  enjoyed and whether or not she replied or

24  acknowledged the rights?

S 9

1        A    First I told her she had the right to

2    remain silent, and that meant that she didn't have

3    to talk to myself or to the detectives or anyone

4    else who was at the police station.

5               I told her that anything she said to

6    me or to any of the police officers could later be

7    used against her in Court.

8               I also told her that she had a right

9    to have her own attorney present and that if she

10   wanted to have her own attorney, but could not pay

11   for one, the Court would appoint her one free of

12   charge.

13              I also told her that she could talk

14   to myself and the detectives if she so desired and

15   if she wanted to speak to us, she could speak to

16   us by herself or by having her own attorney

17   present.

18              I also told her if she wanted to

19   talk to us, at any time if she decided she didn't

20   want to talk to us any longer, she could say

21   that's it and the detectives and myself would stop

22   the conversation at that point.

23              After I explained the rights to her,

24   I asked her if she understood everything I said to

1    her and asked her if she had any questions about

2    what I had previously spoken to her, she stated

3    she understood everything and had no questions.

4        Q   At that point, did you, Miss Lindsey and

5    Detective Schalk and Detective Bogucki begin a

6    conversation?

7        A   Yes, I did.  At that point I asked her, I

8    told her why I wanted to talk to her, I told her

9    that I wanted to talk to her about why she was in

10   the police station on that night, the previous

11   night and that morning, and I told her I wanted to

12   talk to her about the cab driver that was killed

13   at O'Hare, if she wanted to talk to me and at that

14   point she agreed to talk to me.

15       Q   Did you in fact have a conversation with

16   her at that time?

17       A   Yes, I did.

18       Q   Approximately how long did this

19   conversation last?

20       A   That conversation took approximately 2

21   hours.

22       Q   It would have been at approximately 3 AM

23   in the morning of the 15th of October -- excuse me

24   the 16th of October, 1992 that you actually left

1    the conference area?

2        A    That is correct.

3        Q    When you left did you leave alone or with

4    anyone?

5        A    The detectives left with me.

6        Q    Leaving Miss Lindsey alone in that

7    conference room?

8        A    That is correct.

9        Q    Did you ever return to that conference

10   room later?

11       A    Yes, I did, a short time after we left,

12   it probably wasn't more than a couple of minutes,

13   I went back into the conference room by myself to

14   talk to Miss Lindsey about what type of statement

15   she wanted to have taken, and also about how she

16   had been treated since she was in police custody.

17       Q    Did you in fact inquire of Miss Lindsey

18   how she had been treated by the police?

19       A    Yes, I did.  First I had asked her if she

20   had any problems with anyone since she had been

21   placed in police custody, specifically with the

22   police or with any Assistant State's Attorneys

23   that she had any contact with prior to that

24   point.  She said she had no problems up to that

1    point with anyone she came into contact with.

2        Q   Did you make any further inquiry of Miss

3    Lindsey?

4        A   Yes, I also asked her if she needed

5    anything at the time, if she needed to use the

6    rest room or if she needed something to drink like

7    a pop or something to eat.  I don't think she

8    wanted anything at that point in time.

9        Q   What was the next thing that happened?

10       A   At that point I told her about the

11   different types of statements and I told her that

12   there were three types of statements, the first

13   type of statement was a statement she had already

14   given me which was an oral statement and if she

15   wanted to leave it at the oral statement what

16   would happen.  I explained to her was I would

17   write a summary of what she told me in my felony

18   review file, she would not get to see what I wrote

19   down and that would be it for the oral statement.

20            The second type of statement she had

21   an opportunity to do is a handwritten statement.

22   I told her what that was, was a summary of what

23   she had told me, I told her that I would write

24   down a summary of her statement and her and I and

1    the detectives would have a chance to go through

2    the statement line by line and word by word and

3    she could make any changes that she wanted in that

4    statement after it was completed.

5              The third type of statement was a

6    Court reported statement.  For a Court reported

7    statement we would have another person come in

8    with a Court Reporter machine and it would be a

9    question and answer statement that I would ask her

10   questions and that she would answer those

11   questions and a Court Reporter would take down

12   what she had to say and when that was all

13   finished, she would have a chance to read through

14   that and make any corrections that she wanted

15   also.

16        Q   At that time did Miss Lindsey indicate to

17   you how she wished to proceed?

18        A   Yes.  At that time she stated she wished

19   to have a Court -- I'm sorry, a handwritten

20   statement done.

21        Q   And what did you do at that point, then?

22        A   At that point, I told her that I was

23   going to go out of the room and write up a summary

24   of her statement and I left the room and got the

S  14

1    paper work from my brief case and started writing

2    up her statement.

3         Q   Now, about how long did it take you to

4    write up the statement?

5         A   It took me approximately an hour, maybe a

6    little bit less.

7         Q   And the statement you wrote up was a

8    synopsis of what she originally told you during

9    the first discussion with her?

10        A   That is correct.

11        Q   Did you ever return to this conference

12   room area?

13        A   Yes, I did, at approximately little after

14   4:00 in the morning, on the 16th, I went back in

15   with both Detective Bogucki and Detective Schalk

16   and we went into the room with the statement that

17   I had prepared.

18        Q   And can you describe for his Honor, Judge

19   Singer what happened after you entered into the

20   room?

21        A   After I entered into the room, I told

22   Miss Lindsey that I had written up the statement,

23   a summary of what she had told me and at that

24   point in time, we were going to go over the

S 15

1    statement together.  I told her that if she wanted

2    to make any changes in the statement, to let me

3    know, I also told her if she found even the

4    simplest error like a spelling mistake, she could

5    correct that too.

6                    I told her what I first wanted her

7    to do was read the first 3 lines to me out loud of

8    my handwritten portion, I told her I wanted her to

9    do that to make sure she could read my handwriting

10   and said at that time read the first 2 or 3 lines

11   out loud to me of the statement.

12       Q   Did you read yourself silently as Miss

13   Lindsey read those words aloud?

14       A   Yes, I did.

15       Q   And were the words that she read the

16   handwriting of yours that she read, were the words

17   she read aloud consistent with the handwriting in

18   which you had written?

19       A   Those were the words I had written on the

20   page which she said to me out loud.

21       Q   What happened after you had done that?

22       A   After I had done that, I told her that I

23   wanted her to read the top portion of the

24   statement which was the introduction, who the

1    statement was by, what the date and the time and

2    the location was and what the statement was

3    concerning and I also told her I wanted her to

4    read the typed portion on the first page which was

5    her Miranda rights. And I told her I wanted her

6    to stop after she read the Miranda rights.

7        Q   Did she in fact read through those

8    materials at that time?

9        A   Yes, she did.

10       Q   And at the conclusion of reading through

11   the materials, did she do anything?

12       A   She told me she was finished when she --

13   when it looked to me like she was finished with

14   the reading of the typed written portion, I asked

15   her at that point if she had any questions about

16   the Miranda warnings, the typewritten portion that

17   she had read on the first page of the statement

18   and she said no, she understood all that.

19               And I stated that at this time, if

20   she wished to waive her Miranda warnings, she

21   could sign the statement, sign the line under the

22   typed portion for the waiver of her Miranda

23   warnings.

24       Q   Now, was there any member of the Chicago

1  Police Department in the conference room with you

2  at the time this was occurring?

3      A   Yes, both Detective Bogucki and Detective

4  Schalk.

5      Q   Now, did Miss Lindsey in fact sign

6  directly below the Miranda portion of the

7  statement in your presence?

8      A   Yes, she did.

9      Q   And that was signed immediately following

10  the time when that portion had been read?

11      A   Yes, after she explained to me that she

12  understood everything.

13      Q   After she told you she understood the

14  Miranda -- her Miranda rights what was the next

15  thing that happened?

16      A   The next thing that happened was I told

17  her we were going to go through each of the pages

18  of the statement and I again reminded her that she

19  could make any changes that she wanted in the

20  statement and just to -- just to say stop when she

21  had a problem with the statement and we would make

22  the change as she found the problems in the

23  statement and at that point in time, I read the

24  statement to her over her shoulder while she --

S 18

1    what appeared to be reading the statement to

2    herself.

3         Q  You read the statement actually aloud to

4    Miss Lindsey?

5         A  Yes, I did.

6         Q  Miss Nelson, I would like to show you

7    what I just marked People's Exhibit number 9 for

8    identification and ask you to take a moment and

9    examine this 4 page document:

10             Miss Nelson, have you seen that

11   document before?

12        A  Yes, I have.

13        Q  What does that document appear to be?

14        A  This is a xeroxed copy of the handwritten

15   statement of Miss Jeri Lindsey.

16        Q  And when had you seen that document

17   before you saw it today?

18        A  I had saw it when I -- actually after I

19   finished writing it up and when we went in to sign

20   it and we -- I actually made xeroxed copies of

21   this original statement.

22        Q  Now is that item other than the fact it's

23   a xeroxed copy in the same or substantially the

24   same condition as it was you and Miss Lindsey went

S 19

1    through it on October 16, 1992?

2        A   The only thing that's different there is

3    a number 9 on the back of the last page.

4        Q   You indicated earlier that you had

5    indicated to Miss Lindsey that if she encountered

6    anything she wished to be corrected she would be

7    allowed to do so, is that correct?

8        A   That is correct.

9        Q   Did this in fact occur during the course

10   of the time you were reading the statement aloud

11   to her?

12       A   Yes, it did.

13       Q   At what point did it occur, if you would

14   indicate and what page?

15       A   I believe -- well the first -- the first

16   change occurred on page 3 of the statement, the

17   changed street that I had written from 79th is

18   what I wrote down in the statement and she wanted

19   it changed to 95th.

20              The second change occurred on the

21   last page of the statement, in the portion where

22   it said she was allowed to smoke.  She was very

23   adamant she didn't smoke and didn't want that in

24   her statement so we X'd that out also.

