File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _7_

EXHIBIT _396 to T100_

TAB (DESCRIPTION) _____

1    Airport, the third or fourth level.  She stated at

2    that point, the cab driver grabbed her by the neck

3    and said one more time, and proceeded to rape her

4    again in the front seat of the cab.  She stated

5    that she grabbed a gun that she had noticed in

6    between the seats previously and shot the cab

7    driver.

8         Q   Did she indicate to you whether or not

9    she had any money with her at the time that this

10   happened?

11        A   Yes.  She stated that the cab driver did

12   ask for her money.  Asked for and she gave him the

13   90 dollars.  She stated that after she shot him,

14   that she left the gun in the car, she didn't take

15   back her money and didn't take any money at all

16   from the cab, she did not lock the cab, she stated

17   that she grabbed her clothes and dressed outside

18   the cab and then left, went down to the highway,

19   flagged down a motorist who called herself Carol

20   Brown who took her home at that point.

21        Q   Previously she told you this Carol Brown

22   person had taken her to the hospital, is that

23   correct?

24        A   That is correct.

1      Q    Now, did she indicate to you whether or

2   not in this version whether or not who was home

3   when she was taken home by the person, Carolyn

4   Brown?

5      A    She said Irene Quiros was home.

6      Q    Did -- was any inquiry made of her as to

7   why she had not made the claim of sexual assault

8   until Sunday the 11th?

9      A    She said that she was afraid.

10      Q    Did she indicate to you why this version

11   of the events had been different, why she told a

12   version differently in the -- at the hospital and

13   to Detective Hines than she had with you?

14      A    All she could say was she was afraid.

15      MR. FORD:    Just one moment, Judge.

16      Q    At that time did Assistant State's

17   Attorney Rosenblum and yourself have occasion to

18   leave the interview room?

19      A    Yes.

20      Q    And did Detective Schalk also leave?

21      A    Yes.

22      Q    Did you ever return to the interview room

23   later that evening?

24      A    Yes.

1          Q   And when you returned, who did you return

2    with?

3          A   Detective Schalk and Assistant State's

4    Attorney Rosenblum.

5          Q   And at that time, did you have another

6    conversation with Miss Lindsey?

7          A   Yes.

8          Q   What time was this conversation

9    occurring?

10         A   This would have been approximately 4 or

11   4:30 AM.

12         Q   And that would have been the early

13   morning hours of October 15, 1992, is that

14   correct?

15         A   Yes.

16         Q   During the course of this conversation,

17   what did you say to Miss Lindsey and what did she

18   say to you?

19         A   Assistant State's Attorney Rosenblum

20   informed Miss Lindsey or told Miss Lindsey that

21   the hospital records showed that there was no

22   trauma when she went in for an examination.  He

23   also cited various inconsistencies between stories

24   at which point Jeri Lindsey then gave us another

1   account of what had occurred.

2       Q   And this account was different than the

3   one she had given earlier?

4       A   Yes.

5       Q   What did Miss Lindsey indicate initially

6   to you at that time?

7       A   Miss Lindsey stated that when she flagged

8   down the cab near the wooded area, that she made a

9   offer of a blow job for a ride.  She stated that

10  the cab driver accepted this offer and he told her

11  that he was supposed to pick someone else up.  He

12  did pick someone else up about a block down and it

13  was the older couple, same older couple.  The

14  events were the older couple stayed the same in

15  this version that she had given.  She stated that

16  after the older couple had been dropped off, that

17  the cab driver pulled over, in other words, to

18  collect his blow job.  She stated that she did

19  orally copulate the cab driver on the side of the

20  road and that he did not ejaculate.

21      Q   Did she indicate to you what happened

22  after this had occurred for a time and there had

23  been no ejaculation?

24      A   They then, the cab driver then drove the

1    cab to O'Hare Airport and went up to the parking

2    garage on the third or fourth level at which time

3    he again wanted oral copulation.

4          Q   Did she indicate to you what she did at

5    that time?

6          A   She stated that she started the oral

7    copulation, to orally copulate the cab driver but

8    her tooth began to hurt at which point she had to

9    stop.  She stated that the cab driver then slapped

10   her twice and she explained that her tooth was

11   hurting and that -- he told her that if you can't

12   finish the job, then you're going to have to give

13   me your money.  At which point she gave him 90

14   dollars.  She stated that while copulating the cab

15   driver, she had noticed that there was a gun in

16   between the seats and that she grabbed, after

17   being slapped and grabbed, she shot the cab

18   driver.

19         Q   Did she say what she did after she shot

20   the cab driver?

21         A   She stated that she left the gun in the

22   car and she took her wallet and her clothes, her

23   clothes were on, at this point in time, she said

24   she took her wallet and she fled leaving the gun

1    in the car.

2        Q   Did she indicate to you whether or not

3    she took the cab driver's money?

4        A   I'm sorry counsel.

5        Q   Whether or not she took the cab driver's

6    money?

7        A   Yes -- no, she stated she did not at that

8    point.

9        Q   And, I'm sorry you might have indicated

10   this, she indicated she did what with the gun?

11       A   She left the gun in the cab.

12       Q   And did she describe what happened after

13   this occurred?

14       A   Yes, she said she left the cab and

15   started to run but then slowed down so she won't

16   make herself noticeable and then she walked down

17   out to the highway and got a ride by a female

18   white.

19       Q   Now, after you and Assistant State's

20   Attorney Rosenblum and Detective Schalk had this

21   conversation, Detective Bogucki, did you step out

22   of the interview room at that time?

23       A   Yes.

24       Q   And what was the next thing that

1    occurred?

2        A   The next thing that occurred was Miss

3    Lindsey was placed in the Area 5 -- the 25th

4    District lock up and she was held past Court call

5    in order for June Hess and John Eiselt to view her

6    in a line up on the following day.

7        Q   And did that in fact occur on -- this

8    would have been the day time hours of October 15,

9    1992?

10       A   Yes.

11       Q   And were you present and involved in

12   conducting the line-up on that date?

13       A   Yes.

14       Q   Would you describe for his Honor, Judge

15   Singer initially how you went about conducting the

16   line-up?

17       A   There was several participants, there

18   were 5, I believe there were 5 participants in the

19   line up.  Miss Lindsey was -- she was -- I have to

20   think of the right word, she was allowed to choose

21   her position in the line up.

22       Q   Do you recall today which position she

23   chose in the line up?

24       A   I don't recall as I'm thinking right now.

1          Q   Did Miss Hess and Mr. Eiselt view the

2    line up separately?

3          A   Yes.

4          Q   Would this have been roughly at 3 o'clock

5    in the afternoon on October 15, 1992?

6          A   That is correct.

7          Q   Detective I would like to show you now

8    what has been previously marked People's Exhibit

9    number 7 for identification and I will I'll ask

10   you if you recognize what is depicted in that

11   photograph?

12         A   Those would be the participants of the

13   line up on that date.

14         Q   Does that photograph fairly and

15   accurately depict the people that portrayed in the

16   line up in which Miss Lindsey was placed in, the

17   line up viewed by Miss Hess and Mr. Eiselt?

18         A   Yes.

19         Q   Does that photograph fairly and

20   accurately depict the order in which those people

21   were within that line up?

22         A   Yes.

23         Q   Now, speaking now initially with

24   reference to Miss Hess, was she able to identify

1    anyone of the individuals within the line up that

2    I just showed you People's Exhibit number 7 for

3    identification as having been with her in the cab

4    on October 9, 1992 from the Empress River Casino

5    to the Red Roof Inn?

6         A   Yes.

7         Q   And detective, I'm now -- what position

8    is that individual in within the line-up

9    photograph that I showed you People's Exhibit

10   number 7 for identification?

11        A   From left to right, it would be position

12   number 2.

13        Q   And do you see the person depicted here

14   in Court today that is depicted in position 2 of

15   that photograph?

16        A   Yes, I do.

17        Q   Would you please identify that person?

18        A   It's the female black with the blue jump

19   suit on.

20        MR. FORD:   For the record your Honor

21   indicating the defendant Jeri Lindsey.

22        THE COURT:   The record may so -- that photo

23   isn't in evidence, the record may not so reflect.

24        MR. FORD:

1          Q   Detective, I'm going to give you a pen

2   and ask you to place a circle around the head of

3   the individual identified by Miss Hess within the

4   line-up.  Now, did Mr. Eiselt identify anyone

5   different than Miss Hess had?

6          A   No, he identified the same person.

7          MR. FORD:  Thank you, detective.

8          Q   Now, detective, after Miss Lindsey had

9   been identified by both Miss Hess and Mr. Eiselt,

10  what did you do next relative to your

11  investigation in this case?

12         A   The Felony Review Unit was again

13  notified.

14         Q   And did an Assistant State's Attorney

15  respond to Area 5 Violent Crimes?

16         A   Yes, Assistant State's Attorney Julie

17  Nelson responded.

18         Q   And after Miss Nelson responded, did you

19  and Miss Nelson and Detective Schalk have occasion

20  to re-enter the room in which you had placed Miss

21  Lindsey?

22         A   Yes.

23         Q   Approximately what time did this occur?

24         A   Approximately 1 o'clock in the morning on

1    what would now be the 16th of October.

2            Q   What happened when Miss Nelson yourself

3    and Detective Schalk first entered the room in

4    which Miss Lindsey was located?

5            A   Miss Nelson advised Jeri Lindsey of her

6    rights per Miranda.

7            Q   And was that done from memory?

8            A   Yes, it was.

9            Q   Describe the room where you had placed

10   Miss Lindsey at that time?

11           A   This is what we call the conference

12   room.   It's on the south end of the Area 5 office.

13           Q   At that time, did Miss Lindsey indicate

14   whether or not she understood her rights pursuant

15   to Miranda as they were given to her by Miss

16   Nelson?

17           A   Yes, she said she understood each of the

18   rights.

19           Q   And did Miss Lindsey indicate to you,

20   Miss Nelson and Detective Schalk whether or not

21   she wished to make a statement at that time?

22           A   Yes, she did.

23           Q   Now, what did she -- at that time, did

24   you and Miss Nelson -- excuse me, Miss Nelson

1    yourself Detective Schalk and Miss Lindsey have a

2    conversation?

3         A   Yes.

4         Q   Were you present for the duration of that

5    conversation?

6         A   Yes.

7         Q   How long did this last conversation last?

8         A   Oh, it was approximately, approximately 2

9    hours.

10        Q   And at that time, did Miss Lindsey give a

11   version which was again different from that which

12   she had offered on previous occasions?

13        A   Yes, she did.

14        Q   What did Assistant State's Attorney

15   Nelson do relative to that last statement?

16        A   She prepared a handwritten version of

17   that statement.

18        Q   Have you subsequently had an opportunity

19   to view that handwritten version of that

20   statement?

21        A   Yes, I have.

22        MR. FORD:   If I could ask the Court's

23   indulgence, the statement.   Thank you, Judge.

24        Q   Detective, I'm now going to show you what

1      is in evidence, People's Exhibit number 9, I'll

2      ask you to take a moment and examine that.

3          A    This is a xeroxed copy of a handwritten

4      statement prepared by Assistant State's Attorney

5      Nelson.

6          Q    And you have had an opportunity to read

7      that statement in the past, is that correct?

8          A    Yes, I have.

9          Q    And you were present for the oral

10     conversation between Miss Nelson and Miss Lindsey

11     at the police station beginning at roughly 1 in

12     the morning on October 16, 1992, is that correct?

13         A    That is correct.

14         Q    And you've read that synopsis of the

15     statement, that is People's Exhibit number 9, is

16     that correct?

17         A    That is correct.

18         Q    Is the information brought forth by Miss

19     Lindsey and recorded in People's Exhibit number 9,

20     are they one and the same?

21         A    Yes.

22         Q    What happened at the conclusion of the

23     preparation of People's Exhibit number 9 for

24     identification -- People's Exhibit number 9?

1           A   This statement was presented to Jeri

2      Lindsey, if I recall correctly, she was asked to

3      read the Miranda rights as printed on the

4      statement, pre-printed on the statement.

5           Q   Did Miss Lindsey sign that statement in

6      your presence?

7           A   Yes, she did.

8           Q   And did she sign directly below the

9      Miranda rights portion of that statement?

10          A   Yes, she did.

11          Q   Did she sign any of the other pages of

12     that statement at the conclusion of the

13     preparation of the statement itself?

14          A   Every page is signed.

15          Q   Was that signed by Miss Lindsey in your

16     presence?

17          A   Yes.

18          Q   And did you and Detective Schalk also

19     sign that statement?

20          A   Yes, we did.

21          Q   How about Assistant State's Attorney

22     Nelson, did she also sign that statement?

23          A   Yes, she did.

24          MR. FORD:   Thank you.   If I could have that

1    back.  Re-tender it to the Court.

2         Q   Detective, I would now like to show you

3    what I just marked as People's Exhibit number 18

4    for identification.  Ask you to take an

5    opportunity to examine it.  Have you ever seen

6    People's Exhibit number 18 for identification

7    before?

8         A   This is the Metra train schedule that was

9    given to myself and Detective Schalk from June

10   Hess and John Eiselt.

11        Q   Did Miss Hess and Mr. Eiselt give it to

12   you at the first time you came into contact with

13   them when you first met them?

14        A   Yes.

15        Q   At their home on the near south side in

16   the City of Chicago?

17        A   Yes.

18        Q   And is that the very same train schedule

19   that was given to you by Miss Hess in the middle

20   part of October, 1992?

21        A   Yes.

22        Q   On the first visit to their home?

23        A   That is correct.

24        Q   Is that in the same or substantially the

1    same condition as it was at the time it was given

2    to you on October, of 1992?

3        A  Yes, it is.  The only thing it's got some

4    more marks on it, obviously from chemical

5    processing for fingerprints.

6        Q  And this schedule is the schedule for the

7    Rock Island district Chicago to Joliet run, is

8    that correct?

