File Date: _Feb 29, 2008_

Case No: _07cv6658_

ATTACHMENT # _9_

EXHIBIT _V51 to V159_

TAB (DESCRIPTION) _____

1         Q   Yes, yeah.

2         Q   When you talked about the fact you had

3    been with these people October 9, the first time

4    you said that to anyone was today when you

5    testified here in Court today?

6         A   No, not today, had to be at that time

7    when that happened.

8         Q   You remember who that was that you talked

9    to?

10        A   It had to be Irene --

11        Q   I'm asking you whether or not you don't

12   remember, if you don't remember that's fine.

13        A   Who I talked to?

14        Q   Yes?

15        A   Angie.

16        Q   Now is Angie here today?

17        A   No.

18        Q   Has she ever come down here with you?

19        A   No, not with us.

20        Q   Do you remember when was the next time

21   that you saw Angie after you left her home that

22   night?

23        A   When she came over, had to be like a week

24   later when that happened and they found out.


V 51

1          MR. FORD:  No further questions, Judge.

2          THE COURT:  Redirect.

3                  REDIRECT EXAMINATION

4                         BY

5              MR. SOROSKY:

6      Q  Did I tell you what to say?

7      A  No.

8      Q  Did anyone tell you what to say?

9      A  No.

10         MR. SOROSKY:  Nothing further from this

11  witness.

12         THE COURT:  Recross.

13         MR. FORD:  Nothing, thank you, Judge.

14         THE COURT:  Thank you, you're excused.

15                          (Witness excused.)

16         THE COURT:  Call your next witness.

17             Step up, remain standing and raise

18  your right hand.

19                          (Witness sworn.)

20         THE COURT:  Please be seated.

21

22

23

24


                        V 52

```
1                    DOROTHY RAMIREZ,

2     called as a witness on behalf of the  Defense,

3     having been first duly sworn, was examined and

4     testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MR. SOROSKY:

8          Q   Ma'am, would you please state your name

9     in full and spell your last name speak loudly and

10    slowly?

11         A   My name is Dorothy Ramirez,

12    R-a-m-i-r-e-z.

13         Q   And how old are you?

14         A   I'm 25.

15         Q   And do you know the defendant, Jeri

16    Lindsey?

17         A   Yes.

18         Q   And for how long a period of time have

19    you known her?

20         A   It's been about 8 years.

21         Q   How long?

22         A   8 years.

23         Q   And how did you happen to come to know

24    Jeri Lindsey?
```

V 53

1          A    She's a friend of my sister-in-law,

2    Irene.

3          Q    And by Irene you mean Irene Quiroz?

4          A    Irene Quiroz.

5          Q    And who is the person -- who is your

6    fiance' the person you refer to as your husband?

7          A    Robert Quiroz.

8          Q    And see the man who previously testified

9    today?

10          A    Yes.

11          Q    And you and he have any children

12    together?

13          A    Yes we do.

14          Q    How many children and what are their

15    ages?

16          A    3 children, 7 -- no, 8, 7 and 5.

17          Q    Where do you live?

18          A    8911 South Houston.

19          Q    Is that in Chicago, Illinois?

20          A    Yes.

21          Q    And did you live there in October of

22    1992?

23          A    Yes.

24          Q    And where does your mother in law, Amelia

V 54

1    Quiroz live?

2         A    The same address, she lives in the front

3    house, we live in the rear.

4         Q    Are they 2 separate buildings?

5         A    Yes.

6         Q    Now, do you see the defendant, Jeri

7    Lindsey in Court today?

8         A    Yes.

9         Q    Could you please point her out?

10        A    Right there.

11        MR. SOROSKY:  We would ask the record to

12   indicate the witness is pointing to the defendant.

13        THE COURT:  The record may so reflect.

14        MR. SOROSKY:

15        Q    And do you know the defendant by any

16   nickname?

17        A    We call her Robin.

18        Q    Now, would you tell his Honor Judge

19   Singer how you first heard about Jeri Lindsey

20   getting arrested?

21        A    I saw it on TV on the news.

22        Q    Now, within a week of the defendant being

23   arrested, did you have occasion to come down to

24   the Criminal Court Building here at 2650 South

V 55

1    California, Chicago, Illinois?

2        A   Yes, we did.

3        Q   And who did you come with?

4        MR. FORD:  Objection.

5        THE COURT:  Sustained?

6        A   I came with Amelia --

7        THE COURT:  When I sustain an objection you

8    don't answer.

9        A   Okay.

10       MR. SOROSKY:

11       Q   Now calling your attention to October 9,

12   1992, Friday, did you have occasion to see Jeri

13   Lindsey on that day?

14       A   Yes, I did.

15       Q   Would you tell his Honor, Judge Singer,

16   about what time and under what circumstances you

17   first saw Jeri Lindsey?

18       A   It was around 2 o'clock or 2:15 and we

19   were going shopping.

20       Q   And where were you when you first saw

21   her?

22       A   She came to my house.

23       Q   And was she, the defendant, alone or was

24   she with anyone else?

V 56

1       A   She was with Irene Quiroz.

2       Q   And who else was in your house at this

3   time?

4       A   My fiance', Robert Quiroz and me and they

5   picked up Emily and then they came to my house.

6       Q   And by Emily, is that your mother in law

7   Amelia Quiroz?

8       A   Yes.

9       Q   And where did you folks go shopping?

10      A   We went to River Oaks, we went to

11  Walgreens and then we went to Ventures.

12      Q   And did you go in 2 cars or one?

13      A   2 cars.

14      Q   Would you tell his Honor, Judge Judge

15  Singer, who was in one car and who was other

16  another car?

17      A   In my car my fiance' me and my 3 kids and

18  in the other car it was Irene, and Robin and

19  Amelia.

20      Q   And could you tell his Honor, Judge

21  Singer, whether your children were in your --

22      MR. FORD:  Objection, Judge.

23      THE COURT:  Sustained.

24      MR. SOROSKY:  With your children in your car

V 57

```
 1      --

 2           MR. FORD:  Objection, Judge.

 3           THE COURT:  Sustained.

 4           MR. SOROSKY:

 5           Q  Where did you meet up with your children?

 6           MR. FORD:  Objection.

 7           THE COURT:  Sustained.

 8           A  I picked up my kids at school.

 9           MR. FORD:  Assumes facts not in evidence.

10           THE COURT:  Overruled.

11           MR. SOROSKY:

12           Q  When did you pick up your children from

13      school?

14           A  At 2:30.

15           Q  Is this before or after you first saw

16      Jeri Lindsey on that day?

17           A  That was after.

18           Q  And after you picked up your children,

19      where did you go?

20           A  We came back to the house and met them,

21      they were already in the car waiting for husband

22      and we took off from there to shopping.

23           Q  Now, about what time did you folks leave

24      the River Oaks shopping center?
```

1        A   Me and my family left around 5:15.

2        Q   And your children left with you?

3        A   Yes, we left.

4        Q   And did the other car leave at the same

5    time?

6        A   Well we left them in the parking lot of

7    Ventures there and we said we were leaving and we

8    were just going to go separate ways.

9        Q   And that's the last time you saw Jeri

10   Lindsey on October 9, 1992?

11       A   Yes.

12       Q   Where did you and your husband go after

13   that, if you know?

14       A   We had to go just a couple of blocks down

15   on State Street to pick up a check for him of a

16   previous job.

17       Q   And then where did you go?

18       A   Then we went home.

19       Q   What did your husband do that night?

20       A   He just dropped us off and he had to go

21   to work, he works at Hiney's Chicken, delivery and

22   he had to be at work at 5:30.

23       MR. SOROSKY:   Nothing further from this

24   witness.

V 59

1          THE COURT:  Cross.

2               CROSS EXAMINATION

3                    BY

4               MR. FORD:

5          Q  So it is your testimony today you picked

6     up your children, took them home and then you met

7     Irene and the defendant?

8          A  Well we didn't take the kids home, we

9     picked them up from school and drove back to the

10    house to meet them in their car, to drive you

11    know, we just went from the school to the house to

12    pick them up.

13         Q  You went from --?

14         A  From school.

15         Q  From your home?

16         A  From my home to pick up the kids.

17         Q  Right.  And who was with you when you

18    left to pick up your children?

19         A  My husband, my fiance'.

20         Q  You and he drove together to the grade

21    school?

22         A  Yes.

23         Q  Which is at what address?

24         A  It's 90th and Exchange.

V 60

1        Q  And you drove back to Houston?

2        A  Yeah.

3        Q  And when are you drove back to 89th and

4  Houston, then you met up with Irene and the

5  defendant?

6        A  Yeah.

7        Q  Then you talked about -- they told you

8  they were going shopping?

9        A  No, when they came at 2 o'clock that

10  afternoon, they showed us some things they had

11  bought and we were having a haloween party so she

12  showed us that and we went shopping the same place

13  they had already been so we could pick up the same

14  things they had.

15        Q  So --?

16        A  So after 2:30 we went shopping.

17        Q  So they came over, then you went and

18  picked up the kids and you and your husband

19  together and went back with them at your home?

20        A  Yes.

21        Q  River Oaks is south of the school, isn't

22  it?

23        A  I don't know what direction that is, all,

24  we went to pick up the kids.

1    Q It's at a 110th?

2    A 150th or something.

3    Q South of your house, isn't it?

4    A Yeah, I guess I suppose so.  I don't know

5 directions.

6    Q You went south of your home to pick up

7 the kids because the kids go to school at 90th

8 Street, right?

9    A Yeah.

10    Q And you came back to your home, and then

11 you drove together in kind of a convoy down to

12 that address, isn't that right?

13    A Yeah.

14    Q How much time did you spend at Walgreens?

15    A I don't know, I couldn't really tell you,

16 it was just like we were there shopping a little

17 while.

18    Q 10 or 15 minutes?

19    A Maybe little bit more, like a half hour,

20 45 minutes.

21    Q 45 minutes?

22    A Maybe.

23    Q And then you went to Walgreens?

24    A We went to Walgreens first.

1          Q   Or Ventures?

2          A   Yes.

3          Q   How long were you at Venture?

4          A   The remainder of the time, must have been

5     like maybe an hour.

6          Q   An hour at Venture?

7          A   Probably.

8          Q   And then you went home, and then you and

9     your husband went to pick up your check and went

10    home?

11         A   Yes.

12         Q   When is the first time somebody told you

13    Jeri Lindsey was missing?

14         A   Okay, that was the Friday, then Saturday,

15    the 10th.

16         Q   Saturday the 10th, who told you Jeri

17    Lindsey was missing?

18         A   My sister-in-law, Angela, she lives

19    upstairs from Irene, she told us.

20         Q   She told you that Jeri was missing?

21         A   Yes.

22         Q   Did you go and talk to Irene after that?

23         A   Yeah.

24         Q   Who was present when you were first told

1    Irene was missing -- I mean that Jeri was missing?

2        A   I don't really remember who was there

3    that day.

4        Q   You were in your home weren't you?

5        A   When they told -- when I talked to them.

6        Q   That was on Saturday?

7        A   Yes.

8        Q   Your husband was there, wasn't he?

9        A   Yeah.

10       Q   He was there when you Angela told you

11   that --?

12       A   We're always together.

13       Q   That Jeri was missing. He was there

14   watching TV, wasn't he?

15       A   I don't remember what he was doing.

16       Q   Now, did you go out and help everyone

17   look for Jeri Lindsey on the 10th?

18       A   Yeah, me and Angela went.

19       Q   Where did you and Angela go to look for

20   Jeri Lindsey?

21       A   We went to mutual friends of ourselves.

22       Q   What is their name?

23       A   Mary Lu and Maria, I don't know their

24   last name.

V 64

1          Q   She wasn't there, was she?

2          A   Yeah, we talked to Mary Lu and Maria.

3          Q   But I mean the defendant wasn't there,

4     was she?

5          A   No she wasn't there, she was missing.

6          Q   You kept looking that whole day on the

7     Saturday?

8          A   Yeah, we were just taking you know,

9     driving around.

