**File Date:** _Feb 29, 2008_

**Case No:** _07cv6658_

**ATTACHMENT #** _10_

**EXHIBIT** _W to Y_

**TAB (DESCRIPTION)** _____

05-1458

FILED
APPELLATE COURT 2ND DIST.
FEB 08 2006
STEVEN M. RAVID
CLERK

'96 OCT 15 P4:15
ROBERT S. MARGUTIS
CLERK OF COURT

Crim. Div. No. 94-B

CCCR-310



APPELLATE   **Court of Illinois**

FIRST   **District**

**Circuit Court No.**   92 CR 25135

**Trial Judge**   SHELVIN SINGER

**Reviewing Court No.**   95 1535

**FILED**

APPELLATE COURT 1st DIST.

NOV 07 2002

STEVEN M. RAVID
CLERK

APPELLATE COURT 1st DIST.

FEB 08 200?

STEVEN M. RAVID
CLERK

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

JERI LINDSEY   (01)

**from**

**...URT**

**92 CC 25/35**   **ILLINOIS**

**...RIMINAL   DIVISION**

**VOLUME EIGHT OF NINE**

**REPORT OF PROCEEDINGS**

**AURELIA PUCINSKI**

**Clerk of Court**

Per   AP./SIR _____

**Deputy**

1  STATE OF ILLINOIS )
                     )  ss
2  COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION

4

   THE PEOPLE OF THE )
5  STATE OF ILLINOIS )
                      )  Case No. 92 CR 25135
6      vs.           )
                     )  Charge: MURDER
7  JERRI R. LINDSEY  )

8              REPORT  OF  PROCEEDINGS

9          BE IT REMEMBERED that on the 31st day of

10 January, 1995, this cause came on for hearing

11 before the Honorable SHELVIN SINGER, Judge of said

12 Court, upon the information herein, the defendant

13 having entered a plea of not guilty.

14      APPEARANCES:
                HON. JACK O'MALLEY,
15              State's Attorney of Cook County, by
                MR. NICK FORD,
16              Assistant State's Attorney,
                Appeared on behalf of the People;

17
                MR. SHELDON SOROSKY,
18              Appeared on behalf of the Defendant.

19

20

21

22

   Kenneth Madoch
23 Official Court Reporter
   Circuit Court of Cook County
24 County Department-Criminal Division.

                        W 1

1         THE CLERK:  People of the State of Illinois

2    versus Jeri Lindsey.

3         THE COURT:  Do we have Mr. Sorosky here.

4         MR. FORD:  He's here, Judge.

5         THE COURT:  Do you know where Mr. Sorosky

6    is, Mr. Ford?

7         MR. FORD:  No, I don't, Judge, I'm sorry.

8         THE COURT:  Miss Lindsey, did you talk to

9    your lawyer?

10        THE DEFENDANT: Went out the front door.

11        MR. FORD:  He's here Judge, I saw him.

12        THE COURT:  Elusive fellow, isn't he?

13        THE COURT:  Well, as soon as you find Mr.

14   Sorosky, I'm holding you personally responsible.

15        MR. FORD:  I expected as much, Judge.

16                      (Recess taken.)

17        THE COURT:  Court is back in session.

18        THE COURT:  The record should reflect the

19   defendant, Jeri Lindsey, is present in her own

20   person, the State is present through its counsel.

21   Mr. Sorosky, you're ready to proceed.

22        MR. SOROSKY:  Yes, your Honor.

23        THE COURT:  Call your next witness.

24        MR. SOROSKY:  Your Honor, we do not have any

W  3

1    other testimony or witnesses.  However, before the

2    defense rests, the defense would be asking to

3    introduce into evidence Defendant's Exhibits 2, 3

4    and 4 for identification.

5              These were various receipts from

6    Walgreens and Venture that the witness, Irene

7    Quiroz testified to that she in fact made those

8    purchases that are reflected on those receipts on

9    the -- at the date and time she testified to as

10   reflected in her testimony.

11        THE COURT:  Any objection, Mr. Ford.

12        MR. SOROSKY:  Those were all identified by

13   her and she said that --

14        MR. FORD:  I have no objection to this,

15   Judge.

16        THE COURT:  All right.  Defendant's Exhibit

17   2, 3 and 4 will be admitted into evidence.

18        MR. SOROSKY:  Now, the defense is not going

19   to introduce any photographs at this time because

20   the State has introduced various photographs and

21   we seek to in our argument, refer to those

22   photographs, but to keep the record clean, we'll

23   just refer to those as the Plaintiff's exhibits or

24   People's Exhibits but we would like any benefit we

1    argue from them.

2         THE COURT:  Anything that is in evidence,

3    you're certainly free to argue from.

4         MR. SOROSKY:  Thank you.

5         THE COURT:  All right.

6         MR. SOROSKY:  Would you want me to put these

7    3 exhibits with the states, so they're all

8    together.

9         THE COURT:  Can we keep them all together.

10        MR. FORD:  I have a file for the exhibits,

11   Judge.

12        MR. SOROSKY:  And just for the record,

13   exhibit 2 indicates --

14        MR. FORD:  I would object, the record will

15   speak for itself.

16        THE COURT:  I would sustain that objection.

17        MR. SOROSKY:  In case they're lost, can you

18   put them in the record?

19        THE COURT:  No,.

20             They'll speak for themselves.  They'll

21   speak for themselves.

22        MR. SOROSKY:  They've never been identified

23   orally and sometimes things have a habit of

24   getting lost.

1          THE COURT:  They were identified.

2          MR. SOROSKY:  She said, yes, it reflects

3     this purchase here and this purchase here.

4          THE COURT:  You should have your own

5     photocopies of them.  If you want to, that would

6     be fine.

7          MR. SOROSKY:  I'll make photocopies.

8          THE COURT:  Just so I have them available.

9     All right.  Then I take it you're ready to rest?

10         MR. SOROSKY:  Yes, your Honor, we would

11    rest.

12         THE COURT:  Mr. Ford, any rebuttal.

13         MR. FORD:  Yes, Judge, at this time I would

14    ask leave of Court to call Chicago police officer

15    Balaszek.

16         THE COURT:  Mr. Riley, could you join us?

17         THE CLERK:  Raise your right hand.

18                    (Witness sworn.)

19         THE COURT:  Please be seated.

20

21

22

23

24

1                    LES BALASZEK,

2    called as a witness on behalf of the People of the

3    State of Illinois, having been first duly sworn,

4    was examined and testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MR. FORD:

8        Q   Officer would you please state your name,

9    star number and unit of assignment?

10       A   Officer Balaszek, B-a-l-a-s-z-e-k, Les,

11   L-e-s, 15734, 5th District, Pullman.

12       Q   Were you a Chicago police officer

13   assigned to the 5th District in October of 1992?

14       A   Yes, I was.

15       Q   In particular, were you working as a

16   Chicago police officer on October 11, 1992 around

17   6:00 in the evening?

18       A   Yes, I was.

19       Q   Who were you working with that day?

20       A   Officer Kaye, K-a-y-e, I believe, last

21   name Deheer, D-e-h-e-e-r.

22       Q   And were you and Officer Deheer working

23   in plain clothes or uniform?

24       A   Uniform.

1      Q   Were you using a marked or unmarked car

2  on that night?

3      A   Unmarked squad.

4      Q   During the course of your shift at around

5  5:56 or 6:00 in the evening, were you called

6  anywhere in order to -- in connection with an

7  investigation?

8      A   Yes, we were.

9      Q   And as a result of your -- what sort of

10 investigation were you called out on?

11     A   To take a missing person's report.

12     Q   And who was the missing person, the

13 purported missing person that you were taking that

14 missing report out on, what was the name of that

15 person?

16     A   (No response.)

17     Q   Would it have been Jeri Lindsey?

18     A   Jeri Lindsey, yes, with a J.

19     Q   And and as a result, did you in fact make

20 a report in connection with the missing person?

21     A   Yes.

22     Q   Now, as part of your missing person, did

23 you come in contact with anybody who knew Miss

24 Lindsey?

1           A   Yes, the person, the 2 people I remember

2      that were there, one of them was the daughter I

3      believe, Tenisha and she was young at the time and

4      the other person was a person, actually the adult

5      making the report.

6           Q   Did that person identify themselves in

7      terms of their relationship to Miss Lindsey?

8           A   Yes, they said they were Miss Lindsey's

9      roommates' slash -- for choice of a better word,

10     lover.

11          Q   And was this a Hispanic woman?

12          A   Yes, from what I observed she appeared to

13     be Hispanic.

14          Q   And did she tell you, this individual who

15     identified herself as Jeri Lindsey's roommate

16     slash lover tell you when she had last seen Miss

17     Lindsey?

18          A   The date that I recall was 3 o'clock in

19     the morning on the 9th of October.

20          Q   October 9, 1992?

21          A   Yes.

22          Q   Did she also give you a description of

23     Miss Lindsey at the time you made your report?

24          A   The description they gave us was 5 --

1    about 5-5, 150 pounds.

2        Q   Did she indicate to you anything relative

3    to jewelry that Miss Lindsey was wearing?

4        A   Some jewelry on her left hand.

5        Q   Did she indicate anything at the time you

6    made your report regarding a ring in her nose?

7        A   A ring in her nose?

8        Q   Yes, in Miss Lindsey's nose?

9        MR. SOROSKY:  Objection, I don't know that

10   he asked her about a ring in her nose.

11       THE COURT:  Overruled.  A .

12       MR. FORD:

13       Q   Did she indicate, you asked her about her

14   jewelry, is that correct?

15       A   Yes.

16       Q   And the only thing she told you was rings

17   on the hand?

18       A   Yes, at that time.

19       Q   What hand?

20       A   Left.

21       MR. FORD:  If I could have a moment, Judge.

22       THE COURT:  Yes, I'm sorry, could the

23   reporter read me the answer as relating to what

24   time this Hispanic woman said was the last time

W  10

1    she saw the defendant.

2                          (Record read.)

3         MR. FORD:  No further questions, Judge.

4         THE COURT:  Cross.

5

6                    CROSS EXAMINATION

7                          BY

8                    MR. SOROSKY:

9         Q   Now, Officer, where did you physically go

10   to, to take this missing person's report, what

11   location and you could look, I would mark this

12   Defendant's Exhibit number, I guess 5 for

13   identification and ask you to look at that and is

14   that in fact your police report?

15        A   Yes, it is.

16        Q   Feel free to look at that to refresh your

17   memory.  Where did you go to physically to take

18   this report?

19        A   We went to a residence in the 5th

20   District being that we were beat 517 which is the

21   north end of the 5th District.

22        Q   Do you know what the address is?

23        A   At this time I don't recall.

24        Q   Is there anything in your report that

1    would refresh your memory?

