**File Date:** _Feb 29, 2008_

**Case No:** _07cv6658_

**ATTACHMENT #** _11_

**EXHIBIT** _Z to AA_

**TAB (DESCRIPTION)** _____

CCCR-310



# Transcript of Record
## Appeal
to

APPELLATE        Court of Illinois

District

Circuit Court No.        92 CR 25135

Trial Judge        SHELVIN SINGER

Reviewing Court No.        95 1535

FILED
APPELLATE COURT 1st DIST.

THE PEOPLE OF THE STATE OF ILLINOIS        NOV 07 2002

### VS.        STEVEN M. RAVID
CLERK

JERI LINDSEY    (01)

from

92cr25135        URT

ILLINOIS

CRIMINAL   DIVISION

VOLUME NINE OF NINE
REPORT OF PROCEEDINGS

AURELIA PUCINSKI

Clerk of Court

Per    AP./SIR

Deputy

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF          )
ILLINOIS,                       )
                                )
            Plaintiff,          )
                                )
        vs.                     )    92 CR 25135
                                )    MURDER
JERI R. LINDSEY,                )
                                )
            Defendant.          )


        REPORT OF PROCEEDINGS HAD at the BENCH TRIAL of

the above-entitled matter, before the Honorable SHELVIN

SINGER, Judge of the Circuit Court of Cook County, on the

10TH day of FEBRUARY, A.D., 1995.


        PRESENT:            HON. JACK O'MALLEY,
                            State's Attorney of Cook Co.
                            BY: MR. NICK FORD,
                            Asst. State's Attorney,
                                on behalf of the State;

                            MR. SHELDON SAROSKY,
                                on behalf of Defendant.


Mary Catherine McGreal Redmon, CSR
Official Shorthand Reporter
Circuit Court of Cook County


                        Z-1

1          THE CLERK:  People of the State of Illinois versus

2     Jeri Lindsey.

3          THE COURT:  All right.  Counsels, you ready to

4     argue?

5          MR. FORD:  Yes, Judge.

6          MR. SAROSKY:  Yes.

7          THE COURT:  Mr. Ford?

8          MR. FORD:  Thanks, Judge.

9               Your Honor, on October 9, 1992, the Empress

10    River Casino, Joliet, Illinois, Rudolph Bennett appeared

11    in a red and white taxicab.

12               He was the partial owner of the Circle Cab

13    Company.  In order to pick up an older couple.

14               The names of those 2 people are June Hess and

15    John Eiselt.

16               As Miss Hess and Mr. Eiselt were waiting to get

17    into the cab, as they saw it approach they saw a person

18    flag down the cab as it came towards the cab stand,

19    towards the area there at the front of the Empress Casino

20    and get into the cab, initially in the back seat.

21               They observed that person as well as they

22    could.  When they first saw her they could only see that

23    she was an African American, a female and they could tell

24    she got into the back seat of the cab.


                              Z-3

1          However when the cab approached the place where

2      the couple was standing, they saw that person get out of

3      the cab and move to the front seat of the car.   That

4      person, Your Honor, is Jeri Lindsey.

5          Miss Lindsey got into the front seat of the

6      cab, sat very close to the cab driver, the victim in this

7      case.

8          And for this portion of the argument, Judge, I

9      am going to ask you to harken back to the testimony of

10     Miss Hess and Mr. Eiselt because it was very probative as

11     to their ability to observe and to what they saw.

12         They were seated directly behind Miss Lindsey.

13     They saw her profile.  They saw her entire face.

14         You heard how Mr. Hess, excuse me, Mr. Eiselt

15     and Miss Hess described the manner in which the defendant

16     Jeri Lindsey sat next to the victim.  She was very close

17     to him.

18         He became nervous, she became nervous.   They

19     talked again and again during the course of their

20     testimony about the agitated manner of Miss Lindsey.

21         All that, Judge, bears weight on how they were

22     able to sit in that cab and see what they said they saw

23     and secondarily about what was going through the mind of

24     the victim.


                                Z-4

1          It could very well have been the case that that
2     was the first point at which he saw the gun which would
3     later be used to kill him.
4          Based on their testimony, Judge, that inference
5     would properly be made.  Based on the way they observed
6     the cab driver act and Miss Lindsey act.
7          As they drove from the casino initially to a
8     store where the couple wanted to buy a 6 pack of beer
9     they continued to observe the defendant.  They continued
10    to watch her, they continued and initiated a conversation
11    with her about ways of going between Chicago and Joliet.
12         The older couple had mentioned, distinctly
13    mentioned that they had done so on the Greyhound bus,
14    that is how they had gone from Chicago to Joliet.  Miss
15    Lindsey indicated to them and gave them a train schedule
16    from Chicago to Joliet and it's important, Judge, you
17    will see that train schedule includes a stop at 83rd
18    Street very near the place where Jeri Lindsey has
19    testified she lives.
20         Not just a train schedule for anywhere from
21    Joliet.  This is a train schedule that would take one
22    from the area where Jeri Lindsey lives to Joliet.
23         Secondarily they had a conversation with her,
24    she indicated to them that they should take the train the

Z-5

1    next time.

2           They arrived at the liquor store, I think Mr.

3    Eiselt testify he got out briefly.  They got back into

4    the cab and they were dropped off at the Red Roof Inn.

5           But they heard something as they were in the

6    cab which is important also.  They heard her say to the

7    cab driver, Judge, "I have to be at O'Hare by 4:30."

8           They heard those words.  Both Miss Hess and Mr.

9    Eiselt support not only the identification of Jeri

10   Lindsey which both of them made in a photographic array

11   and subsequent line up.

12          And you will have the opportunity to observe

13   both, Judge.

14          The line up in particular was one which

15   included people very similar height, shape and weight to

16   Miss Lindsey but secondarily they heard her announce her

17   intent to go to O'Hare airport.

18          And after they got out of the cab that is

19   exactly what happened.  The defendant and the victim in

20   this case, Mr. Bennett, went to O'Hare airport.  The time

21   when Mr. Hess and Miss Eiselt --

22          Mr. Eiselt, Miss Hess testified they arrived at

23   O'Hare, Judge --

24          Excuse me.  They were dropped off at the Red

Z-6

1    Roof Inn was consistent with the amount of time it would

2    take to travel from Joliet to O'Hare because we know that

3    the cab itself got in at O'Hare at 4:59 in the afternoon.

4         2 days later the body of the victim was found

5    in O'Hare airport in the place where Jeri Lindsey said it

6    would be.

7         How do we know about the vicious period of time

8    that passed between the time that Miss Hess and Mr.

9    Eiselt were dropped off at the Red Roof Inn and what

10   happened at O'Hare airport after the cab itself was

11   parked?

12        We know what happened because of her words.

13   The words she told an Assistant State's Attorney, 2

14   Chicago police officers, and 2, to somewhat of an extent

15   Officer Tovar at 11th and State.  That is how we know

16   what happened.

17        Now, and I know the Court will have an

18   opportunity and may have already had an opportunity to

19   review Miss Lindsey's statement.

20        It's factually rich.  It includes information

21   relating to her interaction with Miss Hess and Mr.

22   Eiselt, and it contains information relating to the

23   topics of conversation, it includes actions by her which

24   are consistent with the way in which the victim's death

Z-7

1    was caused and you will see that from looking at the

2    protocal.

3            She talks about multiple shots.  The victim was

4    shot multiple times.  She talks about a handgun.  The

5    victim was shot with rounds from a handgun.

6            But what is most damning and most reflective of

7    how guilty Miss Lindsey is in this case, Judge, is really

8    what she herself said before any of this came to light.

9            What she herself said on October 11, 1992, at

10   9:32 p.m. when she showed up at South Chicago hospital

11   with this story about being attacked by a cab driver and

12   having to kill him as a result of the attack.

13           And I know the Court can recall this initial

14   story, the one that she told Detective Jack Hines, the

15   one that she told medical personnel.  The one that she

16   said before the body of the victim had even been

17   recovered.  "I was the victim of a sex assault."  A theme

18   that would travel throughout many of her statements.

19           My assaulter, the person that I had to

20   eventually kill, was an African-American.  He was a cab

21   driver.  The cab was red and white in color.

22           Judge, we have already gone through such a

23   narrowing process in terms of information that she chose

24   that for, to assume that this was just coincidence would

Z-8

Ñk12.6H

1    be ludicrous, Judge, especially, it would be ludicrous to

2    the point especially when you look at the identifications

3    of the couple.

4          But the coincidences go on and on.  She

5    describes a vehicle, a red and white cab which had 4

6    doors.

7          There is more detail in her initial statement

8    to the police.  I was in the woods at a point during the

9    event, and finally the real piece of information that

10   separates this most distinctly, "I ended up in Joliet."

11         This whole thing began in Joliet.

12         You can see the beginnings of the machinations

13   that Miss Lindsey went through and the many lies that she

14   told and I know this Court has heard her before; heard

15   her testify just the other day about how she told lie

16   after lie.

17         And you can look at the 5 statements that were

18   given to Detectives Bogucki and Schalk and Assistant

19   State's Attorney Nelson and you can see the way her mind

20   went through these lies.  And you can even see the really

21   ineffectual kind of amatuerish attempt to cover up the

22   death that she had caused in this first statement before

23   the body had even been found.

24         The coincidences continue, Judge.  "I killed

Z-9

1    the cab driver."

2              Obviously that is what happened in this case,

3    the cab driver was killed.  The cab driver was left dead

4    in the car.  Again 3 days later they or 2 days later they

5    would find a cab driver dead in the car.

6              "I ran into the woods at a period of time next

7    to sundown."

8              Why is that important?  You can see within that

9    statement before the body had even been found that she is

10   placing her death-causing actions at a time in proximity

11   to sundown, which in October would be very near the time

12   after 5:00 p.m when she did in fact flee the scene, not

13   in Joliet but at O'Hare.

14             She is placing that crime in time and place,

15   she is using enough of the facts to try to excuse her

16   actions.

17             And, Judge, she has not been sucessful.  This

18   was all done before the body of Mr. Bennett had even been

19   found.

20             All these things, all these factors which would

21   be, turn out to be very consistent, amazingly consistent

22   with the crime itself.

23             It's not amazing consistency, Judge, because

24   she was there and caused a death at O'Hare.

Z-10

1          But all these factors, I guess there is 10 of

2     them at least, and I am sure more in the Court's review,

3     were consistent with the manner of death for the victim,

4     the way the victim died, consistent with the place the

5     victim died; were consistent with stories she'd later

6     tell to Detectives Bogucki and Assistant State's Attorney

7     Nelson in an effort to excuse or remove responsibility

8     for her conduct that day.

9          Fortuitously, Judge, Detective Jack Hines

10    following his receipt of that statement which he viewed

11    initially and he testified, I believe he was

12    cross-examined on this, to be one which was utterly

13    without merit; that did not, that the sexual assault

14    cannot have occurred in this way.

15         Upon his becoming aware of the death of Mr.

16    Bennett and the finding of the body at O'Hare Airport

17    Detective Hines put 2 and 2 together, Judge.  He had a

18    red and white cab.  He had a cab driver dead.  He had a

19    cab driver left dead in a location in the street, in this

20    case in a parking garage.

21         All these coincidences, he contacted the area

22    in which this murder had occurred, that being Area 5

23    Violent Crimes at 5555 West Grand, and through his

24    aggresive intelligence and intuitive case work, Judge,

Z-11

1   and his interaction with Detectives Schalk and Bogucki

2   they did put 2 and 2 together.

3        Miss Lindsey was brought into the police

4   station, she offered the same version of events that she

5   offered before but again before Area 5 was involved

6   Detective Hines wanted to give her an opportunity to

7   identify the face of the man she killed.

8        And already, Judge, already she was refusing to

9   cooperate because we know at 111th and Ellis at Area 2

10   Violent Crimes Detective Hines attempted to show her a

11   group of photographs, one of which was the victim's, Miss

12   Lindsey refused to cooperate.  She refused to even look

13   at the photographs, Judge.

14        The next day Detective Schalk and Bogucki go to

15   her home, pick her up, they take a photograph of her,

16   they include that photograph in the photo array that the

17   Court will see and 2 individuals, and Miss Hess and Mr.

18   Eiselt testified about this, while viewing the group of

19   photographs separately identified her as the perpetrator

20   or as the person that they rode in the cab with from the

21   Empress Casino to the Red Roof Inn; that they spent a

22   period of time with, that they had a conversation with;

23   the person, Miss Lindsey, who told the cab driver she

24   wanted to go to O'Hare.

1          Shortly after that, shortly after they are

2     confronted with the Hess and Eiselt identification, that

3     preliminary identification, Miss Lindsey is at 11th and

4     State and she begins to change her story.

5          Initially she says she wasn't ever in a cab.

6     She was never in a cab and she wasn't there.

7          She is told that that doesn't make sense.   And

8     the first thing that comes out of her mouth, the first

9     thing, words that she says was, "yes, I was in the cab at

10    O'Hare, but another man came up and shot the victim."

11         That is to Officer Tovar who testified in this

12    Court in rebuttal a few days ago.   Those were the first

13    words that left her mouth.

