IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JERRI ROBBIN LINDSEY, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 07 C 6658 |
| CAROLYN TRANCOSO, Warden, Lincoln Correctional Center, | ) ) ) ) | The Honorable Milton I. Shadur, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

The following exhibits are manually being filed contemporaneously with

respondent's answer to the petition for writ of habeas corpus filed in the above-

captioned cause:

Exhibit BB:  Trial Transcript, *People v. Lindsey*, No. 92-CR-25135.[1]

---

[1] Exhibits A - AA were filed under a separate letter.

February 29, 2008                     Respectfully submitted,

                                      LISA MADIGAN
                                      Attorney General of Illinois

                          By:      *Eric M. Levin*
                                      _____
                                      ERIC M. LEVIN, Bar # 6284971
                                      Assistant Attorney General
                                      100 West Randolph Street, 12th Floor
                                      Chicago, Illinois 60601
                                      TELEPHONE: (312) 814-8812
                                      FAX: (312) 814-2253
                                      E-MAIL: elevin@atg.state.il.us

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS       Page 001

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 92CR2513501

JERI     R LINDSEY

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | |
|---|---|---|
| 38-9-1-A(1) | F | MURDER |
| 38-9-1-A(2) | F | MURDER |
| 38-9-1-A(3) | F | MURDER |
| 38-18-2-A | F | ARMED ROBBERY |

The following disposition(s) was/were rendered before the Honorable Judge(s):

| | | |
|---|---|---|
| 11/16/92 IND/INFO-CLK OFFICE-PRES JUDGE | 11/23/92 1701 | |
| 11/16/92 BAIL AMOUNT PREVIOUSLY SET | | $ 250000 |
| 11/23/92 DEFENDANT IN CUSTODY | | |
|     BASTONE, ROBERT P. | | |
| 11/23/92 CASE ASSIGNED | 11/23/92 1707 | |
|     BASTONE, ROBERT P. | | |
| 11/23/92 DEFENDANT IN CUSTODY | | |
|     SINGER, SHELVIN | | |
| 11/23/92 PRISONER DATA SHEET TO ISSUE | | |
|     SINGER, SHELVIN | | |
| 11/23/92 MOTION DEFT - CONTINUANCE - MD | 12/02/92 | |
|     SINGER, SHELVIN | | |
| 12/02/92 DEFENDANT IN CUSTODY | | |
|     SINGER, SHELVIN | | |
| 12/02/92 PRISONER DATA SHEET TO ISSUE | | |
|     SINGER, SHELVIN | | |
| 12/02/92 DEFENDANT ARRAIGNED | | |
|     SINGER, SHELVIN | | |
| 12/02/92 PLEA OF NOT GUILTY | | |
|     SINGER, SHELVIN | | |
| 12/02/92 PRETRIAL DISC ORDER ENTERED | | |
|     SINGER, SHELVIN | | |
| 12/02/92 CONTINUANCE BY AGREEMENT | 01/19/93 | |
|     SINGER, SHELVIN | | |
| 01/19/93 DEFENDANT IN CUSTODY | | |
|     SINGER, SHELVIN | | |

EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 002

PEOPLE OF THE STATE OF ILLINOIS

                        VS                    NUMBER 92CR2513501

    JERI      R LINDSEY

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/19/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/19/93 CONTINUANCE BY AGREEMENT                02/09/93
        SINGER, SHELVIN
02/09/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
02/09/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
02/09/93 CONTINUANCE BY AGREEMENT                03/02/93
        SINGER, SHELVIN
03/02/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
03/02/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
03/02/93 DEF WAIVES RIGHT TO BE PRESENT
        SINGER, SHELVIN
03/02/93 CONTINUANCE BY AGREEMENT                03/25/93
        SINGER, SHELVIN
03/25/93 DEFENDANT IN CUSTODY
        LOCALLO, DANIEL M.
03/25/93 PRISONER DATA SHEET TO ISSUE
        LOCALLO, DANIEL M.
03/25/93 CONTINUANCE BY AGREEMENT                04/30/93
        LOCALLO, DANIEL M.
04/30/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
04/30/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
04/30/93 MOTION DEFT - CONTINUANCE - MD          06/04/93
        SINGER, SHELVIN
06/04/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/04/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/04/93 MOTION DEFT - CONTINUANCE - MD          06/11/93
        SINGER, SHELVIN
06/11/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 003

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR2513501

    JERI      R LINDSEY

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/11/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/11/93 MOTION DEFT - CONTINUANCE - MD        06/22/93
        SINGER, SHELVIN
06/22/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/22/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/22/93 MOTION DEFT - CONTINUANCE - MD        06/24/93
        SINGER, SHELVIN
06/24/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/24/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/24/93 CONTINUANCE BY AGREEMENT              07/19/93
        SINGER, SHELVIN
07/19/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
07/19/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
07/19/93 MOTION DEFT - CONTINUANCE - MD        07/28/93
        SINGER, SHELVIN
07/28/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
07/28/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
07/28/93 CONTINUANCE BY AGREEMENT              08/13/93
        SINGER, SHELVIN
08/13/93 DEFENDANT IN CUSTODY
        BRADY JOHN D
08/13/93 PRISONER DATA SHEET TO ISSUE
        BRADY JOHN D
08/13/93 CONTINUANCE BY AGREEMENT              09/21/93
        BRADY JOHN D
09/21/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
09/21/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 004

PEOPLE OF THE STATE OF ILLINOIS

                    VS                        NUMBER 92CR2513501

     JERI      R LINDSEY

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

     I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
09/21/93 MOTION TO WITHDRAW AS ATTORNEY                    D
        SINGER, SHELVIN
09/21/93 CONTINUANCE BY AGREEMENT              10/15/93
        SINGER, SHELVIN
10/15/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
10/15/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
10/15/93 WITNESSES ORDERED TO APPEAR           10/15/93
        SINGER, SHELVIN
10/15/93 CONTINUANCE BY AGREEMENT              11/23/93
        SINGER, SHELVIN
11/23/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
11/23/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
11/23/93 WITNESSES ORDERED TO APPEAR           11/23/93
        SINGER, SHELVIN
11/23/93 CONTINUANCE BY AGREEMENT              12/21/93
        SINGER, SHELVIN
12/21/93 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
12/21/93 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
12/21/93 WITNESSES ORDERED TO APPEAR           12/21/93
        SINGER, SHELVIN
12/21/93 CONTINUANCE BY AGREEMENT              01/19/94
        SINGER, SHELVIN
01/19/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/19/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/19/94 WITNESSES ORDERED TO APPEAR           01/19/94
        SINGER, SHELVIN
01/19/94 CONTINUANCE BY AGREEMENT              02/15/94
        SINGER, SHELVIN
02/15/94 MOTION TO SUPPRESS                        E        2
        STATEMENTS
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 005

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR2513501

JERI        R LINDSEY

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

02/15/94 CONTINUANCE BY AGREEMENT              02/16/94
    SINGER, SHELVIN
02/16/94 DEFENDANT IN CUSTODY
    SINGER, SHELVIN
02/16/94 PRISONER DATA SHEET TO ISSUE
    SINGER, SHELVIN
02/16/94 WITNESSES ORDERED TO APPEAR           02/16/94
    SINGER, SHELVIN
02/16/94 CONTINUANCE BY AGREEMENT              02/17/94
    SINGER, SHELVIN
02/17/94 DEFENDANT IN CUSTODY
    SINGER, SHELVIN
02/17/94 PRISONER DATA SHEET TO ISSUE
    SINGER, SHELVIN
02/17/94 MOTION TO SUPPRESS                               E        2
    SINGER, SHELVIN
02/17/94 CONTINUANCE BY AGREEMENT              02/18/94
    SINGER, SHELVIN
02/18/94 DEFENDANT IN CUSTODY
    SINGER, SHELVIN
02/18/94 PRISONER DATA SHEET TO ISSUE
    SINGER, SHELVIN
02/18/94 MOTION TO SUPPRESS EVIDENCE                     D        2
    SINGER, SHELVIN
02/18/94 CONTINUANCE BY AGREEMENT              03/17/94
    SINGER, SHELVIN
03/17/94 DEFENDANT IN CUSTODY
    SINGER, SHELVIN
03/17/94 PRISONER DATA SHEET TO ISSUE
    SINGER, SHELVIN
03/17/94 MOTION DEFT - CONTINUANCE - MD        03/21/94
    SINGER, SHELVIN
03/21/94 DEFENDANT IN CUSTODY
    SINGER, SHELVIN
03/21/94 PRISONER DATA SHEET TO ISSUE
    SINGER, SHELVIN
03/21/94 CONTINUANCE BY AGREEMENT              04/13/94
    SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 006

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

    JERI        R LINDSEY

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/13/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
04/13/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
04/13/94 MOTION DEFT - CONTINUANCE - MD          04/14/94
        SINGER, SHELVIN
04/14/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
04/14/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
04/14/94 MOTION TO SUPPRESS                               E        2
        STATEMENTS
        SINGER, SHELVIN
04/14/94 WITNESSES ORDERED TO APPEAR            04/14/94
        SINGER, SHELVIN
04/14/94 CONTINUANCE BY AGREEMENT               05/25/94
        SINGER, SHELVIN
05/25/94 CHANGE PRIORITY STATUS            P
05/25/94 WITNESSES ORDERED TO APPEAR            05/25/94
05/25/94 CONTINUANCE BY AGREEMENT               06/28/94
06/22/94 CASE ADVANCED                          06/22/94
        SINGER, SHELVIN
06/22/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/22/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/22/94 MOTION DEFT - CONTINUANCE - MD          06/27/94
        SINGER, SHELVIN
06/27/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/27/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/27/94 MOTION DEFT - CONTINUANCE - MD          06/28/94
        SINGER, SHELVIN
06/28/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/28/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 007

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

        JERI       R LINDSEY

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/28/94 SPECIAL ORDER
        STATEMENTS
        SINGER, SHELVIN
06/28/94 MOTION TO WITHDRAW AS ATTORNEY                 D       2
        SINGER, SHELVIN
06/28/94 WITNESSES ORDERED TO APPEAR          06/28/94
        SINGER, SHELVIN
06/28/94 MOTION DEFT - CONTINUANCE - MD       08/03/94
        SINGER, SHELVIN
06/28/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
06/28/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
06/28/94 SPECIAL ORDER
        STATEMENTS
        SINGER, SHELVIN
06/28/94 MOTION TO WITHDRAW AS ATTORNEY                 D       2
        SINGER, SHELVIN
06/28/94 WITNESSES ORDERED TO APPEAR          06/28/94
        SINGER, SHELVIN
06/28/94 MOTION DEFT - CONTINUANCE - MD       08/03/94
        SINGER, SHELVIN
08/03/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
08/03/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
08/03/94 WITNESSES ORDERED TO APPEAR          08/03/94
        SINGER, SHELVIN
08/03/94 CONTINUANCE BY AGREEMENT             08/10/94
        SINGER, SHELVIN
08/10/94 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
08/10/94 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
08/10/94 WITNESSES ORDERED TO APPEAR          08/10/94
        SINGER, SHELVIN
08/10/94 CONTINUANCE BY AGREEMENT             09/12/94
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 008

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 92CR2513501

JERI      R LINDSEY

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
09/12/94 DEFENDANT IN CUSTODY
     SINGER, SHELVIN
09/12/94 PRISONER DATA SHEET TO ISSUE
     SINGER, SHELVIN
09/12/94 MOTION TO SUPPRESS                                 E          2
     SINGER, SHELVIN
09/12/94 CONTINUANCE BY AGREEMENT              09/13/94
     SINGER, SHELVIN
09/13/94 DEFENDANT IN CUSTODY
     SINGER, SHELVIN
09/13/94 PRISONER DATA SHEET TO ISSUE
     SINGER, SHELVIN
09/13/94 MOTION TO SUPPRESS                                 D          2
     SINGER, SHELVIN
09/13/94 WITNESSES ORDERED TO APPEAR           09/13/94
     SINGER, SHELVIN
09/13/94 CONTINUANCE BY AGREEMENT              11/14/94
     SINGER, SHELVIN
11/14/94 WITNESSES ORDERED TO APPEAR           11/14/94
     SINGER, SHELVIN
11/14/94 MOTION DEFT - CONTINUANCE - MD        12/15/94
     SINGER, SHELVIN
12/15/94 DEFENDANT IN CUSTODY
     SINGER, SHELVIN
12/15/94 PRISONER DATA SHEET TO ISSUE
     SINGER, SHELVIN
12/15/94 WITNESSES ORDERED TO APPEAR           12/15/94
     SINGER, SHELVIN
12/15/94 MOTION STATE - CONTINUANCE -MS        12/28/94
     SINGER, SHELVIN
12/28/94 DEFENDANT IN CUSTODY
     SINGER, SHELVIN
12/28/94 PRISONER DATA SHEET TO ISSUE
     SINGER, SHELVIN
12/28/94 CONTINUANCE BY AGREEMENT              01/04/95
     SINGER, SHELVIN
01/04/95 DEFENDANT IN CUSTODY
     SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 009

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

    JERI      R LINDSEY

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/04/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/04/95 JURY WAIVED
        SINGER, SHELVIN
01/04/95 CONTINUED BENCH TRIAL                    01/06/95
        SINGER, SHELVIN
01/06/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/06/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/06/95 MOTION DEFT - CONTINUANCE - MD           01/09/95
        SINGER, SHELVIN
01/09/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/09/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/09/95 CONTINUANCE BY AGREEMENT                 01/10/95
        SINGER, SHELVIN
01/10/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/10/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/10/95 HOLD ON CALL                             01/11/95
        SINGER, SHELVIN
01/11/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/11/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/11/95 MOTION DIRECT VERD OR FINDING                    D      2
        SINGER, SHELVIN
01/11/95 CONTINUANCE BY ORDER OF COURT            01/30/95
        SINGER, SHELVIN
01/30/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/30/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/30/95 CONTINUANCE BY AGREEMENT                 01/31/95
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 010

PEOPLE OF THE STATE OF ILLINOIS

                     VS                    NUMBER 92CR2513501

        JERI      R LINDSEY

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

  I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/31/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
01/31/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
01/31/95 MOTION DEFT - CONTINUANCE - MD        02/07/95
        SINGER, SHELVIN
02/07/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
02/07/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
02/07/95 CONTINUANCE BY ORDER OF COURT        02/10/95
        SINGER, SHELVIN
02/10/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
02/10/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
02/10/95 FINDING OF GUILTY              C002
        SINGER, SHELVIN
02/10/95 FINDING OF GUILTY              C004
        SINGER, SHELVIN
02/10/95 CHANGE PRIORITY STATUS         M
        SINGER, SHELVIN
02/10/95 JGMT ON FINDING/VERDICT/PLEA                F
        SINGER, SHELVIN
02/10/95 BAIL REVOKED
        SINGER, SHELVIN
02/10/95 PRE-SENT INVEST. ORD, CONTD TO        03/27/95 1707
        SINGER, SHELVIN
03/27/95 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
03/27/95 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
03/27/95 MOTION DEFENDANT - NEW TRIAL                D
        SINGER, SHELVIN
03/27/95 SPECIAL ORDER
        DEF. FOUND ELIGLIBLE FOR DEATH
        SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 011

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

     JERI      R LINDSEY

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| Date | Event | | |
|---|---|---|---|
| 03/27/95 | NO ORDER ON COUNT | C001 | |
| | SINGER, SHELVIN | | |
| 03/27/95 | NO ORDER ON COUNT | C003 | |
| | SINGER, SHELVIN | | |
| 03/27/95 | DEF SENTENCED ILLINOIS DOC | C002 | |
| | 45 YRS | | |
| | SINGER, SHELVIN | | |
| 03/27/95 | DEF SENTENCED ILLINOIS DOC | C004 | |
| | 45 YRS | | |
| | SINGER, SHELVIN | | |
| 03/27/95 | DEF ADVISED OF RIGHT TO APPEAL | | |
| | SINGER, SHELVIN | | |
| 04/05/95 | NOTICE OF APPEAL FILED, TRNSFR | | |
| 05/02/95 | NOTICE OF NOTICE OF APP MAILED | | |
| 05/02/95 | CONTINUANCE BY ORDER OF COURT | 05/05/95 | 1713 |
| 05/05/95 | ILL STATE APPELLATE DEF APPTD | | |
| 05/05/95 | O/C FREE REPT OF PROCD ORD N/C | | |
| 05/05/95 | MEMO OF ORDS & NOA PICKED-UP | | |
| 05/09/95 | APPELLATE COURT NUMBER ASGND | 95-1535 | |
| 06/01/95 | REPT OF PRCDS ORD FR CRT RPT | | |
| 09/15/95 | TRANS PROC REC/FILED CLKS OFF | | |
| 09/21/95 | REPORT OF PROCEEDINGS PREPARED | | |
| 09/21/95 | COMMON LAW RECORD PREPARED | | |
| 09/26/95 | CLR RECD BY APP COUNSEL | | |
| | STATE APPELLATE DEFENDER | | |
| 09/26/95 | REPRT/PROCDS RECD BY APP ATTRY | | |
| | STATE APPELLATE DEFENDER | | |
| 01/15/98 | MANDATE FILED | 01/29/98 | 1701 |
| 01/29/98 | REVIEW COURT AFFIRMANCE | | |
| | COGHLAN, MARY ELLEN | | |
| 04/07/98 | POST-CONVICTION FILED | CALL 04/10/98 | 1701 |
| 04/07/98 | PAUPER PETITION FILED | 04/10/98 | 1701 |
| 04/07/98 | HEARING DATE ASSIGNED | 04/10/98 | 1701 |
| 04/10/98 | CASE ASSIGNED | 04/17/98 | 5702 |
| | FITZGERALD, THOMAS R. | | |
| 04/17/98 | DEFENDANT NOT IN COURT | | |
| | SINGER, SHELVIN | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 012

PEOPLE OF THE STATE OF ILLINOIS

                              VS                    NUMBER 92CR2513501

          JERI      R LINDSEY

              CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/17/98 PUBLIC DEFENDER APPOINTED
       SINGER, SHELVIN
04/17/98 CONTINUANCE BY ORDER OF COURT          05/05/98
       SINGER, SHELVIN
05/05/98 DEFENDANT NOT IN COURT
       SINGER, SHELVIN
05/05/98 DEFENDANT IN CUSTODY
       SINGER, SHELVIN
05/05/98 PRISONER DATA SHEET TO ISSUE
       SINGER, SHELVIN
05/05/98 CONTINUANCE BY AGREEMENT               08/06/98
       SINGER, SHELVIN
08/06/98 DEFENDANT IN CUSTODY
       SINGER, SHELVIN
08/06/98 PRISONER DATA SHEET TO ISSUE
       SINGER, SHELVIN
08/06/98 CONTINUANCE BY AGREEMENT               11/05/98
       SINGER, SHELVIN
11/05/98 DEFENDANT IN CUSTODY
       SINGER, SHELVIN
11/05/98 PRISONER DATA SHEET TO ISSUE
       SINGER, SHELVIN
11/05/98 MOTION DEFT - CONTINUANCE - MD         11/13/98
       SINGER, SHELVIN
11/13/98 DEFENDANT IN CUSTODY
       SINGER, SHELVIN
11/13/98 PRISONER DATA SHEET TO ISSUE
       SINGER, SHELVIN
11/13/98 CONTINUANCE BY AGREEMENT               02/11/99
       SINGER, SHELVIN
02/11/99 DEFENDANT IN CUSTODY
       SINGER, SHELVIN
02/11/99 PRISONER DATA SHEET TO ISSUE
       SINGER, SHELVIN
02/11/99 CONTINUANCE BY AGREEMENT               05/06/99
       SINGER, SHELVIN
05/06/99 DEFENDANT IN CUSTODY
       SINGER, SHELVIN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 013