1          Q   Miss Nelson, did you read the entire

2     statement aloud?

3          A   Yes.

4          Q   At the conclusion of your having read the

5     entire statement aloud to her what did you do

6     next?

7          A   At that point in time I asked her if

8     there was anything besides the 2 changes that she

9     wanted to change in the statement.  And she stated

10    no, that that was fine, fine the way it was. I

11    stated to her if she was sure there was nothing

12    else she wanted to change, and this was an

13    accurate statement as to what happened, that we

14    would go through, that her, myself and both of the

15    detectives would sign the bottom of each of the

16    pages of the statement.

17         Q   What did she say after you told her that?

18         A   She said that was fine and we went

19    through and all of us, the 4 of us signed the

20    bottom pages of each of the statements.  As far as

21    the last page of the statement, I told her -- well

22    I told her that there would be nothing added to

23    the bottom of the statement and that we would sign

24    at the very end of the statement but it was the

1    last line that was signed.

2        Q    In your presence, did Miss Lindsey

3    actually sign each of the pages of the statement?

4        A    Yes, she did.

5        Q    And with reference to Detective Bogucki

6    and Schalk, did she they also sign the statement

7    in your presence?

8        A    They did.

9        Q    And you signed each of the pages of the

10   statement?

11       A    Yes, I did.

12       Q    What did you do after the statement had

13   been completed and signed by yourself and Miss

14   Lindsey and the 2 detectives?

15       A    After we -- all the statement was signed,

16   then I went out and finished up, I did some

17   xeroxing of the materials that I needed and I did

18   some paper work that I needed to do.

19       Q    Did that end your contact with Miss

20   Lindsey?

21       A    Yes, it did.

22       MR. FORD: Your Honor, at this time I would

23   ask the identification marks be stricken from

24   People's Number 9 for identification and that it

1    be moved into evidence and I would submit Miss

2    Nelson to Mr. Sorosky for the purposes of cross

3    examination if he wishes to do so prior to the

4    publication of that exhibit.

5         THE COURT:  Mr. Sorosky, you may cross at

6    this time for the limited purposes of testing the

7    admissibility of People's Exhibit number 9.

8         MR. SOROSKY:  Would that be limited to

9    merely the Miranda rights.

10        THE COURT:  No, anything relative to the

11   admissibility of the statement.  The State is now

12   offering the statement into evidence.  Before I

13   rule I feel I must give you an opportunity to

14   cross examine this witness.  It deals with

15   everything relative to the admissibility of the

16   statement.

17        MR. SOROSKY:  Very well.

18        THE COURT:  The reliability of the statement

19   as well and the weight to be given the statement.

20   If there is further evidence that Mr. Ford wishes

21   to elicit in from the witness, you'll have

22   additional opportunity to cross examine her about

23   that further information.

24        MR. SOROSKY:  Very well.

S 23

1          THE COURT:  I don't recall anything other

2     than relative to the -- the events leading up to

3     the statement and the statement so far elicited by

4     Mr. Ford from this witness but perhaps there may

5     be more.

6                    CROSS EXAMINATION

7                         BY

8               MR. SOROSKY:

9          Q  Miss Nelson, at this time, you were

10    assigned to the Felony Review Unit of the State's

11    attorney office, were you not?

12         A  That is correct.

13         Q  And one of the primary functions of the

14    Felony Review Unit of the State's attorney office

15    is to take statements or confessions from

16    arrestees, isn't that correct?

17         A  That's if they want to give them.

18         Q  Right, but that is one of the primary

19    functions of that unit?

20         A  It is a function, yes.

21         Q  And for how long a period of time had you

22    been in this unit on October 16, 1992,

23    approximately?

24         A  I believe since March of that same year.

1          Q   And did you as an Assistant State's

2     Attorney receive any instructions or any

3     directions when you got into this unit as to how

4     statements should be taken?

5          A   There was some instruction as to what

6     forms to use and about how they -- we were

7     supposed to include the fact that they were

8     advised of their Constitutional rights if we did

9     so advise them of their Constitutional rights and

10    also, to include how they told us they were

11    treated at the end of the statement.

12         Q   So in other words, you didn't come to

13    this unit with a congratulations you arrived here,

14    now go out and take your first statement whenever

15    it comes, you received some direction and

16    instruction before you were to go out and take a

17    statement, did you not?

18         MR. FORD:   Objection.

19         THE COURT:   Sustained.

20         MR. SOROSKY:

21         Q   So you did receive direction and

22    instruction before you took a statement, is that

23    correct?

24         MR. FORD:   Objection, Judge.

1    THE COURT:  Overruled.

2    A   We did have some instruction from our

3    partners, our more senior partners on our team, we

4    also had some training from our supervisors.

5    Q   Now, and when you took your statement

6    from Miss Lindsey, you followed all the directions

7    that you had received from more senior State's

8    Attorney's and training you had received from

9    supervisors, did you not?

10   A   The directions that they had given me,

11   yes.

12   Q   And I believe when you testified, you

13   said that you gave Miss Lindsey 3 choices, she

14   could make an oral statement, she could give a

15   written statement where you would write up a

16   summary of what she said or 3, there would be a

17   Court reported statement with questions and

18   answers, is that correct?

19   A   That is correct.

20   Q   You did not give her a choice of writing

21   out what occurred in her own words, did you?

22   A   No, I did not.

23   Q   Did you ever inquire of Miss Lindsey as

24   to whether she could read and write?

1          A   Yes, I did, I asked her if she could read

2    when I went in to talk to her about how she had

3    been treated by the police and when we went over

4    the types of statement.

5          Q   And did you ever inquire of Miss Lindsey

6    how far she went in school?

7          A   I don't remember if I did.

8          Q   Now, obviously there are -- strike that.

9    During the course of your duties in the Felony

10   Review Unit wherein you took statements from

11   arrestees, there were a number of arrestees you

12   came upon who had limited educational skills and

13   limited reading and writing skills, isn't that

14   correct?

15         MR. FORD:   Objection.

16         THE COURT:   Sustained.

17         MR. SOROSKY:

18         Q   Did you ever inquire of Miss Lindsey

19   whether she is capable of writing out her own

20   version of events in her own words?

21         A   No, I did not.

22         Q   Now, when you spoke to Miss Lindsey, and

23   gave her these choices, you were in the presence

24   of the 2 police officers you mentioned, were you

1    not?

2         A   No, I was not, it was just myself and

3    Miss Lindsey.

4         Q   And for how long had you been alone with

5    her at this time?

6         A   It was no more than 10 minutes.  I went

7    over the types of statements and how she had been

8    treated by the police at that time.

9         Q   Now, in going over -- what time did you

10   come to work that day?

11        A   I was at, working the evening shift so I

12   started at I think, I believe at 6 o'clock in the

13   evening and I received the assignment shortly

14   after I arrived at work.

15        Q   So when you began working on this case,

16   you were pretty fresh, if I could use that street

17   expression, you understand it?

18        MR. FORD:  Objection.

19        THE COURT:  Sustained.

20        MR. SOROSKY:

21        Q   When you arrived at work, you were not

22   tired, you were not tired, were you?

23        A   It was my first assignment.

24        Q   So you were bright and alert when you

1    began questioning Miss Lindsey, were you not?

2         MR. FORD:  I'll stipulate to that, Judge.

3         THE COURT:  Okay.

4         MR. SOROSKY:

5         Q  You had occasion to review the reports

6    and notes of the other -- of the detectives you

7    had mentioned, had you not, before you began

8    speaking to Miss Lindsey, did you not?

9         A  Yes, I did.

10        Q  And were you aware at the time you began

11   speaking to Miss Lindsey how long she had been in

12   custody?

13        A  I believe -- I knew she had been there

14   for a while because another Assistant State's

15   Attorney had talked to her earlier that same day.

16        Q  Now if I'm not mistaken, you took your

17   statement of Miss Lindsey on 10-16-92 at 4:10 AM,

18   that would be Friday morning at 4:10 AM in the

19   morning, right?

20        A  I don't remember what day of the week it

21   was but it was on the 16th and the handwritten

22   statement when we went over it after it was

23   written up was 4:10 in the morning.

24        Q  Were you aware that Miss Lindsey had been

1   in police custody since Wednesday around 11 AM?

2        MR. FORD:  Objection.

3        THE COURT:  Sustained.

4        MR. SOROSKY:

5        Q  Did you have occasion to review your

6   police notes?

7        A  Yes, I did.

8        Q  And did those police noes relate when

9   Miss Lindsey was in custody or what time she was

10  brought to the police station?

11       MR. FORD: Objection.

12       A  I believe --

13       THE COURT:  Sustained.

14       MR. SOROSKY:

15       Q  Now, were you aware of the fact that Miss

16  Lindsey had not talked, spoken to any family

17  members in the time she was in custody until the

18  time she spoke to you?

19       MR. FORD:  Objection.

20       THE COURT:  Sustained.

21       MR. SOROSKY:

22       Q  Now, is there any particular reason why

23  you didn't allow Miss Lindsey to write out her own

24  version of events?

1          MR. FORD:  Objection.

2          THE COURT:  Sustained.

3          MR. SOROSKY:

4          Q   When you wrote up the version of events

5    which Miss Lindsey originally signed, you did not

6    hear those version of events from Miss Lindsey,

7    did you?

8          A   It was a summary of what she told me the

9    statement that I wrote up.

10         Q   And when did she tell you this?

11         A   When I had the conversation with her

12   between 1:00 and 3 o'clock in the morning.

13         Q   And when you had this conversation with

14   her, the detectives were with you, were they not?

15         A   That is correct.

16         Q   Now, prior to speaking to Miss Lindsey, I

17   believe you testified you had occasion to review

18   the police reports or various detective's notes on

19   this case, isn't that correct?