9        A  Yes.

10       MR. FORD:  Just one moment, Judge.

11       THE COURT:  Mr. Ford.

12       MR. FORD:  Thank you, Judge.

13       Q  Detective, I would now like to show you

14   what has just been marked people's 19 for

15   identification, I'll ask you if you recognize what

16   is depicted in that photograph?

17       A  This is a photo of the victim as he

18   appeared when he was found in his taxicab.

19       Q  And does that photograph show his

20   positioning within the cab?

21       A  Yes, it does.

22       Q  Is that photograph taken from the

23   prospective of an individual standing on the

24   passenger or driver's side of the car?

1      A   From the passenger's side.

2      Q   Is that the position the body was in at

3   the time you found it in the garage on October, of

4   1992?

5      A   Yes.

6      Q   Does that photograph fairly and

7   accurately depict the internal or inside of the

8   cab that you found in October of 1992 which

9   contained the victim, Rudolph Bennett?

10      A   Yes, it does.

11      Q   Now, detective, I would like to show you

12   what I just marked as People's Exhibit number 20

13   for identification and ask you if you recognize

14   what is depicted in that photograph?

15      A   This would be the rear seat of the same

16   cab.

17      Q   And does that photograph fairly and

18   accurately depict the rear side of the cab, the

19   Circle Cab you found on October 12, 1992 here in

20   the City of Chicago?

21      A   Yes, it does.

22      Q   And does that photograph fairly and

23   accurately depict the inside of the cab?

24      A   Yes it does.

1          Q   Now I would like to show you detective

2     what I previously marked People's Exhibit Number

3     21 for identification, I'll ask you if you

4     recognize what is depicted in that photograph?

5          A   It would be the upper portion of the

6     victim's body and the back of his head, next to

7     his head is a cartridge casing.

8          Q   Is that the position of that cartridge

9     casing at the time you originally came upon the

10    victim on October 12, 1992?

11         A   Yes, it is.

12         Q   The casing is in the same spot it was at

13    that time you found the victim?

14         A   Yes.

15         Q   The casing itself is on the seat itself,

16    is that correct?

17         A   Yes.

18         Q   Does that photograph fairly and

19    accurately depict the position of the victim and

20    the seat and the casing as you saw it on October

21    12, 1992?

22         A   Yes, it does.

23         Q   Now, detective, I would like to show you

24    what has been previously marked People's Exhibit

1   Number 22 for identification and ask you if you

2   recognize what is depicted in that photograph?

3         A   This I believe is the driver's side

4   floor.

5         Q   And does that photograph show any of the

6   evidence that you recovered from the positioning

7   it was at the time you first saw the inside of the

8   cab on October 12, 1992?

9         A   Yes, it depicts a cartridge casing just

10  under the front seat.

11        Q   And that would have been the left side of

12  the front seat of the Circle Cab that you found on

13  October 12, 1992 in which you located the victim,

14  Rudolph Bennett?

15        A   That is correct.

16        Q   Does that photograph fairly and

17  accurately depict the location of the second shell

18  casing you found on October 12, 1992 and its

19  location within the car?

20        A   Yes.

21        Q   Detective, I now show you what has been

22  -- detective, I now show you what I'm marking

23  People's Exhibit number 23 for identification, and

24  I'll ask you if you recognize what is depicted in

1    that photograph?

2         A   This is a front view of the face of the

3    victim.

4         Q   And does -- the face of the victim that's

5    depicted within that photograph, is that after he

6    had been removed from the cab?

7         A   Yes, it is.

8         Q   Does that photograph fairly and

9    accurately depict the victim's face and the -- or

10   the face itself as you found it on October 12,

11   1992 after you removed him from the cab itself?

12        A   That is correct.

13        Q   And I now show you what I'm marking

14   People's Exhibit number 24 for identification.

15   Detective Bogucki, and I'll ask you if you

16   recognize what is depicted in that photograph?

17        A   It's a -- it's the photograph of the

18   wounds of the victim, on the victim's body, it

19   would be his right chest.

20        Q   And does that photograph fairly and

21   accurately depict the wounds and the location on

22   the body of the victim after you removed him and

23   rolled up his shirt so you can identify the places

24   where the bullets had struck the victim?

1   A Yes.

2   Q Does that photograph fairly and

3 accurately depict the victim itself and the nature

4 of the wounds you found on October 12, 1992?

5   A Yes.

6   Q Lastly, detective, I would like to show

7 you what I just marked as People's Exhibit number

8 25 for identification and ask you if you recognize

9 what is depicted within that photograph?

10   A These are 2 more wounds, they would be,

11 it is a photo of 2 wounds that would be on the

12 left side of the back, left back side.

13   Q Now that portion of the victim's body was

14 revealed to you by pulling up the victim's shirt

15 and exposing the back of the victim, is that

16 correct?

17   A That is correct.

18   Q That was done after the victim had been

19 removed from the cab?

20   A That is correct.

21   Q And does that photograph fairly and

22 accurately depict the nature of the wounds to the

23 victim's back and the exits wounds to the victim's

24 back that you saw on October 12, 1992?

1          A   Yes.

2          MR. FORD: If I may have one moment, your

3    Honor.

4          THE COURT:   Yes.

5          MR. FORD:

6          Q   Detective, I would now like to show you

7    what I previously marked as People's Exhibit

8    number 6 for identification, I'll ask you if you

9    recognize the person depicted in that photograph?

10         A   This would be the victim, Rudolph

11   Bennett.

12         Q   And does that photograph fairly and

13   accurately depict the face of Rudolph Bennett as

14   you saw his face on October 12, 1992?

15         A   Yes.

16         Q   Now, there is a rag number visible at the

17   lower portion of that photograph, is that correct?

18         A   Yes.

19         Q   Can you read the rag number on the plate

20   that is seen within People's Exhibit number 6 for

21   identification?

22         A   It appears to be 218 October, '92.

23         Q   Thank you, detective.

24         MR. FORD:   Just one moment, Judge.

1          THE COURT:  Yes.

2          MR. FORD:  Just one more moment, Judge.

3          THE COURT:  Yes.

4          MR. FORD:

5          Q   Detective, O'Hare Airport is located here

6   in Chicago, Cook County, Illinois, is that

7   correct?

8          A  Yes, it is.

9          MR. FORD:  I have no further questions of

10  Detective Bogucki, Judge.

11         THE COURT:  Mr. Sorosky, I anticipate your

12  cross examination will be lengthy, is that

13  correct.

14         MR. SOROSKY:  Yes.  You want to take a 2

15  minute recess.

16         THE COURT:  No.  I was thinking of putting

17  it over until tomorrow morning.

18         MR. SOROSKY:  Whatever anyone wants.

19         MR. FORD:  I will be here tomorrow, Judge.

20         THE COURT:  Okay.  Please do not discuss

21  your testimony with anyone.  The time is 6:30.  We

22  were going all day.  So we'll put it over to

23  tomorrow morning at 10 a.m..  10 AM.  Okay?

24         A  Yes, sir.

1          THE COURT:  Again I'll remind you do not

2     discuss your testimony with anyone.  Okay.

3          All right.  Counsels, have a good evening.

4          MR. FORD:  Thank you.

5                    (Whereupon, the further hearing

6                    of the above-entitled cause

7                    was continued to 1-11-95, at

8                    10:00 o'clock a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )

3          THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
               I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15
     _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 14th day of June, 1995.


S 120

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS** } ss
**COUNTY OF COOK**

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . . VOLUME FIVE OF A NINE VOLUME . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED IN . . THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . JERI LINDSEY    (01) . . . . . . . . . . . . WAS . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

in said County, . SEPTEMBER . . . . . 20 . . . . , 19 . 95

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**



92 CR
25135

Circuit Court No. 92 CR 25135

Trial Judge SHELVIN SINGER

Reviewing Court No. 95 1535



05 1458

THE PEOPLE OF THE STATE OF ILLINOIS

FILED
APPELLATE COURT 1st DIST.

**VS.**

NOV 07 2002

JERI LINDSEY   (01)

STEVEN M. RAVID
CLERK

92cr25135

COU                                          VISION

VOLUME SIX OF NINE

REPORT OF PROCEEDINGS

FEB 08 2006

STEVEN M. RAVID
CLERK

**AURELIA PUCINSKI**

**Clerk of Court**

Per AP./SIR

**Deputy**

```
 1    STATE OF ILLINOIS )
                        )   ss
 2    COUNTY OF C O O K )

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE )
 5    STATE OF ILLINOIS )
                        )   Case No. 92 CR 25135
 6       vs.            )
                        )   Charge: MURDER
 7    JERI R. LINDSEY   )

 8            REPORT  OF  PROCEEDINGS

 9            BE IT REMEMBERED that on the 11th day of

10    January, 1995, this cause came on for hearing

11    before the Honorable SHELVIN SINGER, Judge of said

12    Court, upon the indictment herein, the defendant

13    having entered a plea of not guilty.

14        APPEARANCES:
              HON. JACK O'MALLEY,
15            State's Attorney of Cook County, by
              MR. NICK FORD,
16            Assistant State's Attorney,
              Appeared on behalf of the People;
17
              MR. SHELDON SOROSKY,
18            Appeared on behalf of the Defendant.

19

20

21

22
      Kenneth Madoch
23    Official Court Reporter
      Circuit Court of Cook County
24    County Department-Criminal Division.
```

1      THE CLERK:  People of the State of Illinois

2  versus Jeri Lindsey.

3      THE COURT:  All right.  The record should

4  reflect the defendant is present, the defendant,

5  Jeri Lindsey is present in her own person through

6  counsel.  State is present through its counsel.

7      MR. SOROSKY:  Your Honor, I believe we're at

8  the stage now where we're supposed to begin cross

9  examination of Officer Bogecki.  However, there is

10  one witness the defendant has who has to go to

11  work this afternoon, I've spoken to the State's

12  Attorney and he, the State's Attorney, has no

13  objection to this witness being taken out of turn

14  at this time.  I related to the State's Attorney

15  the prospective testimony of this witness and it

16  should be not very lengthy.

17      THE COURT:  All right.  Mr. Ford, you would

18  agree?

19      MR. FORD:  We can do that Judge, I don't

20  have any objection.

21      THE COURT:  All right.  Mr. Sorosky, call

22  your first witness.

23      MR. FORD:  My motion to exclude is still in

24  effect.

T 3

1          MR. SOROSKY:  Everyone is leaving.

2             This is the witness.

3          THE COURT:  Swear in the witness.

4          THE CLERK:  Raise your right hand.

5                          (Witness sworn.)

6          THE COURT:  Please be seated.

7                   JACK ST. CLAIR,

8     called as a witness on behalf of the Defense,

9     having been first duly sworn, was examined and

10    testified as follows:

11                  DIRECT EXAMINATION

12                      BY

13                  MR. SOROSKY:

14        Q   Sir, would you please state your name in

15    full and spell your last name?

16        A   Jack W. St. Clair, S-t period C-l-a-i-r.

17        Q   And how old are you?

18        A   45.

19        Q   And where do you live?

20        A   8801 South Bishop, Chicago.

21        Q   And for how long have you lived there,

22    approximately?

23        A   I could say for the last 20 years.

24        Q   And are you married, single or divorced?

```
 1          A   I'm single.

 2          Q   And what line of work are you in?

 3          A   Well I work for a plastic company, a

 4     machine operator.

 5          Q   For how long -- what company do you work

 6     for?

 7          A   Nickle Container, I have been there 3

 8     years now.

 9          Q   What do you do there?

10          A   Machine operator.

11          Q   And where did you work before that?

12          A   Polycon.

13          Q   And what did you do there?

14          A   Machine operator.

15          Q   And has that been your line of work

16     throughout your adult life?

17          A   No.  For the last 8 years, I have been in

18     plastics.

19          Q   Very well.  Now, do you know the

20     defendant, Jeri Lindsey?

21          A   Yes.

22          Q   Do you also know her by the nickname of

23     Robin?

24          A   Yes.
```

```
1         Q   Do you see her in Court?

2         A   Yes, I do.

3         Q   Could you point her out?

4         A   (Indicating).

5         MR. SOROSKY.  We would ask the Court to

6    indicate the witness has pointed to the

7    defendant.

8         THE COURT:  The record may so reflect.

9         MR. SOROSKY:

10        Q   For how long have you known Jeri Lindsey?

11        A   For --

12        Q   Approximately?

13        A   About 7 years now.

14        Q   Now, did you hear about Jeri Lindsey's

15   arrest?

16        A   Yes, sir.

17        MR. FORD:  Objection.

18        THE COURT:  Overruled.

19        MR. SOROSKY:

20        Q   Where did you hear about it?  How did you

21   hear about it?

22        A   News.

23        MR. FORD:  Objection.

24        THE COURT:  Overruled.  Go ahead.
```

T  6

1          MR. SOROSKY:

2          Q   You heard about it on the news, is that

3     correct?

4          A   Uh-hum.

5          THE COURT:  Is that a yes or no?

6          A   Yes, sir.

7          MR. SOROSKY:  Yes?

8          A   Yes, sir.

9          MR. SOROSKY:

10         Q   Now, what shift do you -- strike that.

11    The Friday night before Jeri Lindsey's -- the

12    Friday night before you had heard about Jeri

13    Lindsey's arrest, were you with her?

14         A   Yes.

15         Q   And what time did you get off work or

16    what shift did you work that Friday?

17         A   I work second shift, I got off work

18    11:30.

19         Q   That would be October 9, Friday, second

20    shift, is that correct?

21         A   Okay.

22         Q   And what time did you meet up with Miss

23    Lindsey approximately?

24         A   Maybe about 1:30, 1:15, somewhere around

T 7

1    in there.