10          Q   Your husband helped too, didn't he?

11          A   Yes.

12          Q   And you also looked on Sunday, the next

13     day?

14          A   I don't really remember.

15          Q   Who is Frank Bailey Junior?

16          A   I don't know.

17          MR. FORD:   If I could have a moment, Judge.

18          THE COURT:   Yes.

19          MR. FORD:

20          Q   When you got home that night did you go

21     over to Irene and Jeri's at all the night of the

22     9th?

23          A   No.

24          Q   Did your husband, Robert ever go there

V 65

1    the night of the 9th?

2          A   No.

3          Q   Did Irene ever go to look for Jeri with

4    you?

5          A   No.   I don't remember her coming with

6    me.

7          Q   Did Angie tell you when the last time she

8    saw Jeri was?

9          A   Friday the 9th.

10         Q   Did she tell you where she had seen her

11   that night?

12         A   She was at home, when she went to go put

13   some biscuits in Irene's oven.

14         Q   You weren't there when they put biscuits

15   in the oven were you?

16         A   No.

17         Q   You know about that from talking to Olga

18   Martinez, is that right?

19         A   Yeah, because Angie and them told me when

20   they seen me Saturday to tell me she was missing

21   --

22         Q   Miss Ramirez I'm going to ask you a

23   question?

24             MR. SOROSKY:   Objection.


                         V 66

1          MR. FORD:  My objection is it's not

2     responsive, Judge.

3          THE COURT:  Sustained.  Just answer the

4     questions.

5          MR. FORD:

6          Q  Miss Ramirez, you and Olga Martinez came

7     down here today together, is that right?

8          A  Yeah, we all came down.

9          Q  And well Angela wasn't here, was she?

10         A  No.

11         Q  You and Olga Martinez talked about the

12    fact that Olga Martinez had been involved in this

13    today's events too, didn't you?

14         A  We didn't talk about anything, when we

15    were outside we didn't talk about anything about

16    this.

17         Q  How about the last day you were here,

18    October 11, excuse me, January 11, 1994, just

19    about 2 weeks ago, do you remember that date don't

20    you?

21         A  Yes.

22         Q  You came down together everybody in the

23    same car didn't you?

24         A  Yeah.

V  67

1          Q   And on that date, when everybody came

2     down here together in the same car you talked

3     about what had happened on October 9, 1992, didn't

4     you?

5          A   Yeah.

6          Q   You talked about the fact that Olga

7     Martinez had been standing out in the street with

8     biscuits?

9          A   Yes.

10         Q   And you talked about the fact that Olga

11    Martinez wanted to cook the biscuits in Jeri

12    Lindey's and Irene's oven?

13         A   Yes.

14         Q   And Robert talked about it with your

15    mother and you talked about it with your mother

16    and you all kind of remembered the events of that

17    day together, is that right?

18         A   Yeah.

19         Q   Now, prior to January 11, 1994, when was

20    the last date before that that you --

21         THE COURT:  Just a minute. January 11, 1994.

22         MR. FORD:  That would have been the last

23    date the case was up.  I'm sorry 95.

24                   Prior to January 11, 1995, I'm sorry

1    Miss Ramirez, prior to that date when was the last

2    date before that that you had all gotten together

3    to remember this incident together?

4          A    The last time that we talked about it was

5    when the lawyer came to tell us that we were going

6    to have to come to testify.

7          Q    Who was present when the group of you

8    talked about it on that day?

9          A    Me, Irene and Robert.

10         Q    Okay?

11         A    And Amelia.

12         Q    That's your mom?

13         A    My mother in law.

14         Q    And all of you talked about that date

15    together on that date?

16         A    Yes.

17         Q    When was that?

18         A    I don't know exactly what date.

19         Q    Within the last couple of months, 2 or 3

20    months?

21         A    Yeah.

22         Q    Prior to that time, it's true, isn't it

23    that you and Irene, Irene had asked you to recall

24    this event 2 weeks after it had happened, is that

1    correct?

2          A   Not 2 weeks, it was a week after that

3    that we came down.

4          Q   What day was it that Irene first asked

5    you to recall what had happened?

6          A   I don't really remember, but.

7          Q   Do you remember where you were?

8          A   I heard it on TV.

9          Q   Do you remember where you were when Irene

10   first asked asked you to recall what had happened?

11         A   At home because that's where I seen it on

12   TV.

13         Q   What happened, what did you do after you

14   saw this that Jeri Lindsey had been arrested on

15   TV?

16         A   Nothing, I was just watching TV and I was

17   just shocked by the fact.

18         Q   Did you call anyone?

19         A   No.

20         Q   Did your husband call anyone?

21         A   I don't remember him.

22         Q   You didn't talked to any other members of

23   your family about what had happened?

24         A   Well no not until Angie came and told me

1    that later.

2          Q    When did she come and tell you that?

3          A    Later in the evening.

4          Q    And you --?

5          A    And then on, saw it on TV, you know.

6    Then we talked about all we had all seen it.

7          Q    You didn't talk about it at all at that

8    time?

9          A    No.

10         Q    Was it a month or 2 months later that you

11   all talked about it or when did you all talk about

12   it?

13         A    Well we all live in this immediate area

14   and we talk about it if we see each other, any

15   day.

16         Q    You have been talking about it

17   continuously since it happened?

18         A    Yeah.

19         MR. FORD:    No further questions, Judge.

20         THE COURT:    Redirect.

21                    REDIRECT EXAMINATION

22                         BY

23               MR. SOROSKY:

24         Q    Now, I believe your testimony is that you


                            V 71

1    first heard about the defendant's arrest while

2    watching television, correct?

3        A   Yes.

4        Q   And then after you heard about this on

5    television, Angie who would be your sister-in-law

6    also mentioned this to you, is that correct?

7        A   Yes, later that evening.

8        Q   Now, about a week later, you also had an

9    occasion --

10       MR. FORD:  Objection.

11       MR. SOROSKY:  -- to discuss the events of

12   October 9, 1992, didn't you.

13       MR. FORD:  Objection.

14       THE COURT:  Sustained.

15       MR. SOROSKY:  Well your Honor with all due

16   respect I think the State's Attorney opened the

17   door.  He implied all kinds of things.

18       THE COURT:  I'll change my ruling.

19       MR. FORD:  I would like to be heard on that.

20   I think the witness has testified, he's talking

21   about a conversation a week later, I'm asking --

22   there may have been an accusation of recent

23   fabrication Judge, but the initial fabrication

24   that Miss Ramirez has testified to or the initial

V 72

1    conversation Miss Ramirez has testified to

2    occurred prior to the time when Mr. Sorosky is

3    about to question the witness so it isn't a prior

4    consistent statement, Judge.

5         THE COURT:  Overrule the objection now, you

6    may inquire.

7         MR. SOROSKY:

8         Q   Now, about a week after you heard about

9    this arrest, you came to this building, did you

10   not?

11        A   Yes.

12        Q   Did you come to a courtroom or the

13   State's Attorney's office?

14        A   We came to the office.

15        Q   And were you questioned by Assistant

16   State's Attorneys and or police?

17        A   Yes.

18        Q   Do you know any of their names?

19        A   No, I don't, it was a woman and a man

20   officer.

21        Q   And did they ask you about the events of

22   October 9, 1992?

23        A   Yes.

24        Q   And did you relate to those people

V 73

1    substantially the same thing that you are, that

2    you testified to before Judge Singer today?

3            A   Yes.

4            Q   And at the time you related those events,

5    did you know me?

6            A   No.

7            Q   Had you spoken to any lawyer on behalf of

8    Jeri Lindsey?

9            A   No.

10           Q   As any of your other family members who

11   came down with you today?

12           MR. FORD:  Objection.

13           MR. SOROSKY: To the State's Attorney's

14   Office spoken to any lawyer on behalf of Jeri

15   Lindsey?

16           MR. FORD:  Objection.

17           THE COURT:  Sustained.

18           MR. SOROSKY:

19           Q   When the State's Attorney questioned all

20   of you folks, or an investigator, did they

21   question you in one group or did they question you

22   each individually?

23           A   Individually.

24           Q   So when you gave your statement you were

V 74

1    separate?

2           MR. FORD:  Objection.

3           Q  And apart from your other family members?

4           THE COURT:  Sustained.

5           MR. SOROSKY:  Nothing further of this

6    witness.

7                    RECROSS EXAMINATION

8                         BY

9                    MR. FORD:

10          Q  Miss Ramirez?

11          A  Yes.

12          Q  On that date, the date you came down here

13   and stated you talked to an Assistant State's

14   Attorney and to the police, you all came together

15   in a car, you, Robert, Amelia and Irene, is that

16   right?

17          A  Yes.

18          Q  You talked about this time period then on

19   the way down here, didn't you?

20          A  Well yeah, we probably discussed it.

21          Q  And you talked about it before then,

22   hadn't you?

23          A  It had only been a week, so yeah, we

24   probably did.

```
 1          MR. FORD:  At at this time I would make a
 2    motion to strike all the testimony relative to the
 3    conversation with the Assistant State's Attorney,
 4    Judge.
 5          THE COURT:  Overruled.  Denied rather.
 6          MR. FORD:
 7          Q  And it was Irene that first asked you to
 8    recall that date, is that right?
 9          A  No, nobody asked me to remember it.
10          Q  Well --?
11          A  We would just discuss it all among us
12    all.
13          Q  Okay Miss Ramirez, you're watching TV and
14    see Jeri Lindsey is arrested, is that right?
15          A  Yes.
16          Q  When was the first time after you saw
17    that on TV that Irene came over and you talked to
18    her?
19          A  Well we had to go down here to the
20    office.
21          Q  That was a week later was the first time
22    you saw her?
23          A  Yeah, all the time I can remember.
24          Q  Who came over, nobody gave you a subpoena
```

1    to come down here, did they?

2         A   For that week we came.

3         Q   The first time?

4         A   No.

5         Q   So Irene just comes over out of the blue

6    and says I want you to go to 26th and California

7    with me, is that right?

8         A   That's -- the day that we had to come

9    down here.

10        Q   I'm asking you yes or no.  Objection.

11   Not responsive Judge.

12        THE COURT:  Sustain the objection, just

13   answer the question.

14        MR. FORD:

15        Q   Miss Ramirez, did Irene come over out of

16   the blue, yes or no, and ask you to come down here

17   to 26th Street?

18        MR. SOROSKY:  Objection to the form of the

19   question, out of the blue.

20        THE COURT:  Sustained.

21        MR. FORD:

22        Q   Miss Ramirez, did Irene come over and

23   tell you that day, the very day you had to come

24   down here that she wanted you to go down to 26th

V 77

1    and California with her?

2         A   No, must have been the night before to

3    tell us.

4         Q   Did she tell you over the phone or did

5    she tell you in person?

6         A   She came to my house probably, it's kind

7    of hard to remember.

8         MR. FORD:   No further questions.

9         THE COURT:   Redirect.

10                   REDIRECT EXAMINATION

11                        BY

12                   MR. SOROSKY:

13        Q   Did you and your other family members

14   plan to concoct this alibi defense to lie for Jeri

15   Lindsey?

16        A   No.

17        MR. FORD:   Objection.

18        THE COURT:   Overruled.

19        MR. SOROSKY:

20        Q   Did Irene Quiroz ask you and your family

21   members to lie for Jeri Lindsey?

22        A   No.

23        Q   Did anyone tell you to make this up?

24        A   No.

1       Q   All that you're testifying to?

2       A   No.

3           MR. SOROSKY:   Nothing further from this

4   witness.

5           THE COURT:   Recross.

6                   RECROSS EXAMINATION

7                       BY

8                   MR. FORD:

9       Q   Miss Ramirez, you didn't write down all

10  the events of October 9, 1992 at the time they

11  were happening, did you?

12      A   No.

13      Q   You didn't write down the amount of time

14  you spent at Venture and the amount of time you

15  spent at Walgreens, did you?