2           A   No, there isn't.

3           Q   So, you don't know what district you went

4    to, is that correct?

5           A   Not -- I didn't say what district.

6           Q   Excuse me.  What address you went to?

7           A   What residence, right.

8           Q   Now, are you familiar with the location

9    within the City of Chicago of 800 South Houston?

10          A   Yes, I am.

11          Q   That is not in the 5th District, is it?

12          A   No it is not, the 4th District.

13          Q   That is in the 4th District?

14          A   Yes.

15          Q   So therefore without knowing what

16   specific address you went to, you certainly know

17   you did not go to any residence or apartment on

18   the block of 800 South Houston, in Chicago?

19          A   No, we would not.

20          Q   Now 9514 South Perry, that address would

21   be in the 5th District, would it not?

22          A   Yes, it would.

23          Q   And do you have any way of knowing

24   whether 9514 South Perry, Chicago, Illinois, is or

1    was the residence of a man by the name of Jerry

2    Lindsey on October 11, 1992?

3          MR. FORD:  Objection.

4          THE COURT:  Overruled.

5          MR. SOROSKY:

6          Q   Is there anything in there which would

7    refresh your memory to answer that question?

8          A   As to what?

9          Q   As to whether the location you went to to

10   take this missing person's report was in fact 9514

11   South Perry, Chicago, Illinois, is there anything

12   in this report to refresh your memory as to that?

13         A   No there is not, there is nothing

14   documented.

15         Q   Is there anything in this report as to

16   refresh your memory as to the name of the person

17   who lived at the residence you went to?

18         MR. FORD:  Objection.

19         THE COURT:  Sustained.

20         MR. SOROSKY:

21         Q   Do you know the name of the person who

22   lived at the residence you went to?

23         MR. FORD:  Objection.

24         THE COURT:  Overruled.

1          A   The --

2          MR. SOROSKY:   If you don't, you don't?

3          A   The person who was there along with the

4    child was a person that made the report out at

5    that address.

6          Q   Now, you see a name on your report,

7    Angela Rios -- Angela Rios, is that correct?

8          A   Yes.

9          MR. FORD:   Objection.

10         THE COURT:   Sustained.

11         MR. SOROSKY:

12         Q   Do you know whether -- is Angela --

13   Angela Rios, to the best of your knowledge, would

14   be a Hispanic name, would it not?

15         MR. FORD:   Objection.

16         THE COURT:   Sustained.

17         MR. SOROSKY:   Well, we would submit this

18   officer testified on direct examination that he

19   took some statement from a woman he believed to be

20   a Hispanic woman.   Based on that, I feel it's fair

21   game to ask him if the name Angela Rios is a

22   Hispanic name to the best of his knowledge.

23         THE COURT:   Overruled.

24         A   I've gone over, I'd say a good majority

W 14

1    of Hispanic names that end in Rios.

2         Q  So to the best of your knowledge you

3    would say Angela Rios could very well be a

4    Hispanic name, would that be an accurate

5    statement?

6         MR. FORD:  Objection, he just said that.

7         THE COURT:  Sustained.

8         MR. SOROSKY:

9         Q  To the best of your knowledge is Angela

10   Rios a Hispanic name, plain and simple?

11        MR. FORD:  Objection.

12        THE COURT:  Sustained.

13        MR. SOROSKY:

14        Q  Is there any other name on your report

15   that we've already marked other than Angela

16   Rios?

17        MR. FORD:  Objection.

18        THE COURT:  Sustained.

19        MR. SOROSKY:

20        Q  What is the name of the box 43 entitled

21   close friend?

22        MR. FORD:  Objection.

23        THE COURT:  Sustained.

24        MR. SOROSKY:

1          Q  You stated in your direct examination

2    that you took this missing person's report from

3    someone who was a Hispanic woman, is that correct?

4          A  Yes.

5          Q  And you do not today of your own

6    independent memory remember that person's name, do

7    you?

8          MR. FORD:  Objection.

9          THE COURT:  Overruled.

10         A  At this time I don't recall her name, no.

11         MR. SOROSKY:

12         Q  I would ask you to look at the report

13   which we've marked as Defendant's Exhibit number 5

14   and I ask you does that refresh your memory any as

15   to the name of the person who you took the report

16   from?

17         A  She's not listed on here, no, the name is

18   not on here.

19         Q  What name is not on here?

20         A  The -- I said before lover slash

21   roommate.

22         Q  So that name is not on there.  The name

23   of the person who was the missing person's lover

24   and roommate who made the complaint, you didn't

1    put that name in your report, did you?  That's

2    what you're telling the Judge, right?

3           MR. FORD:  Objection, Judge.

4           THE COURT:  Overruled.

5           MR. SOROSKY:

6           Q  Is that correct?

7           A  Her name is not on here.

8           Q  Her name is not.  Is there a name Angela

9    Rios in that report?

10          MR. FORD:  Objection.

11          THE COURT:  Sustained.

12          MR. SOROSKY:

13          Q  Is there any name on that report?

14          MR. FORD:  Objection.

15          THE COURT:  Sustained.

16          MR. SOROSKY:

17          Q  Why didn't you put this person's name in

18   your report?

19          MR. FORD:  Objection.  ·

20          THE COURT:  Overruled.

21          A  The person's name listed on the report is

22   the relative which is the daughter.

23          Q  Isn't there another name on the report?

24          MR. FORD:  Objection.

W 17

1        THE COURT:  Sustained.

2        MR. SOROSKY:  Why is the state afraid of

3    having what name is in the report come out?

4        MR. FORD:  Judge, I'm objecting to a

5    question which was improperly posed.

6        THE COURT:  Sustained.

7        MR. SOROSKY:

8        Q   Does this report contain a name of close

9    friend?

10       MR. FORD:  Objection.

11       THE COURT:  Overruled.

12       A   Yes, it does.

13       MR. SOROSKY:

14       Q   And who is listed as close friend?

15       MR. FORD:  Objection.

16       THE COURT:  Overruled.

17       A   Angela Rios.

18       MR. SOROSKY:

19       Q   And what address is listed for Angela

20   Rios?

21       MR. FORD:  Objection.

22       THE COURT:  Sustained.

23       MR. SOROSKY:

24       Q   Do you know what relation Angela Rios was

W 18

1    to the missing person?

2          MR. FORD:  Objection.

3          THE COURT:  Overruled.

4          A   I believe she told me she was a friend.

5          MR. SOROSKY:

6          Q   Now, the body of your report reads in

7    summary, witness stated, and then the report goes

8    on to recite what the witness stated, is that

9    correct?

10         A   Yes, it does.

11         Q   However, your report never states who the

12   witness is, does it?

13         MR. FORD:  Objection.

14         THE COURT:  Sustained.

15         MR. SOROSKY:

16         Q   Does your report -- did you make up this

17   report?

18         A   Yes, I did.

19         Q   Who were you referring to when you said

20   "witness"?

21         A   Witness is the person that was relaying

22   the information to me.

23         Q   Why didn't you write this person's name,

24   address and phone number down?

W  19

1          MR. FORD:  Objection.

2          THE COURT:  Sustained.

3          MR. SOROSKY:

4          Q  Did you write this person's name, address

5     and phone number down?

6          MR. FORD:  Objection.

7          THE COURT:  Overruled.

8          A  No, I didn't.

9          MR. SOROSKY:

10         Q  So, you don't know who told you this

11    information you've recited to on direct

12    examination, do you?

13         MR. FORD:  Objection.

14         THE COURT:  Overruled.

15         A  The person that was there --

16         MR. SOROSKY:

17         Q  A name, you don't know a name, do you?

18         MR. FORD:  Objection, Judge, I ask the

19    witness be allowed to answer the question.

20         THE COURT:  Overruled.

21         A  She --

22         MR. SOROSKY:

23         Q  Officer, I think I've asked you a simple

24    question.  You don't know the name?

1     MR. FORD:  He wouldn't be allowed to

2   complete a syllable, Judge?

3     MR. SOROSKY:  I asked him if he knows the

4   name of the person.

5     THE COURT:  Counsel, if you don't like -- if

6   you feel you have an objection to the answer, for

7   whatever reason, not being responsive or whatever,

8   address that to me.

9     MR. SOROSKY:  Very well.  I'll repeat the

10  question.

11    Q  Do you know the name of the person who

12  told you the information you recited on direct

13  examination?

14    A  Not her regular proper name, no.

15    Q  And there is nothing in your report to

16  refresh your memory as to her name, is there?

17    MR. FORD:  Objection, asked and answered.

18    THE COURT:  Sustained.

19    MR. SOROSKY:

20    Q  And the only woman's name in your report

21  other than the defendant's daughter is Angela

22  Rios, correct?

23    MR. FORD:  Objection, Judge, asked and

24  answered.

1          THE COURT:  I'm sorry.

2          MR. FORD:  Objection, asked and answered.

3          THE COURT:  Sustained.

4          MR. SOROSKY:  I don't think that's been

5     asked and answered precisely, your Honor, with all

6     due respect.

7          THE COURT:  Really an improper question,

8     sustain the objection.

9          MR. SOROSKY:

10         Q  I would ask you to look at your report

11    and other than the missing person, Jeri Lindsey,

12    and Jeri Lindsey's daughter, what is the name of

13    any other person in that report other than those 2

14    names?

15         MR. FORD:  Objection.

16         THE COURT:  Sustained.

17         MR. SOROSKY:  Nothing further from this

18    witness.

19         THE COURT:  Redirect.

20                  REDIRECT EXAMINATION

21                         BY

22              MR. FORD:

23         Q  The narrative Officer Balaszek does

24    include -- can I have the report.  Does describe

W 22

1   the witness' relationship to the missing person,

2   doesn't it?

3        A  Yes, it does.

4        MR. SOROSKY:  Objection, your Honor.

5        THE COURT:  Overruled.

6        MR. FORD:

7        Q  And that relationship is described as

8   girlfriend slash --

9        MR. SOROSKY:  Objection, I never went into

10  the content of the report.  Never.

11       THE COURT:  Sustained.

12       MR. FORD:  Judge, I believe he did.  The

13  allegation -- this is the thing, Judge.  He went

14  entirely into the fact there is no description,

15  this is in the nature of rehabilitation there is a

16  description of who the witness is.  He says the

17  witness has been -- he's making the accusation in

18  the nature of his cross accuses the officer of not

19  having named or -- named the person, the

20  complainant or the witness in this case and the

21  relationship of the witness to the defendant is

22  very germane on the issue of the identity of the

23  complainant.

24       THE COURT:  All right.  Overrule the

W 23

1    objection.