14         Suddenly 2 facts are brought into the equation

15    that did not exist before.   One is the means of the agent

16    of death is changed from a knife, which is what she

17    originally said, to a gun which is consistent with the

18    causing, with the instrument that caused the death of the

19    victim in this case.

20         And secondarily she at first puts herself at

21    the site of the crime in this case, O'Hare Airport in the

22    parking garage, not as a result of any prompting, not as

23    a result of something that someone told her to say.

24         Because she alone knew the gruesome facts of

                              Z-13

1    the crime she committed.

2         And from that point until Assistant State's

3    Attorney Nelson has her first contact with her roughly a

4    day or so later, Miss Lindsey's stories go through a

5    series of machinations which begin to weave in the many

6    facts of the crime that, and the many inconsistencies

7    that she is confronted with.

8         And finally at the end she tells the police

9    exactly what happened in this case.  She explains why the

10   gun is not found at the scene.  She explains why she puts

11   the car at the appropriate level.

12        You heard Assistant State's Attorney Nelson and

13   the Detectives testify these facts and information were

14   not provided by them:  These were words that she said.

15        And it's intrinsic within the defense's case,

16   Judge, that somehow they constrained her to say that.

17   They overcame her will, Judge.

18        Well you would have to ignore the Hess and

19   Eiselt identifications in order to accept that.  That is

20   one of the parts of the problem.

21        Second part is they are absolutely saying that

22   the Detectives are to be disbelieved and that the

23   Assistant State's Attorney is to be disbelieved.

24        That these words were not her words but their

Z-14

1   words that she signed off on.

2          And the Defendant vacillated considerably

3   during the course of this proceeding and prior

4   proceedings about just what percentage came from her and

5   what percentage came from them.

6          Why?  Because she told so many lies, Judge,

7   that she doesn't even remember what happened.

8          She knows what happened in the crime, though,

9   because before she ever talked to a police officer,

10  before she ever talked to any of the people from Area 5

11  Violent Crimes or before the body was even found she is

12  describing an incident that is similar and in many

13  respects to the incident that would in fact cause the

14  death of the cab driver, Mr. Bennett, in this case,

15  before anyone became involved.

16         That is an indicia of proof of the validity of

17  the statement that supports the statement collaterally

18  that I assert that the Court view closely.

19         Pair that with the Hess Eiselt identifications,

20  Judge, and you have an open and shut case.

21         You have, you have information recovered at the

22  scene, 2 eye witnesses placing her in that car.

23         Solid identifications, conducted in an orderly

24  legal manner.  You have got the statement by Miss Lindsey

Z-15

1   herself describing her own criminal conduct.  You have

2   got information contained within the statement which she

3   alone would know provided by her.

4          And all these things, Judge, all these things

5   point inevitably at her and the reason they point at her

6   is because she alone must bear the responsibility for

7   killing Rudolph Bennett in that cab on October 9, 1992.

8          She was in the cab at O'Hare, she admitted to

9   her conduct, she made a signed handwritten confession as

10  to her conduct, and as I said, before she could ever

11  fabricate anything she was telling a version of events

12  that were similar to the version that she'd eventually

13  inculpate herself with at the police station.

14         All these things, Judge, point to one

15  inescapable conclusion:  Jeri Lindsey killed Rudolph

16  Bennett in a cab at O'Hare Airport in the garage on

17  October 9, 1992, and I ask that you make a finding of

18  guilty of first degree Murder and Armed Robbery, because

19  of her words and because of the identification.

20         Because those 2 factors or really 3 factors,

21  since 2 separate eye witnesses were able to see her and

22  many other things in this case all point to that

23  conclusion.

24         THE COURT:  Excuse me for about 5 minutes.

Z-16

1          MR. SAROSKY:  Sure.

2          THE COURT:  Mr. Sarosky?

3          MR. SAROSKY:  Yes, Judge Singer.

4              Mr. Ford, Miss Lindsey?

5              I will certainly concede that there is some

6     evidence wherein one could conclude that Jeri Lindsey may

7     have committed this crime.

8              And I think Mr. Ford did a very good job of

9     presenting a case and argued very effectively that

10    evidence that Miss Lindsey committed this crime.

11             However, I would state to Your Honor once

12    again, as I know Your Honor knows, as a lawyer would

13    argue to a jury, the issue now is and there is only one

14    issue, has the State proved Jeri Lindsey guilty of this

15    crime beyond a reasonable doubt?

16             The issue is not has the State produced some

17    evidence that Jeri Lindsey is guilty?

18             And I think Mr. Ford has done a very effective

19    job of squeezeing all the juice that he can out of the

20    lemon and he has produced and the state has produced some

21    evidence that Jeri Lindsey has committed this crime.

22    There is some evidence of that.

23             But I would submit there is not proof beyond a

24    reasonable doubt.


                          Z-17

1     THE COURT:  One moment, please.

2     MR. SAROSKY:  Very good.

3     THE COURT:  Mr. Sarosky, I apologize.  Proceed.

4     MR. SAROSKY:  No problem.

5         When the defense made its opening statement the

6     defense said that there were 2 categories of evidence

7     which showed Miss Lindsey could be guilty.

8         One would be what I categorized the

9     circumstantial eye witnesses.

10        These were not people who saw the crime, but

11    they are circumstantial eye witnesses in the sense that

12    they are eye witnesses who allegedly saw Miss Lindsey and

13    therefore that is some evidence that Miss Lindsey

14    committed the crime.

15        The other piece of evidence which shows Miss

16    Lindsey is guilty is her statement.  These are the 2

17    pieces of evidence and only pieces of evidence that the

18    state has to show Miss Lindsey is guilty.

19        Every other piece of evidence shows Miss

20    Lindsey is not guilty.

21        Now first I would like to go over all these

22    other pieces of evidence that show that Miss Lindsey is

23    not guilty and then I will return to the evidence which

24    allegedly incriminates her and show how that evidence is

Z-18

1   not that strong.

2          First according to the state's version of

3   events Miss Lindsey is in this cab:  That Miss Lindsey is

4   in the back seat, she is in the front seat, she is riding

5   from Joliet to O'Hare, and then she supposedly commits a

6   murder within that cab at O'Hare.

7          The State has produced no fingerprint evidence

8   to show that Miss Lindsey was in that cab.

9          If Miss Lindsey was in that cab and through

10  that whole ride and always getting out of one seat and

11  getting into another seat and doing all that she did,

12  there certainly would be some fingerprint evidence that

13  she was in that cab.

14          There is nothing.

15          Secondly the elderly couple who allegedly saw

16  Miss Lindsey very succinctly stated that they received a

17  Metra train schedule from the person who was in the cab

18  and they gave that very train schedule to the police.

19  And both witnesses testified that Miss Lindsey reached

20  into her purse with her hand and gave that train schedule

21  to Miss Hess.

22          The police have that train schedule and Miss

23  Lindsey's fingerprints are not on that train schedule.

24          If they were you would have heard it.


Z-19

1              So thirdly, according to the evidence the State

2      presented, this cab entered the O'Hare parking lot at

3      4:59 p.m. because the parking stamp was found in the cab.

4              That is 4:59 p.m. on October 9, 1992.

5              Miss Lindsey, in her statement, says the

6      shooting occurred right there at O'Hare, and I shot this

7      man 3 times and ran out of the cab, in the O'Hare parking

8      lot.

9              Now, I would submit to Your Honor, Your Honor

10     could use his own everyday common sense living

11     experience; experiences as a jury is entitled to.

12             On a Friday afternoon, at 5:00 o'clock at

13     O'Hare, that is an extremely crowded time, and how does a

14     shooting occur at O'Hare where 3 shots are fired, and

15     someone is killed and no one hears it, sees it or knows

16     about it?

17             I am not talking about catching the offender.

18     I will accept the fact an offender could get away.  But

19     this body is not found until 3 days later.

20             How could a shooting occur at O'Hare parking

21     lot without one person hearing shots, and saying, "oh

22     there is something over there."

23             That is impossible.

24             Now then, Miss Lindsey testified that she

Z-20

1  weighed over 200 pounds at the time that she was arrested

2  and taken into custody.  That is corroborated by the

3  picture that the police took which is in evidence that

4  Your Honor will see that this woman is of a weight in

5  accord with that number.

6        And her picture, taken by the police, is not in

7  accord with the description given by the elderly couple

8  of a female black in her 20s, 130 to 140 pounds and

9  chunky.

10        The defendant indicated that she had a mole on

11  her nose which is depicted in the pictures and that she

12  had an earring in her nose which she was wearing on

13  October 9, 1992, and that earring was taken from her by

14  the police when she was taken into custody, and that she

15  was wearing that earring that day.

16        And witnesses for the defense acknowledge that

17  she was wearing an earring and she always wore an

18  earring.

19        The State presented no evidence in rebuttal to

20  deny that the earring was confiscated as soon as she was

21  taken into custody as Miss Lindsey said.  There was no

22  evidence in rebuttal to that.

23        And it's very believable that jewelry is taken

24  off a person when they are in custody.  The police also

Z-21

1  indicated that is normal routine police procedure.

2          So therefore if we have such a brilliant

3  identification, these 2 eye witnesses do not mention the

4  mole on the nose of the accused which is depicted very

5  clearly in police pictures; do not mention an earring in

6  her nose which the defendant said she had which witnesses

7  on behalf of the defendant said she had; and the

8  defendant stated that earring was taken from her as soon

9  as she was taken into custody.

10          And that fact concerning the taking of the

11  earring was not rebutted by the police.

12          So this identification that Mr. Ford refers to

13  is fraught with inconsistencies, fraught with

14  deficiencies.

15          This elderly couple supposedly said that they

16  were very nervous because of Miss Lindsey.  However, the

17  evidence clearly shows that when this gentleman, Mr.

18  Eiselt, wanted to get alcohol he had no qualms about

19  leaving his companion, Miss Hess, with Miss Lindsey and

20  the cab driver.

21          If he was so nervous about Miss Lindsey, why

22  would he leave her alone?  Why wouldn't he say, "why

23  don't you come into the store with me?"

24          And I mean I think that aspect of the case is

Z-22

Ñk12.6H

1    all poppycock, the alleged nervousness of the person in

2    the car and the alleged nervousness of the couple based

3    on the person in the car.

4            But even though it's poppycock and is no

5    evidence, that in and of itself is inconsistent because

6    if you are riding with a woman and you are concerned

7    about someone in the car and you are going into get some

8    liquor or whatever, you say to your woman companion,

9    "well why didn't you come in with me?"

10            You don't want this woman to be with the

11   alleged bad person, if that is what the State is trying

12   to show.  So that is inconsistent.

13            Also if you go over the testimony of Miss Hess

14   she stated that they got there on Wednesday, and that she

15   left on Sunday and she remembers that the woman that she

16   saw who she identified was in the cab the day before they

17   left.

18            That meant that Miss Hess is identifying a

19   woman who was in the cab Saturday, October 10, as opposed

20   to Friday, October 9.

21            And that was Miss Hess' testimony on

22   cross-examination; that the woman she identified was in

23   the cab the day before they left the Joliet area.

24            Now, we all know even if the Court accepts the

Z-23

1    identification of Miss Hess and Mr. Eiselt as gospel, we

2    all know that absent the confessions that certainly would

3    not be enough to convict anyone of anything.

4           So when the State's Attorney talks about an eye

5    witness coupled with a confession there is an implication

6    that there are eye witnesses to this shooting and a

7    confession.  So the record is very clear that absent a

8    confession Miss Lindsey couldn't even be charged or

9    probably would not have been charged.

10          Now when, when the state presents a confession

11    the State is in effect saying the confessor is true

12    concerning the confession.

13          Now the State acknowledges that Miss Lindsey is

14    an untruthful person and a liar and you can't believe a

15    word she says.

16          If they are saying that how could they then

17    double talk and say, "but, Judge, we want you to believe

18    her confession on that."  She is truthful, because the

19    confession rests not on the integrity of the State's

20    Attorney or police; the confession rests on the integrity

21    of the defendant and her believability.

22          And I think if the one thing the State has

23    clearly shown in this case is that the defendant is an

24    untruthful person.  That she says anything and that she

1  lies.

2          If she lies how could you believe her

3  confession?  What is truthful, what makes her last

4  statement which the State seizes more truthful than any

5  of the other statements?

6          Now, let's go over Miss Lindsey's statements.

7          Before she was arrested she said that she was

8  attacked by a cab driver and raped.

9          We all know that is a lie.  The police

10  testified that they didn't think it was true when they

11  went to her house that day to bring her to the police

12  station.

13          Now the State is saying that this was the

14  beginning of a lie to cover up the murder.

15          Miss Lindsey has given a different version for

16  the lie.  She said that I made up this lie because I had

17  been out partying all weekend and doing cocaine with the

18  brothers St. Clare and I didn't want my lesbian lover,

19  Irene Quiroz, to know about what I was really doing so I

20  made up this lie.