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

     JERI      R LINDSEY

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/06/99 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
05/06/99 MOTION DEFT - CONTINUANCE - MD          08/05/99
        SINGER, SHELVIN
08/05/99 DEFENDANT IN CUSTODY
        SINGER, SHELVIN
08/05/99 PRISONER DATA SHEET TO ISSUE
        SINGER, SHELVIN
08/05/99 CONTINUANCE BY AGREEMENT                10/07/99
        SINGER, SHELVIN
10/07/99 DEFENDANT IN CUSTODY
        EPSTEIN, JAMES R.
10/07/99 PRISONER DATA SHEET TO ISSUE
        EPSTEIN, JAMES R.
10/07/99 CONTINUANCE BY AGREEMENT                12/17/99
        EPSTEIN, JAMES R.
12/17/99 DEFENDANT IN CUSTODY                    00/00/00
        EPSTEIN, JAMES R.
12/17/99 PRISONER DATA SHEET TO ISSUE            00/00/00
        EPSTEIN, JAMES R.
12/17/99 MOTION DEFT - CONTINUANCE - MD          01/28/00
        EPSTEIN, JAMES R.
01/28/00 DEFENDANT IN CUSTODY                    00/00/00
        HABERKORN, CATHERINE M.
01/28/00 PRISONER DATA SHEET TO ISSUE            00/00/00
        HABERKORN, CATHERINE M.
01/28/00 CONTINUANCE BY AGREEMENT                03/10/00
        HABERKORN, CATHERINE M.
03/10/00 DEFENDANT IN CUSTODY                    00/00/00
        EPSTEIN, JAMES R.
03/10/00 PRISONER DATA SHEET TO ISSUE            00/00/00
        EPSTEIN, JAMES R.
03/10/00 MOTION DEFT - CONTINUANCE - MD          06/09/00
        EPSTEIN, JAMES R.
06/09/00 DEFENDANT IN CUSTODY                    00/00/00
        EPSTEIN, JAMES R.
06/09/00 CONTINUANCE BY AGREEMENT                09/15/00
        EPSTEIN, JAMES R.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 014

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 92CR2513501

JERI        R LINDSEY

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 09/15/00 DEFENDANT NOT IN COURT | 00/00/00 | |
| EPSTEIN, JAMES R. | | |
| 09/15/00 CONTINUANCE BY ORDER OF COURT | 09/29/00 | |
| EPSTEIN, JAMES R. | | |
| 09/29/00 DEFENDANT NOT IN COURT | 00/00/00 | |
| EPSTEIN, JAMES R. | | |
| 09/29/00 NOTICE OF APPEAL FILED, TRNSFR | 00/00/00 | |
| EPSTEIN, JAMES R. | | |
| 09/29/00 POST-CONV PETITION DENIED | 00/00/00 | |
| EPSTEIN, JAMES R. | | |
| 10/05/00 NOTIFICATION SENT TO DEFENDANT | 00/00/00 | |
| 09/29/00 NOTICE OF APPEAL FILED, TRNSFR | 00/00/00 | |
| 10/10/00 NOTICE OF NOTICE OF APP MAILED | 00/00/00 | |
| 10/10/00 HEARING DATE ASSIGNED | 10/13/00 | 1713 |
| 10/13/00 ILL STATE APPELLATE DEF APPTD | 00/00/00 | |
| 10/13/00 O/C FREE REPT OF PROCD ORD N/C | 00/00/00 | |
| 10/13/00 MEMO OF ORDS & NOA PICKED-UP | 00/00/00 | |
| 10/23/00 APPELLATE COURT NUMBER ASGND | 00/00/00 | 00-3480 |
| 11/09/00 COMMON LAW RECORD PREPARED | 00/00/00 | |
| 11/15/00 CLR RECD BY APP COUNSEL | 00/00/00 | |
| STATE APPELLATE DEFENDER | | |
| 11/28/00 TRANS PROC REC/FILED CLKS OFF | 00/00/00 | |
| 11/29/00 REPORT OF PROCEEDINGS PREPARED | 00/00/00 | |
| 12/05/00 REPRT/PROCDS RECD BY APP ATTRY | 00/00/00 | |
| STATE APPELLATE DEFENDER | | |
| 11/28/00 REPT OF PRCDS ORD FR CRT RPT | 00/00/00 | |
| 03/19/03 MANDATE FILED | 03/28/03 | 1701 |
| 03/28/03 CASE ASSIGNED | 04/04/03 | 5702 |
| REVERSED AND REMANDED | | |
| BIEBEL, PAUL JR. | | |
| 04/04/03 DEFENDANT IN CUSTODY | 00/00/00 | |
| HABERKORN, CATHERINE M. | | |
| 04/04/03 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| HABERKORN, CATHERINE M. | | |
| 04/04/03 CONTINUANCE BY AGREEMENT | 04/18/03 | 5702 |
| HABERKORN, CATHERINE M. | | |
| 04/18/03 DEFENDANT IN CUSTODY | 00/00/00 | |
| EPSTEIN, JAMES R. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 015

PEOPLE OF THE STATE OF ILLINOIS

              VS                    NUMBER 92CR2513501

JERI      R LINDSEY

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/18/03 PRISONER DATA SHEET TO ISSUE            00/00/00
     EPSTEIN, JAMES R.
04/18/03 PUBLIC DEFENDER APPOINTED               00/00/00
     EPSTEIN, JAMES R.
04/18/03 CONTINUANCE BY AGREEMENT                05/23/03 5702
     EPSTEIN, JAMES R.
05/23/03 DEFENDANT IN CUSTODY                    00/00/00
     EPSTEIN, JAMES R.
05/23/03 PRISONER DATA SHEET TO ISSUE            00/00/00
     EPSTEIN, JAMES R.
05/23/03 MOTION DEFT - CONTINUANCE - MD          07/18/03 5702
     EPSTEIN, JAMES R.
07/18/03 DEFENDANT IN CUSTODY                    00/00/00
     EPSTEIN, JAMES R.
07/18/03 PRISONER DATA SHEET TO ISSUE            00/00/00
     EPSTEIN, JAMES R.
07/18/03 CONTINUANCE BY AGREEMENT                09/12/03 5702
     EPSTEIN, JAMES R.
09/12/03 CONTINUANCE BY AGREEMENT                11/14/03 5702
     EPSTEIN, JAMES R.
11/14/03 DEFENDANT IN CUSTODY                    00/00/00
     EPSTEIN, JAMES R.
11/14/03 PRISONER DATA SHEET TO ISSUE            00/00/00
     EPSTEIN, JAMES R.
11/14/03 CONTINUANCE BY AGREEMENT                01/16/04 5702
     EPSTEIN, JAMES R.
01/16/04 MOTION DEFT - CONTINUANCE - MD          03/05/04 5702
     EPSTEIN, JAMES R.
03/05/04 MOTION DEFT - CONTINUANCE - MD          04/09/04 5702
     EPSTEIN, JAMES R.
04/09/04 MOTION DEFT - CONTINUANCE - MD          05/21/04 5702
     EPSTEIN, JAMES R.
05/21/04 MOTION DEFT - CONTINUANCE - MD          06/25/04 5702
     EPSTEIN, JAMES R.
06/25/04 MOTION DEFT - CONTINUANCE - MD          08/27/04 5702
     EPSTEIN, JAMES R.
08/27/04 MOTION DEFT - CONTINUANCE - MD          10/29/04 5702
     EPSTEIN, JAMES R.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 016

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

    JERI       R LINDSEY

             CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/29/04 CONTINUANCE BY AGREEMENT              12/03/04 5702
        EPSTEIN, JAMES R.
12/03/04 MOTION DEFT - CONTINUANCE - MD        01/28/05 5702
        EPSTEIN, JAMES R.
01/28/05 CONTINUANCE BY AGREEMENT              03/11/05 5702
        EPSTEIN, JAMES R.
03/11/05 MOTION DEFT - CONTINUANCE - MD        04/01/05 5702
        EPSTEIN, JAMES R.
04/01/05 CONTINUANCE BY AGREEMENT              04/15/05
        EPSTEIN, JAMES R.
04/15/05 DEFENDANT NOT IN COURT                00/00/00
        EPSTEIN, JAMES R.
04/15/05 SPECIAL ORDER                         00/00/00
        STATES MOTION TO DISMISS GRANTED
        EPSTEIN, JAMES R.
04/15/05 NOTICE OF APPEAL FILED, TRNSFR        00/00/00
        EPSTEIN, JAMES R.
04/15/05 NOTICE OF APPEAL FILED, TRNSFR        00/00/00
04/19/05 NOTICE OF NOTICE OF APP MAILED        00/00/00
04/19/05 HEARING DATE ASSIGNED                 04/29/05 1713
05/05/05 APPELLATE COURT NUMBER ASGND          00/00/00 05-1458
04/29/05 ILL STATE APPELLATE DEF APPTD         00/00/00
        BIEBEL, PAUL JR.
04/29/05 O/C FREE REPT OF PROCD ORD N/C        00/00/00
        BIEBEL, PAUL JR.
04/29/05 MEMO OF ORDS & NOA PICKED-UP          00/00/00
        BIEBEL, PAUL JR.
07/15/05 CLR RECD BY APP COUNSEL               00/00/00
        STATE APPELLATE DEFENDER
08/30/05 TRANS PROC REC/FILED CLKS OFF         00/00/00
09/29/05 REPORT OF PROCEEDINGS PREPARED        00/00/00
10/06/05 REPRT/PROCDS RECD BY APP ATTRY        00/00/00
        STATE APPELLATE DEFENDER - ONE VOLUME
10/19/05 SUPPL REPORT OF PRCD PREPARED         00/00/00
        CETAIN DOCUMENTS
10/20/05 SUPPL REC RECD BY APPL COUNSEL        00/00/00
        STATE APPELLATE DEFENDER - ONE VOLUME

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 017

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR2513501

    JERI       R LINDSEY

              CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
07/06/06 MANDATE FILED                        07/14/06 1701
07/14/06 REVIEW COURT AFFIRMANCE              00/00/00
      BIEBEL, PAUL JR.
01/10/07 MANDATE FILED                        01/22/07 1701
      MANDATE RECALL
01/22/07 MANDATE RECALLED                     00/00/00
      OF 06/29/06
      GAINER THOMAS V JR.
01/24/07 MANDATE FILED                        02/02/07 1701
02/02/07 SPECIAL ORDER                        00/00/00
      AFFIRMED
      GAINER THOMAS V JR.



                    I hereby certify that the foregoing has
                    been entered of record on the above
                    captioned case.
                    Date 12/06/07

                    _____
                              DOROTHY BROWN
                    CLERK OF THE CIRCUIT COURT OF COOK COUNTY

NOTICE

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

No. 1-95-1535

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 92 CR 25135 |
| JERRI ROBIN LINDSEY, | ) | Honorable Shelvin Singer, |
| Defendant-Appellant. | ) | Judge Presiding. |

## ORDER

Following a bench trial, defendant Jerri Robin Lindsey was found guilty of first degree murder and armed robbery. She was subsequently sentenced to 45 years' imprisonment. On appeal, defendant contends (1) the trial court erred in denying her motion to suppress involuntary statements, (2) the trial court erred when it failed to suppress statements and evidence which resulted from her arrest without probable cause, (3) she was denied a fair trial when the prosecutor misstated the facts in closing argument, (4) trial counsel provided ineffective assistance, and (5) she was denied her constitutional right to choose trial counsel. We affirm.

## Background

On October 12, 1992, Rudolph Bennett (victim), a taxi cab driver, was found shot to death in a cab located in a parking garage at O'Hare International Airport (O'Hare). Defendant was

EXHIBIT B

1-95-1535

charged in connection with the victim's death.  Private counsel
Sheldon Sorosky filed an appearance as counsel for defendant on
November 5, 1992.

On February 15, 1994, defendant requested that a member of
the Public Defender's Office be appointed to represent her
because she could no longer afford to pay Sorosky and because she
felt that Sorosky was no longer acting in her best interests.
Counsel then stated that he and the defendant disagreed on how to
present defendant's case.  The court denied defendant's request
after stating that he believed the request was merely an attempt
to delay the proceedings.

On June 28, 1994, defense counsel sought to withdraw.  In
his motion, counsel sought fees for a private investigator and
for a polygraph examination.  Counsel argued that if he were
allowed to withdraw and the public defender's office was
thereafter appointed, they would be able to provide the
investigator and the polygraph examination.  The trial judge
denied the request and indicated that he believed that the motion
was an effort to delay the proceedings.

### Motions to Suppress

Defendant proceeded on her motion to quash her arrest and
suppress evidence based on her 4th amendment rights.  Chicago
Police Officer Raymond Schalk (Schalk) testified that on October
10, 1992, the victim had been reported as a missing person.
Shortly thereafter, the victim's body was discovered in a cab

2

1-95-1535

parked at O'Hare. Schalk interviewed June Hess and John Eiselt,
the last known "fares" picked-up by the victim. Eiselt and Hess
indicated that about 2:30 p.m. on October 9, 1992, they called
the Circle Cab company (Circle) and requested a pick-up from the
Empress Casino in Joliet, Illinois. As they waited in front of
the casino, they observed a Circle cab approach. The cab stopped
and picked up a woman standing near the road. The cab continued
toward them and stopped. The driver indicated that he was there
to pick them up. The woman who had been seated in the back seat
moved to the front seat. Hess and Eiselt were taken to a nearby
hotel and dropped off at about 3:15 p.m. Eiselt and Hess told
Schalk that the woman who rode with them in the victim's cab
indicated that she had to get to O'Hare by 4:30 p.m. They
described the woman as a female, black, approximately 5'2" to
5'4", weighing about 130 or 140 pounds with a "chunky" build.

Schalk further testified that a ticket stub was recovered
from the victim's cab which indicated that he had entered the
O'Hare parking garage at 5 p.m. on October 9, 1992.

Schalk stated that at the time he talked to Hess and Eiselt,
he was aware that the defendant had reported a sexual assault on
October 11, 1992. Defendant had informed police that on that
date she had been sexually assaulted by a cab driver. The cab
driver had taken her to a wooded area where she escaped by
stabbing him in the chest. The reports from the hospital where
defendant was treated indicated that she had not suffered any

3

1-95-1535

vaginal trauma.

On October 13, 1992, Schalk and other officers went to the defendant's home and asked her if she would come to the police station to discuss her report of a sexual assault and a homicide that they were also investigating. Defendant agreed and they arrived at the police station at about noon. At the station, defendant agreed to allow the officers to fingerprint and photograph her.

While the officers talked with the defendant, the photograph of the defendant was placed in an array and shown to Eiselt and Hess, both of whom identified defendant as the woman who was riding in the cab they took on October 9, 1992. During this time at the station, defendant had been seated in an unlocked interview room and was not handcuffed or placed under arrest. At approximately 1:30 p.m., prior to informing the defendant that she had been identified as the person last seen with the victim, she was read her <u>Miranda</u> rights. Defendant recanted her rape complaint but denied killing the victim.

Defendant testified that on October 13, 1992 at about 11 a.m., officers came to her home while she was sleeping. According to defendant, the officers told her to get dressed and come with them. She complied. Defendant testified that she agreed to have her photograph taken and to be fingerprinted. When defendant asked the officers when she would be allowed to go home, they did not respond. The officers told defendant that

4

1-95-1535

they did not believe her sexual assault report and that they
believed that she was involved in the victim's murder. The
officers read defendant her Miranda rights and told her that two
witnesses had identified her as the person seen with the victim
prior to his death.

After hearing arguments, the trial judge found that the
officers had probable cause to place the defendant under arrest
following her identification by Hess and Eiselt. Accordingly,
the court denied defendant's motion to suppress the resulting
evidence.

Thereafter, the court heard testimony and arguments on
defendant's motion to suppress statements based on a violation of
her 5th amendment rights. Prior to admitting testimony, the
trial judge stated that defense counsel had combined two 5th
amendment claims in one motion--one based on police coercion, and
one based on the police officer's failure to advise the defendant
of her Miranda rights. The court stated that the state had the
burden of disproving the allegations of coercion and the
defendant had the burden of establishing a Miranda violation.

The state recalled Detective Schalk who recounted the events
leading to the defendant's arrest. Schalk testified that after
defendant was read her Miranda rights, she indicated that she
understood them and that she wanted to speak to the officers.
Defendant then confessed to police that her sexual assault report
was a lie but maintained that she was not involved in the

5

1-95-1535

victim's murder.  Defendant agreed to take a polygraph
examination at about 6:45 p.m., and she was transported to a
different location to undergo the examination.  During the
examination, defendant indicated that she was present when the
victim was murdered but that she had not participated.  However,
the polygraph examiner indicated that she was not being honest.
Defendant returned to the police station at approximately
midnight.

At approximately 3 a.m., Assistant State's Attorney (ASA)
Rosenblum arrived at the police station and again advised
defendant of her Miranda rights.  Defendant then talked with
investigators for about two hours.  At 3:00 p.m. on October 15,
1992, defendant was placed in a lineup.  Defendant did not speak
to anyone again until 1:00 a.m. on October 16 when she spoke with
detectives and ASA Nelson.  At about 4 a.m. defendant signed a
written statement.

Schalk, the other detectives and the ASAs, who spoke with
the defendant, testified that they did not threaten the defendant
or promise her that she would be released if she admitted to
killing the victim.  ASA Nelson testified that during the morning
hours of October 16, 1992, defendant indicated that she wanted to
talk to her.  Nelson advised the defendant of her Miranda rights
and the defendant spoke with Nelson for two hours.  During this
time, defendant told Nelson that she had been treated well by the
police and that she did not need anything to eat or drink.

6

1-95-1535

Defendant further stated that the police had not threatened her or promised her anything in exchange for a statement. Nelson testified that the defendant did not appear to be under the influence of drugs or alcohol. Nelson prepared a written statement and reviewed it with the defendant. Defendant made corrections and signed the statement.

Defendant testified on her own behalf and stated that the police asked her if she would come to the station to identify the man who had raped her. While there, defendant agreed to be fingerprinted and photographed. She was placed in an interview room and told that two people had identified her as someone seen with the victim just prior to his murder. The police told defendant that even if she had not killed the victim she would receive the death penalty because she knew who had killed him. Defendant admitted that she had lied in making her sexual assault report, and stated that she did so because she did not want her lover, Irene, to know that she had been out getting high. The officers then told defendant that if she told the truth she could go home. Defendant testified that she signed a statement because she was mentally and emotionally drained and because she was tired of officers telling her that she did something. Defendant also stated that during her time at the police station she occasionally dozed off while waiting for officers to return. Defendant explained her exhaustion was a result of the fact that she had been out getting high for the two previous days and

7

1-95-1535

because she was taking tetracycline and Tylenol for a toothache. She said that she made up her statement because she was tired of having people "in her face."

Defendant then recounted the events of the days leading to the victim's murder.  On October 10, 1992, defendant went to the house of her friend Jack St. Clair and drank beer.  St. Clair then pulled out some cocaine and she and St. Clair smoked cocaine for several hours.  Upon realizing that she had spent all of her money on cocaine, defendant decided to make-up a story to deceive her girlfriend as to where she had been.

Defendant walked to a nearby hospital and told workers there that she had been raped by a cabdriver.  After being examined by hospital personnel and talking with police, she returned home on the night of October 11.  Defendant had difficulty sleeping because the medication she was taking made her go to the washroom every five minutes.

At the conclusion of the defendant's testimony, the trial court denied her motion to suppress her statements.  In so ruling, the trial judge stated that defendant voluntarily accompanied police to the station and submitted to fingerprinting, photographs and a polygraph examination.  The trial judge also stated that he did not believe that the medication the defendant claimed to have taken prior to her time at the police station would have required her to go to the washroom every five minutes for three days.  Accordingly, the

8

1-95-1535

trial judge found that the police had not coerced the defendant into making her statement.

Defendant then indicated that she did not desire to proceed with her motion to suppress based upon her claim that she had not been informed of her Miranda rights.

### Trial

At trial, John Eiselt and June Hess testified about their encounter with the defendant in the victim's cab. Both witnesses also identified the defendant in court as the person that they saw in the victim's cab. Detective Jack Hines testified that on October 11, 1992, he was assigned to investigate the defendant's sexual assault allegations. Defendant told him that while she was riding in a cab, the driver pulled out a gun and forced her to have intercourse with him. The driver then brought the defendant to a wooded area, where she escaped by stabbing him in the chest.