20         A   That is correct.

21         Q   And you also had occasion to speak to the

22   2 detectives you mentioned, isn't that correct?

23         A   That is correct.

24         Q   And prior to interviewing Miss Lindsey,

1    were you aware of the fact that she had made

2    multiple statements?

3            MR. FORD:  Objection.

4            THE COURT:  Sustained.

5            MR. SOROSKY:

6        Q  Did you ever have occasion to ask Miss

7    Lindsey why she had made earlier statements in

8    conflict with this one?

9            MR. FORD:  Objection.

10           MR. SOROSKY:  This one being the handwritten

11   statement.

12           MR. FORD:  Objection.

13           THE COURT:  Sustained.

14           MR. SOROSKY:

15       Q  Now, I believe you testified that Miss

16   Lindsey made 2 amendments to her statement, isn't

17   that correct?

18       A  Yes, she did make 2 changes.

19       Q  And wouldn't you say that the 2

20   amendments she made were meaningless to her

21   statement?

22           MR. FORD: Objection.

23           THE COURT:  Sustained.

24           MR. SOROSKY:

S 32

1          Q   You have no idea whether the contents of

2     this statement are true, do you?

3          A   It's what she told me and she told me it

4     was the truth.

5          Q   But you personally have no idea whether

6     they're true?

7          A   No.  I was not present for the incident.

8          Q   And you have no idea whether this written

9     statement she gave is more truthful or more

10    accurate than any of the earlier statements she

11    gave?

12         A   She told me this was a true and accurate

13    statement as to what happened and that her

14    previous statements were not true and I believe

15    that's included on the last page of the statement.

16         Q   Now, in the course of your reviewing of

17    all of Miss Lindsey's prior statements such as the

18    3rd statement, 4th statement, 5th statement, 6th

19    statement or 7th statement, didn't she also say

20    after each of those statements that that one was

21    true and all the prior ones were untrue?

22         MR. FORD:  Objection.

23         THE COURT:  Sustained.

24         MR. SOROSKY:  Well I think this goes to

1   rebutt the statement the State might be clinging

2   to in that this statement is true because Miss

3   Lindsey said this statement is true and all the

4   others were false.  We believe, your Honor, the

5   evidence would show if we were allowed to proceed

6   into this area that every time Miss Lindsey gave a

7   statement she always said this one is true and the

8   others are false.

9          THE COURT:  Yeah, but counsel this is a

10  trial itself.  So far as the evidence I heard, the

11  witness was present for only one statement.  How

12  would she know what -- first of all, I know of no

13  other -- I think you said 6 or 7 prior statements,

14  I know of no evidence that there were 6 or 7 prior

15  statements.  That's not in evidence at this

16  juncture.

17         MR. SOROSKY:  Correct.

18         THE COURT:  The witness was not present so

19  far as I understand the evidence at any alleged

20  prior statements, accordingly, how could she been

21  asked if the other statements were true, how would

22  she know what went on relative to those other

23  statements.  She wasn't there.

24         MR. SOROSKY:  However, this witness did

S 34

1    testify before she questioned Miss Lindsey, and

2    spoke to Miss Lindsey, she reviewed the police

3    reports.

4         THE COURT:  Sure, but that --

5         MR. SOROSKY:  And she received some

6    information.

7         THE COURT:  But now you're introducing

8    hearsay through this witness.

9         MR. SOROSKY:  I understand that and we would

10   say --

11        THE COURT:  The State has objected to it and

12   so far as I know, I don't know what exception to

13   the hearsay rule if any that this would apply,

14   would apply to this.  Do you have any such

15   exception to offer to me?

16        MR. SOROSKY:  We would merely say this is

17   cross examination your Honor and the stringent

18   rules of hearsay which would apply to direct

19   examination would not apply to cross examination.

20        THE COURT:  Sustain the objection.

21        MR. SOROSKY:

22        Q  So this handwritten statement that you

23   wrote up would be nothing more than a repeat of

24   the oral statement Miss Lindsey gave you earlier,

1    correct?

2        A   Yes, it's a summary of her previous oral

3    statement to me.

4        Q   And from your conversations with the

5    police, the oral statement that she gave you would

6    be pretty much in accord with the last oral

7    statement the police took from her?

8        MR. FORD:   Objection.

9        THE COURT:   Sustained.

10       MR. SOROSKY:

11       Q   Well prior to being called to the police

12   station, before you were called to the police

13   station, you had received information from the

14   police that the defendant had made certain

15   statements, had you not?

16       MR. FORD:   Objection.

17       MR. SOROSKY:   I should say prior to your

18   arrival at the police station you received

19   information from the police --

20       THE COURT:   Overruled.

21       MR. SOROSKY:   That the defendant had made

22   certain statements, is that correct?

23       A   I received information that she did speak

24   to the police prior to me arriving.

1          Q   And the police told you that she was
2      making the statement and they wanted, they, the
3      police, wanted you to come to the police station
4      and take that statement, is that correct?
5          A   They wanted me to come out and in
6      addition to speaking to Miss Lindsey, speak to the
7      2 witnesses who were not interviewed by my
8      predecessor on the case, Mr. Rosenblum who I
9      interviewed over the phone as well as the witness
10     who was present in the police station who had not
11     been interviewed.
12         Q   You didn't write up any interview of any
13     witnesses, did you?
14         A   No, I did not.
15         Q   And you didn't write up any interview of
16     Miss Lindsey's witness, did you?
17         A   No.
18         MR. FORD:  Objection.
19         THE COURT:  Overruled.
20         MR. SOROSKY:
21         Q   The only write up you did was of Miss
22     Lindsey's statement, correct?
23         A   That is correct.
24         Q   So obviously, your most important

1    function there was to take a statement of Miss

2    Lindsey, wasn't it?

3          MR. FORD:  Objection.

4          THE COURT:  Sustained.

5          MR. SOROSKY:

6          Q  Now, you had been told prior to your

7    coming to the police station that Miss Lindsey had

8    made statements, had you not?

9          A  Yes, I had.

10         Q  Now, when Miss Lindsey gave you her oral

11   statement, the police officers were present, were

12   they not?

13         A  That is correct.

14         Q  Did the police detectives tell you that

15   the oral statement she gave you was the same oral

16   statement she had previously given them?

17         MR. FORD:  Objection.

18         THE COURT:  Overruled.

19         A  At what period of time?

20         MR. SOROSKY:

21         Q  The last statement?

22         A  I don't remember if they said it was the

23   same or not, I don't remember if they told me.

24   They might have but I don't remember.

S 38

1    Q  Did the detectives perhaps say okay, Miss

2    Lindsey, tell the Assistant State's Attorney what

3    you told us?

4    A  No.

5    Q  Did they begin like that?

6    A  No.  I began and I told her why I was

7    there and asked her if she wanted to talk to me

8    about it and that's when she started to talk to

9    me, it was not at the prompting of the police, it

10   was at my questions to her.

11   Q  So, you had no idea whether the statement

12   Miss Lindsey gave you is in accord with the

13   previous statements she had given the police?

14   MR. FORD:  Objection.

15   THE COURT:  Sustained.

16   Q  Did you in your duties as an Assistant

17   State's Attorney ever ask the police how this

18   statement, this written statement compared with

19   the prior statements she gave?

20   MR. FORD:  Objection.

21   THE COURT:  Sustained.

22   MR. SOROSKY:

23   Q  Now, didn't Miss Lindsey ask you if she

24   could have a lawyer and -- did Miss Lindsey ever

S 39

1   ask you if she could have a lawyer?

2       A  No.

3       Q  And did you ever say to Miss Lindsey,

4   you're a lawyer and I decide who is telling the

5   truth and who is not?

6       A  No, I did not, I did tell her I was a

7   lawyer when I first introduced myself but I

8   specifically told her I was not her attorney.

9       Q  Now, didn't Jeri Lindsey tell you that

10  she knew nothing about a cab at Joliet involving

11  old people but that this is what the police had

12  previously told her?

13      A  No, she did not, she's the one who gave

14  me the statement about the cab in Joliet and the 2

15  people who were picked up in the cab with her.

16      Q  Although she told you about a cab in

17  Joliet and 2 old people and someone giving her or

18  the old lady giving her a transit line pamphlet,

19  the old man stopping for alcohol, you remember

20  those contents of Miss Lindsey's statement?

21      A  Yes, I do.

22      Q  Didn't Miss Lindsey -- now Miss Lindsey

23  mentioned those things, did she not?

24      A  Yes, she did.

1      Q   But didn't Miss Lindsey tell you that the

2  police told her that these were things that were

3  told her by the police, didn't Miss Lindsey tell

4  you that?

5      A   No.   She did not tell state to me that

6  the police told her anything to say.

7      Q   I'm not saying the police told her to say

8  anything, I'm just telling you didn't Miss Lindsey

9  say that these were facts related to her by the

10  police during her prior conversations with the

11  police?

12      A   She never told me information of what was

13  told to her in prior conversations, no.

14      Q   You have no idea how Miss Lindsey learned

15  these facts about a cab in Joliet and 2 old people

16  in the cab, do you?

17      MR. FORD:   Objection.

18      THE COURT:   Sustained -- overruled,

19  overruled.   Go ahead.

20      A   She told me that she was present in the

21  cab and I assume that she knew it because she was

22  there.