2         THE COURT:  Is that 1:30, 1:15 AM or PM?

3         A  AM, after 12 o'clock.

4    MR. SOROSKY:

5         Q  So what we commonly call as Friday night

6    would be technically Saturday morning?

7         A  Right.

8         Q  So you met Jeri Lindsey Saturday morning,

9    October 10, about 1:00 or 1:15 AM, is that

10   correct?

11        A  Yes, sir.

12        Q  But in a certain street sense, you would

13   sort of call that late Friday night?

14   MR. FORD:  Objection.

15   THE COURT:  Sustained.

16   MR. SOROSKY:

17        Q  Now, did you telephone Miss Lindsey

18   before you met her at this hour?

19        A  Yes.

20        Q  And could you tell Judge Singer, did she

21   call you or did you call him concerning the late,

22   you know, late Friday night, did you call her or

23   did she call you?       .

24   MR. FORD:  Objection to the leading.

1          THE COURT:  Overruled.

2          MR. SOROSKY:

3          Q   What happened, tell the Judge.

4          A   Well Friday, when we got in touch with

5     each other, she called me early in the morning.

6          Q   She called you about what time?

7          A   11 o'clock, 11:15.

8          THE COURT:  About what time?

9          A   11 o'clock in the morning, you know,

10    before I went to work.

11         MR. SOROSKY:

12         Q   And without getting into all the details

13    of the conversation, did she and you make plans to

14    meet later that evening?

15         A   Yes, we did.

16         Q   After you got off work, did you call her

17    or did she call you?

18         A   I called her.

19         Q   And about what time would you say you

20    called her, approximately?

21         A   1 o'clock.

22         Q   So that would have been technically early

23    Saturday morning?

24         A   You want to say that, yeah, I worked

1    Friday, Saturday morning.

2        Q   And did you call her from work?

3        A   No.

4        Q   Where did you call her from?

5        A   From the street, pay phone.

6        Q   And did you speak to her?

7        A   Yes.

8        Q   And you recognized her voice when you

9    spoke to her?

10       A   Oh, yeah.

11       Q   And once again without getting into all

12   the details of the conversation, did she and you

13   make plans to meet?

14       A   Yes.

15       Q   And after that conversation, did you and

16   Jeri Lindsey meet?

17       A   Yes.

18       Q   Could you tell his Honor, Judge Singer,

19   where you and she met and the circumstances of

20   that meeting and what you did thereafter?

21       A   Well I picked her up at her house, I took

22   her over my house.

23       Q   And when you say you picked her up, were

24   you driving?

1      A   Yes.

2      Q   And after you picked her up, was there

3   anyone else in the car other than you and her?

4      A   No.

5      Q   And where did you go?

6      A   To my house.

7      Q   And what is that address again?

8      A   8801 South Bishop.

9      Q   Who do you live with?

10      A   My mom.

11      Q   Does anyone else live there or did anyone

12   else stay there?

13      A   I got a sister, 2 brothers.

14      Q   And what are your 2 brother's names?

15      A   One of them is Marquette St. Clair and

16   one of them is Jerry St. Clair.

17      Q   Now, how long does it take to get from,

18   let's say Jeri Lindsey's house to your house,

19   approximately?

20      A   20, 30 minutes.

21      Q   And what happened once you got to your --

22   where did you go after you picked up Lindsey, Jeri

23   Lindsey, did you go straight to your house, did

24   you do anything first?

```
1          A   Stopped off and got me some beer.

2          Q   Where?

3          MR. FORD:   Judge, I didn't hear?

4          A   I stopped off and got us some beer.

5          MR. SOROSKY:

6          Q   Do you remember where that was at?

7          A   Not necessarily but I usually go on the

8    corner of 87th Street.

9          Q   And was Jeri Lindsey with you then?

10         A   Yes.

11         Q   And then what did you do?

12         A   Went to my house.

13         Q   And approximately what time would you say

14   you and Jeri Lindsey got to your house,

15   approximately?

16         A   Quarter to 2:00, 10 minutes to 2:00,

17   something like that, around in that time.

18         Q   That would be early Saturday morning?

19         A   Uh-hum.

20         Q   What happened once you got to the house

21   with Jeri Lindsey, tell Judge Singer what

22   occurred, what took place and tell Judge Singer

23   what happened?

24         A   Me and Jeri are friends, we have been
```

1    friends for years.  We're friends, like my

2    girlfriend so to speak but not my girlfriend,

3    she's my real close friend.

4         Q  And what happened, tell the Judge what

5    happened?

6         A  We got into it.

7         Q  Pardon me?

8         A  Me and her got into it.

9         Q  By getting into it did you and she have

10   sexual relations?

11        A  Yes.

12        Q  And once again without getting into all

13   the details, for how long a period of time did you

14   and she have sexual relations, approximately?

15        A  I think she stayed with me til maybe

16   around 3 o'clock, 3:30, about an hour, 2 hours.

17        Q  You were not watching the clock?

18        A  No, sir.

19        Q  What happened after that?

20        A  She wanted to leave so to speak, she and

21   my brother are friends too, you know, we all work

22   together, so she decided to go with my brother.

23        Q  And which brother is that?

24        A  Jerry.

1      Q   And when you say she went with your

2   brother, do you mean she left the premises with

3   your brother or just went off with your brother

4   out of your room?

5      A   She went, left my room, my brother lives

6   in the basement.

7      Q   So to the best of your knowledge, she

8   went with your brother to his basement apartment?

9      A   Right.

10      Q   And did you fall asleep then?

11      A   Yes, I didn't go back out of the room

12   after that.

13      Q   And you didn't see her later that day,

14   did you?

15      A   No.

16      Q   And is the next time you heard about Jeri

17   Lindsey when she was arrested?

18      A   Right.

19      MR. FORD:   Objection to leading.

20      THE COURT:   Overruled.

21      A   Yes.

22      MR. SOROSKY:

23      Q   And just so the record is clear you first

24   heard about this on the news?

1        A   Yes, sir.

2        MR. SOROSKY:  Nothing further from this

3  witness.

4        THE COURT:  Cross.

5        MR. FORD:  Briefly, Judge.

6              CROSS EXAMINATION

7                  BY

8           MR. FORD:

9        Q   Now, the first time you actually saw Jeri

10  Lindsey was at 1:30 in the morning on October 10,

11  1992, is that correct?

12        A   Around that time, I can't tell you exact

13  time but around that time, yes.

14        Q   The early morning hours of October 10,

15  1992?

16        A   Uh-huh.

17        Q   You and she on other nights had hooked up

18  like this late at night, is that correct?

19        A   Yes, she's my -- yeah, we ride together,

20  I used to ride her so I used to be with her a lot.

21        Q   And you know a woman name Irene Quiros

22  don't you?

23        A   Yes.  I work with her.

24        Q   Now, she and Jeri Lindsey lived together,

1    didn't they?

2           A   Yes.

3           Q   They also had a romantic or sexual

4    relationship, didn't they?

5           MR. SOROSKY:   Objection.

6           THE COURT:   Overruled.

7           A   What can I say?

8           THE COURT:   Overruled at this time.

9           A   I knew they was friend but I don't know,

10   I know they was friends.

11          MR. FORD:

12          Q   Well Mr. St. Clair, you knew Jeri

13   Lindsey?

14          A   Right.

15          Q   And you in that Irene Quiros worked a

16   different shift than you did, didn't she?

17          A   Yes.

18          Q   In fact she started at 11 PM each night

19   and would work through until the early morning

20   hours of the next day?

21          A   Okay.

22          Q   And you and Miss Lindsey never hooked up

23   at a time when Irene Quiros was at home, did you?

24          A   No.

1    Q   Normally you and Jeri Lindsey hooked up

2    at a time when Irene was at work, didn't you?

3    A   (No audible response.)

4    THE COURT:  Is that a yes?

5    A   Yes.

6    MR. FORD:  You have to answer out loud.

7    A   Yes.

8    THE COURT:  What?

9    A   Yes, sir.

10   MR. SOROSKY: Just so my objection is clear,

11   I have no objection to the witness being asked the

12   question about any relationship between the

13   defendant and Irene Quiroz, the question is just

14   does he know about it, if he knows about it, I

15   have no objection to his answering, there is no

16   hearsay objection to it or anything like that,

17   just I don't know if he knows.

18   THE COURT:  Proceed.

19   MR. FORD:  May I proceed Judge.

20   THE COURT:  Yes.

21   MR. FORD:

22   Q   Now, Mr. St. Clair, it's true, isn't it,

23   that you spent a couple hours with Jeri Lindsey

24   when you picked her up at 1:30 in the morning from

T 17

1       her house?

2           A   Yes.

3           Q   The first thing you did what's buy a beer

4       and went over to your bedroom?

5           A   No, to my -- my bedroom, okay, yeah.

6           Q   And did you do any cocaine with her that

7       night?

8           A   No.

9           Q   It's true though, isn't it, Mr. St.

10      Clair, that Miss Lindsey, Jeri Lindsey, your

11      friend Jeri Lindsey here, asked you if it would be

12      okay if she went down and stayed with Jerry after

13      she was done -- you and she were done?

14          A   Right.

15          Q   You told her you had no problem with that

16      she's a grown woman, she can do what she wanted to

17      do?

18          A   (No audible response).

19          THE COURT:   You have to answer out loud.

20          A   Yes, I did.

21          MR. FORD:

22          Q   Now she also asked you if you could hold

23      her money for her too, didn't she?

24          A   Yeah.

1    Q   And why did she ask you that?

2    A   Because she knows when she indulges in

3    what she do she get carried away and wouldn't stop

4    and spend her money.

5    Q   By that you mean smoking coke?

6    A   I mean she won't have no money when she

7    comes back.

8    Q   And she won't have -- and you know your

9    brother Jerry, don't you?

10    A   Right.

11    Q   She and Jerry smoke coke together a lot,

12    didn't they?

13    A   I wasn't down there in the basement, sir.

14    But I know she went down there for that but I

15    can't tell you what they did in the basement.

16    Q   You weren't aware of what went on in the

17    basement?

18    A   Right.  I stayed in my room.

19    Q   Did you hold her money for her that

20    night?

21    A   No.

22    Q   Did you take her back?

23    A   No.

24    Q   That morning?

1      A   No.

2      Q   Did you see her -- did you go down and

3  see your brother the next morning like at 8 or 9

4  o'clock in the morning on October 10, 1992?

5      A   No.

6      Q   Did you ever see her at all after that?

7      A   No.

8      Q   Did you ever see your brother, Jerry

9  during the course of that Saturday or Sunday?

10     A   I think I seen Jerry Sunday, late Sunday

11  but not you know, you see I work both of them,

12  that particular weekend 2 days, Saturday and

13  Sunday.

14     Q   What time would you begin work at the

15  plastic factory?

16     A   I have to be at work at 3:30.

17     Q   Now, -- if I could have one moment,

18  Judge?

19     THE COURT:  Yes.

20     MR. FORD:  Did you and Jeri Lindsey ever

21  talk about Irene Quiroz?

22     A   Sure.

23     Q   Did she ever indicate to you that she had

24  to hide the relationship that you and she enjoyed

1    from Irene Quiroz?

2         A   Oh, yeah.

3         Q   Did she ever lie to Irene Quiroz in your

4    presence about the time you and she had spent

5    together?

6         A   Not in my presence, no.

7         Q   At any time when you ever picked her up

8    did you ever run into Irene Quiroz?

9         A   No.   Irene didn't know we was friends

10   though.

11        Q   Didn't know you were friends?

12        A   Sure.

13        MR. FORD:   No further questions, Judge.

14        THE COURT:   Redirect.

15                 REDIRECT EXAMINATION

16                      BY

17             MR. SOROSKY:

18        Q   Mr. St. Clair, if I could use the word

19   secret, would it be accurate or fair to say to the

20   best of your knowledge that your relationship with

21   the defendant was a secret from Irene Quiroz?

22        MR. FORD:   Objection to what would be fair

23   to say?

24        A   Yes.

T 21

1          THE COURT:  Sustained as to what would be

2     fair.

3          MR. SOROSKY:

4          Q   To the best of your knowledge was your

5     relationship a secret from Irene Quiroz?

6          A   Yes.

7          Q   The State's Attorney Mr. Ford brought up

8     the topic of cocaine, you remember that?

9          A   Yes, I do.

10         Q   Now, on October 9th or 10th of 1992, you

11    did not use cocaine, did you?

12         A   No.

13         Q   But to the best of your knowledge, your

14    brother, Jerry, was a cocaine user, isn't that

15    correct?

16         A   Yes.

17         Q   And to the best of your knowledge, the

18    defendant used cocaine,?

19         A   Yes.

20         Q   Isn't that correct?

21         A   Yes.

22         Q   So you wouldn't be shocked or surprised

23    at the fact that your brother, Jerry and the

24    defendant used cocaine after they left you, would

1    you?

2          A  No.

3          MR. FORD:  Objection, Judge.

4          THE COURT:  Sustained.

5          MR. SOROSKY:

6          Q  In fact to lay down a five dollar beat

7    you would probably bet they did?

8          MR. FORD:  Objection.

9          A  Yes.

10         THE COURT:  Sustained.

11            Gambling is illegal.

12         MR. SOROSKY:  Yes, nothing further.

13         MR. FORD:  Very briefly.

14         THE COURT:  Recross.

15                   RECROSS EXAMINATION

16                        BY

17              MR. FORD:

18         Q  You said you saw your brother, Jerry on

19    Sunday?

20         A  Yeah.

21         Q  At the time you saw him on Sunday, where

22    were you within the building that you folks own at

23    8801 South Bishop?

24         A  Not for sure, might have been out on the

T 23

1    porch, might have been in the kitchen.

2         Q  Did he mention that he and Jeri had been

3    together that night?

4         A  Uh-huh.

5         THE COURT:  You have to say yes or no.

6         A  Yes, sir.

7         MR. FORD:

8         Q  And did he mention to you that he and

9    Jeri or that Jeri was still there?

10         A  I asked him about her.

11         Q  And he in fact said she was gone, is that

12    right?