16      A   No.

17      Q   And you didn't keep a journal between the

18  date that happened and today's date about where

19  you were every minute of that day, did you?

20      A   No.

21      Q   And it's true, isn't it, Miss Ramirez,

22  that as you said, you and your family got together

23  and talked about this day many times since?

24      A   Since it happened, yes.

V 79

1          Q   Now you don't remember whether it was

2     October 9TH or a week before, October 2ND, do you?

3          A   No, I know it was October 9 because

4     that's his pay day.

5          Q   Were you at home when Irene Quiroz called

6     your brother, Robert, and asked what date you guys

7     had gone shopping?

8          MR. SOROSKY:   Objection.   OUTSIDE the scope

9     of the recross.

10         A   I don't understand.

11         THE COURT:   Sustained.

12         MR. FORD:

13         Q   Were you at -- you and Robert that day

14    when it happened, when you saw it on TV you said

15    you were STUNED, is that correct?

16         A   Yes.

17         MR. SOROSKY:   Objection.   Outside the scope

18    of the recross.

19         THE COURT:   Overruled.

20         MR. FORD:

21         Q   Is that correct?

22         A   Yes.

23         Q   Did you call Irene immediately?

24         A   No.

V 80

1          Q   Who told you that the victim had in this

2     case died on October 9?

3          MR. SOROSKY:  Objection, outside the scope

4     of the recross.

5          THE COURT:  Overruled.

6          A   I think it was Irene.

7          MR. FORD:

8          Q   And when did she tell you that?

9          A   I don't really remember exactly when but

10    maybe like the next time after Angie told me about

11    her being arrested, maybe probably a day or so

12    after that.

13         Q   And that was before or after you come

14    down here to 26th and California?

15         A   That was before.

16         Q   When was that?

17         MR. SOROSKY:  Objection.  All this is

18    outside the scope.

19         A   Before I came down here --

20         THE COURT:  Overruled.

21         A   To the district attorneys office.

22         MR. FORD:

23         Q   Who was with you --?

24         A   Whenever they told me.

V 81

1          Q   -- when Irene told you that?

2          A   I don't remember, probably my fiance'.

3          Q   Robert?

4          A   Yeah.

5          MR. FORD:  No further questions.

6          THE COURT:  Redirect.

7          MR. SOROSKY:  No further questions.

8          THE COURT:  Thank you, you're excused.

9                            (Witness excused.)

10         THE COURT:  Call your next witness.

11         MR. SOROSKY:  Your Honor, although the

12    State's Attorney's Office does acknowledge that

13    these folks did come down for this interview --

14         MR. FORD:  Judge, there is no evidence of

15    that.  I don't -- other than what that they say

16    they came down here to interview, I don't know --

17    I mean there is no evidence in the record of

18    that.

19                   If counsel can proof otherwise, --

20         MR. SOROSKY:  Well.

21         THE COURT:  There is evidence in the record,

22    there there is testimony.

23         MR. FORD:  Right, that is correct, Judge.

24         THE COURT:  All right.

V 82

1        MR. FORD:  I misspoke, I apologize.

2        MR. SOROSKY:  We would like to just

3    introduce in the evidence that the State's

4    Attorney's Office has not produced any notes or

5    written material or whatever of this interview on

6    whatever date it occurred.

7        MR. FORD:  I'll stipulate that I produced no

8    notes -- I'm not stipulating that the interview

9    occurred but I'm stipulating that --

10       THE COURT:  Well gentlemen, I'm a bit

11   confused, are you alleging a discovery violation?

12       MR. SOROSKY:  No, I'm not alleging a

13   discovery violation in the sense --

14       THE COURT:  Then I suppose the problem is I

15   was on vacation for 2 weeks and I'm not back into

16   the swing of things perhaps.  I think I am, but

17   because I'm at a loss, what is this about?

18       MR. SOROSKY:  A discovery violation to me

19   would be if the State's Attorney had something and

20   did not give that to me.  I'm not alleging that.

21   What I'm saying is that the mere fact that the

22   State's Attorney's Office did not give anything to

23   me and the mere fact that the State's Attorney who

24   is trying this case is sort of just finding out

V 83

1    about this interview as these witnesses are

2    testifying shows that there was some desire on the

3    part of someone, be that police officers, State's

4    Attorney or State's Attorney's investigator -- I

5    have.

6        MR. FORD:  I have an ongoing objection to

7    this.

8        THE COURT:  Please allow counsel to make

9    these argument.

10       MR. SOROSKY:  To somewhat bury, if I could

11   use that street expression the interview of all

12   these people.  In other words 4 people come down

13   to the State's Attorney's Office, they have all

14   testified under oath or at least one person

15   testified under oath that she gave a statement

16   concerning the events of October 9, 1992.  Your

17   Honor saw that I attempted to ask those of the

18   other people but that was objected to.

19            So, assuming, I still have some wits

20   about me, these people undoubtedly would have said

21   yes on October, yes on whatever date I came down,

22   I related what I did about the defendant on

23   October 9, 1992.  What I'm saying is that here you

24   have the statement from 4 people who are potential

1    alibi witnesses for the defendant.

2         THE COURT:  Potential, I don't understand.

3         MR. SOROSKY:  That's why I used the word

4    potential.  And the State's Attorney's Office did

5    not make any, did not record this interview, did

6    not make any notes of this interview, did not have

7    these people sign a statement as to what they did,

8    as to what their interview was and I think it

9    shows there is, there was some effort on the part

10   of the State's Attorney's office to bury this

11   interview or these interviews.

12        THE COURT:  Counsel, you know, you're

13   arguing what may be coget, what may be whatever

14   but I have to tell you, at least I feel I have to

15   tell you, we're not at final argument.  I assure

16   you Mr. Sorosky, I'll give you an opportunity to

17   make a final argument.

18             But as I understand this, again I do

19   point out I have been away for a couple of weeks,

20   but I still will tell you it has been my

21   understanding that the time for argument is when

22   all the evidence is closed and so far as I can

23   recall, you have not rested and if you had, I

24   haven't given the opportunity for the State to

                        V 85

1    rebutt if they can and when we have gone through

2    that process and both sides are content with all

3    the evidence, that they have introduced all the

4    evidence, by golly I'll give you an opportunity to

5    argue.

6         MR. SOROSKY:  I would just ask the record --

7         THE COURT:  I don't know what you want at

8    this time, I don't know what you want me to do at

9    this time.  It sounds like to me you're -- you

10   want to argue your case.

11        MR. SOROSKY:  No.  No.  I would just want

12   the record to reflect and I don't know if I have

13   to call this Assistant State's Attorney or someone

14   that the State's Attorney's Office does not have

15   any written interviews of this --

16        THE COURT:  I don't know what the State's

17   Attorney's Office has or has not.  In the way of

18   interview statements or notes or whatever.  If you

19   allege a discovery violation, you know, I would

20   proceed from there, but you don't allege a

21   discovery violation.  I can't let the record

22   reflect something without some evidence to support

23   it and I'm at a loss.  Do you understand, I don't

24   understand what you're about at this juncture

V 86

1    except sounds to me as though your chomping at the

2    bit to go into final argument and have indeed have

3    gone into final argument.

4        MR. SOROSKY:  Well, there are some, maybe we

5    should adjourn for the day because there is only

6    one more witness I want to call.

7        THE COURT:  Oh no, no, no, let's go, call

8    your witness.

9        MR. SOROSKY:  Well I have to call Mr. Ford,

10   he's the only one I have available and he would

11   just say that there is no notes, that he has no

12   notes from this, no interview, nothing to turn

13   over.  The only witness I want to call.

14       MR. FORD:  Far be it for me to interject but

15   I feel duty bound to indicate that the presence --

16   I mean all materials in this case have been

17   tendered, counsel has his arguments if they exist,

18   4 people that say they were here.  That's the

19   argument.  If he wants to make that and I concur

20   with the Court a closing argument.  But to

21   support, try to support it collaterally by saying

22   because I don't have a record of that thing we're

23   somehow deep sixing this is beyond the kin of a

24   logical inference that can be made in this case.

V 87

1    So far afield, so greatly collateral that I must

2    object to it's admission.

3         THE COURT:  I don't know what we're talking

4    about.

5         MR. FORD:  I agree with the Court, I don't

6    even think there is evidence here, I don't even

7    think it exists as relevant in any relevant

8    identifiable form.  If counsel can find some way

9    to package it, it would but I don't see that it

10   exists.

11        MR. SOROSKY:  I just, I would like --

12        THE COURT:  Counsel at this juncture, I say

13   to you, Mr. Sorosky, call your next witness.

14        MR. SOROSKY:  Nicholas Ford.

15        THE COURT:  Do you object to testifying?

16        MR. FORD:  I object to being called as a

17   witness, Judge.

18        THE COURT:  I'm going to have to sustain

19   that objection.

20        MR. SOROSKY:  Then I call the investigator

21   who is in the back whatever his name is, there is

22   one detective in back.

23        THE COURT:  Okay.

24        MR. SOROSKY:  Although he'll --

V 88

1          MR. FORD:  There is a detective in the back,

2     Jerry Bogecki, I think he's still here.

3          THE COURT:  By golly if you want to call him

4     as your witness, call him.

5               Is this your last witness, Mr. Sorosky?

6          MR. SOROSKY:  I believe so.

7          THE COURT:  And do you have a witness.

8          MR. FORD:  I have a rebuttal witness for

9     tomorrow morning, he was ill today, contacted me,

10    he will be here first thing in the morning.

11                         (Witness sworn.)

12         THE COURT:  Please be seated.

13                    JEROME BOGUCKI,

14    called as a witness on behalf of the Defense,

15    having been first duly sworn, was examined and

16    testified as follows:

17                    DIRECT EXAMINATION

18                         BY

19                    MR. SOROSKY:

20         Q   Sir, would you please state your name in

21    full and spell your last name?

22         A   Detective Jerome Bogucki, B-o-g-u-c-k-i.

23         Q   And you are one of the 2 main detectives

24    on this case, are you not, it would be you and

1    your partner Detective Schalk?

2         A   That is correct.

3         Q   Now, you are aware of the fact that this

4    case involves a homicide that occurred on October

5    9, 1992?

6         A   Yes.

7         Q   And approximately a few days later, on

8    Wednesday, October 14, 1992, the defendant, Jeri

9    Lindsey, was arrested, you were aware of that?

10        A   Yes.

11        Q   And approximately one week after that,

12   are you aware of any interview of Irene Quiroz,

13   Amelia Quiroz, Robert Quiroz, and Dorothy Ramirez

14   concerning those folks' statements concerning

15   their activities on October 9, 1992?

16        MR. FORD:   Objection.

17        THE COURT:   Well it's a compound question so

18   I'm sustaining.

19        MR. SOROSKY:

20        Q   Are you aware of any interview of Irene

21   Quiroz about one week after the arrest of Jeri

22   Lindsey?

23        MR. FORD: Objection.

24        THE COURT:   Overruled.


V 90

1          A    I'm not certain of any interview.

2          MR. SOROSKY:

3          Q    Are you aware of any interview of Amelia

4     Quiroz concerning the events of October 9, 1992

5     about one week after the arrest of Jeri Lindsey?

6          MR. FORD:    Objection.

7          THE COURT:    Overruled.

8          MR. FORD:    Judge, if I could be heard on

9     that objection?

10         THE COURT:    All right.

11         MR. FORD:    His awareness of an interview

12    occurring at a place unnamed within the question

13    is very very relevant.

14         THE COURT:    I assume that if the officer had

15    some awareness he would then follow up on it and

16    complete the time place location and to so forth,

17    so overruled.

18         A    I'm not aware of any particular

19    interview.

20         MR. SOROSKY:

21         Q    Are you an aware of any interview of

22    Dorothy Ramirez concerning her version of events

23    of October 9, 1992, approximately one week after

24    the arrest of Jeri Lindsey?

V 91

1           A   No.   No, I'm not aware of that.

2           Q   Are you aware of any interview of Amelia

3    Quiroz concerning her version of the events of

4    October 9, 1992, approximately one week after the

5    arrest of Jeri Lindsey?