2         MR. FORD:

3         Q   Now officer --

4         MR. SOROSKY:  Your Honor.

5         MR. FORD:

6         Q   Included within your report --

7         MR. SOROSKY:  We would strongly object to

8    this, because first of all the officer has

9    testified to this on direct examination and the

10   State's Attorney is just repeating what was said

11   on direct examination.  I never went into the

12   substance of what was said, I merely attempted to

13   point out that the only name in the report was the

14   name we've mentioned.

15        THE COURT:  As was pointed out, the

16   substance of what was not said, so I'm overruling

17   the objection.

18        MR. FORD:

19        Q   Officer Balaszek, you did include within

20   your report that the witness was the girlfriend

21   and roommate of the missing person, Jeri Lindsey,

22   didn't you?

23        A   Yes.

24        MR. FORD:  No further questions.

1              THE COURT:  Recross.

2                      RECROSS EXAMINATION

3                          BY

4              MR. SOROSKY:

5          Q  Officer, you certainly learned at the

6     police academy you should take the name and

7     address of all significant witnesses, shoe not?

8              MR. FORD:  Objection.

9              THE COURT:  Overruled.

10             MR. SOROSKY:

11         Q  Did you not learn that?

12         A  Yes, I did.

13             MR. SOROSKY:

14         Q  And how long have you been a police

15    officer on October 11, 1992 approximately?

16         A  About a year and a half.

17         Q  And certainly all your experiences as a

18    police officer certainly confirmed the importance

19    of getting names and addresses of witnesses, did

20    it not?

21             MR. FORD:  Objection.

22             THE COURT:  Overruled.

23         A  Yes.

24             MR. SOROSKY:

1          Q    And you've got the name and address of

2     the defendant's daughter, did you not?

3          A    Yes.

4          Q    And even the phone number, correct?

5          A    Yes.

6          Q    And you got the name and address and even

7     the phone number of a person by the name of Angela

8     Rios, did you not?

9          A    Yes.

10         Q    Yet you do not have the name and address

11    and phone number of the person who you now say is

12    giving you the information, is that correct?

13         MR. FORD:  Objection, Judge.

14         THE COURT:  Sustained.

15         MR. SOROSKY:

16         Q    You do not have the name and address and

17    phone number of the person who supposedly give you

18    this information?

19         MR. FORD:  Objection.

20         THE COURT:  Sustained.

21         MR. SOROSKY:

22         Q    You don't have the name and address of

23    the person who gave you this information?

24         MR. FORD:  Objection.

1          THE COURT:  Sustained.

2          MR. SOROSKY:

3          Q   Do you have the address of the person who

4     gave you this information?

5          MR. FORD:  Objection.

6          THE COURT:  Overruled.

7          A   It's not documented.

8          MR. SOROSKY:

9          Q   Do you have the address, -- the answer is

10    you do not, correct?

11         A   No, not on my person I don't have it.

12         Q   Do you have it anywhere?

13         MR. FORD:  Objection.

14         THE COURT:  Overruled.

15         A   I don't keep things from 1992.

16         MR. SOROSKY:

17         Q   Did you ever keep it anywhere?

18         MR. FORD:  Objection.

19         THE COURT:  Overruled.

20         A   No, I probably didn't.

21         MR. SOROSKY:

22         Q   Why did you take the name and address and

23    phone number of Angela Rios?

24         MR. FORD:  Objection.

1          THE COURT:  Overruled.

2          A   I believe she was another adult that was

3    there, if I recall right.

4          Q   How many adults were there?

5          A   I believe there was 2.

6          Q   Well there were the 2 people who lived

7    there, were there not?

8          MR. FORD:  Objection.

9          MR. SOROSKY:

10         Q   Didn't 2 people live at this place that

11   you went to?

12         THE COURT:  Overruled.

13         A   I don't know how many people lived there.

14         MR. SOROSKY:

15         Q   But there were some people that lived

16   there, is that correct?

17         MR. FORD:  Objection.

18         THE COURT:  Overruled.

19         MR. SOROSKY:

20         Q   Weren't there some people who lived

21   there?

22         A   I don't know.

23         MR. SOROSKY:

24         Q   The people who lived at the premises were

1    black, were they not as opposed to Hispanic?

2         MR. FORD:  Objection.

3         THE COURT:  Overruled.

4         A   I can't recall, it was from '92.

5         MR. SOROSKY:

6         Q   Don't you have the name and address and

7    phone number of Angela Rios because she's the

8    person who gave you the information?

9         MR. FORD:  Objection.

10        THE COURT:  Overruled.

11        A   She's the one documented as a close

12   friend.

13        Q   And she's the person who gave you

14   information, isn't she?

15        A   No, she's not.

16        MR. SOROSKY:  Nothing further from this

17   witness.

18        THE COURT:  Redirect.

19        MR. FORD:  Nothing, thank you Judge.

20        THE COURT:  Thank you, you're excused.

21                      (Witness excused.)

22        THE COURT:  Call your next witness.

23        MR. FORD:  I would ask leave of Court to

24   Detective Ernie Halvorsen.

1        THE CLERK:  Raise your right hand.

2                              (Witness sworn.)

3        THE COURT:  Please be seated.

4        MR. FORD:  May I inquire Judge.

5        THE COURT:  Yes.

6                    ERNEST HALVORSEN,

7   called as a witness on behalf of the People of the

8   State of Illinois, having been first duly sworn,

9   was examined and testified as follows:

10                  DIRECT EXAMINATION

11                        BY

12                  MR. FORD:

13      Q  Detective, would you state your name,

14   star number and unit of assignment?

15      A  Detective Ernest Halvorsen, star 20692,

16   Chicago Police Department Area 5, Detectives.

17      Q  How long have you been a detective

18   assigned to Area 5?

19      A  15 years.

20      Q  How long have you been a Chicago police

21   officer?

22      A  24 years.

23      Q  Detective, I would like to direct your

24   attention to the date of October 15, 1992, do you

1    recall that date?

2           A   Yes, I do.

3           Q   Were you working as a Chicago Police

4    Department Detective on that date?

5           A   I was.

6           Q   And were you assigned to go to an area

7    outside Area 5 on October 15, 1992?

8           A   That is correct.

9           Q   What address did you have to go to?

10          A   I don't recall the address, it was on the

11   southeast side of Chicago.

12          Q   Would it have been 8931 South Houston?

13          A   That is correct.

14          Q   And when you went there, did you come

15   into contact with anyone?

16          A   Yes, I did.

17          Q   Who did you come into contact with?

18          A   An Irene Quiroz.

19          Q   Would that be spelled Q-u-i-r-o-z?

20          A   That is correct.

21          Q   And when you first came into contact with

22   her, was that at that address on Houston?

23          A   That is correct.

24          Q   Who were you with at the time you first

1    came into contact with Miss Quiroz?

2           A   My partner Detective Renaldo Guevara.

3           Q   For what reason had you gone to that

4    address on South Houston?

5           A   I had been requested by detectives Schalk

6    and Bogucki to locate Irene Quiroz and bring her

7    back to Area 5 so she could be interviewed by an

8    Assistant State's Attorney.

9           Q   Did you have a conversation with Miss

10   Quiroz at the 8931 address prior to the time that

11   you left?

12          A   Yes, I did.

13          Q   And who was present for that

14   conversation?

15          A   Myself, Detective Guevara and Miss

16   Quiroz.

17          Q   Did you say anything to Miss Quiroz and

18   what if anything did she say to you?

19          A   I asked her if she knew where her friend,

20   Jeri Lindsey, had been the afternoon of the

21   previous Friday.  This would be the 9th of

22   October.  She said she wasn't sure, but she

23   thought she might have been with Miss Lindsey, her

24   brother Bob, Miss Quiroz' mother and one other

1    family member shopping at Venture, I then asked

2    her is there some way she can find out for sure

3    what days it was she went shopping with Miss

4    Lindsey at Venture.  She then told me she tried

5    calling her brother Bobby which she did.

6        Q  Were you present when she made a phone

7    call?

8        A  Yes, I was.

9        Q  And when she returned from the phone

10   call, what was the first thing that she said?

11       A  She told me that it was Thursday that

12   they had gone shopping at Venture.

13       Q  Now, did you remain at the home for a

14   while after that?

15       A  Yes, I did.

16       Q  Did anything happen as you were still

17   waiting to accompany Miss Quiroz to Area 5?

18       A  Approximately 5 minutes after this, a

19   phone call was received in her apartment, Miss

20   Quiroz --

21       Q  Do you know who called?

22       A  I did not talk to the person on the

23   phone, Miss Quiroz identified the person as being

24   her brother, Bobby.

W 33

1          Q   That was after the conversation she

2     indicated that?

3          A   That is correct.

4          Q   And what happened after that?

5          A   Miss Quiroz told me that her brother had

6     called back to inform her that the more he thought

7     about it, it was probably Friday they had gone to

8     Venture.

9          MR. FORD:  No further questions, Judge.

10         THE COURT:  Cross, please.

11                   CROSS EXAMINATION

12                         BY

13                   MR. SOROSKY:

14         Q   Now, you didn't inform Irene Quiroz that

15    you were coming to her apartment to inquire of her

16    as to her activities on October 9, 1992 prior to

17    your arrival there on the 15th, did you?

18         MR. FORD:  Objection.

19         A   You LOST me with the question.

20         MR. SOROSKY:  I apologize.

21         Q   You arrived at Irene Quiroz' apartment on

22    October 15, 1992, is that correct?

23         A   Correct.

24         Q   About what time did you arrive?

W 34

1        A   It was sometime in the early evening.

2        Q   Before you arrived at that address, you

3   didn't call her up and tell her you were coming,

4   did you?

5        A   I did not.

6        Q   To the best of your knowledge, no other

7   police officer did, isn't that correct?

8        A   I have no idea.

9        Q   Do you have any knowledge of any police

10  officer calling her and telling her that you were

11  coming?

12       A   No.

13       Q   And within minutes of your arrival at her

14  apartment, you asked her about her activities on

15  October 9, 1992, did you not?

16       A   No.  I asked her about the activities of

17  Jeri Lindsey on October 9, 1992.

18       Q   Right.  I'll amend my question.  Within

19  minutes of your arrival at Irene Quiroz'

20  apartment, you asked Irene Quiroz about Jeri

21  Lindsey's activities on October 9, 1992, did you

22  not?

23       A   That is correct.

24       Q   And Irene Quiroz said that she, Irene,

W 35

1    thought that she was with Jeri Lindsey and her

2    brother and mother on Friday, October 9, 1992 but

3    she wanted to check with her brother to make sure,

4    is that correct?

5        A   That's incorrect.

6        Q   She told you she thought she was with

7    her, Jeri Lindsey, on Thursday?