21          So there is no doubt there is a lie.  The

22  question is what's the reason for the lie?

23          I don't think the state's reason for the lie or

24  Mr. Ford's alleged argument that the real reason for the

1    lie is to lay the groundwork for a murder.

2            I don't think that is, I don't think there is

3    any evidence to substantiate that more than Miss

4    Lindsey's reason for the lie.

5            And this is not based on the credibility of Mr.

6    Ford versus Miss Lindsey because I acknowledge Mr. Ford a

7    more honest, honorable person.

8            The question is this is just an argument Mr.

9    Ford is making.  This is just an argument he is making to

10   help his case.

11           And the defense did bring in a witness who was

12   an honest, truthful person, not based on Miss Lindsey's

13   credibility, but the credibility of Mr. St. Clair, who

14   testified concerning the activities with Miss Lindsey

15   that night and that weekend.

16           So we are asking you --

17           And that was unrebutted.

18           Now then, Miss Lindsey, in her statement, said,

19   and I will just turn to the most important thing:  She

20   removed a pocket knife stabing the offender in the left

21   upper chest with a knife.

22           Now if she is this slick, smart person who's

23   laying the groundwork or laying the sides for a potential

24   defense to a murder, why wouldn't she say she shot the

1   person?  Why would she say she stabbed the person?

2           Mr. Ford, in his closing statement, used the

3   word coincidence.  And I think the State is trying to

4   seize on a coincidence and take this coincidence as proof

5   beyond a reasonable doubt.

6           The only meaningful fact that comes out of this

7   first lie is that Miss Lindsey made statements which are

8   just as much unrelated to the actual homicide as are

9   actually related to the homicide.

10          Mr. Ford has seized on the cab and the shooting

11  in Joliet.

12          However Miss Lindsey, in her original

13  statement, refers to a stabing.  She does not mention

14  O'Hare, and if she was laying the groundwork for this

15  she'd mention those things.

16          When Miss Lindsey was taken into custody and

17  the police confronted her with the fact that they didn't

18  believe her rape story and that this homicide had

19  occurred, she immediately denied that she was involved in

20  this and she told the police the reason why she did this.

21          If she was this slick person, if she was this

22  slick person, she'd have stuck with the story about the

23  rape and the attack and all that.

24          And as the police continued to question her,

                        Z-27

1    and as she said that she believed the police were

2    indicating to her that it might be in her interests had

3    there been this sexual attack, now, she, now this is

4    based on her belief.  This has nothing to do with the

5    credibility of Miss Lindsey versus the police.

6         The police said certain things to her.  The

7    police acknowledged they talked to her.  Miss Lindsey has

8    never said that the police said, "well you better say

9    this or you better say that," and the police then

10   testified, "well, we never said that," where Your Honor

11   would have to choose who you believe, the police or Miss

12   Lindsey.

13        The police do acknowledge after Miss Lindsey

14   said that I didn't do this, I lied and she gave the

15   reason for the lie, the police continued to question her.

16        As the police continued to question her, and as

17   the police continued to talk to her, Miss Lindsey

18   believed that it was in her interests or that the police

19   were signaling to her that it was in her interest, had

20   she been attacked.

21        Now, we are not saying the police said that.

22        We are merely saying that based on what the

23   police said, Miss Lindsey believed that it was in her

24   interest to return to a, if I could just use the generic

Z-28

1    phrase, rape allegation.  And she did.  And she made many

2    different statements and everytime she said something

3    different.

4              Now, why did she say something different?

5    There are multiple reasons why someone could continuously

6    say something different but one reason could certainly be

7    if she didn't do it she didn't really know what happened

8    and the police knew what happened and she is just making

9    up stories and then the police are telling her, "well,

10   this can't be right and this can't be right and this

11   can't be right.  Well if you didn't do it, then you

12   really can't confess accurately.  So you, you have got to

13   say untruthful things."

14             Now why is Miss Lindsey's second story or third

15   story or fourth story or fifth story or sixth story,

16   whatever, why is one of greater believability than

17   another?

18             The State asks you to believe the last one, I

19   guess, because that is the one most beneficial to their

20   case.  But the State has not presented any evidence as to

21   why that one is more believable than the others.

22             And there are a number of stories in between

23   her first denial and her last story which indicate guilt

24   but are still not as perfect, if I could use that, as the

Z-29

1    last one, perfect for the state, so the State is in

2    effect asking Your Honor to convict someone based on a

3    confession.

4        That is really what they are asking Your Honor

5    to do, because the Eiselt and Hess testimony is of

6    limited value.

7        I will grant you it provides circumstantial

8    evidence to corroborate the confession.  I can see that.

9    This isn't a naked, solely based on a confession,

10   testimony.  I can see it does that.

11       But they are in effect asking you to convict

12   someone on proof beyond a reasonable doubt based on a

13   confession when they say you can't believe a word this

14   woman says, she is a liar.  And they are presenting

15   nothing to show why this last confession is more truthful

16   than any of the others.

17       Now, it's very interesting that from the very

18   inception of this case there was evidence in the police's

19   possession that Miss Lindsey was not in Joliet but she

20   was shopping with, at the River Oaks shopping center.

21       In fact testimony has been given which is

22   unrebutted that Irene Quiroz was at the station before

23   Miss Lindsey was charged or the police were at Irene

24   Quiroz' house picking her up and taking her to the

1   station wherein they were asking about this day, October

2   9, 1992, and I believe Irene Quiroz said, "well, I know

3   we were shopping.  It was either Thursday or Friday.  Let

4   me call my brother."

5          And supposedly the brother called back and said

6   no, it was definitely Friday, not Thursday, the brother

7   remembered.

8          And this was testimony given by the police and

9   the police acknowledged that when the brother called back

10  and said it was definitely Friday, not Thursday, the

11  brother then had no idea that Friday was so critical as

12  opposed to Thursday.

13         So from the very inception the police knew that

14  there was this alibi, that there was this evidence that

15  Miss Lindsey was elsewhere and she might have been

16  innocent.

17         The State's Attorney clearly testified under

18  oath that she was never told this information.  She said

19  that in rebuttal.  She was never told that.  A week after

20  Miss Lindsey was charged these witnesses all came down to

21  the State's Attorney's Office and gave a statement.

22         Except the police never took any statements.

23  There was nothing turned over to the defense.  This

24  aspect of the case was completely pushed aside.  Not

Z-31

1   considered.

2          So the point I want to make is these witnesses

3   who testified for Miss Lindsey are not people who came up

4   to Your Honor's Courtroom 2 and a half years later to

5   help a friend; these are people who gave their version of

6   events to police authorities before I was involved in the

7   case.

8          So there wasn't any lawyer back then telling

9   them what to say, and there was no testimony rebutting

10  the fact that when all these witnesses told Your Honor,

11  they told either police or state's attorneys,

12  investigators a few days after this occurred, without the

13  benefit of any lawyers or any advice or people telling

14  anyone what to say.

15         And Your Honor is an experienced Judge.  He

16  knows witnesses.  And the members of Miss Quiroz' family

17  really only had a marginal relationship with Miss

18  Lindsey.  They may have known her but they only knew her

19  because of her relationship with their, whatever Miss

20  Quiroz was, the daughter or sister-in-law or sister, they

21  had a marginal relationship with her.

22         And all these people were honorable people.

23  These were not unbelievable people.  A good State's

24  Attorney cross-examined them.  They were not shown to be

Z-32

1    lying in any way.

2              Like all witnesses there may be some minor

3    inconsistencies but these people were shown to be

4    fundamentally truthful.

5              I would submit, Your Honor, based on all the

6    evidence that you have heard, good police created a case.

7              I don't know what other word to use.  I am not

8    saying they did anything illegal or improper.  They

9    created a case against Miss Lindsey.

10             They had a goofy woman and that is what she is,

11   who doesn't stop talking, who, who, who lies, and good

12   police got a confession out of her.

13             And now the State is saying we want you, Judge,

14   based on this confession, to say that is proof beyond a

15   reasonable doubt that she is guilty.

16             Now, Your Honor knows the facts of this case,

17   Your Honor knows that Miss Lindsey lied before she was

18   ever arrested.  Your Honor knows Miss Lindsey gave

19   different statements which the State is saying is

20   untruthful.

21             We concede that Miss Lindsey lied.  So if the

22   State stands up and calls her a liar we agree and say

23   amen.

24             But just because someone is a liar doesn't mean

Z-33

1   they are a murderer.  And the State has not produced any

2   evidence to show why their version of her lies or their

3   reason why she lied is anymore believable than the

4   defense reason as to why she lied.

5        The defense reason to why she lied originally

6   is I didn't want to get jammed up with my lover as to why

7   I was out partying and cocaineing all weekend so I made

8   up this lie.  I never thought it would lead to this.  And

9   then afterwards based on what the police were telling me,

10  I figured that they were telling me, they being the

11  police, it was in my best interests to start to say this

12  person attacked me.

13       And he really didn't attack me and I really

14  wasn't in the cab and I didn't know what exactly occurred

15  so I kept saying different things.

16       That is the defense reasons as to why she lied.

17       The state's reason as to why she lied

18  originally is she was laying a groundwork or seed work

19  for any eventual story she'd have to tell the police,

20  should she ever be confronted with the fact that she

21  committed this murder.

22       If that were the case, then why would she say I

23  stabbed the cab driver?  She'd say I shot him.

24       If that were the case that she is laying the

Z-34

1  groundwork for and a possible defense to this murder, as

2  soon as the police confront her with the fact that she

3  was maybe involved in this homicide why would she then

4  say no, I didn't do it?

5         It's inconsistent to call her a brilliant

6  genius who's laying the groundwork for a potential

7  defense before she is arrested and then as soon as she is

8  confronted by the, by the police with these allegations

9  say oh, no, no, no, that was all a story I made up.  I

10  just said that to cover up my partying for the weekend.

11         There is something else I would like to point

12  out.  If Your Honor were to believe her last confession

13  is gospel, the gospel truth, and all the alibi witnesses

14  are lying and my arguments are all bogus, if Your Honor

15  should choose to believe that, then let's look at her

16  last confession.

17         And I know Your Honor will read it over

18  thoroughly so I am not going to waste Your Honor's time

19  reading it piece by piece.

20         But in essence the confession is we were at

21  O'Hare, meaning she and this cab driver, the cab driver

22  grabbed her by the throat, grabbed her by the arm, she

23  saw that there was, noticed there was a gun in the cab,

24  and she shot the cab driver.

Z-35

1        That is in essence -- a number of times.

2        That is in essence her last confession.

3        Sort of if I could use the words a feeble

4   self-defense, or an overreaction.

5        If the Court accepts that as gospel, and this

6   is what the State is asking you to believe, then there is

7   no robbery; there is no felony murder.   There is just --

8        Is that conduct of Miss Lindsey murder, second

9   degree murder or self-defense?

10       Miss Lindsey said after that occurred as a

11  separate act in her confession I took money.   I don't

12  think if you accept this evidence as gospel, this being

13  the confession, there is not any felony murder here.

14       This isn't a Robbery.   There is, the only

15  evidence the State has presented of the actual crime is

16  the confession, and if we accept that confession as

17  gospel, there is no effort on the part of Miss Lindsey to

18  commit a Robbery.

19       I just point that out to Your Honor's

20  attention, also.

21       It's very interesting that the first police

22  officers who talked to Miss Lindsey when she began making

23  statements acknowledged that Miss Lindsey didn't say

24  anything about being in Joliet and, or being with an

Z-36

1   elderly couple in a liquor store.

2       MR. FORD:  Objection to the part about being in

3   Joliet, Judge.

4       THE COURT:  I am sorry?

5       MR. FORD:  I have an objection to the part about

6   being in Joliet.

7           I know you recall the evidence that you heard

8   but I do know that that witness that counsel is referring

9   to, Detective Hines, did mention the Joliet aspect of it.

10      MR. SAROSKY:  No, I am not speaking about Detective

11  Hines.  I am speaking about Officer Robert Tovar.

12      MR. FORD:  I will withdraw the objection, Judge.

13      MR. SAROSKY:  And Tovar was at 11th and State.  He

14  worked at 11th and State at an assignment there.

15          That is the first police station Miss Lindsey

16  was brought to and that is where Miss Lindsey first began

17  confessing, if I could use that expression, and in her

18  first admissions or confessions concerning this crime,

19  and they were multiple and each one was different, there

20  never was any specificity concerning these facts about

21  the elderly couple and going out and getting this train

22  and getting this train schedule from the elderly couple

23  and the elderly man going out and getting alcohol.

24          There was none of that.

                        Z-37

1          It is interesting that those facts only came in

2    to play after the police spoke to this elderly couple.

3    And I think that has some meaning.

4          And there is not one scintilla of evidence in

5    the confession which relates to any particular or

6    peculiar fact that only the offender would know; any

7    peculiar fact which Mr. Ford might say, "well, how would

8    Miss Lindsey know that if the confession were not true?

9    How would Miss Lindsey know that if the confession were

10   not true?"