ASA Nelson testified regarding her conversation with the defendant. Defendant's confession was admitted into evidence. In her confession, defendant indicated that she took a cab to O'Hare. When the driver pulled into the parking lot, she decided not to pay him for the ride and tried to leave the cab. The driver grabbed the defendant by the arm. Defendant reached for a gun that she had previously noticed wedged between the seats in the cab and shot the driver. Defendant then took the driver's wallet and removed the cash.

9

1-95-1535

Defendant testified on her own behalf and stated that she did not rob or shoot the victim.  Defendant acknowledged that she told varying accounts of her alleged rape and her involvement with the victim's murder.  Defendant testified that she gave these contradictory statements because she was confused and tired and just wanted the police to leave her alone.

At the close of evidence, the trial court heard arguments and found the defendant guilty of first degree murder and robbery.  Defendant was sentenced to 45 years in prison.

### Discussion

#### I.

On appeal, defendant first asserts that the trial court erred in ruling that the defendant's confession was voluntary. Additionally, defendant argues that because the trial court improperly bifurcated her motion alleging a violation of her 5th amendment rights, her conviction must be reversed and she must be granted a new trial.

Prior to trial, defendant filed two motions to suppress. The second motion, filed on April 13, 1994, sought to suppress defendant's statements because they had been coerced.  The motion did not allege that defendant had not been informed of her Miranda rights.  Paragraph 12 of the motion alleged that the police denied defendant's request for an attorney, and paragraph 13 alleged that the police denied defendant's request to make a telephone call.  The trial judge indicated that he believed that

10

1-95-1535

this second motion contained two separate claims. The court
further indicated if defendant was claiming that she had not been
advised of her Miranda rights, she would have the burden of going
forward; whereas, if defendant's claim was a "fundamental 5th
amendment" violation, the state would have the burden of going
forward. Based upon these statements by the trial court,
defendant claims that the court did not consider the allegations
contained in paragraphs 12 and 13 in ruling on her motion to
suppress her confession as involuntary.

Initially, we note that defendant has waived consideration
of this issue by withdrawing her claim based on a violation of
Miranda. People v. Enoch, 122 Ill. 2d 177 (1989). After the
trial court denied defendant's motion to suppress, counsel
stated, as did the defendant, that she did not want to proceed on
the portion of her motion alleging a violation of Miranda.
Moreover, a review of the record leads us to conclude that the
trial court did not err in denying defendant's motion to suppress
her statements as involuntary.

First, we shall address defendant's claim that the trial
court erred in bifurcating her motion to suppress. Contrary to
defendant's claims, the court was correct in asserting that
defendant had the burden of proof as to her claim that the police
failed to meet the requirements of Miranda. Initially, a
defendant alleging a violation of Miranda has the burden of
establishing that she was under arrest at the time when the

11

1-95-1535

police allegedly failed to advise her of her rights. See People v. Lucas, 132 Ill. 2d 399, 417 (1989); People v. Williams, 164 Ill. 2d 1 (1994). Once defendant had established that she was under arrest, it was then incumbent upon the state to establish that the officers had complied with the dictates of Miranda. Accordingly, the trial court did not err in stating that the defendant had the burden to "go forward" to support her claim that she was not advised pursuant to Miranda.

Similarly, we find an absence of error in the trial court's determination that the defendant's statements to police were voluntary. In her motion, defendant alleged that her lack of sleep combined with the medication that she was taking made her vulnerable to the coercive tactics used by the police. Moreover, defendant alleged that the police promised to send her home if she confessed, told her she was going to be sentenced to death and otherwise coerced her statements.

In deciding whether a statement was voluntary, the court must decide whether the statement was freely made or whether the defendant's will was overcome at the time she confessed. People v. Melock, 149 Ill. 2d 423, 447 (1992). This determination is made by considering the totality of the circumstances including the existence of any threats, promises or physical coercion; the age, intelligence and education of the accused; the length of the detention and the duration of questioning; and whether the accused was advised of her rights. People v. House, 141 Ill. 2d

12

1-95-1535

323, 376 (1990); People v. Clemon, 259 Ill. App. 3d 5, 9 (1994).
While no single fact is dispositive, a finding of wrongful or
coercive police conduct is a necessary precursor to a finding
that a confession is involuntary. People v. Clemon, 259 Ill. App.
3d at 9.  A trial court's ruling on a motion to suppress will not
be disturbed absent a showing that it was manifestly erroneous.
People v. Glass, 209 Ill. App. 3d 384 (1991).

After hearing testimony and arguments, the trial court
denied the defendant's motion to suppress finding that
defendant's testimony regarding the effects of the medication she
had taken three days earlier was incredible.  Even if we assume,
as defendant contends, that the trial judge improperly took
judicial notice of the effects of the medications taken by the
defendant prior to her arrest, we cannot say that it rendered the
trial judge's ruling manifestly erroneous.  Assuming that the
medications taken by the defendant caused her to persistently
urinate and therefore deprived her of sleep, this fact alone does
not render the actions of the investigating officers coercive as
there is an absence of additional, credible evidence to establish
the existence of a coercive atmosphere.  In ruling on the
defendant's motion, the court noted the incredibility of the
defendant's claims.  Questions regarding the credibility of
witnesses are best left to the trial judge and are not reversible
on appeal. People v. Higgins, 50 Ill. 2d 221 (1972).  We will not
second guess the trial court's determination regarding the

13

1-95-1535

credibility of defendant's claims of coercion and therefore find
an insufficient basis in the record to support her current claim.

Finally, we shall address defendant's claim that the trial
court erred in excluding from its ruling the allegations
contained in paragraphs 12 and 13 of her motion. Clearly, these
alleged facts would be relevant to a determination of the
voluntary nature of the statements and would constitute a part of
the totality of the circumstances that existed. However, we do
not agree with defendant's claim that the trial judge denied the
defendant an opportunity to have these allegations considered for
that purpose. After the trial court indicated that the
allegations contained in paragraph 13 related to a <u>Miranda</u>
violation, the following exchange occurred:

"MR. SOROSKY [Defense counsel]: If I may respond.
I think fourteen as well as the substance of paragraph
thirteen are facts. We are alleging those facts. We
intend to prove those facts, and we feel those facts--

THE COURT: Mr. Sorosky, I am not saying they
aren't. Please listen to me. You have two different
kinds of motions wrapped up in one pleading. *** the
State has the burden of going forward if it is a
fundamental 5th amendment violation, coercion, fraud,
overcoming the will. If it is Miranda versus Arizona
violation, the Defense has the burden of going forward.
I am not suggesting that you haven't stated facts which

14

1-95-1535

> give rise to a right to a hearing.
>
> MR. SOROSKY: Very well.
>
> THE COURT: Not at all. I am telling you you have
> the two mixed up in one motion.
>
> MR. SOROSKY: I understand."

Clearly, the trial judge expressed his belief that defendant had
the burden of going forward on the _Miranda_ violation which had to
be established separately from the allegation that her confession
was involuntary. However, we disagree with the defendant's claim
that the comments above constitute a ruling by the trial court
that the defendant could not present testimony regarding the
allegations in paragraphs 12 or 13 in support of her claim that
her confession was involuntary. Defendant testified at the
hearing on her motion to suppress her statements as involuntary.
At no time did defense counsel attempt to elicit testimony
regarding the allegations in paragraphs 12 or 13, nor did she
object to the alleged prohibition from doing so. Accordingly, we
find no error. Moreover, if the trial court did in fact limit
defendant's testimony on this issue, she waived present
consideration by failing to object.

## II.

Next, defendant argues that the trial court erred in denying
her motion to quash the arrest and suppress evidence. Defendant
contends that because a reasonable person would not have felt
free to leave at the time defendant was photographed, she was

15

1-95-1535

legally under arrest at that time.  Moreover, defendant argues
that because the police possessed insufficient evidence to
establish probable cause, her arrest was illegal and all the
evidence resulting therefrom must be suppressed.

An arrest occurs when a person's freedom of movement has
been restrained by physical force or by a show of authority.
People v. Melock, 149 Ill. 2d 423, 436 (1992).  In determining
whether an arrest has occurred, the question to be answered is
whether a reasonable, innocent person would, under the
circumstances, have considered herself under arrest or free to
leave. People v. Reynolds, 94 Ill. 2d 160, 165 (1983).  A
reviewing court will not disturb the determination of the trial
court on a motion to suppress unless the determination is
manifestly erroneous. People v. Glavin, 127 Ill. 2d 153, 162
(1989).

It was undisputed in the present case that the defendant
voluntarily accompanied officers to the police station and
submitted to fingerprinting and photographs.  At no time during
the questioning was defendant handcuffed, told she was not free
to leave, or placed in a locked room.  Moreover, we note that
defendant had reported to police that she had been the victim of
a sexual assault only days before.  In this context, we do not
believe that a reasonable, innocent person would have believed
that they were not free to leave.  Accordingly, we cannot say
that the trial court erred in finding that the defendant was not

16

1-95-1535

arrested until after she had been identified by Hess and Eiselt and informed of her <u>Miranda</u> rights.

Furthermore, we find no error in the trial court's determination that the arresting officers had probable cause to arrest the defendant after her identification.  Probable cause to arrest exists where the facts and circumstances known to the arresting officer at the time of the arrest are sufficient to warrant a man of reasonable caution to believe that an offense has been committed by the person arrested. <u>People v. Lippert</u>, 89 Ill. 2d 171 (1982).  A determination of probable cause is governed by common-sense, practical considerations, not by technical legal rules. <u>People v. Mitchell</u>, 45 Ill. 2d 148 (1970). While probable cause requires more than a mere suspicion, it does not require sufficient evidence to convict. <u>People v. Moody</u>, 94 Ill. 2d 1 (1983).  The existence of probable cause is determined by examining the totality of the circumstances at the time of the arrest. <u>Illinois v. Gates</u>, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983).  Whether probable cause exists is a mixed question of law and fact.  <u>People v. Lippert</u>, 89 Ill. 2d 171. Ordinarily, a trial court's ruling on a motion to suppress will not be reversed unless it is manifestly erroneous. <u>People v. Foskey</u>, 136 Ill. 2d 66 (1990).

The facts known to the arresting officers after defendant's identification were clearly sufficient to support a finding that they had probable cause to effectuate her arrest.  At that time,

17

1-95-1535

Hess and Eiselt had identified the defendant as the woman last seen with the victim. Based on these circumstances, the officers clearly had knowledge of sufficient facts to support a reasonable belief that the defendant had committed a crime.

### III.

Next, defendant argues that the prosecutor's repeated misstatements regarding the evidence in this case denied her a fair trial. Defendant identifies two specific statements made by the prosecutor in closing argument.

First, the prosecutor stated that the common element contained in all of the defendant's stories regarding her actions on the dates in question was that she admitted to killing a cab driver. Defendant argues that this constituted a misstatement of the evidence because in defendant's statements regarding her alleged sexual assault she had only indicated that she stabbed a cab driver in the chest. Second, defendant argues that the prosecutor misstated the evidence when, after noting that defendant had reported being assaulted by a man driving a red and white cab, the prosecutor stated that the victim drove a red and white cab when, in fact, his cab was maroon and white.

We find this argument by defendant to be without merit. Not only has defendant waived this issue by failing to object to the complained of comments (People v. Chapman, 262 Ill. App. 3d 439 (1992)), but we find the comments at issue to be permissible as based on reasonable inferences drawn from the evidence. People v.

1-95-1535

Morgan, 112 Ill. 2d 111 (1986).

IV.

Defendant further argues that she was denied the effective assistance of counsel at trial. To support this contention, defendant identifies numerous alleged omissions by trial counsel which she claims resulted in prejudice.

First, defendant claims that trial counsel was ineffective because he failed to fully impeach Hess' and Eiselt's identification of her. Specifically, defendant argues that counsel was ineffective for failing to point out that Hess and Eiselt described defendant as weighing between 130 and 140 pounds when in fact she weighed 190 pounds. Similarly, defendant contends that counsel should have also pointed out that neither Hess nor Eiselt included in their description of the defendant the fact that she had a mole on her nose.

The evidence of defendant's actual weight which defendant claims counsel should have introduced to impeach the witnesses was in a police report. A police report is not available to impeach a witness other than the officer who prepared the report. People v. Pendleton, 256 Ill. App. 3d 983 (1991). With regard to the witnesses' failure to note in their description the fact that the defendant had a mole on her nose, the failure of a witness to describe a particular characteristic does not destroy the identification of the defendant. People v. Slim, 127 Ill. 2d 302 (1989). Accordingly, counsel's decision not to attempt to impeach

19

1-95-1535

the identifications made by Hess and Eiselt cannot be identified as an unreasonable omission which resulted in prejudice.

Next, defendant asserts that trial counsel was ineffective for failing to move to suppress the photographic lineup as suggestive. Defendant contends that the lineup was suggestive because she was the only person depicted therein with a "chunky" build and that otherwise generally matched the description previously given by Hess and Eiselt.

For identification evidence to be inadmissible, a defendant must prove that the identification procedures were so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. People v. Blumenshine, 46 Ill. 2d 508 (1969). When determining whether due process has been violated, the court must examine (1) the suggestiveness of the identification, and (2) the reliability of subsequent identifications. People v. Miller, 254 Ill. App. 3d 997 (1993).

In the present case, the photographs used in the lineup are included in the record. We have reviewed the photographs and find no suggestiveness. All of the women depicted in the photographs have short hair and similar complexions. Five of the six women in the photographs appear to be "chunky" and are similarly dressed. Based on the photographs themselves, we find no suggestiveness and therefore find no error in counsel's decision not to challenge the lineup.

Finally, defendant argues that counsel was ineffective for

20

1-95-1535

failing to argue the allegedly involuntary nature of the
defendant's confession at trial.  Moreover, defendant suggests that
counsel failed to present the court with all of defendant's
testimony which evinced the involuntary nature of her statements to
police.

Prior to trial, counsel filed a motion to suppress defendant's
statements as involuntary.  The defendant testified that she had
been threatened and coerced into making statements and counsel
argued the motion before the court.  The trial court denied the
defendant's motion and the case proceeded to a bench trial.
Defendant now apparently contends that counsel should have re-
argued defendant's claim that her statements were not voluntary.
We find no merit to this allegation of error.  The trial judge had
already ruled that defendant's statements were voluntary when he
denied the defendant's motion to suppress.  We therefore find no
error in counsel's decision not to argue this issue again at trial.
Furthermore, defendant has not identified what additional evidence
of coercion trial counsel failed to use.  When viewed in its
entirety, the record contains no evidence that trial counsel was
ineffective.

V.

Defendant's final contention on appeal is that she was denied
her 6th amendment right to choose counsel.  While the 6th amendment
provides an accused the right to assistance of counsel, it does not
include the right to select counsel of choice where it would delay

21

1-95-1535

or impede the administration of justice. People v. Barrow, 133 Ill. 2d 226 (1989). Similarly, while a defendant may have the right to be represented by retained counsel of her choice, she does not have the right to choose appointed counsel. People v. Lewis, 88 Ill. 2d 129 (1981).

In the present case, defendant was represented by retained counsel of her choice. Shortly before trial, she requested the appointment of counsel because she could no longer afford to pay retained counsel and because she felt that retained counsel was no longer acting in her best interests. Defendant did not elaborate regarding this claim and the trial court found that defendant was merely attempting to delay the proceedings. Contrary to defendant's contention on appeal, the present case is dissimilar to People v. Young, 207 Ill. App. 3d 130 (1990). In that case, defendant was represented by appointed counsel. On the day of trial, private counsel sought to file an appearance on behalf of the defendant. The trial court denied defendant's request and this court reversed after noting that the trial court failed to inquire as to whether retained counsel was ready, willing and able to make an unconditional entry of appearance. People v. Young, 207 Ill. App. 3d at 134.

By contrast, defendant in the present case was already represented by retained counsel of her choice who indicated that he was ready and willing to represent defendant. Moreover, defendant failed to provide any specific reasons for seeking a change in her

22

1-95-1535

representation. While counsel indicated that defendant would be able to secure an investigator and a polygraph examination if the public defender's office represented her, the trial court found that defendant was merely attempting to delay the proceedings. Based on the record, we cannot say that the trial court abused its discretion in denying this request. People v. Solomon, 24 Ill. 2d 586 (1962).

### Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed. As part of our judgment, we grant the state's request and assess defendant $150 as costs for this appeal.

Affirmed.

HOURIHANE, J., with HARTMAN, P.J., and SOUTH, J., concurring.

Westlaw.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 1
(Cite as: 1996 WL 33651681)


For Opinion See 713 N.E.2d 831

        Appellate Court of Illinois, First District, Fourth Division.
            PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
                                    v.
                Jerri Robbin LINDSEY, Defendant-Appellant.
                             No. 1-95-1535.
                             October 15, 1996.

Appeal from the Circuit Court of Cook County, Illinois Criminal Division No.
92-CR-25135 The Honorable Shelvin Singer, Judge Presiding


        Brief and Appendix of Defendant-Appellant Jerri Robbin Lindsey
Robert R. Stauffer, Andrew Byerly Birge, Jenner & Block, One IBM Plaza, Chicago,
Illinois 60611, (312) 222-9350, Attorneys for Defendant-Appellant, Jerri Robbin
Lindsey.