23      Q   That's just an assumption on your part?

24      A   That's what she told me.

```
 1            Q   Now, when you were conducting this

 2      interview, you attempted to be fair, did you not?

 3            MR. FORD:  Objection.

 4            THE COURT:  Sustained.

 5            MR. SOROSKY:

 6            Q   Right, would that be --

 7            THE COURT:  Sustain the objection.  Fairness

 8      is in the eyes and minds of the beholder.

 9            MR. SOROSKY:  Well I'll accept whatever Miss

10      Nelson's subjective definition of fair is, I'm

11      asking you.

12            THE COURT:  The may not be consistent with

13      my definition of what fairness is or Mr. Ford's

14      definition of fairness.

15            MR. SOROSKY:  Very well.

16            Q   Now, I believe you testified that there

17      was a friend of Miss Lindsey's at the police

18      station, is that correct?

19            A   Yes.

20            Q   And you personally didn't make any

21      notations so that you would know this woman's name

22      and address, did you?

23            MR. FORD:  Objection.

24            A   Yes.
```

S 42

1          THE COURT:  Overruled.

2          A   Yes, I included her name and address in

3     my felony review file, I didn't remember what her

4     name was today.

5          Q   Did you ever take a statement from this

6     woman?

7          A   No.

8          MR. FORD:  Objection.

9          A   I never --

10         THE COURT:  Sustain the objection.

11         MR. SOROSKY:

12         Q   Did you make any determination as to

13    whether this woman was merely present as a friend

14    of Miss Lindsey or whether this woman could

15    provide any information concerning this case?

16         MR. FORD:  Objection.

17         THE COURT:  Sustained.

18         MR. SOROSKY:

19         Q   Did you ever attempt to make an inquiry

20    of this woman?

21         A   Yes, I did speak to her.

22         Q   And did you speak to her concerning the

23    facts of this case or Miss Lindsey's potential

24    involvement in this?

1           MR. FORD:  Objection.

2           THE COURT:  Sustained.

3           MR. SOROSKY:  Nothing further, Judge.

4           THE COURT:  Redirect.

5           MR. FORD:  Nothing by way of redirect, thank

6   you, Miss Nelson.

7                At this time, I would ask leave of

8   Court to publish People's Exhibit number 9 for

9   identification.  Actually what I would ask is the

10  Court take it into it's own custody at this time

11  and review it at a time for convenience to the

12  Court.

13          THE COURT:  All right, first of all I would

14  admit -- any objection to the admission of

15  People's Exhibit number 9 into evidence.

16          MR. SOROSKY:  Yes, we would object, we would

17  say it should not be admitted into evidence under

18  the method of which it was taken.

19          THE COURT:  Objection overruled.  People's

20  Exhibit number 9 will be admitted in evidence,

21  markings for identification stricken and in

22  evidence inserted in its place, may I have it.

23          THE WITNESS:  Yes.

24          THE COURT:  All right, anything further from

S 44

1    this witness, Mr. Ford.

2         MR. FORD:  No, thank you Judge.

3         THE COURT:  Any further cross examination.

4         MR. SOROSKY:  No.

5         THE COURT:  Thank you, have a good evening.

6         THE WITNESS:  You too.

7                        (Witness excused.)

8         THE COURT:  Call your next witness.

9         MR. FORD:  At this time I would ask leave of

10   Court to call Chicago Police Officer Michael

11   Gallagher.

12        THE COURT:  Please remain standing face the

13   clerk and raise your right hand.

14                        (witness sworn.)

15        MR. FORD:  May I inquire?

16        THE COURT:  Please.

17                  MICHAEL GALLAGHER,

18   called as a witness on behalf of the People of the

19   State of Illinois, having been first duly sworn,

20   was examined and testified as follows:

21                  DIRECT EXAMINATION

22                        BY

23             MR. FORD:

24        Q  Sir, would you please state your name,

1    spelling your first and last name Court Reporter

2    and speaking loudly?

3        A   Officer Michael Gallagher, M-i-c-h-a-e-l`

4    G-a-l-l-a-g-h-e-r.

5        Q   And Mr. Gallagher, by whom are you

6    employed?

7        A   Chicago Police Department.

8        Q   And what capacity did you work for the

9    Chicago Police Department?

10       A   I'm a patrolman at O'Hare Airport.

11       Q   How long have you been with the Chicago

12   Police Department?

13       A   27 years.

14       Q   And how long have you been out at O'Hare?

15       A   6 years.

16       Q   Now, Officer Gallagher, will you describe

17   what police area an officer assigned to O'Hare

18   Airport works in.  What's the area that you patrol

19   in?

20       A   I'm assigned to a squadcar, a vehicle,

21   patroling the whole airport from the southern

22   boundary to the northern boundary, any incidents

23   that happen at the airport, we're responsible for.

24       Q   Now, Officer Gallagher, I would like to

S 46

1    direct your attention to October 12, 1992, were

2    you working as a Chicago police officer assigned

3    to O'Hare Airport on that date?

4        A    Yes, sir, I was.

5        Q    And on October 12, 1992, did you receive

6    a call around 6:00 or 6:12 in the evening?

7        A    Yes, sir, I did.

8        Q    What was the nature of that initial call?

9        A    I was assigned by our communications

10   center to go to the main garage, the Level 4

11   Section D-7.

12       Q    Where is the main garage at O'Hare

13   Airport?

14       A    The main garage is located, it's the

15   enclosed garage at the airport, there are 2

16   outside lots and the main building itself has 6

17   levels of indoor parking, 5 levels of indoor

18   parking and --

19       Q    And section -- excuse me Level 4 Section

20   D-7 is located within the inside parking, is that

21   right?

22       A    Right.

23       Q    Now, were you told why you had to go to

24   that area?

S 47

1          A   I was assigned there to meet a security

2     guard I believe he was from Andy Frain security,

3     he had a suspicious cab with an occupant.

4          Q   Now, is Level 4 Section D-7 a place where

5     taxi cabs normally go?

6          A   No.

7          Q   In fact are they even allowed in that

8     area?

9          A   They're not allowed on that level, no.

10         Q   Can you describe for his Honor, Judge

11    Singer what you saw when you arrived at Level 4

12    Section D-7?

13         A   When I arrived there I observed a maroon

14    Chevy cab with white lettering on it, the vehicle

15    was parked back into a spot where normally you

16    would pull into a spot.  It was backed up into the

17    spot.  The cab was from Circle Cab Company, I

18    believe.

19         Q   And did it indicate where Circle Cab

20    Company was located?

21         A   I believe the cab said it was in Joliet,

22    a sign Joliet.

23         Q   And was the license plate number of that

24    vehicle Illinois 10488 T X?

1          A    I don't specifically remember the license

2     number.

3          Q    Would anything refresh your recollection?

4          A    If I saw the report, yes, sir.

5          MR. SOROSKY:  I have no objection, I'll

6     stipulate that's the license plates.

7          MR. FORD:  At this time, there would be a

8     stipulation the maroon cab which Officer Gallagher

9     is talking about was in fact the Circle Cab from

10    Joliet Illinois and the license plate number was

11    10488 T X.

12         THE COURT:  So stipulated.

13         MR. SOROSKY:  10488 T X.

14         MR. FORD:

15         Q    Now Officer Gallagher, were the doors,

16    what did you do after you noticed the cab parked

17    in that unusual manner?

18         A    I looked inside the cab.

19         Q    Can you describe for his Honor, Judge

20    Singer what you saw inside the cab?

21         A    When I looked inside the cab, I observed

22    a male black subject lying across the passenger's

23    seat from the -- he was lying with his -- his rear

24    portion under the steering wheel and his head by

S 49

1    the right front passenger door.

2        Q   And was that person moving at all at that

3    time?

4        A   I beg your pardon?

5        Q   Was the person moving at all at that

6    time?

7        A   No, sir, he was not.

8        Q   Did you notice anything about the doors

9    to that cab?

10       A   All 4 doors of the cab were locked.

11       Q   Did you see anything else regarding the

12   cab?

13       A   On the front seat beside the victim or

14   the body I saw, I noticed a shell casing on the

15   seat and also on the dashboard of the cab, I

16   noticed a shell casing.

17       Q   What did you do after you made these

18   observations?

19       A   I notified my supervisors and we called

20   the Area 5 Violent Crimes Section, also notified

21   the crime lab, Chicago Police Department crime lab

22   and they came to the scene.

23       MR. FORD:  May I have a moment, your Honor.

24       THE COURT:  Yes.

1        Q  Now did you ever open the door to that

2  taxicab, Officer Gallagher?

3        A  No, sir, I did not.

4        Q  You left that for the Violent Crimes

5  detectives and the crime lab?

6        A  Yes, I did.

7        Q  Did you ever notice whether or not the

8  car had entered in or -- at what time the car had

9  entered into the garage at O'Hare?

10       A  There was an O'Hare parking sticker on

11  the windshield but I didn't note the times on it.

12       Q  By parking sticker did you mean an actual

13  short term parking tab issued by machine at the

14  entry way to the garage itself?

15       A  It's a card and rectangular card that you

16  pick up when you go into the airport, into the

17  main garage, there is a machine that dispenses the

18  parking tickets and you take that and you put that

19  on your window.

20       Q  And is that, Officer Gallagher, is that

21  issued to every car as it goes through a sort of a

22  gate at that parking garage?

23       A  You take the parking ticket out of the

24  machine and the gate goes up to let you proceed

1    through to your parking area.

2         Q ?

3         MR. FORD:  Your Honor may I approach the

4    witness.

5         THE COURT:  Your witness.

6         MR. FORD:

7         Q  Officer Gallagher, I would like to now

8    show you I what I just marked People's Exhibit

9    number 10 for identification and ask you if you

10   recognize what is depicted in that photograph?

11        A  Yes, sir, I do.

12        Q  Can you describe what is depicted in that

13   photograph?

14        A  It's a maroon Chevrolet taxicab with the

15   name circle on the light on top of the -- on the

16   roof of the cab.

17        Q  And have you seen -- have you seen that

18   picture before?

19        A  This picture, yes, sir, I have.

20        Q  Have you seen what is depicted in that

21   photograph before?

22        A  Yes, sir.

23        Q  When did you see that?

24        A  On the night of the incident, I believe

1    it was October 12.