13         A  Right.

14         MR. FORD:  No further questions -- that was

15    on Sunday morning, right?

16         A  Yes -- not necessarily -- it was on

17    Sunday sometime before I went to work, so it was

18    morning.

19         MR. FORD:

20         Q  It was on Sunday before you went to work?

21         A  Right.

22         Q  Which would have been Sunday October 11,

23    1992, the day after?

24         A  Yes.

1          MR. FORD:  No further questions.

2          MR. SOROSKY:  No questions.

3          THE COURT:  Thank you, you're excused.

4          A   Thank you.

5                              (Witness excused.)

6          THE COURT:  We'll recess five minutes and

7     resume with the trial.

8                              (Recess taken.)

9          THE COURT:  People versus Lindsey.

10         THE COURT:  All right.  The record should

11    reflect Miss Lindsey is present in her own person

12    through counsel.  State is present through its

13    counsel.  Motion to exclude witnesses is still in

14    force.  I don't have to remind you of that.  We're

15    ready now to proceed with the cross examination of

16    Officer Bogucki, is that correct.

17         MR. FORD:  Bogucki.  Would you please have

18    the officer return to the stand.

19         THE COURT:  Please have the witness

20    re-sworn.

21                              (Witness sworn.)

22         THE COURT:  Please be seated.  Would you

23    please state your name again for the record?

24         A   Detective Jerome Bogucki.

1        THE COURT:  And you're the name witness who

2   was testifying when we recessed this matter

3   yesterday, is that correct, sir?

4        A  Yes, it is, Judge.

5        THE COURT:  Counsel.

6        MR. SOROSKY:

7        Q  Officer, I believe your testimony

8   indicated yesterday that you were called to O'Hare

9   Airport, is that correct?

10       A  Yes.

11       Q  And you were called to O'Hare Airport to

12   view a body that was in a taxicab, is that

13   correct?

14       A  In essence, yes.

15       Q  And the taxicab was in fact locked when

16   the police, whether it was you or other police,

17   first arrived at the taxicab, was it not?

18       A  That is correct.

19       Q  And you never -- did the police ever

20   obtain a key to open the cab?

21       A  No.

22       Q  So, somehow through extraordinary efforts

23   other than the use of a normal key, the taxicab

24   was opened, is that correct?

1      A  It was through a device called a Slim

2  Jim.

3      Q  And one of the items found in the taxicab

4  was an item that we would commonly call a parking

5  ticket stub, is that correct?

6      A  Yes.

7      Q  And that has already been marked and

8  identified by you during your testimony, has it

9  not?

10     A  Yes.

11     Q  And to the best of your knowledge, --

12     THE COURT:  Excuse me counsel, do you have a

13  witness coming in.

14     MR. SOROSKY: Step out.

15         And to the best of your knowledge and

16  memory, that parking stub indicated the time of

17  4:59 PM, October 9, 1992, is that correct?

18     A  Yes.

19     Q  So, to the best of your knowledge and

20  belief, that cab arrived at O'Hare at 4:59 PM on

21  October 9, 1992, I know you don't know, you

22  weren't there when the cab arrived, but based as a

23  police officer working on this case, would that be

24  your assessment of when the cab arrived?

T 27

1    MR. FORD:  Objection.

2    THE COURT:  I'm sorry.

3    MR. FORD:  Objection.

4    THE COURT:  Sustained.

5    MR. SOROSKY:

6       Q  Now, your detective area includes O'Hare

7    Airport, does it not?

8       A  Yes, it does.

9       Q  Now, this cab was found in a regular

10   parking location, was it not?

11      A  It was found in a parking spot in a

12   parking lot.

13      Q  And normally regular cars would park

14   there as opposed to cabs, is that correct?

15      A  That is correct.

16      Q  And this would be cars carrying people

17   that would be either traveling somewhere or

18   picking people up, whatever someone would normally

19   do at O'Hare, right?

20      MR. FORD:  Objection.

21      THE COURT:  Well, overruled.

22      A  Yes.

23      MR. SOROSKY:

24      Q  And from your experiences as a police

T 28

1    officer on a Friday afternoon at 4:59, or shortly

2    after 4:59, let's say between 4:59 and 6:00 or

3    7:00, O'Hare Airport tends to be very crowded,

4    does it not?

5            MR. FORD:  Objection, Judge.

6            THE COURT:  Sustained.

7            MR. SOROSKY:

8        Q    Have you ever been at O'Hare Airport on

9    Fridays around 5 PM?

10       A    I don't specifically recall that, no.

11       Q    Now, you, according to the last statement

12   that Miss Lindsey gave, she indicated in that

13   statement that this shooting occurred at O'Hare

14   Airport, is that correct?

15       A    Yes.

16       Q    And she indicated in that last statement

17   that this shooting occurred shortly after the cab

18   arrived at O'Hare, is that correct?

19       A    That's what I understood, yes.

20       Q    I don't mean to pinpoint to any time but

21   shortly after it arrived at O'Hare as opposed to 4

22   hours later or 5 hours later?

23       A    That would be correct.

24       Q    Did her statement indicate whether the

1    shooting occurred inside the cab or outside the

2    taxicab?

3         A   I understood it to be inside the cab.

4         Q   Did the police department conduct any

5    tests of firing a gun at O'Hare within a cab to

6    determine how loud these sounds would be?

7         MR. FORD:   Objection.

8         THE COURT:   Overruled.

9         A   No.

10        MR. SOROSKY:

11        Q   Now, looking at Miss Lindsey's last

12   statement, would you relate to Judge Singer what

13   she said she did after the shooting inside the

14   cab, what do you recall and remember?   You can

15   have the statement to refresh your memory if you

16   need it.   Do you remember what she said

17   occurred?

18        A   I believe I do.

19        Q   Would you relate it to his Honor, Judge

20   Singer?

21        A   I believe she left the cab, did not lock

22   the cab, she stated that she started to run and

23   but then she slowed down so that she wouldn't draw

24   attention and then she made her way down to the

1   highway and flagged down someone for a ride and

2   then was brought home.

3       Q   So, she told you from the parking lot,

4   she went to the highway as opposed to the area

5   within O'Hare Airport where people would go to

6   after they park their car, is that correct?

7       A   I can only tell you what she said.

8       Q   Yeah.  She told you she went to a highway

9   and hitchhiked, is that correct?

10      A   She didn't use those words, but in

11  essence, she summoned a ride in some manner.

12      Q   Did your investigation of this case

13  indicate any contact that the defendant would have

14  with O'Hare Airport?

15      MR. FORD:  Objection.

16      THE COURT:  Sustained.

17      MR. SOROSKY:

18      Q   Did your investigation reveal or show

19  that the defendant ever worked at O'Hare Airport?

20      MR. FORD:  Objection.

21      THE COURT:  Overruled.

22      A   My investigation did not show anything

23  like that.

24      MR. SOROSKY:

1       Q  Did your investigation show that the

2  defendant ever had any friends at O'Hare Airport?

3       A  No.

4       MR. FORD:  Objection.

5       THE COURT:  I'll sustain that.

6       MR. SOROSKY:

7       Q  Did your investigation ever show that the

8  defendant ever lived in the O'Hare Airport area?

9       A  No, it didn't.

10      Q  Where did the defendant live, if you

11  know?

12      A  8931 South Houston.

13      Q  That would be at a complete opposite end

14  of the City of O'Hare Airport, would it not?

15      A  Yes, it would.

16      MR. FORD:  Objection.

17      THE COURT:  Sustained.

18      MR. SOROSKY:

19      Q  Now, did the defendant tell you in her

20  last statement that this woman driver who picked

21  up the defendant drove the defendant to South

22  Chicago Hospital?

23      A  No, she didn't.  I don't believe she did.

24      Q  Now, when the defendant made her first

1  complaint to the police, of being the victim of a

2  rape, she did not mention that she was in the cab

3  with an elderly couple, did she?

4      A   No.

5      Q   And she did not mention that this elderly

6  couple or one of the -- or the woman of this

7  elderly couple, the woman member of the elderly

8  couple had given her a Metra train schedule, did

9  she?

10     A   No, she did not.

11     Q   And she did not mention that the

12  gentleman member of the elderly couple had stopped

13  to pick up some alcohol en route from the casino,

14  riverboat to the hotel, did she?

15     A   No.

16     MR. FORD:   Objection.

17     THE COURT:   Sustained.

18     MR. SOROSKY:   There is a reason for that,

19  your Honor and I'll tie it up, I would ask if your

20  Honor would hold that.

21     THE COURT:   All right.

22     MR. SOROSKY:

23     Q   And when the defendant first made this

24  statement of rape complaint, the police department

T 33

1    had not yet met this elderly couple, June Hess or

2    John Eiselt, did they?

3            MR. FORD:  Objection to police department

4    met.

5            THE COURT:  Sustained.

6            MR. SOROSKY:

7        Q   Well the defendant made this complaint of

8    rape Sunday night, October 11, at approximately

9    11:30 PM, did she not?

10           MR. FORD:  Objection.

11           THE COURT:  Sustained.

12           MR. SOROSKY:

13       Q   Do you know what time the defendant made

14    this complaint?

15           MR. FORD:  Objection.

16           THE COURT:  Sustained.

17           MR. SOROSKY:

18       Q   You had occasion to review your notes and

19    the various police reports concerning this rape

20    allegation, did you not?

21           MR. FORD:  Objection.

22           MR. SOROSKY:  Have you not.

23           THE COURT:  I'll overrule that, to that

24    question of reviewed reports.

1          A   Yes, I've reviewed reports.

2          MR. SOROSKY:

3          Q   Do you know what time the defendant, what

4      date and time the defendant made her original

5      complaint about being raped?

6          MR. FORD:   Objection.

7          THE COURT:   Sustained.

8          MR. SOROSKY:

9          Q   When -- do you know the substance of the

10     defendant's original rape complaint?

11         MR. FORD:   Objection.

12         THE COURT:   Overruled as to that question.

13         A   Yes.

14         MR. SOROSKY:

15         Q   Would you relate that?

16         MR. FORD:   Objection.

17         MR. SOROSKY:   In summary, I don't mean you

18     have to relate every detail, just in summary.

19         THE COURT:   Sustain the objection.

20         MR. SOROSKY:   Okay, every detail.

21         MR. FORD:   Objection.

22         THE COURT:   Sustained.

23         MR. SOROSKY:

24         Q   Well what was her original rape

1    complaint?

2         MR. FORD:  Objection.

3         THE COURT:  Sustained.

4         MR. SOROSKY:  I thought we can -- I thought

5    you said that was not sustained, you said I could

6    ask.

7         THE COURT:  I said only as to the question

8    of he's familiar with the original rape complaint.

9         MR. SOROSKY:

10        Q  You are familiar with that?

11        THE COURT:  Familiarity from all that I've

12   heard arises from having read the police reports.

13   This detective did not receive the original rape

14   complaint so what you're talking about is hearsay

15   upon hearsay, not even hearsay of the officer who

16   took the complaint but rather --

17        MR. SOROSKY:  I understand.

18        THE COURT:  -- The officer who took the

19   complaint, made the report and tendered the report

20   and what is in the report.  I'm sustaining the

21   objection.

22        MR. SOROSKY:

23        Q  Now, when did -- which police officers

24   first came in contact with June Hess and John

1    Eiselt?

2         MR. FORD:  Objection, form of the question.

3         THE COURT:  I'm going to sustain.

4         MR. SOROSKY:

5         Q  When did you first come in contact with

6    them?

7         A  That would have been on October 13th in

8    the evening hours.

9         Q  That was at their apartment?

10        A  Yes.

11        Q  And to the best of your knowledge, were

12   you and in the first group of police officers that

13   contacted them on this case?

14        MR. FORD:  Objection.

15        THE COURT:  Overruled.

16        A  Yes.

17        MR. SOROSKY:

18        Q  Now, prior to this October 13th contact

19   between the police and Miss Hess and Mr. Eiselt,

20   the only statement the defendant had made was her

21   original rape allegation, is that correct?

22        MR. FORD:  Objection.

23        THE COURT:  Sustained.

24        MR. SOROSKY:

1      Q   At that time, on October 13, 1992, when

2  you and your fellow officers met June Hess and Mr.

3  Eiselt, the defendant had not yet been arrested,

4  had she?

5      A   No.

6      Q   So therefore all the statements the

7  defendant made with the exception of her original

8  rape complaint were made subsequent to the police

9  contact with June Hess and Mr. Eiselt, isn't that

10  correct?

11      MR. FORD:  Objection.

12      THE COURT:  Sustained.

13      MR. SOROSKY:

14      Q   Do you know of any statement the

15  defendant made prior to your meeting with June

16  Hess and Mr. Eiselt?

17      MR. FORD:  Objection.

18      THE COURT:  Sustained.  Counsel, the problem

19  that I see is that you're asking this officer for

20  information obtained by other police officers.

21  And what you're talking about is information that

22  would be first hearsay but secondly, is beyond the

23  scope, beyond the scope of the direct examination.

24      MR. SOROSKY:

1      Q  Did you take any statement from the

2  defendant prior to your contact with June Hess and

3  Mr. Eiselt?

4      A  No.

5      Q  Do you know of any police officer who

6  took any statement from the defendant prior to

7  your contact with June Hess and and Mr. Eiselt

8  other than the original rape complaint?

9      MR. FORD:  Objection.

10      THE COURT:  Sustained.  Once again, you're

11  asking at best for hearsay and it's beyond the

12  scope because because the prosecutor questioned

13  the officer regarding his involvement in the case

14  and did not ask him any questions relative to the

15  time before this detective was assigned to the

16  case.