6           A   No.

7           Q   Have you ever seen any written statements

8    concerning any interview of the people I've

9    mentioned about one week after the arrest of Jeri

10   Lindsey?

11          A   No.

12          MR. SOROSKY:   Nothing further from this

13   witness.

14          THE COURT:   Cross.

15          MR. FORD:   No questions.

16          THE COURT:   Thank you, you're excused.

17          THE COURT:   Call your next witness.

18          MR. SOROSKY:   We have no further witnesses

19   at this time -- excuse me, excuse me, we do have

20   one last person.   The defendant is going to

21   testify, your Honor but she's going to testify

22   merely to the reasons why she gave her statement

23   and not to the alibi.   Will the Court accept

24   that?

V 92

1           THE COURT:  Wait a minute, it's not up to me

2      to accept it.  Counsel, wait, wait, wait.  You're

3      the lawyer.

4           MR. SOROSKY:  I'm asking you --

5           THE COURT:  I'm the Judge and I sit here.  I

6      don't don't want to interfere with your case, I

7      don't tell you what questions to ask.  Sometimes I

8      would say is it A.M. or P.M. or might say the

9      location is that in Chicago, but I find myself,

10     confine myself to that.  I'm correct in saying I

11     let the lawyers try the case.  You present the

12     evidence, Mr. Sorosky and by golly, I rule.

13          THE CLERK:  Raise your right hand.

14                     (Witness sworn.)

15          THE CLERK:  Be seated.

16                     JERI R. LINDSEY,

17     called as a witness on her own behalf, having been

18     first duly sworn, was examined and testified as

19     follows:

20                 DIRECT EXAMINATION

21                        BY

22                  MR. SOROSKY:

23          Q   Ma'am, would you please state your name

24     in please?

V 93

1          A  Jeri Robin Lindsey, J-e-r-r-i, R-o-b-i-n,

2     L-i-n-d-s-e-y.

3          Q  On October 9, 1992, did you kill and rob

4     the deceased in this case?

5          A  No, I did not.

6          Q  Did you intentionally murder him or shoot

7     him and steal money from him or rob him or

8     anything of that nature?

9          A  No.

10         THE COURT:  Excuse me, excuse me a moment:

11    All right, go ahead.

12         MR. SOROSKY:

13         Q  On Wednesday, October 14, 1992, you were

14    taken to the police station station, were you not?

15         A  Yes.

16         Q  And you were taken from your house about

17    11 o'clock to the police station, is that correct?

18         A  Yes.

19         Q  And after you were at the police station

20    for a while, you were confronted with this murder

21    allegation, were you not?

22         A  Yes.

23         Q  And the police told you that they didn't

24    believe your allegation of rape, did they not?

V 94

1          A   Yes, they did.

2              MR. FORD:  Objection to the leading.

3              THE COURT:  Sustained.

4              MR. SOROSKY:

5          Q   What did the police tell you concerning

6      your rape allegation?

7          A   They told me that I was lying, that they

8      didn't believe me, and --

9          Q   Now, after the police told you that, and

10     after the police confronted you with this murder

11     allegation, did the police ask you to tell the

12     truth and tell them what really happened?

13         A   Yes.

14         Q   And did you in fact tell the police the

15     truth as to what really happened that day?

16         A   Yes, I told them the truth.

17         Q   And what did you tell, could you tell his

18     Honor Judge Singer the first version of events you

19     told the police after you were confronted with the

20     murder allegation and when the police told you

21     they didn't believe your rape allegation?

22             THE COURT:  I do have to interfere.

23             MR. FORD:  Objection.

24             THE COURT:  I don't understand your

V 95

1    question.  What have I got to do with it?

2         MR. SOROSKY:  You have everything to do with

3    it.

4         THE COURT:  I have everything to do with it

5    now.

6         MR. SOROSKY:  No, I'm sorry if I misspoke.

7         THE COURT:  I don't know what you're talking

8    about.

9         MR. SOROSKY:

10        Q   After the police told you they didn't

11   believe your murder -- your rape story and after

12   the police told you you were a suspect in the

13   murder case, they asked you to tell them what

14   happened, did they not?

15        A   Well any way they asked me, I just told

16   them.

17        Q   You told them?

18        A   Yes.

19        Q   And tell Judge Singer what you told the

20   police?

21        A   I told them that I was lying about the

22   rape, and that I just told the lie to get in the

23   house because I didn't want Irene to know I was

24   out getting high and what I was lying, you know.

1        Q   And what did the police say to you and

2   what did you tell the police concerning whether

3   you committed this murder?

4        MR. FORD:  Objection.

5        A   I don't understand.

6        MR. SOROSKY:

7        Q   Well did they ask you if you murdered the

8   man?

9        A   No, they told me that I did.

10       Q   What did you say?

11       A   I told them I didn't, that I wasn't even

12   there, I don't even know the man and then I went

13   on to tell them that I was lying, you know, to get

14   in the house.

15       Q   What did they say to you after that?

16       MR. FORD:  I'm objecting for foundation,

17   Judge.

18       THE COURT:  Sustained.

19       THE COURT:  Time and place, who was present,

20   who were the officers, so forth.

21       MR. SOROSKY:

22       Q   Do you remember which officers were

23   present when you said that?

24       A   Yes, detective Boducky and Detective

1    Schalk.   There was another detective but I'm not

2    quite sure if he was in the room at the present

3    time, you know.   It was just I think it was just

4    the two of them, the third one he was in and out.

5         Q   Did you tell the police many different

6    versions of events after that?

7         A   Yes, but not directly after that.

8         Q   What was the truth, your first version of

9    events or your many different versions of events

10   after that?

11        A   The first version.

12        MR. FORD:   Objection.

13        THE COURT:   Sustained. I don't know what the

14   first version in or -- let's get what version

15   you're talking about.   First version as I

16   understood is the version about the rape.

17        MR. SOROSKY:   Right, but she was not in

18   custody then, her first coplaint about rape was

19   when she was just a person making the allegation.

20        Q   Now, after you were in custody, after you

21   were in custody, what was the first version of

22   events you told the police?

23        A   I told the police the truth.   I told them

24   that I was not raped, and that I was lying because

V 98

1    I didn't want Irene to know I was out smoking

2    rocks, I was out getting high so I told a lie, I

3    made up a lie, I told them that, I told them I was

4    by my friends --

5          MR. FORD:  Objection to narrative.

6          THE COURT:  Overruled.

7          MR. SOROSKY:  Go on?

8          A   I told them I was by my friend Jerry's

9    house and I was getting high and I didn't want

10   Irene to know because she was going to be mad and

11   if she found out I didn't want to lose her and I

12   promised my daughter I wasn't going to get high

13   any more.

14         Q   Now, so, was your allegation, your

15   original allegation of rape the truth or a lie?

16         A   Could you repeat that, please?

17         Q   Was your original allegation of rape

18   before you were arrested, was that allegation a

19   truth or a lie?

20         A   It was a lie.

21         Q   And did you tell that to the police after

22   you were confronted with this murder allegation?

23         A   Yes.

24         Q   Now after you told the police what you

V 99

1    previously recited, did you tell the police other

2    versions of events?

3         A   Yes, after the -- after I took the

4    polygraph test.

5         Q   Did you tell the police other versions of

6    events?

7         A   Yes.

8         Q   Yes or no?

9         A   Yes.

10        Q   Were those other versions of events the

11   truth or a lie?

12        MR. FORD:  Objection?

13        A   They were all lies.

14        THE COURT:  Overruled.

15        A   Except the third, the version with the

16   old people I did not tell them that, they told me

17   that.

18        MR. SOROSKY:

19        Q   Did you ever tell the police that you had

20   met Mr. Eiselt and Miss Hess or someone who

21   typifies them?

22        A   No.

23        Q   Did you ever tell the police you were in

24   Joliet?

1          A   No.

2          Q   Did you ever tell the police you were in

3     a cab?

4          A   No.

5          Q   Where did you get that -- where did you

6     receive that information from?

7          A   Okay.  With the lie that I told, I said

8     that I was raped by a cab driver.  And I remember

9     saying something about that a lady had picked me

10    up and I asked her where was I at and she said

11    Joliet.  And the reason why I said Joliet because

12    I have been to Joliet before and I knew it had

13    woods, you understand what I'm saying.  I'm just

14    telling you, you want me to explain it or no?

15         Q   Now then, now then, I show you what has

16    been marked as People's Exhibit Number Two which

17    would purport to be -- which is a statement --

18         MR. FORD:  I'm sorry, that's number 9.

19         MR. SOROSKY:  I apologize exhibit number 9

20    which has been identified as a statement, a

21    written statement of Jeri Robin Lindsey, have you

22    seen that before?

23         A   Yes.

24         Q   Or not that, you've seen photocopies of

```
1    that, have you not?
2         A    Yes.
3         Q    And is that in your handwriting?
4         A    No.
5         Q    Did you in fact sign that?
6         A    Yes, I did sign the paper stating
7    whatever.
8         Q    Are the contents -- you've read this
9    over, have you not?
10        A    Yes.
11        Q    And are the contents of this statement
12   true and direct?
13        A    No, not for me it's not.
14        Q    Well if they're not true, why did you
15   sign it, why did you sign it?
16        A    I signed the paper because I was mentally
17   and emotionally drained, I was tired of having
18   them in my face telling me I killed the man and I
19   didn't do it and I gave up and I knew once I came
20   --
21        Q    Slow down, please.
22        A    I signed the paper because I was mentally
23   and I was emotionally drained and I was tired, I
24   was tired of them telling me that I killed him and
```

1    I know I didn't so I gave up, I was tired of them

2    in my face constantly badgering telling me over

3    and over that I killed him and I know I didn't so

4    I signed the paper and I knew I had to fight for

5    my life when I went to jail and I didn't care.  I

6    wanted them out of my face.

7         Q   How long had you been in custody or jail

8    when you signed that, approximately?

9         A   2 days, 3 days, I don't know.

10        Q   When you were taken into custody on

11   October 14, 1992, did you have any jewelry?

12        A   Yes.

13        Q   Within your person?

14        A   Yes.

15        Q   Would you tell Judge Singer what jewelry

16   you had?

17        A   I had a gold in my nose.

18        Q   A gold what?

19        A   A gold loop, in my nose that I wore at

20   all times.  I had --

21        Q   Now prior to October 14, 1992, how long

22   had you worn that earring approximately?

23        A   Maybe a couple of years.

24        Q   And what happened to that earring once

V 103

1    you were taken to the police station?

2         A   Okay.  When I finally got in the lock up,

3    that's when they took my earring but that was

4    like, that was Wednesday, let's say Thursday

5    morning, they took my earring, you know, they put

6    it in the property, in a bag, took all my jewelry

7    I had.

8         Q   Did you have that earring in your nose on

9    October 9, 1992?

10        A   Yes.

11        Q   Now you saw some pictures taken of you

12   after you were in custody, did you not throughout

13   the trial, the State has shown various pictures of

14   you after you were in custody, did you not, such

15   as the line-up picture and Polaroid pictures of

16   you, you've seen those pictures have you not?

17        A   Okay, I saw --

18        Q   Just have you seen those pictures?

19        MR. FORD:  Objection, Judge.

20        THE COURT:  Overruled.

21        MR. SOROSKY:

22        Q   Have you seen those pictures?

23        A   Half of them.

24        Q   Well in this courtroom, you've seen those

V 104

1    pictures, have you not?

2          A    I saw the pictures that they took of me

3    after the line-up, they didn't --

4          Q    Did you see pictures of you, did you see

5    pictures of you?

6          A    Yes.

7          Q    Did those pictures have this earring in

8    your nose?

9          A    No.

10         Q    Was the earring removed from your nose

11   before any of those pictures?

12         A    Yes, before that particular picture.

13         MR. FORD:  I'm objecting to that, Judge.

14         THE COURT:  Sustained.  I don't know what

15   picture you're talking about.