8        A   She told me she was unsure of whether it

9    was Friday or Thursday.  That's when I asked her

10   to call someone to see if she can determine

11   exactly which day it was.

12       Q   So she talked to her brother, is that

13   correct?

14       A   That is correct.

15       Q   And how long were you in Irene's

16   apartment?

17       A   No more than 15 minutes.

18       Q   So within this 15 minute time period,

19   Irene was first told by her brother that they were

20   with Jeri Lindsey on Thursday and subsequently

21   told by her brother that they were with Jeri

22   Lindsey on Friday, is that correct?

23       A   That is correct.

24       Q   And to the best of your knowledge, these

W 36

1    conversations that Jeri Lindsey had with her

2    brother was the first time the police received any

3    information from her brother, isn't that correct?

4          MR. FORD:  Objection?

5          A   You're getting the names wrong,

6    Counsellor.

7          THE COURT:  Sustained.

8          MR. SOROSKY:  I apologize.

9          Q   Did the police ever inquire of Irene

10   Quiroz' brother prior to these telephone

11   conversations?

12         MR. FORD:  Objection.

13         A   Sustained.

14         MR. SOROSKY:

15         Q   Did you go to Irene Quiroz' brother's

16   house after these telephone conversations and talk

17   to him?

18         A   No.

19         MR. FORD:  Objection.

20         THE COURT:  Overruled.

21         MR. SOROSKY:

22         Q   And you did not talk to him even though

23   you left that apartment with the knowledge that

24   both Irene and her brother believed they were with

W  37

1    the defendant on Friday, October 9, 1992, isn't

2    that correct?

3         MR. FORD:  Objection.

4         THE COURT:  Sustained.

5         MR. SOROSKY:

6         Q  After you left that apartment, you had

7    received information from Irene that her brother

8    believed that she, Irene, and her brother were

9    with the defendant on October 9, 1992, had you

10   not?

11        MR. FORD:  Objection.

12        THE COURT:  Sustained.

13        MR. SOROSKY:

14        Q  Well what did Irene tell you after her

15   second conversation with her brother?

16        MR. FORD:  Objection.

17        THE COURT:  Overruled.

18        A  She told me that her brother, Bobby had

19   called back.  The more he thought about it, it

20   could have been Friday the day they all went

21   shopping at Venture.

22        MR. SOROSKY:

23        Q  So, shortly thereafter, you left Irene

24   Quiroz' apartment, did you not?

W 38

```
 1          A   Yes.
 2          Q   Did you know her brother Bobby lived a
 3    few doors away from her?
 4          MR. FORD:  Objection.
 5          THE COURT:  Sustained.
 6          MR. SOROSKY:
 7          Q   Did you ever ask Irene where her brother,
 8    Bobby lived?
 9          MR. FORD:  Objection.
10          THE COURT:  Sustained.
11          MR. SOROSKY:
12          Q   Did you make any effort to make any
13    inquiry of Bobby?
14          MR. FORD:  Objection.
15          THE COURT:  Sustained.
16          MR. SOROSKY:
17          Q   Where did you go after you left Irene
18    Quiroz' apartment?
19          A   We drove back to my office at Area 5,
20    5555 West Grand Avenue.
21          Q   Who did you drive back with?
22          A   Myself, Detective Guevara and Irene
23    Quiroz.
24          Q   Did you ask Irene about her brother?
```

1          A   We had no further conversation with her

2     after we left her house.

3          MR. SOROSKY:  Nothing further from this

4     witness.

5          THE COURT:  Redirect.

6          MR. FORD:  Nothing, thank you.

7                         (Witness excused.)

8          THE COURT:  Call your next witness.

9                         (Witness sworn.)

10         THE COURT:  Please be seated.

11         A   Thank you.

12                    JULIE NELSON,

13    called as a witness on behalf of the People of the

14    State of Illinois, having been first duly sworn,

15    was examined and testified as follows:

16                    DIRECT EXAMINATION

17                         BY

18                    MR. FORD:

19         Q   Ma'am, would you please state your name

20    spelling your last name for the Court Reporter?

21         A   My name is Julie Nelson, N-e-l-s-o-n.

22         Q   And Miss Nelson, by whom are you

23    employed?

24         A   By the Cook County State's Attorney's

1    Office.

2         Q   And in what capacity do you work for the

3    Cook County State's Attorney's Office?

4         A   The felony trial division in Judge

5    Kelly's courtroom.

6         Q   How long have you been assigned to the

7    felony trial division?

8         A   I have been assigned to my current

9    assignment since November of the past year.

10   Before that I was in different units of the

11   office.

12        Q   And in October of 1992, were you in

13   felony review?

14        A   Yes, I was.

15        Q   And at that time were you an attorney

16   licensed to practice in the State of Illinois?

17        A   Yes, I was.

18        Q   I would like to direct your attention, if

19   I may, to October 16, 1992, do you recall that

20   date?

21        A   Yes, I do.

22        Q   And did you come into contact on October

23   16, 1992 with anyone you see here in Court today?

24        A   Yes, Miss Jeri Lindsey who is seated at

1   counsel table in the blue outfit the white shirt

2   under.

3         MR. FORD:  For the record indicating the

4   defendant, your Honor.

5         THE COURT:  The record may so reflect.

6         MR. FORD:

7         Q  Now, Miss Nelson, at any time -- did you

8   have a conversation with Miss Lindsey in the early

9   morning hours of October 16, 1992 and the late

10  evening hours of October 15, 1992?

11        A  Yes, I did.

12        Q  And during the course of those

13  conversations, did Miss Lindsey ever indicate to

14  you that on October 9, 1992, Friday, October 9,

15  1992, she had gone to Walgreens and to Venture and

16  to Shakeys?

17        A  No, she did state she ate and went to

18  certain stores but never those places.  I think

19  she stated a liquor store, submarine place and

20  Chinese and Polish Sausage but never stated that.

21        Q  Did she indicate to you when she had

22  visited these stores?

23        A  She stated that it was after she had left

24  O'Hare and shot the victim in this case.

1          Q   Did she ever indicate to you at any time

2     when you were with her on October 16 and 15, 1992,

3     that she had been with Irene Quiroz on October 9,

4     1992?

5          A   No, she never did.

6          Q   Did she ever indicate to you when you

7     were, during all the time that you were with her

8     that she had been with Amelia Quiroz on October 9,

9     1992?

10         A   No, she never mentioned Amelia Quiroz to

11    me.

12         Q   Did she ever mention to you that on

13    October 9, 1992, she had been with Robert Quiroz?

14         A   No, she never mentioned that either.

15         Q   Did Miss Lindsey ever mention to you on

16    October 15, and 16, 1992, that on October 9, 1992,

17    she had been run into Olga Martinez in front of

18    her home on the south side of the City of Chicago?

19         A   She never mentioned an Olga Martinez to

20    me during any of my conversations with her.

21         Q   Did Miss Lindsey ever mention to you

22    during any of the time that you spent with her

23    that she had also been with a woman named Dorothy

24    Ramirez on October 9, 1992?

1          A   She never mentioned Dorothy Ramirez

2     either.

3          Q   Did any of those names with the exception

4     of Irene Quiroz ever come up?

5          A   She only mentioned Irene Quiroz.

6          MR. FORD:   If I could have a moment, your

7     Honor.

8          THE COURT:   Yes.

9          MR. FORD:

10         Q   At any time when you were with Miss

11    Lindsey, there was a Chicago police department

12    detective with you in the same room, is that

13    correct?

14         A   All except for one time when I went in by

15    myself and asked her how she had been treated by

16    the police.

17         Q   For the other times, Detective Schalk and

18    Bogucki were in the room with you, is that

19    correct?

20         A   That is correct.

21         Q   At any time when she was giving you the

22    information which you put into her handwritten

23    statement, did either Detective Schalk or Bogucki

24    provide the information for Miss Lindsey who then

W 44

1    repeated it to you?

2         A   No, Miss Lindsey had a conversation with

3    me, it was her, she told me what happened from her

4    own mouth.

5         Q   Did Detective Schalk and Bogucki add

6    anything to what she was saying at the time she

7    was describing the incidents as it related to the

8    incident of October 9, 1992?

9         A   No.

10        MR. FORD:  One moment, Judge.

11        THE COURT:  Yes.

12        MR. FORD:  Just one moment, Judge.

13        Q   Did Miss Lindsey ever indicate to you she

14   was signing -- Miss Lindsey signed -- I'm going to

15   show you what has been previously marked State's

16   exhibit number 9 in evidence at this time.  I'm

17   going to ask you if you recognize this?

18        A   Yes.  It's a xeroxed copy of the

19   handwritten statement that Miss Lindsey, myself

20   and Detective Schalk and Bogucki had signed.

21        Q   Now is that in the same or substantially

22   the same condition as the statement that you took

23   from Miss Lindsey on October 16, 1992?

24        A   Yes, the only thing that is different

W 45

1    with the exhibit mark on the back and looks as if

2    it was faxed so there is a time, a date and some

3    numbers on the top.

4        Q    Now during the period of time that you

5    spent with Miss Lindsey, who provided the date of

6    October 9, 1992 as the date on which these events

7    occurred, Friday October 9?

8        A    I believe she stated it was Friday.

9        Q    And with reference to the other

10   information.  At the time Miss Lindsey's signature

11   appears on every page of the document, does it

12   not?

13       A    Yes, it does and twice on the first page.

14       Q    At any time that you were with Miss

15   Lindsey, did she ever indicate to you during the

16   course of the preparation of that exhibit number 9

17   that, did she ever indicate to you she was just

18   signing that document because she was tired of

19   being questioned?

20       A    No, she did not.

21       Q    Did she ever indicate -- did she ever

22   indicate to you she was tired and wished to

23   discontinue questioning?

24       A    No, she did not.

1          Q   The information that is included within

2    this exhibit, the actual description of the events

3    of October 9, 1992 from where did that information

4    come?

5          A   From Miss Lindsey.

6          Q   Is that exclusively?

7          A   Yes.

8          Q   In other words she said what is in that

9    statement to you?

10         A   That's a summary of what she said to me,

11   yes.

12         MR. FORD:   No further questions, Judge.

13         THE COURT:   Cross.

14                  CROSS EXAMINATION

15                       BY

16              MR. SOROSKY:

17         Q   Miss Nelson, you only were alone with

18   Miss Lindsey for about 30 seconds to one minute?

19         A   No, it was longer than that because I

20   also discussed with her what type of statement she

21   wanted to take, so it was at least 5 minutes.

22         Q   So, you asked her if she was treated okay

23   by the police, is that correct?

24         A   That is correct, I also asked her if she

1    had any problems with anyone she had come in

2    contact with, the police or otherwise.

3        Q   And she told you she didn't have any, is

4    that correct?