11         Each of those facts was told to the police by

12   the elderly couple before the police even say that Miss

13   Lindsey ever told them about those facts.

14         I know Your Honor has spent a lot of time with

15   this case and Your Honor probably remembers more facts

16   than I do and should there be some fact which indicates

17   that Miss Lindsey is not guilty I know Your Honor will

18   certainly consider that, even if I failed to mention it.

19         And I would just state to Your Honor, I, I

20   think the defense was accurate when we made our opening

21   statements and said the police had to get a confession in

22   this case.  If they didn't get a confession, there would

23   not be a case.

24         The police were determined to create a case and

1    they got their confession.  But there is --

2           Just because the police have a confession

3    doesn't mean that that confession is truthful.

4           The traditional reasons why someone would

5    believe a confession are completely absent here.

6           This woman is a liar, as far as the State is

7    concerned.  She's lied a number of times.  She lied.  The

8    police acknowledged she lied.

9           Yet the State says we want you to believe her

10   confession as gospel.

11          It's inconsistent.  The very person who they

12   are damning and saying is unbelievable they are asking

13   you to accept this damning, lying person's statement as

14   proof beyond a reasonable doubt that she is guilty.  And

15   I just don't think that creates proof beyond a reasonable

16   doubt.

17          We'd ask for a finding of not guilty.

18   THE COURT:  Mr. Ford?

19   MR. FORD:  By way of reply, Judge, the Defendant's

20   statement can't be taken, anyone, standing alone.

21          And we are not asking you to take anyone of

22   them standing alone, Judge.

23          The indicia of her guilt exists within the

24   first statement she ever made to a nurse at South Chicago

Z-39

1   hospital.

2          And it's a common thread that begins there and

3   extends all the way until the final statement that she

4   made to the Assistant State's Attorney which was

5   encapsulated within a handwritten statement which she

6   signed off on.

7          That is Jeri Lindsey's statement.  From the

8   beginning to its end.

9          And what is unmistakable when you take and look

10  at that statement from its beginning to its end is that

11  it does include lies.

12         But this Court doesn't need to find that that

13  statement is believable beyond a reasonable doubt.

14         The Court is determining whether Miss Lindsey

15  is responsible for killing Rudolph Bennett beyond a

16  reasonable doubt.

17         And in this case, Judge, she is.  Because the

18  one common thread that begins from the first statement

19  she ever makes to the nurse and continues until she talks

20  to Assistant State's Attorney Nelson at 555 West Grand is

21  that she killed somebody.  And that the person she killed

22  was a cab driver and the person was driving a red and

23  white cab and that the person was an African American.

24         And all those other facts that I pointed out in

Z-40

1   opening argument of that is the thread that is there.

2          And I know this Court has seen many cases,

3   probably innumerable cases in which the statement in its

4   final form or in its beginning form probably contains

5   things which just flat out weren't true.

6          But the bottom line is she told an Assistant

7   State's Attorney that she killed Rudolph Bennett in the

8   parking garage at O'Hare and then upon saying that signed

9   a statement in which she described that conduct.

10          So I am not asking you to ignore any of those

11   statements, Judge.  All those statements, if you just had

12   the last statement alone, Judge, then you'd have

13   problems.

14          But it's when you look at these statements

15   collectively that you saw how her mind was working,

16   Judge, and I don't believe you have to presume that she

17   is a Mensa candidate because she had it in her head to

18   walk into South Chicago hospital and say, "I just killed

19   a cab driver," in order to set the table for hopefully

20   what would later be a way of getting out from under this

21   murder.

22          I don't think you have to do that.

23          I think this is disjointed, inappropriate, bad

24   thought process on her part from the beginning when she

Z-41

1  killed the cab driver until the end when she described

2  her conduct to the Police Department and Assistant

3  State's Attorney.

4          It's just disjointed; there is mistakes.  She

5  made mistakes all the way around.

6          Probably if Miss Lindsey would have walked into

7  the hospital and described her conduct she'd not be here

8  today.  We would never have found Miss Hess and Mr.

9  Eiselt.

10         And that leads me to the second point I want to

11 make, Judge.  In no way can what they saw and what they

12 heard be ignored, because make no mistake about it, the

13 defendant herself only when she testified said she was

14 there.  She was never in that cab.  So she wants you to

15 ignore them.

16         You can't accept the Eiselt Hess identification

17 and ignore the statement and what she is saying now

18 because she says she was never in the cab in the first

19 place, when she testified here a few days ago.

20         She is still doing it.

21         Judge, if she says she is not in the cab then

22 she is lying, Judge, because these people who have

23 nothing to do with anything put her in the cab,

24 identified her again and again and in a manner which is

Z-42

1    obviously Constitutionally solid and secondarily very

2    probative.

3                They had ampel opportunites to observe.  They

4    were observing under lighted conditions.  They had

5    conversations with her.  They interacted with her and

6    they saw her in that cab.

7                And her lie about the fact that she was in the

8    cab, Judge, is put forth by her even today to remove

9    these responsibilities and the guilt which she alone

10   bears.

11               Now, if you look at some of the other factors

12   here, Judge, there is just a few things I want to point

13   out:

14               The information is her's.  The statement is

15   her's.  There is no testimony from anyone that she was

16   provided with information or told that she wasn't, if she

17   didn't say something something would happen to her.

18               And this is, this takes us to the statement

19   itself and the manner in which it was, it came into

20   existence.

21               The number of statements.  I knew this was

22   going to happen, Judge, if you stuck around in this

23   building long enough sooner or later you were going to

24   hear that someone confessed because of nothing.  No

1    coercion.

2           This is a confession because of absence of

3    coercion, because Miss Lindsey herself doesn't ever

4    describe any coercive conduct.

5           She just describes how she was again and again

6    confronted with lies and inconsistencies and that is the

7    way in which her version of the events developed, Judge.

8           So she is saying that she was constrained to

9    admit her conduct because of what?  I don't know.

10           She never has ever asserted any basis for

11    admitting her conduct other than she just felt like

12    changing her story.

13           Never has she done that, because there is no

14    constraint.  There is no evidence from Bogucki, Schalk or

15    Assistant State's Attorney Nelson that she indicated to

16    them anything.

17           And that leads me to perhaps what is the

18    biggest point in this case, and I know the Court most

19    recently heard from a series of alibi witnesses in this

20    case and there are several things that must be mentioned

21    when talking about the alibis and the first thing is when

22    is an alibi an alibi?

23           If I committed a crime, Judge, and I went into

24    police custody and I went through a series of interviews

Z-44

1    and my mother and my sister and my brother came in a day

2    later and said that I was with them at the Jewel store

3    during the period of time when it alleged that a crime

4    occurred, only I never said that during the course of any

5    of the interview, have I asserted an alibi?

6              That is the question, Judge.  Did Miss Lindsey

7    ever assert an alibi until the day she testified in

8    Court?  No.

9              Never did she assert an alibi until after her

10    alibi witnesses had testified.

11              In all the many versions of the events that

12    Miss Lindsey offered to the police when she was in

13    custody did she ever say, "wait a minute, I went to

14    Walgreen's, I went to Venture, we bought Halloween stuff.

15    I saw Olga, you know?  We went to Sharkey's and I had a

16    smorgasboard special."

17              Did that ever happen once?

18              No, that is why there is no alibi here because

19    the person who would benefit the most to assert an alibi

20    just never decided to assert it because the alibi didn't

21    exist because the crime occurred on the 9th and the

22    shopping trip, if it did occur, and there is really, the

23    evidence is speculative that it did, probably occurred on

24    the 8th.

1          How do we know that?  What evidence do we have

2     that they could be so profoundly off on the date?

3          We have the evidence of the police officers,

4     the beat Officer that took the original missing person's

5     report from a person he identified as the lover

6     girlfriend/roommate of the missing person, Miss Jeri

7     Lindsey.

8          That person is Irene Quiroz, Judge.  That

9     inference is there.  It's contained within the report

10    made by the police officer.

11         And despite the fact that he was confronted

12    with the fact that Miss Quiroz' name wasn't in the

13    report, Judge, she is described in the report.

14         And Miss Quiroz herself admitted, although not

15    initially, that she made the report.  And in that report

16    Jeri Lindsey is reported missing as of 3 a.m. on October

17    9, 1992.

18         MR. SAROSKY:  We'd object to this.  This is clearly

19    outside the scope of my closing argument.  I didn't get

20    into the missing person's report.

21         THE COURT:  No, but you got into the alibi so --

22         MR. SAROSKY:  Right.  I am not talking about alibi.

23         THE COURT:  So therefore, counsel, what counsel is

24    commenting on, the alibi, it is true you did not get into

                              Z-46

1    that missing person's but you did get into the alibi and

2    now Mr. Ford is addressing that alibi.

3            He is using something that you did not use but

4    still he is addressing the alibi.

5            So therefore your objection is overruled.

6        MR. FORD:  The people that were involved with the

7    preparation and the issuance, if you will, of the missing

8    person's report put her as missing as of 3:00 o'clock in

9    the morning on October 9th, 1992.

10           Why do, why should we believe that?  Well that

11   is the time that Irene Quiroz gave the police, one.

12           Well let's say Irene Quiroz is reporting her

13   lover missing and she made a mistake on that date.  She

14   wouldn't have been with her at 9:00 o'clock if it is as

15   she has testified here the other day, that she was at

16   work when that happened.  She wouldn't have seen the

17   defendant at that time.  So of course it was at 3:00

18   o'clock in the morning on the 8th.  Of course --

19           Or excuse me, on the 9th.

20           Of course it was, and that is what the missing

21   person's report contains and that leads me to Miss Quiroz

22   generally.

23           And there is a couple of things I wanted to

24   point out about her.  At one point during the period,

1  during her testimony, she said that "I never talked to

2  the police at the house when this missing person's report

3  was made." This was during her testimony.

4  At a later point within that same testimony by

5  her "I spoke to the police and gave them a description."

6  But the description leads me to another little side track

7  and that is height and weight.

8  The height and weight within the missing

9  person's report. The one provided by the people that are

10 closest to Jeri Lindsey make her 150 pounds. Again

11 before anybody is ever found they are describing her

12 weight at 150.

13 Why do they hide from 150 pounds, Judge?

14 Because Miss Hess and Miss Eiselt separately and apart

15 prior to ever coming into contact with Jeri Lindsey put

16 her height and weight, put her weight at between 130 and

17 140 pounds. Within 10 pounds.

18 A very good description of the person that in

19 fact is the person that sat before this Court on many

20 different occasions.

21 And the height was simply very close to the

22 height that was given in the missing person report and in

23 the description offered by Hess and Eiselt.

24 So that is why they want to say that she

Z-48

1    weighed 220 pounds back then, Judge, because they know

2    that when they reported her missing they reported her

3    weight at 150 and they know when she was at the police

4    station and Officer Bogucki asked her what her weight was

5    it was 150, and they know when Miss Hess and Mr. Eiselt

6    saw her it was around 150 pounds.

7         First time I asked her who was present, okay?

8    Then when she admitted to having made the missing persons

9    report which she did admit.  I said who was there?  She

10   says the Defendant's stepmother, the Defendant's

11   stepfather and myself.  That is it.

12        Well a few clinks now.  "Well, what about

13   Angela (Sic) Quiroz?"  "Oh, that's right.  She was there

14   too."

15        Indicative of attempting to remove that piece

16   of evidence which clearly puts the defendant missing at

17   least as of 3:00 o'clock in the morning on October 9,

18   1992.

19        Which leads me to Jack St. Clair.

20        And Mr. St. Clair is most interesting, Judge,

21   because first of all he testifies inconsistently with

22   Irene Quiroz.  Neither one of them knows either.

23        Jack says he is right there with her.  Irene

24   Quiroz stands and says, "I don't know who you are talking

1     about.  I have never come into contact with you."

2            That is in the record.

3            But the thing about him, he never even talks

4     about the period of time when this crime occurred.  It's

5     truth.

6            Counsel points out his testimony is unrebutted

7     but she sat through a series of his testimony and the

8     only things he ever talked about was the late evening

9     hours and the early morning hours of October 9 and 10,

10    1992, well after the crime in this case had occurred.

11           Well after this, that Circle cab had checked in

12    at O'Hare Airport and well after Miss Lindsey would have

13    had the opportunity to return to Chicago on the L which

14    runs right out to O'Hare, return, eat as she described in

15    the statement and then go shack up with Jack St. Clair

16    for the weekend.

17           How about Jack St. Clair?  You never heard from

18    him.  Now where Jeri Lindsey was, I realize this is all

19    after the crime occurred.  It's not in the nature of

20    alibi but they put this evidence on, Judge.  We heard

21    from Jack St. Clair.  We never heard from Jerry St. Clair

22    and only he can account for her into the early morning

23    hours of the 10th of October, 1992, and Miss Lindsey

24    doesn't ever go to the police station until October --

Z-50

Ñk12.6H

1          Excuse me.  To the hospital until October 11 at

2     9:30 at night.