                        *i TABLE OF CONTENTS

POINTS AND AUTHORITIES ... iii

NATURE OF THE CASE ... 1

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF JURISDICTION ... 2

STATUTES INVOLVED ... 2

STATEMENT OF FACTS ... 2

I. Undisputed evidence that a crime occurred ... 3

II. Testimony of the elderly couple ... 4

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 2

III. Ms. Lindsey's whereabouts ... 5

IV. Ms. Lindsey's Rape Complaint ... 6

V. The arrest ... 7

VI. The interrogations ... 11

VII. Pretrial motions ... 16

   A. Motion to suppress statements as involuntary ... 16

   B. Motion to suppress evidence as fruits of an arrest without probable cause ...
17

   C. Motions for substitution of counsel and appointment of an investigator ... 18

VIII. Trial ... 19

IX. Verdict and post-trial proceedings ... 19

*ARGUMENT*

I. THE TRIAL COURT ERRED IN FAILING TO SUPPRESS EVIDENCE OF MS. LINDSEY'S STATEMENTS
ON THE GROUNDS THAT THEY WERE INVOLUNTARY ... 21

   A. Trial Court Improperly Addressed The Burden Of Proving Allegations Of *Miranda*
Violations And Improperly Severed Coercive *ii *Miranda* Violations From The Motion To
Suppress Statements ... 22

   B. The Trial Court Improperly Discounted The Prolonged Detention ... 28

   C. The Trial Court Improperly Relied On His Own Opinions To Reject Evidence Of The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 3
(Cite as: 1996 WL 33651681)

Effect Of Medication ... 31

  D. The Totality Of The Circumstances Demonstrates That Ms. Lindsey's Statements
Were Involuntary ... 32

  E. There Is Insufficient Evidence To Sustain The Conviction Without The Involuntary
Statements And Confession ... 34

II. THE TRIAL COURT ERRED IN FINDING THAT MS. LINDSEY'S POLAROID IDENTIFICATION,
FINGERPRINTS, LINE-UP IDENTIFICATION, AND CONFESSION WERE NOT THE FRUIT OF AN
ILLEGAL ARREST ... 36

  A. Ms. Lindsey was in custody by the time the detectives took the Polaroid
Photograph ... 37

  B. The Detectives Lacked Probable Cause to Detain ms. Lindsey When The Detectives
Took Ms. Lindsey's Picture ... 44

  C. The Polaroid Identification Did Not Provide Probable Cause to Arrest Ms. Lindsey
... 46

  D. All The Evidence Gathered Was Tainted ... 47

  E. The Trial Court Erred In Ruling In The Alternative That The Inevitable Discovery
Doctrine Applies To Any Identification of Ms. Lindsey ... 52

III. PROSECUTOR ENGAGED IN PREJUDICIAL ARGUMENT ... 52

IV. MS. LINDSEY WAS DENIED HER SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF
COUNSEL ... 55

V. MS. LINDSEY WAS DENIED HER RIGHT TO CHOICE OF COUNSEL ... 61

VI. CONCLUSION ...

Note: Table of Contents page numbers missing in original document

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                                    Page 4
(Cite as: 1996 WL 33651681)

## *iii POINTS AND AUTHORITIES

I. THE TRIAL COURT ERRED IN RULING THAT MS. LINDSEY'S CONFESSION WAS VOLUNTARY ... 21

*People v. Kincaid,* 87 Ill.2d 107, 57 Ill.Dec. 610, 429 N.E.2d 508 (1981) ... 21

*In re Lamb,* 61 Ill.2d 383, 336 N.E.2d 753 (1975), *cert. denied,* 425 U.S. 938 (1976) ... 21

*People v. House,* 141 Ill.2d 323, 370, 152 Ill.Dec. 572, 593, 566 N.E.2d 259, 282-83 (1990) ... 21

*People v. Williams,* 230 Ill.App.3d 761, 172 Ill.Dec. 445, 595 N.E.2d 1115 (1st Dist.), *app. denied,* 146 Ill.2d 649, 176 Ill.Dec. 819, 602 N.E.2d 473 (1992) ... 21

A. Trial Court Improperly Addressed The Burden Of Proving Allegations Of *Miranda* Violations And Improperly Severed Coercive *Miranda* Violations From The Motion To Suppress Statements ... 22

*People v. Reid,* 136 Ill.2d 27, 554 N.E.2d 174, 143 Ill.Dec. 239 (1990) ... 24

*People v. Allen,* 148 Ill.App.3d 200, 101 Ill.Dec. 514, 498 N.E.2d 838 (1st Dist. 1986) ... 27

725 ILCS 5/114-11(d) ... 34

*Oregon v. Elstad,* 470 U.S. 298, 105 S. Ct. 1285, 84 L.Ed.2d 222 (1985) ... 25

*Michigan v. Tucker,* 417 U.S. 433, 94 S. Ct. 2357, 41 L.Ed.2d 182 (1974) ... 25

18 U.S.C. § 3501(B) ... 25

*Haley v. Ohio,* 332 U.S. 596, 68 S. Ct. 302, 92 L.Ed 224 (1948) ... 26

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 5
(Cite as: 1996 WL 33651681)

*Ashcraft v. Tennessee*, 322 U.S. 143, 64 S. Ct. 921, 88 L.Ed. 1192 (1944) ... 26

*People v. Koesterer*, 44 Ill.App.3d, 3 Ill.Dec. 128, 358 N.E.2d 295, 304 (5th Dist. 1976) ... 26, 27

*iv   *People v. McClure*, 43 Ill.App.3d 1059, 3 Ill.Dec. 23, 358 N.E.2d 23 (1st Dist. 1976) ... 27

*Jackson v. Denno*, 378 U.S. 368, 380, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964) ... 28

*People v. Ralon*, 211 Ill.App.3d 927, 156 Ill.Dec. 266, 570 N.E.2d 742 (1st Dist. 1991) ... 28

      B. Trial Court Improperly Discounted The Prolonged Detention ... 28

*Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975) ... 29

*People v. Williams*, 230 Ill.App.3d 761, 172 Ill.Dec. 445, 595 N.E.2d 1115 (1st Dist.), app. denied, 146 Ill.2d 649, 176 Ill.Dec. 819, 602 N.E.2d 473 (1992) ... 29

*County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct. 1661, 114 L.Ed.2d 49 (1991) ... 29, 30

*United States v. Wilson*, 838 F.2d 1081 (9th Cir. 1988) ... 29, 30

*People v. House*, 141 Ill.2d 323, 152 Ill.Dec. 572, 597, 566 N.E.2d 259, 284 (1990) ... 29, 30

C. The Trial Court Improperly Relied On His Own Opinions To Reject Evidence Of The
                    Effect Of Medication ... 31

*People v. White*, 183 Ill.App.3d 838, 539 N.E.2d 456 (3d Dist. 1989) ... 31

*Murdy v. Edgar*, 103 Ill.2d 384, 83 Ill.Dec. 151, 469 N.E.2d 1085 (1984) ... 31

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 6
(Cite as: 1996 WL 33651681)

D. The Totality Of The Circumstances Demonstrates That Ms. Lindsey's Statements
                     Were Involuntary ... 32

     *People v. Williams*, 230 Ill.App.3d 761, 172 Ill.Dec. 445, 595 N.E.2d 1115, 1126
(1st Dist.), *app. denied*, 146 Ill.2d 649, 176 Ill.Dec. 819, 602 N.E.2d 473 (1992)
                              ... 34

   *v   E. There is insufficient evidence to sustain the conviction without the
              involuntary statements and confession ... 35

     *People v. Koesterer*, 44 Ill.App.3d, 3 Ill.Dec. 128, 358 N.E.2d 295 (5th Dist.
                           1976) ... 35

*People v. Howard*, 74 Ill.App.3d 870, 393 N.E.2d 1084 (2d Dist. 1979) ... 35

II. THE TRIAL COURT ERRED IN FINDING THAT MS. LINDSEY'S POLAROID IDENTIFICATION,
  FINGERPRINTS, LINE-UP IDENTIFICATION, AND CONFESSION WERE NOT THE FRUIT OF AN
                        ILLEGAL ARREST ... 36

     *People v. Vega*, 203 Ill.App.3d 33, 148 Ill.Dec. 386, 560 N.E.2d 983 (1st Dist.
                           1990) ... 36

*Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975) ... 36

*Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L.Ed.2d 824 (1979) ... 36

*People v. Reynolds*, 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766 (1983) ... 36

    A. Ms. Lindsey was in Custody by the Time the Detectives Took the Polaroid
                           Photograph

     *People v. Vega*, 203 Ill.App.3d 33, 148 Ill.Dec. 386, 560 N.E.2d 983 (1st Dist.
                    1990) ... 37, 38, 40, 41, 43

*Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L.Ed.2d 565 (1988) ...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 7
(Cite as: 1996 WL 33651681)

37

_People v. Townes_, 91 Ill.2d 32, 61 Ill.Dec. 614, 435 N.E.2d 103, 104-05, _cert. denied,_ 459 U.S. 878 (1982) ... 38, 41, 43

Wayne R. LaFave, _Search and Seizure_ § 5.1(a), 4-5 (3d ed. 1996) ... 38, 43

_People v. White_, 117 Ill.2d 194, 111 Ill.Dec. 288, 512 N.E.2d 677, 687 (1987), _cert. denied,_ 485 U.S. 1006 (1988) ... 38

_United States v. Phillips_, 497 F.2d 1131, 1133 (9th Cir. 1974) ... 41

*vi    _Spano v. New York_, 360 U.S. 315, 323, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959) ... 42

Wayne R. LaFave, _Search and Seizure_ § 8.2(i), 688 & n.243 (3d ed. 1996) ... 43

_People v. Savory_, 105 Ill.App.3d 1023, 61 Ill.Dec. 737, 435 N.E.2d 226 (2d Dist. 1982) ... 44

B. The Detectives Lacked Probable Cause to Detain Ms. Lindsey When The Detectives Took Ms. Lindsey's Picture ... 44

_People v. Booker_, 209 Ill.App.3d 384, 154 Ill.Dec. 211, 568 N.E.2d 211, 218 (1st Dist. 1991) ... 44

C. The Polaroid Identification Did Not Provide Probable Cause to Arrest Ms. Lindsey ... 46

D. All the Evidence Gathered Was Tainted ... 47

_People v. White_, 117 Ill.2d 194, 111 Ill.Dec. 288, 512 N.E.2d 677, 687 (1987), _cert. denied,_ 485 U.S. 1006 (1988) ... 47, 48, 49, 50

_Wong Sun v. United States_, 371 U.S. 471, 487-88 (1963) ... 47, 49

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*People v. Smith*, 232 Ill.App.3d 121, 173 Ill.Dec. 165, 596 N.E.2d 789, 794, (1st Dist.), *app. denied*, 146 Ill.2d 647, 176 Ill.Dec. 817, 602 N.E.2d 471 (1992) ... 48, 52

725 ILCS 5/114-11 ... 48

*People v. Cole*, 168 Ill.App.3d 172, 118 Ill.Dec. 965, 532 N.E.2d 635, 641 (1st Dist.), *app. denied*, 122 Ill.2d 582, 530 N.E.2d 253, 125 Ill.Dec. 228 (1988) ... 49

*Bynum v. United States*, 262 F.2d 465 (D.C. Cir.1958) ... 49

*People v. Vega*, 203 Ill.App.3d 33, 148 Ill.Dec. 386, 560 N.E.2d 983 (1st Dist. 1990). ... 50

*vii   *People v. Jones*, 157 Ill.App.3d 1006, 110 Ill.Dec. 895, 511 N.E.2d 1215 (1st Dist.), *app. denied*, 116 Ill.2d, 113 Ill.Dec. 310, 515 N.E.2d 119 (1987) ... 50

*Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975) ... 50

*People v. Pettis*, 12 Ill.App.3d 123, 298 N.E.2d 372 (1st Dist. 1973) ... 51

*United States v. Edmons*, 432 F.2d 577 (2d Cir. 1978) ... 51

F. The Trial Court Erred In Ruling in The Alternative That The Inevitable Discovery Doctrine Applies To Any Identification of Ms. Lindsey ... 52

*People v. Hoffman*, 84 Ill.2d 480, 50 Ill.Dec. 696, 419 N.E.2d 1145 (1981) ... 52

III. PROSECUTOR ENGAGED IN PREJUDICIAL ARGUMENT ... 52

*People v. Buckley*, 282 Ill.App.3d, 218 Ill. Dec. 250, 668 N.E.2d 1082 (3d Dist. 1996) ... 53

*People v. Roach*, 213 Ill.App.3d 119, 156 Ill.Dec. 731, 571 N.E.2d 515 (3d Dist.), *app. denied*, 141 Ill.2d 555, 162 Ill.Dec. 504, 580 N.E.2d 130 (1991) ... 53

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                         Page 9
(Cite as: 1996 WL 33651681)

IV. MS. LINDSEY WAS DENIED HER SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF
COUNSEL ... 55

   *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984) ... 55, 56

   *People v. Karraker*, 261 Ill.App. 3d 942, 199 Ill.Dec. 259, 633 N.E.2d 1250 (3d
Dist. 1994) ... 55

   *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) ... 55

         A. A Series Of Errors Fell Below Objective Reasonableness ... 56

            *People v. Morris*, 3 Ill.2d 437, 121 N.E.2d 810 (1954) ... 56

   *Moffett v. Kolb*, 930 F. 2d 1156 (7th Cir. 1991) ... 56

*viii   *People v. Brinson*, 80 Ill.App.3d 388, 35 Ill.Dec. 721, 399 N.E.2d 1010 (2d
Dist. 1980) ... 56, 58, 60

   *People v. Skinner*, 220 Ill. App. 3d 479, 163 Ill.Dec. 301, 581 N.E.2d 252 (1st
Dist. 1991) ... 58

   *People v. Wright*, 111 Ill.2d 18, 94 Ill.Dec. 726, 488 N.E.2d 973 (1986) ... 60

   *State v. Lopez*, 3 Ariz. App. 200, 412 P.2d 882 (1966) ... 60

         B. The Series of Errors Prejudiced Ms. Lindsey ... 60

            *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984) ... 60

   *United States v. Wolf*, 787 F.2d 1099 (7th Cir. 1986) ... 60

   *People v. Whitlow*, 89 Ill.2d 322, 60 Ill.Dec. 587, 433 N.E.2d 629 (1982), cert.
denied sub nom, *Gibson v. Illinois*, 459 U.S. 830 (1982) ... 60

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

V. MS. LINDSEY WAS DENIED HER SIXTH AMENDMENT RIGHT TO CHOICE OF COUNSEL ... 61

*People v. Young*, 152 Ill.Dec. 67, 207 Ill.App.3d 130, 565 N.E.2d 309, 311, *app.
denied*, 571 N.E.2d 155 (1990) ... 61

*United States v. Rogers*, 769 F.2d 1418, 1423 (9th Cir. 1985) ... 62

*People v. West*, 137 Ill.2d 558, 148 Ill.Dec. 196, 560 N.E.2d 594, 608 (1990) ... 62

*United States v. Morrissey*, 461 F.2d 666, 667 (2d Cir. 1972) ... 62, 63

*People v. Morris*, 3 Ill.2d 437, 121 N.E.2d 810 (1954) ... 62

**\*1** *NATURE OF THE CASE*

Defendant-Appellant Jerri Lindsey was charged with murder, felony murder and armed
robbery in the homicide death of Rudolph Bennett. (App. A 45.)[FN1] The trial court,
the Honorable Shelvin Singer presiding, denied Ms. Lindsey's motions to suppress
evidence and then convicted her of murder and armed robbery following a bench trial,
based primarily on certain evidence of custodial statements made by Ms. Lindsey and
the testimony of two witnesses. (App A 7.) Although the State requested the death
penalty (AA21-AA22), the trial court sentenced Ms. Lindsey to 45 years
incarceration. (AA29 at App. A 2.)

> FN1. References to the common law record will be made with the abbreviation CR
> and/or to the pages of the appendix ("App.") where appropriate. All other
> references are to the trial court record and or appendix where appropriate.
> For example, "P45" would be a reference to page 45 of the P section of the
> trial record.

*ISSUES PRESENTED FOR REVIEW*

1. Did the trial court err in failing to suppress evidence of Ms. Lindsey's
statements on the grounds they were involuntary?

2. Did the trial court err in failing to suppress Ms. Lindsey's statements and other
evidence as the fruits of an arrest made without probable cause?

3. Was Ms. Lindsey denied a fair trial when the State improperly misstated the facts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                      Page 11
(Cite as: 1996 WL 33651681)

in closing argument?

4. Did Ms. Lindsey receive effective assistance of counsel when her trial counsel
committed a series of errors through the pre-trial motions and at trial?

5. Was Ms. Lindsey denied her constitutional right to choice of counsel?

STATEMENT OF JURISDICTION

This is an appeal from a bench verdict entered by the Circuit Court of Cook County.
Jurisdiction in this Court is proper pursuant to the Illinois Constitution of 1970,
Art. VI sec. 6, and Illinois Supreme Court Rules 602 et seq.

STATUTES INVOLVED

725 ILCS 5/114-11

(a) Prior to the trial of any criminal case a defendant may move to suppress as
evidence any confession given by him on the ground that it was not voluntary.

(d) The burden of going forward with the evidence and the burden of proving that a
confession was voluntary shall be on the State ....

STATEMENT OF FACTS

Defendant/appellant Jerri Lindsey (Ms. Lindsey), a single mother with no prior
criminal record (CR76, AA27), was convicted of murdering and robbing Rudolph
Bennett, a taxi cab driver. The victim had been found dead with no wallet or
identification on October 12, 1992, in his Circle Cab Company cab parked in a garage
at O'Hare Airport. (S47-S48, S67-S68.)

The evidence supporting the conviction at trial consisted exclusively of: 1)
custodial statements and a *3 confession signed in a police interrogation room at
4:10 a.m. on October 16 -- over forty hours after Ms. Lindsey had been taken to the
police station for questioning -- and 2) two identifications by an elderly couple
who identified Ms. Lindsey as the unremarkable, short and "chunky" 130-140 pound
woman with whom they shared a ride in the victim's cab just before the cab headed
with the woman alone to the O'Hare Airport at 3:30 p.m. on October 9th. Ms. Lindsey,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whose most remarkable features are a prominent mole on her nose and her build-- 190
pounds on a 5'5 frame (App. A 74; AA3-AA7), testified in her own defense. She
contended that the evidence against her was the product of an illegal arrest, that
her statements were not the product of her free will, and that the eye witnesses
were mistaken because she had an alibi and did not fit the profile.

## I. *Undisputed Evidence That A Crime Occurred*

There is no dispute that on Sunday October 12, 1996, at 6:00 p.m., Rudolph Bennett
was found shot to death in his locked cab, parked in a parking garage at O'Hare
Airport. (F 6, S47.) The cab was maroon in color, with the cab company's name,
Circle Cab Company, inscribed in white lettering on the side doors of the cab. (App.
A 75, S48). Cabs are not ordinarily permitted to enter the parking garage where the
victim was found. (S48.) The victim had no wallet, identification or money on his
person. (S67.) Spent bullets and shell casings were found at the scene. (S61-S68.) A
parking stub under the windshield indicated that the cab had entered the garage at
about 5:00 p.m. on October 9, 1996. (S51, S58, S60.)

## *4 II. *Testimony of the Elderly Couple*

Once the victim's identity was discovered, detectives learned that his last known
fares were a pre-arranged pick-up at the Empress Casino in Joliet and a fare that
was not prearranged to the O'Hare airport around that same time. (S68, S74-S76.) On
October 13, the police located the individuals who had called the Circle Cab Company
for the pre-arranged ride from the Empress Casino. The individuals were John Eiselt
and June Hess, an elderly Chicago area couple that had been gambling and needed a
ride back to their hotel. (S70.)

The elderly couple reported to the police that as they waited for their cab to
arrive at about 2:30 p.m. on the afternoon of October 9, they saw a cab stop a half
block short of the casino to pick-up a young, black woman standing at the side of
the road. The woman was five-foot two-inch to four-inch, "chunky," 130-40 pounds,
and in her twenties. (F 16, P46.) The cab continued at a slow pace toward the casino
where the couple was standing. (P18, P55.) When the couple knocked on the cab door
and asked if the cab was there for them, the woman inside and the driver exchanged
words, at which point the woman exited the back seat of the cab and entered the
front passenger seat. (P18, P55.) The couple then shared their ride with the
unidentified woman.

On the way to the hotel, the couple told the cab driver that they would like to stop
on the way to buy some beer. The cab driver asked the unidentified woman in the
front seat if that would be okay, and the woman replied that it was fine *5 with her
as long as she got to O'Hare Airport by 4:30. (P57-P58.) She also handed the couple

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 13
(Cite as: 1996 WL 33651681)

a train schedule and suggested that, in the future, the couple should take the train
from Chicago to Joliet. (P56-P57) Following the brief stop for the beer, the cab
dropped-off the elderly couple at their hotel at around 3:00 p.m. at the latest.
(P49, P59.) The driver and the unidentified woman remained in the cab.

### III. *Ms. Lindsey's Whereabouts*

At trial, Ms. Lindsey's family and friends testified that over the course of the day
on October 9, Ms. Lindsey and her family went to their land-lady to pay the rent,
shopped at Venture and Walgreens as well as ate lunch together at a Shakey's.
(T97-T112; V11; V22-V27; V42; V56-V59.) According to the testimony, Ms. Lindsey
could not have been in Joliet hailing a cab to the O'Hare Airport that same day.

After midnight on October 9, in the early morning hours of October 10, Ms. Lindsey's
unrebutted testimony was that she went to a friend's home and descended into a
two-day cocaine binge, during which she obtained little rest. (V147, M120, M122,
M125-M133.) The friend was Jack St. Clair. (M123.) Ms. Lindsey conversed, drank
beer, and eventually had sex with Jack. (M124, T13.) Rather than going to sleep
after the interlude, she went out with Jerry St. Clair, Jack's brother, to buy and
consume crack cocaine. (M122, M125.) Soon she was in the midst of an extended crack
cocaine binge. (M128-M130.) On October 11, when Ms. Lindsey still had not returned
home, her family filed a missing persons report. (W7-W29.)

### *6 IV. *Ms. Lindsey's Rape Complaint*

Fearful that she would not be let back into her own home because she had been
consuming drugs, Ms. Lindsey admittedly fabricated a kidnapping and rape story. At
about 11:25 p.m. on October 11, Ms. Lindsey appeared at South Chicago Hospital to
receive treatment for her alleged rape. (F17.) The hospital staff provided her with
some medication for her continued consumption over the next couple of days as a part
of her treatment, although they found no signs of vaginal trauma.