2        Q   That would have been the night you saw

3    the victim and you found the cab itself, is that

4    correct?

5        A   That is correct, sir.

6        Q   And does that photograph truly and

7    accurately depict the cab in its position at the

8    time you found it on the date and time in

9    question?

10       A   Yes, sir.

11       Q   Officer I now show you what I just marked

12   as People's Exhibit number 11 for identification,

13   I'll ask you to describe what is depicted in that

14   photograph?

15       A   This is a picture of the cab taken from

16   the rear view and on the back of the cab, it

17   states Circle Cab Company, a telephone number and

18   license plate number.

19       Q   And does that photograph fairly and

20   accurately depict the scene as you saw it as you

21   viewed the cab from behind on the date and time in

22   question?

23       A   Yes, sir, it is.

24       Q   Now officer I would like to show you what

1    has been previously marked People's Exhibit number

2    12 for identification and ask you if you recognize

3    what is depicted in that photograph?

4         A    This is the picture of the victim as I

5    saw him looking into the car window of the cab.

6         Q    Now is there anything about that

7    prospective of the victim which differs from the

8    prospective that you saw when you first found the

9    victim in the taxicab on Level 4?

10        A    No,  sir.

11        Q    Is the driver's door to the cab at the

12   time that picture was taken open or closed?

13        A    At the time I saw the victim, all the

14   doors were closed and locked.

15        Q    Now other than the fact that the driver's

16   door is open in the photograph that I showed you

17   People's Exhibit number 12 for identification, is

18   the body in the same position as it was at the

19   time you observed the victim in the car on that

20   date?

21        A    Yes, sir, it is.

22        Q    And that is a fair and accurate depiction

23   of what you saw on the date and time in question,

24   is that correct?

1          A   Yes, sir, that is.

2          Q   Lastly officer I would like to show you

3     what I just marked People's Exhibit number 13 for

4     identification and if ask you if you recognize

5     what is depicted in that photograph?

6          A   In this photograph it's a picture of the

7     O'Hare parking -- O'Hare main garage parking

8     ticket, it's the ticket that is dispensed from the

9     machine and on the ticket, it states, I don't have

10    my glasses but this is the ticket that you get

11    when you go into the parking lot.

12         Q   Now, is that -- at the place where that

13    ticket is located within the taxicab, is that in

14    the same place it was at the time you first

15    initially viewed the cab on the date and time in

16    question?

17         A   Yes, sir, it is.

18         Q   Does that photograph fairly and

19    accurately depict the positioning of the ticket on

20    the dashboard of the taxicab at the time you found

21    it on October 12, 1992?

22         A   Yes, sir, it does.

23         MR. FORD:   If I could have one moment,

24    Judge.

1          THE COURT:  Yes.

2          MR. FORD:  I have no further -- Officer

3    Gallagher -- excuse me Judge, may I ask one

4    further question.

5          THE COURT:  Yes.

6          MR. FORD:

7          Q   Officer Gallagher, the area where you

8    found the victim in this case, where the taxicab

9    was parked is that in Chicago, Cook County

10   Illinois?

11         A   Yes, sir, it is.

12         MR. FORD:  I have no further questions,

13   thank you.

14         MR. SOROSKY:  No questions.

15         THE COURT:  Cross.  I'm sorry.

16         MR. SOROSKY:  No questions.

17         THE COURT:  Thank you, you're excused.

18         A   Thank you.

19                        (Witness excused.)

20         THE COURT:  Call your next witness.

21         MR. FORD:  Thank you, Judge.

22         THE COURT:  Please remain standing, raise

23   your right hand, face the clerk to be sworn.

24                        (Witness sworn.)

1          THE COURT:  Please be seated.

2                    JEROME BOGUCKI,

3     called as a witness on behalf of the People of the

4     State of Illinois, having been first duly sworn,

5     was examined and testified as follows:

6                    DIRECT EXAMINATION

7                         BY

8                    MR. FORD:

9          Q  Officer, would you please state your

10    name, star number and unit of assignment?

11         A  Detective Jerome Bogucki, B as in boy,

12    B-o-g-u-c-k-i.  Star number 20668, Area 5 Violent

13    Crimes Chicago Police.

14         Q  How long have you been with the Chicago

15    Police Department?

16         A  Approximately 18 years.

17         Q  And how long have you been a detective?

18         A  About 14 years.

19         Q  Detective Bogucki, were you a detective

20    working in Area 5 Violent Crimes on October 12,

21    1992?

22         A  Yes, I was.

23         Q  And on that date, did you receive an

24    assignment to go anywhere in the afternoon hours?

1         A   Yes.

2         Q   What was the nature of that assignment?

3         A   It was an apparent homicide victim inside

4    a cab in the O'Hare main parking garage.

5         Q   On receiving the assignment, did you go

6    anywhere?

7         A   Yes, I did.

8         Q   Where did you go?

9         A   I went to the 4th level of the main

10   parking garage at the O'Hare Airport.

11        Q   Did you go there alone or with anyone?

12        A   With my partner, Detective Raymond

13   Schalk.

14        Q   Can you describe what you saw on arrival

15   on Level 4 -- excuse me, Judge, Level 4 Section D

16   7 of the O'Hare parking garage?

17        A   I observed a maroon colored cab with

18   white lettering that described it as a cab from

19   the Circle Cab Company.  Inside was an apparent

20   dead male black, approximately 50 years old.  The

21   doors of the cab were locked, there was a short

22   term parking stub or ticket from the O'Hare

23   parking garage in the dashboard showing through

24   the window.

1          Also on the dashboard was a

2   cartridge casing from a semi-automatic weapon, a

3   second cartridge casing was observed on the front

4   seat lying next to the victim.  At that point,

5   that's all I observed.

6          Q  Now, were the doors to the car still shut

7   and locked when you got there?

8          A  Yes, they were.

9          Q  And had the crime scene been maintained,

10  were there other officers already on the scene?

11         A  Yes, there were officers on the scene and

12  the scene had not been touched as of yet.

13         MR. FORD:  May I approach?

14         THE COURT:  Your witness.

15         MR. FORD:  Thank you.

16         Q  At this time I would ask leave of Court,

17  officer to show you what I just marked as People's

18  Exhibit number 14 for identification.  I'll ask

19  you if you recognize what is depicted in that?

20         A  This is a xeroxed copy of the short term

21  parking stub or ticket that I observed in the

22  window of the car, the taxicab.

23         Q  Now, is that in fact an accurate xeroxed

24  copy of the parking ticket you saw in the window

1    of the cab on October 12, 1992?

2          A   Yes.

3          Q   And obviously but for the fact it's a

4    xeroxed copy is it a fair and accurate depiction

5    of the ticket you saw within the cab located on

6    Level 4 of the O'Hare parking garage on October

7    12, 1992?

8          A   Yes, it is.

9          Q   Now, when you initially saw that parking

10   ticket stub in the window of the cab, were you

11   able to make a note of the ticket time that was on

12   the ticket?

13         A   Yes.   The time on the ticket was 1659

14   hours.

15         Q   And within common people's time, normal

16   time as opposed to military time what time would

17   that be?

18         A   4:59 PM.

19         Q   And was there a date indicated on that

20   ticket as well?

21         A   9 October.

22         Q   Was this ticket located in the driver's

23   side or passenger side of the taxicab?

24         A   It was in the driver's side.

1       Q   After you made those initial

2   observations, Detective Bogucki, what was the next

3   thing that you did, what was the next thing that

4   you did?

5       A   Upon the arrival of the mobile crime lab

6   unit, the cab was opened up.

7       Q   Did you notice anything once you were

8   able to look more closely within the cab?

9       A   Yes.  There was a third cartridge case

10  that was on the floor of the drivers -- the

11  driver's side floor in front.

12      Q   Go on?

13      A   Also, before or when the body was removed

14  from the cab, there were two fired bullets that

15  fell from the deceased's clothing.

16      THE COURT:  Wait a minute,.

17      MR. FORD:

18      Q   Now were those items retrieved by you,

19  detective?

20      A   They were retrieved by the crime lab

21  personnel that were on the scene.

22      Q   How about the shell casings that were

23  found within the cab itself, were those items

24  retrieved?

1          A   They were also recovered by the crime lab
2     personnel.
3          Q   Were you present when they were
4     recovered?
5          A   Yes.
6          Q   Did you see the items at the time they
7     were recovered?
8          A   Yes.
9          Q   What did you do after those items of
10    physical evidence were recovered?
11         A   Well I observed the crime lab photo and
12    process the cab for fingerprints.
13         Q   Now, were you able to notice whether or
14    not the victim had been injured in any way?
15         A   Yes, the victim had been apparently shot
16    several times in the right side chest.
17         Q   And there were three wounds, entry
18    wounds?
19         A   Yes.
20         Q   Now, detective, I would like to show you
21    what I just him marking People's Exhibit number 14
22    for identification.  I would ask you to go ahead
23    and open up and ask you if you recognize what is
24    contained in People's Exhibit number 14 A and B

1    for identification.

2                Detective, have you had an

3    opportunity to open up the envelope that was

4    People's group number 14 for identification?

5         A   Yes, I did.

6         Q   And have you removed the contents from

7    that envelope?

8         A   Yes.

9         Q   Do you recognize the contents of people's

10   group exhibit number 14 for identification?

11        A   These appear to be the fired bullets that

12   fell out of the clothing of the victim.

13        Q   I'll ask you to examine the exterior of

14   the envelope and I'll ask you whether or not you

15   recognize the names of the persons that are

16   depicted on the exterior of the envelope in terms

17   of the people that were there from the crime lab?

18        A   Yes, Detective Stella and Carey were the

19   crime lab personnel on the scene.