17      MR. SOROSKY:

18      Q  Now, where he you spoke to June Hess and

19  Mr. Eiselt, they told you about this ride in the

20  cab from the riverboat casino to the Red Roof Inn

21  in Joliet, did they not?

22      MR. FORD:  Objection to the form of the

23  question, foundation.

24      THE COURT:  I'm going to sustain.

1        MR. SOROSKY:

2        Q   On October 13, 1992, in the evening

3  hours, when you went to the home of June Eiselt

4  and Mr. Hess, you interviewed both of them, did

5  you not?

6        A   Yes.

7        Q   And without getting into specifically

8  what each of them may have said, you interviewed

9  them both jointly, did you not, the first time?

10       A   Yes.

11       Q   And like I said, I don't mean to hold you

12  to what each person said, but if I could use the

13  phrase they, they told you that they were in

14  Joliet on Friday, October 9, 1992, did they not?

15       A   Yes.

16       Q   And they told you that at around

17  approximately 2:30 PM, they were waiting at the

18  the entrance or exit of a riverboat casino for a

19  cab, did they not?

20       A   Yes.

21       Q   And it was at this time on October 13,

22  1992, they told you that on October 9, 1992, at

23  approximately 2:30, this cab pulled up with a

24  black woman in it and that the black woman got in

1    the front seat and they got in the back seat and

2    June Eiselt handed this woman a train schedule and

3    the cab went on to the Red Roof Inn but prior to

4    reaching the Red Roof Inn, the gentleman, Mr.

5    Eiselt stopped for some alcohol and the black

6    woman spoke about having to be at O'Hare, this is

7    when you found out all this information, was it

8    not?

9        MR. FORD:  Objection.

10        THE COURT:  Overruled.

11        A   Yes, basically, something was said that

12    wasn't quite correct.  The black woman they spoke

13    of is the one that handed the train schedule to

14    Miss Hess.

15        Q   So, you were armed with this information

16    from Miss Hess and Mr. Eiselt when you and your

17    fellow officers began to interview Jeri Lindsey,

18    were you not?

19        A   Yes.

20        Q   Now, your first conversation with Jeri

21    Lindsey was at her house, was the it not?

22        A   Yes.

23        Q   And this would have been on October 14,

24    1992, Wednesday morning, around 11 AM?

1          A    That is correct.

2          Q    And she said she was in Joliet, she was

3    assaulted by a cab driver in a red and white cab

4    and she had injured the cab driver with a knife,

5    did she not?

6          A    She did not say that at that time, no.

7          Q    When did she say that?

8          A    She said that once we were arrived in

9    Area 5.

10         Q    That would have been her first statement

11   to you, is that correct?

12         A    Other than general talk, yes.

13         Q    Now, the injured cab driver was not in

14   fact wounded by a knife, was he?

15         A    No.

16         Q    Or excuse me, the deceased in this case

17   was not wounded by a knife, was he?

18         A    No.

19         Q    Now, the next thing you did was take

20   photographs and fingerprints of Miss Lindsey, did

21   you not?

22         A    That was done before we arrived at Area

23   5.

24         Q    And when you took photographs and

1    fingerprints of -- strike that.  When you took the

2    fingerprints of Miss Lindsey, the police

3    department still had custody of the taxicab in

4    which the deceased was found at the time?

5        A  Yes.

6        Q  And the police department certainly had

7    custody of the Metra train schedule, did it not?

8        A  Yes.

9        Q  And the police department had custody of

10   the parking ticket stub, did it not?

11       A  Yes.

12       Q  Now, you took a Polaroid photo of Miss

13   Lindsey for purposes of doing a photo show up, did

14   you not?

15       A  Yes.

16       Q  Now, did you remove the ring from Miss

17   Lindsey's -- excuse me, did you remove the ring

18   from Miss Lindsey's nose prior to the photograph

19   or did other police do that, if you know?

20       MR. FORD:  Objection.

21       THE COURT:  Sustained.

22       MR. SOROSKY:

23       Q  Did you remove the ring from Miss

24   Lindsey's nose?

1          MR. FORD:  Objection.

2          THE COURT:  Sustained.  I don't know of any

3    evidence of a ring.  Perhaps it's in the

4    photographs but I haven't seen the photographs

5    yet.

6          MR. SOROSKY:

7          Q   When you picked up Miss Lindsey, did she

8    have a ring in her nose or don't you remember?

9          A   I don't remember.

10         Q   And it's standard police procedure that

11   whenever any detainee or arrestee is put in the

12   lock up, that all jewelry is removed from the

13   person of that detainee, is it not or arrestee, is

14   it not?

15         MR. FORD:  Objection.

16         THE COURT:  Overruled.

17         MR. SOROSKY:

18         Q   By jewelry I mean earrings, rings, the

19   normal type of jewelry that someone might --

20   wristwatch, normal type of jewelry that someone

21   might be wearing, isn't it normal police procedure

22   to remove those items from the arrestee?

23         A   Having never worked a lock up, in any

24   capacity, I couldn't answer that for sure.

1       Q  Well for how many years have you been a

2  police officer?

3       A  Eighteen.

4       Q  Based on your knowledge of 18 years of

5  being a policeman, is that not normal procedure of

6  the Chicago Police Department to remove the

7  ordinary jewelry, rings, wristwatches, earrings,

8  items of that nature from an arrestee or detainee

9  if that person is put in the lock up?

10      MR. FORD:  Objection.

11      THE COURT:  Overruled.

12       A  I believe it is, but I can't say for sure

13  how far they go with that.

14       Q  When you showed Miss Eiselt and -- excuse

15  me, when you showed Mr. Eiselt and Miss Hess this

16  photo array, there were other photographs, there

17  were other Polaroid photographs, where were those

18  other Polaroid photographs obtained if you know?

19       A  Those were obtained from our collection

20  of photographs.  We save photograph for just that

21  purpose.

22       Q  So, somewhere along the line these were

23  other arrestees?

24       A  Or witnesses, someone had who had come in

1    contact with us.

2        Q   Now, when you interviewed the duo that

3    has been referred to as the elderly couple, June

4    Hess and Mr. Eiselt on October 13, 1992 at their

5    home, in the evening hours, you asked them for a

6    description of this black woman that was in the

7    cab, is that correct?

8        A   Yes.

9        Q   And they gave you a description, did you

10   not -- did they not?

11       A   Yes, they did.

12       Q   And once again, this was a joint

13   description with both of the people putting their

14   input into that description, isn't that correct?

15       A   Yes, that would be correct.

16       Q   And you wrote that description in your

17   police report, did you not?

18       A   Yes.  I believe so.

19       Q   And eliminating clothing, eliminating

20   that form of the description, the description June

21   Hess and Mr. Eiselt gave you was a female black in

22   her twenties, 5-2 to 5-4, 130 to 140 pounds, would

23   that be correct?

24       A   Yes, I believe they also gave a hair

1    description.

2        Q    And the hair description would be

3    straight hair combed to the left side, is that

4    correct?

5        A    Yes, I do believe so.

6        Q    But you first sought the defendant

7    October 14, 1992, is that correct?

8        A    That is correct.

9        Q    And June Hess and Mr. Eiselt allegedly

10   saw the defendant on October 9, 1992, isn't that

11   correct. Yes.

12       Q    And based on your experience as a police

13   officer, within 4 days, a woman could certainly

14   change her clothing and hair style, could she not?

15       MR. FORD:  Objection.

16       THE COURT:  Overruled.

17       A    Yes.

18       MR. SOROSKY:

19       Q    But certainly one's age and weight and

20   height would not be subjected to change within

21   four days the way a hair style and clothing would

22   be, is that correct?

23       MR. FORD:  Objection.

24       THE COURT:  Overruled.

1          A   That would be correct.

2          MR. FORD:   Just one moment, Judge.

3          THE COURT:   Yes.

4          MR. SOROSKY:

5          Q   Now, I'll show you what has been marked

6    People's Exhibit number 4 and 7 for

7    identification.  And ask you to look --

8          THE COURT:   I think they're in evidence are

9    they not?

10         MR. FORD:   I haven't moved the photographs

11   yet, Judge.

12         THE COURT:   Okay.

13         MR. SOROSKY:   We have no objection to these

14   being in evidence but for the record they're

15   People's Exhibits 4 and 7 for identification.

16         THE COURT:   All right.  Mr. Sorosky.

17         MR. SOROSKY:

18         Q   And exhibit 7 for identification would

19   comonly be referred to as a photo of a line up, is

20   that correct?

21         A   Yes, that is correct.

22         Q   And that contained Jeri Lindsey as one of

23   the people in the line up, does it not?

24         A   Yes, it does.

1      Q   And exhibit 4 would be a photograph of

2   the defendant, would it not?

3      A   That is correct.

4      Q   And both of these photographs were taken

5   by the police department, were they not?

6      A   Yes.

7      Q   And these photographs were taken on

8   either October 14th or 15th of 1992, were they

9   not?

10     A   I believe it was the 15th.

11     Q   And during the course of your --- now,

12   the police department never weighed Jeri Lindsey,

13   did they?

14         MR. FORD:  Objection.

15         THE COURT:  Sustained.

16         MR. SOROSKY:

17     Q   Did you ever make any effort to weigh

18   Miss Lindsey after she was in police custody?

19     A   No.

20     Q   Do you know of any attempt made by the

21   police department to weigh her?

22     A   No, I don't.

23     Q   Now during the course of your 18 years as

24   a police detective, you have had occasion at times

T 49

1   to give descriptions of people, have you not?

2       A   Yes.

3       Q   Yes. Yes.

4       Q   You have been called upon to give

5   descriptions of people?

6       A   I have not very often, I would normally

7   then accepting those descriptions.

8       Q   As a result of 18 years of accepting

9   descriptions of people, have you gained some

10  knowledge upon seeing someone and being able to

11  determine that person's height and or weight?

12      MR. FORD:  Objection.

13      THE COURT:  Overruled.

14      A   I have some perception of that.

15      Q   And as you look at exhibit 7 for

16  identification which contains the photograph of

17  Miss Lindsey, does she look like a woman that

18  weighs 130 to 140 pounds or does she look like a

19  woman who weights far in excess of that?

20      MR. FORD:  Objection, Judge.

21      THE COURT:  Sustained.

22      MR. FORD: And secondarily, I believe Mr.

23  Sorosky indicated he had no objection to move them

24  in evidence, I have no objection either, therefore

T 50

1   I would be asking they be moved into evidence.

2       MR. SOROSKY:  Fine.

3       THE COURT:  All right, they will be admitted

4   as People's Exhibit People's Exhibit number 4,

5   People's Exhibit 7 will be admitted in evidence.

6       Counsel, I'm sustaining the objection not

7   because of the question about the officer's

8   ability to estimate weight, that is something that

9   I think is within the kin of general knowledge and

10  not particular as to his expertise but you're

11  asking to do that from some photographs and I'm

12  not sure the photographs provide a sufficient

13  foundation for people to do that.  Now that

14  they're in evidence I can see one of the

15  photographs.  There was a, almost a head shot,

16  head and shoulder shot.

17      MR. SOROSKY:  I was not referring to that.

18      THE COURT:  The other photograph is the line

19  up, that is correct, but again it's a photograph

20  and I don't know, the fact there is a photograph,

21  I don't believe would appear to be substantially,

22  to substantially reduce the ability of one to make

23  a good identification.

24      MR. SOROSKY:  I would like you to ask look

1    at --

2          THE COURT:  Certainly you ask the witness

3    about her weight, when he observed her.  As to

4    various matters, the witness may testify.

5          MR. SOROSKY:  I would ask you to look at

6    exhibit 4 and as the Judge stated that is

7    primarily a head shot of Miss Lindsey, is it not?

8          A   Yes.

9          Q   And that photo depicts Miss Lindsey's

10   nose, does it not?

11         A   Yes, it does.

12         Q   And do you notice anything on Miss

13   Lindsey's nose?

14         MR. FORD:  Objection.

15         THE COURT:  Sustained.  The photograph will

16   speak for itself, it's now in evidence and of

17   course as a photograph, that's something that

18   doesn't require any particular knowledge, indeed

19   it's something that would be apparent to an

20   observer.

21         MR. FORD:  These are in evidence and I'll

22   tender them to the Court.

23         MR. SOROSKY:

24         Q   Do you, officer, remember Jeri Lindsey's

1    weight on the day in particular, October 14th or

2    October 15th, 1992 or what her approximate weight

3    from your observations of her was?

4         A   I can't accurately answer that, no.

5         Q   Do you know if there were -- you had

6    occasion, officer, to see all the photos that the

7    State's Attorney has shown to you and have been

8    marked as either photos for identification or

9    photos in evidence, have you not?

10        A   Yes.

11        Q   And you in fact saw those photos before

12   you testified, did you not?

13        A   No.

14        Q   Well you certainly saw them when you

15   testified?

16        A   Yes.

17        Q   Did you not?

18        A   Yes.

19        Q   And didn't you see them shortly before

20   you testified, in other words today or yesterday,

21   just to go over your testimony with the State's

22   Attorney?

23        A   Not all of them.

24        Q   But do you know of any photographs taken

T 53

1    by the police department of Miss Lindsey other

2    than these that have been either introduced into

3    evidence or marked for identification?

4        MR. FORD:  Objection.

5        THE COURT:  Sustained.

6        Q  You were with Miss Lindsey from the time

7    she was first taken into custody and brought to

8    11th and State, were you not?

9        A  Yes.

10       Q  And I believe you testified that all the

11   Polaroid pictures which have been marked for

12   identification or at least the one Polaroid

13   picture of Miss Lindsey was taken at 11th and

14   State, isn't that correct?

15       A  Yes.

16       Q  Do you know of any other photographs

17   taken of Miss Lindsey at 11th and State that day

18   than the Polaroid picture?