16         MR. SOROSKY:

17         Q    Well, you've seen a number, throughout

18   this trial you've seen many pictures of you, have

19   you not?

20         A    Yes.

21         Q    I'll show you what has been marked

22   People's Exhibits 1 A, 4, and 7.  1 A is a

23   Polaroid picture of you, number 4 would be a close

24   up photo of you, and number 7 would be a line up


                    V 105

1    photo of you and other women in the line up and

2    you see all these pictures today, do you not?

3         A   Uh-hum, yes.

4         Q   And you've seen these pictures prior to

5    you looking at them this immediate moment, have

6    you not?

7         A   Yes.

8         Q   And in fact you've seen these pictures

9    both prior to trial and during the trial, correct?

10        A   Yes.

11        Q   Now, in any of these pictures, do you

12   have an earring in your nose?

13        A   No.

14        MR. FORD:  Objection, Judge, the photos

15   speak for themselves.

16        THE COURT:  Sustained.

17        MR. SOROSKY:

18        Q   Was the earring removed from your nose

19   prior to any of these pictures being taken?

20        A   Yes.

21        Q   Now, what did the police say to you after

22   you told them that you had lied about the rape,

23   and that you didn't do the shooting, what did they

24   say?

V 106

1          A   I think, I can't remember what was next,

2     I don't know if I said I would take a polygraph

3     test or I would do anything to prove that I didn't

4     do it.  I can't remember what they said after I

5     said I didn't do it.  First they was saying I was

6     lying about the rape and all that but, you know, I

7     can't remember what they said after that, I took

8     they took me to the room and read me my rights, I

9     took the polygraph test.

10         Q   Okay.  Now, did you give another version

11    of events?

12         A   Yes, after the polygraph test.

13         Q   And why did you -- were those other

14    versions of events the truth or a lie?

15         A   They were lies.

16         Q   Why did you make -- why did you state

17    those lies to the police?

18         MR. FORD:  Objection.

19         THE COURT:  Overruled.

20         A   Because he told me.

21         Q   That is a police officer told you?

22         A   Yes, the detective, I can't remember his

23    name, the one that gave me the polygraph test.

24    This is where the interrogation begins.  He tells

1    me that I was up here and I should be down here,

2    that you know, that I failed the polygraph test.

3    He said the polygraph placed me in the cab with

4    the gun and I told him that wasn't true, that he

5    was framing me up because I knew I wasn't in the

6    cab.  And he said, okay now, remember, you're up

7    here, you could be down here, right, so he said 5

8    years ago, the deceased had raped --

9         MR. FORD:  Objection to the narrative.

10        THE COURT:  Overruled.

11    A   The deceased had raped this girl and he

12    said it's good that he's -- he hate to say it but

13    it's good that he's dead, in other words, right,

14    and he said and he got away with the case, I can't

15    remember his exact words right now, but he said he

16    got away with the case and all I got to do is tell

17    the truth, you know, tell the truth like I was in

18    the cab.  He's saying that the polygraph test put

19    me in the cab with the gun and I'm telling him I

20    wasn't there.  So he was saying I said so, can I

21    go home, he said if you tell me the truth.  He

22    said now remember this man raped somebody about 5

23    years ago and he got away with it, so ---.

24    Q   But believe the policeman was giving you

1    a signal to change your story?

2            A   Yes.

3            Q   And what did you believe the man wanted

4    you to say?

5            MR. FORD:  Objection to the leading Judge.

6            THE COURT:  Sustained.

7            MR. SOROSKY:

8            Q   Well what did you believe the policeman

9    wanted you to say, I don't know how else I could

10   ask it?

11           MR. FORD:  Objection.

12           THE COURT:  The previous question was

13   leading.

14           MR. SOROSKY:

15           Q   What did you believe the policeman wanted

16   you to say?

17           MR. FORD:  What is the relevance of that,

18   Judge.

19           THE COURT:  It goes to why she made the

20   statement.  I believe that in general this is

21   proper examination.

22           MR. SOROSKY:

23           Q   What did you believe the policeman wanted

24   you to say?


                        V 109

1        A   I believe he wanted me to say that I did

2   it, that I was in the cab, that I was raped which

3   I had already told them that I was not, but by him

4   bringing that up, that made me think that's what

5   he wanted me to say again so I can go home and all

6   I'm thinking in my mind I want to go home.

7                So I made up this tale, said this

8   man, I was sitting in a cab and this man came up

9   with a leather coat.  So I wasn't there so I'm

10  making up anything because I didn't know what

11  happened.

12       Q   Why you did keep changing your story?

13       A   Because if I say one thing, that was

14  never good enough or that's not right, I said well

15  can I go home?  You can go home if you just tell

16  me this.  Something is not quite right, always

17  something.  So I would change it again, I would

18  make up anything, anything else, you know, just

19  anything stupid that I could think of just so I

20  can go home because in my mind, I'm going home,

21  you know.

22       Q   Did you believe the policemen were

23  signaling to you if you gave the right story you

24  could go home?

V 110

1          A   Uh-hum.

2          MR. FORD:  Objection to leading.

3          A   In my mind I thinking I'm going home.

4          THE COURT:  Sustained.

5          MR. SOROSKY:

6          Q   What did you believe the policemen were

7    telling you?

8          A   To say I did it.

9          MR. FORD:  Objection.

10         THE COURT:  Overruled.

11         MR. FORD:  Foundation.

12         A   So to say I had something to do with it.

13         THE COURT:  You said something after the

14   objection.

15         MR. FORD:  My objection is foundation, at

16   what point during the many many points.

17         THE COURT:  Sustained.

18         MR. SOROSKY:

19         Q   What did you believe the policemen were

20   telling you after you told your first lie and that

21   you were in the cab and so forth, in other words,

22   I apologize.  Why did you keep changing your

23   story?

24         A   Like I said, it never was good enough for

V  111

1    them.  I wanted to go home, so I would just keep

2    making up stuff so I can go home.  I'm thinking in

3    my mind I'm going home.  To the end I knew I

4    wasn't going home, I had a feeling I wasn't going

5    home.

6         Q  After you were in custody, after you were

7    in custody, was your first version of events to

8    the police the truth?

9         MR. FORD:  Objection, asked and answered.

10        A  Yes.

11        THE COURT:  Sustained.

12        MR. SOROSKY:

13        Q  Was every version of events thereafter a

14   lie?

15        A  Yes.

16        MR. FORD:  Objection.

17        THE COURT:  Overruled.

18        MR. SOROSKY:

19        Q  Where did you learn about the elderly

20   couple, Miss Hess and Mr. Eiselt?

21        MR. FORD:  Objection.

22        THE COURT:  Overruled.

23        A  From Detective Bogucki and from Detective

24   Schalk.


V 112

1          Q  What did they tell you about the elderly

2     couple in Joliet and so forth, what did they tell

3     you?

4          A  Okay.

5          MR. FORD:  Objection, foundation.

6          THE COURT:  Sustained.  Foundation.  Where,

7     when.

8          THE COURT:  Excuse me, excuse me one

9     moment.

10              Mr. Sorosky.  Continue.

11         MR. SOROSKY:

12         Q  Now, how did you first find out about

13    this elderly couple June Hess, Mr. Eilelt?

14         A  Detective Bogecki and from Detective

15    Schalk.

16         Q  And what did they tell you about this

17    couple?

18         A  They said that I, that me, that I was in

19    Joliet at the River Boat Casino.  That I got in

20    you a half a block -- or either -- okay, the cab

21    driver pulled in, I got in the cab or either they

22    got in the cab a half a block after me or before

23    me I can't remember, then they said that I was in

24    the back seat.  They said me, I was in the back

V 113

1    seat, and that, okay, he asked me he said, did

2    you, when the two old people came in, did you get

3    in the back seat, were you in the back seat or

4    were you in the front seat.  I said I wasn't

5    there.  So I don't know.

6                    He said okay.  Listen, so which one

7    asked to go to the liquor store, this is how he's

8    talking to me.  I said I don't know because I

9    wasn't there.

10                   He said so, the 2 old people, when

11   you was going to O'Hare Field, I said I didn't, I

12   wasn't in the cab, I wasn't going to O'Hare field,

13   right.  He was like somewhere did you drop the 2

14   old people off, right, like that, that's how he

15   was telling me.

16                   Then he said I gave the 2 old people

17   a bus ticket and he was saying something about

18   which one of the old people asked me, asked me or

19   the cab driver, could he stop at the liquor store

20   or something like that.  And that's it, that's how

21   they was telling me, that's how he was saying, you

22   got in the cab, or the old people got in the cab

23   and which one of them asked you to go to the

24   liquor store.

V 114

1              And I'm like, I don't know, I wasn't

2    there, why would they ask me, you know, you know.

3         Q  Did the police tell you about this

4    elderly couple in the cab and Joliet before or

5    after you told the police that your rape

6    allegation was a lie, that you didn't -- and that

7    you were innocent of the murder?

8         A  Okay.

9         MR. FORD:  Objection.

10        THE COURT:  Overruled.

11        A  When I went into the police station, they

12   told me that they -- I'm trying to think back,

13   they didn't bring me in there for what they said

14   they brought me in there for, they brought me in

15   for the murder of Mr. Bennett.  I told them that I

16   didn't do it.  They said well 2 old people said

17   that you did, they identified you because when I

18   went to the police station, on 11th and State,

19   they took a Polaroid picture of me which they

20   didn't display in Court with my cap on and my

21   earring in my ear --  my nose, excuse me and they

22   said they showed the polygraph picture to the 2

23   old picture.  They said it was me in the cab

24   placing me in the cab and they said my

V  115

1    fingerprints was in the cab before and after the

2    polygraph test and everything that's when they

3    start telling me about the 2 old people.

4         Q   And what did you tell the police at

5    first?

6         A   About what, the 2 old people?

7         Q   Yeah?

8         A   I said I didn't see the 2 old people I

9    said I wasn't in the cab, I hadn't been in a cab

10   in over 3 years, in over a year like that, because

11   I got my own car.

12        MR. SOROSKY:   Nothing further from this

13   witness.

14        THE COURT:   Cross.

15                 CROSS EXAMINATION

16                      BY

17                 MR. FORD:

18        Q   Miss Lindsey, before you talked to anyone

19   from the police department, the first person you

20   told this story about a cab to was somebody at the

21   hospital at Christ Hospital, is that right --

22   excuse me, South Chicago Hospital?

23        A   Yes, the lie that I told?

24        Q   I'm just asking you about your first

1      STORY, the first version of events you told,

2      right?

3            A   Right.

4            Q   You show up at South Chicago Community

5      Hospital, right?

6            A   Yes.

7            Q   That was on the Sunday after this

8      happened, is that right?

9            A   Right.

10           Q   And you told them at 12:30 in the morning

11     on October 10, 1992 you were abducted?

12           A   Yes, I don't know if I said 12:30, I

13     think I said much later than that but whatever I

14     said.

15           Q   Do you recall saying at either 12:30 or 1

16     o'clock in the morning?

17           MR. SOROSKY:  We'll stipulate that --

18           MR. FORD:  Judge, I would ask to be allowed.

19           THE COURT:  Yes, let him cross.

20           MR. FORD:

21           Q   Did you tell them at the hospital at

22     South Chicago Hospital that on October 10, at

23     12:30 or 1 o'clock in the morning, you had been

24     abducted by a cab driver, driving a red and white

V 117

1    cab?

2         A   Yes.

3         Q   And you told them that you had been

4    abducted and that he held you at knife point from

5    then until that Sunday evening, is that right?

6         A   Yes.

7         Q   You told them at Christ Hospital that you

8    had killed this cab driver by stabbing him in the

9    chest, didn't you?

10        A   No, I did not.

11        Q   You told them at Christ Hospital --

12   excuse me, at South Chicago Hospital you stabbed

13   him in the chest, didn't you?

14        A   I said I stabbed him.  I didn't know

15   where I stabbed him.  I stabbed him like that and

16   ran.