5        A   That is correct.

6        Q   And you asked her what type of statement

7    she wanted to give and she told you, right?

8        A   Right, that was after I explained the 3

9    types to her.

10       Q   And then after this brief period of time,

11   that you were alone with her, -- excuse me.  When

12   you first saw her, you didn't see her alone, you

13   saw her in the company of police, is that correct?

14       A   That is correct, with the 2 detectives.

15       Q   And then you had the police leave the

16   room and you spoke to her for you say

17   approximately 5 minutes, is that correct?

18       A   Well all three of us left the room, I

19   went back in with Miss Lindsey, myself.

20       Q   And then you spoke to her for about 5

21   minutes, is that correct?

22       A   That is correct.

23       Q   And then you asked her the questions you

24   recited, is that correct?

1      A   That is correct.

2      Q   Are you treated okay, what type of

3   statement do you want to give and you explained

4   what types of statements were available to her, is

5   that correct?

6      A   That is correct, and I also asked her if

7   she needed anything, to use the rest room or

8   something to eat or drink.

9      Q   Then you left the room, is that correct?

10      A   That is correct.

11      Q   And when you returned, you returned with

12   the police, is that correct?

13      A   That is correct.

14      Q   Now, before speaking to Miss Lindsey, you

15   certainly spoke to the police, did you not?

16      A   Yes, I did.

17      Q   And they related to you all the facts of

18   this case, did they not?

19      MR. FORD:   Objection.

20      THE COURT:   Overruled.

21      A   They gave me a summary of what was

22   happening and I also read some police reports.

23      MR. SOROSKY:   All right.

24      Q   When you were at the police station or

1    when you arrived at the police station, did you

2    know if Irene Quiroz was also at the police

3    station?

4         A   I don't remember if she was already there

5    or arrived after I got there but I know she was

6    there during the time period that I was there.

7         Q   And during the time when you were at the

8    police station, you certainly learned a summary of

9    the facts concerning Irene Quiroz' involvement

10   with or relationship to the facts of this case and

11   Jeri Lindsey, did you not?

12        MR. FORD:   Objection.

13        THE COURT:   Sustained.

14        MR. SOROSKY:

15        Q   Did you learn anything from the police

16   about Irene Quiroz?

17        MR. FORD:   Objection.

18        THE COURT:   Overruled.

19        A   Yes, I did.

20        MR. SOROSKY:

21        Q   Did you ever come to learn the fact that

22   the police had received some information that the

23   defendant could have been with Irene Quiroz and

24   Irene Quiroz' brother on October 9, 1992?

W 50

1           MR. FORD:  Objection.

2           THE COURT:  Sustained.

3           MR. SOROSKY:

4           Q  Did you ever learn any information

5    concerning Irene Quiroz being a possible alibi

6    witness for the defendant?

7           MR. FORD:  Objection.

8           THE COURT:  Sustained.

9           MR. SOROSKY:

10          Q  You and Miss Lindsey certainly discussed

11   Irene Quiroz, did you not?

12          MR. FORD:  Objection.

13          THE COURT:  Overruled.

14          A  I just asked her who she was.

15          MR. SOROSKY:

16          Q  And wasn't there some discussion between

17   you and Miss Lindsey concerning whether Irene

18   Quiroz was with her on Thursday, October 8th or

19   Friday October 9th or for this shopping trip?

20          MR. FORD:  Objection.

21          THE COURT:  Sustained.

22          MR. SOROSKY:

23          Q  Did you ever have any discussion with

24   Jeri Lindsey about her activity on October 9,

W 51

1    1992?

2         MR. FORD:  Objection.

3         THE COURT:  Overruled.

4         A  Yes, that was what the basis of the

5    conversation was, what her activities were on the

6    9th.

7         MR. SOROSKY:  And in fact, her statement

8    indicates a whole series of events that Miss

9    Lindsey allegedly participated in, on October 9,

10   1992, is it not?

11        A  That's a summary of what Miss Lindsey

12   gave me as to what she did on that date.

13        Q  Correct.  Now then, was there ever any

14   inquiry by you as to whether or not she was with

15   Irene Quiroz on this shopping trip to River Oaks

16   on October 9, 1992?

17        MR. FORD:  Objection.

18        THE COURT:  Sustained.

19        MR. SOROSKY:

20        Q  Did you ever ask her anything about this?

21        MR. FORD:  Objection.

22        THE COURT:  Sustained.

23        MR. SOROSKY:

24        Q  Did you ever ask Miss Lindsey any

1    questions?

2        A  Yes, I did.

3        Q  Well could you relate some of the

4    questions you asked her?

5        A  First I went through her rights and asked

6    her if she understood those.  I also asked her if

7    she wanted to speak to me about the events on

8    October 9.  She said yes, she did.

9              And when she started to go through

10   what had happened.  I know I asked her other

11   questions to clarify certain things she said as to

12   the specific questions, I couldn't remember what

13   they were.

14       Q  Did you ever bring up the topic as to

15   whether she was with Irene Quiroz shopping on

16   October 9, 1992?

17       MR. FORD:  Objection.

18       THE COURT:  Overruled.

19       A  No, she stated to me --

20       MR. SOROSKY:

21       Q  I just asked you if you ever brought up

22   that topic?

23       A  No, I did not.

24       Q  Did you know that piece of information

W 53

1    that the police had received some information that

2    the defendant may have been shopping with the

3    Quiroz family on October 9, 1992, did you know

4    that piece of information?

5         MR. FORD:  Objection.

6         MR. SOROSKY:  That's all I'm asking.

7         THE COURT:  Sustained.

8         MR. SOROSKY:

9         Q   Did you -- but you acknowledge you did

10   not bring that topic up with Miss Lindsey?

11        MR. FORD:  Objection.

12        THE COURT:  Sustained.

13        MR. SOROSKY:

14        Q   Now, you did talk to the police before

15   you questioned Miss Lindsey, did you not?

16        A   Yes, I did.

17        Q   And you say they gave you a summary of

18   the facts of the case?

19        A   Yes, they did.

20        Q   And in their summary of facts of the

21   case, did they give you the piece of information,

22   well one detective went out to question Irene and

23   Irene related to this detective that she and her

24   brother might have been with the defendant on

1    October 9, 1992?

2          MR. FORD:  Objection.

3          THE COURT:  Overruled.

4          A  No, the police didn't tell me that.

5          MR. SOROSKY:  Nothing further from this

6    witness.

7          THE COURT:  Redirect.

8          MR. FORD:  Nothing, thanks, Judge.

9          THE COURT:  Thank you, you're excused.

10         A  Thank you, your Honor.

11                           (Witness excused.)

12         THE COURT:  Call your next witness.

13         MR. FORD:  Thanks, Judge, I would ask leave

14   of Court to call Jeri Bogucki.

15         THE COURT:  Please face the clerk, raise

16   your right hand.

17                           (Witness sworn.)

18         THE CLERK:  Be seated.

19         THE COURT:  Please be seated.

20         MR. FORD:  May I inquire, your Honor?

21         THE COURT:  Please.

22

23

24

1                    JEROME BOGUCKI,

2    called as a witness on behalf of the People of the

3    State of Illinois, having been first duly sworn,

4    was examined and testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MR. FORD:

8         Q   Sir, would you please state your name

9    star number and unit of assignment?

10        A   Detective Jerome Bogucki, star number

11   20668, Area 5, Detective Division.

12        Q   How do you spell your last name?

13        A   B as in boy, o-g-u-c-k-i.

14        Q   And how long have you been a Detective,

15   Detective Bogucki?

16        A   Approximately 14 years.

17        Q   And how long have you been a Chicago

18   police officer?

19        A   Approximately 18 years.

20        Q   And in your capacity as a detective

21   assigned to Area 5, you're assigned to investigate

22   the murder case of a victim Rudolph Bennett, is

23   that correct?

24        A   Yes.

1          Q   Now, you arrested someone in connection

2     with your investigation, is that correct?

3          A   Yes.

4          Q   Do you see that person here in Court

5     today?

6          A   Yes, I do.

7          Q   Would you please identify that person by

8     an article of clothing she's wearing today?

9          A   It's the female black wearing a blue jump

10    suit.

11         MR. FORD:  For the record your Honor

12    indicating the defendant, Jeri Lindsey.

13         THE COURT:  The record may so reflect.

14         MR. FORD:

15         Q   Now Detective Bogucki, during the course

16    of your interaction with the defendant, did you

17    ever make inquiry of her as to her height?

18         A   Yes.

19         Q   And at what point did you do that?

20         A   When I filled out her arrest report.

21         Q   It would have been in preparation for

22    your paper work in connection with this case, is

23    that correct?

24         A   Yes.

W 57

1      Q  Did Miss Lindsey indicate to you what her

2    height was?

3      A  I believe it was 5-5.

4      Q  And did she -- did you also make an

5    inquiry as to her weight?

6      A  Yes.

7      Q  And did Miss Lindsey indicate to you what

8    her weight was?

9      A  Yes.

10     Q  What did she indicate to you her weight

11   was?

12     A  150.

13     Q  And that was --

14     THE COURT:  Is that pounds?

15     A  Yes.

16     MR. FORD:

17     Q  Now, Detective, during the course of time

18   that you were with Miss Lindsey, did she ever tell

19   you that on October 9, 1992, she had actually been

20   shopping at Walgreens and Venture?

21     A  No.

22     Q  Did Miss Lindsey ever tell you that

23   during the course of time that you were -- this is

24   during the course of your interviews, did she ever

1    tell you on October 9, 1992 she had been with

2    Amelia Quiroz?

3          A   No.

4          Q   Did she ever tell you that during the

5    course of your interviews and the time you spent

6    with her she had been with Irene Quiroz?

7          A   No.

8          Q   Did Miss Lindsey ever indicate to you

9    during the course of your interviews with her that

10   on October 9, 1992 she had been with a woman named

11   Dorothy Ramirez?

12         A   No.

13         Q   Did she ever even mention the name

14   Dorothy Ramirez to you?

15         A   Never heard that name.

16         Q   Did Miss Lindsey ever indicate to you

17   during the course of your interviews with her that

18   she had been, run into a neighbor named Olga

19   Martinez on October 9, 1992?

20         A   No.

21         Q   Did Miss Lindsey ever indicate to you

22   that she had been with an individual named Robert

23   Quiroz on October 9, 1992?

24         A   No.

1    Q  Were any of those names I just asked you

2    ever mentioned by Miss Lindsey during the course

3    of the many interviews you conducted with her?

4    A  Well Irene had been mentioned but not

5    along those lines.