3          Maybe Miss Lindsey and Irene Quiroz had a

4     discussion about what she had done and the decision was

5     made between them that she was going to go and come up

6     with this story about being sexually assaulted and

7     dropped off in Joliet.

8          And in a feeble effort to avoid the situation

9     that she now finds herself confronted with and that

10    situation is this, Judge:  There is a statement signed by

11    her in which she admitted to killing another human being

12    at O'Hare Airport and taking his money from him.

13          There are 2 people who had never come into

14    contact with Miss Lindsey before in their life who

15    identified her as being in the cab immediately prior to

16    the time this has happened.

17          There is a dispatcher to who talked to Mr.

18    Bennett at the time he was headed for O'Hare and said he

19    had a single fare, that being contemporaneous with the

20    time Miss Hess and Mr. Eiselt had come into contact with

21    the defendant.

22          The last thing is this is about, this relates

23    to all the alibi witnesses and it finally came out

24    towards the end of it.

Z-51

1          Miss Quiroz in particular talked about the

2     events, the alleged events of October 9th, 1992, in a, a

3     kind of systematic matter.  Walgreen's, Venture, Shakey.

4     Walgreen's, Venture, home.  It's there.

5          The receipts mean nothing; you can look at

6     those, for one thing you won't see the items purchased or

7     described within the Defendant's Exhibits.  Those

8     receipts, you wouldn't see any Halloween costumes.

9          What you will see is a case of beer and a quart

10    of tequila, I believe, and some Clearasil and some other

11    stuff.

12         You won't see any Halloween costumes on any of

13    the things and that seems to be the one element that

14    everyone is using to associate this day's shopping.

15         You won't see that on the receipts.  You won't

16    see the names of the people that bought the items on the

17    receipts, obviously.  You won't see the name Walgreen's

18    on 2 of the receipts.  You have got one receipt from

19    Venture on October 9.  Again no name associated with it.

20    No personnel from Venture here to describe a purchase

21    that was made.  No business record keeper from Venture or

22    from Walgreen's to describe what other indicia might be

23    codified within those receipts that might indicate when

24    the purchases were made.

Z-52

1          2 of them bear, all of them bear times and

2     dates but they certainly don't quote particular people at

3     particular places at a certain time.

4          But what about Irene Quiroz?  Less than a week

5     after the incident they asked her what happened and this

6     thing that she described with this sort of, you know,

7     systematic precision on the bench she can't even recall

8     what date it was on then, just a week after the incident.

9          And her brother can't do it either because he

10    gives her a bad date.

11         And make no mistake about it, they were asking

12    Miss Quiroz about the 9th and Miss Quiroz knew they were

13    asking her about the 9th because that is the time when

14    the murder had occurred based on the parking ticket,

15    based on the conversation with the dispatcher and based

16    on the observations of Miss Hess and Mr. Eiselt.

17         And it was back then, Judge, that they made

18    their mistake and said, "well we are not really sure."

19         Now how can you go 5 or 6 days removed from the

20    incident about not being sure what date you did what you

21    said you did to 2 and a half years later saying she went

22    to Shakeys, you know?  "I had certain foods.  We talked

23    about shopping.  We talked about Halloween decorations."

24         And there are a few inconsistencies with the

1   various alibi witnesses attempts.  There are major

2   inconsistencies with their attempts, Judge, and they

3   really are endemic to the testimony of the alibi

4   witnesses generally.

5           And I harken back to this notion, I call them

6   alibi witnesses but they only labeled themselves as that.

7           The defendant, when given the opportunity to

8   describe what happened, never even mentioned these

9   people.

10          You know.  Olga never saw the mother.  The

11  mother never saw Olga.  Who was present when they picked

12  up the children?  How many times they went to Walgreen's

13  in the morning, whether they went to Walgreen's in the

14  morning.

15          All these things varied from witness to

16  witness, which is indicative perhaps of the fact that

17  maybe this shopping trip did occur on some date prior to

18  the 9th.

19          But it's clear that if it was such a meaningful

20  events in their lives they would have remembered it 5

21  days after it happened much better than they remembered

22  it today.  And they didn't even remember it at all then.

23          So it doesn't, the alibi doesn't fly, Judge,

24  and it conflicts, as I said, directly with Miss Hess and

Z-54

1    Mr. Eiselt, with the Defendant's own words during the

2    whole course of her period of time in custody and it's

3    clear the police wrote down everything she said.

4          I mean we had a Officer come in here and

5    testify that at one point she said, "I didn't do it.  I

6    don't know what you are talking about."

7          So if Miss Lindsey would have ever uttered the

8    words Shakeys, Walgreen's and Venture, it would have

9    found its way into a report and it's not there.

10          The alibi is unbelievable.  If it did exist it

11    existed on a prior date.

12          Jack St. Clair is a wash and he never talks

13    about the period of time when the murders would have

14    occurred anyway and that leads me to another thing about

15    the alibi.

16          Obviously we are talking about the offender's

17    lover.  We are talking about a person who has a lot to

18    gain or lose by way of the incarceration of the

19    defendant; talking about someone with whom she had a 5

20    year relationship and it is Miss Quiroz who possesses the

21    ability to control or to contact or to talk about the

22    events that day and to try to help people recall the

23    events the way she wants them to recall it as a member of

24    that Quiroz family.

Z-55

1        And it's very clear from their testimony that

2   that is what exactly what occurred.  Only thing is here's

3   another difference.  1 or 2 of the witnesses said we

4   never talked about this incident until I hit the stand

5   today, but a few of them you started to see that the

6   little blinking light coming through.

7        Oh yes, last time we were here we all tried to

8   rehash this thing and talk it over.  There was a devious

9   game planning coming into this Courtroom, Judge, and it

10  was a game plan developed through repeated appearances

11  here at 26th and California and repeated trips down here

12  together and repeated discussions by them about a series

13  of events that they can't even remember what day it

14  happened, oh, only 5 days after they happened.

15        So the alibi, Judge, for those many reasons is

16  without merit.

17        Last thing I want to say is it this, Judge.

18  Sometimes it's the tendency, I know it's my own tendency,

19  it's a tendency to view things in a way that is perhaps

20  more complicated than they exist in reality.

21        This case should be broken down to its most

22  minimal level and I am urging the Court to do so in

23  viewing the evidence in this case.

24        2 witnesses identified the offender and in

Z-56

1    appropriate ways.  They describe her, they describe how

2    she wanted to go to O'Hare.  They described the person

3    that they saw to police.

4           The description was accurate and then they

5    identified in a photo array and line up.  That same

6    person is brought into the police, goes to the hospital a

7    few days later and describes a series of facts which bear

8    a very strong resemblance to the death of Mr. Bennett in

9    this case.

10          They bring in the defendant in the case, they

11   ask her what happened, and she tells them, "I am

12   responsible for the murder, I killed the victim."

13          She signs this statement and we stand here some

14   3 years later or 2 years later discussing whether she did

15   it.

16          Judge, this is on its most minimal level, is a

17   simple case.  The evidence in this case while

18   circumstantial in nature absent the handwritten is

19   strong, very strong.  As strongly supporting

20   circumstantial evidence as can be imagined in light of

21   the facts and circumstances of this case.

22          After all she chose a cab driver, a person who

23   works alone.  A person who's out there in an enterprise

24   with cash, alone, driving people where they want to go.

Z-57

1    Places he is unfamiliar with.

2              She chose her victim wisely, Judge.  She just

3    didn't tell and choose all these subsequent stories

4    wisely.

5              She is responsible for death of Rudolph Bennett

6    and her responsibility extends to her today just as it

7    did at the time she first walked into the hospital there

8    at South Shore, came up with the version that inculpates

9    her by the many similarities it bears to the version of

10   events as it occurred that day.

11             And I am asking this Court to hold her

12   responsible by finding her guilty of murder in the first

13   degree and Armed Robbery.

14        THE COURT:  Counsels, I have considered all the

15   evidence, save the Exhibits.  Now, take me about 15

16   minutes to look at the Exhibits and compare it with the,

17   my notes.

18             If you wish to wait that length of time, I'd do

19   it tonight or you wish me to put it over to Tuesday, I

20   will do it Tuesday.  Whatever is your --

21        MR. FORD:  Judge, I'd ask that you do it tonight.

22        MR. SAROSKY:  Right.

23        THE COURT:  All right.  Can I have all the physical

24   evidence?  Does that include also the receipts?

1    MR. FORD:  The receipts are coming right now.

2    THE COURT:  All right.  Give me about 15 minutes.

3                    (Whereupon this case was

4                     passed and later recalled with

5                     proceedings had as follows:)

6

7    THE COURT:  All right.  People versus Jeri Lindsey.

8         Record should reflect the defendant is present

9    in her own person and through counsel; state is present

10   through the state's counsel.

11        Although the trial was lengthy in part of the --

12        Because of the number of days over which it was

13   tried and the number of delays we had in the trial, we

14   are in the final analysis is not, the evidence in the

15   final analysis is not that complicated.

16        On the one hand we have the principal evidence

17   from the state and identification of Hess and Eiselt,

18   physical evidence and the statement by the defendant

19   coupled with her various explanations.

20        Some explanations, other than the statement,

21   the physical corroboration are consistent with the event.

22        On the other hand from the defense we have what

23   constitutes an alibi, a number of alibi witnesses and we

24   also have some witnesses who are really not alibi and

1    that is the 2 gentlemen, St. Clair, on the events that

2    occurred after the killing.

3         Number of things I must point out initially and

4    I will start with the state's case:  The identification

5    by Hess and Eiselt of the defendant as the person who

6    came into the cab on that mid-afternoon of the killing is

7    as good an identification as I think we are ever going to

8    get.

9         We have a event like this and an identification

10   of stranger upon stranger.

11        First I point out that although they are

12   referred to as elderly people, they are approximately in

13   their mid-60s; they are certainly alert and most

14   important they had the most optimal kind of circumstances

15   in which to observe the person they identified as the

16   defendant.

17        It was daylight hours, mid-afternoon, they were

18   in close range, they were all in a taxicab for a period

19   of time, they engaged in a conversation over a period of

20   time, circumstances of the person they identified as the

21   defendant being in the cab while are, they are unusual,

22   they are surprising, they are really not all that

23   threatening.

24        And it followed up by the selection of the

Z-60

photograph of the defendant from what I believe is a fair

parade.

Of course once having selected the photograph

of the defendant from an array of photographs to then see

the line up and select the defendant from the line up in

my opinion is significant.

What you have is a superb identification.    I

can't think of any better identification that I have ever

seen.

Secondly, you have the Defendant's statements

and while we begin with the statements regarding the

alleged rape, even the defense concedes is a fabrication,

you still have a consistency with the physical evidence

of the killing in this case.

And even when the defendant testified and her

testimony attempted to rebut the more incriminating parts

of the statement, that is it's not as benign as the State

had been saying it is, in effect the defendant testified

here that she finally succumbed and indicates and gave

herself over because this was testimony of an extended

period of time and she was just worn down.

But even if we take the Defendant's testimony,

you know, in the light most favorable to her as to this

which was as to that which was of the Defendant's own

1    volition, not a result of what she says was the continual

2    pressure or the repetition by the interrogators, you

3    still have a substantial amount of evidence coming from

4    the defendant that is consistent with this killing.

5         And I must disagree with defense counsel

6    telling him that even without those parts of the

7    Defendant's statement wherein she says she killed and

8    robbed the decedent, to take those out, exorcise those

9    out, and you would have evidence and I am not commenting

10   about the alibis at this time, you would have evidence in

11   which there would be sufficient, in my opinion, to

12   conclude beyond a reasonable doubt that the defendant

13   indeed did the killing and the robbery.

14        You add to it the statement, that portion of

15   the statement in which she does admit the killing and the

16   robbery, and the evidence becomes even stronger.

17        Length of time and the different versions are

18   the result of the Defendant's own fabrications, that is

19   in my opinion the police were obligated to investigate

20   the allegations of the rape and that accounted for much

21   of the time that the defendant was with the police and

22   much of the time the police were asking questions of the

23   defendant.  Time when they couldn't be sure that there

24   was indeed not a rape of the defendant in this killing.

Z-62

1          But of course you cannot ignore the alibi.

2          I would initially point out one of the strange

3   things about the alibi is of course Irene Quiroz;

4   according to her testimony she worked a full shift, came

5   home, did a variety of things, went shopping and then

6   worked another almost full shift all without sleep.

7          But then the other part I find somewhat

8   inconsistent in the alibi is that the number of witnesses

9   claimed they came down to this building and were

10  interviewed about the alibi or whatever they told, those

11  people, I don't know what that was, and there is no

12  agreement as -- there is no --

13         Not only is there no agreement but there isn't

14  any precise case as to when they came down here.

15         On the other hand they have a precise date of

16  when they were with, on the shopping enterprise --

17         Well of course you can say, well, that is

18  because they learned 2 days later that Miss Lindsey was

19  arrested.  And so they can relate the arrest to that

20  shopping.