Ms. Lindsey consumed <u>Tylenol</u> for a toothache in addition to the prescribed
medication for the alleged rape. According to Ms. Lindsey, the "four big pills" she
took at the hospital and bottle of "blue pills" prescribed for her continued
consumption at home (one of which she thought was "<u>Tetracycline</u> or something") and
the <u>Tylenol</u> prevented her from sleeping. (M119-120, M137.) She testified that the
combination of drugs dehydrated her, caused her to consume excess liquid, caused a
near constant need to urinate, and thereby deprived her the ability to sleep for any
length of time on Monday and Tuesday. (M120, M140)

On the night Ms. Lindsey reported the rape, Detective Jack Hines spoke with Ms.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Lindsey to take her statement on the rape complaint. Ms. Lindsey alleged that on
October 9 she hailed a cab at 69th and Ridgeland within the city of Chicago to take
her to 8931 South Houston, her home. She described this cab as a red and white, or
red and yellow, cab with smoked windows. (F18, F34-35, S80.) Instead of taking her
where she *7 wanted to go, the cab driver blindfolded her, took her to an unknown
location where he raped her repeatedly in some room. Several days later, the cab
driver blindfolded her again and took her to a wooded area to let her go. Before he
let her go, he insisted on one more rape. Ms. Lindsey said she stabbed him in the
chest with a pocketknife and fled, leaving the pocketknife in the cab driver's
chest. She described the rapist as a black male about 35-40 years old. (F18-F19.)
She alleged that she was subsequently picked-up by an unidentified white woman who
told her she was in Joliet and took her to the South Chicago hospital. (F18.)

On the evening of October 12, Detective Jack Hines met Ms. Lindsey at her home and
asked if she would come to the police station to look at some photos of possible
rape suspects. Ms. Lindsey did so. Coincidentally, a photo of the victim, Randolph
Bennett, was included in the photo or photos presented, although Detective Hines was
not aware that Mr. Bennett was the victim of a homicide. (F93.) Ms. Lindsey
testified at trial that none of the individuals depicted looked like her alleged
rapist. Officer Hines testified that she refused to look at any photos. (F93.)


                              V. *The Arrest*


At 11:00 a.m. on October 14, Detectives Raymond Schalk, Jerome Bugucki and Ernest
Halvorsen arrived in plainclothes at Ms. Lindsey's home. (F 19.) Ms. Lindsey was
sleeping in bed, having been up late watching television. (F81.) Her lover, Irene
Quiros, roused Ms. Lindsey, who *8 appeared at the door in a bath robe or T-Shirt
and shorts.


(S73, F58) Detective Schalk testified at the suppression hearing:
I told her we were police detectives with the Chicago Police Department, we would
like to talk to her regarding her sexual assault and homicide investigation that we
were working on and we would like her to come with us to the police station to talk
about it. (F22.)


Detective Schalk also described his request somewhat differently in earlier
testimony: "[We told her we wanted] to talk to her regarding the sexual assault she
had reported and regarding a homicide investigation that we were working on." (D
16.) At trial, Detective Bogucki explained: "[W]e asked her if she wouldn't help us
in our investigation of her sexual incident and also that we were looking into a
murder." (S73.)


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 15

Ms. Lindsey testified that she "voluntarily" complied because the three officers told her to accompany them to the station (F88.), and because she believed that the three officers were investigating her rape complaint and wanted her to look at pictures. (F64, F66.) She testified that they did not mention a murder investigation. (F66.) Before leaving, Ms. Lindsey asked if she could get ready, and was able to dress, wash her face and brush her teeth before leaving. (F59, F65.) The officers did not tell her that she did not have to come with them, or that she could come to the station at her convenience. (D15-D16, F23, S73).

*9 Detective Schalk testified that while ostensibly on the way to Area 5 headquarters, as they neared another police station at 11th and State Streets, he asked Ms. Lindsey if the detectives could "take a photograph of her and have her printed, obtain her fingerprints to help us in our investigation." (F24.) The 11th and State Street station is only a couple of blocks away from where Mr. Eiselt and Ms. Hess live. (F26.) Although Ms. Lindsey said that they could stop, she also testified that she was told the picture was for a rapist identifying his victims and the fingerprints were to verify she was a victim. (F66.)

Ms. Lindsey testified that she did not feel free to leave the detectives' company as soon as she arrived at the station if not from the time she was getting ready to leave home:
Q: When did you not feel you were free to leave?
A: Well, I got the feeling when, you could say when I went into the police station. but I got the feeling that I wasn't going home when they were fingerprinting me, that's why I started wining [sic] and asking to go home, you know, but I knew I wasn't able to get up and walk when I got ready. I knew that when I walked in there.

(F 87-88.)

At the suppression hearing, Detective Schalk explained that the purpose of obtaining Ms. Lindsey's photograph was to show it to the elderly couple that claimed to have been in the *10 cab with the victim and an unidentified woman. (F36.) The purpose of the fingerprints was to determine if Ms. Lindsey's fingerprints were in the victim's cab or on the train schedule that had been handed to the elderly couple by the unidentified woman. (F36.) The detectives had no other purpose for this evidence. (F36, S74.)

The Polaroid photograph was taken inside the station in an interview room with all three detectives present. Detectives Schalk and Bogucki then left Ms. Lindsey in the interview room in order to bring the photograph to Mr. Eiselt and Ms. Hess for identification. No detective or officer at any time informed Ms. Lindsey that she was free to leave. (F50.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 16
(Cite as: 1996 WL 33651681)

While Detectives Schalk and Bogucki were away, Ms. Lindsey was fingerprinted by
Detective Halvorsen at the fourth floor identification section of the building (but
not the booking area), and then placed back in the interview room. While being
fingerprinted, she protested and expressed her desire to go home, but her request
went unheeded. (F67, F83.)

Ms. Lindsey testified that at the time she continued to suffer from a lack of sleep
lost over the previous several days:
[W]hen they came and got me, I couldn't hardly see because I had been up from the
time -- from that Saturday until they picked me up Wednesday because I barely got
any sleep because I was constantly going to the washroom every two seconds because
of the medicine they gave me, and I was dropping Tylenols a *11 lot because I had a
real bad toothache in my front tooth, so by the time they came and got me, I
couldn't even see, so when they was fingerprinting me, I was whining saying I wanted
to go home. I couldn't hardly stand up, and I couldn't see. That was it. Like I say,
I didn't get that much sleep, and I had been getting high for about two days, so I
didn't really get any sleep, period, for a week, barely." (M120.)

She also indicated that she had stayed up late watching television the night before
she was brought in. (M141.)

In the meantime, Mr. Eiselt and Ms. Hess each independently selected Ms. Lindsey's
picture from an array of photographs. When Detectives Bogucki and Schalk returned to
Ms. Lindsey, they took her to Area 5 headquarters, located at Grand and Chicago.

                        V. *The Interrogations*

The Detectives and Ms. Lindsey arrived at Area 5 at approximately 1:30 in the
afternoon on October 14, two and a half hours after she was picked up from her home.
Detective Schalk testified that they placed Ms. Lindsey in another interview room at
Area 5, read her the *Miranda* rights and informed her that they wanted to talk to her
about her rape and "the homicide we were investigating that occurred of a cab driver
at O'Hare Airport." (M33.) Ms. Lindsey was willing, but then the detectives informed
her that two witness had identified *12 her as a woman last seen with a cab driver
on the way to O'Hare Airport where the driver was shot and killed. (F41, M34, S85.)

Ms. Lindsey testified that the officers did not read her the *Miranda* rights until
after they handcuffed her in yet another interview room following statements to the
effect that they did not believe her rape story and that she would get the death
penalty. (F71.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                  Page 17
(Cite as: 1996 WL 33651681)

The detectives proceeded to speak with Ms. Lindsey for approximately half an hour in
the interview room. Ms. Lindsey denied killing anyone and retracted her rape
complaint, explaining that she had invented the tale. (M34.) When the idea was
suggested to her, she agreed to take a polygraph test. (M34.) Ms. Lindsey remained
where she was for several hours, apparently because a polygraph exam could not be
arranged immediately. (M34.)

Well more than six hours into her custody, at approximately 6:45 that evening, Ms.
Lindsey was taken from the Area 5 interview room to the polygraph unit back at 11th
and State Streets. The exam concluded at about 10:50 p.m. (M16.) Examiner Robert
Tovar informed Ms. Lindsey that the results indicated deception. (M48, M84.) Ms.
Lindsey first responded by, among other things, indicating that she was in the cab
at O'Hare when some third party shot the victim. (M66, M150.) Examiner Tovar
recalled her saying at one point that she had been in a cab at O'Hare, and had just
been raped or attacked by the victim when she witnessed a third party shoot him.
(W71.) Detective Schalk recalled that, upon questioning, Ms. Lindsey *13 offered
that she had shot the cab driver in self defense when he tried to attack or rape
her. (M67.) Neither the detectives nor examiner Tovar offered testimony on the
matter of whether Ms. Lindsey appeared particularly tired when she made the
statements nearly twelve hours into her custody.

Detective Bogucki returned Ms. Lindsey to an interview room at Area 5 around 12:30
a.m. on October 15, spoke with her for another half hour. Ms. Lindsey continued to
change her story as the detectives discussed with her the substance of each previous
story. (M68.) In some versions Ms. Lindsey was the victim of a kidnapping and rape
which concluded in shooting the cab driver with his own gun in self-defense.
(S89-92.) In other versions, there was an offer of sexual favors in exchange for a
ride, which concluded in her shooting the cab driver when he tried to take her
money. (S99.) The detectives then contacted an Assistant State's Attorney (ASA).
(M50, S101.) ASA Rosenbloom arrived around 1:00 or 1:15 a.m. (M51), and he and the
detectives continued to interrogate Ms. Lindsey until about 5:15 a.m., some 17 hours
into her custody. (M52.)

At 5:15 a.m., Ms. Lindsey was taken to the lockup at the 25th District. (M19.)
However, she continued to have trouble getting rest while in custody. Her only
apparent sleep throughout her experience in pre-presentment custody came in brief
episodes while she was in the interrogation room:
Q: Did you get any sleep while you were in police custody?
*14 A: Yes, a little but, but barely, but [sic] laying on the table for a while
waiting for them for hours and hours to come back and interrogate me again. (M119.)

At 3 p.m. on October 15, Ms. Lindsey was placed in a lineup, at which time Mr.
Eiselt and Ms. Hess identified her again. Ms. Lindsey was informed that she had been
identified again and returned to the interview room. (M52-53.) She had been in
custody for about 27 hours.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Later that evening, at around 6:30 or 7:00 p.m., ASA Julie Nelson reviewed paperwork in the case to prepare for further questioning of Ms. Lindsey. At about 1:00 a.m. on October 16, over 36 hours after Ms. Lindsey was picked up by the police and six days since the beginning of her cocaine binge and sleeplessness, ASA Nelson and Detectives Schalk and Bogucki reentered the interview room to question Ms. Lindsey. ASA Nelson testified at the suppression hearing that she re-issued *Miranda* warnings and that Ms. Lindsey waived them. The questioning proceeded for several hours. (M89.) At trial Ms. Lindsey testified that, at one point in the questioning, ASA Nelson specifically denied her the right to counsel. (V195.)

Over the course of all the questioning, Ms. Lindsey told five or six different stories, revising her story in response to the questioning. (M40-M41, P96.) Ms. Lindsey testified without specific rebuttal that the material details came as a consequence of the questioning or prompting by the detectives and ASAs, including the precise location of the scene *15 of the crime (M150), the date of the homicide (S94), the nonexistence of a third-party shooter (M150), the existence or nonexistence of an attempted sexual assault by the victim (M154), her hailing the cab in Joliet (M149), and the sharing of the ride with an elderly couple. (M150, 154.) Details in her various stories, such as her leaving her purse and the gun at the scene (S92), were innocuously inconsistent with the known facts and inconsistent with the trial court's conclusion that Ms. Lindsey confessed from independent knowledge. In closing, the State acknowledged the inconsistencies by terming them "lies." (Z40.)

At the suppression hearing, ASA Nelson testified that Ms. Lindsey did not appear to be on drugs but no testimony was offered on whether Ms. Lindsey was simply exhausted. At trial, ASA Nelson did testify that, notwithstanding almost two full days of detention spent primarily in an interview room, Ms. Lindsey never indicated she wished to discontinue the questioning because she was tired or that she was confessing because she was tired of the questioning. (W46.)

Once the interrogators ceased their questioning, ASA Nelson gave Ms. Lindsey the options of signing a confession hand-written by ASA Nelson which Ms. Lindsey could review, having the confession recorded in question-answer format by a stenographer, or leaving the confession recorded as it was in ASA Nelson's notes without an opportunity to review the notes. (M89-M90.) Ms. Lindsey chose the hand-written option. (M90.) At 4:10 a.m. on October 16, ASA Nelson returned to the interview *16 room with the detectives and the confession she had drafted. Ms. Lindsey read the first few lines of the statement aloud, and then ASA Nelson read the remainder of the statement aloud in Ms. Lindsey's presence. Each page was signed by Ms. Lindsey, ASA Nelson, and the detectives. (M90-93; App. A 68.) Ms. Lindsey had been in custody for no less than 40 hours.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 19

### VII. *Pretrial Motions*

Ms. Lindsey filed four basic pretrial motions. She filed a motion to suppress statements as involuntary (App. A 54); a motion to suppress evidence as the fruits of an arrest without probable cause (App. A 50); a motion for appointment of an investigator (App. A 61); and more than one motion to withdraw counsel and have a public defender appointed to her case. (App. A 58, A 76-77).

#### A. *The motion to suppress statements as involuntary.*

Ms. Lindsey alleged that medication prescribed as a result of her rape complaint combined with the Tylenol she took for a toothache caused dehydration, leading her to consume excess liquids and ultimately to lose sleep due to her need to urinate. This lack of sleep, coupled with coercive statements and conduct by her investigators, rendered her incriminating statements and confession involuntary. Among the coercive comments she alleged were allegations that she requested and was denied counsel, that she was told the police will decide if she gets a lawyer, and that she was prevented from contacting anyone other than her interrogators while she was in custody. (App. A 54-56.)

**\*17** The trial court determined that these last allegations were of *Miranda* violations. Under the erroneous understanding that the defendant bore the burden of proof on *Miranda* violations, the trial court refused to consider these allegations in conjunction with the motion to suppress statements as involuntary. He correctly noted that the State bears the burden of proving that a defendant voluntarily confessed. (M4-M6; App. A 26-28.)

With regard to the other allegations, the trial court found that the statements and signed confession were voluntary because he did not believe Ms. Lindsey's medication could cause the effects Ms. Lindsey testified to or that Ms. Lindsey was under the influence of any drugs at the time she confessed. The trial court did not make any specific findings on coercive statements by the investigators, implicitly rejecting such testimony. (N24-N29, App. A 29-34.)

#### B. The motion to suppress evidence as fruit of an *arrest without probable cause.*

Ms. Lindsey alleged that her confession, fingerprints and the Hess and Eiselt identifications should be suppressed as the fruit of an illegal arrest. The trial court did not make a specific finding of when Ms. Lindsey was first in custody for the purposes of the Fourth Amendment; rather, he ruled that Ms. Lindsey had accompanied the detectives voluntarily at least until after the Polaroid picture was taken. Because Ms. Lindsey had volunteered for the Polaroid photograph, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                    Page 20
(Cite as: 1996 WL 33651681)

detectives had probable cause to hold her from that time on. The trial court also
appeared to hold that the inevitable discovery doctrine *18 applied. The motion to
suppress was denied and no evidence was suppressed, although the fingerprints were
not introduced as evidence at trial. (App. A 15.)


    C. The motions to withdraw as counsel and for *appointment of a public defender.*


Ms. Lindsey, both through counsel and acting *pro se*, filed three motions for her
retained counsel to withdraw and for appointment of a public defender. On September
21, 1993, defense counsel orally moved to withdraw as counsel for Ms. Lindsey.
Defense counsel's grounds for the motion were Ms. Lindsey's inability to pay his fee
and lack of cooperation from her family. (C1-C3). The trial court denied the motion
because the case had been on call for one year and Ms. Lindsey, through counsel, had
obtained four previous motions for continuance.


On February 14, 1994, Ms. Lindsey issued a handwritten letter to the trial court
expressing profound dissatisfaction with defense counsel and profound neglect of the
case by defense counsel. (CR35, App. A 76-77.) She requested the appointment of a
public defender because she no longer wanted her retained counsel to represent her
and she could not afford to retain anyone else. The trial court never addressed this
*pro se* motion for substitution of counsel.


On June 28, 1994, Ms. Lindsey, through defense counsel, filed a written motion for
withdrawal of retained counsel. The motion cited Ms. Lindsey's and her family's
desire that retained counsel no longer represent Ms. Lindsey, an inability to afford
retained counsel, and counsel's inability to adequately defend Ms. Lindsey without
additional funds for *19 non-legal services such as an investigator. (CR53-CR54;
App. A 76-77.) Ms. Lindsey's affidavit stated that she had no specific complaint
against trial counsel. (App. A 60A-B.) The motions were denied because the trial
court determined that the fees problem was not a basis for withdrawal and the court,
on a motion supported by affidavit, could order Ms. Lindsey in custody to be
accompanied by officers to any location where an alibi witness might be found.
(L7-L13; App. A 35.)


                              VIII. *Trial*


The State's case at trial hinged on Ms. Lindsey's confession and the eye-witness
identifications. In defense, Ms. Lindsey again contended that her confession was
involuntary. She testified that she confessed primarily as a consequence of
exhaustion and the prompting of her interrogators. Ms. Lindsey also presented an
alibi defense. Several friends and family members testified that Ms. Lindsey went to
lunch and shopped at Walgreens and Venture sufficiently near the alleged time of Mr.
Bennett's homicide that she could not have been his killer. Defense counsel made

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                          Page 21
(Cite as: 1996 WL 33651681)

some attempts to impeach the eye-witness identifications, primarily on the grounds
that Ms. Lindsey's weight did not fit the profile provided by the witnesses to the
police.

## IX. *Verdict and post-trial proceedings*

On February 10, 1995, the trial court found Ms. Lindsey guilty of armed robbery and
murder. The trial court found the confession convincing and the eye-witness **20**
identifications strong. He rejected the alibi defense entirely. (Z59-Z67; App. A
42.)

At the March 27, 1995 hearing on the post-trial motions (CR85), defense counsel
preserved his pretrial motions. He then offered documentary evidence of Ms.
Lindsey's weight from around the time of Mr. Bennett's homicide indicating that Ms.
Lindsey weighed some 40 pounds more than the profile. (AA3.) Defense counsel also
contended that the confession was inconsistent with murder and armed robbery because
Ms. Lindsey confessed to shooting Mr. Bennett after he grabbed her by the arm and
throat, and because she confessed to taking the wallet as an afterthought. The Court
found the difference in weight immaterial, and accepted as much of the confession as
was consistent with murder and armed robbery. On sentencing, the State requested the
death penalty. The trial court sentenced Ms. Lindsey to 45 years incarceration.
(AA3-AA29; App. A 2.)

### **21** ARGUMENT

## I. THE TRIAL COURT ERRED IN RULING THAT MS. LINDSEY'S *CONFESSION WAS VOLUNTARY*

Ms. Lindsey's incriminating statements and the written confession -- signed more
than 40 hours after she arrived at the 11th and State Street station -- were
involuntary. When a defendant moves to suppress a confession as involuntary, "[t]he
State bears a heavy burden of establishing that a statement was knowingly,
intelligently and voluntarily made.... The test to determine whether a confession is
voluntary is whether the accused's will was overborne at the time [s]he confessed."
*People v. Kincaid, 87 Ill.2d 107, 116, 57 Ill.Dec. 610, 429 N.E.2d 508, 511 (1981).*
A court considers the totality of all the relevant circumstances. *In re Lamb, 61
Ill.2d 383, 388, 336 N.E.2d 753, 756 (1975),* cert. denied, *425 U.S. 938 (1976).* The
trial court's finding must be reversed if it is contrary to the manifest weight of
the evidence. *Id.*

Because the trial court resolved the conflicting testimony against Ms. Lindsey, the
reviewing court must analyze the issue by accepting as true the testimony of the
State's witnesses and the uncontroverted testimony of the defendant. *People v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_House,_ 141 Ill.2d 323, 370, 152 Ill.Dec. 572, 593, 566 N.E.2d 259, 282-83 (1990);
_People v. Williams,_ 230 Ill.App.3d 761, 777, 172 Ill.Dec. 445, 595 N.E.2d 1115, 1126
(1st Dist.), _app. denied,_ 146 Ill.2d 649, 176 Ill.Dec. 819, 602 N.E.2d 473 (1992).