20        Q   And were they in fact the individuals

21   that inventoried what I just showed you, People's

22   Number 14 for identification, A and B?

23        A   Yes.

24        Q   And are those items the bullets

1    themselves, 14 A and B in the same or

2    substantially the same condition as they were at

3    the time they were recovered in your presence on

4    October 12, 1992?

5        A   Yes, they are.

6        Q   Now detective, you said there were also a

7    group of shell casings recovered from within the

8    vehicle itself, is that correct?

9        A   That is correct.

10       Q   Now were those shell casings the kind

11   normally associated with semi-automatic weapons or

12   were they associated with repeating firing arms?

13       A   They would be with a semi-automatic

14   weapon.

15       Q   Detective, I would like to now show you

16   what I just marked as People's Exhibit number 15

17   for identification, I ask you to take a moment and

18   examine it and I'll ask you to open it.

19   Detective, have you had an opportunity to open

20   that envelope, People's Exhibit number 16 for

21   identification?

22       A   Yes.

23       Q   And can you describe what is contained

24   within it?

1          A    It's one, 380 caliber cartridge casing.

2          Q    Have you seen that 380 cartridge casing

3    before?

4          A    Yes.

5          Q    Where have you seen it before?

6          A    It was on the seat of the taxicab near

7    the head of the victim on the front seat.

8          Q    And that was the same taxicab that you

9    found on October 12, 1992?

10         A    Yes.

11         Q    And is that item in the same or

12   substantially the same condition as it was at the

13   time you recovered it back in October of 1992?

14         A    Yes, it appears to be.

15         Q    Now detective, I would like to show you

16   People's Exhibit number 16 for identification,

17   I'll ask you to take a moment and examine that.

18   Have you had an opportunity to examine it?

19         A    Yes.

20         Q    Detective?

21         A    Yes.

22         Q    If you would open that envelope and

23   remove its contents.  Can you describe what is

24   contained in People's Exhibit number 16 for

1    identification, Detective Bogucki?

2         A   It's another 380 caliber cartridge

3    casing.

4         Q   Have you seen that 380 cartridge casing

5    before?

6         A   Yes.

7         Q   When have you seen that item before?

8         A   This also would have been in the front

9    passenger area of the taxicab that the victim was

10   found in.

11        Q   Lastly, detective, I'll show you what I

12   marked as People's Exhibit number 17 for

13   identification.  And I would ask you to open

14   that.  Is this item that I just showed you

15   People's Number 16 for identification is it in the

16   same or substantially the same condition as it was

17   on the date you recovered it from taxicab?

18        A   Yes.

19        Q   Now, I ask you to take People's Number 17

20   for identification and open it and describe what

21   is contained in that envelope?

22        A   It's a third, 380 caliber cartridge case.

23        Q   Have you seen that 380 cartridge casing

24   before?

1          A   Yes.

2          Q   Where have you seen that 380 cartridge

3    casing before?

4          A   It was the cartridge case on the

5    dashboard of the taxicab.

6          Q   Is that item I just showed you People's

7    number 17 for identification the same or

8    substantially the same condition as it was on the

9    date and time that you recovered it on October 12,

10   1992?

11         A   Yes, it appears to be.

12         Q   Now, when you located and found this

13   victim with the 3 wounds within the taxicab, did

14   you search the body in order to ascertain the

15   identity of the victim?

16         A   Yes.

17         Q   Were you able to locate a wallet on the

18   victim's person at that time?

19         A   No.

20         Q   Were you able to locate identification of

21   any kind on the victim's person at that time?

22         A   No, there was none.

23         Q   Were you able to locate any money on the

24   victim's person at that time?

S 67

```
1              A   There was no money.

2              Q   At that time, what happened to the victim

3    that you found in the taxicab?

4              A   The victim was removed from the taxicab

5    and transported to the Cook County medical

6    examiner's office.

7              Q   What did you and Detective Schalk do at

8    that time?

9              A   At that point, we went back to the Area 5

10   office and made inquiries with the telephone.

11             Q   Who did you contact initially over the

12   telephone?

13             A   We contacted I believe it was Area 2

14   youth and the Joliet police department as to a

15   missing person report that was made with both

16   Chicago and Joliet police departments.

17             Q   And did you ever attempt to contact

18   anyone from the Circle Cab Company?

19             A   Yes, we contacted several employees of

20   the Circle Cab Company and the wife of the missing

21   person.

22             Q   Were you able to identify the missing

23   person that night?

24             A   Yes.
```

S 68

1        Q   What was the identity of the missing

2    person, the victim that you found in the taxicab

3    on October 12, 1992 --

4        THE COURT:  Wait a minute, 2 questions

5    there, 2 very important, you're asking for the one

6    question -- please.

7        MR. FORD:  I understand the Court's concern,

8    I'll make the clarification. Were you able to

9    ascertain whether or not there was a missing

10   person in the Joliet area?

11       A   Yes, we did.

12       Q   What was the identity of the missing

13   person from the Joliet area who's identity you

14   ascertained?

15       A   That person was named Rudolph Bennett.

16       THE COURT:  Rudolph who?

17       A   Bennett.

18       MR. FORD:

19       Q   Were you able, ever able to identify the

20   actual victim that you found on October 12, 1992

21   in the Circle Cab?

22       A   Yes.

23       Q   What was his name?

24       A   Rudolph Bennett.

1          Q   Detective, what shift of the day were you
2     working on October 12, 1992?
3          A   It would have been 4:30 in the afternoon
4     until 1 AM.
5          Q   Now, I would ask you to direct your
6     attention to the next day now, October 13, 1992,
7     did you continue your investigation in this case?
8          A   Yes.
9          Q   What did you do relative to your
10    investigation of this case on October 13, 1992?
11         A   We were -- we did talk to the Joliet
12    police department and also to Area 2 detectives.
13         Q   And following your conversation with
14    those individuals, did you have a conversation
15    with 2 civilians?
16         A   Yes.
17         Q   Where did that conversation occur?
18         A   That conversation was at the apartment of
19    June Hess and John Eiselt.
20         Q   Would that have been located here in the
21    City of Chicago on the near south side?
22         A   Yes.
23         Q   Did you have a conversation with Miss
24    Hess and Mr. Eiselt?

1          A   Yes, I did.

2          Q   After your conversations at Area 2

3    Violent Crimes, were you looking for anyone in

4    particular?

5          A   Yes, we were looking for a female black

6    in her twenties, heavy set.

7          Q   Now, detective, I would like to direct

8    your attention to October 14, 1992, were you still

9    continuing your work in this investigation?

10         A   Yes.

11         Q   What did you do in connection with your

12   investigation on October 14, 1992 at around 11

13   o'clock in the morning?

14         A   Myself, Detective Schalk and Detective

15   Halvorsen from Area 5 went to the home of Jeri

16   Lindsey.

17         Q   Now, do you see the person that you

18   eventually came to see at that home here in Court

19   today?

20         A   Yes, I do.

21         Q   Please identify that person by an article

22   of clothing they're wearing today?

23         A   It's the female.

24             THE COURT:   She's wearing today?

1          A    Female black with the white top and blue
2    jump suit.
3          MR. FORD:  For the record your Honor
4    indicating the defendant Jeri Lindsey.
5          THE COURT:  The record may so reflect.
6          MR. FORD:
7          Q   Where did you first come into contact
8    with Miss Lindsey?
9          A   It would have been at her front door.
10         Q   And what address?
11         A   It would be 8931 South Houston.
12         Q   That's here on the south side of the City
13   of Chicago?
14         A   Yes, it is.
15         Q   What happened when you and Detective
16   Schalk and the other detective first approached
17   that residence?
18         A   Well we rang the doorbell or knocked on
19   the door, I'm not sure which, but a female white
20   Hispanic who we later came to know as Irene Quiros
21   had answered the door.
22         Q   What happened after Miss Quiros answered
23   the door?
24         A   We asked to speak to Jeri Lindsey.

1          Q   What happened after that?

2          A   Jeri Lindsey came to the door in a bath

3     robe and we asked her if she wouldn't help us in

4     our investigation of her sexual incident and also

5     that we were looking into a murder.  She agreed

6     and she got dressed and came out about 10 or 15

7     minutes later.

8          Q   Now, did you and Miss Lindsey and the 2

9     other detectives go anywhere after you left the

10    home at 8931 South Houston?

11         A   Yes.

12         Q   Where did you go?

13         A   We headed back north and stopped at the

14    1st District at 11th and State.

15         Q   Detective, backtracking just for a

16    moment, had how you originally come to the name of

17    Miss Lindsey and the address of 8931 South

18    Houston?

19         A   That -- Jeri Lindsey had given a report

20    of a criminal sexual assault that had allegedly

21    occurred on the 11th of October, I believe.  In

22    that report, she cited several things that

23    happened.  She stated that she was in Joliet, that

24    she was assaulted by a cab driver with a red and

S 73

1    white or red and yellow cab and that she injured

2    that cab driver with a knife.

3         Q   Now, going back to where we were before,

4    you stopped initially at the 1st District, is that

5    correct?

6         A   Yes.

7         Q   And that was with Miss Lindsey?

8         A   Yes.

9         Q   For what purpose did you stop there

10    initially?

11         A   Well initially, we wanted to do 2 things,

12    we wanted to -- actually 3 things, we wanted to

13    take her photo, which she agreed to do, we took a

14    Polaroid photo of her, and we also wanted to take

15    her fingerprints which she also agreed to do.

16         Q   And what did you do with the Polaroid

17    photograph you took of Miss Lindsey?

18         A   We put it, put that Polaroid photograph

19    among other -- with 5 other Polaroid photographs

20    and went to the home of June Eiselt -- I'm sorry,

21    June Hess and John Eiselt and showed each of those

22    people a photo spread.

23         Q   Now did this happen while Miss Lindsey

24    remained at the 1st District?