19       A  No.

20       Q  Did you personally participate in the

21   taking of any other pictures other than the

22   Polaroid pictures?

23       MR. FORD:  Objection.

24       THE COURT:  Overruled.

1          A   No.

2          MR. SOROSKY:

3          Q   Did you order Miss Lindsey photographed

4     other than in the Polaroid picture? A ?

5          MR. FORD:  Objection.

6          THE COURT: Overruled.

7          A   At what point?

8          Q   At 11th and State, at her first visit to

9     11th and State?

10         A   No.

11         Q   How long was she at 11th and State,

12    about, approximately?

13         A   It would be my estimation to be about 45

14    minutes.

15         Q   Now after Miss Lindsey told you that she

16    had been in Joliet and assaulted by this cab

17    driver and that she wounded him with a knife, she

18    gave different stories, did she not?

19         A   Yes.

20         Q   Every different story that she gave was

21    preceded by conversation between a police officer

22    and her, was it not?

23         MR. FORD:  Objection.

24         THE COURT:  Overruled.

T 55

1          A   There was --

2      MR. SOROSKY:

3          Q   I think that calls for a yes or no

4      answer, Officer.

5          MR. FORD:  Objection to that, Judge.

6          THE COURT:  Yeah.  I'm going to sustain that

7      objection because you know it may be some, may be

8      part.  If you're asking him a compound question

9      that he can't answer, sometimes you can't answer

10     yes or no.

11         MR. SOROSKY:

12         Q   If I may ask this question by way of

13     example because I'm not a good enough lawyer to

14     ask any other way.  Was there ever a situation

15     where Miss Lindsey said I was raped by a cab

16     driver and then the questioning stopped and then

17     Miss Lindsey called you back and said you know,

18     officer, I want to change that, I wasn't raped by

19     a cab driver?

20         MR. FORD:  Objection.

21         MR. SOROSKY:

22         Q   Was there ever a change of story by Miss

23     Lindsey as I've described without conversation and

24     comment on Miss Lindsey's story by a police

1    officer and I think that calls for a yes or no

2    answer, Judge.

3          MR. FORD:  Objection.

4          THE COURT:  Overruled.

5          A  As to a yes or no, answer Judge.

6          THE COURT:  I don't know if you can answer

7    yes or no, you know, you're saying yes but there

8    are several conversations, might have been a no,

9    yes, yes, might have been no, never, but then it

10   might have been any combination of those, but to

11   ask for a yes or no answer.

12         MR. SOROSKY:  Can you answer that.

13         THE COURT:  I will have to sustain the

14   objection because it's really a compound question.

15         MR. SOROSKY:

16         Q  Did Miss Lindsey ever change her story

17   without prior conversation between she and the

18   police ever?

19         A  There was a conversation back and forth

20   in a constant manner.  I don't know how to answer

21   your question, counsel.

22         Q  Would it be accurate to say that whenever

23   Miss Lindsey gave a series of events, there was

24   conversational intercourse thereafter between Miss

1    Lindsey and the police department concerning her

2    version of the events and thereafter Miss Lindsey

3    gave a different version of events, would that be

4    an accurate statement?

5         MR. FORD:  Objection.

6         THE COURT:  Overruled.

7         A   I do not understand your question,

8    counsel.

9         MR. SOROSKY:

10        Q   Well Miss Lindsey first told you, I was

11   in Joliet, I was accosted by a cab driver in a red

12   and white cab and I injured that cab driver with a

13   knife, is that correct?

14        A   That is correct.

15        Q   She then changed her story, right?

16        A   Yes.

17        Q   When did you say to her before she

18   changed her story?

19        A   I told her that there were two witnesses

20   that identified her inside the Circle cab on the

21   day that he was killed.

22        Q   So then there was a certain conversation

23   between you and her which then caused Miss Lindsey

24   to change -- there was a certain conversation

T 58

1    between you and her after her first story and

2    between her second story, is that correct?

3          MR. FORD:  Objection.

4          THE COURT:  Overruled.

5          MR. SOROSKY:

6          Q   Isn't that correct?

7          A   Yes, at that point, this was.

8          Q   And when you told her that there were two

9    witnesses that saw her in a cab, what did she say

10   thereafter?

11         MR. FORD:  Objection.

12         THE COURT: Sustained.

13         MR. SOROSKY:

14         Q   Is there anything else you told her?

15         MR. FORD:  Objection to the form of the

16   question.

17         THE COURT:  Sustained.

18         MR. SOROSKY:

19         Q   At the time that you told Miss Lindsey

20   that there were 2 witnesses that saw her in a cab,

21   what time did you tell Miss Lindsey that 2

22   witnesses said they saw her in a cab?

23         A   The question again, counsel.

24         Q   What time, what time and where did you

1    tell Miss Lindsey you saw her or what time and

2    place, at what time and at what place did you tell

3    Miss Lindsey that there were 2 witnesses who saw

4    her in the cab?

5         A   It --

6         Q   Approximately?

7         A   It would have been approximately 1:30 in

8    the afternoon at Area 5 on the 14th of October.

9         Q   Anything else you told her at this time?

10        A   We told her that we did not believe her

11   original rape story.

12        Q   What did she say then?

13        A   She stated that she made up the entire

14   story and she knew nothing about any murder and

15   she was never in Joliet and she was never in a

16   cab.

17        Q   Did they tell you why she made it up?

18        A   Yes.  She stated that she made it up

19   because she was away too long from her lover,

20   Irene, Irene Quiros and that she feared that she

21   would be mad at her.

22        Q   Did the police -- did you ever conduct

23   any investigation as to whether she was, whether

24   Irene Quiros was her lover, or any other of the

1    substantive matters that Miss Lindsey said at that

2    time?

3         A   Yes.

4         Q   And did that investigation reveal that

5    Irene Quiroz and Jeri Lindsey were in fact lovers,

6    to the best of your knowledge?

7         A   That's what I understood, yes.

8         Q   Did you ever ask Miss Lindsey where she

9    was at or who she was with for this period of time

10   she was away?

11        A   To some extent.

12        Q   And what did Miss Lindsey tell you?

13        A   She stated that -- at which point,

14   counsel?

15        MR. SOROSKY:  No, at this time.  At this

16   time. At that time, yes.

17        Q   Yes?

18        A   No.

19        Q   No you didn't hear or no, she didn't say

20   anything,?

21        A   She didn't.

22        Q   After she told you that she didn't commit

23   this -- that she wasn't in Joliet, that she wasn't

24   raped, she just made up the story because she

T 61

1    needed an excuse to explain her absence from her

2    lover, although you confirmed that she in fact had

3    Irene Quiros as a lover, you didn't do any further

4    investigation of her stpru at this time, is that

5    correct?

6          A   Not at that point.

7          Q   And that statement Miss Lindsey gave was

8    a version of her innocence, was it not?

9          MR. FORD:   Objection.

10         THE COURT:   Sustained.

11         MR. SOROSKY:

12         Q   And you did nothing to -- was this last

13   statement given to you at 11th and State or Area

14   5, the one we just related to where she said I

15   wasn't in the cab, I made up the story to explain

16   away my absence from my lover?

17         A   At Area 5.

18         Q   I believe you testified that Miss

19   Lindsey's next version of events was that a cab

20   driver tried -- that the cab driver tried to rape

21   here and she shot him, is that correct?

22         A   That is correct.

23         Q   Now immediately, just immediately

24   preceding that, there was conversation between you

T 62

1    and Miss Lindsey prior to her saying a cab driver

2    tried to rape her and she shot him, wasn't there?

3        A   Yes.

4        Q   And was there any conversation by you or

5    or other police officers in your presence to the

6    effect that you know, this cab driver, a rapist

7    and lot of women are getting off on these charges

8    when they say that they were raped by a cab driver

9    and -- was there any conversation along those

10   lines, not those specific words, by you or other

11   police officers in your presence before Miss

12   Lindsey said that she was in the cab with the cab

13   driver and he raped her and she shot him?

14       A   No.

15       MR. FORD:  Objection.

16       THE COURT:  Sustained.

17       THE COURT:  Mr. Sorosky, one of the problems

18   you have with some of these long rather rambling

19   type of questions which are really compound

20   questions and become difficult if not impossible

21   to answer because they are compound and they are

22   long and rambling.

23       MR. SOROSKY:

24       Q   Was there ever a statement by the police

T 63

1    to Miss Lindsey prior to Miss Lindsey saying that

2    the cab driver tried to rape her and shot her, it

3    might be in Miss Lindsey's best interests to say

4    she was in the cab?

5            MR. FORD:  Objection.

6            THE COURT:  Sustained.

7            MR. SOROSKY:

8        Q  Was there of any conversation or comment

9    by you to Miss Lindsey that she would be better

10   off if she said she was in the cab and that she

11   shot him in self-defense after the attempted rape?

12           MR. FORD:  Objection.

13           THE COURT:  Overruled.

14       A  No.

15           MR. SOROSKY:

16       Q  Now, Miss Lindsey then proceeded to make

17   a number of other statements, did she not, after

18   her statement that she was in the cab driver --

19   she was in the cab and the cab driver tried to

20   rape her and she shot him, she made about 2 or 3

21   or 4 statements thereafter, did she not?

22       A   There were a number of different

23   versions, yes.

24       Q   And each version was different than the

1    prior one, was it not?

2        A   Yes, if not somewhat -- somewhat, in some

3    fashion it was different, yes.

4        Q   And you related those differences in your

5    direct examination, did you not?

6        A   Yes.

7        Q   And I believe you testified that after

8    Miss Lindsey told you that she was not in the cab

9    and that she made up this rape story, -- strike

10   that.  After Miss Lindsey told you that she was

11   not in the cab and that she made up this rape

12   story, you told Miss Lindsey 2 people saw you in

13   the cab, didn't you?

14       A   I told her that before she said that.

15   Might have mentioned it again.

16       Q   Miss Lindsey told you that she was not in

17   the cab and that she made up this rape story at

18   one point, did she not?

19       A   Yes.

20       Q   You then told Miss Lindsey that can't be

21   true, because 2 people saw you in the cab, right,

22   and they've identified your photograph, correct?

23       A   Something to that effect.

24       Q   So you did inform Miss Lindsey about the

1    fact that 2 people saw her in the cab, correct?

2        A   Yes.

3        Q   Now a little later in the evening, didn't

4    you tell Miss Lindsey that these 2 people were an

5    elderly couple, that they had -- and that she had

6    given them a train schedule and her here

7    fingerprints were on the train schedule?

8        A   No.

9        Q   Now, you have been a detective for 18

10   years, have you not?

11       A   14.

12       Q   14?

13       A   Yes.

14       Q   And you have been involved in the

15   charging of hundreds of people, have you not?

16       A   Yes.

17       Q   So you knew that unless Miss Lindsey

18   confessed to this charge, she would not be charged

19   with murder, didn't you?

20       MR. FORD:   Objection.

21       THE COURT:   Sustained.

22       MR. SOROSKY:

23       Q   Did you ever have any conversations with

24   the State's Attorney concerning the facts that if

T 66

1    Miss Lindsey did not confess, she wouldn't be

2    charged?

3          MR. FORD:  Objection.

4          THE COURT:  Sustained.

5          MR. SOROSKY:

6          Q  Now, you believed Miss Lindsey lied when

7    she made her original rape complaint, don't you?

8          MR. FORD:  Objection.

9          THE COURT:  Sustained.

10         MR. SOROSKY:  Nothing further from this

11   officer.

12         THE COURT:  Redirect.

13         MR. FORD:  Very briefly, Judge.

14               REDIRECT EXAMINATION

15                     BY

16               MR. FORD:

17         Q  Officer Bogucki, you were there when they

18   processed the cab at the scene in the garage, is

19   that correct?

20         A  Yes.

21         Q  Now, were you aware of whether or not any

22   lifts at all were recovered from within or on the

23   cab itself, fingerprint lifts?

24         A  I'm aware of one lift.

T 67

1      Q   The only one recovered, correct?

2      A   Yes.

3          MR. SOROSKY:  Objection to that.  It's

4      outside the scope.

5          THE COURT:  Sustained.

6          MR. FORD:  Actually Judge he did make

7      inquiry as to whether or not certain aspects very

8      early on in the lengthy cross examination relative

9      to fingerprints.

10         THE COURT:  No he didn't, he didn't ask

11     about fingerprints in the cab.

12         MR. FORD:  May I proceed then Judge.

13         THE COURT:  Proceed.  Sustaining the

14     objection.

15         MR. FORD:  I understand that Judge.

16     Q   When you -- after this case was completed

17     you prepared an arrest report for Miss Lindsey?

18     A   Yes.

19     Q   And at that time, did you ask her what

20     her height was?

21     A   Yes.

22     Q   And what did she indicate to you her

23     height was?

24     A   I would have to have something to refresh

1    my memory.

2         Q   Would your arrest report itself, the

3    arrest report --

4         MR. SOROSKY:   I have no objection to the

5    State's Attorney reading that one thing.

6         MR. FORD:

7         Q   Did she indicate to you her height was 5

8    foot 5 inches tall?

9         A   I believe that's what it was.

10        Q   And did she indicate to you what her

11   weight was during the course of the preparation of

12   the arrest report?

13        A   She did.

14        Q    What did she indicate her weight was?

15        A   I don't recall exactly what she

16   indicated.

17        Q   Did she indicate to you her weight was

18   150 pounds.

19        A   If that's what it says there, yes.

20        Q   Now, at the time you picked her up at her

21   home at 8931 South Houston on the date that you

22   first came into contact with her, was her hair

23   straight as it is here in Court today?

24        A   No.

T 69

1      Q  Her hair was straight however, it was

2  straight, was it not, it had been relaxed, it

3  wasn't an afro, right?

4      A  Well I don't exactly know what -- how

5  straight is straight or --

6      MR. FORD:  Okay, no further questions,

7  Judge.

8      THE COURT:  Recross.

9      MR. SOROSKY:  No.

10     THE COURT:  Thank you, you're excused.

11     THE COURT:  I'm going to take a 5 minute

12  recess.