17        Q   Do you recall telling them --?

18        A   I didn't say I killed them.

19        Q   I'm going to ask the questions and if

20   they call for a yes or no answer I would

21   appreciate if you could answer like that.  Do you

22   recall telling them at South Chicago Hospital that

23   you stabbed the cab driver on the left side of the

24   chest?

V 118

1          A    Yes, I remember saying I stabbed him.

2          Q    On the left side of the chest?

3          A    I could have said that, I can't remember

4     but I know I said I stabbed him.

5          Q    And you ran into some woods and you told,

6     you were told you were in Joliet, is that right?

7          A    That's right, that's the lie I told.

8          Q    And this lie that you say you told, you

9     included the fact that you were in this woods, is

10    that right?

11         A    Uh-hum.

12         Q    When you came --

13         THE COURT:  You have to say yes or no?

14         A    I'm sorry, yes.

15         MR. FORD:

16         Q    And you told them that these woods were

17    in Joliet?

18         A    Yes.

19         Q    So you told them that you had been

20    released in Joliet, is that right?

21         A    Released?  What you mean?

22         Q    Well you escaped from this sexual

23    assault?

24         A    Yes.

V  119

1          Q   So the first person to ever talk about

2    sexual assault by the cab driver was you, right?

3          A   Yes.

4          Q   And the first person to ever talk about

5    the color of the cab that the sexual assault

6    occurred in was you, right?

7          A   But I didn't say specific.

8          Q   True or false, answer that?

9          A   Yes.

10         Q   The first person to ever talk about the

11   fact that there was even a cab involved was you,

12   wasn't it, Miss Lindsey?

13         A   Yes.

14         Q   And the first person to talk about the

15   fact that this had occurred, originated in Joliet

16   was you, is that right?

17         A   Yes.

18         Q   And that was all at a time when you were

19   at South Chicago Hospital?

20         A   Yes.

21         Q   Okay.  I want to talk about the date of

22   October 9, 1992.  The evening hours.  What time

23   did Irene Quiroz go to work that night?

24         MR. SOROSKY:  Objection, I didn't ask any

V 120

1    questions about October 9, 1992.

2         THE COURT:  Sustained.

3         MR. FORD:  Judge, I would ask to be heard on

4    that objection.

5         THE COURT:  All right.

6         MR. FORD:  How can counsel expect to

7    restrain or constrain me during the course of my

8    cross examination about an incident she described

9    to the police if I can't go into the incident?

10   It's perfectly illogical Judge, very relevant to

11   all these purported versions of the events that

12   Miss Lindsey is offering.

13        THE COURT:  What is it question a lead off

14   to?

15        MR. FORD:  A lead off into the course of

16   events that she's describing in the handwritten

17   statement.

18        THE COURT:  All right, I'm going to

19   overrule.

20        MR. SOROSKY:  Your Honor, if I could be

21   heard.

22        THE COURT:  Yes.

23        MR. SOROSKY:  I only asked questions

24   concerning Miss Lindsey's version of events after

V 121

1    she was taken into custody.

2          THE COURT:  No, you didn't because of course

3    the events --

4          MR. SOROSKY:  Now --

5          THE COURT:  Excuse me, before she was taken

6    into custody, someone was killed and robbed and

7    you had asked her.

8          MR. SOROSKY:  Did she do it.

9          THE COURT:  Yes.

10         MR. SOROSKY:  She said she didn't.

11         THE COURT:  Well that was it.  So therefore

12   you did ask about those events that occurred

13   before she was taken into custody.

14         MR. SOROSKY:  Very well.

15         THE COURT:  Accordingly, within the scope.

16   I just re-read my notes on that and it is within

17   the scope.

18         MR. SOROSKY:  Very well.

19         THE COURT:  Mr. Ford's reasons

20   notwithstanding, it still was within the scope.

21   Go ahead.

22         MR. FORD:  Thank you Judge.

23         Q   Now, you left Irene in the early morning

24   hours of October 9, 1992, didn't you?


                        V 122

1        A   No.

2        Q   You didn't hook up with Jerry St. Clair

3   on October 9, 1992?

4        A   No.

5        Q   You left and hooked up with Jeri Jerry

6   St. Clair after Irene went to work on October 9,

7   and 10, 1992, is that correct?

8        A   It was October 10 like around 1:20 or

9   quarter to or something like that in the morning.

10       Q   In the morning?

11       A   Yes.

12       Q   Now, that was when Irene was at work?

13       A   Yes.

14       Q   She told you she was going to work at 11,

15   is that right?

16       A   Yeah I saw her go.

17       Q   And at the time that you -- may I have a

18   moment, Judge?

19       THE COURT:   Yes.

20       Q   And you called Jerry St. Clair before you

21   went over to his house, didn't you?

22       A   No he called me.   And it wasn't Jerry it

23   was Jack.

24       Q   Did you call Jack, did you call Jack's

V 123

1    house before you went over?

2         A   No he called me, I called like earlier.

3         Q   I'm asking you at all that night did you

4    call him?

5         A   No, I did not.

6         MR. FORD:   Just one moment, Judge.

7         THE COURT:   Yes.

8         MR. FORD:

9         Q   You say you went over to Jerry St.

10   Clair's house or Jack St. Clair's house?

11        A   Yes.

12        Q   Who was the St. Clair that came in and

13   testified?

14        A   That was Jack.

15        Q   And it was Jack St. Clair's house you

16   went over to, is that right?

17        A   Yes.

18        Q   After you went to Jack St. Clair's house

19   you stayed there until the next morning, that

20   would have been the morning of the 10th, Saturday

21   morning, is that right?

22        A   I went over his house the 10th, I stayed

23   over there until Sunday night.

24        Q   So you were there continuously until

1    Sunday night?

2         A   Yes.

3         Q   How many times did you see Jack between

4    --?

5         A   Okay, Jack picked me up, I saw him from

6    the time we got to his house, I was with him for

7    about maybe a half -- maybe an hour.

8         Q   And then you stayed in the house the

9    whole weekend?

10        A   Yes, I did.

11        Q   Now, it was after spending that time over

12   at the St. Clair's you then walked out, is that

13   correct?

14        A   Sunday night, Jerry walked me to the bus

15   stop and that's when you know I was telling him

16   about how I was going to tell the lie and he was

17   telling me not to do it.

18        Q   You were telling Jerry that?

19        A   Yes and he was telling me don't do it,

20   just tell Irene.  She wasn't going to be mad.

21        Q   Irene knew about Jerry and Jack St.

22   Clair, didn't she?

23        A   They used to work with us but not any

24   more.


V 125

1          Q    At Policon?

2          A    Right.

3          Q    They worked together, is that right?

4          A    We all did.

5          Q    Now, at the time -- what did -- if I

6     could have a moment, Judge?

7               THE COURT:  Yes.

8               MR. FORD:  Just one moment, Judge.

9          Q    Now Miss Lindsey, it's your testimony

10    today regarding the statement that what is

11    contained in the statement which is People's

12    Exhibit number 9 for identification, the

13    handwritten statement that your attorney showed

14    you, that's what the police told you to say?

15         A    That's what they told me.

16         Q    What you thought the police wanted you to

17    say?

18         A    That's what they told me.

19         Q    So none of the information in here was

20    provided by you?

21         A    Except a couple of things I added my own

22    little stuff like I walked down the expressway

23    because I was tired, I was tired of them in my

24    face.

1          Q    You added the things because you were

2     tired, is that right?

3          A    That's right, I was.

4          MR. SOROSKY:   Your Honor, I think if you're

5     talking about a long detailed statement, I think

6     the State's Attorney should be specific as to what

7     Miss Lindsey supposedly considered herself and

8     what Miss Lindsey considers the police.

9          THE COURT:   I think he was relatively

10    specific, indeed more so then you had been.

11         MR. SOROSKY:   I grant you I may not have

12    been specific, but I think we're dealing now with,

13    you know --

14         THE COURT:   I think he was sufficiently

15    specific although many times such an objection

16    would be well taken but not now.

17         MR. SOROSKY:   Very well.

18         MR. FORD:

19         Q    Talking about your hand written statement

20    now Miss Lindsey, okay?

21         A    Uh-hum.

22         Q    The information provided in here was all

23    information that the police told you to say or

24    that they wrote themselves and then had you adopt?


                           V  127

1          A   They told me that, they told me that,
2      they told me all of that except a couple of things
3      like little stupid stuff in there.  You see, that
4      I walked down the expressway, walked home or
5      something like that, stopped at Chinese place,
6      that's when I was tired you know, I already
7      thought -- ---.
8          Q   You added at that point?
9          A   That's what I added.
10         Q   That you went to the restaurant. You told
11     them you were 30 years old, didn't you?
12         A   Yes, I did.
13         Q   And you told them that you took a train
14     from Chicago to Joliet, didn't you?
15         A   No, I did not.
16         Q   Who was the first person to tell you you
17     had to say you took a train from Chicago to
18     Joliet?
19         A   Okay, you see I know, I told so many
20     tales.
21         Q   It's hard when you tell a lot of lies?
22         A   Yeah, it is, real bad, you know.
23         Q   Now, Miss Lindsey, I'm going to ask you
24     this question?

1      A   I could have said that, I could have said

2  that, so I'm not going to deny it.

3      THE COURT:  Wait, wait, counsel, counsel, we

4  do have a super Court Reporter but I don't think

5  even the Court Reporter can catch what is being

6  said when 2 people are talking.  Indeed I have

7  some difficulty and I'm not nearly as good as he

8  is.

9      MR. FORD:  I apologize to the Court.

10     THE COURT:  Let us have one person talk at a

11  time.  If you think the answer is not responsive,

12  you can object.

13     MR. FORD:  Thank you, Judge.

14         So you think Miss Lindsey, that you

15  might have told them that you took the train from

16  Chicago to Joliet?

17     A   Uh-hum.

18     Q   You have to say yes or no?

19     A   Oh, I'm sorry, yes.

20     Q   Now, you told them that when you got to

21  Joliet, you began walking around, is that right?

22     A   Yes, you could say I told the State's

23  Attorney that.  I didn't tell the detective

24  anything.

V 129

1        Q   Well you never had told the detectives

2    that you began to walk around?

3        A   No.   They was there when I was talking to

4    her, after she said she was not going to believe

5    when I said.

6        THE COURT:   Now you're the culpret, you must

7    wait until the question has been asked before you

8    start talking?

9        A   Okay.

10       THE COURT:   Because what you have to say is

11   very important.

12       A   Okay.

13       THE COURT:   And it's difficult to hear what

14   you're saying when someone else is talking along

15   with you.   Wait for the question.

16       MR. FORD:   May I inquire Judge.

17       THE COURT:   Please.

18       MR. FORD:

19       Q   Did you ever tell the police before the

20   Assistant State's Attorney got there that when you

21   got to Joliet you began to walk around in the

22   woods?

23       A   No.

24       Q   They told you to say that when the

V 130

1    Assistant State's Attorney got there?

2          A    No.

3          Q    You just made it up when the Assistant

4    State's Attorney got there?

5          A    Yes.

6          Q    So you did tell them that?

7          A    That, yes.

8          Q    Now, I'm talking about the handwritten

9    statement now again, you told the Assistant

10   State's Attorney, didn't you Miss Lindsey, that

11   you walked for a while and ended up near a

12   building while you were still in the woods, do you

13   remember telling the Assistant State's Attorney

14   that?

15         A    No.

16         Q    You didn't never say that?

17         A    Uh-huh, no.

18         Q    You have to say no?

19         A    No, I'm sorry.

20         Q    Now, Miss Lindsey, you did tell the

21   Assistant State's Attorney that you had gone too

22   far and you didn't want to walk back to town at

23   that time when you came upon the building in the

24   woods, didn't you?

V 131

1          A    No.

2          Q    You never told the Assistant State's

3    Attorney that?

4          A    No.

5          Q    Did you ever tell the Assistant State's

6    Attorney that you saw a cab and you decided to

7    stop him so you could get a ride back to home?