6    Q  Now, you are -- if I could have a moment,

7    Judge?

8    THE COURT:  Yes.

9    MR. FORD:

10   Q  Detective, I would like to show you what

11   has been previously marked People's Exhibit number

12   9 in evidence.  I'll ask you to take a moment to

13   examine it.  Have you had an opportunity to

14   examine it, Detective?

15   A  Yes.

16   Q  What is it, People's Number 9 in

17   evidence?

18   A  This is a handwritten statement, the

19   handwritten statement or xeroxed copy of it, of

20   the statement given by Jeri Lindsey to the

21   Assistant State's Attorney, Nelson.

22   Q  Now, you're familiar with the contents of

23   that statement, is that correct?

24   A  Yes.

1        Q   Is the information provided within that

2    statement information that you told Miss Lindsey

3    had occurred or is it information she provided to

4    you?

5        A   No, she provided this information.

6        Q   Did Miss Lindsey ever indicate to you

7    that she had done anything other than -- well

8    strike that, I'm sorry.

9            At the time when -- before the

10   Assistant State's Attorney arrived at the scene,

11   did Miss Lindsey ever indicate to you -- strike

12   that.

13           Who was with you at the time you

14   were with Miss Lindsey during the interview

15   process an October 14, 15 and 16, 1992?

16       A   My partner, Detective Schalk.

17       Q   And his first name is?

18       A   Raymond.

19       Q   And at the time you and Detective Schalk

20   were with Miss Lindsey, did Detective Schalk ever

21   indicate to you to Miss Lindsey information that

22   went on to be included within the handwritten

23   statement that I showed you, State's number 9?

24       A   No.

W 61

1     Q   The information in State's number 9 is

2  the information that Miss Lindsey gave you about

3  what she did on October 9, 1992, is that correct?

4     A   That is correct.

5     MR. FORD:  If I could have a moment, your

6  Honor.

7     THE COURT: Yes.

8     MR. FORD:  No further questions of the

9  detective, thank you, Judge.

10    THE COURT:  Cross.

11              CROSS EXAMINATION

12                    BY

13            MR. SOROSKY:

14    Q   Detective, I would show you what we would

15  mark Defendant's Exhibit number 6 for

16  identification which would purport to be a police

17  report and that is made out by you and your

18  partner, is it not?

19    A   Yes.

20    Q   And the date of this report is October

21  14, 1992, is it not?

22    A   Yes, it is.

23    Q   And there is nothing in this report to

24  indicate any substantive content of any statement

1    Miss Lindsey made, is there?

2         MR. FORD:  If I could have a moment, Judge.

3         THE COURT:  Yes,.

4         MR. FORD:  Okay, thanks?

5         A  No, not on this report.

6         MR. SOROSKY:  And I would show you what we

7    marked Defendant's Exhibit number 7, the other one

8    was marked 6.  Number 7 for identification which

9    would also purport to be your police report and

10   that of Detective Schalk, is that correct?

11        A  That is correct.

12        Q  And this police report is dated October

13   18, 1992, is it not?

14        A  It's October 19.

15        Q  October 19?

16        A  Yes.

17        Q  And this police report contains the

18   substantive statements that Miss Lindsey made,

19   does it not?

20        A  Yes, it does.

21        Q  And all the statements that Miss Lindsey

22   made concerning her alleged activities in Joliet,

23   all those statements occurred after you

24   interviewed Miss Hess and Mr. Eiselt?

1          MR. FORD:  Objection.

2          MR. SOROSKY:  Did they not?

3          THE COURT:  Sustained.

4          MR. SOROSKY:

5          Q   You interviewed Mr. Hess -- excuse me,

6     you interviewed Miss Hess and Mr. Eiselt, did you

7     not?

8          A   Yes.

9          Q   And they related to you certain

10     information concerning seeing a black woman in a

11     cab and various activities that occurred in that

12     cab with that black woman, did they not?

13          MR. FORD:  Objection.

14          THE COURT:  Sustained.

15          MR. SOROSKY:  Now the State's Attorney asked

16     you various questions concerning what Miss Lindsey

17     told you just now, did he not?

18          A   Yes.

19          Q   And you said that Miss Lindsey told you

20     all those things, did you not?

21          A   Yes.

22          Q   And Miss Lindsey told you all those

23     things after you had spoken to Miss Hess and Mr.

24     Eiselt?

1           MR. FORD:  Objection.

2           MR. SOROSKY:  Didn't you?

3           THE COURT:  Overruled.

4           A   Yes.

5           MR. SOROSKY:

6           Q   So, before Miss Lindsey told you the

7      things the State's Attorney asked you, you were

8      armed with that information from Miss Hess and Mr.

9      Eiselt, weren't you?

10          MR. FORD:  Objection.

11          THE COURT:  Sustained.

12          MR. SOROSKY:  Nothing further.

13          THE COURT:  Redirect.

14                    REDIRECT EXAMINATION

15                         BY

16                    MR. FORD:

17          Q   You personally never talked to Jeri

18     Lindsey until after you talked to Mr. Eiselt and

19     Miss Hess, is that correct?

20          A   That is correct.

21          MR. FORD:  No further questions.

22          THE COURT:  Recross.

23          MR. SOROSKY:  Nothing further.

24          MR. FORD:  Thank you, detective.

1    THE COURT:  You're excused.

2                      (Witness excused.)

3    MR. FORD:  Judge, at this time with the

4    Court's indulgence I ask if the Court could take a

5    brief 5 minute recess, one additional witness and

6    stipulation.

7    THE COURT:  We'll recess 10th minutes.

8                      (Recess taken.)

9    THE COURT:  Court is back in session. People

10   versus Jeri Lindsey.  Record should reflect the

11   defendant is present in her own person through her

12   counsel, state is present through its counsel.

13              Please call your next witness, Mr.

14   Ford.

15   MR. FORD:  At this time your Honor, I

16   believe there will be a stipulation.  The

17   stipulation is as follows, your Honor.

18              If we were to call the keeper of

19   records, employment records for Policon Industries

20   a business located at 1009 East 99th Street, here

21   in the Chicago, County of Cook, State of Illinois,

22   he or she would testify --

23   THE COURT:  That's Poligon.

24   MR. FORD:  Policon, c-o-n.  He or she would

1   testify that she is in fact the keeper of records

2   for Policon Industries employment section, that

3   she did in fact have a record of Irene Quiroz'

4   employment at Policon Industries in October of

5   1992, that the employment records of Policon

6   Industries kept for the month of October, 1992

7   indicated that on the date of October 9th,

8   beginning at the end or beginning of Miss Quiroz'

9   shift at 11:30 PM Miss Quiroz was placed on

10   voluntary laid off status, that means she went to

11   work but was excused after an hour or less than --

12       MR. SOROSKY:  Objection, they don't know how

13   long.

14       MR. FORD:  She did not work a full shift on

15   October 9, 1992.

16       MR. SOROSKY:  Because of employer reasons.

17       THE COURT:  Wait a minute, I want to know

18   what the stipulation is.

19       MR. SOROSKY:  She did not work a full shift

20   because of employer reasons, in other words the

21   line wasn't working or they don't know the reason

22   why or there wasn't enough work to do that day.

23       MR. FORD:  For a reason unrelated -- for an

24   employer related reason.  Employer related reason.

1          THE COURT:  What time she went to work.

2          MR. FORD:  11:30.

3          THE COURT:  PM.

4          MR. FORD:  Yes.

5          MR. SOROSKY:  She went to work, she arrived

6    at work.

7          MR. FORD:  But did not work her shift.

8          THE COURT:  Arriving at 11:30 PM.

9          MR. FORD:  But did not work her shift

10   because of employer related reasons.

11         MR. SOROSKY:  This is what the records

12   indicate.  The records.

13         MR. FORD:  So stipulated.

14         MR. SOROSKY:  We would stipulate the keeper

15   of the records would say that.  They don't know

16   how long she was there.

17         MR. FORD:  You know what --

18         MR. SOROSKY:  They can't say how long she

19   was there.

20         THE COURT:  Okay.

21         MR. FORD:  At this time I would ask leave of

22   Court to call Chicago Police Officer Tovar.

23         THE COURT:  Could you ask Mr. Riley to join

24   us.  Please rise, raise your right hand.

W 68

1        THE CLERK:  Raise your right hand.

2                          (Witness sworn.)

3        THE COURT:  Please be seated.

4        A   Thank you.

5        MR. FORD:

6                ROBERT M. TOVAR,

7   called as a witness on behalf of the People of the

8   State of Illinois, having been first duly sworn,

9   was examined and testified as follows:

10               DIRECT EXAMINATION

11                    BY.

12               MR. FORD:                  .

13       Q   Sir, will you please state your name,

14  star number and who you are employed by?

15       A   My name is Robert M.  Tovar, T-o-v-a-r,

16  my star number 12847, and I'm employed by the

17  Chicago Police Department.

18       Q   How long have you been with the Chicago

19  Police Department?

20       A   Approximately over 25 years or so.

21       Q   Were you working as a Chicago police

22  officer on October 14, 1992?

23       A   Yes.

24       Q   And that was at 7:15 at night?

1          A   Yes.

2          Q   Did you have occasion to come into

3    contact with anyone you see here in Court tonight

4    at 7:15 on October 14, 1992?

5          A   Yes.

6          Q   Please point to that person and identify

7    that person by an article of clothing she's

8    wearing?

9          A   The lady at the table there.

10         MR. FORD:  For the record indicating the

11   defendant, Jeri Lindsey.

12         THE COURT:  The record may so reflect.

13         MR. FORD:

14         Q   Did you in fact have a conversation with

15   Miss Lindsey?

16         A   I did.

17         Q   Did you indicate to her that you felt she

18   was lying to you?

19         MR. SOROSKY:  Object -- withdraw.

20         A   Yes.

21         MR. SOROSKY:  No objection.

22         A   Yes.

23         MR. FORD:

24         Q   And at that time, did Miss Lindsey make a

W 70

1    statement to you about the events of October 9,

2    1992?

3         A   Yes.

4         Q   What did she indicate to you at that

5    time?

6         A   She told me she was in a cab at O'Hare

7    Airport, that she had been raped by the cab driver

8    --

9         THE COURT:  Wait a minute, start over again?

10        A   Okay.  She had told me, your Honor, that

11   she had been in a cab at the O'Hare Airport and

12   she had been raped by the driver and she was

13   sitting in the front seat with her clothing, she

14   had her coat on and this driver said he was done

15   with her and then someone came up from the

16   driver's side of the cab, they were inside the

17   parking area of O'Hare Airport and fired at the

18   cab driver.  She then told me she grabbed her

19   clothing and ran out of the car and ran out and

20   flagged a car and left the area.