21         But on the other hand this all related to the

22  arrest.

23         They came down to the building on a certain

24  date, but they don't remember the date.  They don't

Z-63

1  remember the time and they don't even remember who they

2  spoke with.  It again related to the, to the arrest of

3  Miss Lindsey.

4  I also have to point out that the Exhibits 2, 3

5  and 4 are not consistent with the, with going shopping

6  for Halloween to prepare for Halloween paraphernalia on

7  the part of children, probably.

8  There was 24 cans of beer purchased.  That is

9  true.  But the other shopping deals with things that are

10  quite -- personal hygiene.

11  And finally, Miss Quiroz was originally quiered

12  about the shopping it was the day before.  She did it,

13  totally changed the story allegedly after telephoning her

14  brother.

15  Her brother called back, rather, but once again

16  it seems to me more likelihood is they then realized that

17  they, the date important to Miss Lindsey was Friday and

18  not Thursday when they, when Irene Quiroz was quiered

19  independently about the shopping, it was Thursday.

20  There are other inconsistencies but what I have

21  on one hand is the identification of 2 disinterested

22  people, no motive.  Not a single motive to lie.  A superb

23  identification.  Ampel opportunity.  Circumstances to see

24  with crystal clarity Miss Lindsey.  The statement of Miss

Z-64

1    Lindsey.

2         And even if you exorcise the final statement

3    and those portions of the statement in which Miss Lindsey

4    says she killed this individual and robbed him, even if

5    you exorcise that you got so much corroboration of the

6    facets of this case.

7         I also have to point out that, about knowing

8    the O'Hare parking lot is busy, that is the main parking

9    lot is used in sections.  Some sections are not used

10   entirely, other sections are, so you can't really tell

11   how busy it was in the precise section the cab that was

12   there.  (Sic)

13        Whatever happened it's clear that the cab was

14   in the O'Hare parking lot at some time in this case.

15        In evaluating all the evidence I do disbelieve

16   the outcome.

17        I am convinced of the guilt of the defendant

18   beyond a reasonable doubt and I will enter finding and

19   judgment of guilty of First Degree Murder as alleged in

20   Count 2 and of Armed Robbery as alleged in Count 4.

21        It's finding and judgment of guilty and order a

22   Pre-Sentence Investigation.

23        I also have 35 days and I am going to have Miss

24   Lindsey come back to the Courtroom on the 14th of

Z-65

1  February.

2         Of course you can be here for that if you wish,

3  Mr. Sarosky.

4       MR. SAROSKY:  Did you say the 14th?

5       MR. FORD:  The 14th for the Pre-Sentence

6  Investigation.

7       THE COURT:  Yes.  For the interview for the

8  Pre-Sentence Investigation.  We have to give a date then

9  about 45 days after that.

10       MR. FORD:  May I suggest March 22, Judge?  23, I am

11  sorry?

12         I realize that is a little more than 35 days

13  but I won't be here the week of the 14th through the

14  17th.

15       THE COURT:  March 23 will be fine.

16       MR. FORD:  Extend the time for the post-trial

17  motions to that day also?

18       THE COURT:  I will extend the time for filing the

19  post-trial motions.

20       MR. SAROSKY:  Can we make it the 27th, is that okay?

21       THE COURT:  27?  All right.  I will make it the 27th

22  and I will extend the time for filing post-trial motions

23  until the 27th.

24       MR. SAROSKY:  Thank you.


                          Z-66

Ñk12.6H

1    THE COURT:  I am going to ask the State to take

2  custody of the Exhibits.  Bond is revoked.

3    MR. FORD:  Motion state --

4    MR. SAROSKY:  There are a number, I don't know, was

5  there a bond?  I don't know.

6    THE COURT:  I don't know if there was a bond on

7  this.

8      Mr. Ford, I am putting this on for the 27th, I

9  am sorry, for the 14th and then you will have to remind

10  me on the 14th that I set the 27th.

11    MR. FORD:  Yes, Judge.

12

13      (Whereupon this was all the proceedings

14        had at the hearing of the above-entitled

15        cause of action on said date.)

16

17

18

19

20

21

22

23

24

Z-67

Ñk12.6H

```
1   STATE OF ILLINOIS      )
                           )  SS:
2   COUNTY OF COOK         )

3          I, MARY CATHERINE REDMON, CSR, OFFICIAL

4   SHORTHAND REPORTER OF THE CIRCUIT COURT OF COOK COUNTY,

5   ILLINOIS, DO HEREBY CERTIFY THAT I REPORTED IN SHORTHAND

6   THE PROCEEDINGS HAD AT THE HEARING OF THE ABOVE-ENTITLED

7   MATTER, AND THAT THE FOREGOING IS A TRUE AND CORRECT

8   REPORT OF PROCEEDINGS HAD AT SAID CAUSE.

9

10                         Mary Catherine Redmon

11                         OFFICIAL SHORTHAND REPORTER
                           CIRCUIT COURT OF COOK COUNTY
12                         COUNTY DEPARTMENT-CRIMINAL DIVISION

13

14

15

16

17

18

19

20

21

22

23

24
```

Z-68

```
1   STATE OF ILLINOIS )
                      )  ss
2   COUNTY OF C O O K )

3           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE )
5   STATE OF ILLINOIS )
                      )  Case No. 92 CR 25135
6       vs.           )
                      )  Charge: MURDER
7   JERI LINDSEY      )

8              REPORT   OF   PROCEEDINGS

9           BE IT REMEMBERED that on the 27TH day of

10  March, 1995, this cause came on for hearing before

11  the Honorable SHELVIN SINGER, Judge of said Court,

12  upon the information herein, the defendant having

13  entered a plea of not guilty.

14          APPEARANCES:
               HON. JACK O'MALLEY,
15             State's Attorney of Cook County, by
               MR. MICHAEL CAWLEY,
16             Assistant State's Attorney,
               Appeared on behalf of the People;
17
               MR. SHELDON SOROSKY,
18             Appeared on behalf of the Defendant.

19

20

21

22
    Kenneth Madoch
23  Official Court Reporter
    Circuit Court of Cook County
24  County Department-Criminal Division.
```

AA 1

1      THE CLERK: People of the State of Illinois

2   versus Jeri Lindsey.

3      MR. SOROSKY: Your Honor, Sheldon Sorosky,

4   representing Jeri Lindsey.  We're here today for

5   post trial motions, for a new trial and or

6   possibly sentencing should the post trial motions

7   be denied.  As the Court remembers, I know the

8   Court remembers this trial well.

9      THE COURT:  Indeed I do.

10      MR. SOROSKY: A critical issue in the case

11   was the identification of Miss Lindsey in the

12   taxicab by 2 customers who were customers of the

13   taxicab.

14            Throughout the trial, one of the

15   points the defense attempted to make was that Miss

16   Lindsey in fact weighed more at that time than the

17   weight description first given by these people to

18   the police when these people were first introduced

19   to the police and the police asked these folks for

20   a description of the woman who was in the cab and

21   these folks first gave some sort of general

22   description of the woman who was in the cab and

23   they gave the weight description among other

24   things.

1              Subsequently, there was a photo show

2    up and line up where they did in fact identify

3    Miss Lindsey.  However, their first encounter with

4    law enforcement authorities was the police asked

5    them were you in the cab on such and such a date,

6    was there a woman in the cab, can you describe her

7    or something to that effect or I believe that's a

8    reasonable summary of what occurred.

9              Not to repeat, it's always been the

10   defense position Miss Lindsey weighed more than

11   the description originally given by those folks.

12   It is Miss Lindsey's request that this matter be

13   continued, this post trial motion be continued, so

14   she could present records from the county jail

15   which would show that she in fact weighed the

16   greater weight that Miss Lindsey maintained that

17   she weighed and maintained that she weighed at

18   trial as opposed to the lower or lesser weight

19   that these folks described the person in the cab

20   as weighing.

21        THE COURT:  How much of a variance do you

22   say was between the weight that's listed in the

23   records at the county jail and the weight that the

24   witnesses testified to?

AA 3

1      MR. SOROSKY: I'd say the variance was about

2  40 or 50 pounds, 40 or 50 pounds.

3      THE COURT: Well can you show me --

4      MR. SOROSKY: I don't have those, that's what

5  we want.

6      THE COURT: What do you say the county jail

7  -- well can I have the file on this case. All

8  right. The matter first -- the matter, the trial

9  in this case was concluded on February 10, 1995.

10 Today's date of course is March 27, 1995. So, a

11 month and a half has passed since the conclusion

12 of the trial and -- since the conclusion of the

13 trial. Furthermore, this matter has been

14 continuously in the Court system since November 5,

15 1992, which of course almost 2 years and 6 months.

16     MR. SOROSKY: We may have it, Judge. Go

17 ahead, continue.

18     THE COURT: 2 years 6 months. The

19 photographs I saw of the --

20     MR. SOROSKY: If I may interrupt you, we have

21 the documentation. It's in Court.

22     THE COURT: Okay. Then why do you need a

23 continuance?

24     MR. SOROSKY: We didn't know we had it but we

AA 4

1    have it.  So we would just incorporate that in our

2    argument, the motion.

3         THE COURT:  Are we ready to proceed in the

4    post trial motion?

5         MR. SOROSKY:  Ready to proceed for post trial

6    motion.

7         THE COURT:  Do I have a copy of that motion?

8    All right.  Argument.

9         MR. SOROSKY:  Your Honor, we would argue of

10    course, number one there is not proof beyond a

11    reasonable doubt as to the defendant's guilt and I

12    know your Honor has taken notes and reviewed those

13    notes and I'm not going to belabor that point.

14              I'll just add this little proviso

15    that Miss Lindsey asked me to insert at this time

16    which would be within the topic of not proof

17    beyond a reasonable doubt.  Miss Lindsey always

18    maintained that she weighed throughout the trial

19    190 pounds.  I don't know that the State ever gave

20    any evidence or presented any evidence as to what

21    Miss Lindsey's weight was.  I'm not claiming they

22    did.  However the only evidence the State came

23    forth with as to weight was this estimation given

24    by the 2 folks in the cab.

AA 5

1    THE COURT:  What did they estimate?

2    MR. SOROSKY: Their estimate was between 130

3    and 140.  I will acknowledge that subsequent to

4    that estimate, there were two identifications of

5    Miss Lindsey, one by photograph and the other by

6    in person identification.  This estimate was given

7    by them when the police first received the tip or

8    the lead that these 2 folks might have been in the

9    taxicab with the possible offender to this murder

10   and the police went up to those folks, interviewed

11   them and asked for a description and these folks

12   gave a description and they said a black woman

13   between a certain age and they did give a weight

14   of between, they either said 130 or 140 or 140 and

15   150, but in any event it was substantially less

16   than what Miss Lindsey maintained is 190 pounds.

17            We would now ask to present a

18   document which we would call exhibit one to our

19   motion for a new trial which would be the records

20   of the county jail which shows that when Miss

21   Lindsey was inducted into the jail or a day later,

22   she in fact at least according to the jail weighed

23   190 pounds which we would present as I have

24   nothing else, some proof that Miss Lindsey in fact

AA 6

1    was truthful when she said she weighed 190 pounds

2    on the date that this offense took place and that

3    the estimate if you will, by the folks in the cab

4    is that the person in the cab weighed 130 to 140

5    pounds was not a correct analysis of the weight of

6    Miss Lindsey, and then that raises the question

7    perhaps those folks who were referring to another

8    woman in the cab as opposed to Miss Lindsey

9    because, Miss Lindsey waist 190 pounds, she

10   obviously could not be the woman those folks were

11   referring to who weighed 130 to 140 pounds.

12            I'll knowledge that subsequent there

13   to, subsequent to these folks giving the estimate

14   of the weight of the woman in the cab, they did

15   first participate in a photo line up and then did

16   participate in an actual line up and they did

17   identify Miss Lindsey.

18            So, there you have it all on that

19   point, and we would ask if the Court would just

20   consider that and we'd raise that as to point

21   one.

22            Point 2 concerns the pre-trial

23   motions and I think those points speak for

24   themselves.  We have had extensive arguments on

1   those motions and the Court ruled, there is

2   nothing new on those points and wherever we would

3   stand on all the evidence that has been -- and

4   arguments that have been presented to date.

5   Concerning point 4, point 4 only concerns 2

6   counts, that would be the armed robbery count and

7   the felony murder count based on the armed

8   robbery.

9           The only evidence the State has

10  concerning those 2 counts is our Miss Lindsey's

11  multiple statements.  In other words, even if the

12  Court believed the gospel as that the 2 folks in

13  the cab unquestionably identified Miss Lindsey as

14  the person who was in the cab, and even if the

15  Court believes from the totality of all Miss

16  Lindsey's statements that she was in fact the

17  shooter, all that evidence would only go to the

18  murder per se.  That would not flow to the armed

19  robbery and the felony murder count.