In this case, the trial court applied an improper analysis, and its determination
that Ms. Lindsey's statements **22** were voluntary was against the manifest weight of
the evidence properly considered. Part A below demonstrates that the trial court
improperly applied the burden of proof on certain allegations and failed to consider
the totality of the circumstances. Part B explains how the court improperly weighed
one of the most important factors in the totality of Ms. Lindsey's circumstances--
the prolonged nature of her detention. Part C demonstrates that the trial court
improperly rejected Ms. Lindsey's testimony to a reaction to medication, based in
part on facts not in evidence. Part D demonstrates that, under a proper application
of the totality of the circumstances test, Ms. Lindsey's confession was involuntary.
Part E explains that the judgment of conviction should be reversed because there is
insufficient evidence to sustain the conviction without the involuntary statements.


> A. Trial Court Improperly Addressed the Burden of Proving Allegations of _Miranda_
> Violations and Improperly Severed Coercive _Miranda_ Violations From The _Motion To_
> _Suppress Statements._


Ms. Lindsey's motion to suppress statements alleged that the incriminating
statements she made while in custody and the confession she signed while in custody
were involuntary because she was suffering from a reaction to her medication and
because her interrogators had coerced her with promises, threats and suggestions.
Her coercion allegations included what the Court deemed _Miranda_ violations. The
trial court erroneously determined that the defendant bears the burden on
allegations of _Miranda_ violations, and then improperly refused to consider how those
allegations might bear on the voluntariness issue.


**23** Ms. Lindsey alleged in paragraph 12 of the motion that the coercive statements
included the comments in response to her invocation of the right to counsel that "we
[the police] won't give you a lawyer" and "I [policeman] decide if you get a
lawyer." (CR36-CR43; App. A 54 ¶ 12.) Paragraph 13 alleged that the police refused
to allow Ms. Lindsey to make any telephone calls to her family and friends.
(CR36-CR43; App. A 54 ¶ 13.)


The trial court decided that only paragraphs six, ten, eleven and fourteen related
to coercion, or at least to fundamental Fifth Amendment violations. (M4-M6, App. A
26.) He determined that the other allegations, which must include those in
paragraphs 12 and 13, regarded _Miranda_ violations. Because he believed the burdens
were different for suppressing on the basis of _Miranda_ versus on the basis of
coercion, the trial court split the motion in two and decided to rule on each issue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 23

separately:
.... If it is Miranda versus Arizona, the Defendant has the obligation to go
forward. If it is a fundamental 5th Amendment kind of motion, the State has the
burden of going forward.
.... You have two different kinds of motions wrapped in one pleading. That is,
first, there is the fundamental 5th Amendment violation where the will of the
Defendant is overcome by these coercive tactics or misrepresentations, fraud. That
is a motion separate and distinct from a Miranda versus *24 Arizona violation. The
burdens are different, for example. That is, the State has the burden of going
forward if it is a fundamental 5th Amendment violation, coercion, fraud, overcoming
the will. If it is a Miranda versus Arizona violation, the Defense has the burden of
going forward.


(M5,M6; App. A 26.)


As described below, (1) the trial court was wrong in its assessment of the burdens;
(2) the trial court improperly severed the Miranda violations from the other
allegations of coercion; and (3) these errors cannot be cured on appeal by reference
to the trial record.[FN2]


     FN2. Following the conclusion of the voluntariness motion, Ms. Lindsey elected
     not to pursue a free-standing Miranda motion. (N29.)
1. The State carries the burden of going forward once the defendant raises the issue
                       of compliance with Miranda.


Contrary to the trial court's ruling, the State, not the defendant, has the burden
of putting on evidence and establishing compliance with Miranda once the defendant
raises the issue. People v. Reid, 136 Ill.2d 27, 51, 554 N.E.2d 174, 185, 143
Ill.Dec. 239, 250 (1990); People v. Allen, 148 Ill.App.3d 200, 203, 101 Ill.Dec.
514, 498 N.E.2d 838 (1st Dist. 1986); 725 ILCS 5/114-11(d). Because the trial court
believed the defendant carries the burden on allegations that the State failed to
comply with Miranda, its analysis of the evidence is fatally flawed.


*25 2. The trial court failed to consider the Miranda allegations when it considered
                       the other allegations of coercion.


The trial court erred when it severed the allegations that the interrogators
violated Miranda from the remainder of the motion to suppress statements as
involuntary. Contrary to the trial court's statements, compliance with Miranda bears
directly on the question of voluntariness. Oregon v. Elstad, 470 U.S. 298, 305-310,
105 S. Ct. 1285, 84 L.Ed.2d 222 (1985); Michigan v. Tucker, 417 U.S. 433, 94 S. Ct.
2357, 41 L.Ed.2d 182 (1974); 18 U.S.C. § 3501(B). The alleged refusals to honor Ms.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lindsey's invocation of the right to counsel qualify as coercive conduct designed to overcome the will of the accused in violation of the Fifth Amendment. *See Elstad,* 470 U.S. at 30911 (distinguishing "noncoercive *Miranda* violations" from methods that "undermine the suspect's will to invoke his rights once they are read to him").

Furthermore, here the State introduced evidence that Ms. Lindsey was read her *Miranda* rights in order to establish that Ms. Lindsey confessed with knowledge of her rights and free of compulsion. (M33, M46, M54, M88.) Ms. Lindsey was not allowed to rebut that testimony with evidence that, although she was read her *Miranda* rights, she was denied one of the rights read to her. (M121.) Hence, even if the mere failure to administer warnings is not in itself a violation of the Fifth Amendment, *Elstad,* 470 U.S. at 306 n.1., coercive *Miranda* violations logically cannot be severed from a motion grounded in the Fifth Amendment.

**\*26** In addition, the trial court improperly struck from the motion paragraph 13, regarding holding Ms. Lindsey incommunicado. Holding a defendant incommunicado is a classic form of coercion. *Haley v. Ohio,* 332 U.S. 596, 68 S. Ct. 302, 92 L.Ed 224 (1948); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S. Ct. 921, 88 L.Ed. 1192 (1944).

By considering only those allegations in the motion the trial court deemed unrelated to compliance with *Miranda,* the trial court shut its ears to some of the critical circumstances within the totality of circumstances that determine whether a confession was voluntary. Therefore, the trial court did not rule on the motion to suppress based on the totality of the circumstances. The motion was improvidently denied because the trial court applied an incorrect test. *See In re Lamb,* 61 Ill.2d at 388, 336 N.E.2d at 756 (totality of the circumstances test applies to motion to suppress statements as involuntary).

3. *Review of the record on appeal cannot cure the errors.*

The trial court's refusal to consider all of Ms. Lindsey's allegations before denying the suppression motion cannot be cured on appellate review because the trial court used the wrong standard and the record will not otherwise permit affirmance of the trial court's result.

Where the trial court specifically refuses to consider the totality of the circumstances and denies a motion to suppress statements as involuntary, the appellate court must vacate the judgment. *People v. Koesterer,* 44 Ill.App.3d 468, 479, 3 Ill.Dec. 128, 358 N.E.2d 295, 304 (5th Dist. 1976) **\*27** (failure to consider evidence of drug usage constituted a failure to consider the totality of the circumstances).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 25

"Moreover, unless we can say on the record before us that the confession was not voluntary, we should remand this cause for the circuit court to re-determine the voluntariness issue under the appropriate standards." *Id.* (declining to remand because the record revealed that the confession was involuntary).

Furthermore, the trial court below decided not to consider certain allegations before any evidence was heard. The record is incomplete. Hence, authorities such as *People v. Allen,* 148 Ill.App.3d at 204, 498 N.E.2d 840-41 and *People v. McClure,* 43 Ill.App.3d 1059, 1061-62, 3 Ill.Dec. 23, 358 N.E.2d 23 (1st Dist. 1976) are not to the contrary. In those cases, the reviewing courts found the errors in determining whether *Miranda* rights had been waived were cured by "convincing testimony" on a complete record at trial. Note also that where the question is whether a statement was involuntary under the Fifth Amendment totality of the circumstances test, the appellate court must vacate and remand the issue unless the evidence that is in the record requires a finding that the confession was *not* voluntary. *Koesterer,* 44 Ill.App.3d at 479, 358 N.E.2d at 304.

Even if the Court were to review Ms. Lindsey's trial for "convincing testimony" favoring the State, the record would reveal an absence of such "convincing testimony" where evidence of coercive *Miranda* violations managed to pass into the record without objection. For instance, Ms. Lindsey testified at trial *28 that ASA Nelson specifically refused her a lawyer. (V 150.) ASA Nelson, who questioned Ms. Lindsey for a period outside of the presence of the detectives, did not testify at trial to the contrary. While ASA Nelson did testify at the suppression hearing that Ms. Lindsey waived her rights, the trial court's ruling necessarily prevented Ms. Lindsey from cross examining ASA Nelson on the issue.

Ms. Lindsey should not be denied her entitlement to a fair hearing in which all the underlying factual issues bearing on the voluntariness of a confession are actually and reliably determined. *See Jackson v. Denno,* 378 U.S. 368, 380, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964). "Appellate review is an inadequate substitute for a full and reliable determination of the issue of voluntariness by the trial court." *People v. Ralon,* 211 Ill.App.3d 927, 948, 156 Ill.Dec. 266, 570 N.E.2d 742, 756 (1st Dist. 1991).

    B. The Trial Court Improperly Discounted the *Prolonged Detention.*

In addition to the trial court's failure to consider the totality of the circumstances, the trial court's analysis of those factors it did consider was improper. One of the most coercive factors in the totality of Ms. Lindsey's circumstances was the amount of time she was held before she signed the written confession. The trial court improperly discounted the effect of this delay when he found the delay was justified by the need to continue interrogating Ms. Lindsey.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(N28, Z-62.)


Because Ms. Lindsey was arrested without a warrant, the State was required under the Fourth Amendment to provide her *29 with a prompt determination of probable cause by a neutral, detached magistrate. _Gerstein v. Pugh, 420 U.S. 103, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975); People v. Williams, 230 Ill.App.3d at 779, 595 N.E.2d at 1127._ A presentment may not constitutionally be delayed at any point simply for the purpose of gathering more evidence to support an arrest. _County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L.Ed.2d 49, 63 (1991); United States v. Wilson, 838 F.2d 1081, 1084-86 (9th Cir. 1988)._ The failure to promptly present a suspect is a factor to consider in determining the voluntariness of a statement. _People v. House, 141 Ill.2d 323, 380, 152 Ill.Dec. 572, 597, 566 N.E.2d 259, 284 (1990)._ Although providing this hearing within 48 hours _generally_ satisfies this constitutional requirement, presentment within 48 hours does not _per se_ satisfy due process. _McLaughlin, 500 U.S. at 56._


Some 40 hours after she was taken into custody on October 14, Ms. Lindsey signed a written confession in the early morning hours of October 16. She did not have her presentment until court call sometime later on October 16. (CR14.) The trial court found that Ms. Lindsey's prolonged detention was justified because Ms. Lindsey is difficult to understand and because she was a rape complainant as well as a possible innocent witness. (N28, Z-62).[FN3] But because the need to gather the kind of evidence to sort out such matters is not a *30 reasonable grounds for delaying presentment, _McLaughlin, 500 U.S. at 56,_ the trial court necessarily failed to properly consider how the prolonged detention bore on the voluntariness of Ms. Lindsey's incriminating statements and final confession extracted over the course of her two day pre-presentment detention. _See People v. House, 141 Ill.2d at 380, 152 Ill.Dec. at 597, 566 N.E.2d at 284_ (delay of presentment a factor to consider in the totality of the circumstances).


> FN3. This finding disregards that Ms. Lindsey was clearly in custody by the evening of October 14 and had been placed in the lock-up in the early morning hours of October 15.


If the trial court was correct in ruling that the detectives had probable cause no later than by 1:30 p.m. in the afternoon on October 14 following Ms. Lindsey's arrest, then Ms. Lindsey was available for presentment at court call on October 15 if not on the very afternoon of her arrest. Constitutional or not, this delay maintained Ms. Lindsey in a coercive environment for an extensive period and prevented Ms. Lindsey from seeing and hearing a neutral and detached party explain her fundamental rights before she signed her final confession if not before she uttered a single incriminating word. This prejudiced her regardless of a waiver of those rights in the context of a coercive environment. _See Wilson, 838 F.2d at 1087_ ("If unreasonable delay in excess of six hours can itself form the basis for a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 27

finding of involuntariness [[of the confession], that same delay may also suggest involuntariness of the *Miranda* waiver.").

**\*31** C. The Trial Court Improperly Relied On His Own Opinions To Reject Evidence Of The Effect Of *Medication.*

The trial court rejected Ms. Lindsey's testimony concerning the side effects from her medication, based in part on facts not in the record. Deliberations of the trial court are generally limited to the facts in the record. See *People v. White,* 183 Ill.App.3d 838, 840, 539 N.E.2d 456, 458 (3d Dist. 1989) (it was plain error for judge to rest verdict in part on determination that cut on victim's arm was not the type of cut that would result from falling on a broken bottle). Courts may take judicial notice of matters which are commonly known or, if not commonly known, are readily verifiable from sources of indisputable accuracy. *Murdy v. Edgar,* 103 Ill.2d 384, 394, 83 Ill.Dec. 151, 469 N.E.2d 1085 (1984).

Ms. Lindsey testified that the combination of medications she took as a consequence of the visit to the hospital and for a tooth ache caused dehydration, consumption of excess liquid, and consequently a constant need to urinate even while she tried to sleep. The State offered no evidence to the contrary, nor did the State contest Ms. Lindsey's position. Nonetheless, the trial court rejected Ms. Lindsey's testimony because he did not believe the pharmaceuticals were "that kind of medicine." (N27; App. A 32)

Although the trial court did not state it was taking judicial notice, the ruling had the practical effect of judicial notice of a medical fact. Ms. Lindsey never testified unequivocally to what medication she was prescribed, although **\*32** she thought it might have been Tetracycline, an antibiotic. (M119-120, M137.) The trial court committed plain error in rejecting Ms. Lindsey's testimony on medical grounds without knowing with any degree of certainty what she had been prescribed at the hospital. *People v. White,* 183 Ill.App.3d at 840, 539 N.E.2d at 458.

D. The Totality Of The Circumstances Demonstrates *That Ms. Lindsey's Statements Were Involuntary.*

In ruling in favor of the State, the trial court necessarily credited the testimony of the State's witnesses where evidence contradicted Ms. Lindsey's. The totality of the circumstances, even as related in the testimony of the State witnesses and the unrebutted testimony of Ms. Lindsey, nevertheless warrants reversal of the trial court's voluntariness finding as contrary to the manifest weight of the evidence.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Although the trial court credited the testimony of the State witnesses that Ms. Lindsey did not appear to be under the influence of any drugs, Ms. Lindsey's testimony that she entered custody without having had much sleep over the prior few days stands unrebutted. Once in custody, she was held primarily in an interview room that cannot be considered a place conducive to rest. She was placed in lock-up for only eight hours during normal waking hours-- a time which is not conducive to rest. Consequently, she was unable to get meaningful rest while detained. Indeed, she was primarily interrogated during normal sleeping hours. Her incriminating statements and confession arose at late-night and early-morning questioning sessions *33 (between 10:50 p.m. and 5:15 a.m. on October 14-15 and between 1:00 a.m. and 4:10 a.m. on October 16).

ASA Nelson's testimony that Ms. Lindsey did not *say* she was confessing because of exhaustion fails to sufficiently or directly rebut the evidence that Ms. Lindsey was not afforded a reasonable opportunity sleep while in custody and got little sleep prior to her pre-presentment custody. A defendant should not be required to protest specific sources of coercion where the state has the burden of proving the statement was voluntary. The state never offered evidence on the question of whether Ms. Lindsey previously made such protests or how any such protests were addressed by the interrogators.

Although the testimony is unclear, the various interrogation sessions appeared to last from fifteen minutes to several hours each. Ms. Lindsey was held in custody for a total of over 40 hours before she signed a written confession, and she did not receive her presentment until sometime after she signed the confession.

She was held for the sole purpose of extracting incriminating identifications and statements: a Polaroid picture was taken in a small room surrounded by officers; she was submitted to fingerprinting where her pleas for release were denied; she submitted to polygraph exam; she was placed in a line-up; she was interrogated. Finally, at least some of her testimony at trial that she was denied counsel went unrebutted. (V 150.)

*34 Although *People v. Williams*, 230 Ill.App.3d at 778, 595 N.E.2d at 1127, suggested that prolonging a detention alone will not establish coercion unless the suspect is particularly susceptible to coercion, Ms. Lindsey was prone to suggestion. In addition to suffering from sleep deprivation dating from before she entered custody, she had no prior experience with the criminal justice system and the trial court specifically found that she has difficulty expressing herself. (N28.) The testimony at trial and at the suppression hearing indicated that Ms. Lindsey's signed confession was the product of a series of incriminating statements successively amended in response to information prompted by the detectives whenever Ms. Lindsey offered a story inconsistent with the detectives' knowledge of events. (M40-M41, P96, M150, M149, M154.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

While the trial court necessarily found that Ms. Lindsey was not the subject of
those specific incidents of coercive conduct entered into the record and rebutted by
the State, the trial court never considered the allegations of coercive *Miranda*
violations or of Ms. Lindsey being held incommunicado. The overwhelming weight of
the undisputed evidence warrants suppression. On balance, the totality of the
circumstances demands a finding that Ms. Lindsey's statements were not freely
offered.

   E. There is insufficient evidence to sustain the conviction without the involuntary
                         statements *and confession.*

Ms. Lindsey's judgment of conviction should be reversed because there is
insufficient evidence to sustain the **\*35** conviction once the involuntary statements
are excluded. Where the record on appeal reveals that not only the motion to
suppress statements should have been granted but also that without the evidence of
the statements there is insufficient evidence to sustain the conviction, the
judgment of conviction must be reversed. *Koesterer, 44 Ill.App.3d at 480, 358 N.E.2d
at 305.*

With the incriminating statements and confession suppressed as involuntary, the only
other evidence arguably implicating Ms. Lindsey in the homicide of Mr. Bennett are
the Hess and Eiselt identifications and the bizarre, fabricated rape and stabbing
complaint. The trial court found that the Hess and Eiselt identifications placed Ms.
Lindsey at O'Hare Airport near the time of the homicide. Even assuming that the
scene of the crime could properly be defined as broadly as O'Hare Airport, Ms.
Lindsey's presence at O'Hare fails to amount to sufficient evidence to convict her
of murdering and robbing Mr. Bennett. *See People v. Howard, 74 Ill.App.3d 870, 877,
30 Ill.Dec. 737, 393 N.E.2d 1084, 1090 (2d Dist. 1979).* Ms. Lindsey's report that
she stabbed a cab driver in self-defense in Joliet on October 11 hardly fills the
void in the charge that she shot and killed Mr. Bennett at O'Hare Airport on October
9. *See id.* (arguably incriminating statement by defendant did not cure the
insufficiency in proofs where the only other evidence was that the defendant was at
the scene).

**\*36** II. THE TRIAL COURT ERRED IN FINDING THAT MS. LINDSEY'S POLAROID IDENTIFICATION,
   FINGERPRINTS, LINE-UP IDENTIFICATION, AND CONFESSION WERE NOT THE *FRUIT OF AN
                         ILLEGAL ARREST.*

As shown on Part I, the trial court should have granted Ms. Lindsey's motion to
suppress statements as involuntary. Even if this Court affirms the denial of that
motion, the statements and other evidence should have been suppressed for the reason
stated in Ms. Lindsey's other motion to suppress-- that the Polaroid identification
of Ms. Lindsey, her fingerprints, the line-up identification, her statements and her
signed confession were fruits of an arrest without probable cause. It was manifest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                              Page 30
(Cite as: 1996 WL 33651681)

error for the trial court to fail to suppress this evidence. *People v. Vega*, 203
Ill.App.3d 33, 44, 148 Ill.Dec. 386, 560 N.E.2d 983 (1st Dist. 1990) (evidence
obtained through an illegal arrest must be suppressed).