S  74

1        A    Yes.   At that time, Detective Halverson

2    had taken her to the identification section where

3    she had voluntarily given her fingerprints.

4        Q    And who went actually went to the

5    Hess-Eiselt home in order to show Mr. Eiselt and

6    Miss Hess the photographs?

7        A    That would have been myself and Detective

8    Schalk.

9        Q    And this would have been then in the

10    early afternoon hours of October 14, 1992?

11        A    It was approximately noon.

12        Q    Detective, I would now like to show you

13    what I previously marked People's Exhibit number 1

14    A through F for identification and ask you if you

15    recognize this group of photographs?

16        A    Yes, I do.

17        Q    Have you seen that group of photographs

18    before, detective?

19        A    Yes.

20        Q    When have you seen that group of

21    photographs before?

22        A    This was a group of photos that were

23    shown to June Hess and John Eiselt on the 14th of

24    October, at about noon.

1      Q   And were those items shown to Miss Hess

2   and Mr. Eiselt by you?

3      A   Pardon me.

4      Q   Were those items shown to Miss Hess and

5   Mr. Eiselt by you?

6      A   Yes.

7      Q   Are they in the same or substantially the

8   same condition today as they were then on the date

9   they were taken?

10     A   Yes.

11     Q   Now, can you describe the procedure by

12  which you showed initially the photographs to Miss

13  Hess?

14     A   There was a counter that we laid the

15  photos down on or that I laid the photos down on

16  and she was allowed to look at all the photos.

17     Q   Did you say anything to her prior to the

18  time she looked at the photos?

19     A   Yes, we asked -- we told her that if she

20  should see the person that she shared the cab

21  with, on October 9, if she sees him in that group,

22  if she sees that woman in that group to let us

23  know.

24     Q   And when you did in fact show that group

S 76

1    of photographs to Miss June Hess on October 14,

2    1992 in her home, did she indicate to you whether

3    or not she had in fact seen anyone depicted in

4    those photographs on this October 9th date?

5         A   Yes, she picked the Polaroid photo of

6    Jeri Lindsey as the person who she shared a cab

7    with.

8         Q   Would you indicate for the record what is

9    marked on the back of that photograph, which of

10   the 1 A through F she did indicate to you was in

11   fact the person who had been in in the cab with

12   her on October 9, 1992?

13        A   It would be this photo right here, marked

14   1-A.

15        Q   For identification.  Now, was that done

16   in Mr. Eiselt's presence or was he shown the

17   photographs at a separate place at a different

18   time?

19        A   Mr. Eiselt was instructed to stay in

20   another room while Miss Hess was viewing the

21   photos and then Miss Hess was instructed to go

22   into the other room where Mr. Eiselt viewed the

23   photos.

24        Q   Now, after Miss Hess had identified the

1    photograph of Jeri Lindsey as the person in the

2    cab on October 9, 1992, you showed the photographs

3    to Mr. Eiselt?

4          A    That is correct.

5          Q    Did you tell him to make the same -- ask

6    the same question of him that you had of Miss

7    Hess?

8          A    Yes.

9          Q    And did he or was he able to identify any

10   of those photographs as being the photograph of

11   the African American woman he had shared a cab

12   with on October 9, 1992 in the area of the Empress

13   River Casino?

14         A    Yes, he also picked the photo of Jeri

15   Lindsey.

16         Q    And do you see the photo in that group of

17   photographs that he picked in your presence on

18   October 14, 1992?

19         A    Yes, I do.

20         Q    Is that the same photograph you've

21   already indicated?

22         A    Yes, it is.

23         Q    And that would be People's Exhibit number

24   1 A for identification, is that correct?

1          A    That is correct.

2          Q    After Miss Hess and Mr. Eiselt had both

3    identified the photograph of Jeri Lindsey, as the

4    person that had shared the cab with them on

5    October 9, 1992, what did you and Detective Schalk

6    do?

7          A    We returned to the police headquarters at

8    11th and State and we were joined by Jeri Lindsey

9    and Detective Halverson and then we all went into

10   Area 5 and continued the investigation.

11         Q    That's located here on the northwest side

12   of the City of Chicago, is that correct?

13         A    Yes, it is.

14         Q    5555 West Grand?

15         A    That is correct.

16         MR. FORD: Let me just have one moment, your

17   Honor.

18         Q    Where did you and Miss Lindsey go upon

19   arrival at Area 5 Violent Crimes?

20         A    Miss Lindsey was placed in an interview

21   room.

22         Q    And after she was placed in the interview

23   room, what did you do next in connection with your

24   investigation?

1          A   We went into the room and we asked Miss

2     Lindsey if she would tell us what happened on her

3     criminal sexual assault case.

4          Q   At that time, did you and Miss Lindsey

5     have a conversation?

6          A   Yes.

7          Q   Who was -- who went into the interview

8     room initially with you at that time?

9          A   Detective Schalk.

10         Q   And was there anyone there other than you

11    Detective Schalk and Miss Lindsey?

12         A   No.

13         Q   After you made that initial inquiry of

14    Miss Lindsey, what did Miss Lindsey say to you?

15         A   Miss Lindsey stated that on Friday night,

16    October 9, that she had been in the area of 79th

17    and Ridgeland and flagged down a suburban cab.  At

18    that time, she got into the cab and told him that

19    she wanted to go to 8931 South Houston to her home

20    and the cab driver pulled off.

21              The cab driver was going in the

22    opposite direction.  She asked the cab driver

23    where are you going.  And with that, she stated

24    that the cab driver pulled out a gun and said shut

1  up and he pulled over and at that point, got a

2  blindfold out of the glove compartment and

3  blindfolded Miss Lindsey.

4      Q  Did he indicate what he did, did Miss

5  Lindsey indicate what this alleged cab driver did

6  after he blindfolded her?

7      A  Yes.  She stated that she drove to some

8  point along, quite a ways to a building and into a

9  bedroom.  She said she was still blindfolded as

10  she was led into there.  She stated until Sunday

11  afternoon, she was repeatedly raped and forced to

12  perform oral copulation.

13      Q  That was a period of some 40 hours, is

14  that correct detective?

15      A  I believe that's what we figured, yes.

16      Q  Now, did she indicate to you what

17  happened at the end of this 40 hour period?

18      A  She stated that the cab driver then put

19  the blindfold back on her and led her back out to

20  the taxicab and he again pulled out, pulled over

21  on the road, on a highway, she doesn't -- didn't

22  know where and she stated that he told her that he

23  wanted just one more and he grabbed her by the

24  neck and at that point, she pulled out a pocket

1    knife that she carried for her own protection,

2    stabbed the cab driver in the chest.

3        Q  Did she indicate to you what she did

4    after she stabbed this alleged cab driver in the

5    chest?

6        A  She said she got out of the cab and

7    walked to a point at a wooded area.  She said she

8    hid in the wooded area until -- until it became

9    dark at which time she flagged down a female white

10   motorist who drove her -- drove her to the

11   hospital, South Chicago Hospital.  I believe she

12   described this woman as, introducing herself as

13   Carolyn Brown.

14       Q  Did Miss Lindsey indicate to you the

15   coloration of the cab in which this alleged

16   assault had begun?

17       A  Yes, she said it was red and white or red

18   and yellow.

19       Q  Did she indicate to you this assault had

20   begun on October 9, 1992 at about 1 in the

21   morning?

22       A  Yes.

23       Q  Now, after this initial conversation with

24   Miss Lindsey, detective, what was the next thing

1    that you did?

2         A    The next thing we did, we then advised

3    her of her rights per Miranda.

4         Q    Who actually did that?

5         A    Detective Schalk did that.

6         Q    Did he do that from memory or a

7    pre-printed source?

8         A    He did it from his F.O.P. calendar book.

9         Q    And do you have a similar F.O.P. calendar

10   book with you here in Court today?

11        A    Yes, I do.

12        Q    Would you today as Detective Schalk --

13   may I have one moment, Judge?

14        THE COURT:   Yes.

15        MR. FORD:

16        Q    Detective, would you today as Detective

17   Schalk did then read the Miranda rights that

18   Detective Schalk read to Miss Lindsey in the

19   interview room at Area 5 aloud and also indicate

20   whether or not Miss Lindsey responded to those

21   rights as they were given to her on that date and

22   at that time?

23        A    Do you understand do you have the right

24   to remain silent.   Miss Lindsey replied yes.

S 83

1           Do you understand that anything you

2   say can and may be used against you in Court or

3   other proceedings.  She said she understood.

4           Do you understand that you have the

5   right to talk to a lawyer before we ask you any

6   questions and to have him with you during

7   questioning.  She stated she understood that.

8           If you cannot afford or otherwise

9   obtain a lawyer and you want one, a lawyer will be

10  appointed for you.  And we'll not ask any

11  questions until he has been appointed.  She

12  understood that right.

13          If you decide to answer questions,

14  answer now with or without a lawyer, you still

15  have the right to stop the questioning at any time

16  or to stop the questioning for the purpose of

17  consulting a lawyer.  She stated she understood

18  that.

19          You may waive the right to advice of

20  counsel and your right to remain silent and you

21  may answer questions or make a statement without

22  consulting a lawyer if you so desire.  She did

23  understand that.

24          Do you understand each of these

1    rights.  Jeri Lindsey said she she did.

2                Do you wish to answer questions at

3    this time.  She said yes.

4        Q   Now detective, at that time, did you have

5    a second conversation with Miss Lindsey?

6        A   Yes.

7        Q   About what time would this have been

8    then, on October 14, 1992?

9        A   This would be approximately 1:30 in the

10   afternoon.

11       Q   And who was present for the second

12   conversation between you and Miss Lindsey other

13   than you and Detective Schalk?

14       A   Just myself and Detective Schalk.

15       Q   What did Miss Lindsey say initially after

16   you had advised her of her Miranda rights?