13              (Witness excused.)

14     THE COURT:  People versus Jeri Lindsey.

15        The record should reflect the

16  defendant is present, Jeri Lindsey, is present in

17  her own person through counsel, state is present

18  through its counsel.

19     MR. FORD:  I would ask leave of Court to

20  call Miss Rita Bennett, Judge.

21              (Witness affirmed).

22     THE COURT:  Please be seated:  Counsel.

23     MR. FORD:  Thank you, Judge.

24

1                    RITA BENNETT,

2    called as a witness on behalf of the People of the

3    State of Illinois, having been first duly

4    affirmed, was examined and testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MR. FORD:

8         Q   Ma'am, would you state your name,

9    spelling your last name for the Court and speaking

10   loudly so everyone here today can hear you?

11        A   Rita Bennett, B-e-n-n-e-t-t.

12        Q   Miss Bennett, you live here in the City

13   of Chicago, don't you?

14        A   Yes.

15        Q   And you're employed, is that correct?

16        A   Am I employed?

17        Q   Do you work?

18        A   Yes.

19        Q   Now Miss Bennett, I want to direct your

20   attention now to the period of time in October of

21   1992, at that time, were you married?

22        A   Yes.

23        Q   What was your husband's name?

24        A   Rudolph Bennett.

1       Q   How long had you and Mr. Bennett been

2   married in the month of October, 1992?

3       A   A couple of years.

4       Q   And did you and your husband work at that

5   time?

6       A   Yes.

7       Q   What did you and your husband do for a

8   living back in October of 1992?

9       A   We had a cab company in Joliet.

10      THE COURT:  Ma'am, I'm sorry but I can't

11  hear you.

12      A   We had a cab company in Joliet.

13      Q   What was the name of the cab company that

14  you and your husband owned?

15      A   Circle Cab.

16      Q   And you said that was located in Joliet?

17      A   Yes, sir.

18      Q   What was the business address of the

19  Circle Cab Company in Joliet during that period of

20  time?

21      A   232 East Cass.

22      Q   And that's in the City of Joliet itself?

23      A   Yes.

24      Q   And -- how many taxi cabs did you and

1    your husband operate through your business?

2         A   About 4 at that time.

3         Q   What did you normally do within the

4    business itself to assist in the business?

5         A   I was a dispatcher.

6         Q   And what did your husband do in

7    connection with the operation of the business?

8         A   Well he worked on the cars, he drove

9    sometimes.

10        Q   Miss Bennett, I want to direct your

11   attention to the date of October 9, 1992, do you

12   recall that date?

13        A   Yes.

14        Q   Were you working at the Circle Cab

15   Company in Joliet as a dispatcher on October 9,

16   1992?

17        A   Yes.

18        Q   What was your husband doing in connection

19   with the operation of the business on that date?

20        A   Well earlier in the morning, he had been

21   working on some cars and I stopped him to go to

22   the bank for me and he went to the bank and then

23   when he came out of the bank he went to pick up a

24   fare.

1          Q   Now Miss Bennett, do you remember

2     approximately the last time that you saw your

3     husband, Rudolph Bennett?

4          A   Yes.

5          Q   What time would that have been on October

6     9, 1992?

7          A   I'd say around 12:30 in the afternoon.

8          Q   And can you describe his health and

9     appearance to his Honor, Judge Singer at that

10    time?

11         A   Yes, he was in good health.

12         Q   Now he went out to do some errands in

13    connection with the business?

14         A   Yes.  I had sent him to the bank to make

15    a deposit.

16         Q   Did you continue your work as a

17    dispatcher during the period of time he was away?

18         A   Yes.

19         Q   What happened after he had gone to the

20    bank?

21         A   Well when he came out of the bank, he

22    radioed in, we were kind of busy that day and he

23    radioed in and asked if there was anything he

24    could pick up and I told him there was a fare at

T 74

1    the Empress, in fact there were two fares at the

2    Empress.

3        MR. SOROSKY:  Objection.

4        THE COURT:  Why?

5        MR. SOROSKY:  Well his comments, I mean her

6    comment per se is not hearsay, but her stating --

7        THE COURT:  As to her statement that there

8    was a fare at the Empress, overrule that objection

9    but I'll strike the further statement in fact

10   there were two fares there.

11       MR. SOROSKY:  But your Honor, the only way

12   that statement is meaningful is based upon her

13   prior conversation with her late husband as

14   hearsay.

15       THE COURT:  Well, she told her husband there

16   were fares.  Now, in any event, it's simply, it

17   simply explains why he went to the location he

18   did.  In short, I'm accepting the testimony as the

19   reason why the decedent went to the location of

20   the Empress.  Overrule that objection.

21       MR. SOROSKY: Yes, okay.

22       THE COURT:  I can't hear you.

23       MR. SOROSKY:  For the record we would object

24   and say it's hearsay and a derivative of hearsay.

T 75

1          THE COURT:  You already have.

2          MR. FORD:  May I proceed your Honor?

3          THE COURT:  Yes.

4          MR. FORD:

5          Q   Now Miss Bennett, about what time did you

6     have this conversation with your husband?

7          A   I'd say around 1:30, maybe 1:30, 2

8     o'clock, somewhere in there.

9          Q   After that, did you ever have any further

10    conversation with your husband?

11         A   Yes.  I talked to him once he got to the

12    Empress, I radioed him to see if he had the fare

13    and to also let him know that to make sure he did

14    not forget the other fare, there were two calls

15    and that he had 2 fares and he said yes, he had

16    both.

17         Q   After he told you that, what did you say

18    to him?

19         A   I asked him where he was going and he

20    told me to O'Hare.

21         Q   Did you say anything to him after he told

22    you that?

23         A   I asked him --

24         MR. SOROSKY:  Objection, to going to O'Hare

1    as hearsay.

2            THE COURT:  Sustained as to that.

3            MR. FORD:

4        Q  Did you say anything to your husband

5    after he said that -- after he spoke to you?

6        A  Nothing other than what I just said, I

7    asked him where was he going because I had to put

8    it on the sheet.

9        Q  And now were you aware what taxicab he

10   was using that day?

11       A  Yes.

12       Q  What was the license plate number of the

13   taxicab he was using on October 9, 1992?

14       A  10488 TX.

15       Q  And that was an Illinois license plate?

16           THE COURT:  Say that again?

17       A  10488 TX.

18       Q  That was an Illinois license plate?

19       A  Taxi plate.

20       Q  After the initial conversation, did you

21   ever have another conversation with your husband?

22       A  After he had been gone for a little

23   while, I radioed in to see where he was and what

24   he was doing and he said he was on his way to

1    O'Hare and he said I love you.

2        MR. SOROSKY:  Objection.

3        THE COURT:  Sustained.

4        MR. FORD:

5        Q   Now, Miss Bennett, to your knowledge at

6    the time this happened, did your husband have his

7    wallet with him?

8        A   Yes.

9        THE COURT:  Mr. Riley, could we -- Mr.

10   Riley:  Would some water help you?

11       A   Yes.

12       MR. SOROSKY:  Your Honor, we would object to

13   that question, she would only know if he had his

14   wallet if he told her.

15       THE COURT:  Well I'm sorry, could you get us

16   a cup of water for the witness.

17       THE CLERK:  Sure.

18       THE COURT:  The witness is physically upset,

19   I'm trying to calm her so we can continue with the

20   case.

21       MR. FORD:

22       Q   Would it be okay if I proceed?

23       A   Yes.

24       Q   Miss Bennett the cab company owned the

T 78

1    taxicab your husband was using that day, is that

2    correct?

3        A   Yes.

4        Q   I would like to show you what I just

5    marked People's Exhibit number 26 for

6    identification:  Go ahead and take a moment police

7    Bennett if you would and examine what I'm just

8    showing you People's Exhibit number 26 for

9    identification.  Do you recognize the registration

10   document, certified registration?

11       MR. SOROSKY:  We'll stipulate to all of that

12   material.

13       MR. FORD:  This is a self-authenticating

14   certified registration for the taxicab in question

15   here Judge, under the license plate 10488 TX owned

16   by the Circle Cab Company in Joliet Illinois.

17       MR. SOROSKY:  So stipulate.

18       MR. FORD:  I would ask it identification

19   marks be stricken from that and it be moved into

20   evidence at this time Judge.

21       THE COURT:  Any objection.

22       MR. SOROSKY:  No objection.

23       THE COURT:  It will be admitted in evidence.

24       MR. FORD:

1          Q    Miss Bennett, I would now like to show

2     you what has been previously marked People's

3     Exhibit number 10 for identification and I'll ask

4     you if you recognize what is depicted in that

5     photograph?

6          A    Yes, it's our taxi.

7          Q    Is that in fact the taxi that your

8     husband was using on October 9, 1992?

9          A    Yes.

10         MR. SOROSKY:    We stipulate she would

11    identify the deceased as her husband, your Honor.

12         MR. FORD:    At this time there would be a

13    stipulation that if I were to show Miss Bennett

14    People's Exhibit number of 6 for identification,

15    she would identify it as the photograph of her

16    husband, Rudolph Bennett taken after he had died

17    and it is in fact her husband.

18         THE COURT:    So stipulated?

19         MR. SOROSKY:    So stipulated.

20         MR. FORD:    There would be a second

21    stipulation if I were to show Miss Bennett

22    People's Exhibits number 5 and 23 for

23    identification, she would identify both of those

24    photographs as photographs taken of her husband,

1    Rudolph Bennett after he died.

2           MR. SOROSKY:  So stipulated.

3           MR. FORD:  If I could have just a moment,

4    Judge.

5           THE COURT:  Yes.

6           MR. FORD:

7           Q   Ma'am I would like to direct your

8    attention to the period of time after the cab had

9    been located, do you remember when that was?

10          A   Monday night is when I got a call.

11          Q   Would that have been on Monday October

12   12, 1992?

13          A   Yes.

14          Q   The next time you saw your husband he was

15   dead, is that correct Ma'am?

16          A   Yes.

17          MR. FORD:  No further questions, Judge.

18          THE COURT:  Cross.

19          MR. SOROSKY:  No questions of Miss Bennett.

20          THE COURT:  Thank you Ma'am, you're excused.

21                        (Witness excused.)

22          MR. FORD:  I would ask leave of Court of

23   Miss Bennett to remain within the courtroom.

24          THE COURT:  Yes, if you wish please take a

1   seat in the courtroom, why don't you stay on the

2   left as you go out.

3          Call your next witness.

4       MR. FORD:  At this time, your Honor, there

5   would be a stipulation.  If I may confer with

6   counsel briefly, Judge.

7          Your Honor at this time there would be a

8   stipulation that if we were to proceed with the

9   next witness it would be Mr. Robert H> Kirschner,

10  M.D., deputy chief medical examiner of the Cook

11  County Medical Examiner's Office.  There would be

12  a stipulation that Doctor Kirschner would be found

13  by this Court to be an expert in the area of

14  forensic pathology.  Having done the course work

15  and advanced study necessary to establish that

16  expertise.

17          Doctor Kirschner would testify that

18  on October 13, 1992, he had occasion to examine

19  the body of Rudolph Bennett, he would indicate was

20  a male African American age 50, there would be a

21  further stipulation that the medical examiner's

22  office of Cook County assigned a medical examiner

23  number of 218 October of 1992 to this case.

24          There would be a second stipulation,

1    Judge, that Rudolph Bennett the victim in this

2    case died as a result of multiple gunshot wounds

3    he suffered severe internal injury which caused

4    his death and that the manner of death was

5    homicide.  His pathological diagnosis, a

6    stipulation his diagnosis would be a gunshot wound

7    to the shoulder penetrating the spinal column,

8    transection of the upper Thorasic spinal cord and

9    gunshot wounds 2 of the chest with injury to the

10   right lung, liver, pancreas and left kidney and

11   there would be a further stipulation that there

12   was a hemorrhage within the victim's body at the

13   time of his death.

14              At this time, Judge, having marked

15   the actual protocol which is a self-authenticating

16   document as People's Exhibit number 27 for

17   identification, I would ask that the

18   identification marks be stricken and the protocol

19   of the postmortem examination of Rudolph Bennett

20   the victim in this case be moved into evidence.

21        THE COURT:  Mr. Sorosky, are you

22   stipulating.

23        MR. SOROSKY:  Yes, we stipulate to that,

24   yes, so stipulated.

1        THE COURT:  Any objection to the admission.

2        MR. SOROSKY:  No objection.

3        THE COURT:  That will be admitted in

4    evidence as People's Exhibit number 27.

5        MR. FORD:  Judge, at this time then, we

6    would have a motion to admit the evidence that

7    we've already had identified by this Court within

8    our exhibit list number 1 through 26 inclusive

9    with the exception of those items that have

10   already been admitted which are I believe numbers

11   4, 7, 26--.  We would ask the identification marks

12   be stricken from all those that have not been

13   previously admitted and those items be moved into

14   evidence.

15       THE COURT:  Any objection.

16       MR. SOROSKY:  No.

17       THE COURT:  They will be admitted in

18   evidence and marked now in evidence.

19       MR. FORD:  With that we rest, Judge.

20       MR. SOROSKY:  Your Honor, the defendant asks

21   for a directed finding of not guilty on all

22   counts.

23       THE COURT:  Motion denied.

24       MR. SOROSKY:  Specifically if the Court

1    would look at the felony murder, if we accept the

2    defendant's statement as gospel, her last

3    statement as the gospel truth which the State is

4    asking you to do, it's apparent that the defendant

5    got into some argument and struggle with the

6    victim and that the shooting occurred and that

7    there was no attempt on the part of the defendant

8    to rob anyone or commit armed robbery or anything

9    of that nature.

10           THE COURT:  Counsel,.

11           MR. SOROSKY:  And the defendant said she

12   merely as an afterthought took money.