8          A    No.

9          Q    You never told the Assistant State's

10   Attorney that?

11         A    Uh-uh -- I'm sorry, no.

12         Q    Did you ever tell the Assistant State's

13   Attorney that you got into the cab and the cab

14   stopped a short distance later and picked up an

15   older couple?

16         A    No, I did not.

17         Q    You never told that to the Assistant

18   State's Attorney?

19         A    No, I did not.

20         Q    Did you ever tell the Assistant State's

21   Attorney, I'm talking about, you remember the one

22   that came in Julie Nelson, blond haired woman?

23         A    Yes.

24         Q    Okay?

V 132

1        A   Okay, okay.  Wait a minute, we're talking
2   about the State's Attorney now right?
3        Q   Well, I asked the question about the
4   State's Attorney?
5        A   That statement right there I said, I
6   repeated what the police told me and I made up my
7   own, added little stuff in there, you understand
8   what I'm saying.
9        Q   I'm asking you now, whether or not you
10  told that to an Assistant State's Attorney?
11       A   Yes.  I told that to her.
12       Q   Was that something you made up or the
13  police told you to say?
14       A   Something that the police told me.
15       Q   The police told you to say you got in a
16  cab?
17       A   Yeah, they said that I was in the cab
18  with the old people.
19       Q   But you had told the police already?
20       A   I wasn't in the cab with the old people.
21       Q   Miss Lindsey, I'm just talking about
22  getting into the cab initially, you were the first
23  person to say you ever got in a cab on October 9,
24  1992, is that right?

V 133

1        A   Yes.

2        Q   And when you told the Assistant State's

3   Attorney when she was making the handwritten

4   statement that you got into a cab on October 9,

5   1992, that was the same thing that you told the

6   hospital people, wasn't it?

7        A   Excuse me, but I didn't say I got in a

8   cab October 9, I didn't say that, I never said

9   that.

10       Q   You never said you got into a cab on

11  October 9th?

12       A   No, I did not, I never said October 9, I

13  kept telling her it was not the 9th, I can't be in

14  2 places at one time, and she listened to me.

15       Q   You told the Assistant State's Attorney?

16       A   Yes, I did.

17       Q   That you had been to Venture?

18       A   Yes.  I tried to tell her.

19       Q   You told the Assistant State's Attorney

20  that you went to Walgreens?

21       A   Yes.

22       Q   And you told the?

23       A   She would not believe me.

24       Q   You told the Assistant State's Attorney

V 134

1    -- where did you eat that day?

2              A    I told her we went to Shakeys.

3              Q    That was for dinner is that correct?

4              A    No.  It was not for dinner.

5              Q    Was it for lunch?

6              A    It was in the morning time, you could say

7    lunch, 12:00.

8              Q    So it was for lunch?

9              A    Yeah you could say that.

10             Q    And that was at a time when she was

11   talking to you about what had happened, is that

12   correct?

13             A    Uh-hum, she told me that the Judge wasn't

14   going to believe me because I had told too many

15   lies, she wasn't going to believe me so I threw up

16   my hands at that point.

17             Q    And then did you tell the Assistant

18   State's Attorney that you got out of the back seat

19   and got into the front seat next to the cab

20   driver?

21             A    No, uh-uh.

22             Q    Did you tell the Assistant State's

23   Attorney that you talked to the cab driver about

24   going to O'Hare Airport?

V  135

1              A   No, you see --

2              Q   Did you tell the Assistant State's

3       Attorney that the cab stopped at a liquor store

4       and the older couple, so the older couple could by

5       some beer, did you tell that to the Assistant

6       State's Attorney?

7              A   No.

8              Q   Did you tell the Assistant State's

9       Attorney that they dropped the couple off and

10      drove, then you and the cab driver drove directly

11      to O'Hare?

12             A   ( No audible response.)

13             Q   No?  You have to answer out loud?

14             A   No, I'm sorry.

15             Q   Did you tell the Assistant State's

16      Attorney that when you got to O'Hare, that the cab

17      driver drove up into the parking lot and drove

18      around until he parked?

19             A   No.

20             Q   Did you tell the Assistant State's

21      Attorney that you didn't know why the cab driver

22      parked in the garage?

23             A   Yes, that's something I said, yes.

24             Q   You did say that?

V 136

1          A   Uh-hum.

2          THE COURT:   You have to say yes or no?

3          A   Yes.

4          MR. FORD:

5          Q   So Miss Lindsey, did you tell the

6     Assistant State's Attorney that the cab driver

7     stopped, after he had stopped, he said he was not

8     going to drive her home, drive you home, did you

9     tell the Assistant State's Attorney that?

10         A   No, I didn't say that.

11         Q   Miss Lindsey, did you tell the Assistant

12    State's Attorney that you didn't intend to pay the

13    cab driver?

14         A   No.

15         Q   Did you tell the Assistant State's

16    Attorney that you then opened the passenger's door

17    and got out of the cab and attempted to get out of

18    the cab when the cab driver grabbed your arm, did

19    you tell that to the Assistant State's Attorney?

20         A   Yes, I believe I said something to that

21    effect, yes, I did. Then I told her I ran. I ran

22    to the expressway or something and started walking

23    home.

24         Q   Did you tell the Assistant State's

V 137

1    Attorney, Miss Nelson, that you then turned around

2    and the cab driver and he put his hand on your

3    throat and let go of your arm?

4         A   Yes.

5         Q   You told her that?

6         A   Yes.

7         Q   And did you tell the Assistant State's

8    Attorney while you were riding in the cab you

9    noticed a gun between the seats of the cab?

10        A   Yes.

11        Q   And you told the Assistant State's

12   Attorney that after the cab driver let go of your

13   arm, you grabbed the gun from between the seats?

14        A   Yes .

15        Q   And now, that was something you made up?

16        A   Yes.

17        Q   Did you also tell Miss Nelson, the

18   Assistant State's Attorney, that after you grabbed

19   the gun you pulled the trigger and held it and it

20   went off a few times?

21        A   Could you repeat that?

22        Q   Okay.  Do you recall telling Miss Nelson

23   the Assistant State's Attorney that after you

24   grabbed the gun, you pulled the trigger and held

V  138

1    it and the gun went off more than once, do you

2    recall telling the Assistant State's Attorney

3    that?

4         A   No, I didn't say that.

5         Q   Do you recall telling the Assistant

6    State's Attorney that you were sitting next to the

7    cab driver when you fired the gun at him?

8         A   Yes.

9         Q   And was that something you made up?

10        A   Yes.

11        Q   Were you sitting -- did you tell the

12   Assistant State's Attorney, Miss Lindsey, that

13   after you fired the gun, you reached into the cab

14   driver's pocket and took out his wallet?

15        A   No.

16        Q   And nobody else ever told the Assistant

17   State's Attorney that in your presence, did they?

18        A   No, the detective --

19        Q   I'm asking --?

20        A   No, no.

21        Q   Whether or not anybody else ever said

22   that in your presence?

23        A   No.

24        Q   And no one else ever said that in your

V 139

1    presence, right?

2         A   The detectives.

3         Q   They told her to write it like that?

4         A   She wrote it like she wanted to write it,

5    he told me, they said just like this.

6         Q   Miss Lindsey --  Objection, Judge, not

7    responsive?

8         THE COURT:  Sustained.

9         MR. FORD:

10        Q   Miss Lindsey, I'm going to ask you the

11   question like this.  At the time when you were

12   preparing the handwritten statement with the

13   Assistant State's Attorney Nelson, did you ever

14   say the words that after you fired the gun, you

15   reached into the cab driver's pocket and took out

16   his wallet?

17        A   No.

18        Q   Did you ever say those words?

19        A   No.

20        Q   Did you ever say the words, did you ever

21   say anything like that?

22        A   No.

23        Q   Did you ever say the words that you took

24   the gun and your purse from the cab, did you say

1    you took the gun and your purse from the cab and

2    left?

3          A    No.

4          Q    Did you ever say anything like that?

5          A    (No audible response.)

6          Q    You have to answer out loud?

7          A    I'm thinking.  I could have said that, I

8    could have said that.

9          Q    Now,--

10         A    I would say.

11         Q    If you said that, you said that because

12   you made it up, is that right?

13         A    Right, some things I said, some things I

14   didn't say that's on the paper.

15         Q    That's why I'm asking you Miss Lindsey.

16         A    Okay.

17         Q    Did you ever tell the police that after

18   you got out of the parking garage, -- excuse me,

19   did you ever tell the Assistant State's Attorney

20   after you got out of the parking garage and on to

21   the street you threw the gun on the side of the

22   road and kept walking and took the cash out of the

23   cab driver's wallet and put the cash in your

24   wallet, did you ever tell the Assistant State's

```
1     Attorney that?

2          A   Yes.

3          Q   Was that something you made up?

4          A   Yes.

5          Q   Did you ever tell the Assistant State's

6     Attorney that you threw the cab driver's wallet on

7     the side of the road and also threw your purse

8     into the middle of the road?

9          A   Yes, I think I did.

10         Q   Was that something that you made up?

11         A   Yes.

12         Q   Did you ever tell the Assistant State's

13    Attorney that somebody stopped and picked you up

14    up and you told the lady that you had been raped?

15         A   Yes.

16         Q   Now that was the same thing you had said

17    at the hospital, right?

18         A   That's what I said at first but I didn't

19    say that later.

20         Q   I'm just asking you whether or not that's

21    the same thing you said at the hospital, yes or

22    no?

23         A   Yes but I didn't say that there, you

24    understand what I'm saying.
```

V 142

1          Q   You never said that to the Assistant

2     State's Attorney?

3          A   No.

4          Q   Miss Lindsey, did you ever say to the

5     Assistant State's Attorney that the woman's name

6     who picked you up was Carolyn Brown?

7          A   Yes.

8          Q   Did you make that up?

9          A   Yes.

10         Q   You never told her you had been picked up

11    by a lady, but you told her the name of the lady

12    who picked you up?

13         A   Right because I was telling her about the

14    rape allegation, you understand what I'm saying.

15    You see I said so many different things, I told so

16    many lies, you understand what I'm saying, I told

17    so many lies.

18         Q   I think I'm starting to understand what

19    you're saying.

20         A   I think I said that, I said a lot of

21    things, but I did not, quote unquote, I did not

22    say that I was in the cab with two old people, I

23    did not say that I stole his money or killed this

24    man.

V 143

```
 1            MR. FORD:  Objection, Judge.

 2            THE COURT:  Sustained.

 3            MR. FORD:

 4            Q   Miss Lindsey, did you tell the Assistant

 5       State's Attorney that the lady, Carolyn Brown

 6       dropped you off at 95th Street and the Dan Ryan?

 7            A   Yes, I could have said that.

 8            Q   And did you make that up?

 9            A   Yes.

10            Q   Did you tell the Assistant State's

11       Attorney that you then went to the el stop to get

12       some food?

13            A   Yes.

14            Q   And did you make that up?

15            A   Yes.

16            Q   Did you tell the Assistant State's

17       Attorney that you went into a bar and had some

18       drinks and went to a Polish sausage stand?

19            A   Yes.

20            Q   Did you make that up?

21            A   Yes.

22            Q   The only thing the police fed you was

23       this business about the older people?

24            A   Yes, what I told you they told me.
```

V  144

1          Q   Let me ask the questions, okay Miss

2     Lindsey, the only thing that the police fed you

3     was the thing about the older people, is that

4     true?

5          A   Yes.

6          Q   And they fed you the fact that you shot

7     somebody, is that right?

8          A   Yes.

9          Q   All the other facts were things that you

10    had made up?

11         A   Yes.

12         Q   Now Miss Lindsey, did you ever tell the

13    Assistant State's Attorney that on Sunday you

14    began to worry about what you had done so you went

15    to South Chicago Hospital and reported you had

16    been raped by a cab driver you had killed?