21        MR. FORD:  No further questions, Judge.

22        MR. SOROSKY:  Miss Lindsey --

23        THE COURT:  Wait a minute.

24        MR. SOROSKY:  Sorry.

1      THE COURT:  All right, cross.

2                   CROSS EXAMINATION

3                         BY

4                  MR. SOROSKY:

5      Q   Now, Miss Lindsey told you that all these

6  events occurred at O'Hare Airport, is that

7  correct?

8      A   Yes, that is correct.

9      Q   Miss Lindsey didn't tell you about being

10  involved -- being in a taxicab in Joliet with an

11  elderly couple, did she?

12      MR. FORD:  Objection.

13      THE COURT:  Overruled.

14      A   I don't recall her mentioning that,

15  Joliet or a taxicab in Joliet, counsel.

16      MR. SOROSKY:

17      Q   Now, you never interviewed in your

18  capacity as a police officer on this case a June

19  Hess or John Eiselt, did you?

20      A   No.

21      MR. SOROSKY:  Nothing further of this

22  witness.

23      THE COURT:  Redirect.

24      MR. FORD:  Nothing further, thank you.

W 72

1          THE COURT:  Thank you, you're excused.

2          A   Thank you, your Honor.

3                              (Witness excused.)

4          MR. FORD:  We would rest in rebuttal, Judge.

5          THE COURT:  Surrebuttal.

6          MR. SOROSKY:  Your Honor, the only witness

7    the defense might want for surrebuttal is Irene

8    Quiroz concerning this latest piece of information

9    the State's Attorney has given us and we just saw

10   this this afternoon concerning the shift.  I tried

11   to reach her today and I can't, she doesn't have a

12   home phone.  So I don't know if we would call her

13   or not call her, that's our position so the only

14   thing I can say right now is we need to continue

15   this for that reason.

16                    If your Honor feels that little

17   point is not that significant to the entirety of

18   all the evidence, I would abide by your guidance.

19         THE COURT:  Counsel, I'm not going to guide

20   you.  It's your case, it's up to you to decide

21   what witnesses you wish to call.

22         MR. SOROSKY:  Let me just ask you for a

23   continuance.

24         THE COURT:  I'm not going to, you know.

W 73

1          MR. SOROSKY:  I understand.

2          THE COURT:  I have some idea of what you

3     want of me.

4          MR. SOROSKY:  Let me, we would be asking for

5     a continuance.

6          THE COURT:  I may be incorrect, but I tell

7     you whatever I perceive you want me to say, all I

8     would tell you is it's your case, it's up to you

9     to try your case, and not for me to try your case.

10          MR. SOROSKY:  Then we would be asking for a

11     continuance for that reason, just to confer with

12     her, that would be the only witness on that point

13     and I confess, or admit we may not call her, but

14     I've not talked to her about that one point.

15          THE COURT:  You want me to put this over

16     until tomorrow.

17          MR. SOROSKY:  Yes.

18          MR. FORD:  Judge I won't be here tomorrow.

19          MR. SOROSKY:  How about Friday.

20          MR. FORD:  I won't be here Friday.

21          THE COURT:  He's going on -- off the record.

22          MR. FORD:  Thank you Judge.

23                    (Off the record.)

24          THE COURT:  Back on the record, he's going

W 74

1    on vacation.

2         MR. SOROSKY:  We'll wait until he comes

3    back.

4         MR. FORD:  I suggest the date of October 8th

5    -- excuse me, February 8th.

6         THE COURT:  What?

7         MR. FORD:  I won't be here until the 7 and I

8    think the 7th. There is something else going on

9    here.

10        THE COURT:  Well I hope there is something

11   else going on in here, I hope there is something

12   else going on in here every day.

13        MR. SOROSKY:  How about February 10th,

14   that's a Friday, I will be in the building all day

15   Friday so all we'll do, should this woman testify,

16   she testifies and all we do is argue.  I know your

17   Honor remembers the case well.

18        MR. FORD:  I will be here on October 7th or

19   8th, Judge.

20        THE COURT:  On what?

21        MR. FORD:  Excuse me February 7th or 8th.

22   Either one of those dates is fine, the next

23   available date.

24        MR. SOROSKY:  Can we do it on the 10th.

W 75

THE COURT: Not the 10th. We have a jury trial scheduled for the 6th.

(Off the record.)

MR. FORD: Conceivably the next date I have Mr. Sorosky doesn't have -- if he doesn't call another witness or if he does, just that witness and arguments and hopefully that's it.

THE COURT: You know, I will be quite candid with all of you and not pull any punches, one of the problems I found is that I can not, you know, I want to get going on other matters.

MR. FORD: I understand.

THE COURT: This has been a torturously long trial. Part of the problem I perceive is continuing -- a continuing problem and that's failure of lawyers to get here on time.

MR. SOROSKY: The 10th I will be in the building all day.

THE COURT: I'm not going to put it over to the 10th. The 10th is not a good day. The 10th is my status day. We have a lot of business on the 10th. On the 10th I generally go late in the evening. Lawyers seem to like to work and work because they have all day Saturday and Sunday to

W 76

1    recover.  Nothing else to do those days but

2    relax.  But I have a full day scheduled for the

3    10th.  When are you going to be back, Mr. Ford.

4            MR. FORD:  I will be here the 7th on.

5            THE COURT:  You'll not be here the 6th.

6            MR. FORD:  No, your Honor.

7            THE COURT:  Well I'll do it the 7th at 10:00

8    AM.

9            MR. SOROSKY:  Can we do it in the afternoon

10   your Honor.

11           THE COURT:  No, that's why I can't do it in

12   the afternoon, because I can't do it in the

13   afternoon because I anticipate a jury.  What do

14   you want me to do with the jury.

15           MR. SOROSKY:  Let's do it, how about the

16   9th.  The 9th at 10th o'clock.

17           THE COURT:  Do it the 7th.  What have you

18   got on the 7.

19           MR. SOROSKY:  A bail hearing set with

20   witnesses.

21           THE COURT:  A bail hearing?

22           MR. SOROSKY:  How about the 8th.

23           THE COURT:  I'll do it the 7th, Tuesday at

24   12:30.

1          MR. SOROSKY:  Okay.  Okay.  Now 12:30,

2     that's 12:30 PM.

3          MR. SOROSKY:  Okay.  Mr. Ford.

4          MR. FORD:  I will be here no matter what,

5     Judge, I will be here all day the 7th,

6     presupposing I don't injure myself.

7          THE COURT:  If you do I have noted that Mr.

8     Cawley --

9          MR. FORD:  Somebody will be here.

10         THE COURT:  Why not Mr. Cawley.

11         MR. FORD:  I have been here for everyone of

12    the dates, it would be a disservice to everyone

13    concerned to have Mr. Cawley here who wasn't even

14    assigned to the case to be forced to argue, Judge.

15         THE COURT:  Well all right, 12:30.  Tuesday,

16    February 7.  12:30 PM.

17                    (Whereupon, the further hearing

18                    of the above-entitled cause

19                    was continued to 2-7-95, at

20                    12:30 o'clock p.m.)

21

22

23

24

```
1    STATE OF ILLINOIS )
                       )  SS.
2    COUNTY OF C O O K )

3        THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         COUNTY DEPARTMENT   -   CRIMINAL DIVISION
4
                  I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15
                                    _____
16   Official Shorthand Reporter
     Circuit Court of Cook County.
17

18

19

20

21

22

23

24   Dated this 15th day of June 1995.
```

W 79

```
 1    STATE OF ILLINOIS )
                        )   ss:
 2    COUNTY OF COOK    )

 3             IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE    )
 5    STATE OF ILLINOIS,   )
                           )      Criminal
 6             Plaintiff,  )       No. 92-CR-25135
          vs.              )
 7                         )      Charge:  MURDER
      JERRI LINDSEY,       )
 8                         )
               Defendant.  )
 9
               BE IT REMEMBERED that on the 7th day of
10
      February, 1995, A.D., this cause came on for hearing
11
      before the HONORABLE SHELVIN SINGER, Judge of said
12
      Court, upon the indictment herein, the defendant
13
      having entered a plea of not guilty.
14
               APPEARANCES:
15                 HONORABLE JACK O'MALLEY,
                        State's Attorney of Cook County, by:
16                 MR. NICHOLAS FORD and MR. MICHAEL CAWLEY,
                   Assistant State's Attorneys,
17                      for the People of the State of Illinois;

18                 MR. SHELDON SOROSKY,
                        for the defendant.
19

20    Christine E. Rockwell, CSR
      Official Court Reporter
21    2650 S. California Ave. Room 4C02
      Chicago, Illinois  60608
22

23

24
```

1          THE CLERK:  People of the State of Illinois

2    versus Jerri Lindsey.  Sheet 1.

3          THE COURT:  All right.  What was the last

4    date of trial on this, last day we took

5    evidence?

6          When was the last day we took evidence on

7    this?  All right.  January 31.  All right.  The State

8    has rested in rebuttal, and this is surrebuttal,

9    right?

10                         (Witness sworn.)

11                    IRENE QUIROZ,

12   called as a witness herein, having been first duly

13   sworn, was examined and testified as follows:

14              THE COURT:  Be seated.

15                 DIRECT EXAMINATION

16                 BY MR. SOROSKY:

17   Q    Ma'am, would you please state your name in

18   full and spell your last name.

19   A    Irene Quiroz, Q-u-i-r-o-z.

20   Q    Are you the same Irene Quiroz who previously

21   testified in this case?

22   A    Yes.

23   Q    All right.  Now, calling your attention to

24   October 9, 1992, which was a Friday, you have already

1   testified in this case concerning events on that day;

2   have you not?

3        A    Yes.

4        Q    Did you go to work on that day?

5        A    Yes, I did.

6        Q    Would you tell his Honor, Judge Singer once

7   gain were you work?

8        A    I work at Polarcut Industries.

9        Q    Where is that located?

10       A    1001 East 99th Street.

11       Q    All right.  Is that in Chicago, Illinois?

12       A    Yes, it is.

13       Q    What do you do there?

14       A    I am a floor leader.

15       Q    You basically work on an assembly line?

16       A    Yes.

17       Q    Now, what time did you go to work that day?

18       A    11 p.m.

19       Q    And was that the shift you were regularly

20   working at that time in your life?

21       A    Yes.

22       Q    And until what time did you work?

23       A    I worked from 11:30 to a little bit after 6

24   that night.

1      Q    And by 6, would you mean 6 a.m. on October

2   10th '91 (sic)?

3               MR. FORD:  Objection, Judge.

4               THE COURT:  Sustained.

5   BY MR. SOROSKY:  Q    When you say until 6, what time

6   do you mean?

7               MR. FORD:  Objection.

8               THE COURT:  Well, you mean 6 a.m. or p.m.?

9      A    A.M.

10  BY MR. SOROSKY:  Q    What day?

11     A    October 9th.

12     Q    You worked from about 11 or 11:30 October 9th

13  until what time?

14     A    6 a.m.

15     Q    On what day?

16     A    October 10th.

17     Q    All right.  What time is your shift supposed

18  to work until?

19               MR. FORD:  Objection.

20               THE COURT:  Overruled.

21     A    8 o'clock a.m.

22  BY MR. SOROSKY:  Q    So you did get off work a little

23  early, did you not?

24     A    Yes, I did.

1    Q    Where did you go after work?

2    A    Home.

3    Q    So although, technically, you did get off

4    work a little early did you consider it a night's

5    work?

6    A    Yes.

7    Q    And if you testified earlier that you worked,

8    you know, and went home were you in any way lying when

9    you said that?

10   A    No.

11        MR. FORD:  Objection.

12        THE COURT:  Sustained.

13        MR. SOROSKY:  Nothing further of this

14   witness.

15        THE COURT:  Cross.

16        MR. FORD:  Yes.

17              CROSS-EXAMINATION

18              BY MR. FORD:

19   Q    All right.  Ms. Quiroz, you were CE-VL, that

20   is voluntary lay-off on the night of the 9th?

21   A    Yes.

22   Q    You know that because it came up during the

23   course of this trial?

24   A    Yes they had the time.

1     Q    All right.  Now, voluntary lay-off is where

2   you and management agree that you are willing to go

3   home early, isn't it?

4     A    Yes.

5     Q    Now, you were also on voluntary layoff on the

6   15th day, the day you went to the police station,

7   weren't you?

8     A    Yes.

9     Q    That day you didn't go into the plant, did

10   you?

11     A    Yes.

12     Q    You went into the plant on the 15th?

13     A    No.

14     Q    Are you sure?

15          MR. SOROSKY:  Objection to this.  I don't

16   know what relevance it has.

17          THE COURT:  Sustained.  It is relevant.  I

18   will sustain the objection.

19          MR. FORD:  Judge, I would ask to be heard on

20   this, because the issue is, what hours she worked.

21   Now, this is just her testimony.  We have had the

22   records exist, and I can probe whether or not what he

23   is saying is supported by what was the normal

24   procedure at her place of work.

1              THE COURT:  All right.

2              MR. FORD:  That iswhat I am asking, on the

3     15th.

4              THE COURT:  All right.  I will overrule that

5     at this time.  Don't go too far astray?  That is the

6     only day I am going to --

7     BY MR. FORD:  Q     Now, Ms. Quiroz, on the 15th you

8     were scheduled to work, weren't you?

9         A     Yes, I was.

10        Q     All right.  You decided to go into work that

11    day?

12        A     No, I didn't.

13        Q     You were voluntarily off on 7-15, too,

14    weren't you?

15        A     Yes, I was.

16        Q     All right.  You did report for one point of

17    the work, did you?

18        A     No, because I was at the police station.

19        Q     Right.  You were voluntarily off on the 9th,

20    too, though, weren't you?

21        A     Yes.

22        Q     All right.  You don't have any records from

23    them, do you?

24        A     Pardon me?

1      Q      You don't have your records for policy about

2   what hours you worked on the 9th, do you?

3      A      No, they wouldn't give them to me.

4      Q      All right.  Do you have any records or policy

5   about what hours you worked on the 9th?

6      A      No, I don't.

7             MR. FORD:  No further questions.

8                      REDIRECT EXAMINATION

9                      BY MR. SOROSKY:

10     Q      Now, the state's attorney referred to the

11  night of October 15th; is that correct?

12     A      Yes.

13     Q      And on that day you were marked BVM, VLO,

14  correct?

15     A      Yes.

16     Q      All right.  Could you tell his Honor, Judge

17  Singer how and under what circumstances you were able

18  to obtain the mark of VLO?

19     A      All right.  The supervisor gave me VLO on the

20  15th?

21     A      Why did she give it to you?

22     A      Because she --

23             MR. FORD:  Objection.

24             THE COURT:  Sustained.

1          MR. SOROSKY:  The state's attorney opened the

2     door, your Honor.

3          THE COURT:  All right.  Yes, but why are you

4     probing the state of mind of someone else?

5     BY MR. SOROSKY:  Q    All right.  Did you have a

6     conversation with your supervisor?

7          A    Yes.

8          MR. FORD:  Objection.

9          THE COURT:  Overruled as to did you have a

10    conversation with your supervisor.

11    BY MR. SOROSKY:  Q    All right.  Where were you when

12    you had that conversation?

13         A    I was at the police station.

14         Q    All right.  Where was your supervisor?

15         MR. FORD:  Objection.

16         THE COURT:  Overruled at this point.

17    BY MR. SOROSKY:  Q    All right.  Was your supervisor

18    at work?  All right.  Was this conversation over the

19    telephone?

20         A    Yes, it was.

21         Q    All right.  And could you tell his Honor,

22    Judge Singer, what you told the supervisor?

23         A    (No response).

24         Q    What was the conversation between you and the

1    supervisor?

2              MR. FORD:  Objection.

3              THE COURT:  Sustained.

4              MR. SOROSKY:  Well, your Honor, we would make

5    an offer of proof that the witness would testify that

6    she called work and explained that she was at the

7    police station, and the police substantiated that she

8    was at the police station; and that she was there on,

9    if I can use the term, police business, and because of

10   this work gave her 5 VL0, as opposed to absence,

11   because she was there for, if I can use the generic

12   term, police work police purposes, police purposes.

13             THE COURT:  You can have her testify to what

14   she said, but if you are asking for this specific

15   witness to recite something that is in the state of

16   mind, or something that someone else said that you are

17   offering for truth or falsity of what was said;

18   therefore, it is hearsay.

19   BY MR. SOROSKY:   Q     What did you tell -- you heard

20   the judge.  Tell the judge what you said over the

21   phone to your supervisor?

22        A     I had told her that I was at the police

23   station being questioned, and I don't think I will be

24   making it to work because I was all the way on the

1    north side.  So she told me --

2              MR. FORD:  Objection.

3    BY MR. SOROSKY:  Q    No.  You can't say what she

4    said.  Did the police ever talk to your supervisor?

5         A    No, they didn't.

6         Q    And you remember specifically calling work on

7    October 15th, the day you were at the police station?

8              MR. FORD:  Objection.

9              THE COURT:  Sustained.

10             MR. SOROSKY:  Nothing further of this

11   witness.

12             THE COURT:  Recross?

13                  RECROSS-EXAMINATION

14                  BY MR. FORD:

15        Q    You could get a VOL without ever going into

16   work on the 15th; is that correct?

17        A    No.

18        Q    You got a VLO without going to work, did you,

19   yes or no?

20        A    Yes.

21             MR. SOROSKY:  I think the witness is entitled

22   to answer that with more than a yes or no.

23             THE COURT:  All right.  Well, she said,

24   "Yes," so I will let the answer stand.

1          MR. FORD:  No further questions,

2                  REDIRECT EXAMINATION

3                  BY MR. SOROSKY:

4     Q     Did you explain how you got the VOL over on

5  the 15th?

6          MR. FORD:  Objection.  We have been over

7  that.

8          THE COURT:  Sustained.  This has already been

9  done.

10         MR. SOROSKY:  I don't know that it has

11  already been done, your Honor.  You cut off the

12  conversation.

13         THE COURT:  I guess as to what someone else

14  said.  Because of the amount of -- all right.

15  Anything further of this witness?

16         MR. SOROSKY:  No.

17         THE COURT:  All right.  Thank you.  You are

18  excused.  Call your next witness.

19                                  (Witness excused.)

20         MR. SOROSKY:  We will call Lindsey for one

21  question, Judge.

22         MR. FORD:  I still have my motion to exclude,

23  Judge.

24         THE COURT:  All right.  Well, I assume that

1    you are not going to recall --

2             MR. SOROSKY:  I am only going to ask her one

3    question which has nothing to do with --

4             THE COURT:  Miss, can you just step outside.

5                          (Witness sworn.)

6                    JERRI LINDSEY,

7    the defendant herein called as a witness on his own

8    behalf, having been first duly sworn, was examined as

9    follows:

10            THE COURT:  Please, be seated.

11                   DIRECT EXAMINATION

12                   BY MR. SOROSKY:

13       Q    Ms. Lindsey, during the time that you were in

14   police custody, did any police officer ever ask you

15   your weight?

16       A    No.

17            MR. SOROSKY:  Nothing further, Judge.

18            THE COURT:  Cross.

19            MR. FORD:  No cross.

20            MR. SOROSKY:  That is --

21            THE COURT:  All right.  Thank you.  You can

22   return to counsel table.

23            I am sorry, Mr. Sorosky.

24            MR. SOROSKY:  Nothing further.  Judge, we

1    would rest on rebuttal.

2         THE COURT:  Any rebuttal, surrebuttal?

3         MR. FORD:  No, Judge.  I have no further

4    rebuttal.

5         THE COURT:  All right.  We are going to have

6    final argument when?

7         MR. SOROSKY:  Friday.

8         MR. FORD:  I am going to have to call these

9    people, Judge, and try to find some way to get ahold

10   of them.

11        THE COURT:  If they can't be here on Friday,

12   I will put it over until tomorrow.  I have indicated

13   it will be tomorrow.

14                    (Whereupon, the case was continued to

15                    the 10th day of February, 1995, A.D.)

16

17

18

19

20

21

22

23

24

```
1     STATE OF ILLINOIS    )
                           ) SS:
2     COUNTY OF C O O K    )

3

4               I, CHRISTINE E. ROCKWELL, Official Court

5     Reporter of the Circuit Court of Cook County, County

6     Department-Criminal Division, do hereby certify that I

7     reported in shorthand the proceedings had in the

8     above-entitled cause; that I thereafter caused to be

9     transcribed into typewriting the above transcript,

10    which I hereby certify is a true and correct

11    transcript of the proceedings had before the

12    HONORABLE SHELVIN SINGER.

13

14

15

16    _____
      Official Court Reporter
17    Circuit Court of Cook County
      Criminal Division
18

19

20

21

22

23

24
```

Y-16

(Rev. 2/18/93) CCCR-56

**STATE OF ILLINOIS**  } ss
**COUNTY OF COOK**

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME EIGHT OF A NINE VOLUME . . . .

. RECORD CONSISTING OF THE REPORT OF PROCEEDINGS. . NO PRAECIPE HAVING BEEN FILED IN . . .

. THE APPELLATE COURT UNDER APPELLATE COURT NO. 95 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . . . . . . . JERI LINDSEY    (01) . . . . . . . . . . . WAS . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . . SEPTEMBER . . . . . . 20 . . . , 19 . . 95

*Aurelia Pucinski*

Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**