20          In the evidence concerning those 2

21  counts, Miss Lindsey never made any statements

22  that she intended to commit an armed robbery or

23  participated in any armed robbery.  The evidence

24  and the statement speaks for itself that there was

AA 8

1    some type of agreement between Miss Lindsey and

2    the cab driver to go to O'Hare, that once they got

3    to O'Hare, arguments ensued, and that Miss Lindsey

4    felt that she was somewhat endangered by this man,

5    she saw a gun in the car which she said was his

6    gun, not her gun and she shot this man and this

7    man died tragically.

8                    Even if the Court accepts all that

9    once again as gospel which is in her confession,

10    statement, that in and of itself is not any

11    evidence of armed robbery or felony murder.  Miss

12    Lindsey then said after the shooting, she noticed

13    there was money in his wallet and she grabbed the

14    money.

15                    The State has never connected up

16    beyond a reasonable doubt the taking of this money

17    with the shooting or that -- and that therefore we

18    would ask if the Court would find Miss Lindsey not

19    guilty of the armed robbery and felony murder only

20    on that narrow point, just based on her

21    confession, it was based on her confession which

22    is the only evidence the State has as to armed

23    robbery and felony murder.  There is not proof

24    beyond a reasonable doubt that this Court cannot

1    guess and say, oh, maybe that's just a story Miss

2    Lindsey is saying, maybe she really tried to rob

3    the guy and the robbery went astray. I think

4    that's what has to be done here in order to

5    convict Miss Lindsey of robbery and felony

6    murder.

7              And I believe that if the Court were

8    to sustain the defendant's motion on this point

9    which is sort of a narrow point of law, it would

10   have no effect on the proof beyond a reasonable

11   doubt arguments the defense has presented

12   concerning to the participation in the crime

13   itself, in other words this Court could believe,

14   yes I believe Miss Lindsey was in the cab, yes I

15   believe Miss Lindsey shot this man, I don't -- and

16   murdered this man. I don't think there was any

17   self-defense or justification for the shooting.

18              However the Court could believe I

19   don't know that Miss Lindsey intended to rob this

20   man. I don't know that the shooting had any

21   relation to an armed robbery. And I don't think

22   the State has presented any evidence let alone

23   evidence beyond a reasonable doubt that there was

24   a robbery here. And therefore we would ask for a

AA 10

1   ruling in favor of the defendant on that narrow

2   but nevertheless most meaningful point. Like I

3   said, I think the basis for it is clear and that's

4   the only oral arguments we make at this time.

5          THE COURT: Mr. Cawley.

6          MR. CAWLEY: Yes, Judge. Firstly as to the

7   description of the defendant's weight, I would

8   point out to the Court that the police never were

9   looking for somebody who weighed a certain amount

10  or looked a certain way, the police were looking

11  for Jeri Lindsey, a name first and a name they got

12  through a rape report she made at a hospital.

13          This wasn't a case they put together

14  through an identification and height and weight

15  and color of hair and so forth. The police were

16  looking for Jeri Lindsey, they went and found Jeri

17  Lindsey, they stood her in a line up and she was

18  identified as the person who was in the cab.

19          As to the armed robbery, Judge,

20  beyond the handwritten statement, we have evidence

21  the body was found without valuables, the wallet

22  was gone. Also you heard testimony from the

23  victim's wife who was a business partner of the

24  victim, that the victim did not carry a weapon.

1    So we do know certainly a weapon was present in

2    that cab, Judge and what we also know is that it

3    was the defendant who brought that weapon into the

4    cab.

5              In her handwritten statement itself,

6    it indicates that once she got up to O'Hare

7    Airport she decided she was not going to pay the

8    cab driver.  It was at that point, Judge, that she

9    says she found a weapon in the vehicle, Judge, in

10   fact it's our argument we believe the evidence

11   shows it was her weapon.  At that point, she fired

12   and killed the cab driver and removed from his

13   body the remainder of whatever he had which was

14   his wallet which she investigated and removed the

15   cash from and she threw away.

16              We would ask, Judge, that we believe

17   the evidence shows the defendant certainly was

18   guilty beyond a reasonable doubt of the murder and

19   armed robbery and certainly there isn't any

20   question as to identification in this particular

21   case and you should deny the motion.

22        THE COURT:  Mr. Sorosky.

23        MR. SOROSKY: In response, your Honor, the

24   State is arguing a theory that the gun was not --

1   that the gun was in fact Miss Lindsey's.  This is

2   just an argument by the prosecutor.  There is zero

3   evidence to show that the gun was in fact Miss

4   Lindsey's.  In fact, the only evidence at trial

5   concerning the gun was the evidence introduced by

6   the state containing Miss Lindsey's statements

7   wherein Miss Lindsey said the gun was in the cab,

8   the gun was not hers, she saw the gun and for

9   reasons of her own physical concern and safety,

10  she picked up the gun and fired the gun and

11  tragically shot Mr. Bennett.

12              Now, your Honor has concluded that

13  based on that statement that that statement was --

14  that statement by Miss Lindsey was in fact

15  truthful.  You did not feel that based on her

16  reasons for the shooting, that there was any

17  justifiable reason for the shooting and the State

18  has asked you to believe this confession as

19  truthful and therefore convict her and your Honor

20  did.  Now, the State then can't say, oh, but by

21  the way, one little aspect of that confession,

22  your Honor, we want you to accept as a boldfaced

23  lie and disbelieve.  And that is that the gun that

24  she picked up was not really the cab driver's, it

1    was really hers.

2              Furthermore, I don't think the State

3    could ask your Honor to do that in light of the

4    fact that there is no evidence at all to

5    contradict Miss Lindsey's statement.  So

6    therefore, if the state accepts Miss Lindsey's

7    statement as true, and says based on this

8    statement, we're prosecuting Miss Lindsey for

9    murder and presents that to the Court and the

10   Court believes that statement, which has come to

11   pass, Miss Lindsey certainly could be prosecuted

12   for murder, the Court can conclude as it has there

13   is proof beyond a reasonable doubt that she's

14   guilty of murder, but that statement is not proof

15   beyond a reasonable doubt that she committed armed

16   robbery and hence, what we commonly refer to as

17   felony murder.

18             Now, I'm not saying the State could

19   not also present evidence as to armed robbery and

20   felony murder, if they had other evidence to show

21   that Miss Lindsey was guilty of this but they have

22   not.  The State is in effect asking you to guess

23   that one aspect of what Miss Lindsey said is not

24   true and believe a version on guessing more

1  favorable to the State's getting a conviction on

2  all counts.  And I don't think that there is proof

3  beyond a reasonable doubt that Miss Lindsey

4  committed armed robbery.

5          And therefore we would ask for a

6  finding of not guilty only on the armed robbery

7  and the felony murder and I think I had, I could

8  speak with legal clarity when I say if the Court

9  were to rule in the defendant's favor on that

10  narrow point, narrow but meaningful it would have

11  no effect on the advocacy or strength of the other

12  aspect of the State's case.

13          And therefore we would ask for such

14  a ruling, thank you.

15    THE COURT: First I would point out the tryer

16  of fact does not have to accept the defendant's

17  statement, confession as entirely truthful or

18  entirely false.  The tryer of fact may accept part

19  of it as true, part of it as not true.

20          Secondly, as to the weight, I have

21  to point out that these people are, at this moment

22  I don't recall what the weight was that was

23  testified to, but in any event, during all but the

24  first few seconds of the observation of the

1    defendant by the witnesses, the defendant was

2    seated in the front seat of the car, the cab,

3    while the witnesses were in the back seat of the

4    cab.  So, if they were experts, even if they were

5    experts on judging weight, they were not in a

6    position to judge accurately the weight of the

7    defendant once she was in the cab and she got in

8    the cab very quickly.

9                 So, that really is a point which is

10   a non-point, in my opinion.  In any event, I saw

11   no evidence or heard no evidence that the

12   witnesses were experts in telling weight.  The

13   point that is important is that there was an

14   identification made under circumstances where it

15   seemed to be a fair witness suspect confrontation,

16   first the photo array as well as in the line up.

17                 And of course, I pointed out a good

18   deal of other corroborating evidence as well in

19   the case.  This matter, it seems to me I gave a

20   full and complete finding to support my

21   conclusions at each stage, both at the stage

22   dealing with pre-trial motions and at the

23   conclusion of the trial.

24                 I also feel I have to point out that

1    all I have is a form from the county jail which is

2    alleged to list the defendant's weight at 190

3    pounds.  The State has not had the opportunity to

4    test the authenticity of that form or the manner

5    in which the person filling out the form arrives

6    at the conclusion it was 190 pounds weight.  If

7    indeed he or she did arrive at that conclusion.

8             In my mind the evidence of the

9    defendant's guilt at trial was overwhelming.

10   Accordingly, motion for new trial is denied.

11            Do you want to pass it for a moment

12   now and I'll -- I would like to see both counsels

13   in chambers.

14            (Case passed.)

15     THE COURT:  All right.  Recalling People

16   versus Jeri Lindsey.

17            The record should reflect the

18   defendant is present in her own person.  I would

19   say your lawyer is present as well but where is

20   Mr. Sorosky? There is Mr. Sorosky.  All right.

21   All right.  The record should reflect the

22   pre-sentence investigation has been distributed.

23   Are we ready to proceed to the second stage,

24   counsellors?

AA 17

1          MR. CAWLEY:  Yes.

2          THE COURT:  Mr. Sorosky, you ready too?

3          THE COURT: All right.  Now to the death

4     penalty stage now, Mr. Cawley, Mr. Sorosky.

5          MR. SOROSKY: Yes, Judge.

6          THE COURT:  I need the age of the defendant.

7          MR. SOROSKY: 33.

8          THE COURT:  How old?

9          MR. SOROSKY: 33.

10         THE COURT:  Anything further by way of the

11    eligibility for death penalty?

12         MR. CAWLEY:  Judge, the facts adduced at

13    trial indicated that this was a murder that took

14    place in the course of a forcible felony, that

15    forcible felony being armed robbery.  She stands

16    before you convicted of murder and of armed

17    robbery.  She's therefore eligible for the death

18    penalty Judge, and we would ask you make a finding

19    that she's eligible for the dealt penalty.

20         THE COURT:  Mr. Sorosky.

21         MR. SOROSKY: I have no statement to make

22    based on that.

23         THE COURT:  I do find the defendant is

24    eligible for punishment under the provisions of

AA 18

1    Chapter 720 Illinois Compiled Statutes, section 5

2    slash 9 dash 1, B, small B in parenthesis, 6 in

3    parenthesis.

4                Are you now ready for a hearing in

5    aggravation and mitigation?

6            MR. CAWLEY: Yes, Judge.

7            MR. SOROSKY: Yes.

8            THE COURT:  Aggravation?

9            MR. CAWLEY: Judge, in aggravation, the

10   victim in this case was Rudolph Bennett.  He was

11   50 years old at the time of his murder.  The

12   evidence you heard at trial shows you, about this

13   man, he was a cab driver in the City of Chicago.

14   He was a man who was working for a living.  He was

15   a man who was killed white he was in the course of

16   doing his job which is often a dangerous job

17   unfortunately in the city.

18                His body was found, Judge, in a

19   parking lot at O'Hare Airport in his cab.  The

20   doors were locked, his wallet was gone, he had

21   been shot twice in the right side of the chest,

22   once in the left side of the back.

23                Now, Judge that occurred on October

24   9, 1992.  The police found the body in the vehicle

AA 19

1   and from there, they found themselves looking for

2   Jeri Lindsey.  The reason why Jeri Lindsey become

3   a suspect is because of good police work on the

4   part of the City of Chicago police officers, after

5   her report of a rape, her blame of a cab driver

6   for it and the fact this occurred in a red and

7   white cab which was the type of cab that the

8   victim's body was found in.  The police found Jeri

9   Lindsey and they interviewed her and they heard a

10  series, a series of different statements that were

11  made by Jeri Lindsey, Judge.

12              But in the end she made a statement,

13  yes, she was in the cab.  Not only was she in the

14  cab but she went up to O'Hare Airport and when she

15  got to O'Hare Airport she decided she wasn't going

16  to pay the cab driver and began to leave the cab

17  and the cab driver stopped her and when she was

18  stopped she picked up a gun, it's her testimony.

19  She began to shoot him and when she was finished

20  shooting him she took his wallet and then left the

21  scene.

22              Now, Judge, a brutal heinous

23  exceptionally brual, exceptionally heinous act,

24  this killing, this senseless reasonless close

AA 20

1   range firing of this person as he sat in the car

2   defenseless.

3               Aside from her statement, aside from

4   her varying statements that place her with the

5   victim at the time of these offenses there was

6   also the testimony of June Hess and John Eiselt

7   and they testified in this Court, Judge, to a

8   rather unusual circumstances in which they met

9   both the defendant and the cab driver, the

10  eventual victim, of the trip to the casino and

11  eventually of them getting out of the cab and

12  leaving the victim alone with the defendant.

13              The testimony of those 2 passengers

14  in the cab, the defendant's own handwritten

15  statements, the work that the police did in

16  placing -- in putting this case together, there

17  certainly is no doubt that she's found guilty of

18  murder and armed robbery.  It's a brutal and

19  heinous offense in this particular case,

20  exceptionally brutal and heinous to kill somebody

21  while under these circumstances and also a cab

22  driver, Judge, who is simply in the course of his

23  employment and of his work.

24              We would ask, Judge, that this

1    defendant be sentenced to death and if it is not

2    to be a death sentence on your part, Judge, we

3    would ask you extend the sentence from 60 to 1

4    hundred years and sentence her to an extended

5    term.   Thank you.

6         THE COURT:   Mr. Sorosky.

7         MR. SOROSKY: Judge Singer, gentlemen of the

8    prosecution.   There is no doubt that a tragedy

9    occurred.   Mr. Bennett was killed.   For that I'm

10   personally sorry, I apologize to the family for

11   that.   Miss Lindsey is sorry and once this trial

12   began, there was nothing either Miss Lindsey or

13   myself could do to bring Mr. Bennett back.

14        The State's Attorney states that the

15   folks in the cab identified Miss Lindsey as being

16   the person who was in the cab and that was her

17   trial and your Honor has already ruled in favor of

18   the state on the merits of the case.

19        However, the folks in the cab

20   notwithstanding their identification of Miss

21   Lindsey cannot present any evidence to this Court

22   as to how this actual shooting occurred or what

23   exactly precipitated it. The State's Attorney

24   refers to the very excellent police work done by

AA 22

1    the Chicago police officers.  And I must
2    acknowledge if I were a spectator, this is some
3    good police work, but once again, there isn't any
4    Chicago police officer who could testify as to
5    circumstances of the shooting, the motivation for
6    the shooting or the facts that led up to the
7    shooting.
8    In fact the police couldn't even
9    give an educated police opinion which would have
10   more value because they were sophisticated and
11   trained police as opposed to the ordinary person.
12   The Court knows that Miss Lindsey
13   has no prior criminal record.  She does not come
14   from a history of someone who very often has been
15   involved in similar scrapes with the law before
16   wherein the Court could conclude, oh, she got
17   lucky on a few prior occasions but now she's been
18   caught.  Miss Lindsey has no prior arrests for
19   anything such as this.  She has no prior criminal
20   record.
21   Once again, the only evidence the
22   Court has as to how this shooting occurred were
23   the statements given by Miss Lindsey.  And this
24   Court would have to guess that there was no basis

AA 23

1    to the substance of what Miss Lindsey said and I

2    would remind this Court, based on the evidence

3    presented by the state, specifically the

4    statements of Miss Lindsey, the confessions of

5    Miss Lindsey, the Court accepted those confessions

6    as true, and found Miss Lindsey guilty.

7               In those statements which the Court

8    has accepted as true, Miss Lindsey gave her

9    version as to the facts leading up to the

10   shooting.  There is nothing in evidence to the

11   contrary.  And I don't mean to belabor the facts

12   or go into those facts, I know the Court remembers

13   them well.  There was an agreement she would be

14   driven to O'Hare, there were statements concerning

15   possible sexual activities or sexual activities

16   which did occur or that were going to further

17   occur.  Miss Lindsey felt that she was in danger

18   and she did what she did.  That is her statement,

19   that is what she has been found guilty of.

20              The substance of Miss Lindsey's

21   statement would be in accord with someone who does

22   not have a history of prior criminal activity as

23   opposed to the State's theory that this is an

24   armed robbery, per se.  Therefore we would ask the

1 Court be merciful, we would suggest there is no

2 basis for the death penalty here, and impose a

3 minimum sentence upon Miss Lindsey.  And -- that's

4 all.

5   THE COURT:  Miss Lindsey, is there anything

6 you would care to say before I impose sentence?

7   THE DEFENDANT:  Your Honor, --

8   THE COURT: You will have to talk nice and

9 loud so I can hear.

10   MR. SOROSKY: Speak up loud.

11   THE DEFENDANT:  I just want to say that --

12   THE COURT:  I can't hear you?

13     If you want to come forward and stand

14 in front of the bench that's fine.  If any of the

15 family would like to come forward and sit in the

16 jury box, please feel free to do so.  That's

17 fine.

18   THE DEFENDANT: Your Honor,.

19   MR. SOROSKY: Loud, Jeri, say it loud, you

20 you got to say it loud.

21   THE DEFENDANT: The only thing I want to say

22 is please don't send me to the penitentiary for

23 something I didn't do.  I can't do it, I didn't do

24 it.  The only thing I'm guilty of is telling a lie

AA 25

1   but I didn't kill anyone because I'm not like

2   that.  I'm sorry about Mr. Bennett, but I didn't

3   do it.  I'm not the one.  I just can't see me

4   going down to the penitentiary away from my

5   daughter for something I didn't do.  I feel my 8th

6   and 14th amendments was violated, I feel that I

7   had improper representation, and it was reported

8   of pictures, everything, evidence that wasn't

9   displayed and important witnesses that wasn't

10  brought to my trial.

11          I can't, I can't go down there for

12  something I didn't do because I didn't do it.  I'm

13  guilty of lying, using drugs but I'm not a

14  murderer and not a thief.  I signed a paper I told

15  you because I was tired of them in my face, I knew

16  I had lied but I didn't kill him.  I don't even

17  know him, I never seen him.  And I think it's so

18  so unfair for me to go to the penitentiary for

19  something I didn't do.

20          And I never been to jail, I never

21  been in a gang, always worked, I don't hang around

22  rifraff, it's just not me and I can't see me going

23  for something I didn't do.

24          Your Honor, I just don't know what

AA 26

1    to say.  I just wish that you could reconsider,

2    give me a motion to reconsider the verdict, the

3    sentencing, or whatever, I just can't do it.  I

4    can't see me going down there for something I

5    didn't do.  And I don't have anything else to say

6    but I'm sorry for even lying, getting myself into

7    this and bringing the Courts into this but I'm not

8    a murderer and I'm not a thief and I just can't,

9    just can't do it.  I just can't do it.

10           THE COURT:  Well I regret to tell you in my

11   opinion the evidence of guilt was overwhelming, it

12   was not a close case.  And I certainly am

13   convinced of your guilt, convinced of it beyond a

14   reasonable doubt to a certainty.  It may be

15   difficult for you to face up, perhaps impossible

16   for you to face up to that fact, but that is the

17   fact.

18                On the mitigation side, I do have to

19   point out that you are 33 years of age and have

20   never -- you have had no criminal history.

21   Curiously, the information provided by the

22   probation department puts you at 150 pounds but

23   that's irrelevant at this time.

24                On the other hand, you came from a

1    good good environment, it's true your mother died

2    at an early age and that -- but you were brought

3    up in your father's family with your father's new

4    wife and stepmother and apparently had a good

5    family life.

6              On the aggravating part, I'm sorry

7    to tell you this but all the evidence that I see

8    is one where you killed a person who was trying to

9    earn a living, trying to earn a honest living in a

10   manner that is -- that indicates he's a hard

11   worker.  He was a hard working honest man and you

12   killed him while in the act of trying to rob him.

13   You killed him for money.  A man who has a loving

14   family, tried his best to provide for them.

15             I'm not going to impose any kind of

16   a death sentence or an extended term, but in my

17   opinion, it's a very serious, a very heinous

18   crime.  There is nothing I can do to bring back

19   the decedent.  Sentencing is the most difficult

20   task I have.

21             To sum up, the mitigating side, 33

22   years of age and have no prior convictions.  On

23   the aggravating side, you killed for profit.

24   There was no emotion involved, took an innocent

1   person, didn't know him previously, he was trying

2   his best to earn a livlihood and you killed him to

3   deprive him of money he earned by the sweat of his

4   brow.

5          Accordingly, I'm going to sentence

6   you to 45 years of incarceration in the Illinois

7   State Penitentiary.  Miss Lindsey, you have a

8   right to appeal both the conviction as well as the

9   sentence imposed.  However, before you can appeal,

10  you must first file a notice of appeal.  That

11  notice of appeal must be in writing and must be

12  filed with the Court within thirty days of today's

13  date.

14          You'll need a lawyer to represent

15  you.  If you're unable to hire your own lawyer I

16  would appoint one for you without costs to you.

17  You would also need a transcript and record.  If

18  you're unable to purchase that transcript and

19  record, I would order that it be provided to you

20  without costs to you.  Do you understand what I

21  said?

22      THE DEFENDANT: Yes.

23      THE COURT:  Defendant will receive credit

24  for time in the Cook County Jail while awaiting

AA 29

1    disposition.  If the state and defense can agree

2    as to how much time, please advise the clerk and

3    he'll include it in the mittimus.  If you cannot

4    agree, please advise me and I will hold a hearing

5    to determine how much credit the defendant should

6    receive.  Mr. Sorosky, I will direct that you file

7    a notice of appeal.

8         MR. SOROSKY: Right.

9         THE COURT:  If you're not going to represent

10   the defendant in the appeal, I think you should

11   designate the State Appellate Defender.

12        MR. SOROSKY: Right.

13        THE COURT:  And I'll direct that that be

14   done.

15        MR. SOROSKY: We would ask the State

16   Appellate Defender be appointed.

17        THE COURT:  I would do that and please

18   prepare the appropriate documents.

19        MR. SOROSKY: Okay.

20        THE COURT: That's all that remains.

21        MR. SOROSKY: Miss Lindsey would like a stay

22   of mittimus for a couple weeks.

23        THE COURT:  I'll stay the mittimus for one

24   week?

1      THE DEFENDANT: Your Honor could I have 2

2  weeks please?

3      MR. SOROSKY: Like 2 weeks you will be here

4  all this week and next week.

5      It's like a 2 week stay.

6      THE COURT:  One week stay.

7      THE DEFENDANT:  Your Honor, can I talk to my

8  aunt, please?

9      THE COURT:  Do you want to do it now?

10     THE DEFENDANT: Yes.

11     THE COURT:  Has to be very brief.  Do you

12 want to search her?

13     THE DEFENDANT: Better if I wait, would it be

14 better if I wait and talk to her for a little

15 while.

16     THE COURT:  Do it now.

17     MR. SOROSKY: Your Honor concerning the time

18 in jail, both sides would agree Miss Lindsey has

19 been in jail for 8 hundred 94 days.

20     THE COURT:  Tell Mr. Riley.

21         Stand in recess for 10 minutes.

22         (Which were all of the

23         proceedings had at the hearing

24         of the above-entitled cause.)



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    STATE OF ILLINOIS )
                      )  SS.
2    COUNTY OF C O O K )

3         THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT    -    CRIMINAL DIVISION
4
               I, Kenneth Madoch, Official
5
     Shorthand Reporter of the Circuit Court of Cook
6
     County Department-Criminal Division do hereby
7
     certify that I reported in shorthand the
8
     proceedings had at the hearing in the
9
     above-entitled cause; and that I thereafter
10
     caused to be transcribed into typewriting the
11
     foregoing transcript, which I certify is a
12
     true and correct transcript of said
13
     proceedings.
14

15   _____
     Official Shorthand Reporter
16   Circuit Court of Cook County.

17

18

19

20

21

22

23

24   Dated this 15th day of June, 1995.

*Office # 612*

IN T    CIRCUIT COURT OF COOK ( JNTY
COUNTY DEPARTMENT CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
)
vs, )                    NO. 92-25135
)
*Jerri Lindsey* )
)

### REPORT OF COMPLIANCE

I, Thomas G. McEnery, Supervisor of the Official Court Reporters
of the Circuit Court of Cook County, County Department, Criminal Division,
do hereby state that on the _15th_ day of _Sept._       A.D. 1995
the original Report of Proceedings ~~in the above entitled~~ in the above entitled
cause were filed with the Clerk of the Criminal Division.

*Copy to SA)*

_Thomas G. McEnery 71)_
Thomas G. McEnery,
Supervisor

Received by _____
Deputy Clerk, Criminal Division

*1251 pages*

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS**   } ss
**COUNTY OF COOK**

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME NINE OF A NINE VOLUME . . . . .

. RECORD. CONSISTING .OF .THE .REPORT. OF. PROCEEDINGS. . .NO. PRAECIPE HAVING BEEN FILED IN . . .

. THE. APPELLATE .COURT .UNDER. APPELLATE. COURT. NO. . 95 .1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . . . . . . . . . . . . JERI LINDSEY . . . . . . (01) . . . . . . . . . . . . . . WAS . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

in said County, . . SEPTEMBER. . . . . . 20 . . . , 19 . . 95

*Aurelia Pucinski* . . . .
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**



05-1458

FILED APPELLATE COURT
1st DIST.

'96 OCT 15 P 2:15

ROBERT S. MARCUS
CLERK OF COURT

F I L E D
APPELLATE COURT 1st DIST.
FEB 08 2006
STEVEN M. RAVID
CLERK

**Crim. Div. No. 94-B**