Evidence must be suppressed where it was obtained by exploitation of the illegality
of an arrest or seizure. *See Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45
L.Ed.2d 416 (1975). It is a violation of the Fourth Amendment to seize and question
an individual in custody on less than probable cause. *Dunaway v. New York*, 442 U.S.
200, 99 S. Ct. 2248, 60 L.Ed.2d 824 (1979). Where the trial court's ruling on a
motion to suppress was manifestly erroneous, the reviewing court must reverse the
decision. *People v. Reynolds*, 94 Ill.2d 160, 165, 68 Ill.Dec. 122, 445 N.E.2d 766
(1983).

Part A of this section describes how Ms. Lindsey was in custody within the meaning
of the Fourth Amendment by the time her Polaroid picture was taken. Part B
demonstrates that **37** the detectives lacked probable cause to detain Ms. Lindsey for
that photograph. Part C describes how, even if Ms. Lindsey was not in custody by the
time the Polaroid picture was taken, the identifications from that photograph did
not provide probable cause for arresting Ms. Lindsey. Part D demonstrates that,
because Ms. Lindsey was in custody without probable cause, all the evidence employed
to convict her should have been suppressed as fruit of an illegal arrest. Part E
explains that the trial court's alternative reliance on the inevitable discovery
doctrine will not rescue the evidence for the State.

   A. Ms. Lindsey was in Custody by the Time the *Detectives Took the Polaroid*
                                  *Photograph.*

The test for determining whether an individual is in "custody" within the meaning of
the Fourth Amendment is whether "in view of all the circumstances surrounding the
incident, a reasonable person would have believed that he was not free to leave."
*People v. Vega*, 203 Ill.App.3d at 41, 569 N.E.2d at 989 (citing *Michigan v.
Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L.Ed.2d 565 (1988)).

Factors favoring a finding that an individual was in custody within the meaning of
the Fourth Amendment include: questioning that takes place away from home; a failure
to disclose that the individual can leave; a failure to disclose that the individual
can choose whether she goes to the police station in the squad car or on her own;
the number of officers present or a show of force or authority; a request to produce
evidence; no independent means of departure; and the individual's inexperience with
the criminal justice system. **38** *See, e.g., People v. Vega*, 203 Ill.App. at 41-42,
569 N.E.2d at 989-90 (noting these and similar factors); *People v. Townes*, 91 Ill.2d
32, 38, 61 Ill.Dec. 614, 435 N.E.2d 103, 104-05 (same), *cert. denied*, 459 U.S. 878
(1982).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 31

An individual's voluntary cooperation with the police generally supports a finding that the person was not in custody. *See* Wayne R. LaFave, *Search and Seizure §* 5.1(a), 4-5 (3d ed. 1996). For a defendant to have voluntarily accompanied the police requires consideration of the same factors as are considered in the consensual search context. *Id.* at § 5.1(a), at 5 & n.23. Voluntariness in the consensual search context turns on whether the consent was freely and intelligently given. *See, e.g.,* People v. White, 117 Ill.2d 194, 227, 111 Ill.Dec. 288, 512 N.E.2d at 687, 690 (1987), cert. denied, 485 U.S. 1006 (1988) ("consent" to enter home for warrantless arrest obtained by "subterfuge"). Consensual cooperation derived from coercive, ambiguous or deceptive circumstances lacks the willingness element of voluntariness. *See, e.g., id.;* People v. Townes, 91 Ill.2d 32, 61 Ill.Dec. 614, 435 N.E.2d 103, 104-05 (1982) (suspect's cooperation obtained in coercive environment); LaFave, *Search and Seizure § 8.2(i),* 688 & n.243.

The trial court found Ms. Lindsey was not in custody until sometime after her picture was taken, relying heavily on Ms. Lindsey's own testimony that she voluntarily complied with the officers' requests. Subpart 1 explains that an objectively reasonable person in Ms. Lindsey's position would have realized she was not free to leave her police escort by the time the **39** detectives took her picture. Subpart 2 explains that Ms. Lindsey's cooperation was not, in fact, freely consensual under the circumstances.[FN4]

> FN4. This follows whether Ms. Lindsey's testimony (that she cooperated because she was affirmatively mislead by the officer's stated intentions) or the officers' testimony (that they disclosed a dual purpose to their investigation) is believed, because any consent to a Fourth Amendment seizure was not knowing or free in either event.

1. Ms. Lindsey Was in Custody Within the Meaning of the Fourth Amendment Before She Provided Any *Evidence.*

The totality of circumstances makes clear that Ms. Lindsey was in custody within the meaning of the Fourth Amendment before she provided any evidence later used against her. Three detectives arrived at Ms. Lindsey's home on the morning of October 14 seeking Ms. Lindsey's cooperation in the investigation of Mr. Bennett's homicide. Ms. Lindsey was not questioned at her home. She was not given the choice of arranging her own transportation to the police station. She was not told that she was free to refuse to come in at all. She rode in the squad car with two officers in the front seat and one in the back seat next to her. She had no prior experience with law enforcement.

In the close confines of the squad car, the officers asked Ms. Lindsey if she would permit them to take her picture and fingerprints "to assist in their investigation." The question was posed as the squad car approached the police station located at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                    Page 32
(Cite as: 1996 WL 33651681)

11th and State Streets, although the detectives were ostensibly on the way to Area 5
headquarters. *40 The 11th and State Street station is only minutes away from the
home of the two eyewitnesses, Mr. Eiselt and Ms. Hess. Ms. Lindsey was not advised
that she did not have to comply with the request for evidence.

Ms. Lindsey was then escorted to a small, barren interview room. All three
detectives were present when Ms. Lindsey was photographed. During the
fingerprinting, the police refused to acknowledge Ms. Lindsey's active pleas to take
her home, and the fingerprinting occurred immediately after the Polaroid photograph
was taken. The photograph and fingerprints were asked for at the same time, and each
piece of evidence had the same potential for evidencing her presence in the victim's
cab. Ms. Lindsey was no more free to leave at the time of the Polaroid than at the
time of the fingerprinting. Indeed, Ms. Lindsey testified that she felt she was not
free to leave when she was escorted to the stationhouse doors. (F 87-88)

Under a totality of the circumstances, an objectively reasonable person in Ms.
Lindsey's position would not have felt free to part company with the detectives that
had so limited her options and then requested she produce evidence. In this way, her
circumstance presents facts very similar to the facts in *People v. Vega,* 203
Ill.App.3d at 41-42, 560 N.E.2d at 989-90. In *People v. Vega,* the defendant had
little experience with the criminal justice system, was given few choices by the
police when they obtained his cooperation in accompanying them to the station, and
was asked in a coercive environment to provide evidence that might incriminate him.
The evidence in *People v. Vega* was suppressed as fruit of an illegal arrest. *See
id.; see also, People v. Townes,* 91 Ill.2d at 38-39, 435 N.E.2d at 104-105
(suppressing evidence voluntarily provided after suspect came to police station
because totality of circumstances revealed he was in custody without probable
cause).

    2. Ms. Lindsey's Cooperation Was The Product of *Deceptively Ambiguous and Coercive
                                Circumstances*

In finding that Ms. Lindsey was not in custody when she was photographed, the trial
court relied upon Ms. Lindsey's testimony that she voluntarily accompanied the
officers from her home and voluntarily provided them evidence because she believed
they were investigating her rape complaint. (App. 15-19.) The trial court erred
because Ms. Lindsey's mistaken belief was, at least, the product of deceptive
circumstances which preyed upon her exhausted state of mind and inexperience with
the criminal justice system. As such, Ms. Lindsey's voluntary cooperation was not a
free and knowing choice within the meaning of the Fourth Amendment. *See United
States v. Phillips,* 497 F.2d 1131, 1133 (9th Cir. 1974) (where consent by subterfuge
was unknowing consent and not equivalent to voluntary cooperation).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                    Page 33
(Cite as: 1996 WL 33651681)

The detectives' own testimony reveals descriptions of their "investigation" that
were deceptively coercive for what was not said. Detective Schalk explained that the
three officers arrived at Ms. Lindsey's home and explained to her that they wanted
"to talk to her regarding the sexual assault she had reported and regarding a
homicide investigation that we were working on." (D 16.) However, he also described
the request as follows: "I told her we were detectives with the Chicago *42 Police
Department, we would like her to talk to her regarding her sexual assault and
homicide investigation that we were working on and we would like her to come with us
to the police station to talk about it." (F22.) (emphasis added). Ms. Lindsey
testified that she understood that the officers were investigating her fabricated
rape complaint-- a complaint which concluded with her defensive stabbing of the
assailant in the chest with a pocketknife.

By suggesting to Ms. Lindsey that her cooperation was sought in "her investigation,"
the detectives diminished the likelihood that Ms. Lindsey would realize that she was
the suspect in their investigation. Cf. Phillips, 497 F.2d at 1133 (reversing
conviction because consent to enter a business at night obtained by suggesting to
the suspect that his business had been the subject of a robbery). Under the
circumstances, they were not unlike the "false friend" of Spano v. New York, 360
U.S. 315, 323, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959), coaxing cooperation on the
implied grounds that any assistance would be mutually beneficial because they were
working on "her" investigation. Cf. id. (childhood friend coaxed cooperation with
appeal to sympathy).

It was misleading for the officers to state that they sought to question Ms. Lindsey
about her alleged sexual assault. The alleged sexual assault took place in an area
of town other than where Mr. Bennett was found, the officers never identified any
evidence that Mr. Bennett had been involved in any kind of sexual activity or even a
struggle, the detectives knew that Ms. *43 Lindsey's post-rape exam indicated no
vaginal trauma (F42-F43), and the detectives disavowed ever asking Ms. Lindsey
during their interrogations whether Mr. Bennett had raped her. (M60.)

When the detectives obtained Ms. Lindsey's consent to be photographed and
fingerprinted, the detectives' investigation was again described in the singular
without clarification and without any warning to Ms. Lindsey that she had the right
to refuse to provide the evidence. In ambiguous and coercive circumstances, such as
that which the very tired Ms. Lindsey faced in the close confines of the squad car
with three officers present, the failure to warn the suspect of her right to refuse
to cooperate invalidates the expressed consent. See, e.g., LaFave, Search and
Seizure § 8.2(i), 688 & n.243 ("Thus, the failure to warn the person of his Fourth
Amendment rights will sometimes invalidate a consent search because such a warning
was necessary to counteract other coercive elements."); People v. Vega, 203
Ill.App.3d at 41-42, 569 N.E.2d at 989-90 (noting failure to warn of option to not
cooperate); People v. Townes, 91 Ill.2d at 38-39, 435 N.E.2d at 104-105 (the fact
that suspect was asked to submit to search supported determination he was under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arrest-- despite the fact that the suspect complied).


The trial court's apparent reliance on Ms. Lindsey's "voluntary" cooperation in the
investigation of a non-existent rape was manifestly erroneous because there is no
waiver of Fourth Amendment freedoms where the consent was not knowingly and
intelligently given. *See Phillips,* 407 F.2d at 1135 n.4; *cf. also,* **44**_People v._
_Savory,_ 105 Ill.App.3d 1023, 1028, 61 Ill.Dec. 737, 435 N.E.2d 226 (2d Dist. 1982)
(intelligence and mental make-up to be considered in determining whether suspect
under arrest). The totality of the circumstances shows that Ms. Lindsey was in
custody when she agreed to provide and did provide the detectives with evidence for
their investigation.


    B. The Detectives Lacked Probable Cause to Detain Ms. Lindsey When The Detectives
                           Took Ms. Lindsey's Picture.


The detectives lacked probable cause to hold Ms. Lindsey in custody when they took
her into the station to have her picture taken. "Probable cause for arrest exists
when facts and circumstances within the arresting officer's knowledge are sufficient
to warrant a man of reasonable caution in believing that an offense has been
committed and that the person arrested has committed the offense... Mere suspicion
that the person offense has committed the offense is insufficient." *People v.*
_Booker,_ 209 Ill.App.3d 384, 393-94, 154 Ill.Dec. 211, 568 N.E.2d 211, 218 (1st Dist.
1991).


Prior to the October 14 Polaroid identification, the detectives in this
investigation knew only that Ms. Lindsey had filed a complaint consisting of a
repeated rape, a two-day kidnapping in Chicago by a black male cab driver in his
thirties who got stabbed in the chest in Joliet when Ms. Lindsey made her alleged
escape on October 11. In the instant matter, by contrast, the victim, Mr. Bennett,
was a fully-dressed fifty-year-old black cab driver who died of gunshot wounds in
his cab in a parking garage at O'Hare Airport several days before his body was found
on October 12. He was last seen driving a **45** twenty-something, "chunky" 130-140
pound African-American woman to the airport on October 9.


Unlike the unidentified passenger in the cab, Ms. Lindsey was in her early thirties
and purports to weigh about 190 pounds. (AA3-AA7.) Nor did the facts of Mr.
Bennett's homicide correlate with Ms. Lindsey's alleged rape. While Ms. Lindsey
alleged rape, the officers identified no evidence in their possession at the time
indicating Mr. Bennett was even involved in a struggle. Ms. Lindsey alleged that she
escaped by stabbing her assailant; Mr. Bennett died of gunshot wounds. Ms. Lindsey
alleged she stabbed her assailant along woods in Joliet; Mr. Bennett was shot at the
O'Hare Airport and was not stabbed at all. Ms. Lindsey alleged that she stabbed the
victim on Sunday evening; Mr. Bennett died several days before he was found on
Sunday. Ms. Lindsey alleged her assailant was a black cab driver in his thirties;

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Mr. Bennett was fifty. Ms. Lindsey alleged that she had been kidnapped for a forty hour period; Mr. Bennett appeared to have been dead in his cab in the airport garage since the previous Friday evening.

Ms. Lindsey's rape complaint and the description of Mr. Bennett's passenger to the O'Hare airport did not provide probable cause to arrest Ms. Lindsey for Mr. Bennett's murder because the information would not lead a person of reasonable caution to believe that Ms. Lindsey had committed the murder. Because the detectives lacked probable cause to arrest Ms. Lindsey before any evidence was taken from her, her seizure was illegal.

**\*46** C. The Polaroid Identification Did Not Provide *Probable Cause to Arrest Ms. Lindsey.*

The trial court ruled that Ms. Lindsey was not in custody when the Polaroid picture was taken. As shown in Part A, this conclusion was against the manifest weight of the evidence. However, even assuming that this ruling was correct, the trial court nevertheless committed manifest error in failing to suppress evidence as the fruit of an illegal arrest when it ruled that the identifications by Ms. Hess and Mr. Eiselt provided probable cause.

Accepting the identifications as true, the identifications simply place Ms. Lindsey in the victim's cab on the way to O'Hare Airport a full two hours before the victim pulled the cab into the parking garage where cabs do not belong. This evidence amounts to nothing more than a suspicion that Ms. Lindsey was at O'Hare, and in the garage at the time of the killing.

The judge found that there was probable cause by relying additionally on snippets of Ms. Lindsey's fabricated rape and stabbing complaint. Contrary to the trial court's finding, the testimony of Detective Hines did not make it clear that the description Ms. Lindsey provided was that of a Joliet cab. (G44, F97.) Ms. Lindsey identified a red and white or red and yellow cab; Mr. Bennett drove a maroon cab. (App. A 75.) The only white appearing on Mr. Bennett's cab was the lettering on the rear passenger doors. The trial court's finding that the timing of the alleged rape and the murder correlate simply draws an inference from nothing more than that an alleged rape and an **\*47** actual murder occurred within several days of each other in the City of Chicago. Similarly, the trial court's finding of a correlation between wounding by knife and death by multiple gunshots was clearly erroneous.

The State's own conduct in this matter undermines the trial court's ruling. The Polaroid identification was made within half an hour of Ms. Lindsey's arrival at the police station. Rather than promptly proceed to a probable cause hearing in front of a judicial officer, the State delayed some two days. In this time, the State secured

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the results of a lie detector test, placed Ms. Lindsey in a lineup, deprived her of sleep with intermittent and late-night interrogation, kept her in an interview room for all but eight hours, and obtained inculpatory statements and a written confession.

## D. *All the Evidence Gathered Was Tainted*

The Polaroid photograph, identifications, fingerprints, incriminating statements and confession are fruit of an arrest without probable cause. An arrest without probable cause is an illegal arrest. Evidence obtained by illegal means must be suppressed if the evidence was "obtained by exploitation of the initial illegality and not by means sufficiently distinguishable to be purged of the primary taint." *People v. White*, 117 Ill.2d at 222, 512 N.E.2d at 687 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

The factors bearing on the determination of whether evidence must be suppressed as exploitation of an illegal arrest include: (1) the temporal proximity of the arrest and evidence, **48** (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of official misconduct. *Id.* at 688 (confessions); *People v. Smith*, 232 Ill.App.3d 121, 129, 173 Ill.Dec. 165, 596 N.E.2d 789, 794 (1st Dist.), *app. denied*, 146 Ill.2d 647, 176 Ill.Dec. 817, 602 N.E.2d 471 (1992) (lineup identification). The State bears the burden of demonstrating sufficient attenuation between an illegal arrest and the subsequent gathering of the incriminating evidence to render evidence admissible. *People v. White*, 117 Ill.2d at 222, 512 N.E.2d at 687; 725 ILCS 5/114-11.

As shown below, the Polaroid photograph, the lineup identification, Ms. Lindsey's statements, and the in-court identifications were all tainted by the illegal arrest.

### 1. *The Polaroid identification.*

Given the deceptively coercive circumstances leading Ms. Lindsey to submit to having her picture taken, the temporal proximity to the illegal arrest and the lack of an intervening circumstance, the Polaroid identification by Mr. Eiselt and Ms. Hess should have been suppressed. *See People v. Smith*, 232 Ill.App.3d at 129, 596 N.E.2d at 794 (suppressing lineup identification). The request for, and taking of, the photograph were part and parcel to the illegal arrest. The identification from the photo spread which included the tainted photograph was an exploitation of the illegal arrest and cannot provide the probable cause for holding Ms. Lindsey. *See id.; People v. Cole*, 168 Ill.App.3d 172, 182, 118 Ill.Dec. 965, 532 N.E.2d 635, 641 (1st Dist.), *app. denied*, 122 Ill.2d 582, 530 N.E.2d 253, **49** 125 Ill.Dec. 228 (1988); *Wong Sun*, 371 U.S. at 484-86 & n.12 (citing, e.g., *Bynum v. United States*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                                  Page 37
(Cite as: 1996 WL 33651681)

262 F.2d 465 (D.C. Cir. 1958) (holding inadmissible fingerprints made by defendant after the unlawful arrest)).

2. *The line-up identification.*

Similarly, the October 15 line-up identification was tainted. While the line-up occurred the next day, the delay only compounds the legerdemain which led Ms. Lindsey into custody. Furthermore, Ms. Lindsey did not volunteer for the line-up. Her participation was a clear exploitation of the illegal arrest. It follows that informing her of this second tainted identification cannot cleanse the confession of taint. *People v. White, 117 Ill.2d at 224, 512 N.E.2d at 689.*

3. *The incriminating statements and confession.*

The time between the arrest and the incriminating statements and confession, flagrancy of the illegal arrest, and absence of intervening circumstances support warrant suppression of Ms. Lindsey's incriminating statements and signed confession.

There were no intervening circumstances warranting a finding that the confession was voluntary without regard to the taint of the illegal arrest. Indeed the intervening Polaroid and line-up identifications were themselves tainted. Because these tainted identifications were pressed upon Ms. Lindsey in the interrogations, her incriminating statements and confession could hardly be considered free of taint.

Similarly, the October 14 polygraph exam which indicated Ms. Lindsey was falsely denying her presence and **50** participation in Mr. Bennett's homicide cannot be the basis of probable cause or an intervening circumstance inducing a voluntary confession. The taking of the polygraph exam was not discussed until after Ms. Lindsey was confronted with a tainted identification, polygraph results are not admissible evidence, and the record is unclear with regard to whether Ms. Lindsey or the detectives suggested she take the polygraph exam. *See People v. Vega, 203 Ill.App.3d at 41-42, 560 N.E.2d at 990* (illegal arrest evidenced by suggestion that suspect take a polygraph); *People v. Jones, 157 Ill.App.3d 1006, 110 Ill.Dec. 895, 511 N.E.2d 1215 (1st Dist.), app. denied,* 116 Ill.2d, *113 Ill.Dec. 310, 515 N.E.2d 119 (1987)* (polygraph results do not establish probable cause and are inadmissible); *cf. People v. White, 512 N.E.2d at 689* (proffered inadmissible evidence was insufficiently incriminating to qualify as an intervening circumstance inducing a voluntary desire to confess).

Nor can the testimony to repeated admonitions of her *Miranda* rights be considered evidence purging Ms. Lindsey's confession of taint. *Brown v. Illinois, 422 U.S. at 602.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Because there were no intervening circumstances, the passage of time between the arrest and the statements and confession exacerbate the flagrancy of the scheme to hold Ms. Lindsey in violation of her Fourth Amendment rights for the purpose of obtaining sufficient evidence for an arrest and conviction. Accordingly, the statements and confession should have been suppressed.

### 4. The in-court identifications.

**\*51** Precisely because the arrest of Ms. Lindsey was solely for the purpose of obtaining a photograph and fingerprints, even the in-court identification testimony should not have been admitted in this case because it too was insufficiently attenuated from the illegal arrest. See *People v. Pettis, 12 Ill.App.3d 123, 128, 298 N.E.2d 372 (1st Dist. 1973)* (reasoning that if the arrest was solely in order to obtain the photograph, it may suppress even the in-court identification). *Accord United States v. Edmons, 432 F.2d 577 (2d Cir. 1978)*. in addition to the flagrancy of the Fourth Amendment violation, the length of time that passed between the arrest and trial and the absence of evidence of intervening circumstances supports application of the exclusionary rule.

The substantial amount of time that had passed since both the crime and the pre-trial identifications compounded the prejudice of Ms. Lindsey's presence at the defense table and increased the likelihood that Mr. Eiselt and Ms. Hess lacked an independent recollection of the events. Despite the clear opportunity to view the woman at the time they shared the cab ride, the descriptions Ms. Hess and Mr. Eiselt initially gave the police did not include Ms. Lindsey's actual weight and failed to note her obvious distinguishing features: the prominent mole on her nose. (App. A 74.) The absence of clear and convincing evidence that Mr. Eiselt and Ms. Hess had an independent recollection should have resulted in exclusion of the trial identifications. See *People v. Smith,* 596 N.E.2d at 794-75 (suppressing in-trial identifications because of an **\*52** absence of clear and convincing evidence the witnesses had an independent recollection of events).

### E. The Trial Court Erred in Ruling in The Alternative That The Inevitable Discovery Doctrine Applies To Any Identification of Ms. *Lindsey*

Defense counsel at trial maintained that the Polaroid identification had not taken place before the fingerprinting protest by Ms. Lindsey. The trial court responded by ruling in the alternative that under the inevitable discovery doctrine the taint of any illegal detention during the fingerprinting was purged because the officers would have simply re-arrested Ms. Lindsey once they returned from the Polaroid identification. (G46-49; App. A 22-24.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The trial court ruling was manifestly erroneous because the Polaroid picture was not
free of taint, and because the inevitable discovery doctrine requires proof that the
evidence illegally obtained would have been lawfully obtained in the absence of the
illegal action. _People v. Hoffman, 84 Ill.2d 480, 50 Ill.Dec. 696, 419 N.E.2d 1145,
1149 (1981)_. The State presented no such evidence at the suppression hearings or
trial, despite the clear opportunity to do so. _Cf. id._ (remanding because the record
was incomplete due to defendant's failure to persist in the motion).


              III. _PROSECUTOR ENGAGED IN PREJUDICIAL ARGUMENT_


The prosecutor misstated the evidence in this case. Although there was no objection,
these misstatements amounted to plain error and prejudiced Ms. Lindsey's right to a
fair trial. Despite the latitude even granted a closing argument, *53 the State is
barred from misstating the facts of the case or commenting on factual matters not
based on evidence. _People v. Buckley, 282 Ill.App.3d 81, 89, 218 Ill. Dec. 250, 668
N.E.2d 1082, 1087-88 (3d Dist. 1996)_ (citing _People v. Roach, 213 Ill.App.3d 119,
124-25, 156 Ill.Dec. 731, 571 N.E.2d 515 (3d Dist.), app. denied, 141 Ill.2d 555,
162 Ill.Dec. 504, 580 N.E.2d 130 (1991)_). An incorrect statement in a closing
argument constitutes plain error where the evidence is closely balanced. _Id. 282
Ill.App.3d 81, 89, at 1087-88, 668 N.E.2d 1082, 1087-88_.


Throughout the trial, the State relied on Ms. Lindsey's rape complaint as evidence
she had guilty knowledge of Mr. Bennett's homicide. Early testimony obfuscated the
question of whether Ms. Lindsey claimed to have been in a cab like the victims.
(F96-97, F18, F34.) In closing argument, the State declared:
Because the one common thread the begins from the first statement she ever makes to
the nurse and continues until she talks to Assistant State's Attorney Nelson at 55
West Grand is that she killed somebody. And that the person she killed was a cab
driver and the person was driving a red and white cab
. . . .
. . . . I don't believe you have to presume that she is a Mensa candidate because she
had it in her head to walk into Sough Chicago hospital and say, "I just killed a cab
driver," in order to set the table *54 for hopefully what would later be a way of
getting out from under this murder.


(Z40, Z41.)


Here, the State contended that Ms. Lindsey's fabricated rape complaint actually
concluded with an admitted homicide, when in fact it concluded with a stabbing of
undescribed seriousness. (Z-40.) Similarly, the State misdescribed the crime scene
to once again create a tie to Ms. Lindsey's rape complaint. Ms. Lindsey alleged that
her rapist drove a red and white cab or a red and yellow cab. (F35.) Mr. Bennett's
cab was a maroon cab with some white lettering on the rear passenger doors. (App. A
75.) Nevertheless, the State argued in closing that Mr. Bennett drove a red and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

white cab. (Z-40.)


The misstatements constituted plain error because they bolstered the State's claim
that Ms. Lindsey's false complaint evidenced guilty knowledge, and the evidence was
otherwise closely balanced. Indeed, the trial court fell for the deception in
ruling:
Secondly, we have the Defendant's statements and while we begin with the statements
regarding the alleged rape ... you still have a consistence with the physical
evidence of the killing in this case.


(Z61; App. A 9.) The evidence otherwise consisted of witnesses for each side
testifying to Ms. Lindsey's whereabouts and a *55 suspect, if not involuntary,
confession. No physical evidence linked Ms. Lindsey to the crime.


    IV. MS. LINDSEY WAS DENIED HER SIXTH AMENDMENT RIGHT TO *THE EFFECTIVE ASSISTANCE OF
                                      COUNSEL*


Under the Sixth Amendment to the United States Constitution, applied to the States
by the Due Process Clause, and Art. I § 8 of the Illinois Constitution, Ms. Lindsey
enjoyed the right to effective assistance of counsel in presenting her defense.
*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984); *People v. Karraker*,
261 Ill.App. 3d 942, 952, 199 Ill.Dec. 259, 633 N.E.2d 1250, 1257 (3d Dist. 1994).
In *Strickland*, the Supreme Court developed a two prong test for evaluating an
ineffective assistance claim. First, the defendant must demonstrate that the conduct
of her trial counsel fell below an objective standard of reasonableness. 466 U.S. at
688. Second, the defendant must demonstrate prejudice; that is, but for trial
counsel's errors, there is a "reasonable probability" that the result of the
proceedings would have been different. *Id.* at 694. A trial counsel's performance is
presumed to be within "the wide range of reasonable professional assistance." *Id.* at
689. However, the courts will not manufacture a trial strategy where counsel had
none. *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990).


            A. *A Series Of Errors Fell Below Objective Reasonableness*


A host of errors by trial counsel fell below an objective standard of
reasonableness. No trial strategy could be served by these failures.


*56 Indeed, about one year before trial, Ms. Lindsey complained to the court that
counsel paid scant attention to her case: counsel had met with her only once (in
November of 1992), repeatedly missed hearing dates, had been admonished by the court
for neglect in the past, had "a block" on his phone, had "no communication
whatsoever" with Ms. Lindsey, did not return calls, did not want to listen to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)
(Cite as: 1996 WL 33651681)

Page 41

witnesses who called on him, and knew "nothing" about the case. (C35). A counsel who
makes himself unavailable and pays scant attention to his client's case is an
objectively unreasonable counsel who runs the risk of prejudicing his client's
interests. See *People v. Morris*, 3 Ill.2d 437, 121 N.E.2d 810 (1954) (applying
two-step test similar to current *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct.
2052 (1984) standard). Although in her last motion through counsel for substitution
of counsel Ms. Lindsey subsequently stated vaguely that she had "no specific
complaint against" her trial counsel (CR 55; App. A 60A-B), trial counsel's
inattention resulted in objective unreasonableness that proved prejudicial to Ms.
Lindsey's representation.

### 1. *Counsel failed to impeach eye-witnesses*

Where the issue for decision is the identity of the a perpetrator, courts have not
hesitated to reverse a conviction based on ineffective assistance where trial
counsel's conduct prevented the finder of fact from considering impeaching evidence.
*See, e.g., Moffett v. Kolb*, 930 F. 2d 1156, 1161 (7th Cir. 1991) (reversal for
failure to impeach); *Harris*, 894 F.2d at 878 (reversal for failure to investigate);
*57*People v. Brinson*, 80 Ill.App.3d 388, 35 Ill.Dec. 721, 399 N.E.2d 1010 (2d Dist.
1980).

Here, the identification of Ms. Lindsey by Ms. Hess and Mr. Eiselt as the woman with
whom they shared a cab ride was critical to the State's case. Defense counsel
devised a strategy of impeaching the credibility of the identifications by
confronting the witnesses with the discrepancy between Ms. Lindsey's weight and
their identified weight of the woman with whom they shared the cab. (P46-48.) Ms.
Hess and Mr. Eiselt told the police and testified in court that the woman with whom
they shared the cab weighed about 130-140 pounds. (P46-48.) However, only at the
post-trial motion stage did trial counsel attempt to present documentary evidence
that Ms. Lindsey weighed over 190 pounds when she was booked into the county jail
less than a week after the witnesses shared their ride with the unidentified woman.
(AA3-AA7.) This impeachment evidence was clearly available to counsel for trial, yet
counsel did not offer it until the post-trial motions. (AA3-AA7.)

Also available to counsel was Ms Lindsey herself, who bears a feature no witness who
shared a cab with her would miss: a prominent mole on the left side of her nose.
(App. A 74.) That neither Ms. Hess nor Mr. Eiselt told the police that the woman
with whom they shared the cab bore such a distinctive feature was not exploited by
defense counsel. Counsel simply failed to employ impeachment tools readily available
to him. A failure to employ readily available impeachment tools is objectively
unreasonable. *See *58*People v. Skinner*, 220 Ill. App. 3d 479, 484, 163 Ill.Dec.
301, 581 N.E.2d 252, 255-56 (1st Dist. 1991). *See also, Brinson*, 80 Ill.App.3d at
393-94, 399 N.E.2d at 1013-14 (counsel ineffective for failure to challenge
eyewitness identification).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 42
(Cite as: 1996 WL 33651681)

2) Counsel failed to move for suppression of the *suggestive photo array.*

Trial counsel should have challenged as suggestive the Polaroid photo array identifications. The failure to move for suppression of a suggestive photo array constitutes ineffective assistance of counsel where, as here, the eye-witness descriptions materially conflict with the defendant's actual appearance. *Brinson*, 80 Ill.App.3d at 392-94, 299 N.E.2d at 1013-14.

Mr. Eiselt and Ms. Hess described the woman with whom they shared the cab as a short, "chunky," 130-140 pound woman in her twenties. The Polaroid photo array consists of photos of women from the chest or shoulders and up. (App. A 72-73). Of the photographs included in the photo array, only two are of women who appear to be "chunky" in a head and shoulders picture. (Exh. # 1D, 1B; App. A 72). Of those two pictures, only Ms. Lindsey's picture is in focus and only Ms. Lindsey is wearing clothing appropriate for the season. (Exh. #1D; App. A 72). In fact, Ms. Lindsey's picture is the only picture in focus and the only picture of a person wearing fall clothing. Ms. Lindsey was clearly presented to the witnesses as the prime suspect. Because the eye-witness identifications were one of the two pillars supporting the prosecutions case, it was objectively **59** unreasonable for trial counsel to make no challenge to the suggestive photo array. *Id.*

3) Counsel failed to effectively present and preserve issues that arose in the motion to *suppress statements as involuntary.*

The other pillar to the State's case was Ms. Lindsey's confession. After the trial court refused to consider coercive *Miranda* violations in conjunction with Ms. Lindsey's pretrial motion to suppress incriminating statements as involuntary, trial counsel failed to file a second motion or to present much of Ms. Lindsey's testimony of coercion at the trial. No evidence regarding being held incommunicado or being coerced with threats was presented at trial, although Ms. Lindsey did testify to other coercive statements at the suppression hearing and one coercive *Miranda* violation at trial.

Nor did trial counsel bring to the trial court's attention that the State may have violated Ms. Lindsey's due process right to a "prompt" presentment-- a factor bearing on voluntariness. These omissions cannot be treated as a trial tactic or strategy. The failure to elicit all the facts relating to coercion at the pretrial hearing and at trial was contrary to counsel's own trial strategy and deprived Ms. Lindsey of a fair trial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Furthermore, where, as here, the case virtually turns on suppression of statements, counsel's inability to recognize relevant facts and law, and failure to object to the trial court's inappropriate burden shifting and severance of the involuntariness motion reveals an objectively unreasonable **60 unfamiliarity with a case-dispositive area of the law. *See, e.g., People v. Wright, 111 Ill.2d 18, 30-31, 94 Ill.Dec. 726, 488 N.E.2d 973 (1986)* (counsel's misapprehension of the law constituted ineffective assistance); *Brinson, 80 Ill.App.3d at 392-94, 399 N.E.2d at 1012-1014* (failure to preserve issue of involuntariness of confession constituted ineffective assistance of counsel); *State v. Lopez, 3 Ariz. App. 200, 412 P.2d 882 (1966)* (counsel's failure to object to evidence arguably the fruit of the poisonous tree rendered assistance of counsel ineffective).

## B. *The Series of Errors Prejudiced Ms. Lindsey*

In order to establish prejudice, Ms. Lindsey does not need to establish her innocence or demonstrate that the outcome of her case more likely than not would have been different. *Strickland, 466 U.S. at 693.* Rather, she must only show that "there is *a reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). The effect of the errors, whether by counsel or the court, should be considered on a cumulative basis when it comes to determining prejudice. *United States v. Wolf,* 787 F.2d 1099 (7th Cir. 1986); *People v. Whitlow, 89 Ill.2d 322, 341, 60 Ill.Dec. 587, 433 N.E.2d 629, 638 (1982),* cert. denied sub nom, *Gibson v. Illinois,* 459 U.S. 830 (1982).

Here the cumulative effect of the errors clearly prejudiced Ms. Lindsey. On the issue of identity, counsel failed to impeach the credibility of the witnesses against Ms. **61 Lindsey with readily available tools, and failed to move for suppression of a suggestive photo array. On the issue of voluntariness, counsel failed to note or even argue the matter of an unconstitutionally delayed presentment and failed to recognize or preserve a record of coercion. Accordingly, there is a reasonable probability that Ms. Lindsey's trial would have been different but for counsel's errors and omissions.

## V. TRIAL COURT DENIED MS. LINDSEY'S SIXTH AMENDMENT *RIGHT TO COUNSEL OF HER CHOICE*

On February 14, 1994, Ms. Lindsey submitted a letter to the Court expressing dissatisfaction with the profound neglect of her case by retained counsel and seeking appointment of a public defender. The trial court never addressed the *pro se* letter-motion for substitution of counsel and denied a subsequent motion from counsel, thereby violating Ms. Lindsey's Sixth Amendment right to counsel of her choice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Sixth Amendmemt right to counsel includes the right to counsel of one's choice.
*People v. Young,* 152 Ill.Dec. 67, 207 Ill.App.3d 130, 133, 565 N.E.2d 309, app.
denied, 571 N.E.2d 155 (1990). A motion to substitute counsel is reviewed for abuse
of discretion. *Id.,* 207 Ill. App. at 134, 565 N.E.2d at 311. Factors generally
considered for this review include: 1) the timeliness of the motion; 2) the adequacy
of the court's inquiry into the defendant's complaint; and 3) the gravity of the
defendant's complaint. *See, e.g.,* *62*United States v. Rogers,* 769 F.2d 1418, 1423
(9th Cir. 1985); *People v. West,* 137 Ill.2d 558, 148 Ill.Dec. 196, 560 N.E.2d 594,
608 (1990).

The first factor does not militate against finding an abuse of discretion. Although
Ms. Lindsey's letter is dated some 16 months after the charges had been filed
against her, the motion was filed some 11 months before trial actually commenced.
Moreover, at the June 28, 1994 hearing on counsel's motion to withdraw, the trial
court suggested that a motion for substitution by retained counsel might have been
granted. (L10.) The administration of justice would not have been impeded by
granting Ms. Lindsey's motion. Time might have been saved.

The second factor favors Ms. Lindsey because the Court conducted no inquiry at all
into her allegations. Given the gravity of her complaints, that failure qualifies as
an abuse of discretion. *See United States v. Morrissey,* 461 F.2d 666, 667 (2d Cir.
1972) (serious allegations in defendant's letter to the court warranted more than
perfunctory inquiry). Ms. Lindsey complained of objectively unreasonable
representation in the form of apparent purposeful neglect of her case. (C35; App.
A76-77.) *See People v. Morris,* 3 Ill.2d 437, 121 N.E.2d 810 (1954). Although Ms.
Lindsey subsequently declared in vague and conclusory fashion that she had "no
specific complaints" against trial counsel, the trial court should have inquired
further in light of his own doubts about the representation and the very
contradictions in Ms. Lindsey's representations. *63* Without specifically
referencing Ms. Lindsey's complaints, the trial court noted, in light of defense
counsel's repeated failures to appear, that any dissatisfaction Ms. Lindsey had with
her representation would be "understandable." (L10.)

In *Morrissey,* the Second Circuit admonished the lower court for failing to inquire
about the merits of the defendant's complaints, but nevertheless declined to rule
that the defendant was denied his Sixth Amendment rights because the record as a
whole revealed by the end of trial that the complaints lacked merit. *461 F.2d at
670.* The trial court's disregard of Ms. Lindsey's letter effectively forced her to
accept counsel she did not want. As revealed in part IV, that counsel proved
ineffective for lack of preparation on key issues to Ms. Lindsey's defense. The
trial court's refusal to substitute counsel was an abuse of discretion because Ms.
Lindsey's allegations proved substantial and Ms. Lindsey was willing to accept any
public defender.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33651681 (Ill.App. 1 Dist.)                                    Page 45
(Cite as: 1996 WL 33651681)

**\*64** *CONCLUSION*

The judgment of the trial court should be reversed because Ms. Lindsey's confession
was involuntary and all the evidence incriminating her was the fruit of an illegal
arrest. The performance of trial counsel fell below an objective standard of
reasonableness, prejudicing Ms. Lindsey's right to a fair trial. The trial court's
failure to substitute counsel also deprived Ms. Lindsey of her choice of counsel. In
the alternative, the Court should vacate the trial court judgment and remand for a
new trial or for a rehearing on the issue of the voluntariness of Ms. Lindsey's
confession.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Jerri Robbin LINDSEY,
Defendant-Appellant.
1996 WL 33651681 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.