17       A   She said she understood those rights.  We

18   started out the conversation by informing her that

19   she had been picked out by photo by 2 witnesses as

20   being in the cab or being last seen in the taxicab

21   of a man that was a taxi driver that had been shot

22   and killed at on O'Hare Airport.  We further told

23   her that several of the items that she cited in

24   her criminal sexual assault case, some of the

S 85

1    details were some of the same details or similar

2    details that were involved in the homicide or the

3    murder case.

4              At that point, she stated that she

5    made up the whole criminal sexual assault story

6    and that she did so because she was worried about

7    staying away too long from her lover, Irene

8    Quiros.  She stated that she knew nothing about

9    the murder and that that was it.

10        Q   Did she indicate to you whether she had

11   ever been in a cab on October 9, 1992?

12        A   She said she was not in a cab.

13        Q   Did she indicate to you whether or not

14   she had ever been to Joliet on that date?

15        A   She said she was not.

16        Q   What did you and Detective Schalk do at

17   that time, detective?

18        A   We asked Jeri Lindsey if she would be

19   willing to take a polygraph examination.

20        MR. SOROSKY:  Objection.

21        THE COURT:  Sustained.  That will be

22   stricken.

23        MR. FORD:

24        Q   At that time, did you go to 11th and

1    State?

2          A   Yes.

3          Q   And after a period of time at 11th and

4    State, did you have a third conversation with Miss

5    Lindsey?

6          A   Yes.

7          Q   And would that have been at about 7:15 on

8    October 14, 1992?

9          THE COURT:  AM or PM.

10         MR. FORD:  In the evening?

11         A   Actually it would have been closer to 11

12   o'clock PM.

13         Q   And?

14         THE COURT:  11 PM?

15         A   Yes.

16         MR. FORD:

17         Q   What did you say -- what did Miss Lindsey

18   say to you at the time of that conversation?

19         A   She stated that the cab driver that was

20   killed at O'Hare Airport tried to rape her and

21   that she shot him with his own gun.

22         Q   And where did she say that to you at?

23         A   At the -- in the polygraph examination

24   room.

1              MR. SOROSKY:  Objection.

2              MR. FORD:  Withdraw that question.

3              THE COURT:  What.

4              MR. SOROSKY:  The officer said polygraph

5      examination room, objection to the word polygraph.

6              THE COURT:  Sustained.

7              MR. FORD:

8         Q   Was that in a room at 11th and State?

9         A   Yes.

10        Q   Did you and Miss Lindsey and Detective

11     Schalk go anywhere at that time?

12        A   Yes.

13        Q   Where did you go at that time?

14        A   We went back to the Area 5 office.

15        Q   When you returned to Area 5, where did

16     you -- where did you and Miss Lindsey go?

17        A   We went into the -- into the same

18     interview room that we were in previously.

19        Q   At that time, what time did you actually

20     get to the Area 5 Violent Crimes?

21        A   It was now about 12:30 AM, it would be

22     the 15th of October, now.

23        Q   So this would have been the early morning

24     hours of October 15, 1992, is that correct?

1          A    That is correct.

2          Q    After you placed Miss Lindsey in the room

3     at that time, what was the next thing that

4     happened, detective?

5          A    We reminded her of her rights per

6     Miranda, she said she had remembered them at which

7     time we asked her to explain what had happened

8     with the cab driver.

9          Q    And by we, who was in the interview room

10    with you at this time?

11         A    Detective Schalk.

12         Q    And did you in fact, you and Miss Lindsey

13    have a conversation at that time?

14         A    Yes.

15         Q    Did this conversation begin at roughly

16    12:30 in the morning on October 15, 1992?

17         A    Yes.

18         Q    And during the course of that

19    conversation, what did you say to Miss Lindsey and

20    what did she say to you?

21         A    Again, we asked her to explain, to

22    explain what happened with this cab driver.  She

23    started out by saying that she took the Metra

24    train from her neighborhood to Joliet, she stated

1    that she had no particular destination, she just

2    wanted to go to Joliet and walk around.  She

3    stated that she walked for a long time until she

4    got to a wooded area and knowing she was far away

5    from the place where she got off the train, she

6    decided to flag down a cab.  She did so, and when

7    she got into the cab and told the cab driver she

8    wanted to go to Chicago.

9         Q   Did she say what happened after she had

10   gotten into the cab?

11        A   Yes.  She said that about a block up the

12   road, that the cab picked up an older white

13   couple, male and female.  She stated that the cab

14   driver then asked her to get into the front seat

15   and the older couple were put in the back seat.

16        Q   Did she say -- did she say what happened

17   after the older couple had gotten into the cab?

18        A   There was a conversation, a short amount

19   of conversation between the lady in the couple and

20   Jeri Lindsey and Jeri Lindsey said they discussed

21   taking the train up to Joliet and Jeri Lindsey

22   gave Miss Hess the lady in the back seat a Metra

23   train schedule.  They then stopped at a liquor

24   store in order to buy some beer, that would be the

1    older couple wanted to buy some beer before being

2    dropped off.

3                    She stated the cab driver then

4    dropped the older couple off at the motel.  After

5    leaving the motel, the cab driver pulled over on

6    the highway and pulled out a gun and blindfolded

7    Miss Lindsey.  She stated that he then took her to

8    an unknown building and into a bedroom and raped

9    her repeatedly until Sunday afternoon.  Also

10   forced her to perform oral copulation.

11        Q  Did she indicate to you what happened at

12   the end of this alleged assault?

13        A  She stated she was again blindfolded and

14   she then, the driver then drove for a long time

15   and she at some point the blindfold came off and

16   she observed that she was in the parking garage at

17   O'Hare Airport, about the third or fourth level.

18        Q  Did she indicate to you what happened

19   after the cab stopped on the third or fourth level

20   of the parking garage at O'Hare Airport?

21        A  She stated that the cab driver told her

22   to give him her money and she said that she handed

23   over 90 dollars.  She said that he then told her

24   to get out and then grabbed her by the neck and

1    said no, one more time.  And proceeded to rape her

2    again in the front seat of the cab.

3        Q   And did Miss Lindsey indicate to you what

4    she did or whether or not she noticed anything

5    during the course of this assault?

6        A   She stated that the cab driver had put

7    down his gun before he raped her and it was on the

8    front seat she further stated that after he raped

9    her, she got ahold of the gun from the front seat

10   and shot him several times.

11               She stated that at that point, she

12   just ran from the cab, grabbed her clothes, ran

13   from the cab, she was only wearing a coat and she

14   was naked otherwise.  She said she left her money

15   behind, her purse behind and the gun, she left in

16   the cab, she said she did not lock the doors of

17   the cab.

18               She then fled from the cab and as

19   she was running, she put her clothes on.  She made

20   her way out to the highway, and didn't indicate

21   what highway but she made her way out to the

22   highway where she was able to flag down a female

23   white motorist that she stated introduced herself

24   as Carolyn Brown who then drove her to the

1    hospital on the south side.

2        Q   After she told you this, Detective

3    Bogucki, what was the next thing that you did?

4        A   At that point, myself and Detective

5    Schalk, one of us called the State's Attorney's

6    Office, the Felony Review Unit and Assistant

7    State's Attorney Steve Rosenblum came into the

8    Area 5 office.

9        Q   Did you have occasion to re-enter the

10   interview room in which Miss Lindsey was located?

11       A   Yes.

12       Q   Approximately what time did you re-enter

13   that interview room at Area 5 Violent Crimes?

14       A   It was approximately 3 o'clock in the

15   morning, now.

16       Q   Who did you enter with at that time?

17       A   I entered with Detective Schalk and

18   Assistant State's Attorney Rosenblum.

19       Q   And when you entered into the interview

20   room on that date and at that time, what was the

21   initial thing that happened relative to you and

22   the Assistant State's Attorney and Miss Lindsey?

23       A   Okay.  Assistant State's Attorney

24   Rosenblum again advised Jeri Lindsey of her

1    rights.

2         Q   Would those have been the same rights

3    that you mentioned earlier, the Miranda rights?

4         A   Yes.

5         Q   Did Miss Lindsey indicate to you at that

6    time whether or not she wished to make a

7    statement?

8         A   Yes, she did.

9         Q   And what did she indicate?

10        A   She said she did.

11        Q   And at that time, did you and Miss

12   Lindsey and the Assistant State's Attorney, and

13   Detective Schalk have another conversation?

14        A   Yes.

15        Q   Would you indicate to his Honor, Judge

16   Singer what you said or anyone else said to Miss

17   Lindsey and what Miss Lindsey said to you during

18   the course of this conversation?

19        A   Assistant State's Attorney Rosenblum told

20   Miss Lindsey that her previous statement could not

21   be true because we had evidence that the cab had

22   pulled into the parking garage on the 9th of

23   October and she stated that she arrived there on

24   Sunday, the 11th of October.  With that, Jeri

1    Lindsey gave another account of what happened.

2         Q   What was the account of what happened

3    that Miss Lindsey gave this time?

4         A   She stated in essence the same as far as

5    how she got to Joliet, and as to how she got into

6    the cab, and the older couple being dropped off

7    and their stop for liquor.  Those were the same.

8         Q   Did she indicate to you at that time

9    something different than she indicated earlier?

10        A   Yes.

11        Q   What did she indicate to you at that

12   time?

13        A   She stated that after dropping off the

14   older couple, that the cab driver pulled over on

15   the side of the highway, she stated that she asked

16   him to go to Chicago, he pulled over at the side

17   of the highway, pulled out a gun and raped her on

18   the front seat of the cab.

19        Q   Did she indicate to you what happened

20   after this had allegedly happened?

21        A   Yes.  She said at that point, -- I'm

22   sorry, at that point is when she asked him, the

23   cab driver to drive her to Chicago. The cab driver

24   then drove her to the parking garage at O'Hare