13           THE COURT:  Counsel, I do not have to accept

14   the statement of the defendant as entirely true or

15   for that matter as true in any respect.

16           MR. SOROSKY:  Right.

17           THE COURT:  I can accept parts of the

18   statement and reject other parts of the statement.

19           MR. SOROSKY:  Right.

20           THE COURT:  In my opinion there is

21   sufficient evidence to support both armed robbery

22   and that the shooting occurred.  And also felony

23   murder count.

24           MR. SOROSKY:  All right.

```
 1              THE COURT:  Call your first witness.

 2              MR. SOROSKY:  We'll call our witness now.

 3              THE COURT:  Your first witness has already

 4     been called, this will be your second witness.

 5              MR. SOROSKY:  Right.

 6                      If I could have 30 seconds, your

 7     Honor?

 8              THE COURT:  Yes.

 9                      Would you please rise, Ma'am, to be

10     sworn.

11                              (Witness sworn.)

12              THE COURT:  Please be seated.

13             Mr. Sorosky.

14                     IRENE QUIROZ,

15     called as a witness on behalf of the Defense,

16     having been first duly sworn, was examined and

17     testified as follows:

18                     DIRECT EXAMINATION

19                             BY

20                     MR. SOROSKY:

21         Q   Would you please state your name in full

22     and spell your last name?

23         A   Irene Quiroz, Q-u-i-r-o-z.

24              THE COURT:  Q-u-i -- ?
```

```
 1            A  -- r-o-z.

 2            MR. SOROSKY:

 3            Q  How old are you?

 4            A  34.

 5            Q  And where do you live?

 6            A  8931 South Houston.

 7            Q  Is that in Chicago, Illinois?

 8            A  Chicago, Illinois.

 9            Q  And for how long have you lived at that

10    location approximately?

11            A  Around 2 and a half years.

12            Q  Calling your attention to early October

13    or mid-October of 1992, where did you live at that

14    time?

15            A  8911 -- 8931 South Houston.

16            Q  The same location?

17            A  Yes.

18            Q  And in early October of 1992, who did you

19    live with?

20            A  Jeri Lindsey.

21            Q  And do you see her in the courtroom

22    today?

23            A  Yes, I do.

24            Q  Could you point her out?
```

T 87

1          A   Sitting right there.

2          Q   And at that time, when she and you were

3     living together, were you 2 living together as

4     lesbian lovers?

5          A   Yes, we were.

6          Q   And for how long a period of time had you

7     and the defendant been in this relationship

8     approximately?

9          A   At that time?

10         Q   Yes?

11         A   5 years.

12         Q   And at that time, were you working?

13         A   Yes, I was.

14         Q   Are you still working at the same

15    location?

16         A   Yes, I am.

17         Q   Would you tell his Honor, Judge Singer,

18    the name of the place and where you work and what

19    you do and so forth?

20         A   I work at Polycon Industries.

21         Q   Slow and loud.

22         A   Polycon Industries. And I'm a floor

23    loader, we make plastic containers.

24         Q   And does a Jack St. Clair also work

1    there?

2          A    No, he doesn't.

3          Q    Does a Jerry St. Clair work there?

4          A    No, he doesn't.

5          Q    Do you know I believe it's Jack St.

6    Clair?

7          A    Yes, I do know him.

8          Q    That's the gentleman who previously

9    testified today?

10         A    Yes.

11         MR. FORD:  Objection, Judge.

12         MR. SOROSKY:  That's all I intend to ask on

13   that.

14         THE COURT:  Overruled.

15         MR. SOROSKY:

16         Q    Now, were you with -- were you at the

17   home -- were you and Jeri Lindsey at home on

18   Wednesday, October 14, 1992 when the police came

19   and knocked on your door?

20         A    Yes, I was.

21         Q    And that was at 11 AM in the morning, is

22   that correct?

23         A    Yes, it was.

24         Q    And the police at that time left with

1    Jeri Lindsey, is that correct?

2          A   Yes.

3          Q   And to the best of your knowledge, from

4    that time until today, Jeri Lindsey has been in

5    custody awaiting trial on this case, correct?

6          A   Yes.

7          Q   Now, when Jeri Lindsey left the house

8    that morning with the police, did she have any

9    jewelry on her nose?

10         A   Yes, she did.

11         Q   What did she have?

12         A   A loop earring.

13         Q   And was that earring in her nose as

14   opposed to her ears?

15         A   Pardon me?

16         Q   Well to old fashioned men like myself,

17   women usually wear earrings on their ears.  Was --

18   where was Jeri Lindsey's earring?

19         A   In her nose.

20         Q   And how many earrings did she have in her

21   nose?

22         A   Just one.

23         Q   I show you what has been marked People's

24   Exhibit 4 for identification.

T 90

1          MR. FORD:  In evidence.

2          MR. SOROSKY:  In evidence.  I apologize.

3          MR. FORD:  That is in.

4          MR. SOROSKY:  That is in fact a photograph

5     the police took of Jeri Lindsey shortly after she

6     was in police custody.  I would ask you to look at

7     that photograph and does that depict a true and

8     accurate picture of Jeri Lindsey?

9          A   No.

10         MR. FORD:  Objection.

11         A   She don't have the earring in her nose.

12         THE COURT:  Overruled.

13         MR. SOROSKY:  What?

14         A   She don't have the earring in her nose.

15         MR. SOROSKY:

16         Q   Other than that is that a true and

17    accurate picture of Jeri Lindsey?

18         A   Yes.

19         Q   Is there anything else on Jeri Lindsey's

20    nose that you see?

21         A   A mole.

22         Q   Is that mole very visible when you see

23    Jeri Lindsey in person?

24         A   Yes.

1           MR. FORD:  Objection, Judge.

2           THE COURT:  Sustained.

3           MR. SOROSKY:

4           Q   Whenever you saw Jeri Lindsey, was that

5    mole very visible?

6           A   Yes, it was.

7           MR. FORD:  Objection.

8           THE COURT:  Well, I'll overrule that.

9           MR. SOROSKY:

10          Q   In October of 1992, in all of October of

11   1992, did Jeri Lindsey regularly and always wear

12   this earring in her nose?

13          A   Yes, she did.

14          Q   Do you know for approximately how long

15   she had that earring in her nose, if you do?

16          MR. FORD:  Objection.

17          THE COURT:  Overruled.

18          A   A couple of years.

19          MR. SOROSKY:

20          Q   Did this earring come out when you sleep?

21          A   No, it didn't.

22          Q   Now, shortly after Jeri Lindsey was taken

23   into custody, did you ever have occasion to go to

24   the police station?

1        A   Yes, I did.

2        Q   And did you go to a police station you

3   now know as Chicago police headquarters, Area 5 at

4   approximately Grand and Central in the City of

5   Chicago?

6        A   Yes, I did go there.

7        Q   And could you explain to his Honor, Judge

8   Singer under what circumstances you happened to go

9   to that police station?

10       A   2 detectives had came by the house to

11   pick me up and told me to go with them because

12   they wanted to ask me a couple of questions so I

13   got dressed and went with them.

14       Q   And would this have been approximately a

15   day or so after Jeri Lindsey first left with the

16   police?

17       A   Yes, it was.

18       Q   And did you have conversations with the

19   police at that time?

20       A   Yes, I did.

21       Q   And what did they say to you and what did

22   you say to them?

23       MR. FORD:   Objection, Judge.

24       THE COURT:   Sustained.

1          A   They asked --

2          THE COURT: I sustained the objection.

3          MR. SOROSKY:

4          Q   What was the topic of your conversation,

5      your and Jeri Lindsey's activities on October 9,

6      1992?

7          MR. FORD:  Objection.

8          THE COURT:  Sustained.

9          MR. SOROSKY:  We merely want to show that

10     this woman spoke to the police at that time,

11     that's all about that topic.

12         THE COURT:  All right:  All right, I'll

13     overrule it then.

14         MR. SOROSKY:

15         Q   Now then, a few days later, did you have

16     occasion to come to this building at 26th and

17     California in Chicago, Illinois?

18         A   Yes, I did.

19         Q   And who came with you?

20         A   There was me, my mother, --

21         Q   State your mother's name?

22         A   Emily Quiroz.

23         Q   Spell her first name?

24         A   Amelia, A-m-e-l-i-a.

1       Q  And who else came?

2       A  My brother, Robert Quiroz and his

3  fiance', Dorothy Ramirez.

4       Q  That would be 4 of you, right?

5       A  Yes.

6       Q  And to the best of your knowledge, did

7  you folks go to some office in the Cook County

8  State's Attorney's Office?

9       A  Yes, we did.

10       Q  And there you talked to certain people in

11  the State's Attorney's Office, did you not?

12       A  Yes.

13       Q  All four of you?

14       A  Yes.

15       Q  You folks did, is that correct?

16       A  Yes.

17       Q  And the State's Attorney talked to all 4

18  or someone within the State's Attorney's Office

19  spoke to all four of you folks separately, did

20  they not?

21       A  Yes.

22      MR. FORD:  Objection.

23      THE COURT:  I will overrule it.

24      MR. SOROSKY:

1        Q   And without getting into the substance of

2   the conversation the State's Attorney had with

3   you, was the topic of the conversation your

4   activities with the defendant on October 9, 1992?

5        MR. FORD:  Objection.

6        THE COURT:  Overruled.

7        A   Yes, it was.

8        MR. SOROSKY:

9        Q   And this conversation you had at this

10  building was only 4 or 5 days after October 9,

11  1992, wouldn't that be accurate?

12       MR. FORD:  Objection.

13       THE COURT:  Overruled.

14       A   Yes.

15       MR. SOROSKY:

16       Q   So, shortly after the defendant's arrest,

17  it was the police who asked you to direct your

18  attention to and remember the events of October 9,

19  1992, isn't that correct?

20       A   Yes.

21       Q   Now, would you tell his Honor, Judge

22  Singer, what you did beginning after you woke up

23  on October 9, 1992?

24       A   No, I did not get up, I had got out of

1    work.

2         Q    What time did you get out at work?

3         A    I get out at 8 o'clock in the morning, I

4    work midnights.

5         Q    And where did you go after work?

6         A    I went to go cash my check at the

7    currency exchange.  Then I went home to pick up

8    Jeri Lindsey.  We went to the landlady's house,

9    paid the rent, from there, we went to River Oaks,

10   we went shopping at Ventures.

11        Q    Slow down.  About what time did you get

12   home to pick up Jeri Lindsey approximately?

13        A    Around 8:30.

14        Q    What did you do after 8:30?

15        A    Jeri Lindsey got dressed, we went in a

16   car, went by the landlady's house to pay the rent.

17        Q    And then what did you do after that?

18        A    From there, we went to River Oaks to go

19   pay -- I mean to go shopping.

20        Q    And as best you can recall and remember,

21   approximately what time would you say you arrived

22   at the River Oaks shopping center,

23   approximately?

24        A    I'd say around 9:30 in the morning.

1        Q   And for how long did you remain at the

2   River Oaks shopping center?

3        A   I'd say maybe around an hour because we

4   were looking at all kinds of stuff, shopping for

5   the house.

6        Q   And did you make any -- I'll show you --

7   first let me show you 3 exhibits that I'll mark, I

8   don't know if the defense marked any exhibits

9   before but I have we did, we certainly don't

10  intend to introduce any of any previous, we may

11  have marked a photograph as Defendant's Exhibit.

12       THE COURT:  Why don't you call it

13  Defendant's Exhibit 2 for identification.

14       MR. SOROSKY:  Let's say, I'll mark these

15  defendant 2, defendant 3, defendant 4.  Why don't

16  you just -- why don't you just identify each of

17  these and then we'll take them in their sequence,

18  what is Defendant's Exhibit 2 for identification?

19       A   This is a receipt from Ventures that we

20  had went.

21       MR. FORD:  Objection, Judge.

22       THE COURT:  Yes, I'm going to sustain.  What

23  is the relevancy of this?

24       MR. SOROSKY:  It shows where she was at.

T 98

1          THE COURT:  Yes, but that shows where she

2     was at as I understand it, between the hours of

3     9:30 and 10:30 AM.

4          MR. SOROSKY:  We're just marking these

5     exhibits and we'll go back to the chronological

6     order, that's all.

7          THE COURT:  You know, this is several hours

8     before any of the events that are significant.

9          MR. SOROSKY:  I understand.

10          THE COURT:  Why is this relevant?

11          MR. SOROSKY:  Some of these 2 depict later

12     hours.

13          THE COURT:  Later hours, all right.  All

14     right.

15          MR. SOROSKY:  Okay.

16          Q  Exhibit 2 is a receipt that -- at

17     Venture, is that correct?

18          A  Yes.

19          Q  A receipt from Venture?

20          A  Yes.

21          Q  Did you make the purchases at Venture?

22          A  Yes.

23          Q  And what date and time is indicated on

24     the receipt?

```
 1            A   10-9-92, 16:18.

 2            MR. FORD:  Objection.

 3            THE COURT:  Sustained.

 4            MR. FORD:  I ask the answer be stricken.

 5            THE COURT:  It may be stricken.

 6            MR. SOROSKY:

 7            Q   Was the defendant, Jeri Lindsey, with you

 8     when you made the purchases that are depicted in

 9     this receipt?

10            A   Yes.

11            MR. FORD:  Objection to that.

12            THE COURT:  Well I'll overrule but I wish

13     you would move on because that seems to me to be

14     irrelevant since it's not at any time significant

15     in this case.

16            MR. SOROSKY:  Well I would think 16:18, the

17     time of 16:18 is significantly relevant to this

18     case.

19            THE COURT:  The time was 9:30 AM, she said

20     they went shopping.

21            MR. SOROSKY:  Right, and --

22            THE COURT:  And was there for about an hour.

23            MR. SOROSKY:  Pardon me?

24            THE COURT:  And was there for about an hour.
```