17         A   No.

18         Q   You never told the Assistant State's

19    Attorney that?

20         A   No, I did not.

21         MR. FORD:  One moment, Judge.

22         THE COURT:  Yes.

23         Q   Now you also told Detective Hines the

24    African American detective that came in, the same

1    story about being raped by a cab driver and 40

2    hours of being held at bey and having had this

3    happen, the cab driver get away, didn't you?

4         A  Yes.

5         Q  You told him the cab was a red and white

6    cab from Joliet, didn't you?

7         A  No, I did not.

8         Q  You never told Detective Hines it was a

9    red and white cab?

10        A  No.

11        MR. SOROSKY:  This would be on Monday night

12   just so we're clear.

13        THE COURT:  I'm sorry?

14        MR. FORD:  I gave the name of the officer

15   she spoke to, she knew who I was talking about, I

16   ask counsel refrain from that.

17        MR. SOROSKY:  Well, there has been one

18   interview with this officer and Miss Lindsey, I

19   mean just rather than objecting, I'm just

20   clarifying the date.

21        THE COURT:  No, counsel.

22        MR. SOROSKY:  Well object, he has to mention

23   the date.

24        THE COURT:  Overruled.


V  146

1          MR. FORD:  Just one moment, Judge.

2          Now, Miss Lindsey, you had been smoking

3     cocaine over at the St. Clair's house, right?

4          A    Yes.

5          Q    You had been on kind of a cocaine binge

6     hadn't you?

7          A    Yes.

8          Q    You testified earlier you smoked about 8

9     or 9 rocks of cocaine between the 10th and 11th of

10    October, 1992?

11         A    (No response.)

12         Q    Is that right?

13         A    I don't think I said that, I'm sure I

14    smoked a lot more.

15         MR. FORD:  Just one moment, Judge.

16         Q    Now Miss Lindsey, do you remember how

17    many different stories you told the police about

18    where you had been on October 9, 1992?

19         A    No.

20         Q    I'm sorry?

21         A    No.

22         Q    And when they were talking to you, they

23    were talking to you about the date of October 9,

24    1992, weren't they?

1          A   Yes.

2          Q   Now, did you ever tell the Assistant

3    State's Attorney, Julie Nelson that you had been

4    at Shakeys and the 2 stores?

5          A   Yes, I did.

6          Q   Did you also tell the detectives that you

7    had been at the 2 stores and at Shakeys?

8          A   Yes, they was in there when I talked to

9    her.

10         Q   All three of them were together when you

11   told them the story?

12         A   Yes.

13         Q   And that was towards the end of the time

14   you were with the police, is that correct?

15         A   Yes.

16         Q   That was right before they completed the

17   handwritten, is that right?

18         A   No exactly.  See, excuse me, I told the

19   police eventually before, before I talked to Susan

20   Nelson, Julie Nelson.

21         Q   Julie?

22         A   When she came in there I repeated it

23   again.

24         Q   You had told the detectives one time

1    before that and then you told them when Julie

2    Nelson came in?

3        A   I told them before.

4        Q   That was at a time just prior to the time

5    you made your hand written statement, is that

6    correct?

7        A   Before I told her this?

8        Q   Yes?

9        A   Well --

10       Q   Miss Lindsey, you told her this stuff

11   about Walgreens and Venture and Shakeys

12   immediately prior to the time that you signed your

13   hand written statement in this case, is that

14   right?

15       A   No, I told her as soon as she sat down,

16   we had been in there at this conference room for 2

17   or 3 hours.

18       Q   One of the first things you said to her?

19       A   Yes, it was.

20       Q   And a while later, an hour or 2 hours

21   later, you were presented with a handwritten

22   statement, is that right?

23       A   Yes.

24       Q   You read the handwritten statement,

1    didn't you?

2         A   Yes.

3         Q   Doesn't say anything about Walgreens in

4    there, does it?

5         A   No.

6         Q   Doesn't say anything about Venture or

7    Shakeys?

8         A   No.

9         Q   You signed it and you indicated that you

10   accepted it as something that you had said?

11        A   Like I said --

12        Q   Is that right?

13        A   Yes I signed the paper.

14        Q   And she told you she was an Assistant

15   State's Attorney?

16        A   Yes, she did, she won't give me a lawyer.

17        Q   She told you she was not your lawyer?

18        A   And she also told me that she was the one

19   who decides whether I go to jail or not.

20        Q   You figured if you admitted to shooting a

21   cab driver and taking his money you were going to

22   go home?

23        A   No, at that point --   --

24        Q   I'm asking you is that what you thought?

1            MR. SOROSKY:  She said no.

2            THE COURT:  Is there an objection?

3            MR. SOROSKY:  No, she said no and that's

4    it.  Then he starts criticizing her.

5                    Object to his criticism of her.

6            THE COURT:  I don't know if it could be

7    characterized as criticism but sustaining the

8    objection.

9            MR. FORD:

10           Q  Did you ever tell the polygraph examiner,

11   Mr. Tovar, that you had gone to Shakeys and all

12   these other places, Venture and Walgreens?

13           A  I don't know, I don't think so, I can't

14   recall, I doubt it.

15           Q  You never told Jack Hines you had been to

16   any of these places, had you?

17           A  No, because -- no.

18           MR. FORD:  One moment, Judge.

19           THE COURT:  Yes.

20           Q  What time in the late evening hours of

21   October 9, 1992, what time did Irene go to work?

22           A  She left around 11 o'clock, quarter to

23   11:00 or 11:00.

24           Q  And what was the first thing that

                        V 151

1    happened after she left to go to work?

2         A    My daughter and I, we were watching TV.

3         Q    And you left your daughter alone in the

4    house when you went over to the St. Clairs?

5         A    Yes.

6         Q    How old is she?

7         A    She's 16, she will be 17 March 23.

8         Q    She's 17 years old?

9         A    She will be March 23, she was 14 at the

10   time.

11        Q    Who is she living with now?

12        A    She's staying with my auntie.

13        Q    What's your aunt's name?

14        A    Grace McKnight.

15        Q    What is her address?

16        A    821 East 81st Street.

17        Q    You heard Miss Quiroz during the course

18   of her testimony talk about your step parents, is

19   that right?

20        A    No, no, my father and his girlfriend,

21   they're not married.

22        Q    Okay?

23        A    But that's how she was talking.

24        Q    Is that who she was talking about?

V 152

1          MR. SOROSKY:  Objection.

2          THE COURT:  Sustained.

3          MR. FORD:

4          Q  Well you heard Miss Quiroz testify,

5     didn't you, Miss Lindsey?

6          A  Yes.

7          Q  During the course of her testimony she

8     talked about a production or the making of a

9     missing person report on you, didn't you?

10         A  Yes.

11         MR. SOROSKY:  Objection.

12         THE COURT:  Overruled.

13         MR. FORD:

14         Q  And you heard Miss Quiroz talk about the

15    fact that she went over to some relatives of yours

16    house, is that correct?

17         A  Yes.

18         Q  Whose house did she go over to?

19         MR. SOROSKY:  Objection.

20         THE COURT:  Sustained.

21         MR. FORD:

22         Q  What are the names of the people that she

23    was referring to?

24         MR. SOROSKY:  Objection.


V 153

1           THE COURT:  Sustained.

2           MR. FORD:

3           Q  You said your father and stepmother or

4    your father and woman he lives with, is that

5    right, where do they live?

6           MR. SOROSKY:  Objection.

7           THE COURT:  Overruled.

8           A  9514 South Perry.

9           THE COURT:  That's Chicago?

10          A  Yes.

11          MR. FORD:

12          Q  And -- one moment, Judge.

13             No further questions, Judge.

14          THE COURT:  Redirect.

15                    REDIRECT EXAMINATION

16                         BY

17                    MR. SOROSKY:

18          Q  One or two brief questions.  Did the

19   police ever ask you how much you weigh?

20          A  How much what?

21          Q  How much you weigh?

22          A  No.

23          Q  Your weight?

24          A  No.


                         V 154

1          Q    The police ever ask you your weight?

2          A    No.

3          Q    How much did you weigh when you were

4     arrested?

5          A    210 exactly.

6          Q    Did you hear some testimony in your trial

7     that your weight was put down as 150 pounds?

8          MR. FORD:  Objection.

9          A    Yes.

10         THE COURT:  Overruled.  Well outside -- go

11    ahead, overruled.

12         MR. SOROSKY:

13         Q    Did you have any identification which

14    reflected 150 pounds as your weight, did you have

15    anything on your person or your driver's license

16    or anything?

17         A    No.

18         Q    Do you know where that 150 came from?

19         A    No.

20         MR. SOROSKY:  Nothing further from this

21    witness.

22         THE COURT:  Recross.

23         MR. FORD:  Nothing based on that, Judge.

24         THE COURT:  Thank you, you're excused.

1          A   You're welcome.

2                           (Witness excused.)

3          THE COURT:  Call your next witness.

4          MR. SOROSKY:  At this time, your Honor, we

5     do do not have any other witnesses.  Should this

6     case be put over to tomorrow, we might if we can

7     get ahold of Mr. Jerry St. Clair, he would be our

8     only other witness. That would be it.  Though we

9     just ask that if the case is going to be continued

10    to tomorrow, to be -- to refrain from resting just

11    in case Mr. St. Clair should be available.

12         THE COURT:  Mr. Ford.

13         MR. FORD:  I have certain rebuttal

14    witnesses, Judge, that.

15         THE COURT:  Are they available today.

16         MR. FORD:  They're not available today.  One

17    witness.  My rebuttal case will be ready to go in

18    its entirely tomorrow.

19         THE COURT:  We'll put it over to tomorrow at

20    10 AM.

21         MR. SOROSKY:  I would ask --

22         MR. FORD:  Is the defense resting at this

23    time Judge?

24         THE COURT:  No.

V 156

```
1          MR. FORD:  Then I can't go, with apologies

2    to the Court, I can't possibly say -- I'll do

3    everything I can to rest tomorrow but if he has

4    another witness tomorrow.

5          THE COURT:  I understand that but have your

6    witnesses available.

7          MR. FORD:  I will, they will be here.

8          THE COURT:  Witness or witnesses available.

9          MR. SOROSKY:  Could this be in the afternoon

10   your Honor, at 1 o'clock.

11         THE COURT:  I have a jury set for tomorrow.

12         MR. FORD:  Which one is that.

13         THE COURT:  Jeffrey Latham.

14         MR. FORD:  Miss Peters was sick today, she

15   called in sick today.

16         THE COURT:  I'm going to finish this.  If

17   that jury is ready to go I'll hold it until

18   Wednesday.

19         MR. SOROSKY:  Can we set it at 1 o'clock.  1

20   o'clock.

21         MR. SOROSKY:  Okay 1 o'clock.

22         THE COURT:  Promptly.  1 PM.  Have a good

23   evening, Counsellor.

24
```

V 157

1                    (Whereupon, the further hearing

2                    of the above-entitled cause

3                    was continued to 1-31-95, at

4                    1:00 o'clock p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

V  158

```
1     STATE OF ILLINOIS )
                        )  SS.
2     COUNTY OF C O O K )

3         THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
                    I, Kenneth Madoch, Official
5
      Shorthand Reporter of the Circuit Court of Cook
6
      County Department-Criminal Division do hereby
7
      certify that I reported in shorthand the
8
      proceedings had at the hearing in the
9
      above-entitled cause; and that I thereafter
10
      caused to be transcribed into typewriting the
11
      foregoing transcript, which I certify is a
12
      true and correct transcript of said
13
      proceedings.
14

15
      _____
16    Official Shorthand Reporter
      Circuit Court of Cook County.
17

18

19

20

21

22

23

24    Dated this 15th day of June, 1995.
```

V 159

STATE OF ILLINOIS
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . . VOLUME SEVEN OF A NINE VOLUME RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. NO PRAECIPE HAVING BEEN FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . . . . . . . . JERI LINDSEY     (01) . . . . . . . . . . . . . . WAS . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . SEPTEMBER . . . . . 20 . . . , 19 . 95

*Aurelia Pucinski*

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY