**File Date:** Feb 29, 2008

**Case No:** 07cv 6658

**ATTACHMENT #** 1

**EXHIBIT** D to F

**TAB (DESCRIPTION)** _____

Westlaw.

1997 WL 33762019 (Ill.App. 1 Dist.)                                          Page 1
(Cite as: 1997 WL 33762019)

For Opinion See 713 N.E.2d 831

Appellate Court of Illinois, First District, Fourth Division.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
Jerri Robin LINDSEY, Defendant-Appellant.
No. 1-95-1535.
March 17, 1997.

Appeal from the Circuit Court of Cook County, Criminal Division. Honorable Shelvin
Singer, Judge Presiding.

Brief and Argument for Plaintiff-Appellee
Richard A. Devine, State's Attorney, County of Cook, Room 309 - Richard J. Daley
Center, Chicago, Illinois 60602, Attorney for Plaintiff-Appellee. Rence Goldfarb,
Gael A. McCaughey-O'Brien, Assistant State's Attorneys, Of Counsel.

*1 POINTS AND AUTHORITIES

I.

THE TRIAL COURT DID NOT COMMIT MANIFEST ERROR BY ITS DENIAL OF DEFENDANT'S MOTION
TO SUPPRESS. ... 39

People v. Lucas, 132 Ill. 2d 399, 548 N.E.2d 1009 (1989) ... 39

People v. Williams, 164 Ill. 2d 1, 645 N.E.2d 844 (1994) ... 39

People v. Garcia, 165 Ill. 2d 409, 651 N.E.2d 100 (1995) ... 39

People v. Glass, 209 Ill. App. 3d 384, 568 N.E.2d 211 (1st Dist. 1991) ... 39

A.

EXHIBIT D

1997 WL 33762019 (Ill.App. 1 Dist.)                                                                Page 2
(Cite as: 1997 WL 33762019)

Defendant Has Waived Any Claim That The Trial Court Improperly Stated The Burden
On Her Motion To Suppress For Failure To Give *Miranda* Admonishments Because
Defendant Withdrew The Miranda Motion ... 39

*People v. Hubbard*, 107 Ill. App. 2d 79, 246 N.E.2d 44 (1st Dist. 1969) ... 41

*People v. Enoch*, 122 Ill. 2d 177, 522 N.E.2d 1124 (1988) ... 41

*People v. Burnett*, 267 Ill. App. 3d 11, 640 N.E.2d 1350 (1st Dist. 1994) ... 41

*People v. Medeiros*, 249 Ill. App. 3d 139, 618 N.E.2d 1065 (1st Dist. 1993) ... 41

B.

A Reading Of The Record Proves That The Trial Court Did Not Improperly State
Burdens Of Proof ... 41

*People v. Reid*, 136 Ill. 2d 27, 554 N.E.2d 174 (1990) ... 42

*2 C.

No Manifest Error Occurred In Finding Defendant's Statements Were Voluntary ... 45

*People v. Johnson*, 250 Ill. App. 3d 887, 620 N.E.2d 506 (1st Dist. 1994) ... 45, 47

*People v. Buie*, 238 Ill. App. 3d 260, 606 N.E.2d 279 (1st Dist. 1992) ... 46

*People v. Higgins*, 50 Ill. 2d 221, 278 N.E.2d 68 (1972) ... 46, 48

*People v. Foster*, 168 Ill. 2d 465, 951 N.E.2d 956 (1995) ... 46

*People v. Holman*, 250 Ill. App. 3d 503, 620 N.E.2d 1222 (1st Dist. 1993) ... 47

*People v. Byrd*, 90 Ill. App. 3d 429, 413 N.E.2d 148 (1st Dist. 1980) ... 49

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                    Page 3
(Cite as: 1997 WL 33762019)

*People v. McDermott*, 141 Ill. App. 3d 996, 480 N.E.2d 1293 (1st Dist. 1985) ... 50,
51

*People v. Barragan*, 266 Ill. App. 3d 961, 641 N.E.2d 535 (1st Dist. 1993) ... 52

II.

THE TRIAL COURT DID NOT COMMIT MANIFEST ERROR WHEN IT FOUND THAT DEFENDANT
VOLUNTARILY ACCOMPANIED OFFICERS TO THE POLICE STATION, NOR WHEN IT FOUND THERE WAS
PROBABLE CAUSE TO ARREST ... 52

*People v. Gacho*, 122 Ill.2d 221, 522 N.E.2d 1146 (1988), cert. denied 488 U.S. 109
S.Ct. 264, 102 L.Ed.2d 252 ... 52

*People v. Neal*, 109 Ill.2d 216, 486 N.E.2d 898 (1985) ... 52

*People v. Redd*, 135 Ill.2d 252, 553 N.E.2d 316 (1990) ... 52

*People v. Johnson*, 114 Ill.2d 170, 499 N.E.2d 1355, cert. denied 480 U.S. 951, 107
S.Ct. 1618 ... 52, 55

*People v. Collins*, 182 Ill.App.3d 362, 538 N.E.2d 781 (1989) ... 53

*People v. Winfler*, 68 Ill.2d 158, 368 N.E.2d 870 (1977) ... 53

*People v. Garcia*, 165 Ill. 2d 409, 651 N.E.2d 100 (1995) ... 53

*People v. Williams*, 164 Ill.2d 1, 645 N.E.2d 844 (1994) ... 55

*People v. Matthews*, 205 Ill. App. 3d 371, 562 N.E.2d 1113 (1st Dist. 1992) ... 55

*People v. Martin*, 102 Ill. 2d 412, 466 N.E.2d 228 (1984) ... 56

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

*People v. Marts*, 266 Ill. App. 3d 531, 639 N.E.2d 1360 (1st Dist. 1994) ... 55, 56

**\*3** *People v. McClom*, 262 Ill. App.3d 826, 635 N.E.2d 677 (1st Dist. 1994) ... 56, 57, 59

*People v. Seawright*, 228 Ill. App. 3d 939, 593 N.E.2d 1003 (1st Dist. 1992) ... 56

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983) ... 57

*People v. Tisler*, 103 Ill.2d 226, 469 N.E.2d 147 (1984) ... 57

*People v. Montgomery*, 112 Ill.2d 517, 494 N.E.2d 475 (1984), cert. denied 479 U.S. 1101, 107 S.Ct. 1329 ... 57

*People v. Edwards*, 144 Ill.2d 108, 579 N.E.2d 336, cert. denied (1992), 504 U.S. 942, 112 S.Ct. 2278 ... 59

*People v. Allen*, 249 Ill. App. 3d 1001, 620 N.E.2d 1105 (1st Dist. 1993) ... 60

*People v. Barlow*, 273 Ill. App. 3d 943, 654 N.E.2d 223 (1st Dist. 1995) ... 60

III.

THE PROSECUTOR PROPERLY ARGUED FACTS IN EVIDENCE AND INFERENCES DRAWN FROM THAT EVIDENCE ... 60

*People v. Chapman*, 262 Ill. App. 3d 439, 633 N.E.2d 718 (1st Dist. 1992) ... 61

*People v. Enoch*, 122 Ill. 2d 177, 522 N.E.2d 1124 (1988) ... 61

*People v. Morgan*, 112 Ill. 2d 111, 492 N.E.2d 1303 (1986) ... 61

*People v. Pasch*, 152 Ill. 2d 133, 604 N.E.2d 294 (1992) ... 61

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 5

IV.

DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL. ... 63

*People v. Campbell*, 264 Ill. App. 3d 712, 636 N.E.2d 575 (1st Dist. 1992) ... 63

*People v. Keys*, 195 Ill. App. 3d 370, 552 N.E.2d 285 (1st Dist. 1990) ... 63

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984) ... 64

*People v. Popoca*, 245 Ill. App. 3d 948, 615 N.E.2d 778 (1st Dist. 1993) ... 64

*People v. Buchanan*, 211 Ill. App. 3d 305, 570 N.E.2d 344 (1st Dist. 1991) ... 64, 65, 70

*People v. Greer*, 79 Ill. 2d 103, 402 N.E.2d 203 (1980) ... 64

*People v. Puente*, 125 Ill. App. 3d 152, 465 N.E.2d 682 (1st Dist. 1984) ... 65

*People v. Pendleton*, 256 Ill. App. 3d 983, 628 N.E.2d 505 (1st Dist. 1993) ... 65

*4 *People v. Gagliani*, 210 Ill. App. 3d 617, 569 N.E.2d 534 (2nd Dist. 1991) ... 65

*People v. Slim*, 127 Ill. 2d 302, 537 N.E.2d 317 (1989) ... 67

*People v. Shlimon*, 232 Ill. App. 3d 449, 597 N.E.2d 728 (1st Dist. 1992) ... 68

*People v. Johnson*, 147 Ill. 2d 118, 594 N.E.2d 253 (1992) ... 67

*People v. Kramer*, 278 Ill. App. 3d 963, 664 N.E.2d 126 (1st Dist. 1996) ... 70

*People v. Miller*, 254 Ill. App. 3d 997, 626 N.E.2d 1350 (3rd Dist. 1993) ... 69

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 6

V.

THE TRIAL COURT DID NOT DENY DEFENDANT HER CONSTITUTIONAL RIGHT TO COUNSEL OF HER CHOICE WHERE DEFENDANT WAS REPRESENTED BY HER RETAINED COUNSEL ... 70

*People v. West*, 137 Ill. 2d 558, 560 N.E.2d 594 (1990) ... 70, 72

*People v. Young*, 207 Ill. App. 3d 130, 565 N.E.2d 309 (4th Dist. 1990) ... 70, 72

*People v. Barrow*, 133 Ill.2d 226, 549 N.E.2d 240 (1989) ... 71

*People v. Hall*, 114 Ill.2d 376, 499 N.E.2d 1335 (1986) ... 71

*People v. Johnson*, 75 Ill.2d 180, 387 N.E.2d 688 (1979) ... 71

*People v. Lewis*, 88 Ill.2d 129, 430 N.E.2d 1346 (1981) ... 71

ISSUES PRESENTED FOR REVIEW

Whether the trial court committed manifest error when it denied defendant's motion to suppress on 5th Amendment grounds;

Whether the trial court committed manifest error when it denied defendant's motion to suppress on 4th Amendment grounds;

Whether the prosecutor committed error in his closing argument;

Whether the trial court denied defendant her right to counsel of her choice;

Whether defendant was denied effective assistance of counsel.

STATEMENT OF FACTS

Defendant was charged by Indictment with the 1992 murder of Rudolph Bennett. Mr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                    Page 7
(Cite as: 1997 WL 33762019)

Bennett was found slain in his Circle cab parked in the short term parking lot area
at O'Hare Airport. He had been shot in the chest. Defendant was tried by Judge
Shelvin Singer, and was found guilty of both first degree murder and armed robbery.
Defendant was sentenced to a term of 45 years' imprisonment. Defendant appeals her
conviction.

*PRETRIAL MATTERS:*

*Motion to Withdraw:* On November 5, 1992, Sheldon Sorosky filed his appearance as
counsel in this case. (C.R.17) On September 21, 1993, Sorosky sought to withdraw as
defendant was unable to pay for his services. The trial court denied his request.
(R. C5) On February 15, 1994, defendant requested the court to appoint the Public
Defender to represent her because counsel was "not in my best interests and hasn't
been since this case started..." (R. D1, D4) Counsel Sorosky stated that he was
ready to proceed with the hearing on the motion to suppress which he had prepared
and filed, that the detectives were present and ready to testify, and that if
defendant or the court would like him to, he would withdraw. (R. D4) The Court
responded that defendant, "with bringing that *6 matter up at this time is simply an
effort to delay the proceedings in the case and harass the witnesses unnecessarily".
(R. D5) Counsel explained to the court that he and defendant had differing views as
how to best present the case. The Court responded that defendant's decision was
controlling, "the matter just proceeds the way defendant wishes it to proceed." The
court added that defendant, and not counsel, had her liberty at stake. (R. D6) The
Court told counsel to proceed on the motion as he had not seen any evidence of
ineffective assistance of counsel. (R. D8)

On June 28, 1994, defendant's counsel again sought to withdraw from the case.
Affidavits from both defendant and her family stated that they did not want Mr.
Sorosky to continue in his representation, and that they could not pay him. In
addition to his motion to withdraw, counsel also asked the court for fees for a
private investigator and for a polygraph exam. Counsel explained that the lack of
payment of his fees would not impede his defense of his client. However, funds were
required for an investigator as well as a polygraph. (R. L6) Counsel asked the court
to grant his motion so that a public defender would be appointed, and thus,
investigator services, as well as a polygraph, would be provided by the public
defender. Alternatively, counsel asked the court to allow him to continue
representation, but to provide for these costs of "good lawyering." The court ruled
that he would not allow a polygraph to be administered at the state's expense, as in
all likelihood, its results would be inadmissible. (R. L7) As to the motion to
withdraw, the court stated that the motion was premised on the lack of funds for an
investigator, and the court doubted the sincerity of the motion. "In my opinion,
this has been a continuing effort to delay trial in the case ... I'm willing to
assist counsel in any way I can to get the investigation done but I do not believe
in the context of a case where there is a private lawyer, I can not encumber county
funds." (R. L11) "Again, I'll repeat, I believe based upon the history *7 of this
case, totality and history of this case, this is simply an effort to impede the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 8

conclusion of this case. Impede us to coming to a conclusion....motion...of counsel
to withdraw at this point is denied. Motion... to authorize county funds for payment
of investigator and expenses for polygraph are also denied... I still nevertheless
would probably -- I would probably execute the necessary orders to have that
[polygraph] completed. If the defendant feels he needs his client to accompany him
in locating some alibi witnesses...I'll execute the appropriate orders..." (R. L13)

### Motion to Suppress Confession on 4th Amendment Grounds:

Defendant sought to suppress her confessions, claiming they were the result of an
illegal arrest. Chicago Police Detective Raymond Schalk testified that on October
14, 1992, at 11:00 a.m., he and 2 other officers went to defendant's home. (R. 13-4)
He asked defendant if she would come to the police station to discuss both the
sexual assault she had reported on October 11th and a homicide they were
investigating. (R. D16) The officer testified that neither he nor the other 2
officers went into defendant's home. (R. D25) Defendant agreed to accompany them.
The officer stated that defendant also agreed to provide them with a photograph and
fingerprints for their investigation. (R. D36) She was not taken to an "arrestee"
area to be fingerprinted and photographed. (R. D39)

The officer explained that defendant had filed an assault claim, stating she had
been repeatedly raped by a cab driver for a 40-hour period beginning October 10th at
1 a.m. (R. D27) She stated that the man drove a maroon and white cab suburban cab,
that he drove her to an unknown location, produced a gun, and repeatedly assaulted
her, after which he blindfolded her and drove her to a forest preserve, where she
stabbed the cab driver in the chest, and fled. She said she was picked up by an
unknown white female who took *8 her to the hospital. (R. D30) Medical personnel
advised him that there was no evidence of vaginal trauma. (R. D30)

The officer further testified that in addition to defendant's rape complaint, he was
also investigating the homicide of a Circle Cab driver who drove a maroon and white
suburban cab. He said cab records indicated that the driver's last pickup was at the
Empress Riverboat. He stated that an elderly couple had called for a Circle Cab to
pick them up at the Empress Riverboat Casino in Joliet on October 10th. They saw the
cab approaching them when a black woman stopped the cab and got in. The cab then
pulled up, the driver spoke to them, and the woman in the back seat got out of the
cab, and got into the front seat. (R. D24) The couple stated that the driver left
them off at the Redroof Inn. When the cab left, the woman was still in the front
seat. He showed defendant's photo, in a photo array, to June Hess and John Eiselt,
the elderly couple in the cab. They lived a few minutes away from the police
station. (R. D40) The couple identified defendant from the photo array as the woman
with whom they had shared a cab ride on October 9th from about 2:30 to 3:15 p.m. (R.
D42) The officers returned to the station, informed defendant of her rights, and
told her she had been identified by the couple. (R. D45) She then made a statement
to them regarding the murder of the cab driver. (R. D46)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

The officer further explained that on October 12th, around 7:00 p.m., he went to the main parking garage at O'Hare airport, where he saw a maroon and white Joliet Circle Cab. The driver, a 50-year-old male black later identified as Rudolph Bennett, was slumped over the driver seat. He had apparently been dead for several days. He had gunshot wounds in his chest. (R. F5-6) An O'Hare parking ticket on the front seat indicated that the cab had entered the lot on October 9, 1992, at 4:59 p.m. (R. F7) They learned that Mr. Bennett had picked up a "regular fare", who had arranged to be picked up at 2:30 p.m. at the Empress Casino in Joliet, and were to be driven to the Redroof Inn. The casino *9 called in another fare. That fare was to be taken to O'Hare airport. (R. F12) Mrs. Bennett, the radio dispatcher for Mr. Bennett's cab company, said her husband had radioed that he had picked up both fares and would eventually be on his way to O'Hare. That was her last contact with him. (R. F12) The following day, on October 13, 1992, the detective returned to work and found that Mr. Bennett's death was the result of multiple gunshot wounds. It was then that he learned that the "regular" fare was Ms. Hess and Mr. Eiselt. (R. F13) He went to their home and spoke with them around 7:30 p.m. that night. They explained their arrangements with the Circle Cab Company to pick them up at 2:30 p.m. on October 9, 1992. As they waited at the main entrance to the Casino, they saw a circle cab stop about a block from them to pick up a black female who was on the road. The cab continued towards them, pulled up, and said he was there to pick them up. (R. F14) He said something to the female passenger in the back seat, she got out, and got into the front seat. (R. F14-5) They overheard the woman tell the driver that she had to be at O'Hare by 4:30 p.m. (R. F15) They described the woman as being in her 20's, about 5'4, 130-140 pounds, and "chunky". (R. F15)

On October 13th, around 10:00 p.m., he was contacted by Sgt. Augustine of Area 2 Violent Crimes, who informed him that defendant had filed a sexual assault claim on October 11, 1992 around 11:25 p.m. (R. F17) She stated that she had been picked up on the south side by a male black cab driver, 35-40 years old, driving a red and white suburban cab, who her took her to an unknown location at gunpoint and repeatedly raped her for 40 hours. She stated that she was able to get away from him when she stabbed him in the chest. (R. F18-9)

On October 14, 1992, around 11:00 a.m., he and 2 other officers went to defendant's home. (R. F19) Defendant's lover, Irene Quiroz, answered the door. The officers waited outside the door, and defendant came to the door in her bathrobe. None of the officers went into the home. (R. F21) They told *10 defendant that they were officers working on her assault case, as well as a homicide case, and they would like her to come with them to the police station to speak with them. (R. F22, F35) She stated that she would, but that she would have to get dressed first. (R. F22) The officers waited outside for her for about 20 minutes. When she came outside, they did not touch her or handcuff her. They did not read her rights. Their guns were not drawn. The officers were in civilian clothes. (R. F23) They got to the station around noon. While driving to the station, the officers asked defendant if they could photograph her and print her to help in the investigation. She said "all

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

right". (R. F24) He took a photo of defendant with a polaroid camera. He and Det. Bogucki then went to Ms. Hess and Mr. Eiselt's house with a photo array containing the polaroid shot. They independently identified defendant as the woman who shared their cab from the Empress casino. (R. F26-7) The officers immediately returned to the station. It was now about 12:30 p.m. (R. F29) Defendant was in an interview room, was not cuffed, and the door was unlocked. (R. F29) Defendant had been at the station for less than 40 minutes. During the time the officers first appeared at her door and continuing to that moment, defendant had not been processed or searched. She was never told she was under arrest. She had not been given her Miranda rights. She had not been handcuffed. (R. F30-1)

Irene Quiroz testified that she and defendant had been living together since July, 1992. On October 13, 1992, three police officers in plain clothes knocked on her door around 11:00 a.m. (R. F53-4) She stated that she let the 3 officers into their home, and while the officers waited in the front room, she went into the bedroom to get defendant. (R. F56) Defendant came into the front room and spoke with them. She then "threw some clothes on" and went with the officers to the station. (R. F56)

Defendant testified that she was asleep when the officers came to her home at 11:00 a.m. on October 13th. She stated that they told her to get *11 dressed and to come to the station with them. (R. F63) She stated that they asked to take her photo to show to the man who said he raped someone to see if that someone was her. They also asked to fingerprint her to see if the prints matched those in the cab. She said yes. (R. F66) She stated that the police gave her no answer to her questions about when would she be going home. (R. F68) She stated that after she waited a long while, the officers returned, told her that they did not believe she had been raped, and said she had been identified by two people as being with the victim immediately prior to his death. They then gave her rights. (R. F73) She also stated that the day before, she had gone to the police station with Officer Hines, viewed several photographs, and told the officer that none of these men had raped her. The officer then took her home. (R. F80)

Det. Jack Hines testified that he was assigned to investigate defendant's rape complaint on October 11, 1992. (R. F90) In the late evening of October 12, he went to her home, knocked on her door, and was allowed to enter. He waited for her as she got dressed, and brought her to Area 2 to look at photos of possible rape suspects. (R. F92) The photo array contained the photo of the victim, Rudolph Bennett. (R. F93) The officer was not aware that Mr. Bennett had been murdered. (R. F95) The officer showed her the photo because the victim had been reported as a missing person, and had been driving a red and white suburban cab. (R. F96-7) Defendant refused to look at the photos. (R. F93) She said that she did not want to look at the photos, that she wanted to go home. The officer took her home. Defendant was at the station for about 10 minutes. (R. F94)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 11

The parties agreed that defendant voluntarily accompanied the officers to the police station on October 13th. (R. G9) The trial court ruled that the issues were twofold; (1) whether the defendant was in police custody or otherwise compelled by the police to accompany them to the station; (2) if not, **12** whether custody status arose prior to the officers returning to the station with the positive identification of defendant by the 2 other cab passengers. (R. G39) "To some extent, my task has been made infinitely easier by the fact that the defendant has testified that she accompanied the police to the station voluntarily. And that the belief arose in her for the first time that she was quote, not going to go home, unquote, when the police were in the fingerprinting process of her." (R. G40) The court further ruled that the evidence did not establish at what point defendant asked to go home. The court stated that it was defendant's burden to establish at what point the defendant requested to go home. (R. G41) The court stated that defendant had not established that she was in custodial status when she was at the police station prior to her arrest, nor was she compelled to go to the station by the police. "I do conclude that the objective facts were such that indeed the defendant as she stated she did, went to the police station voluntarily. I point out that defendant said she went to the police station voluntarily. That is consistent with the facts too because based upon the objective facts, there was an investigation of the defendant's rape allegation, indeed if I recall, she conceded that she made the rape allegation and I must agree with the state, that the rape allegation in the context of this case was linked to the killing or finding of the cab driver dead in his cab. Based upon the objective facts, why wouldn't she go to the police station since this was an investigation of her rape allegation?" (R. G43) The court further ruled that probable cause did exist at the time defendant was identified by her fellow cab passengers. (R. G44) In analyzing the evidence that the officers had at the time of the arrest, the court found probable cause. The court indicated that there was the "bizarre" rape allegation as to a Joliet taxi driver, a dead cab driver found at O'Hare 2 or 3 days later, the cab driver arrived at O'Hare on the date of the alleged rape and was killed on that same date, defendant in a Joliet cab **13** heading towards O'Hare on the date of the murder of the driver at O'Hare, and defendant was identified as being in the same cab driven by the deceased, established probable cause. (R. G45) The court further ruled that even if defendant had said she wanted to go home prior to being printed, the inevitable discovery rule would have applied. (R. G48)

*Motion to Suppress on 5th Amendment grounds:*

Prior to proceeding on defendant's motion to suppress on 5th Amendment grounds, the trial court told counsel that he had mixed 2 motions in one, namely, that the confessions were the result of coercion, misrepresentations and implied threats, and that the confession was given without the benefit of *Miranda* admonishments. (R. M4-6) The Court separated the 2 claims, and told the parties that the burden remained on the State for the coercion allegation, and that defendant had the burden as to the *Miranda* allegation. (R. M5) The court asked counsel which of the claims he wished to proceed on first, and counsel chose the coercion allegation. (R. M7)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

As the court ruled that the People had the burden on proving that defendant's confession was not the result of coercion, the People called Det. Schalk, a 13-year police officer assigned to Area 5 violent crimes to testify as to the taking of the confession. (R. M12) Det. Schalk testified that on October 14, 1992, around 11:00 a.m., he went to defendant's home with two other officers to interview defendant. (R. M14, M26) The defendant accompanied them to the police station at 11th and State where she agreed to be photographed and printed. (R. M14) The officer took the photograph to the home of two witnesses, which was located a few blocks from 11th and State, and the witnesses identified defendant as the person they last saw with the deceased. (R. M33) At around 1:30 p.m., defendant went with the officers to Area 5 where the detective read her rights. She told the officers that she understood her rights, and chose to waive her rights and speak with the officers about the her *14 rape allegation and the murder of the cab driver. (R. M15) The defendant spoke with him and Det. Bogucki for about a half an hour. (R. M15) She told the officers that her rape complaint was a lie, but said that she had nothing to do with the cab driver's murder. She agreed to take a polygraph. (R. M34) Later that evening, about 6:45 p.m., defendant went to the polygraph unit at 11th and State. (R. M15) Prior to taking the polygraph, defendant was read her rights. (R. M17) The examiner told the officers that defendant said she was "there" but not involved in the murder, and that the test indicated that she was lying. (R. M35) After the polygraph, she was again advised of her rights, waived them, and spoke to the officers. Defendant returned to Area 5 with the officers around midnight. (R. M17) An assistant State's Attorney was contacted.

ASA Rosenblum arrived around 3:00 a.m. He advised defendant of her rights, she waived them, and spoke with the officers and the Assistant about the murder for almost 2 hours. (R. M18) Defendant returned to the lockup around 5:15 a.m. The officer had no further contact with defendant until the lineup which was conducted at 3:00 p.m. on October 15th. (R. M19) The officer stated that no other police personnel or Assistant spoke to defendant about the incident during the time she was in the lineup or after until the ASA arrived. (R. M19) Around 1:00 a.m. on October 16, 1992, ASA Nelson and the 2 detectives spoke with defendant in an interview room at Area 5. (R. M20) ASA Nelson advised defendant of her rights, defendant waived her rights, and spoke with the assistant state's attorney. ASA Nelson then prepared a written statement based upon this conversation. Around 4:15 a.m., Nelson returned to the interview room with the statement and went over the statement with defendant. Corrections were made to the statement, and defendant as well as the officers and the Assistant signed the statement. (R. M21) The detective did not have any further conversations with the defendant. (R. M22)

*15 The officer stated that neither he nor anyone in his presence told the defendant to "tell us the truth and you can go home." Neither he nor anyone in his presence told her that she made up the rape allegation, that her fingerprints were in the cab, that she had a gun, that video cameras had shown them that she was in Joliet

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

and at O'Hare, or that she was going to get the death penalty. (R. M22-4) He also
stated that no one said to defendant that the deceased had raped someone before, or
that if she told them what they wanted to hear she could go home, or if she said she
shot him because of the rape she could go home, or that she was "up here now, and
you could be down there". (R. M25) The defendant also did not request an attorney.
(R. M26) In total, the defendant gave about 5 contradictory statements regarding her
rape claim and the murder. (R. M41)

Det. Jerome Bogucki, an 18-year veteran of the Chicago police department, testified
that he and Det. Halvorsen accompanied Det. Schalk to defendant's home on October
14th. (R. M44) Defendant told them that she was willing to speak with them at the
police station. They did not speak to her about the murder during their ride to 11th
and State. He explained that the officers left defendant at 11th and State for about
a half an hour while they showed a photo array to witnesses who lived nearby. (R.
M45) Upon returning, they took defendant with them to Area 5 around 1:30 p.m., where
they read defendant her rights. She waived her rights and stated that she wanted to
talk about her incident with the victim, Rudolph Bennett. (R. M46) They spoke
together for about 20 minutes, after which she agreed to take a polygraph. They did
not speak with her further. (R. M47) They left Area 5 with defendant around 6:45
p.m. and went to 11th and State for the polygraph. (R. M47) Following the polygraph,
the examiner told them that there was "deception" in her responses. (R. M49) The
officers then had a short conversation with the defendant, and defendant "changed"
her original statement to them. They left 11th and State *16 around 11:15 p.m. (R.
M49) They returned to Area 5 and contacted the State's Attorney's Office.

ASA Rosenblum arrived around 1:15 a.m. (R. M50) Rosenblum gave defendant her rights,
and she stated that she understood, but wished to speak with them about the murder.
(R. M51) Following that conversation, defendant returned to the lockup around 5:15
a.m. The officers had no further contact with defendant until the lineup at 3:00
p.m. (R. M52) She was identified by 2 witnesses in the line-up, and was aware that
she had been identified. (R. M53) The officers had no further conversation with
defendant at that time. (R. M53)

Around 7:00 p.m. that evening, ASA Nelson arrived at Area 5, conducted witnesses'
interviews and reviewed paperwork in the case. (R. M53) About 5 hours later, the ASA
met with the defendant. She gave defendant her rights, and spoke with defendant in
the presence of the 2 detectives. ASA Nelson reduced the conversation to writing,
and reviewed the statement with defendant around 4 a.m. that morning. (R. M55-7)
Several corrections were made to the statement, then defendant, the officers and ASA
Nelson all signed the statement. (R. M57) Det. Bogucki stated that neither he nor
anyone in his presence told defendant that if she told them what she could go home,
nor told her that she made up the rape allegation, that she was never in the cab
with the deceased, nor that her fingerprints were in the cab, nor that she had a
gun, nor that she was there and knew she did it, nor that she was going to get the
death penalty, nor that someone recorded her at both Joliet and O'Hare, nor that the
deceased had raped a woman a few years ago and it was good that he was dead, nor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

that if she would tell them what they wanted to hear, she could go home, nor that if she said he raped her, and then she parking garage with they would let her go, nor refused to let her have an attorney. (R. M59-60) The officer testified that when they went to her home, they believed there could be a connection between her rape case and the murder of Mr. Bennett because the facts of both cases were so *17 similar. (R. M61) The officer stated that after defendant was told the results of her polygraph, she said that she had been in the parking garage with the victim, and that an unknown person walked up to the cab and shot Mr. Bennett. (R. M66) She also stated that she had been attacked by the cab driver, and that she then pulled his gun and shot him. (R. M67)

Officer Tovar, a polygraph examiner for the Chicago police department, testified that he conducted a polygraph of defendant at 11th and State on October 14, 1992. (R. M68-71) Officer Tovar explained that unless a subject wants to take a polygraph, the results of the test "may not be the most efficient test". (R. M73) For that reason, he spoke with defendant about her willingness to take the test, and she told him that she wanted to take the test. She signed both a Miranda waiver and a consent to take the test. (R. M73) After he performed the polygraph, he told defendant that the test indicated deception. She then said that she had been with the deceased in the cab, and the officer left to ask the 2 detectives to return. She then told all three officers that she had been in the cab with the deceased. (R. M75) Neither he nor anyone in his presence told defendant she could go home if she told the truth, nor told her that she was never in the cab, nor that her rape allegation was false, nor that she had a gun, nor that her fingerprints were in the cab, nor that she knew "who did it", nor that she was going to get the death penalty, nor that video cameras had shown her at Joliet and at O'Hare, nor that the deceased had previously raped someone else and that it was good that he was dead, nor promised to let her go if she said that the victim raped her and she shot him because he raped her. (R. M75-8) Defendant did not ask for an attorney. (R. M78)

Assistant State's Attorney Julie Nelson testified that she met defendant on October 16, 1992, around 1:00 a.m. She explained to defendant that she was an Assistant state's Attorney, and not her attorney, and again advised *18 her of her rights, which defendant again waived. Defendant said that she wanted to talk about Mr. Bennett's murder. (R. M88) She spoke with defendant for 2 hours. She also asked defendant how she had been treated by the police, if she had any problems or needed anything. (R. M89) Defendant said that she had no problems with the police officers, that she didn't want anything to eat or drink, and that she didn't need to use the washroom. (R. M90) She also explained to defendant that she could write a summary of the statement in their file, or she could prepare a written statement that defendant could review, correct, and sign, or they could have a court reporter prepare a statement. (R. M89-90) Defendant stated that she would prefer to make a hand written statement. (R. M90) The statement was prepared, and they read the statement out loud, together. (R. M92) The statement included the following statement by defendant:
Jerri Lindsey stated that she was treated well by the police and the Assistant State's Attorney. Jerri stated that she was not threatened or promised anything in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 15

exchange for this statement."

Defendant never indicated that she had been threatened or that any promises had been made to her. (R. M93) She never said that the police told her that she made up the rape allegation, or that she would get the death penalty, or that her fingerprints were in the cab, or that she had a gun, or that she had been caught on video cameras at both Joliet and O'Hare, or that anyone told her that if she killed the victim because he had raped her she would be let go. (R. M95-6) Defendant did not appear to be under the influence of alcohol or drugs. Ms. Nelson also asked defendant, and "Jeri stated that she was free from the effects of drugs and alcohol." (R. M96-7)

Defendant testified in her own behalf. She stated that she was 32 years old. On October 14, 1992, the police came to her home around 11 a.m. (R. M103) She stated that the police had a man in custody who had raped another woman, *19 and they wanted to see if he was also her assailant. They said they wanted to take her fingerprints and photo to prove that she was one of his victims. (R. M104) She said that she after she was fingerprinted and photographed, she went to Area 5 with the officers. They put her in an interview room and told her that they had brought her there for the murder of Mr. Bennett. She said she told them that she had lied about the rape allegation, and that she did not murder Mr. Bennett. (R. M106) The police told her that 2 people had identified her as being in the victim's cab, and that her fingerprints were in the cab. They said if she didn't do it, she knew who did and she would get the death penalty. (R. M107) She said she had lied because she didn't want Irene to know she had been out getting high, so she went to the hospital and "told the lie." (R. M108-9) She agreed to take the polygraph, and after the test, the examiner told her that the test said she was in the cab, and it placed her with the gun. He told her that the victim had raped a woman 5 years ago and gotten away with it so that it was good that he was dead. He told her that she could get the death penalty or she could go home. She could go home if she said the truth. (R, M112-3) She said he told her that 2 old people had identified her as getting into their cab near the casino in Joliet. (R. M115) She said that she was not there. She said she had not been to O'Hare since she was in 8th grade. (R. M116)

Defendant said she believed that she would go home, "until it got further and further down the line where I knew I wasn't going home. (R. M117) She said she signed the statement that she "did it" because she was mentally and emotionally drained and was tired "of them telling me I did something and I know I didn't do it so I gave up." (R. M119) She said she spent her time in custody dozing off and on, and got a little bit of sleep "laying on a table for hours and hours waiting for them to come back and interrogate me again." (R. M119) She said that she was taking tetracycline and Tylenol for a toothache, *20 and when they came to take her she could hardly see because she had not had much sleep and had been getting high for the two previous days. (R. M120) She said she was "whining" to go home, and that the police did not advise her of her rights until they told her that her fingerprints were in the cab and she had been identified. (R. M121)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Defendant testified that around 1:20 a.m. on the morning of October 10, 1992, she went with Jack St. Clair to his house, and drank the 2 beers she had brought with her. (R. M124) She went to see Jerry, Jack's brother, and Jack "pulled out the coke". (R. M125) They smoked until about 7 p.m. on October 11th. She spent all of her ninety dollars, which was from her unemployment check, on cocaine. (R. M126-130) She decided to tell a lie so she could "get in the house" that she shared with her daughter and her girlfriend, Irene. (R. M130) She told her plan to Jerry, and he told her not to lie, to tell Irene the truth, and she would understand. However, defendant said Irene would not. (R. M133) Irene had said she would leave her if she got high again. (R. M131)

Defendant walked to South Chicago Hospital, and continued to think about her plan. She arrived there around 10:00 p.m., and told them that she had been raped by a cab driver. (R. M131-2) She wore her trench coat and carried her clothes. (R. M149) She said her assailant had raped her orally and vaginally. She told hospital personnel that she stabbed the driver, because they kept asking her how she got away from the cab driver. (R. M134) She said she called Irene from the hospital, and Irene came with her sister. (R. M126) She spoke with police officers at the hospital, and stayed there for about 2 hours. She returned home on the night of October 11th, and went to bed after she spoke with a detective by phone around midnight. (R. M138-9) She said she had a hard time sleeping because the medicine she had been given at the hospital made her go to the washroom "every 5 minutes". (R. M140) She said she barely slept on the 13th because they were up watching t.v. (R. M141) She said **21 that she had pizza after the polygraph. (R. M141-2) She thought she was going back home. (R. M144) She told the officers that she wanted to take the polygraph. (R. M145) Defendant also stated that she had not been in Joliet since grammar school, but she lied about being there on the night of the murder because of "Tovar". (R. M150) She stated that she had never been in a cab with the elderly couple. (R. M150) She thought the polygraph examiner was "framing" her because he said the polygraph put her in the cab. (R. M152) For this reason, she told her third lie about what happened that night, namely, that she had been in the cab and an unknown man came up and shot the driver. (R. M153) She said that the police kept badgering her by saying that she killed the driver. (R. M155) She said that she gave the written statement admitting that she killed the victim because the "lady state's attorney" told her she had told too many lies, and a judge would not believe her. She said she had no hope, so she gave them a statement based upon the story the police had told her about the old people. (R. M158-9) She said she made up the whole thing except the part about the old people in the cab and going to O'Hare. "I said stupid stuff because I was tired of them in my face". (R. M162)

Prior to arguing the Motion to Suppress on involuntary grounds, defendant also indicated that he would prepare another Motion to Suppress upon three separate *Miranda* violations, namely, that she was not read her rights after her denial of involvement in the murder, two, her request for counsel was denied, and three, her use of medication and her lack of sleep made her unable to voluntarily waive her rights under *Miranda.* (R. N3-5)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 17

The court found that in this case, defendant originally was in the police station as a rape victim, and based upon the objective facts, a reasonable innocent person would believe that he was not in custody, but rather was there to assist the police in getting her rapist. (R. N25) "Secondly, after she came off the rape story, she told them evidence which would make her a *22 witness in a murder. So, once again, a reasonable person who is innocent ... Would not believe they were in custody." (R. N26) The court further stated that the amount of time that defendant was in custody was troubling, but it was "lessened" by the defendant's own testimony. "She rambled, she went on and on and on, much of it sounded to me to be nonsense. Inherently contradictory, and I have no doubt that it took the police a good deal of time so that they could get something they could comprehend. Again, that's not for the purpose of wearing down her will but simply to try to understand what was going on, was she a rape victim, was she a witness to a murder, in which she had no part to?" (R. N26) "I cannot believe that there is medication that would cause a person over a period of three days to go to the bathroom every 5 minutes. Her testimony about being under the influence of the narcotics and the drugs just simply does not hold true because there was a three day hiatus between the time she took the medication to the time she met with the police and probably even a four day hiatus between the time she ingested the drugs to the time the police came to talk to her about the alleged rape. (R. N27) The court further ruled that the police did not overcome the will of defendant to make the statement. (R. N29)

Defendant told the court that she did not want to proceed with the *Miranda* motion to suppress. (R. N29) She also waived trial by jury. THE TRIAL:

Ms. June Hess testified that on October 7, 1992, she and her friend, John Eiselt took a Greyhound Bus to the riverboat casinos in Joliet for a few days' stay. They stayed at the Redroof Inn, and contacted a cab company to take them to and from the casino. (R. P14) On October 9th, their "regular" cab driver, Leroy, was to pick them up at the Empress Casino at 2:30 p.m., and return them to their hotel. (R. P15) She explained that there was only one cab company who serviced the casino patrons. (R. P15, 35) As they waited outside *23 for the cab, they saw a Black woman "jump from the woods into the back seat" of the cab. (R. P16) The cab pulled up to the entrance. They asked the driver what had happened to Leroy, and the cab driver did not know. She looked into the back seat and saw defendant, who she identified in court. (R. P17) Defendant got out of the back seat and sat very close to the driver in the front seat. (R. P18) Ms. Hess said that she told her companion that she "didn't like this, something looked funny." (R. P19) The defendant's right hand crossed her body from left to right. (R. P19) Ms. Hess said that the driver was acting frightened and nervous. (R. P19) Ms. Hess again asked where Leroy was, and the driver said he was in Romeoville. (R. P20)

The dispatcher came over the radio and asked the driver if he had picked up the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

couple. (R. P20) He said he did, but that he also had another passenger. The dispatcher asked who it was, and the driver said, "I'll tell you when I get back." (R. P20) Defendant told the driver that she had to be at O'Hare at 4:30. (R. P21) Ms. Hess explained that the ride was frightening, and the cab driver was nervous. (R. P21) She and defendant also engaged in conversation. The defendant told her to take a Metra train the next time she came to the casino. In fact, defendant turned to the back seat and gave Ms. Hess a train schedule. Defendant only used her left hand to achieve this; Ms. Hess never saw defendant take her right hand from where she held it across her body. (R. P37) Mr. Eiselt asked the driver to stop for some beer. The driver asked defendant if this would be all right. Following a stop at a gas station for beer, the driver took them to the Red Roof Inn. (R. P22) Defendant remained in the cab. On October 13, 1992, around 7:00 a.m., Ms. Hess saw a t.v. announcement that a Circle Cab driver from Joliet had been murdered at O'Hare. The next day, detectives came to speak with them. (R. P23)

Ms. Hess described defendant as a female black, in her twenties, 5'2 to 5'4 , 120 to 140 pounds, with black straight hair combed to the side. (R. *24 P46) She stated that she later identified defendant's photo from a photo array. (R. P24-7) She also identified a photo of the line-up that she viewed. She again made an in court identification of defendant as the person she identified in the line-up. (R. P29-31) She identified the victim, Mr. Rudolph Bennett, as their cab driver. (R. P31)

John Eiselt testified that he retired after working for the CTA for 30 years. He also stated that he and Ms. Hess left the boat at 2:30 p.m., and waited for the Circle Cab they had requested. The cab was about 10 minutes late. (R. P53) As they saw the cab approach, a girl jumped from the bushes on the left, the cab slowed down but did not stop, and the girl got into the cab. (R. P54) The cab then pulled up to the entrance, the girl got into the front seat, and Mr. Eiselt and Ms. Hess got into the back seat. He identified defendant in court as the "girl." (R. P55) The cab driver was "very nervous." (R. P56) He identified defendant from a photo array, in a line-up, and in court. (R. P59-63) He identified a photo of the deceased as the cab driver. (R. P65)

Chicago police detective Jack Hines testified that on October 11, 1992 around 11:00 p.m. he was assigned to investigate an aggravated criminal sexual assault case. Defendant was the victim of that alleged crime. (R. R5) He went to South Chicago Hospital but she was not there. (R. R6) He called defendant, who told him that she had hailed a cab on October 10th around 1:00 a.m. to take her from 79th and Ridgeland to 89th and Houston in Chicago. (R. R9-11) However, the cab driver got on the expressway. When she asked where he was going, he pulled out a gun, pointed it at her, and told her to shut up. He drove a long way, forced her into a building, tied her hands behind her back, and forced her to have intercourse numerous times over a period of 40 hours. He then told her he was done with her, put her in a cab, and drove to a wooded area, where he told her he was going to have "one more". She stabbed him in the chest with a *25 knife that she had kept, ran into the woods, and hid there until dark. At sundown, she flagged down a car, and a lady told her she

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

was in Joliet and took her to South Chicago Hospital. (R. R14) Defendant described the cab as red and white. The officer called the Joliet police and the State police, and asked them if they had located a red and white cab with an injured driver. (R. R15) The State police did not have any information, however, the Joliet police gave the officer a photo of a missing 50-year-old black male cab driver. (R. R17-8) The officer went to defendant's home, and asked her to come to the station to view the photo to determine if this was the cab driver who had assaulted her. (R. H18-19) He drove her and her friend to the station. (R. R20) He spread several photos of male blacks, including that of the victim, Rudolph Bennett, on the table. The defendant refused to look at the photos. The officer then took her home. (R. R21) He later learned that the missing cab driver, Rudolph Bennett, had been found murdered at O'Hare Airport. He called the Joliet police and gave them this information. (R. R22)

Assistant State's Attorney Julie Nelson testified that she went to Area 5 on October 15, 1992 after 7:00 p.m., spoke with detectives, reviewed police reports and documentation in the case, and spoke to 3 witnesses. (R. S6) She spoke with defendant, whom she identified in court, at approximately 1:00 a.m. on October 16th. (R. S7-8) She identified herself to defendant, and explained that she was not defendant's attorney. Defendant stated that she understood that. She also gave defendant her rights under *Miranda* from memory, and defendant stated that she understood, and choose to waive them and speak with her. (R. S9-11) She spoke with defendant about Mr. Bennett's murder for 2 hours. (R. S11). Ms. Nelson returned a short while later to speak with the defendant alone. She asked defendant how the police and a prior assistant state's attorney had treated her. Defendant said that she had no problems with anyone she had come "into contact with". (R. S13) Defendant chose to have a **26 written statement of their conversation prepared. (R. S14) Ms. Nelson prepared the statement, and brought it to defendant for her review. Defendant read the statement, made corrections, and signed the statement. (R. S19-21) Defendant told her that this statement was the truth, and that her previous statements were not. (R. S33) Defendant never asked to speak with an attorney. (R. S40) Ms. Nelson never said to defendant that she would decide who was telling the truth. (R. S40) Defendant had brought a friend with her to the station. Ms. Nelson did speak with defendant's friend, but did not take a statement from her. (R. S43-4)

Defendant's statement was admitted into evidence. (R. S44) In her statement, defendant admitted that she flagged down a cab while she was in Joliet. The cab also picked up an elderly couple who was waiting for the cab a short distance away. The driver stopped at a liquor store for the couple, and then brought them to their destination. She and the driver proceeded to O'Hare. The driver drove into the parking lot, but she did not know why. She decided not to pay the driver, and tried to leave the cab. The driver grabbed her by the arm. She said that she had noticed a gun wedged in between the seats, and grabbed the gun. She shot him more than once. She took his wallet from him, and removed the cash. She threw the gun and the wallet on the side of the road. She went to a bar, and had some drinks and a polish sausage. (R. CL. C69, Def't Br. A68-71)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                    Page 20
(Cite as: 1997 WL 33762019)


Chicago police officer Michael Gallagher, a 27 year veteran, testified that he was
assigned to the O'Hare vehicle patrol. On October 12, 1992, around 6:00 p.m., he
investigated a "suspicious cab" call. (R. S47) The cab had been backed into the
space, which was unusual. It was a maroon and white Circle Cab from Joliet. (R. S48)
When he looked inside, he saw a man lying across the passenger's seat. (R. S49-50)
All the doors were locked. He also saw shell casings on the seat and on the
dashboard. (R. S50)


**\*27** Det. James Bogucki testified that he was assigned to investigate a homicide at
O'Hare Airport. He saw a maroon and white Circle Cab with "an apparent dead male
black, approximately 50 years old" inside. (R. S58) A short term parking stub from
the O'Hare parking garage was in the dashboard showing through the window. (R. S58)
The ticket indicated that the cab had entered the parking area on October 9th at
4:59 p.m. (R. S60) The victim had been shot several times in the right side of his
chest. (R. S62) There was no wallet, money or identification found on the victim.
(R. S67-8) The officers contacted several employees of the Circle Cab Company,
including the wife of the deceased who had earlier reported her husband to be
missing. (R. S68) The victim was positively identified to be her husband, Rudolph
Bennett. (R. S69) After speaking with Joliet detectives and 2 elderly persons, the
officer stated that he was looking for a heavy-set female black in her twenties. (R.
S71)


Det. Bogucki went to defendant's home around 11:00 a.m. on October 14, 1992, with
Dets. Schalk and Halvorsen. (R. S71) The officers asked defendant to come to the
station to aid them in the investigation of both her rape complaint, and the murder.
Defendant agreed, went to dress, and came outside. (R. S73) They stopped at 11th and
State to obtain a polaroid photo, and fingerprints of defendant, which she agreed to
provide. (R. S74) The photo was shown to Ms. Hess and Mr. Eiselt, who identified her
as the woman who shared a cab with them on October 9, 1992. (R. S74-9)


The officers returned to the police station where defendant was waiting in an
interview room. The officers asked defendant to again tell the details of her rape.
The officers advised her of her rights under *Miranda*. (R. S83) Defendant stated
that she understood her rights. (R. S83-5) The officers told her that she had been
identified by 2 witnesses as being last seen in the cab of a taxi driver who had
been shot and killed at O'Hare. (R. S85) They also told her that some of the details
of her rape story were the same as some of **\*28** the details of the murder. She then
told the officers that she had made up the rape story, and that she had done so
because she had stayed away too long from her lover. She said she knew nothing about
the murder, and had not been in Joliet. (R. S86) The officers had a third
conversation with defendant around 11:00 p.m. on the 14th. She told the officers
that the cab driver who had been killed at O'Hare had tried to rape her and she shot
him with his own gun. (R. S87)


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

On October 15th, around 12:30 a.m., the officers again advised her of her rights, and asked her to again explain what had happened. Defendant waived her rights, and said that she took the Metra train from her neighborhood to Joliet. She said that she had no particular destination, but just wanted to walk around. She walked for a long time until she found herself in a wooded area. She decided to flag down a cab, and asked the driver to take her back to Chicago. About a block later, the driver picked up an elderly couple. The driver asked her to get in the front seat so that the couple could sit in the back. Defendant spoke with the couple, and gave them her Metra train schedule. They also stopped so that the couple could buy some beer. (R. S90) The driver took the couple to their hotel. After leaving the hotel, the driver pulled over, took out a gun, and blindfolded defendant. He drove her to an unknown building, where he repeatedly raped her and forced her to perform oral copulation until Sunday afternoon. (R. S91) He then took her, again blindfolded, for a long drive until she found that she was in the 4th level of the parking garage at O'Hare airport. The driver told her to give him her money, and she gave him about $90. He then raped her again in the front seat of the cab. (R. S91-2) She said that the driver put the gun on the seat to rape her, and that she was able to get the gun after the rape and shot him several times in the chest. (R. S92) She ran from the cab wearing only her coat. She *29 left her purse and gun behind. She ran out to the highway, where a motorist drove her to a hospital. (R. S92-3) The officer called felony review.

Around 3:00 a.m., ASA Rosenblum spoke with defendant. Mr. Rosenblum advised defendant of her rights, and defendant stated that she wished to make a statement. (R. S94) Mr. Rosenblum said her claim that she went to O'Hare on October 11th could not be true because the garage parking stub indicated that they had entered the garage on October 9th. (R. S94) Defendant then told him that after the driver had dropped the elderly couple at their hotel, he pulled over at the side of the highway and raped defendant on the front seat of the cab. She then asked the driver to take her to Chicago. The driver then took her to O'Hare. (R. S95) The driver went to the 4th level, and raped her again. She took a gun which was between the seats and shot the driver. She left the gun in the cab, as well as her money, and did not lock the cab. She dressed outside the cab, and then went to the highway and flagged down a motorist. (R. S96) The motorist took her home. (R. S96) Irene was home. She did not make the claim of sexual assault until the 11th of October because she was afraid. (R. S97)

When he next spoke with defendant at 4:30 a.m. Mr. Rosenblum told her that they had received the hospital records which showed no signs of trauma, and also cited various inconsistencies in her story. Defendant then said that when she flagged down the cab originally, she had made an offer of a "blow job" for a ride, and that the driver accepted the offer. However, he told her that he had to pick up a fare. They picked up the elderly couple and he dropped them off at their hotel. He pulled over to the side of the road to collect his "blow job." "She stated that she did orally copulate the cab driver on the side of the road and that he did not ejaculate." (R. S99) He took her to O'Hare, pulled into the parking lot, and they again attempted oral copulation. After she began, her tooth started to hurt, and she had to stop.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                            Page 22
(Cite as: 1997 WL 33762019)

She explained her pain, but he responded by slapping her twice. He told her that if she could not **30** finish the job, then she would have to pay him. She said that she gave him her $90, but because he slapped her, she took the gun she had seen in between the seats, and shot him. She took the wallet, and left the gun in the cab. (R. S101)

On October 15, around 3:00 p.m., defendant was placed in a line-up where she was identified by both Ms. Hess and Mr. Eiselt. (R. S103-4)

Assistant State's Attorney Julie Nelson spoke with defendant around 1:00 a.m. on October 16th. (R. S105-6) After she advised defendant of her rights, defendant stated that she understood, and that she wished to make a statement. (R. S106) Defendant spoke with ASA Nelson for about 2 hours, and then ASA Nelson prepared a written statement which was reviewed and signed by defendant. (R. S108-9) The detective never told defendant that her prints were found on the Metra schedule she gave to Ms. Hess. (R. T66) Defendant told the officers when she was processed that she was 5'5 tall and weighed 150 pounds. (R. T69)

Mrs. Bennett, wife of the deceased, testified that she and her husband owned the Circle Cab Company in Joliet. (R. T72) They had 4 cabs; her husband worked as one of the drivers and she worked as the dispatcher. (R. T73) When her husband radioed in around 2:00 p.m. on October 9, 1992, she told him to pick up two fares at the Empress. (R. T75) She radioed him to make sure he had collected both fares at the Empress, and he told her that he had, as well as another fare to O'Hare. He told her where he was going so she could place the destination on the dispatcher sheet. (R. T77) He had his wallet with him. (R. T78) It was stipulated that her husband was found dead in the taxi he owned and was driving when Mrs. Bennett last saw him. (R. T80) Mrs. Bennett stated that when she next saw her husband, on Monday, October 11th, he was dead. (R. T81)

**31** It was stipulated that Dr. Robert Kirschner, deputy-medical examiner of Cook County, would testify that he performed the autopsy on Mr. Bennett. His death was the result of multiple gunshot wounds to the chest. (R. T83)

Jack St. Clair testified that he had known defendant for 7 years. (R. T6) He stated they went out together on October 9th. He said they met shortly after midnight, which would be the 10th of October. (R. T8) He said she had called him earlier, about 11:00 a.m., and they made plans to meet after he got off work. (R. T9) They arrived at his house around 2:00 a.m. on October 10th. (R. T12) He said they made love for about 2 hours, and then she decided to see his brother, Jerry. (R. T13) Jerry had an apartment in the basement. (R. T14) He stated that defendant, Irene, Jerry and himself all worked together. He said that Irene worked the evening shift, 11 to 7. He said defendant never "hooked up" with him when Irene was home. (R. T16) Defendant told him about her relationship with Irene. He testified that he and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                        Page 23
(Cite as: 1997 WL 33762019)

defendant did not have any cocaine, "just beer". (R. T18) Defendant also asked him
to hold on to her money for her. (R. T18) He next saw his brother on Sunday, October
11th, before he went to work. He asked about defendant, and his brother told him
that she was gone. (R. T24)


Irene Quiroz testified that she and defendant lived together as lesbian lovers for
about 5 years. (R. T88) She said she and defendant did not work with Jack or Jerry
St. Clair. (R. T88-9) She said she left work at 8:00 a.m. on October 9th, cashed her
check, picked up defendant at their home, and went to pay the landlady. They went
shopping together at Venture in River Oaks, went to Shakeys for breakfast, went to
Walgreens, returned home, unpacked, and went to her brother's house. (R. T102-5)
Defendant and she then returned to River Oaks with Irene's brother and other family
members around 2:40 p.m. (R. T107) They left the shopping center around 4:30 p.m.,
and returned home. (R. T110) She left for work at 11:00 p.m. Defendant was not home
when she returned at *32 8:00 a.m. (R. T113) The next time she heard from defendant
was Sunday night at 9:00 p.m. (R. T113) Following the phone call, Irene went to
South Chicago Hospital where she found defendant in the emergency room. (R. T114)
Irene took her home around 11:30 p.m. (R. T115) Irene said defendant weighed about
210 pounds. (R. T116) Irene said she told ASA Nelson and the two detectives all
about shopping with defendant on October 9. She denied ever telling the ASA or the
detectives that she could not remember what she had done on October 9th. (R. T125-7)
She also stated that she never talked to the police on the 11th of October to make a
missing persons report on defendant. (R. T129) However, she later testified that she
did speak to the police, and gave them a description of defendant. She said she told
them defendant was 5'5 , but denied telling them that she weighed 150 pounds. (R.
T131) She stated that she could not remember what questions the police asked her, or
what answers she may have given them. (R. T152)


Robert Quiroz, Irene's brother, testified that defendant and Irene came to his house
on October 9, 1992, around 2:00 p.m. He, his mother, his fiance, his 2 children,
Irene and defendant all went to River Oaks to shop. They went in two cars. (R.
V10-1) They all shopped together, until he left around 5:00 p.m. (R. V12) He did not
see Irene until the following Monday or Tuesday. He did not know defendant was
missing, until Irene told him that she had been arrested. (R. V15-6)


Amelia Quiroz, Irene's mother, testified that defendant and her daughter Irene were
friends. (R. V20) She heard from Irene that defendant had been arrested, and either
a few days or a week later, they were asked to go to the State's Attorneys' Office.
(R. V21) She stated that defendant and Irene came to her house around 1:00 p.m. on
October 9, 1992, and asked her if she would like to go shopping with them to River
Oaks. (R. V23) They brought her *33 home around 5:00 p.m. (R. V27) She stated that
defense counsel told her "what the truth was and everything." (R. V37)


Olga Martinez testified that she had known the Quiroz family since 1964. (R. V40-1)
On October 9, 1992, she was waiting for defendant and Irene to come home so they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 24

could use their oven. Defendant came home around 6:00 p.m. (R. V42) She said either Irene or Angie, Irene's sister, asked her about a week after defendant was arrested to remember that on October 9th they had been waiting for them to bake biscuits. (R. V47)

Dorothy Ramirez testified that she had known defendant for 8 years, as she was a friend of her sister-in-law, Irene Quiroz. (Deft. Br. 53-4) She said she first heard about defendant being arrested on the news. (R. V55) She and other family members went to the state's attorney or the police after defendant's arrest. She said defendant came to her house on October 9th around 2:00 p.m. (R. V56) She, her husband, her mother-in-law, Irene and defendant all went to River Oaks. (R. V60-2) On Saturday, October 10th, Angela, Irene's sister, told her and her husband that defendant was missing. (R. V63-4) She and Angela went to look for Irene. Her husband also looked for defendant. (R. V6-45) She said that all her family members talked together about the events of October 9th before they testified. (R. V67-9) She stated that they all live within a close proximity to one another and had been talking about "this" since it happened. (R. V71)

Det. Bogucki testified that he was the investigator assigned to defendant's case, and that he was not aware of any interview the police or state's attorney had with Irene, Dorothy Ramirez or Amelia Quiroz.

Defendant testified in her own behalf. She stated that she did not rob or kill Mr. Bennett. (R. V94) She stated that the police came to her home around 11:00 a.m. on October 14, 1992, and took her to the police station. After she had spoken to them for a while, they told her that they did not **34 believe her rape allegation. (R. V94-5) She told them that she would tell them the truth. (R. V95) She said that she was lying about the rape because she did not want Irene to know that she had been getting high. (R. V96-9) She told them her rape complaint about the cab driver was a lie after she was confronted with his murder. (R. V99) She then told the police that she was with her friends getting high. She gave several different versions after she told them the truth, but only her first statement was the truth, "except for the third, the version with the old people, I did not tell them that, they told me that." (R. V100) She said that she never told the officers that she was in a cab. (R. V101) She admitted that prior to speaking to any police, she had told nurses and doctors at South Shore that she had been abducted by a cab driver in a red and white cab who repeatedly raped her, and then she stabbed him in the chest while in a wooded area of Joliet. (R. V118-9) She stated that she signed her confession because, "I was mentally and I was emotionally drained, and I was tired..."(R. V102) She said that she lied to the polygraph examiner because he told her to. (R. V107) He told her that it was good that the driver was dead because he had raped a girl 5 years ago and gotten away with it. (R. V108) She said that she thought in her mind that she was going to go home, that she wanted to go home, so that she just kept making up "stuff" so that she could go home. (R. V112)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                                          Page 25
(Cite as: 1997 WL 33762019)


Defendant agreed that she was the first person to talk about the fact that there was
a cab and a cab driver involved, that the cab was red and white, and that the crime
originated in Joliet. (R. V120) She also told the State's Attorney that she took the
train from Chicago to Joliet, and that she walked around a bit after she got there.
(R. V129) She also told the Assistant that she got into a cab in Joliet, but not on
the 9th of October because she was shopping that day. (R. V134) She said that she
never told the Assistant that she got into the cab with 2 old people, that she got
in the front seat with the *35 driver, or that they stopped for beer. (R. V136) She
denied telling the Assistant that she told the driver she was not going to pay him,
but agreed that she told Ms. Nelson that when she attempted to get out of the cab,
the driver grabbed her arm, but she got away and ran down the expressway. (R. V137)
Defendant also agreed that she told the Assistant that she saw the gun between the
seats, grabbed it, and shot the driver, but she said she was lying when she told the
Ms. Nelson this statement. (R. V138-9) She agreed that she also told Ms. Nelson that
she took the gun from the cab, as well as the driver's wallet, put the cash from the
wallet into her purse, and threw the gun out on the side of the road. (R. V142) She
also told Ms. Nelson that she was picked up by a woman named Carolyn Brown, whom she
told she had been raped, and Ms. Brown took her to the hospital, but that she made
that up. (R. V143) Defendant stated that she told so many lies she was unclear as to
what else she may have said. (R. V128, 143) She said the only information that the
police "fed her" was the "old people" part. (R. V144) She said that Irene left for
work around 11:00 p.m. on October 9th. Jack St. Clair called her around 1:00 a.m. on
Saturday, October 10th, and she went to his house and stayed there until Sunday
night. (R. V124) Jerry St. Clair walked her to the bus stop, and she told him about
the lie she was going to tell so Irene would not be mad at her. (R. V125) She said
the first thing she told anyone was that she had been shopping with Irene and her
family on October 9th and then went to Shakeys (R. V149); however, she did not tell
Det. Hines this. (R. V151) She also said the police never asked her weight. (R.
V155)


Det. Les Balaszek testified that he was working in uniform on October 11, 1992 while
investigating a missing person's report regarding defendant. (R. W8) He took the
report from defendant's then 14 year-old daughter, Tenisha, and defendant's
"lover/roommate". (R. W23-4) They told the officer that they had last seen defendant
at 3:00 a.m. on October 9, 1992. (R. W9) They described *36 defendant as being 5'5,
150 pounds, and stated that she wore rings on her left hand. (R. W9-10)


Det. Ernest Halvorsen testified that on October 15, 1992, he went to Irene's home to
speak with her. (R. W31) He and his partner, Det. Guevara, asked Irene if she knew
where defendant had been the afternoon of Friday, October 9, 1992. (R. W32) She said
she was not sure, but she thought that was the day that they had gone shopping with
her mother, brother and fiance. The officer asked her if there was some way she
could verify this, such as a receipt, and Irene said she would call her brother. (R.
W32-3) Irene made the call to her brother in the officers' presence. After she
completed the call, she told the officers that they had gone shopping to Venture on
Thursday, not Friday. (R. W33) While the officers where still in Irene's home,
Irene's brother Bobby called back. (R. W33) He said that the more he thought about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 26

it, it was probably Friday when they went shopping. (R. W34)

Assistant State's Attorney Julie Nelson testified that she spoke with defendant in the late evening hours of October 15th. Defendant told her that on October 9, she went to a liquor store, a submarine place, Chinese and polish sausage places, but she never said that she had gone to Venture, Walgreens or Shakeys. (R. W42) She never said she was with Irene, Amelia Quiroz, Bobby Quiroz, Dorothy Ramirez or Olga Martinez on October 9th. (R. W43) Ms. Nelson stated that she was accompanied by Det. Schalk and Bogucki when she was with defendant except when she asked defendant how she had been treated by the police. (R. W44) Defendant's statements were from defendant's "own mouth", Schalk and Bogucki did not add to what she was saying. (R. W45) It was defendant, not the officers, who told her that the rape had occurred on Friday, October 9th. (R. W46, 52) Defendant never said that she was tired, or that she wanted the questioning to stop. (R. W46) Every statement contained in the defendant's confession was made by defendant. (R. W47)

**\*37** Det. Bogucki testified that he prepared defendant's arrest report from information she provided. Defendant told him that she was 5'5 , and that she weighed 150 pounds. (R. W58) During the course of his interviews with defendant, she never told him that she had been shopping at Walgreens or Venture on October 9th. (R. W58-9) She also never mentioned that she had been with Irene or her family on October 9th. (R. W59)

It was stipulated that Irene Quiroz went to work on October 9th at 11:30 p.m., but she did not work a full shift that evening. (R. W67-8)

Officer Tovar, a polygraph examiner for the Chicago police department, testified that he spoke with defendant on October 14th, and told her that he felt she was lying. (R. W70) She then told him that on October 9th, she had been in a cab at O'Hare, that the driver raped her, that as she sat with her clothes in her hands, someone came up and shot the driver, and that she then ran out of the cab with her clothes in her hands. (R. W71)

### The Court's Ruling:

The court ruled that the identification of defendant as the woman last seen with the victim is "as good an identification as I think we are ever going to get." (R. Z60) "What you have is a superb identification". (R. Z61) The court further ruled that even if defendant's confession was considered in "the light most favorable to her", there was still a "substantial amount of evidence coming from the defendant that is consistent with this killing." (R. Z62) The court stated that even if he excised those potions of her statement where she admitted to killing and robbing the defendant as counsel asked him to, there was still evidence sufficient to sustain a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

guilty finding. (R. Z62)

As to the alibi, the court found it "strange" that Irene testified that she worked a full shift on October 9th, came home, did some things, went shopping for the entire day, and then worked almost another full shift all without sleep. (R. Z63) He also found it strange that all the alibi witnesses *38 knew precisely the day they went shopping, but none knew the day they supposedly came down to talk with the police or state's attorney, or knew who they spoke with. (R. Z63-4) He also stated that the testimony was that they went shopping for the children's Halloween items, but the receipts they presented indicated purchases of 24 cans of beer and "quite" personal hygiene products. (R. Z64) "And finally, Ms. Quiroz was originally queried about the shopping, it was the day before. She did it, totally changed the story allegedly after telephoning her brother. Her brother called back, rather, but once again it seems to me more likelihood is they then realized that the important date to Miss Lindsey was Friday and not Thursday when they, when Irene Quiroz was queried independently about the shopping, it was Thursday." (R. Z64) "There are other inconsistencies but what I have on one hand is the identification of 2 disinterested people, no motive. Ample opportunity. Circumstances to see with crystal clarity Miss Lindsey. The statement of Miss Lindsey." (R. Z64-5) The court disbelieved defendant and the alibi witnesses, and was convinced of the guilt of defendant beyond a reasonable doubt. (R. Z65) He found defendant guilty of first degree murder and of armed robbery. (R. Z65)

Following argument on the post-trial motions, the court noted that the witnesses' were not expert at weight determination, they observed defendant seated in the cab. and that their identifications of her were clear and fairly made. (R. AA16) "In my mind, the evidence of the defendant's guilt at trial was overwhelming." (R. AA17)

While finding defendant eligible for the death penalty (AA19), the court sentenced defendant to 45 years' imprisonment. (R. AA29)

*39 ARGUMENT

I.

THE TRIAL COURT DID NOT COMMIT MANIFEST ERROR BY ITS DENIAL OF DEFENDANT'S MOTION TO SUPPRESS.

Defendant argues that the trial court erred when it severed the allegations in his motion to suppress for purposes of proof. Defendant claims that the court, by doing so, refused to consider his involuntary *Miranda* claim. However, a reading of the record proves that the court afforded defendant the opportunity to present such a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 28

claim, and defendant chose not to do so. Additionally, several of the statements made by defendant were made prior to her arrest. *Miranda* claims are limited to instances of custodial interrogation *People v. Lucas, 132 Ill. 2d 399, 548 N.E.2d 1009 (1989)*, and defendant bears the burden of proof that he was seized, and that his seizure was unlawful. *People v. Williams, 164 Ill. 2d 1, 645 N.E.2d 844, 848 (1994)*. In this case, the trial court advised counsel that he had the burden of proving that an arrest had occurred. He did not alter burdens of proof on coercion claims. *People v. Garcia, 165 Ill. 2d 409, 422, 651 N.E.2d 100, 106 (1995)* As to her final, written statement made after her arrest, the record proves that the statement was knowingly and voluntarily made. A trial court's ruling on a motion to suppress will not be disturbed absent a showing that the ruling was manifestly erroneous. *People v. Glass, 209 Ill. App. 3d 384, 391, 568 N.E.2d 211 (1st Dist. 1991)*. As argued below, defendant has not met her burden, and no reversal is required.


A.


Defendant Has Waived Any Claim That The Trial Court Improperly Stated The Burden On Her Motion To Suppress For Failure To Give *Miranda* Admonishments.


Initially, the People request that this Honorable Court decline to review this issue as defendant has based her entire argument on her erroneous **\*40** statement that the trial court refused to consider defendant's claim that her confession was the result of a *Miranda* violation and refused to consider how it affected the voluntariness of her statement. (Deft. Br. 23) Such a claim completely distorts the record in this case. It was defendant who chose to withdraw her claim of a *Miranda* violation, and who requested that the court not consider the claim, a fact that defendant chooses on appeal to mention only in a footnote. (Deft. Br. 24)


Prior to trial, defendant sought to suppress her numerous confessions on various grounds, including 2 involuntary claims, one based upon coercion and the other, a *Miranda* claim, based upon a lack of giving, understanding, or honoring *Miranda* rights. As will be discussed below, the trial court chose consider the coercion claim separately from the *Miranda* claims. The court then asked counsel which of the two claims he would like to proceed on first, the *Miranda* claim, or the coercion claim. (R. M7) Counsel chose the coercion claim. (R. M7) Before arguing the Motion to Suppress as involuntary on coercion grounds, defendant also indicated that he would prepare another Motion to Suppress defining the *Miranda* violations, namely, that she was not read her rights after her denial of involvement in the murder, two, her request for counsel was denied, and three, her use of medication and her lack of sleep made her unable to voluntarily waive her rights under *Miranda*. (R. N3-5) Counsel indicated that much of the evidence already presented at the "coercion" hearing would also apply to this separate motion. (R. N5) The court, however, told counsel that he had heard no testimony regarding *Miranda*. (R. N6) Following arguments, the court found that defendant voluntarily confessed to these crimes, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that her lack of sleep and medication claims were both unbelievable (R. N27), and
did not make her statements involuntary. (R. N29) The following then occurred:
**41** Mr. Sorosky: The defendant does not want to go ahead with the Miranda motion,
this is what she tells me. But like I said --
The Court: Is that correct, Miss Lindsey.
The Defendant: Yes. (R. N29)

Defendant, by claiming that the trial court refused to hear her *Miranda* claim, has
completely misled this Court, and her argument has no merit. Further, her decision
to withdraw her *Miranda* claims has waived review of this issue. *People v. Hubbard,*
*107 Ill. App. 2d 79, 246 N.E.2d 44, 47 (1st Dist. 1969)*. Defendant has also waived
of review of this issue by her failure to include the issue with required
specificity in her motion for new trial. (R. CL 85) *People v. Enoch, 122 Ill. 2d*
*177, 186, 522 N.E.2d 1124 (1988)*. "The mere referral to a cited error in a
post-trial motion as prejudicial or erroneous is insufficient to preserve an issue
on appeal." *People v. Burnett, 267 Ill. App. 3d 11, 15, 640 N.E.2d 1350, 1352 (1st*
*Dist. 1994)*; citing *People v. Medeiros, 249 Ill. App. 3d 139, 140, 618 N.E.2d 1065*
*(1st Dist. 1993)*. In her post-trial motions, defendant alleged that the trial court
erred in his ruling denying the motion as defendant was induced by police to make
the confessions. She did not allege that the trial court erred in its determinations
of burden, or in severing the coercion claim from the *Miranda* claim. (CL. C85) As
such, the issue is waived. Should the Court choose to consider this issue, the trial
court's determination that the confessions were voluntary is not against the
manifest weight of the evidence. Further, the trial court's decision to sever
allegations in the motion was not a manifest abuse of discretion, nor did prejudice
result.

B.

A Reading Of The Record Proves That The Trial Court Did Not Improperly State Burdens
Of Proof.

In this case, defendant made a series of statements regarding her part in the murder
of Rudolph Bennett. As is outlined in the statement of facts, defendant admitted to
nurses that she stabbed the victim and admitted to **42** officers that she stabbed the
victim prior to any arrest. Clearly, no *Miranda* violation could be claimed as to
these statements. While not specifically outlined by defendant, it appears defendant
on appeal argues only that the written statement was improperly allowed into
evidence based upon a *Miranda* violation, while at trial, counsel sought to suppress
all statements made at the station. Defendant argues that the trial court's improper
assessment of the burden of proof as to a *Miranda* claim deprived him the opportunity
to contest the confession. However, defendant's appellate claim overlooks the fact
that trial counsel sought to suppress all statements, which resulted in the trial
court's statement assessing "burdens." The trial was not relieving the State of its

*Miranda* violation burden. Rather, it was advising counsel that he must first prove that the setting in which the contested statement was made was one that triggered *Miranda* rights to argue that the claim was made in violation of *Miranda*.


A claim similar to that advanced by this defendant was made in the case of *People v. Reid,* 136 Ill. 2d 27, 52-3, 554 N.E.2d 174, 186 (1990). In that case, the Supreme Court considered defendant's claim that the trial court improperly placed the burden of persuasion on defendant as to the voluntariness of the confession under a *Miranda* claim. *Reid,* 136 Ill.2d at 53. However, the Supreme Court noted that while the trial court discussed burdens, the remark was unclear, and the Court noted that it believed the trial court was referring to defendant's burden of proof after the People presented evidence of a prima facie case. *Reid,* 136 Ill.2d at 54. The same reasoning applies in this case. Here, during the hearing on the first motion to suppress, the trial court stated that it was defendant's burden to establish that defendant requested to go home to show that a custodial questioning occurred, as the parties had agreed that defendant voluntarily came to the station and voluntarily chose to talk with the police. (R. G41) The court stated that defendant had not **43** established at what point she was in custody when she was at the police station, as she agreed that she voluntarily came to the station. Counsel again revisited the issue in the hearing on a second motion to suppress, and the court again stated that the People had the burden as to any 5th Amendment coercion violation, but as to issues such as allowing a phone call, defendant had the burden of "showing a *Miranda v. Arizona* violation." (R. M5) The court was advising counsel not that he had to prove coercion as to a *Miranda* violation, but that he first had to establish that the statement sought to be suppressed on the basis of a *Miranda* claim was a custodial statement, and that defendant was entitled to have been given those admonishments prior to making the statement in question. It is not the State's burden to prove that defendant's statement was a custodial statement. *Lucas,* 132 Ill. 2d at 417-18; *Williams,* 164 Ill. 2d at 12. The People had already established that defendant voluntarily came to the station and voluntarily spoke with the police. The confusion in this case lies in the fact that there were a number of statements made prior to, and after, the time the court found defendant to be under arrest. Where a defendant claims his statement was coerced, the burden of proof remains on the People whether or not the statement was made in custody. Questions of whether defendant voluntarily waived *Miranda* rights require a showing that defendant was in custody, which is the burden of the defendant. *Lucas,* 132 Ill. 2d at 417-18. In this case, the trial court was not attempting to "shift" the burden on a *Miranda* involuntary claim. Rather, it was telling counsel that he first had to establish that *Miranda* rights should have been given, particularly in light of the fact that the court had already ruled that defendant voluntarily accompanied the police for questioning at the police station. (R. G40-48)


Additionally, prior to argument on this motion to suppress, the court asked counsel if he wanted to go into the *Miranda* issue, including an **44** allegation in the petition that defendant had asked for counsel. The court said "I have heard nothing, not a thing relative to *Miranda*. (R. N4) Counsel agreed, "No, not *Miranda* per se."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(R. N4) The court again told counsel that a generic 5th amendment claim and the
issue of *Miranda* were 2 separate issues. (R. N5) The court was again telling counsel
that he had not shown "*Miranda* itself." (R. N5) Counsel told the court "Let's just
argue this motion, then we'll file another motion regarding *Miranda*." (R. N6) In its
ruling, the trial court again pointed out that defendant was not in custody when the
questioning began, and when she made several of the statements in question, "in
light of no evidence that she -- a reasonable person would believe she was in
custody." (R. N25-6) The trial court was not placing a burden of defendant to prove
coercion, he was again telling counsel that he had not shown that his client was in
custody for all these statements which would trigger *Miranda* rights. The trial court
was telling counsel to separate the statements, and show custodial questioning as to
those statements he sought to suppress under his *Miranda* claim. However, like
appellate counsel, trial counsel simply assumed that custody need not be shown to
succeed on a *Miranda* claim when some statements are made in custody, and some not.
As such, defendant's entire argument is based upon a faulty premise and must fail.

**\*45** C.


No Manifest Error Occurred In Finding Defendant's Statements Were Voluntary.


1.


    The record proves that the trial court did not take judicial notice regarding
defendant's medications; rather, it found defendant's claims as to its effect on her
           confession to be incredible based upon the evidence presented.


Defendant argues that the trial court found that tetracycline and tylenol were not
medications which would cause a person to go to the bathroom every 5 minutes, and
therefore the trial court improperly took judicial notice of the effects of
medication. (Deft. Br. 31) Initially, the People maintain that defendant has waived
review of the issue by his failure to argue this issue at the trial level and by his
failure to include the issue in his motion for a new trial. *People v. Johnson, 250
Ill. App. 3d 887, 620 N.E.2d 506, 511 (1st Dist. 1994).* Further, defendant has
misrepresented the record in this case, and his entire argument must fail. Contrary
to defendant's claims, the finding was one of credibility, not judicial notice of
the effects of medication, and that finding was based upon the evidence presented.


During the hearing on the on the motion to suppress, defendant claimed that she was
coerced into making her statement because, among other things, she was tired as she
was unable to sleep as she had taken tylenol and tetracycline for a toothache. She
stated that these drugs made her go to the washroom every five minutes. (R. M140)
She did not claim that the effects of the medication made her unable to waive her
*Miranda* rights as defendant infers on appeal; rather, she claimed she was tired as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)　　　　　　　　　　　　　　　　　　Page 32
(Cite as: 1997 WL 33762019)

result of the medication and confessed solely because she wanted the officers "out of her face". (R. M119-20) However, ASA Nelson testified that defendant told her that she did not need to go to the **46** bathroom over the several hour period that she was with defendant. (R. M90) In fact, defendant told the ASA that she was "free from the effects of alcohol and drugs." (R. M96-7)

In assessing defendant's claims that she was tired and unable to voluntarily confess as she had taken medication, the trial court found defendant's testimony incredible. "I cannot believe that there is medication that would cause a person over a period of three days to go to the bathroom every 5 minutes. Her testimony about being under the influence of the narcotics and the drugs just simply does not hold true because there was a three day hiatus between the time she took the medication to the time she met with the police and probably even a four day hiatus between the time she ingested the drugs to the time the police came to talk to her about the alleged rape." (R. N27) The trial court's ruling was not one which was supplying his own medical testimony. He was considering the fact that her claim did not ring true in light of the other evidence presented. Conflicts in testimony on a motion to suppress must be resolved by the trier of fact based upon credibility. _People v. Buie, 238 Ill. App. 3d 260, 269, 606 N.E.2d 279 (1st Dist. 1992)_. Questions of credibility are best left to the trial court and should not be reversed upon appeal. _People v. Higgins, 50 Ill. 2d 221, 225, 278 N.E.2d 68 (1972)_. Here, the trial court found defendant's claims regarding the effects of her medication to be incredible, particularly in light of the fact that she told Ms. Nelson at the time she made her statement that she was free from any effects of drugs, and did not exhibit any need to go to the bathroom every five minutes. The finding that defendant's claims were incredible is supported by the record and must not be reversed. Further, the fact that a defendant may be under the influence of drugs does not render the statement inadmissible. _People v. Foster, 168 Ill. 2d 465, 476, 951 N.E.2d 956 (1995)_. Here, the trial court found that defendant's confession was not rendered involuntary by her use of **47** medication based upon both Nelson's testimony, and the testimony of police officers that she was not under the medication's influence when she made her confession. Again, the trial court's ruling is supported by the record and should not be reversed.

2.

The trial court's finding that the totality of circumstances surrounding defendant's confession did not show it to be involuntary is not against the manifest weight of the evidence.

Defendant argues that the totality of circumstances surrounding her confession proves that she was denied sleep and held incommunicado requiring reversal of the trial court's ruling. First, defendant's failure to argue this at the trial level, and failure to include in his motion for a new trial has waived review of the issue. _Johnson, 250 Ill. App. 3d at 892._ Second, the trial court considered defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 33

statements as to the voluntariness of her confession, and found her incredible. The
trial court must only be satisfied by a preponderance of the evidence that
defendant's confession was voluntary. _People v. Holman, 250 Ill. App. 3d 503, 511,
620 N.E.2d 1222 (1st Dist. 1993)_ That finding can only be reversed where defendant
has shown that determination is against the manifest weight of the evidence. _Holman,
250 Ill. App. 3d at 511._ There has been no such showing in this case.


Defendant argues that her claims of sleep deprivation prior to and after her arrest
are unrebutted and show her confession to be coerced. Defendant claims that although
she did not tell ASA Nelson or anyone else that she was tired, and did not ask to
sleep, such evidence should not be considered as "a defendant should not be required
to protest specific sources of coercion where the state has the burden of proving
that the statement was voluntary." (Deft. Br. 33) However, defendant's lack of
complaint of being tired is a factor that supports the trial court's assessment of
the lack of defendant's **48** credibility. As discussed above, the fact remains that
the trial court found defendant's claims of lack of sleep due to medication, which
were not made until she sought to suppress her statements, to be incredible.
Further, the facts in the record show that defendant did in fact sleep while in
custody, and that she was sleeping as recently as 11:00 a.m. on October 14, some 2
and one half hours before she admitted that her rape complaint was a lie. Defendant
testified that she spent her time in custody dozing off and on, and slept "laying on
a table for hours. and hours waiting for them to come back and interrogate me
again." (R. M119) Whether or not it was "meaningful" sleep as questioned by counsel
on appeal was a factual determination best left to the trier of fact. _Higgins, 50
Ill. 2d at 225._ Further, by her own testimony, she was not subject to hours of
interrogation as opined by counsel on appeal, who admits that his opinion is the
result of "unclear testimony". (Deft. Br. 33) Clear testimony establishes that
defendant was afforded ample opportunity to sleep. Irene told officers who came to
their home at 11:00 a.m. on October 14 that she would get defendant out of bed for
them. (R. F19, 56) Contrary to defendant's appellate claim that she went 40 hours
without sleep before she made her confession, she made her first statement some 2
and one half hours after getting up from her night's sleep at home. (R. M15, M63)
She took, and failed, a lie test about 6 hours later, and admitted that she was with
the victim at his death, and gave another statement. The officers then took her out
for pizza. (R. M15, 35) Further, testimony established that on October 16th, the day
of her written confession, the officers had no contact with defendant from 5:15 a.m.
to 3:00 p.m., when she appeared in the line-up. (R. M52) She was told that she had
been identified in the line-up, and officers had no further contact with her until
after 1:00 a.m. when ASA Nelson arrived. She gave her written confession to ASA
Nelson at around 4:15 a.m. (R. M53-7) During those intervening periods of time, 9 to
10 hours in length, defendant by her own **49** testimony was dozing off and on. Where
defendant is given sufficient opportunity to rest, a statement is not considered
involuntary because the defendant was tired. _People v. Byrd, 90 Ill. App. 3d 429,
434, 413 N.E.2d 148 (1st Dist. 1980)_.


Further, while defendant claimed in her _Miranda_ motion that she requested counsel,

1997 WL 33762019 (Ill.App. 1 Dist.)                                                                          Page 34
(Cite as: 1997 WL 33762019)

she withdrew that claim. As such, her appellate claim that at "least some of her
testimony" that she asked for an attorney went "unrebutted" (Def't Br. 33) has no
basis in this appeal. In addition, the record shows that defendant did not request
an attorney. ASA Nelson testified that defendant did not request an attorney. (R.
S40) Officer Tovar testified that defendant did not want an attorney, (R. M78)
Further, testimony was received that 2 assistant state's attorneys (R. M21, 88, S94,
106) and at least 3 officers gave her rights under *Miranda* and she waived them each
time, including her right to counsel. (R. M73, 46, 17, 557, S83-5, 90) Contrary to
defendant's claim, there is no part of her testimony that she requested an attorney
that went "unrebutted."

Defendant was also not held "incommunicado" as claimed on appeal. At no time did
defendant wish to make a phone call. (R. M103-162) ASA Nelson specifically asked her
if she needed anything, and defendant told her no. (R. M89) Like the *Byrd* case,
there is nothing in the record to support defendant's claim that she was held
"incommunicado". *Byrd, 90 Ill. App. 3d at 434*.

Further, in assessing the amount of time that defendant was in custody, the trial
court stated that while "troubling", his concern was "lessened" by the defendant's
own testimony. "She rambled, she went on and on and on, much of it sounded to me to
be nonsense. Inherently contradictory, and I have no doubt that it took the police a
good deal of time so that they could get something they could comprehend. Again,
that's not for the purpose of wearing *50 down her will but simply to try to
understand what was going on, was she a rape victim, was she a witness to a murder,
in which she had no part to?" (R. N26)

In considering the totality of the circumstances surrounding defendant's statements
and written confession, it is clear that the court carefully evaluated each of these
factors and found that defendant was not coerced into making the statements now
complained of on appeal. Defendant has not shown that the trial court's ruling was
manifestly erroneous.

3.

Defendant can not show she was prejudiced by her claim that the trial court refused
to consider his involuntary claim under *Miranda* where the trial court carefully
considered all the claims that defendant stated that she would advance had she
presented a *Miranda* claim.

Further, defendant has not shown how the trial court's supposed refusal to consider
the involuntary claim under *Miranda* prejudiced her such that reversal of that ruling
would be warranted. At trial, counsel stated that the *Miranda* claims would be based
upon assertions that she was not read her rights after her denial of involvement in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 35

the murder, two, her request for counsel was denied, and three, her use of medication and her lack of sleep made her unable to voluntarily waive her rights under *Miranda.* (R. N3-5) in this case, defendant also claimed that her statements were involuntary under "general 5th amendment" claims of involuntariness based, in part, on these same claims. The People bore the burden of proving that the defendant's statements were voluntarily made on the "general" 5th amendment claim. This is a factual question to be determined by the court. *People v. McDermott,* 141 Ill. App. 3d 996, 480 N.E.2d 1293, 1298 (1st Dist. 1985) The trial court, after considering the totality of the circumstances surrounding the taking of the statements, must be convinced by a preponderance of evidence that the statement was *51 voluntary. *McDermott,* 141 Ill. App. 3d at 1004-05. Here, the trial court considered defendant's claim that she was tired and had taken medication, and found that this did not make her statements involuntary on 5th Amendment grounds. The trial court also considered the fact that she had been read her rights on numerous occasions, and waived them. The trial court found that the People had met their burden of proving that defendant's statements were voluntarily and knowingly made, and that defendant's 5th amendment rights were not violated. Defendant has not, and can not, show prejudice that the trial court did not consider these same claims under a *Miranda* label.

4.

Even assuming defendant's confessions were suppressed, there is sufficient evidence to warrant retrial.

Lastly, defendant argues that there is insufficient evidence to warrant a new trial should this Court choose to suppress her confessions. However, defendant has chosen to overlook the overwhelming evidence in this case. Defendant admitted to hospital personnel that she had "stabbed" a cab driver in Joliet in a red and white cab. Two individuals who had ridden in a red and white Joliet cab identified defendant as the person they last saw with the victim cab driver when they exited his cab in Joliet at 3:15 p.m. on October 9th. They overheard defendant tell the driver to take her to O'Hare Airport. (R. D42) The driver was found dead in his cab, parked in an O'Hare parking lot. The parking ticket indicated that he had entered the lot at 4:59 p.m. on October 9th. (R. F7) Defendant admitted that she had fabricated the rape story. In fact, the court stated that even if he excised those portions of her statement where she admitted to killing and robbing the victim as counsel asked him to, there was still evidence sufficient to sustain a guilty finding. (R. Z62) As such, defendant's claim that there is insufficient evidence for a retrial absent her confession to murder has already been rejected by the *52 factfinder in this case, and is unpersuasive on appeal. In fact, the evidence is sufficient to support the trial court's finding of guilt in this case. *People v. Barragan,* 266 Ill. App. 3d 961, 974, 641 N.E.2d 535 (1st Dist. 1993).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 36

## II.

THE TRIAL COURT DID NOT COMMIT MANIFEST ERROR WHEN IT FOUND THAT DEFENDANT
VOLUNTARILY ACCOMPANIED OFFICERS TO THE POLICE STATION, NOR WHEN IT FOUND THERE WAS
PROBABLE CAUSE TO ARREST.

Defendant contends that she was arrested when officers came to her home, and that
this arrest was without probable cause. Defendant further argues that as such, both
her photo array and line-up identifications, as well as her confessions, must be
suppressed as "fruits of the poisonous tree". Defendant also states that the
inevitable discovery doctrine does not apply in her case. Both the record in this
case as well as case law establish that the trial court did not commit manifest
error in its determination that defendant voluntarily accompanied officers to the
station, agreed to have her photo taken, and that there was probable cause for her
arrest. Further, principles of inevitable discovery apply.

Illinois law is well settled that a reviewing court will not disturb a circuit
court's finding on a motion to suppress unless it is manifestly erroneous. _People v.
Gacho, 122 Ill.2d 221, 234, 522 N.E.2d 1146 (1988)_, cert. denied _(1988), 488 U.S.
910, 109 S.Ct. 264, 102 L.Ed.2d 252; People v. Neal, 109 Ill.2d 216, 218, 486 N.E.2d
898 (1985)_. It is the function of the circuit court in a hearing on a motion to
suppress to determine the credibility of the witnesses and to resolve any conflicts
in their testimony. _People v. Redd, 135 Ill.2d 252, 289, 553 N.E.2d 316 (1990)_, and
a reviewing court may not substitute its judgment as to the weight of disputed
evidence or the credibility of the witnesses. _People v. Johnson, 114 Ill.2d 170,
190, 499 N.E.2d 1355_, cert. denied _(1987), 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d
802_. *53 An arrest occurs "when a reasonable person, innocent of any crime and in
view of all the circumstances surrounding the incident, would believe that he was
under arrest or not free to leave." _People v. Collins, 182 Ill.App.3d 362, 364,

538 N.E.2d 781 (2d Dist. 1989)_. While the beliefs of the specific individual at
issue are legitimate considerations, they are not conclusive. _People v. Wipfler, 68
Ill.2d 158, 166, 368 N.E.2d 870 (1977)_. Rather, "[i]n the absence of a threatening
presence of officers, display of a weapon, a physical touching, or use of language
or tone of voice which indicates compliance with the officer's request might be
compelled, a seizure has not taken place." _Collins, 182 Ill.App.3d at 364-65_.

In the instant case, the trial court's ruling was based upon the evidence presented,
and has not been shown to be manifestly erroneous.

### A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 37

### Defendant Has Waived Any Claim That She Was In Custody When She Accompanied Police Officers To The Station.

During the hearing on the Motion to Suppress, defendant testified that she agreed to accompany the police to the station, and agreed to be both fingerprinted and photographed, to help in the investigation of her rape complaint as well as a homicide. (R. F66) The parties then agreed that the defendant voluntarily came to the station with the officers for these purposes. (R. G9) Her trial testimony, and the agreement by her counsel, has waived any claim that she was under arrest at the time she was photographed, or that her identification by photo array as a result must be suppressed. _People v. Garcia, 165 Ill.2d 409, 422, 651 N.E.2d 100 (1995)_.

Further, the trial court did not commit manifest error in its ruling that defendant was not under arrest at the time she was photographed. In the instant case, Det. Schalk and Det. Bogucki testified that they went to defendant's home on October 14th and asked defendant to come with them to the **54** station to speak with them about her rape complaint and the homicide of a cab driver. They both testified that defendant agreed to come with them, and agreed to provide both a photo and fingerprints to aid in their investigation. (Schalk, R. D36, F24; Bogucki, R. M44-5) Defendant also testified that she agreed to come with the officers, (R. F66) No guns were drawn, the officers were in plain clothes, and defendant was not handcuffed. (R. F23) The officers did not take her to be photographed with arrestees. Rather, they took her picture with a polaroid camera in an interview room immediately after arriving at the station. (R. D35) They left her in an unlocked room, with the door open, and uncuffed when they went to speak with Ms. Hess and Mr. Eiselt. (R. F40) She was not read her _Miranda_ rights, nor was she processed. Based on this evidence, the trial court ruled:
"I do conclude that the objective facts were such that indeed the defendant as she stated she did, went to the police station voluntarily. I point out that defendant said she went to the police station voluntarily. That is consistent with the facts too because based upon the objective facts, there was an investigation of the defendant's rape allegation, indeed if I recall, she conceded that she made the rape allegation and I must agree with the state, that the rape allegation in the context of this case was linked to the killing or finding of the cab driver dead in his cab. Based upon the objective facts, why wouldn't she go to the police station since this was an investigation of her rape allegation?" (R. G43)

In defendant's second motion to suppress, the trial court again considered whether defendant voluntarily came to the station and consented to the photo, and again ruled that was the case. (R. N25-6) The trial court's rulings are amply supported by the record. As the Supreme Court explained in _People v. Williams:_
"To determine whether an arrest has occurred, the question to ask is whether a reasonable innocent person under the circumstances would have considered herself arrested or free to leave. [Citation omitted.] A reviewing court will not disturb the determination of a circuit court on a motion to suppress unless it is manifestly erroneous.[cite] On such a motion, the defendant **55** bears the burden of proof that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

the search and seizure were unlawful." *People v. Williams,* 164 Ill.2d 1, 11-12, 645 N.E.2d 844 (1994).

Defendant accompanied the officers to aid in the investigation of her rape complaint which the officers believed may have been committed by or connected to the victim. A reasonable innocent person would have not believed herself to be under arrest. Rather, she would have believed herself to be providing information to the police to find her assailant. In fact, defendant herself testified that she still thought she was going to go home at some point after she took the polygraph, which was several hours after she had been photographed and identified. (R. M144) While defendant's subjective belief does not determine arrest, it is a factor to be considered when weighing whether there was an arrest. *People v. Marts,* 266 Ill. App. 3d 531, 639 N.E.2d 1360 (1st Dist. 1994). All the factors in this case prove there was no arrest until sometime after defendant was identified by Ms. Hess and Mr. Eiselt.

Further, defendant's claim that the officers used a "ruse" to get defendant to come to the station was an issue of credibility - the officers denied any such tactic, and stated that they told defendant they were investigating both the rape and the murder. Defendant claimed that they told her only that they were investigating the rape. Counsel also claimed in argument on the motion that the officers knew at that time that the rape was a sham. However, the trial court found that was not the case, ruling that the police were in fact actively investigating the rape complaint which they believed could be part of the murder. (R. G43, N25-6) It is for the trier of fact to determine the credibility of witnesses and resolve conflicts in testimony. *People v. Matthews,* 205 Ill. App. 3d 371, 403, 562 NE.2d 1113 (1st Dist. 1992), and the reviewing court may not substitute its judgment for that of the trier of fact. *Johnson,* 114 Ill. 2d at 190. Here, the court's ruling as to defendant's lack of credibility was clearly proper. (R. N26-9, Z65) The **56** officers did not know she had fabricated the rape complaint when she accompanied them. They were actively looking for her assailant. (R. F90-94) Even assuming that they did not believe the rape complaint, that does not as a matter of law invalidate defendant's voluntary consent. *People v. Martin,* 102 Ill. 2d 412, 427, 466 N.E.2d 228 (1984). The fact that defendant went with them to the station to speak with them and to take a photo does not convert their brief conversation and photo taking into an arrest. *People v. Marts,* 266 Ill. App. 3d 531, 639 N.E.2d 1360, 1365 (1st Dist. 1994). There is simply no basis for concluding that the circuit court erred in finding that defendant voluntarily accompanied the detectives to the police station, and voluntarily agreed to giving a photo. As this Court explained in *People v. McClom,* 262 Ill. App.3d 826, 635 N.E.2d 677 (1st Dist. 1994), there was nothing in the actions or tone of voice of the offices that indicated that compliance with officer's request might be compelled. There was no seizure of defendant. Here, the evidence established that defendant voluntarily accompanied detectives to the police station, and voluntarily agreed to aid in the investigation of her rape complaint by allowing the detectives to photograph her. She was not cuffed, not read her rights, not processed, and left in a room with the door open. A reasonable, innocent person would not believe himself to be under arrest, rather, they would believe themselves to helping with an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 39

investigation. *See People v. Seawright, 228 Ill. App. 3d 939, 593 N.E.2d 1003 (1st Dist. 1992)* (defendant voluntarily accompanied officers to police station to help them in investigation of his wife's murder).

## B.

### The Trial Court Properly Determined That There Was Probable Cause For Defendant's Arrest.

The trial court found that probable cause existed for defendant's arrest after she had been identified by Ms. Hess and Mr. Eiselt as the woman **57** they saw in the cab. (R. G44) The identification occurred less than 40 minutes after she arrived in the station. (R. F30-1) That finding is not error. Again, as this Court explained: "Probable cause to arrest is determined by the 'totality of the circumstances,' a practical, common-sense determination based on all available information. *(Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317)* The proper standard is whether a reasonable person, possessing the same facts and circumstances as the police officer, would believe that an offense had been committed and that the person arrested had committed the offense. *(People v. Tisler (1984), 103 Ill.2d 226, 237, 469 N.E.2d 147.)* The circumstances need not reach the level of proof beyond a reasonable doubt, but rather just render it more probable that defendant committed the offense. *People v. Montgomery, 1986), 112 Ill.2d 517, 525, 494 N.E.2d 475,* cert. denied *(1987), 479 U.S. 1101, 107 S.Ct. 1329." McClom, 262 Ill. App. 3d at 834.*

In analyzing the evidence that the officers had at the time of the arrest, the trial court found probable cause. Defendant argues that the trial court based its ruling on the photo identification. However, such an argument misstates the trial court's actual ruling. The court based its finding on numerous facts; the "bizarre" rape allegation made by defendant regarding a Joliet taxi driver, a dead Joliet cab driver found at O'Hare who had driven his cab to O'Hare on the date of the alleged rape and was killed on that same date, defendant's description fit that of a woman who was in that Joliet cab heading towards O'Hare about an hour and a half before the murder, and defendant was identified by photo as the last person known to be in the cab driven by the deceased shortly before his death. (R. F2-27, G45) Further, defendant had been reported "missing" during the time of the murder by her lover. (R. W8, 22-4) This evidence established probable cause. The officers knew that defendant claimed to have been driven by a red and white cab to Joliet. As discussed in Argument IV below, the victim's cab was in fact red and white. Defendant said the driver took her to a remote location and raped her over a 40-hour period, until she stabbed him. They contacted the Joliet police, and found that no **58** Joliet cab drivers had been stabbed, but did learn that a driver had been reported missing, and was last known to have been driving to O'Hare. The officers contacted the Joliet cab company, and learned that the last known fares were "regular fares", an elderly couple who were driven to a Joliet Red Roof Inn, and another unknown female who

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 40

wanted to go to O'Hare. The "regular fares", Mr. Eiselt and Ms. Hess, told police
that the driver dropped them off, and drove away with a woman, whose description fit
that of defendant, in the cab around 3:00 p.m. (R. F12-5) The dispatcher was unable
to "raise" the driver on the radio after he told her he was on his way to O'Hare.
(R. F15) Eiselt and Hess told police that defendant jumped from a wooded area into
their reserved cab as they were watching their cab approach. Defendant shared the
ride with them, made the driver seem "nervous", and told the driver to take her to
O'Hare by 4:30 p.m. (R. D24, F13-4) A parking lot ticket showed that the cab entered
the O'Hare lot at 4:59 p.m. (R. S60) Eiselt and Hess described defendant to the
officers, and the officers believed it to be that of defendant. (R. F15) The
officers obtained a photo of defendant, and showed it in a photo array to the
couple, each of whom identified defendant. (R. F26-7, D42) Clearly, contrary to
defendant's claim, this evidence established probable cause. As argued in Argument
IV below, whether or not they correctly guessed defendant's weight does not destroy
their identification. Their description of defendant was such that the officers
believed it to be defendant, and obtained a photo of defendant to show the couple to
confirm their belief. Defendant's arrest was based upon probable cause, and her
subsequent confessions and line-up identification should not be suppressed on a
claim of illegal arrest.

**\*59** C.

The Trial Court Properly Ruled That Even If The Identification Was Improper, The
Inevitable Discovery Rule Applied.

The court further ruled that even if defendant had said she wanted to go home prior
to being fingerprinted, the inevitable discovery rule would have applied. (R. G48)
Even where a defendant was illegally arrested after he accompanied detective to
police station, his identification will not be suppressed where its discovery
through a legitimate source was inevitable. People v. Edwards, 144 Ill.2d 108,
143-44, 579 N.E.2d 336, cert. denied (1992), 504 U.S. 942, 112 S.Ct. 2278 (stating
that the inevitable discovery doctrine is an exception to the exclusionary rule);
McClom, 262 Ill.App.3d at 835. Here, as argued above, the elderly couple described
the woman who shared their cab to officers, and that description fit defendant such
that the officers believed that defendant may have been the person in the cab with
the deceased, particularly in view of the fact that she told the officers she had
been repeatedly raped by a cab driver in Joliet driving a red and white cab. The
officers had a description of defendant prior to any claim of an illegal arrest, a
fact that defendant has chosen to overlook. Even without defendant's voluntarily
provided photo, they could have obtained her previous work photo id, they could have
conducted a show-up after defendant left, or for that matter, at any time on the
street. They took her photo by polaroid, did not wait for the return of prints, and
took the photo, placed it in an array, went to the Hess' home a few blocks away,
returned to the station, and told defendant she had been identified. All this
occurred within a 40-minute period. (R. F30-1) Because defendant's identification
would have been obtained regardless of any improper arrest, it would not have been

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suppressed as a result of an illegal arrest.


### *60 D.


### Even Assuming There Had Been An Illegal Arrest, Attenuation Purged The Taint Of Any Illegal Arrest.


While principles of attenuation were not considered at the trial level as the People successfully defended against defendant's motions, the People assert that the identification of defendant was obtained prior to any arrest (as argued above) and established probable cause. Probable cause is a sufficient intervening event to purge the taint of any illegal arrest. _People v. Allen, 249 Ill. App. 3d 1001, 1014-15, 620 N.E.2d 1105 (1st Dist. 1993)_. However, as the trial court did not consider attenuation, and as defendant declined to argue at what time the arrest took place (R. G41), any argument would be simply speculation and opinion as evidenced by defendant's claims on appeal. As such, should this Court find that defendant did not voluntarily accompany officers to the station, or did not voluntarily provide a photo, the People respectfully request that this case be remanded for an attenuation hearing as provided by this Court's rule in _People v. Barlow, 273 Ill. App. 3d 943, 945, 654 N.E.2d 223 (1st Dist. 1995)_.


### III.


### THE PROSECUTOR PROPERLY ARGUED FACTS IN EVIDENCE AND INFERENCES DRAWN FROM THAT EVIDENCE.


Defendant contends that the prosecutor improperly argued that she admitted to hospital personnel and ASA Nelson that she killed the cab driver in a red and white cab where, in fact, she only admitted to stabbing a cab driver in the chest, who photographs revealed drove a maroon and white cab. Defendant argues that such a misstatement of fact constituted plain error "as it bolstered the State's claim that Ms. Lindsey's false complaint evidenced guilty knowledge... Indeed, the trial court fell for the deception in its ruling." (Deft. Br. 54) Defendant's argument is disingenuous at best, and is **61 itself misleading as to the facts presented in this case, and unfortunately misrepresents the trial court's ruling.


Defendant's failure to object at trial to the comment now complained of on appeal (R. 240-1), and her failure to include the issue with required specificity in her motion for a new trial has waived review of this issue. _People v. Chapman, 262 Ill. App. 3d 439, 633 N.E.2d 718, 731 (1st Dist. 1992)_; _People v. Enoch, 122 Ill. 2d 177, 186, 522 N.E.2d 1124 (1988)_.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Further, the reason why there was no objection to this comment is clear. The comment
was a proper inference based upon the evidence presented, and as such, the plain
error rule does not apply. A prosecutor is allowed great latitude in making his
closing argument. He has a right to comment on the evidence and draw all legitimate
inferences deducible therefrom, even if they are unfavorable to defendant. _People v._
_Morgan, 112 Ill. 2d 111, 132, 492 N.E.2d 1303 (1986)_. No error can be claimed unless
defendant has proven that the remarks resulted in substantial prejudice to defendant
such that absent the remarks, the result would have been different. _People v. Pasch,_
_152 Ill. 2d 133, 185, 604 N.E.2d 294 (1992)_.

The prosecutor's argument was based on the evidence presented. At trial, defendant
admitted that prior to speaking to any police personnel, she had told nurses and
doctors at South Shore that she had been abducted by a cab driver in a red and white
cab who repeatedly raped her, and then she stabbed him in the chest while in a
wooded area of Joliet. (R. V116-9) She next told Det. Hines that she stabbed the
driver of a red and white cab in the chest and ran into the woods. (R. R14) She also
told Det. Bogucki that she stabbed the driver in the chest. (R. S81-3) However, she
later told him that she shot the driver of the red and white cab several times as
she sat next to him in the cab in a parking lot at O'Hare. (R. S87) She told ASA
Rosenblum that she shot the driver several times in the chest while at O'Hare. (R.
S96, S101) She told ASA **62** Nelson that she shot the driver "more than once" as she
sat next to him in the red and white cab which was parked in a O'Hare garage. (R.
CL. C69, Def't. Br. A68-71) The victim died as a result of multiple gunshot wounds.
The prosecutor's argument that defendant consistently admitted that she killed the
cab driver from the time she spoke to a nurse until the time she spoke to ASA Nelson
is clearly based upon the evidence presented at trial and was a proper comment.
Whether she said she stabbed him in the chest, or shot him in the chest, he was
still dead.

Further, defendant's argument that the cab was maroon and white, and not red and
white, is without merit. Maroon is defined as "dark red." _The Scribner-Bantam_
_English Dictionary,_ 1977, p. 554. Defendant admitted that she shot a man in a red
and white cab. The victim's cab was dark red and white. The "maroon" label does not
destroy the fact that the cab was indeed red and white. The prosecutor's argument
that the cab was red and white was based upon the evidence presented, and was
properly made. Further, photos of the cab were admitted into evidence. (R. CL. C69,
Def't. Br. A75). The trial court, as the factfinder, reviewed this photo and stated
that the cab was red and white. This determination is not manifestly erroneous, and
is clearly supported by the photo of the cab. The cab, while dirty, is clearly red
with white lettering.

Lastly, this was a bench trial. As stated, the trial court viewed the photos of the
cab, and agreed that it was a red and white cab. The defendant has not shown, and
can not show, that this comment somehow altered the court's finding in this case.
Additionally, defendant's claim that the trial court relied on this comment in its
finding that the defendant described the crime scene is an unfortunate ellipse of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                                    Page 43
(Cite as: 1997 WL 33762019)

the trial court's ruling. The court also said that the defendant, in her numerous
statements, admitted that she either stabbed or shot the driver of a red and white
cab in an O'Hare parking garage and that she flagged down the cab in Joliet. The cab
was a red and white Joliet *63 cab. The driver was found shot several times in the
chest in a parking lot at O'Hare. Defendant said that she shot the driver more than
once as she sat next to him in the cab which he had parked in the O'Hare parking
garage. She said that they went to the garage on October 9th. The parking stub found
in the cab was stamped October 9th. This is the "physical evidence" that the trial
court found which linked defendant to the crime, not simply the prosecutor's
statement that the cab was red and white. No error occurred as the result of the
comments complained of on appeal.


                                        IV.


                DEFENDANT WAS AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL.


In the instant case, defendant admits that she advised the court, through her sworn
affidavit, that she had "no specific complaints against" Mr. Sorosky. (CR 55, Def't.
Br. 56) However, defendant now contends that her counsel failed to meet the
acceptable standards of reasonableness of representation. As this Court has
previously ruled, a defendant may waive her claim of ineffective assistance of
counsel by failure to properly raise and preserve the issue at trial. _People v.
Campbell, 264 Ill. App. 3d 712, 636 N.E.2d 575, 585 (1st Dist. 1992); People v.
Keys, 195 Ill. App. 3d 370, 372-6, 552 N.E.2d 285, 287-9 (1st Dist. 1990)._
Defendant, by apprising the trial court by sworn affidavit that she had no specific
complaints against her attorney, and by failing to include this issue in her motion
for new trial, can not now claim error as to his trial performance on appeal.


Further, even if waiver did not apply, the record proves that counsel provided
effective assistance to his client. Defendant claims that ineffectiveness was proven
by the fact that counsel did not attempt to impeach Ms. Hess and Mr. Eiselt's
identification of defendant through documentary evidence of her weight, did not move
to suppress the "suggestive" photo array, *64 and did not effectively argue the
motion to suppress her confessions. However, counsel properly refrained from
attempting to impeach these witnesses' testimonies with a police report not in
evidence. Further, the record proves that the photo array was not suggestive and
that counsel effectively argued the motion to suppress defendant's confessions.
Lastly, defendant has not shown that his proposed method of representation would
have caused a different result in this bench trial where the trial court assessed
the credibility of the witnesses, personally viewed defendant and her appearance,
regarded the photo array, and considered the motion to suppress on both 4th and 5th
amendment grounds.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 44

To prevail on a claim of ineffective assistance of counsel, defendant must show that defense counsel's conduct fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's error, the result of the trial would have been different. *Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984)*. In establishing that counsel's performance was deficient, defendant must overcome the strong presumption that the disputed action or inaction taken by counsel was mere trial strategy. *Strickland, 466 U.S. at 689*. The failure to present particular evidence or call certain witnesses does not in itself establish deficient representation. *People v. Popoca, 245 Ill. App. 3d 948, 615 N.E.2d 778 (1st Dist. 1993)*. A reviewing court will examine the totality of counsel's representation in light of all relevant circumstances and under a strong presumption of adequacy and reasonableness. *People v. Buchanan, 211 Ill. App. 3d 305, 317, 570 N.E.2d 344 (1st Dist. 1991)*. "This inquiry typically does not encompass matters of judgment, discretion, or trial tactics or strategy, even where appellate counsel or the reviewing court might have made different decisions." *Buchanan, 211 Ill. App. 3d at 317,* citing *People v. Greer, 79 Ill. 2d 103, 122, 402 N.E.2d 203, 212 (1980)*. "Defendant has the right to competent, **65 not perfect, representation. [Citation omitted.] Moreover, defendant cannot rely on conjecture or speculation that the verdict would have been different with different representation." *Buchanan, 211 Ill. App. 3d at 317,* relying on *People v. Puente, 125 Ill. App. 3d 152, 465 N.E.2d 682 (1st Dist. 1984)*.

As to defendant's first claim of ineffectiveness, counsel can not be said to be ineffective where he failed to act in an improper manner. Defendant claims his counsel's failure to impeach the identification testimonies with "documentary" evidence which proved defendant's weight was not the 140 pounds testified to by Ms. Hess and Mr. Eiselt, but rather the 190 pounds indicated in the booking police report, was ineffective. (Deft. Br. 57) That "documentary" evidence was a police report, "booking" defendant's arrest, which had not been admitted into evidence at the time of these witnesses' testimonies. A police report is not properly used as impeachment against any witness other than the officer who prepared the report. *People v. Pendleton, 256 Ill. App. 3d 983, 628 N.E.2d 509, 509 (1st Dist. 1993)*; *People v. Gagliani, 210 Ill. App. 3d 617, 569 N.E.2d 534, 542 (2nd Dist. 1991)*. As such, counsel can not be said to have been ineffective on the basis that he failed to act improperly.

Further, contrary to defendant's claims, choosing to not question the weight description was sound trial strategy. Det. Bogucki testified that he prepared defendant's arrest report from information she provided. Defendant told him that she was 5'5 , and that she weighed 150 pounds. (R. W58) Defendant also told the booking officer that she weighed 150 pounds. (R. T69) While perhaps impeaching the elderly couple's weight description of defendant, counsel would have also been establishing his own client's lack of honesty. His "inaction" to impeach was sound trial strategy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Additionally, even if the report had been one which had been introduced into evidence and one which was a proper impeachment tool, defendant can not *66 prove ineffective assistance as the failure to impeach these witnesses on their belief as to defendant's weight did not affect the outcome of this trial. Initially, defendant challenged the weight description during the motion for new trial. The trial court stated that, as to defendant's weight testimony, the witnesses were not expert at weight determination, they observed defendant seated in the cab, and that their identifications of her were clear and fairly, made. (R. AA16) In view of that ruling by the court, defendant can not show that he was prejudiced by counsel's failure to put this report regarding her weight into evidence. Additionally, Ms. Hess and Mr. Eiselt testified that the woman who got into their cab was a young black woman, in her twenties, 5'2 to 5'4 , 120 to 140 pounds, with black straight hair combed to the side. While imprecise as to the exact weight, they testified that they considered her to be "chunky." (R. P46) Officer Bogucki testified that he spoke with the elderly couple, and as a result, determined that he was looking for a "heavy-set" woman. (R. S71) Defendant's own daughter, Tenisha, and defendant's lover, Irene, described defendant to police officers as weighing 150 pounds when they filed their missing persons report at the time of the murder. (R. W10) Further, the trial court was in the unique position to view defendant in the court room, as well as view photos of the defendant at the time of her arrest. He also could estimate whether the weight guess was so contrary as to make the identifications questionable. Whether or not an arrest report had properly documented her weight at 190 pounds, defendant's daughter and Irene supported Mr. Eiselt's and Ms. Hess' weight description of defendant. Additionally, whether or not they correctly guessed her weight, they described defendant as chunky and heavy-set. This description, more than the guessed-at weight, actually described defendant, and accurately so. The couple's inability to guess weight, but to accurately describe her physical appearance, does not make their description and identification of defendant improbable or unreasonable, *67 particularly when that description and identification is considered in its entirety. Both Hess and Eiselt positively and clearly identified defendant from the photo array (R. P24-7), from the line-up, and in court. (R. P29-31) They testified that they sat talking with defendant in the cab, and that she turned around to give them a train schedule. They had ample opportunity and excellent conditions to view defendant. The court ruled that the identification of defendant as the woman last seen with the victim was "as good an identification as I think we are ever going to get." (R. Z60) "What you have is a superb identification". (R. Z61) Defendant has not shown, and can not show, that the outcome of this case would have been different if counsel had "impeached" the witnesses' testimonies with a police report stating that defendant weighed 190 pounds.

The same is true with the fact that no one, including defendant's daughter and lover, described defendant as having a mole on her nose. The fact that a witness fails to describe a particular characteristic, such as an extremely prominent nose, does not destroy the identification of the defendant. *People v. Slim, 127 Ill. 2d 302, 537 N.E.2d 317 (1989).* Here, while counsel on appeal obviously believes defendant has a large mole on her nose, not even defendant's daughter or lover thought the characteristic remarkable when describing defendant to police in their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 46

missing persons report. (R. W10) Trial counsel can not be said to be ineffective for
failing to challenge the credibility of Ms. Hess and Mr. Eiselt's identifications on
the basis that they did not describe defendant's mole.


Discrepancies or omissions as to facial traits and discrepancies in height and
weight, simply affect the weight to be given identification testimony and do not in
themselves create reasonable doubt as long as a positive identification has been
made. _Slim, 127 Ill. 2d at 308._ The test of a positive identification is whether the
witness had an opportunity to view the *68 defendant for a sufficient length of time
under conditions adequate for observation; those conditions need not be prolonged or
perfect. _People v. Shlimon, 232 Ill. App. 3d 449, 597 N.E.2d 728 (1st Dist. 1992)._
Here, the conditions were both perfect and prolonged. The couple viewed defendant in
daylight, from about 2:30 p.m. to 3:00 p.m. as they shared a cab ride together. They
watched defendant get out of the back seat of the cab and enter the front seat as
they waited to get in the cab. Defendant spoke with them, even to the point of
giving Ms. Hess a train schedule, throughout the ride. Whether or not the weight
guess was perfect, or whether or not they mentioned a mole, the identification was
clear, convincing and complete.


Counsel was also not ineffective for failing to move to suppress the photo array
identification as suggestive where the array was not suggestive. Further, even if
the array had been suggestive, with or without its admission, Ms. Hess and Mr.
Eiselt picked defendant out of a line-up and identified defendant in court. As
argued above, their identification could not have been more clear, more convincing.
Defendant can not, and has not shown that the result would have been any different
if the array had been suppressed. As such, defendant has not shown he was denied
effective representation on these grounds.


"The law does not require that lineups and photographic arrays shown to witnesses
include near identical or look alikes of the witness' descriptions." _People v.
Johnson, 147 Ill. 2d 118, 147, 594 N.E.2d 253, 267 (1992)._ In _Johnson,_ the court
held that an identification was not improper despite defendant's claims that he was
the only member of the array who matched the assailant's description, that he was
the only one with a medium build, and that he was only one of 2 individuals wearing
a black coat as described by the witness. The court, upholding the identification,
ruled, "That some may be dressed differently, or fail to have one or more of the
characteristics *69 described by the witnesses, is relevant only within the context
of the totality of the circumstances." _Johnson,_ 147 Ill.2d at 147. Defendant bears
the burden of establishing that the identification procedure was so unnecessarily
suggestive and conducive to irreparable mistaken identification that he was denied
due process of law. _People v. Miller, 254 Ill. App. 3d 997, 626 N.E.2d 1350 (3rd
Dist. 1993)._ In this case, the photos were all of young black women of approximately
the same age. Contrary to appellate counsel's opinion, at least 3, if not 4, of the
women pictured appear to be heavy-set, 1A, 1B, 1D, 1F. (Exh. #1D) Again, contrary to
counsel's assertions, two of the individuals are wearing coats, 1B and 1D. The dress

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)
(Cite as: 1997 WL 33762019)

Page 47

for all pictured, except 1C, could be fall clothing. All the women pictured have about the same hair length, all have black hair and brown eyes. This is simply not a suggestive photo array. Counsel can not be said to be ineffective for failing to raise an issue that did not exist.

Lastly, appellate counsel argues that trial counsel was ineffective for failing to preserve the issues regarding the motion to suppress and failing to revisit these issues at trial. (Deft. Br. 59) Initially, defendant's motions as to these issues preserves review, and as such, his argument has no merit. Further, counsel's argument overlooks the fact that this was a bench trial. Trial counsel effectively argued the motion to suppress defendant's confessions on both 4th and 5th Amendment grounds prior to trial. The trial court, the factfinder in this case, found that defendant voluntarily accompanied the officers to the police station and voluntarily spoke with them based upon her own testimony. The court found that defendant was arrested at the time she was told she was under arrest, and at that time the police had probable cause to arrest. She was not held "incommunicado" as claimed by appellate counsel. In fact, she made her first incriminating statements prior to her arrest to hospital personnel. Appellate counsel argues that not all of the coercion *70 evidence was presented, yet fails to advise this Court of what that evidence was. His argument is based on his speculation that there was some other evidence, and again his entire argument must fail. *Buchanan*, 211 Ill. App. 3d at 317. Further, trial counsel challenged the admission of defendant's statements on the basis that they were obtained as a result of an unlawful arrest, and the result of coercion in the form of threats, promises, and exhaustion. That was his chosen strategy, and defendant has not overcome the "strong presumption" that his chosen strategy was reasonable and adequate. Perhaps appellate counsel would have chosen a different tactic, but that does not sustain a showing of ineffective assistance of counsel. *Buchanan*, 211 Ill. App. 3d at 317. Counsel's actions were based on trial strategy and tactics. His actions, both singularly, and viewed in the context of the entire record, prove effective representation. There simply were not cumulative errors undermining the outcome of this case as claimed by defendant, particularly when counsel's representation is considered within the context of the actual facts of this case, and when it is viewed in its entirety. *People v. Kramer*, 278 Ill. App. 3d 963, 968-9, 664 N.E.2d 126, 131-2 (1st Dist. 1996). Defendant has not met either prong under *Strickland* to warrant reversal in this case.

V.

THE TRIAL COURT DID NOT DENY DEFENDANT HER CONSTITUTIONAL RIGHT TO COUNSEL OF HER CHOICE.

Defendant, relying on the Appellate Court opinion in *People v. Young*, 207 Ill. App. 3d 130, 565 N.E.2d 309 (4th Dist. 1990), argues that she was denied her constitutional right to choice of counsel when the trial court denied her request for appointment of the public defender. However, defendant has misapplied the *Young*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

holding. As the Supreme Court has noted in its holding in *People v. West*, 137 Ill.
2d 558, 560 N.E.2d 594 (1990), the constitutional right to counsel of choice does
not extend to the choosing of appointed *71 counsel. Further, defendant can not
argue that she was denied counsel of her choice where she retained private counsel,
where she did not "fire" counsel from his job of representation and where he
continued his representation of her throughout the trial. Lastly, even assuming the
right to counsel of choice extended to the "naming" of appointed counsel to
represent oneself, the trial court did not abuse its discretion in denying
defendant's request to appoint the public defender to also represent her where the
trial court considered the facts of the case up to that point, and determined that
defendant's request was simply another delay tactic meant to harass the witnesses
present in court.

The Illinois Supreme Court has long considered the limitations on the constitutional
right to representation by counsel of choice. The Supreme Court, in its *West*
holding, ruled as follows:
"Although the Sixth Amendment guarantees an accused the right to assistance of
counsel in trials for certain crimes, it does not include the right to select
counsel of choice, particularly where the exercise of that claimed right would delay
or impede the effective administration of justice. (*People v. Barrow* (1989), 133
Ill.2d 226, 252, 139 Ill. Dec. 728, 549 N.E.2d 240; *People v. Hall* (1986), 114 Ill.2d
376, 403, 102 Ill.Dec. 322, 499 N.E.2d 1335.) A defendant has the right to be
represented by *retained* counsel of his own choosing (*People v. Johnson* (1979), 75
Ill.2d 180, 185, 25 Ill.Dec. 812, 387 N.E.2d 688), however, he does not have the
right to choose *appointed* counsel (*People v. Lewis* (1981), 88 Ill.2d 129, 160, 58
Ill. Dec 895, 430 N.E.2d 1346. *People v. West*, 137 Ill. 2d 558, 588, 560 N.E.2d 594
(1990).

Defendant argues that he was denied his constitutional right of counsel of her
choice where the trial court denied his request for the Public Defender. However, as
the Supreme Court has noted, that right does not extend appointed counsel. *People v.*
*Lewis*, 88 Ill. 2d 129, 160, 430 N.E.2d 1346 (1981); *West*, 137 Ill. 2d at 588. As
such, his entire argument must fail. She simply has no constitutional right to
appointed counsel of her choice.

Further, the reasoning of the 4th District *Young* decision does not apply in this
case. In the instant case, unlike the *Young* case relied on by *72 defendant,
defendant was represented by retained counsel. In *Young,* the defendant was
represented by the public defender and sought to replace the public defender with
counsel he had privately retained, and who was prepared to represent defendant. The
4th District Court stated that defendant has a constitutional right to *retained*
counsel, and the trial court's decision not to allow defendant his right was an
abuse of discretion, particularly in light of the fact that there was no showing
that defendant was seeking to impede the trial and the fact that counsel was ready
to represent defendant. *People v. Young*, 207 Ill. App. 3d 130, 565 N.E.2d 309, 312

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                          Page 49
(Cite as: 1997 WL 33762019)

(4th Dist. 1990). However, the *Young* decision is not controlling where, as in this case, the defendant seeks appointment of the Public Defender, where the trial court found the request was simply a delay tactic, and where there was no showing that a public defender stood ready to represent her. Mr. Sorosky, in noting that his request to withdraw was simply a financial matter, told the court that the fact that he was not paid in full would not impede his defense of his client. (R. L6) The trial court, by directing counsel to continue representation of defendant was in fact appointing counsel to represent defendant. However, defendant then had no constitutionally protected right to name the counsel she wanted appointed to represent her. *West, 137 Ill. 2d at 588*.

Further, the trial court can not be said to have abused its discretion in denying defendant's request for the appointment of the Public Defender where, as defendant admits, there was no specific complaint regarding Mr. Sorosky's representation. (Deft. Br. 56) Further lack of specific dissatisfaction is evidenced by the fact that defendant did not discharge Mr. Sorosky from her service. While she requested the Public Defender, at no time did she discharge Mr. Sorosky. From the record, it is apparent that the request was predicated on the belief that the public defender's office would provide an investigator and a polygraph at no expense to defendant, in light of the *73 fact that the trial court had refused her request for fees to provide an investigator and a polygraph.

Lastly, the record proves that defendant was not seeking appointed counsel of her choice by her request for the Public Defender. Rather, she was seeking to delay the outcome of her case, to postpone the hearing on the motion to suppress, and harass the witnesses who were present in court to testify on the motion. Defendant retained Mr. Sorosky to represent her. As outlined in the Statement of Facts, Sorosky was retained, and filed his appearance of November 2, 1992. Ten months later, Sorosky filed a motion to withdraw as counsel for lack of payment of fees. The motion was denied. Five months later, and fifteen months into counsel's representation, the matter came before the court for the hearing on defendant's motion to suppress. The witnesses were present in court. The parties were ready to proceed. Defendant asked the court at that time to appoint the public defender as she believed her attorney was not "acting in her best interests." When queried as to what that meant, Counsel explained that he and defendant differed as to trial strategies. The court told counsel that it was defendant's liberty, not his, which was at stake and to proceed in the manner that defendant desired. The court also stated that there was nothing to suggest that counsel was ineffective, and that in reviewing the age of the case, and the manner in which defendant presented her motion, it was the court's opinion that the motion was nothing more than a delay tactic intended to harass the witnesses present in court. On June 28, 1984, almost 2 years after counsel filed his appearance, counsel again sought to withdraw from the case, explaining that the defendant's family no longer supported her defense, and that he believed an investigator and a polygraph should be obtained. Counsel sought the appointment of the public defender to provide for these services, or in the alternative, to allow fees for the same. (R. L7) The trial court ruled that the motion was premised on the lack of funds for an *74 investigator, and that counsel must have been aware that a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33762019 (Ill.App. 1 Dist.)                                    Page 50
(Cite as: 1997 WL 33762019)

murder case would require investigation from the onset, and as a good deal of time
had passed, and counsel had been paid a fee, and had argued motions. The court
stated that defendant had engaged in a "continuing effort to delay trial in the
case." He advised defendant that he would assist counsel in the investigation. (R.
L11) "Again, I'll repeat, I believe based upon the history of this case, totality
and history of this case, this is simply an effort to impede the conclusion of this
case. Impede us to coming to a conclusion...I would probably execute the necessary
orders to have that [polygraph] completed. If the defendant feels he needs his
client to accompany him in locating some alibi witnesses...I'll execute the
appropriate orders." (R. L13)


The trial court, by its rulings, refused to allow defendant to continue to delay the
hearings on the motions or to continue to "impede" the conclusion of the case, or to
harass the witness who were present in court. He did not refuse her request for
retained counsel of her choice.


### *75 CONCLUSION


The People of the State of Illinois respectfully request that this Honorable Court
affirm defendant's conviction for the murder and armed robbery of Rudolph Bennett.


Pursuant to _People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978)_ and relevant
statutory provisions (_725 ILCS 5/110-7(h)(1992); 725 ILCS 130/13 (1992); 55 ILCS
5/4-2002.1 (1992)_), the People of the State of Illinois respectfully request that
this Court grant the People costs and incorporate as part of its judgment and
mandate a fee of $100.00 for defending this appeal. In addition, pursuant to _People
v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985)_ and _55 ILCS 5/4-2002.1 (1992)_, the
People respectfully request that this Court also grant the People an additional fee
of $50.00 in the event oral argument is held in this case.


PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Jerri Robin LINDSEY,
Defendant-Appellant.
1997 WL 33762019 (Ill.App. 1 Dist.)


END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*9-10-97*

No. **83901**

IN THE
SUPREME COURT OF ILLINOIS

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Appellate Court |
|  | ) | First Judicial District, Fifth Division |
| Plaintiff-Appellee | ) | No. 95-1535 |
|  | ) |  |
| v. | ) |  |
|  | ) | Original Appeal from the |
| JERRI ROBIN LINDSEY | ) | Circuit Court of Cook County, |
|  | ) | No. 92 CR 25135 |
| Defendant-Appellant | ) |  |
| and Petitioner. | ) | Trial Judge: Hon. Shelvin Singer |
|  | ) |  |
|  | ) |  |

PETITION FOR LEAVE TO APPEAL

# FILED

AUG 2 9 1997

SUPREME COURT CLERK

Robert R. Stauffer
Andrew Byerly Birge
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350
Attorneys for Defendant-Appellant
and Petitioner

EXHIBIT E

## TABLE OF CONTENTS

Page

POINTS AND AUTHORITIES..................................................................................iii.

PRAYER FOR RELIEF TO APPEAL.........................................................................1.

JURISDICTIONAL HISTORY...................................................................................3.

STATEMENT OF POINTS RELIED ON FOR REVERSAL.......................................3.

STATEMENT OF FACTS.........................................................................................4.

ARGUMENT...........................................................................................................10.

I.   THE APPELLATE COURT ERRED IN AFFIRMING THE TRIAL COURT'S
     DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS INVOLUNTARY
     STATEMENTS UNDER THE DUE PROCESS CLAUSE............................................10.

     A.   The Trial Court Refused To Consider Evidence In Support Of Ms. Lindsey's
          Motion Related To Access To Counsel And A Telephone...................................11.

     B.   The Trial Court Improperly Mitigated Ms. Lindsey's Prolonged Pre-Presentment
          Period Of Custody............................................................................................13.

     C.   The Trial Court Improperly Rendered A Medical Opinion...................................13.

     D.   The Trial Court's Errors Require Reversal Of The Conviction............................14.

II.  THE APPELLATE COURT ERRED WHEN IT REJECTED MS. LINDSEY'S
     CLAIM THAT HER TRIAL COUNSEL WAS CONSTITUTIONALLY
     INEFFECTIVE FOR FAILING TO RAISE, BEFORE OR DURING TRIAL,
     EVIDENCE RELATING TO ACCESS TO COUNSEL AND A TELEPHONE...........14.

III. THE APPELLATE COURT ERRED WHEN IT IGNORED FOURTH
     DISTRICT PRECEDENT AND DID NOT REVERSE THE TRIAL COURT'S
     DENIAL OF MS. LINDSEY'S SIXTH AMENDMENT RIGHT TO CHOICE OF
     COUNSEL...........................................................................................................17.

IV.  THE APPELLATE COURT ERRED IN UPHOLDING THE TRIAL COURT'S
     DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS EVIDENCE AS THE
     FRUIT OF AN ILLEGAL ARREST.........................................................................17.

CONCLUSION.........................................................................................................20.

APPENDIX

Opinion of the Appellate Court.................................................................................A.

Affidavit of Intent To File Petition For Leave To Appeal .................................................B.

Pretrial Motion To Suppress Statements.........................................................................C.

Trial Court Ruling Refusing To Consider Allegations In The Pretrial Motion
To Suppress Statements ..............................................................................................D.

Pro Se Letter-Motion Seeking Substitution Of Counsel..................................................E.

## POINTS AND AUTHORITIES

Page

I.    THE APPELLATE COURT ERRED IN AFFIRMING THE TRIAL COURT'S
      DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS INVOLUNTARY
      STATEMENTS UNDER THE DUE PROCESS CLAUSE...........................................10.

      A.    The Trial Court Refused To Consider Evidence In Support Of Ms. Lindsey's
            Motion Related To Access To Counsel And A Telephone.................................11.

      Withrow v. Williams, 507 U.S. 680 (1993)................................................1, 12.

      In re Lamb, 61 Ill.2d 383, 336 N.E.2d 753 (1975), cert. denied, 425 U.S. 938 (1976)....12.

      Davis v. North Carolina, 384 U.S. 737 (1966)................................................12.

      People v. Gard, 158 Ill.2d 191, 632 N.E.2d 1026 (1994)................................12.

      People v. Mullen, 141 Ill.2d 394, 566 N.E.2d 222 (1990)...................................12, 13, 14.

      B.    The Trial Court Improperly Mitigated Ms. Lindsey's Prolonged Pre-Presentment
            Period Of Custody...........................................................................13.

      Riverside v. McLaughlin, 500 U.S. 44 (1991)................................................1, 13.

      C.    The Trial Court Improperly Rendered A Medical Opinion..................................13.

      People v. White, 183 Ill.App.3d 838, 539 N.E.2d 456 (3d Dist. 1989)...........................13.

      D.    The Trial Court's Errors Require Reversal Of The Conviction...........................14.

II.   THE APPELLATE COURT ERRED WHEN IT REJECTED MS. LINDSEY'S
      CLAIM THAT HER TRIAL COUNSEL WAS CONSTITUTIONALLY
      INEFFECTIVE FOR FAILING TO RAISE, BEFORE OR DURING TRIAL,
      EVIDENCE RELATING TO ACCESS TO COUNSEL AND A TELEPHONE...........14.

      Crane v. Kentucky, 476 U.S. 683 (1986)................................................2, 15.

      Strickland v. Washington, 466 U.S. 668 (1984)............................................15.

      People v. Bell, 152 Ill.App.3d 1007, 505 N.E.2d 365 (3d Dist. 1987).......................15, 16.

      Lockhardt v. Fretwell, 506 U.S. 364 (1993) ................................................16.

      Jackson v. Denno, 378 U.S. 368 (1964).......................................................16.

People v. Smith, 152 Ill.2d 229, 604 N.E.2d 858 (1992)................................................16.

Wright v. Stokes, 167 Ill.App.3d 887, 522 N.E.2d 308 (5th Dist. 1988)........................16.

Tolefree v. L.C. March, 99 Ill.App.3d 1011, 425 N.E.2d 1247 (1st Dist. 1981)..............16.

III.  THE APPELLATE COURT ERRED WHEN IT IGNORED FOURTH
      DISTRICT PRECEDENT AND DID NOT REVERSE THE TRIAL COURT'S
      DENIAL OF MS. LINDSEY'S SIXTH AMENDMENT RIGHT TO CHOICE OF
      COUNSEL.................................................................................................................16.

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990).................................................................17.

People v. Pondexter, 214 Ill.App.3d 79, 573 N.E.2d 339 (4th Dist. 1991),
      app. denied, 141 Ill.2d 555 (1991)....................................................................2, 17.

United States v. Morrissey, 461 F.2d 666 (2d Cir. 1972)..............................................17.

IV.  THE APPELLATE COURT ERRED IN UPHOLDING THE TRIAL COURT'S
      DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS EVIDENCE AS THE
      FRUIT OF AN ILLEGAL ARREST..................................................................17.

People v. Reynolds, 257 Ill.App.3d 792, 629 N.E.2d 559 (1st Dist. 1994),
      app. denied, 155 Ill.2d 572 (1994)........................................................................18.

3 Wayne R. LaFave, Search and Seizure § 8.2(n) (3d ed. 1996)...............................18, 19.

United States v. Phillips, 497 F.2d 1131 (9th Cir. 1974)................................................19.

People v. Sampson, 86 Ill.App.3d 687, 408 N.E.2d 3 (1st Dist. 1980)...........................20.

## PRAYER FOR LEAVE TO APPEAL

Pursuant to Illinois Supreme Court Rule 315, Jerri Robin Lindsey (hereinafter "Ms. Lindsey") prays for leave to appeal from the judgment of the Appellate Court of Illinois, First District, Fifth Division, affirming her convictions for murder and armed robbery.

Denying Ms. Lindsey's Petition For Leave To Appeal requires turning a blind eye to the United States Constitution and United States Supreme Court and Illinois precedent. First, the incriminating statements Ms. Lindsey offered the police should have been suppressed under the due process clause because they were the product of official coercion. Without those statements in evidence, there is insufficient evidence to sustain the convictions. The Appellate Court misread the trial record in ruling that the trial court had not refused to consider evidence in support of the allegations in Ms. Lindsey's motion that (a) when Ms. Lindsey requested counsel, the police told her "we won't give you a lawyer," (b) that the police told her they decide if she get's a lawyer, and (c) that she was not allowed to make a telephone call. The error requires reversal because United States Supreme Court precedent, such as <u>Withrow v. Williams</u>, 507 U.S. 680, 693 (1993), mandate not only that the totality of circumstances determines whether a statement was voluntary but also that access to counsel issues-- such as those the trial court refused to consider-- bear directly upon voluntariness.

Furthermore, not only did the trial court refuse to consider all of the evidence of coercion, but it erred in ruling on the evidence it did consider. The trial court mitigated Ms. Lindsey's prolonged, over 40 hour pre-presentment period of custody on the grounds that the police needed to continue questioning her, notwithstanding the holding of <u>Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991), that presentment cannot be delayed on the grounds that the police need to question

a suspect further. In addition, the trial court rejected Ms. Lindsey's claim of sleep deprivation as a consequence of a drug reaction with a finding of a medical fact unsupported by the record.

Second, the Appellate Court contravened settled United States Supreme Court and Illinois precedent when it rejected Ms. Lindsey's claim she was denied her Sixth Amendment right to the effective assistance of counsel when her trial counsel failed to present, before or during the trial, evidence in support of the three allegations that the trial court erroneously refused to consider pursuant to the motion to suppress involuntary statements under the due process clause. The Appellate Court ruled, contrary to the holding in Crane v. Kentucky, 476 U.S. 683, 685-91 (1986), that the failure to present evidence of coercion at trial after denial of a pretrial suppression motion could not have prejudiced Ms. Lindsey's right to a fair trial. Alternatively, the Appellate Court ruled that Ms. Lindsey failed to cite to any omitted evidence, notwithstanding Ms. Lindsey's citation to the stricken allegations and settled Illinois precedent that no formal offer of proof is necessary for review on appeal where the nature and substance of omitted evidence is obvious. The allegations subsequently struck from Ms. Lindsey's motion render the nature and substance of the evidence not presented obvious. Counsel's objectively unreasonable failure to present the evidence prejudiced Ms. Lindsey because the evidence establishes that she was subject to such coercion that here statements were too unreliable to support the verdict, if not actually inadmissible either under the due process clause as involuntary statements or under the Fifth Amendment as statements taken in violation of her right to remain silent.

Third, the Appellate Court did not address the trial court's failure to consider Ms. Lindsey's written pro se letter-motion for substitution of counsel, thereby both erroneously affirming the denial of Ms. Lindsey's Sixth Amendment right to choice of counsel and creating a split with the Fourth District opinion in People v. Pondexter, 214 Ill.App.3d 79, 573 N.E.2d 339

(4th Dist. 1991), app. denied, 141 Ill.2d 555 (1991), which holds such pro se motions must be considered.

Fourth, the Appellate Court erred in affirming the trial court's denial of Ms. Lindsey's motion to suppress her incriminating statements and identification evidence as the fruit of an illegal arrest. The Appellate Court affirmed the trial court's finding that Ms. Lindsey voluntarily complied with the officers who requested her assistance. The rulings are without regard to the evidence establishing that Ms.Lindsey's "voluntary" compliance was the product of coercive circumstances and misrepresentations by the police. The trial court's alternative reliance on the inevitable discovery doctrine was erroneous because there was no evidence offered in support of the doctrine and the doctrine is inapplicable where the police engage in misconduct to secure a suspect's compliance.

## JURISDICTIONAL HISTORY

On July 25, 1997, the Appellate Court of Illinois, First District, Fifth Division, entered its order upholding Ms. Lindsey's convictions. (Appx. A.) No petition for rehearing was filed. On August 6, 1997, Ms. Lindsey's counsel filed an Affidavit of Intent to File a Petition for Leave to Appeal. (Appx. B.) This petition is filed in accordance with Supreme Court Rule 315 within 35 days of the Appellate Court's ruling.

## POINTS RELIED UPON FOR REVERSAL

1.  The Appellate Court erred in affirming the trial court's denial of Ms. Lindsey's motion to suppress involuntary statements under the due process clause.

2.  The Appellate Court erred when it rejected Ms. Lindsey's claim that her trial counsel was constitutionally ineffective for failing to raise, before or during trial, evidence relating to access to counsel and the telephone.

3.  The Appellate Court erred when it did not address the trial court's failure to consider Ms. Lindsey's pro se letter-motion for substitution of counsel, depriving Ms. Lindsey of her Sixth Amendment right to choice of counsel.

4.    The Appellate Court erred in upholding the trial court's denial of Ms. Lindsey's motion to suppress statements and identification evidence as fruit of an illegal arrest.

## STATEMENT OF FACTS

Ms. Lindsey, a single mother with no prior criminal record (CR76, AA27)[1/], was convicted of murdering and robbing Rudolph Bennett, a taxi cab driver. The victim had been found shot to death and without a wallet or identification on October 12, 1992, in his cab parked in a garage at O'hare Airport. (S47-48, S67-68.) The evidence supporting Ms. Lindsey's conviction at trial consisted exclusively of: (a) custodial oral statements and a written statement signed in a police interrogation room at 4:10 a.m. on October 16-- over 40 hours after Ms. Lindsey had been taken to the police station for questioning and (b) an elderly couple's identification of Ms. Lindsey as the unremarkable, short and "chunky" 130-140 pound woman with whom they shared a short ride in the victim's cab before the cab took the woman to the airport three days before the victim's body was found.

### Chronology Of Events

Once the victim's identity was discovered, the police were able to locate an elderly couple who were his last known fare. This elderly couple offered a description of a woman with whom they shared a cab ride from the Empress Casino in Joliet to their hotel on October 9, 1992. (F16; P46.) Before they arrived at their destination, they heard the woman tell the victim she wanted to go to the O'hare airport. (P56-57.) The couple described the woman as a young, "chunky" black woman in her twenties who weighed about 130 to 140 pounds. (F16; P47.)

---

1/    Matters that occurred before the trial court are cited by reference to a transcript page number, e.g. "S47." Documents and exhibits in the common law record are cited by reference to a record page number, e.g. "CR76." Citations to documents in the appendix attached to this petition are abbreviated, e.g. "Appx. B." Petitioner's briefs before the Appellate Court are cited as "App. Br." and "Reply." The Appellate Court's opinion is cited as "Op.", and a copy is provided in the appendix. See Appx. A.

Ms. Lindsey weighed about 190 pounds. (W10; V155; T131; AA6.) At trial, Ms.
Lindsey's family and friends testified that over the course of the day on October 9, Ms. Lindsey
and her family went to their land-lady to pay rent, shopped at Venture and Walgreens as well as
ate lunch together at a Shakey's. (T97-116; V11; V26-27; V42; V56-59.) According to their
testimony, Ms. Lindsey could not have been in Joliet hailing a cab to the O'hare airport that same
afternoon. Ms. Lindsey's unrebutted testimony was that after midnight on October 9 through
October 11 she went to a friend's home and descended into a two day crack cocaine binge, during
which she obtained little rest. (V147; M120-22; M125-33.) Her family filed a missing persons
report. (W7-29.)

Fearful that she would not be let back into her home if her family learned that she had been
consuming illegal drugs, Ms. Lindsey fabricated a kidnaping and rape story. (F17-19.) Ms.
Lindsey invented a tale in which she hailed a cab in Chicago to take her home late on October 9,
but that the cab driver blindfolded her, took her to an unknown location, repeatedly raped her
over the course of several days, and eventually took her to the woods of Joliet where she escaped
by stabbing him in the chest with a knife and running to a highway where she hitch-hiked a ride to
Chicago. (F18; F34-35; S80.)

Ms. Lindsey reported to a Chicago hospital late at night on October 11th, which treated
her for rape and provided her with medication for consumption over the ensuing days as a part of
her treatment, even though the hospital personnel found no evidence of vaginal trauma. (M119-
20; M157.) In addition to the rape trauma medications, Ms. Lindsey consumed Tylenol for a
toothache. (M119-20; M137; M140.) Ms. Lindsey testified that the combination of drugs
dehydrated her, caused her to consume excess liquid, caused a near constant need to urinate, and

thereby deprived her of the ability to sleep for any length of time through the morning of October 14th. (M120; M140.)

At 11:00 a.m. on October 14, three armed detectives arrived at Ms. Lindsey's home to question her about her rape story in connection with their investigation of Mr. Bennett's homicide. (F19; F22.) The detectives offered varying testimony about what they said to Ms. Lindsey, including that they told her they were investigating her rape complaint and wanted to talk to her about it. (F22; D16; S73.) Ms. Lindsey accompanied the detectives. In the squad car on the way to the detectives' station, the detectives asked Ms. Lindsey if she would provide them a photo and fingerprints. (F26.) Ms. Lindsey consented, and the detectives stopped at the nearest police station, which also happened to be a few blocks from the home of the elderly couple who had seen the woman on the victim's last known fare. (F26.) Ms. Lindsey was taken to an interrogation room and a Polaroid photo was taken. Two detectives left with the photo to show it in an array to the couple. The third detective took Ms. Lindsey for fingerprinting at the identification section of the station. Ms. Lindsey testified that she did not feel free to leave by the time she arrived at the police station, and that she protested to no avail that she wanted to go home when she was taken to get fingerprinted. (F87-88.)

The couple selected Ms. Lindsey's photo from the array. When the detectives returned to confront Ms. Lindsey with this fact, they questioned her further and Ms. Lindsey explained that her rape story was a lie and that she knew nothing about the victim's homicide. She agreed to take a polygraph exam. (M34.) She took the polygraph exam that night, but was told that the results indicated deception. (M48; M84.) With further questioning Ms. Lindsey began to present different accounts of what she did and saw on October 9. (M67-8; W71; S89-99.) She was questioned through the late night and early morning hours of October 14, and placed in lock-up in

the morning on October 15. (M19.)   In the afternoon of October 15, the police placed her in a

lineup and the elderly couple again identified her. (M52-3.)   The detectives returned Ms. Lindsey

to an interrogation room and questioned her late that night and into the early morning hours of

October 16. (M89.)   At 4 a.m. on October 16, Ms. Lindsey signed a written incriminating

statement which reads, among other things, that she shot the victim with his own gun after he

grabbed for her throat. (M90-93.)

Ms. Lindsey testified at a subsequent suppression hearing and at trial that she slept only a

little while in custody (on the interrogation room table (M119)), compounding her earlier sleep

deprivation, and was subject to various threats, promises and traps by the police such as that she

would be released if she gave a statement, that she would get the death penalty because she failed

a polygraph test, and that it was good the victim was dead because he was a rapist. (F71; M51-3;

M89-93; M19; M119; CR36-39.)

## Motion To Suppress Involuntary Statements

Before trial, Ms. Lindsey moved to suppress her written statement and oral statements on

the grounds that they were the product of a sleep-deprived mind subject to police threats,

promises and coercion in violation of the due process clause of the Fifth and Fourteenth

Amendments to the United States Constitution.   (CR36; Appx. C.)

Among the allegations in her motion were that: (1) when Ms. Lindsey asked for an

attorney, the police told her "we won't give you a lawyer," (2) the police told Ms. Lindsey the

police decide if she gets a lawyer, and (3) the police refused to allow her to make any telephone

calls. (CR38; Appx. C.)   The trial court seized upon these three allegations as relevant only to a

separate issue, the issue of whether Ms. Lindsey properly received and waived her <u>Miranda</u> rights:

> "I would strike paragraph 13 from this portion of the motion to be re-alleged
> later.... [P]aragraph 13 is a Miranda versus Arizona violation, so that is not an

issue here.  If [defense counsel] wants to redraft that and put it in another motion, that is fine...."

(M4-6; Appx. D.)  The trial court then heard evidence on the remaining allegations, which included evidence of a 40 hour pre-presentment custodial detention punctuated by late-night and early morning interrogation, little opportunity for meaningful sleep after a weekend-long drug binge and a reaction to medication, and various threats, promises and encouragement by the police. (F71; M51-3;M89-93;M19;M119; CR36-39.)  The trial court denied the motion to suppress, ruling that the incriminating statements were not the product of coercion.  (N24-29.)

On appeal, Ms. Lindsey challenged the trial court's ruling striking allegations as "not at issue" in the due process motion as well as the trial court's rulings on the remaining allegations. (App. Br. at.21-35; Reply at 1-12.)  The Appellate Court affirmed, holding that the trial court had not barred trial counsel from raising evidence in support of the stricken allegations for the due process motion, that any such error was waived and that the evidence presented did not establish the trial court erred in holding that Ms. Lindsey's will was not overborne.  (Op. at 10-15.)

**Motion To Suppress Evidence As Fruit Of An Illegal Arrest**

Ms. Lindsey also moved to suppress incriminating evidence as the fruit of an illegal arrest stemming from when the three detectives picked her up from her home on the morning of October 14. (CR 26.)  She sought to suppress the Polaroid array identification, fingerprints, a line-up identification and her incriminating oral and written statements.

Ms. Lindsey contended she was in custody without probable cause before any evidence supporting probable cause was obtained because: she was unfamiliar with the criminal justice system (CR76; AA27); she suffered from lack of meaningful sleep (M120); she was not questioned at her home (F59; F65); she was not informed that she did not have to come with the three armed detectives who came to pick her up (D15-16; F23;S73); she was not told that she

could arrange her own transportation (D15-16;F23;S73); she rode in the squad car with three detectives (F19-22); she was asked to provide potentially incriminating evidence in the close confines of the moving squad car (F24); she was not told that she did not have to provide the evidence (F24); she was taken to the police station nearest the home of the eye-witnesses (F26); she testified that she did not feel free to leave the detectives' company by the time they arrived at the station (F87-88); and the detectives picked her up solely for the purpose of obtaining an identification. (F36; F49;S79.)

Ms. Lindsey also contended that her voluntary compliance was not a free and knowing waiver of her Fourth Amendment right not to accompany the police detectives because the detectives misled her as to their purpose in questioning her. One of the detectives testified that when they arrived at Ms. Lindsey's home to pick her up, the three detectives told her that they wanted to <u>talk</u> to her, even though the detectives admitted under oath that their purpose in picking her up was to obtain her picture and fingerprints. (F22; D16.) The detectives also testified to ambiguous explanations to Ms. Lindsey regarding the scope of their purpose; they identified their purpose as investigating her rape complaint and a murder, even though her complaint was not in their district and the picture and prints they sought could not establish the validity of her rape complaint. (F22; D16; S73; F37; F49.)

The trial court denied the motion, finding that Ms. Lindsey stated she went with the officers voluntarily to assist them in investigating her rape complaint and that the detectives had not been misleading in stating that one of their purposes was to investigate her rape complaint. (G39-48.) Alternatively, the trial court held that the inevitable discovery doctrine applied. (G46-49.) The appellate court affirmed on the first ground without addressing whether there was misleading conduct. (Op. at 15-18.)

**Pro Se Written Motion For Substitution Of Counsel**

On several occasions, Ms. Lindsey sought to replace her retained counsel with a public defender. On one such occasion, on February 14, 1994, Ms. Lindsey wrote to the trial court a letter-motion for substitution of counsel listing grievances with her trial counsel. (CR35; Appx. E.) She alleged that her counsel had met with her only once in over a year, repeatedly missed hearing dates, had been admonished by the trial court for neglect in the past, had "a block" on his phone, "had no communication whatsoever" with her, did not return calls, did not want to listen to witnesses who called on him, and knew "nothing" about the case. (CR35; Appx. E). Because Ms. Lindsey could neither afford her retained counsel any longer nor afford a new retained counsel, she asked the court to appoint a public defender. (CR35; Appx E.) Neither the trial nor appellate court ever addressed Ms. Lindsey's letter-motion or the allegations therein.

## ARGUMENT

This Court should exercise its supervisory authority and reverse Ms. Lindsey's unconstitutional conviction. The Appellate Court erred in four significant rulings implicating constitutional rights, each of which requires reversal of the conviction.

## I.    THE APPELLATE COURT ERRED IN AFFIRMING THE TRIAL COURT'S DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS INVOLUNTARY STATEMENTS UNDER THE DUE PROCESS CLAUSE

The Appellate Court erred in failing to reverse the trial court's denial of Ms. Lindsey's motion to suppress statements. The trial court improperly struck allegations from the motion to suppress statements as involuntary, improperly mitigated Ms. Lindsey's prolonged pre-presentment detention and improperly rendered a finding of medical fact. The errors require reversal of Ms. Lindsey's conviction.

**A.** **The Trial Court Erred When It Refused To Consider Evidence In Support Of Ms. Lindsey's Motion Related To Access To Counsel And A Telephone**

Ms. Lindsey claimed on appeal that the trial court improperly struck allegations related to access to counsel and a telephone from Ms. Lindsey's motion to suppress statements under the due process clause. (App. Br. at 22-28; Reply at 1-7.) After agreeing that such allegations should be heard, the Appellate Court ruled that the trial court did not deny the defendant an opportunity to have all of her allegations of coercive conduct considered, and that any such error was waived by trial counsel's failure to object. (Op. at 14-15.) Reversal is mandated because the trial transcript reveals that the trial court explicitly refused to consider the evidence, and the error constitutes plain error.

Ms. Lindsey alleged in paragraphs 12 and 13 of the motion that: (1) when Ms. Lindsey asked for an attorney, the police told her "we won't give you a lawyer," (2) the police told Ms. Lindsey the police decide if she gets a lawyer, and (3) the police refused to allow her to make any telephone calls. (CR36-39; Appx C.) The trial court reviewed all the allegations in all paragraphs of the motion and ruled:

> "It is my opinion that there is a fundamental 5th Amendment violation, so, in my view, it is the State's burden, at least as to those paragraphs that relate to the alleged misrepresentations and implied threats.... More specifically, ... paragraph six, paragraph eight, paragraph nine, paragraph ten, paragraph eleven, paragraph fourteen."
>
> ....
>
> "I would strike paragraph 13 from this portion of the motion to be re-alleged later.... [P]aragraph 13 is a Miranda versus Arizona violation, so that is not an issue here. If [defense counsel] wants to redraft that and put it in another motion, that is fine...."
>
> ....
>
> "....You have two different kinds of motions wrapped up in one pleading. I am not suggesting that you haven't stated facts which give rise to a right to a hearing."

(M4-M6; Appx. D.)

Hence, the trial court explicitly ruled that: only paragraphs 6, 8 through 11, and 14 related to a due process motion; the allegations in 12 and 13 could be relevant only to a motion based on

Miranda; Miranda was "not an issue" in the due process motion; the allegations would therefore
be stricken from the due process motion; but the ruling was without prejudice to Ms. Lindsey
raising the allegations pursuant to a separate motion based on Miranda. Any doubt that the trial
court intended not to hear evidence in support of the allegations in paragraphs 12 and 13 of the
due process motion was resolved when the trial court sustained an objection to Ms. Lindsey's
efforts to testify that an Assistant State's Attorney refused her request for an attorney. (M121.)

      The trial court's rulings contravened United States and Illinois Supreme Court precedent
requiring that courts apply a totality of the circumstances test in determining whether a statement
was the product of official coercion. Withrow v. Williams, 507 U.S. 680, 693 (1993); In re
Lamb, 61 Ill.2d 383, 336 N.E.2d 753 (1975), cert. denied, 425 U.S. 938 (1976). Furthermore,
because the allegations addressed, in part, whether and how the Miranda rights were observed by
the police interrogating Ms. Lindsey, the trial court's action contravened United States Supreme
Court precedent specifically holding that such facts bear directly upon whether a subsequent
statement was voluntary under the due process clause. Withrow, 507 U.S. at 693; Davis v. State
of North Carolina, 384 U.S. 737, 740 (1966).

      Contrary to the Appellate Court's alternative ruling, the error was not waived by trial
counsel's failure to preserve the error with a contemporaneous objection. The error constitutes
plain error because the evidence is closely balanced, the error affects substantial rights, denied Ms.
Lindsey a fair trial and compromised the integrity of the judicial process. See People v. Gard, 158
Ill.2d 191, 204-05, 632 N.E.2d 1026, 1032-33 (1994). Ms. Lindsey was prejudiced by the error
because the conviction turned on the statements subject to the motion, and had the error not been
made the fact finder "may have reached a different result." People v. Mullen, 141 Ill.2d 394, 402-
07, 566 N.E.2d 222, 226-28 (1990).

**B.    The Trial Court disregarded <u>Riverside v. McLaughlin</u>, when it Improperly Mitigated Ms. Lindsey's Prolonged Pre-Presentment Period Of Custody.**

The trial court erred again in ruling on the evidence that it did consider.  Contrary to <u>Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991), the trial court improperly mitigated the extended, over 40 hour period of pre-presentment custody on the grounds that the police needed to determine whether Ms. Lindsey was a witness, a perpetrator, or an innocent victim.  (N28; Z62.)  The Appellate Court never addressed Ms.Lindsey's argument on appeal that the trial court's reasoning contravened <u>Riverside's</u> holding that police cannot delay presentment for an extended period of time for the sole reason that they need to continue questioning the suspect. <u>See</u> <u>id</u>. (App. Br. 28-30.)  Contrary to the State's prior position on appeal, this error also was not waived by any failure to preserve it because of the close balance of the evidence and the importance of Ms. Lindsey's statements to the State's case.  <u>Mullen</u>, 141 Ill.2d at 402-07.

**C.    The trial court improperly rendered a medical opinion.**

Ms. Lindsey testified that she entered custody in an exhausted state, in part, because the combination of Tylenol and her rape-kit medication dehydrated her, causing her to consume excess liquid and need to constantly urinate.  (M120; M140.)  Without foundation in the record, the trial court improperly rejected Ms. Lindsey testimony on the grounds that he did not "believe there is medication that would cause" such a reaction, and that if so, Ms. Lindsey's medication was not "that kind of medicine."  (N27.)  In so ruling on evidence essential to the State's case, the trial court committed plain and reversible error.  <u>See</u> <u>Mullen</u>, 141 Ill.2d at 402-07; <u>see</u> <u>also</u> <u>People v. White</u>, 183 Ill.App.3d 838, 840, 539 N.E.2d 456, 458 (3d Dist. 1989) (reversible error for trial court to rest its ruling on unverifiable facts not in evidence).  Furthermore, the finding that Ms. Lindsey effectively testified to an imposible medical fact necessarily infected the trial court's judgment of the credibility of Ms. Lindsey's other claims of coercive conduct and circumstances.

-13-



**D.    The trial court's errors and failure to suppress require reversal of Ms. Lindsey's convictions.**

Properly considered, Ms. Lindsey's motion to suppress involuntary statements under the due process clause should have been granted and her convictions should be reversed.  In addition to the stricken allegations, Ms. Lindsey's motion was supported by evidence that she entered custody in a pre-exhausted state due to a weekend-long crack cocaine binge and a rape-kit medication reaction (M120-22; M125-33, M140), was subject to late night and early morning interrogation (M66; M150; M68; M50-52;M89), had little opportunity for meaningful sleep on the interrogation room table (M119), was subject to a pre-presentment period of custody over 40 hours long, and contended with various threats and promises relating to the outcome of her case if she confessed. (M112-14; CR36-39.)  Because the State's case hinged on the admissibility and reliability of Ms. Lindsey's statements, the trial courts' errors and failure to suppress the statements mandate reversal.  See Mullen, 141 Ill.2d at 402-07.

**II.    THE APPELLATE COURT ERRED WHEN IT REJECTED MS. LINDSEY'S CLAIM THAT HER TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO RAISE, BEFORE OR DURING TRIAL, EVIDENCE RELATED TO ACCESS TO COUNSEL AND A TELEPHONE.**

The Appellate Court rejected on alternative grounds Ms. Lindsey's claim that her trial counsel was constitutionally ineffective for failing to present, before or during trial, evidence in support of the allegations originally struck from the pretrial suppression motion that: when Ms. Lindsey requested counsel, the police told her they would not get her one, that the police decide if she gets a lawyer, and that the police refused her access to a telephone. (App. Br. at. 59-60; Reply at 20-22 .)  The Appellate Court's reasoning does not stand scrutiny.

First, in response to the part of Ms. Lindsey's claim to the effect that her trial counsel was ineffective for failing to present at trial evidence in support of the stricken allegations, the Appellate Court ruled:

> "Defendant now apparently contends that counsel should have re-argued defendant's claim that her statements were not voluntary. We find no merit to this allegation of error. The trial judge had already ruled that defendant's statements were voluntary when he denied the defendant's motion to suppress."

(Op. at p.21.) In so ruling, the Appellate Court directly contravened the United States Supreme Court's holding in Crane v. Kentucky, 476 U.S. 683, 685-91 (1986), wherein the Supreme Court held that the defendant was deprived of a fair trial because the trial court specifically prevented defense counsel from offering at trial evidence that an incriminating statement was involuntary. The Supreme Court found it unnecessary to address whether the trial court had properly determined on a pretrial motion that the incriminating statement was admissible because a fact finder at trial can always decide that an admissible statement was insufficiently reliable for a guilty verdict. Id. Here, accordingly, Ms. Lindsey could have been, and was, denied a fair trial because the evidence counsel failed to present at trial casts sufficient doubt on the reliability of her statements that there is a reasonable probability she would not have been found guilty. See Strickland v. Washington, 466 U.S. 668, 694 (1984). Because Ms. Lindsey's case hinged on the admissibility and reliability of her statements, there could be no strategy behind abandoning available evidence that the statements were involuntary. See People v. Bell, 152 Ill.App.3d 1007, 1014-15, 505 N.E.2d 365, 370-71 (3d Dist. 1987).

Trial counsel's objectively unreasonable failure to present the evidence at any time prejudiced Ms. Lindsey not only because the evidence casts doubt on the reliability of the verdict by casting doubt on the reliability of the statements but also because the evidence establishes the actual inadmissibility of the statements under the due process clause. See Strickland, 466 U.S. at

694. Furthermore, because prejudice from a counsel's error is established by the deprivation of any substantive or procedural right, Lockhardt v. Fretwell, 506 U.S. 364, 372 (1993), counsel's mere failure to raise the evidence pursuant to the pretrial suppression hearing prejudiced Ms. Lindsey by depriving her of her due process right to a fair pretrial hearing in which all the underlying factual issues bearing on the voluntariness of her statements are actually and reliably determined. Jackson v. Denno, 378 U.S. 368, 380 (1964); Bell, 152 Ill.App.3d at 1014-15.

In addition, because there can be no doubt that Ms. Lindsey was in custody during the questioning (M121; App. Br. 36-44), counsel's failure to raise during the due process voluntariness hearing or at trial evidence supporting the allegations that the police disregarded any request for counsel prejudiced Ms. Lindsey's right to have her statements suppressed for failure to honor her Fifth Amendment right to remain silent. People v. Smith, 152 Ill.2d 229, 604 N.E.2d 858, 868-69 (1992).

Second, the Appellate Court ruled there was no evidence of actual ineffective assistance because Ms. Lindsey failed to identify what evidence in the record her counsel should have raised that was not raised. (Op. at 21.) In so ruling, the Appellate Court failed to address Ms. Lindsey's argument that the allegations improperly stricken from the pretrial motion provided sufficient record for the appellate court to determine the evidence that should have been presented by trial counsel. Illinois courts have long held that "[w]here the nature and substance of the testimony or evidence offered is obvious, a formal offer of proof is unnecessary and a statement by counsel may suffice" for appellate review. Wright v. Stokes, 167 Ill.App.3d 887, 891, 522 N.E.2d 308, 311 (5th Dist. 1988). See also Tolefree v. L.C. March, 99 Ill.App.3d 1011, 425 N.E.2d 1247 (1st Dist. 1981). The nature and substance of the evidence trial counsel should have presented was rendered obvious by the allegations in the pretrial motion subsequently stricken. (See Appx. C.)

-16-

**III.    THE APPELLATE COURT ERRED WHEN IT IGNORED FOURTH DISTRICT PRECEDENT AND DID NOT REVERSE THE TRIAL COURT'S DENIAL OF MS. LINDSEY'S SIXTH AMENDMENT RIGHT TO CHOICE OF COUNSEL.**

The Appellate Court never addressed Ms. Lindsey's claim on appeal that the trial court denied her Sixth Amendment right to choice of counsel when it failed to hold a hearing or otherwise address the allegations raised in Ms. Lindsey's pro se letter-motion to the trial court for substitution of counsel. (App. Br. at 61-63.) The letter-motion alleged facts supporting a finding that Ms. Lindsey's trial counsel was so neglectful of her case that he was providing her ineffective assistance. (CR 35; Appx. E.) See Harris v. Reed, 894 F.2d 871 (7th Cir. 199). In so proceeding, the Appellate Court ignored Ms. Lindsey's citation to the Fourth District's decision in People v. Pondexter, 214 Ill.App.3d 79, 87-88, 573 N.E.2d 339, 345 (4th Dist. 1991), app. denied, 141 Ill.2d 555 (1991), wherein the Fourth District court held that a defendant has a right to be heard on a pro se motion for substitution of counsel that alleges retained counsel is ineffective. (Reply at 26.)

Given that Ms. Lindsey filed her letter-motion nearly a year before her case went to trial, given the profound neglect of her case alleged in her letter-motion, and given the ineffective representation she received, the trial court denied Ms. Lindsey her Sixth Amendment right to choice of counsel when it failed to consider her written pro se motion to substitute her retained counsel with any public defender. See United States v. Morrissey, 461 F.2d 666, 667 (2d Cir. 1972).

**IV.    THE APPELLATE COURT ERRED IN UPHOLDING THE TRIAL COURT'S DENIAL OF MS. LINDSEY'S MOTION TO SUPPRESS EVIDENCE AS THE FRUIT OF AN ILLEGAL ARREST.**

Ms. Lindsey moved to suppress, as the fruit of an illegal arrest, a Polaroid array identification, fingerprints, a line-up identification and her incriminating oral and written

statements. (CR 26-29.) Both the trial and appellate courts relied upon the Polaroid photograph taken when Ms. Lindsey was brought to the police station to support probable cause for her arrest. (G39-48.) However, Ms. Lindsey's contention is that the police arrested her <u>before</u> obtaining that Polaroid when three armed detectives picked her up at her home, offered misleading statements regarding their purpose, drove her to a police station and asked for incriminating evidence along the way. (App. Br. at 39-44.) Accordingly, the Polaroid photo cannot be used to justify the arrest.

The Appellate Court affirmed the trial court's denial of the motion, holding that Ms. Lindsey was not in custody when the Polaroid photo was taken:

> It was undisputed in the present case that the defendant voluntarily accompanied officers to the police station and submitted to fingerprinting and photographs. At no time during the questioning was defendant handcuffed, told she was not free to leave, or placed in a locked room.

(Op. at 16.) However, as argued to the appellate and trial courts, the trial record demonstrates that Ms. Lindsey's "voluntary" compliance was obtained through misleading statements by the police and other custodial circumstances which vitiate otherwise "voluntary" cooperation. (App.Br. at 39-44; Reply at 13.) <u>See</u> 3 Wayne R. LaFave, Search and Seizure § 8.2(n), 712-13 (3d ed. 1996). As explained in <u>People v. Reynolds</u>, 257 Ill.App.3d 792, 799, 629 N.E.2d 559, 564 (1st Dist. 1994), <u>app. denied</u>, 155 Ill.2d 572 (1994): "Even if a defendant was not told that [s]he was under arrest, not touched by a police officer, not handcuffed, fingerprinted, searched, or subject to any other arrest procedures, [s]he may have been illegally detained if [s]he was not told that [s]he could leave and did not feel free to leave."

The evidence supporting Ms. Lindsey's motion that she was in custody without probable cause before any evidence supporting probable cause was obtained included: she was unfamiliar with the criminal justice system (CR76; AA27); she suffered from lack of meaningful sleep

(M120); she was not questioned at her home (F59; F65); she was not informed that she did not have to come with the three armed detectives who came to pick her up (D15-16; F23;S73); she was not told that she could arrange her own transportation (D15-16;F23;S73); she rode in the squad car with three detectives (F19-22); she was asked to provide potentially incriminating evidence in the close confines of the moving squad car (F24); she was not told that she did not have to provide the evidence (F24); she was taken to the police station nearest the home of the eye-witnesses (F26); she testified that she did not feel free to leave the detectives' company by the time they arrived at the station (F87-88); and the detectives picked her up solely for the purpose of obtaining an identification. (F36; F49;S79.)

The evidence supporting Ms. Lindsey's contention that her voluntary compliance was not a free and knowing waiver of her Fourth Amendment right to not accompany the police detectives included the above facts as well as evidence the detectives misled her as to their purpose in questioning her. One of the detectives testified that when they arrived at Ms. Lindsey's home to pick her up, the three detectives told her that they wanted to <u>talk</u> to her, even though the detectives admitted under oath that their purpose in picking her up was to obtain her picture and fingerprints. (F22; D16.) The detectives also testified to ambiguous explanations to Ms. Lindsey regarding the scope of their purpose; they identified their purpose as investigating her rape complaint and a murder, even though her complaint was not in their district and the evidence they sought could not establish the validity of her rape complaint. (F22; D16; S73; F37; F49.) Such misrepresentations of the risk of compliance with the police vitiates consent. <u>See</u> 3 Wayne R. LaFave, Search and Seizure § 8.2(n), 712-13 (3d ed. 1996); <u>United States v. Phillips</u>, 497 F.2d 1131, 1133 (9th Cir. 1974).

In the alternative, the trial court (but not the Appellate Court) held that the Polaroid photo identification supporting probable cause should not be suppressed because of the inevitable discovery rule. (G46-49.) However, the inevitable discovery doctrine is inapplicable. There is no evidence in the record indicating the evidence was available from a public source, and, even if there were such evidence, the inevitable discovery doctrine would not apply because Ms. Lindsey's cooperation was obtained by police misconduct. People v. Sampson, 86 Ill.App.3d 687, 694-95, 408 N.E.2d 3, 9-10 (1st Dist. 1980).

## CONCLUSION

For the foregoing reasons, Ms. Lindsey respectfully requests that this Court grant her Petition for Leave to Appeal.

Respectfully submitted,

JERRI ROBIN LINDSEY

By: _____

One of her attorneys

No. _____

IN THE
SUPREME COURT OF ILLINOIS

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Appellate Court |
| ) | First Judicial District, Fifth Division |
| Plaintiff-Appellee ) | No. 95-1535 |
| ) | |
| v. ) | |
| ) | Original Appeal from the |
| JERRI ROBIN LINDSEY ) | Circuit Court of Cook County, |
| ) | No. 92 CR 25135 |
| Defendant-Appellant ) | |
| and Petitioner. ) | Trial Judge: Hon. Shelvin Singer |
| ) | |
| ) | |

---

## APPENDIX

---

Robert R. Stauffer
Andrew Byerly Birge
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350
Attorneys for Defendant-Appellant
and Petitioner

A

FIFTH DIVISION
JULY 25, 1997

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1-95-1535

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 92 CR 25135 |
| | ) | |
| JERRI ROBIN LINDSEY, | ) | Honorable Shelvin Singer, Judge Presiding. |
| Defendant-Appellant. | ) | |

### ORDER

Following a bench trial, defendant Jerri Robin Lindsey was found guilty of first degree murder and armed robbery. She was subsequently sentenced to 45 years' imprisonment. On appeal, defendant contends (1) the trial court erred in denying her motion to suppress involuntary statements, (2) the trial court erred when it failed to suppress statements and evidence which resulted from her arrest without probable cause, (3) she was denied a fair trial when the prosecutor misstated the facts in closing argument, (4) trial counsel provided ineffective assistance, and (5) she was denied her constitutional right to choose trial counsel. We affirm.

### Background

On October 12, 1992, Rudolph Bennett (victim), a taxi cab driver, was found shot to death in a cab located in a parking garage at O'Hare International Airport (O'Hare). Defendant was

1-95-1535

charged in connection with the victim's death.  Private counsel
Sheldon Sorosky filed an appearance as counsel for defendant on
November 5, 1992.

On February 15, 1994, defendant requested that a member of
the Public Defender's Office be appointed to represent her
because she could no longer afford to pay Sorosky and because she
felt that Sorosky was no longer acting in her best interests.
Counsel then stated that he and the defendant disagreed on how to
present defendant's case.  The court denied defendant's request
after stating that he believed the request was merely an attempt
to delay the proceedings.

On June 28, 1994, defense counsel sought to withdraw.  In
his motion, counsel sought fees for a private investigator and
for a polygraph examination.  Counsel argued that if he were
allowed to withdraw and the public defender's office was
thereafter appointed, they would be able to provide the
investigator and the polygraph examination.  The trial judge
denied the request and indicated that he believed that the motion
was an effort to delay the proceedings.

### Motions to Suppress

Defendant proceeded on her motion to quash her arrest and
suppress evidence based on her 4th amendment rights.  Chicago
Police Officer Raymond Schalk (Schalk) testified that on October
10, 1992, the victim had been reported as a missing person.
Shortly thereafter, the victim's body was discovered in a cab

2

1-95-1535

parked at O'Hare.  Schalk interviewed June Hess and John Eiselt,
the last known "fares" picked-up by the victim.  Eiselt and Hess
indicated that about 2:30 p.m. on October 9, 1992, they called
the Circle Cab company (Circle) and requested a pick-up from the
Empress Casino in Joliet, Illinois.  As they waited in front of
the casino, they observed a Circle cab approach.  The cab stopped
and picked up a woman standing near the road.  The cab continued
toward them and stopped.  The driver indicated that he was there
to pick them up.  The woman who had been seated in the back seat
moved to the front seat.  Hess and Eiselt were taken to a nearby
hotel and dropped off at about 3:15 p.m.  Eiselt and Hess told
Schalk that the woman who rode with them in the victim's cab
indicated that she had to get to O'Hare by 4:30 p.m.  They
described the woman as a female, black, approximately 5'2" to
5'4", weighing about 130 or 140 pounds with a "chunky" build.

Schalk further testified that a ticket stub was recovered
from the victim's cab which indicated that he had entered the
O'Hare parking garage at 5 p.m. on October 9, 1992.

Schalk stated that at the time he talked to Hess and Eiselt,
he was aware that the defendant had reported a sexual assault on
October 11, 1992.  Defendant had informed police that on that
date she had been sexually assaulted by a cab driver.  The cab
driver had taken her to a wooded area where she escaped by
stabbing him in the chest.  The reports from the hospital where
defendant was treated indicated that she had not suffered any

3

1-95-1535

vaginal trauma.

On October 13, 1992, Schalk and other officers went to the defendant's home and asked her if she would come to the police station to discuss her report of a sexual assault and a homicide that they were also investigating.  Defendant agreed and they arrived at the police station at about noon.  At the station, defendant agreed to allow the officers to fingerprint and photograph her.

While the officers talked with the defendant, the photograph of the defendant was placed in an array and shown to Eiselt and Hess, both of whom identified defendant as the woman who was riding in the cab they took on October 9, 1992.  During this time at the station, defendant had been seated in an unlocked interview room and was not handcuffed or placed under arrest.  At approximately 1:30 p.m., prior to informing the defendant that she had been identified as the person last seen with the victim, she was read her <u>Miranda</u> rights.  Defendant recanted her rape complaint but denied killing the victim.

Defendant testified that on October 13, 1992 at about 11 a.m., officers came to her home while she was sleeping.  According to defendant, the officers told her to get dressed and come with them.  She complied.  Defendant testified that she agreed to have her photograph taken and to be fingerprinted.  When defendant asked the officers when she would be allowed to go home, they did not respond.  The officers told defendant that

4

1-95-1535

they did not believe her sexual assault report and that they believed that she was involved in the victim's murder. The officers read defendant her _Miranda_ rights and told her that two witnesses had identified her as the person seen with the victim prior to his death.

After hearing arguments, the trial judge found that the officers had probable cause to place the defendant under arrest following her identification by Hess and Eiselt. Accordingly, the court denied defendant's motion to suppress the resulting evidence.

Thereafter, the court heard testimony and arguments on defendant's motion to suppress statements based on a violation of her 5th amendment rights. Prior to admitting testimony, the trial judge stated that defense counsel had combined two 5th amendment claims in one motion--one based on police coercion, and one based on the police officer's failure to advise the defendant of her _Miranda_ rights. The court stated that the state had the burden of disproving the allegations of coercion and the defendant had the burden of establishing a _Miranda_ violation.

The state recalled Detective Schalk who recounted the events leading to the defendant's arrest. Schalk testified that after defendant was read her _Miranda_ rights, she indicated that she understood them and that she wanted to speak to the officers. Defendant then confessed to police that her sexual assault report was a lie but maintained that she was not involved in the

5

1-95-1535

victim's murder. Defendant agreed to take a polygraph examination at about 6:45 p.m., and she was transported to a different location to undergo the examination. During the examination, defendant indicated that she was present when the victim was murdered but that she had not participated. However, the polygraph examiner indicated that she was not being honest. Defendant returned to the police station at approximately midnight.

At approximately 3 a.m., Assistant State's Attorney (ASA) Rosenblum arrived at the police station and again advised defendant of her Miranda rights. Defendant then talked with investigators for about two hours. At 3:00 p.m. on October 15, 1992, defendant was placed in a lineup. Defendant did not speak to anyone again until 1:00 a.m. on October 16 when she spoke with detectives and ASA Nelson. At about 4 a.m. defendant signed a written statement.

Schalk, the other detectives and the ASAs, who spoke with the defendant, testified that they did not threaten the defendant or promise her that she would be released if she admitted to killing the victim. ASA Nelson testified that during the morning hours of October 16, 1992, defendant indicated that she wanted to talk to her. Nelson advised the defendant of her Miranda rights and the defendant spoke with Nelson for two hours. During this time, defendant told Nelson that she had been treated well by the police and that she did not need anything to eat or drink.

6

1-95-1535

Defendant further stated that the police had not threatened her
or promised her anything in exchange for a statement.  Nelson
testified that the defendant did not appear to be under the
influence of drugs or alcohol.  Nelson prepared a written
statement and reviewed it with the defendant.  Defendant made
corrections and signed the statement.

Defendant testified on her own behalf and stated that the
police asked her if she would come to the station to identify the
man who had raped her.  While there, defendant agreed to be
fingerprinted and photographed.  She was placed in an interview
room and told that two people had identified her as someone seen
with the victim just prior to his murder.  The police told
defendant that even if she had not killed the victim she would
receive the death penalty because she knew who had killed him.
Defendant admitted that she had lied in making her sexual assault
report, and stated that she did so because she did not want her
lover, Irene, to know that she had been out getting high.  The
officers then told defendant that if she told the truth she could
go home.  Defendant testified that she signed a statement because
she was mentally and emotionally drained and because she was
tired of officers telling her that she did something.  Defendant
also stated that during her time at the police station she
occasionally dozed off while waiting for officers to return.
Defendant explained her exhaustion was a result of the fact that
she had been out getting high for the two previous days and

7

1-95-1535

because she was taking tetracycline and Tylenol for a toothache. She said that she made up her statement because she was tired of having people "in her face."

Defendant then recounted the events of the days leading to the victim's murder. On October 10, 1992, defendant went to the house of her friend Jack St. Clair and drank beer. St. Clair then pulled out some cocaine and she and St. Clair smoked cocaine for several hours. Upon realizing that she had spent all of her money on cocaine, defendant decided to make-up a story to deceive her girlfriend as to where she had been.

Defendant walked to a nearby hospital and told workers there that she had been raped by a cabdriver. After being examined by hospital personnel and talking with police, she returned home on the night of October 11. Defendant had difficulty sleeping because the medication she was taking made her go to the washroom every five minutes.

At the conclusion of the defendant's testimony, the trial court denied her motion to suppress her statements. In so ruling, the trial judge stated that defendant voluntarily accompanied police to the station and submitted to fingerprinting, photographs and a polygraph examination. The trial judge also stated that he did not believe that the medication the defendant claimed to have taken prior to her time at the police station would have required her to go to the washroom every five minutes for three days. Accordingly, the

8

1-95-1535

trial judge found that the police had not coerced the defendant into making her statement.

Defendant then indicated that she did not desire to proceed with her motion to suppress based upon her claim that she had not been informed of her <u>Miranda</u> rights.

Trial

At trial, John Eiselt and June Hess testified about their encounter with the defendant in the victim's cab. Both witnesses also identified the defendant in court as the person that they saw in the victim's cab. Detective Jack Hines testified that on October 11, 1992, he was assigned to investigate the defendant's sexual assault allegations. Defendant told him that while she was riding in a cab, the driver pulled out a gun and forced her to have intercourse with him. The driver then brought the defendant to a wooded area, where she escaped by stabbing him in the chest.

ASA Nelson testified regarding her conversation with the defendant. Defendant's confession was admitted into evidence. In her confession, defendant indicated that she took a cab to O'Hare. When the driver pulled into the parking lot, she decided not to pay him for the ride and tried to leave the cab. The driver grabbed the defendant by the arm. Defendant reached for a gun that she had previously noticed wedged between the seats in the cab and shot the driver. Defendant then took the driver's wallet and removed the cash.

9

1-95-1535

Defendant testified on her own behalf and stated that she did not rob or shoot the victim. Defendant acknowledged that she told varying accounts of her alleged rape and her involvement with the victim's murder. Defendant testified that she gave these contradictory statements because she was confused and tired and just wanted the police to leave her alone.

At the close of evidence, the trial court heard arguments and found the defendant guilty of first degree murder and robbery. Defendant was sentenced to 45 years in prison.

## Discussion

### I.

On appeal, defendant first asserts that the trial court erred in ruling that the defendant's confession was voluntary. Additionally, defendant argues that because the trial court improperly bifurcated her motion alleging a violation of her 5th amendment rights, her conviction must be reversed and she must be granted a new trial.

Prior to trial, defendant filed two motions to suppress. The second motion, filed on April 13, 1994, sought to suppress defendant's statements because they had been coerced. The motion did not allege that defendant had not been informed of her Miranda rights. Paragraph 12 of the motion alleged that the police denied defendant's request for an attorney, and paragraph 13 alleged that the police denied defendant's request to make a telephone call. The trial judge indicated that he believed that

10

1-95-1535

this second motion contained two separate claims.  The court
further indicated if defendant was claiming that she had not been
advised of her Miranda rights, she would have the burden of going
forward; whereas, if defendant's claim was a "fundamental 5th
amendment" violation, the state would have the burden of going
forward.  Based upon these statements by the trial court,
defendant claims that the court did not consider the allegations
contained in paragraphs 12 and 13 in ruling on her motion to
suppress her confession as involuntary.

Initially, we note that defendant has waived consideration
of this issue by withdrawing her claim based on a violation of
Miranda. People v. Enoch, 122 Ill. 2d 177 (1989).  After the
trial court denied defendant's motion to suppress, counsel
stated, as did the defendant, that she did not want to proceed on
the portion of her motion alleging a violation of Miranda.
Moreover, a review of the record leads us to conclude that the
trial court did not err in denying defendant's motion to suppress
her statements as involuntary.

First, we shall address defendant's claim that the trial
court erred in bifurcating her motion to suppress.  Contrary to
defendant's claims, the court was correct in asserting that
defendant had the burden of proof as to her claim that the police
failed to meet the requirements of Miranda.  Initially, a
defendant alleging a violation of Miranda has the burden of
establishing that she was under arrest at the time when the

11

1-95-1535

police allegedly failed to advise her of her rights. See People v. Lucas, 132 Ill. 2d 399, 417 (1989); People v. Williams, 164 Ill. 2d 1 (1994). Once defendant had established that she was under arrest, it was then incumbent upon the state to establish that the officers had complied with the dictates of Miranda. Accordingly, the trial court did not err in stating that the defendant had the burden to "go forward" to support her claim that she was not advised pursuant to Miranda.

Similarly, we find an absence of error in the trial court's determination that the defendant's statements to police were voluntary. In her motion, defendant alleged that her lack of sleep combined with the medication that she was taking made her vulnerable to the coercive tactics used by the police. Moreover, defendant alleged that the police promised to send her home if she confessed, told her she was going to be sentenced to death and otherwise coerced her statements.

In deciding whether a statement was voluntary, the court must decide whether the statement was freely made or whether the defendant's will was overcome at the time she confessed. People v. Melock, 149 Ill. 2d 423, 447 (1992). This determination is made by considering the totality of the circumstances including the existence of any threats, promises or physical coercion; the age, intelligence and education of the accused; the length of the detention and the duration of questioning; and whether the accused was advised of her rights. People v. House, 141 Ill. 2d

12

1-95-1535

323, 376 (1990); People v. Clemon, 259 Ill. App. 3d 5, 9 (1994).
While no single fact is dispositive, a finding of wrongful or
coercive police conduct is a necessary precursor to a finding
that a confession is involuntary. People v. Clemon, 259 Ill. App.
3d at 9.   A trial court's ruling on a motion to suppress will not
be disturbed absent a showing that it was manifestly erroneous.
People v. Glass, 209 Ill. App. 3d 384 (1991).

After hearing testimony and arguments, the trial court
denied the defendant's motion to suppress finding that
defendant's testimony regarding the effects of the medication she
had taken three days earlier was incredible.   Even if we assume,
as defendant contends, that the trial judge improperly took
judicial notice of the effects of the medications taken by the
defendant prior to her arrest, we cannot say that it rendered the
trial judge's ruling manifestly erroneous.   Assuming that the
medications taken by the defendant caused her to persistently
urinate and therefore deprived her of sleep, this fact alone does
not render the actions of the investigating officers coercive as
there is an absence of additional, credible evidence to establish
the existence of a coercive atmosphere.   In ruling on the
defendant's motion, the court noted the incredibility of the
defendant's claims.   Questions regarding the credibility of
witnesses are best left to the trial judge and are not reversible
on appeal. People v. Higgins, 50 Ill. 2d 221 (1972).   We will not
second guess the trial court's determination regarding the

13

1-95-1535

credibility of defendant's claims of coercion and therefore find an insufficient basis in the record to support her current claim.

Finally, we shall address defendant's claim that the trial court erred in excluding from its ruling the allegations contained in paragraphs 12 and 13 of her motion. Clearly, these alleged facts would be relevant to a determination of the voluntary nature of the statements and would constitute a part of the totality of the circumstances that existed. However, we do not agree with defendant's claim that the trial judge denied the defendant an opportunity to have these allegations considered for that purpose. After the trial court indicated that the allegations contained in paragraph 13 related to a <u>Miranda</u> violation, the following exchange occurred:

"MR. SOROSKY [Defense counsel]: If I may respond. I think fourteen as well as the substance of paragraph thirteen are facts. We are alleging those facts. We intend to prove those facts, and we feel those facts--

THE COURT: Mr. Sorosky, I am not saying they aren't. Please listen to me. You have two different kinds of motions wrapped up in one pleading. *** the State has the burden of going forward if it is a fundamental 5th amendment violation, coercion, fraud, overcoming the will. If it is Miranda versus Arizona violation, the Defense has the burden of going forward. I am not suggesting that you haven't stated facts which

14

1-95-1535

give rise to a right to a hearing.

MR. SOROSKY: Very well.

THE COURT: Not at all.  I am telling you you have
the two mixed up in one motion.

MR. SOROSKY: I understand."

Clearly, the trial judge expressed his belief that defendant had
the burden of going forward on the Miranda violation which had to
be established separately from the allegation that her confession
was involuntary.  However, we disagree with the defendant's claim
that the comments above constitute a ruling by the trial court
that the defendant could not present testimony regarding the
allegations in paragraphs 12 or 13 in support of her claim that
her confession was involuntary.  Defendant testified at the
hearing on her motion to suppress her statements as involuntary.
At no time did defense counsel attempt to elicit testimony
regarding the allegations in paragraphs 12 or 13, nor did she
object to the alleged prohibition from doing so.  Accordingly, we
find no error.  Moreover, if the trial court did in fact limit
defendant's testimony on this issue, she waived present
consideration by failing to object.

II.

Next, defendant argues that the trial court erred in denying
her motion to quash the arrest and suppress evidence.  Defendant
contends that because a reasonable person would not have felt
free to leave at the time defendant was photographed, she was

15

1-95-1535

legally under arrest at that time. Moreover, defendant argues that because the police possessed insufficient evidence to establish probable cause, her arrest was illegal and all the evidence resulting therefrom must be suppressed.

An arrest occurs when a person's freedom of movement has been restrained by physical force or by a show of authority. People v. Melock, 149 Ill. 2d 423, 436 (1992). In determining whether an arrest has occurred, the question to be answered is whether a reasonable, innocent person would, under the circumstances, have considered herself under arrest or free to leave. People v. Reynolds, 94 Ill. 2d 160, 165 (1983). A reviewing court will not disturb the determination of the trial court on a motion to suppress unless the determination is manifestly erroneous. People v. Glavin, 127 Ill. 2d 153, 162 (1989).

It was undisputed in the present case that the defendant voluntarily accompanied officers to the police station and submitted to fingerprinting and photographs. At no time during the questioning was defendant handcuffed, told she was not free to leave, or placed in a locked room. Moreover, we note that defendant had reported to police that she had been the victim of a sexual assault only days before. In this context, we do not believe that a reasonable, innocent person would have believed that they were not free to leave. Accordingly, we cannot say that the trial court erred in finding that the defendant was not

16

1-95-1535

arrested until after she had been identified by Hess and Eiselt and informed of her Miranda rights.

Furthermore, we find no error in the trial court's determination that the arresting officers had probable cause to arrest the defendant after her identification.  Probable cause to arrest exists where the facts and circumstances known to the arresting officer at the time of the arrest are sufficient to warrant a man of reasonable caution to believe that an offense has been committed by the person arrested. People v. Lippert, 89 Ill. 2d 171 (1982).  A determination of probable cause is governed by common-sense, practical considerations, not by technical legal rules. People v. Mitchell, 45 Ill. 2d 148 (1970). While probable cause requires more than a mere suspicion, it does not require sufficient evidence to convict. People v. Moody, 94 Ill. 2d 1 (1983).  The existence of probable cause is determined by examining the totality of the circumstances at the time of the arrest. Illinois v. Gates, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983).  Whether probable cause exists is a mixed question of law and fact.  People v. Lippert, 89 Ill. 2d 171. Ordinarily, a trial court's ruling on a motion to suppress will not be reversed unless it is manifestly erroneous. People v. Foskey, 136 Ill. 2d 66 (1990).

The facts known to the arresting officers after defendant's identification were clearly sufficient to support a finding that they had probable cause to effectuate her arrest.  At that time,

17

1-95-1535

Hess and Eiselt had identified the defendant as the woman last seen with the victim. Based on these circumstances, the officers clearly had knowledge of sufficient facts to support a reasonable belief that the defendant had committed a crime.

### III.

Next, defendant argues that the prosecutor's repeated misstatements regarding the evidence in this case denied her a fair trial. Defendant identifies two specific statements made by the prosecutor in closing argument.

First, the prosecutor stated that the common element contained in all of the defendant's stories regarding her actions on the dates in question was that she admitted to killing a cab driver. Defendant argues that this constituted a misstatement of the evidence because in defendant's statements regarding her alleged sexual assault she had only indicated that she stabbed a cab driver in the chest. Second, defendant argues that the prosecutor misstated the evidence when, after noting that defendant had reported being assaulted by a man driving a red and white cab, the prosecutor stated that the victim drove a red and white cab when, in fact, his cab was maroon and white.

We find this argument by defendant to be without merit. Not only has defendant waived this issue by failing to object to the complained of comments (People v. Chapman, 262 Ill. App. 3d 439 (1992)), but we find the comments at issue to be permissible as based on reasonable inferences drawn from the evidence. People v.

18

1-95-1535

Morgan, 112 Ill. 2d 111 (1986).

IV.

Defendant further argues that she was denied the effective assistance of counsel at trial. To support this contention, defendant identifies numerous alleged omissions by trial counsel which she claims resulted in prejudice.

First, defendant claims that trial counsel was ineffective because he failed to fully impeach Hess' and Eiselt's identification of her. Specifically, defendant argues that counsel was ineffective for failing to point out that Hess and Eiselt described defendant as weighing between 130 and 140 pounds when in fact she weighed 190 pounds. Similarly, defendant contends that counsel should have also pointed out that neither Hess nor Eiselt included in their description of the defendant the fact that she had a mole on her nose.

The evidence of defendant's actual weight which defendant claims counsel should have introduced to impeach the witnesses was in a police report. A police report is not available to impeach a witness other than the officer who prepared the report. People v. Pendleton, 256 Ill. App. 3d 983 (1991). With regard to the witnesses' failure to note in their description the fact that the defendant had a mole on her nose, the failure of a witness to describe a particular characteristic does not destroy the identification of the defendant. People v. Slim, 127 Ill. 2d 302 (1989). Accordingly, counsel's decision not to attempt to impeach

19

1-95-1535

the identifications made by Hess and Eiselt cannot be identified as
an unreasonable omission which resulted in prejudice.

Next, defendant asserts that trial counsel was ineffective for
failing to move to suppress the photographic lineup as suggestive.
Defendant contends that the lineup was suggestive because she was
the only person depicted therein with a "chunky" build and that
otherwise generally matched the description previously given by
Hess and Eiselt.

For identification evidence to be inadmissible, a defendant
must prove that the identification procedures were so unnecessarily
suggestive and conducive to irreparable mistaken identification
that he was denied due process of law. People v. Blumenshine, 46
Ill. 2d 508 (1969).  When determining whether due process has been
violated, the court must examine (1) the suggestiveness of the
identification, and (2) the reliability of subsequent
identifications. People v. Miller, 254 Ill. App. 3d 997 (1993).

In the present case, the photographs used in the lineup are
included in the record.  We have reviewed the photographs and find
no suggestiveness.  All of the women depicted in the photographs
have short hair and similar complexions.  Five of the six women in
the photographs appear to be "chunky" and are similarly dressed.
Based on the photographs themselves, we find no suggestiveness and
therefore find no error in counsel's decision not to challenge the
lineup.

Finally, defendant argues that counsel was ineffective for

20

1-95-1535

failing to argue the allegedly involuntary nature of the defendant's confession at trial. Moreover, defendant suggests that counsel failed to present the court with all of defendant's testimony which evinced the involuntary nature of her statements to police.

Prior to trial, counsel filed a motion to suppress defendant's statements as involuntary. The defendant testified that she had been threatened and coerced into making statements and counsel argued the motion before the court. The trial court denied the defendant's motion and the case proceeded to a bench trial. Defendant now apparently contends that counsel should have re-argued defendant's claim that her statements were not voluntary. We find no merit to this allegation of error. The trial judge had already ruled that defendant's statements were voluntary when he denied the defendant's motion to suppress. We therefore find no error in counsel's decision not to argue this issue again at trial. Furthermore, defendant has not identified what additional evidence of coercion trial counsel failed to use. When viewed in its entirety, the record contains no evidence that trial counsel was ineffective.

V.

Defendant's final contention on appeal is that she was denied her 6th amendment right to choose counsel. While the 6th amendment provides an accused the right to assistance of counsel, it does not include the right to select counsel of choice where it would delay

21

1-95-1535

or impede the administration of justice. People v. Barrow, 133 Ill.
2d 226 (1989). Similarly, while a defendant may have the right to
be represented by retained counsel of her choice, she does not have
the right to choose appointed counsel. People v. Lewis, 88 Ill. 2d
129 (1981).

In the present case, defendant was represented by retained
counsel of her choice. Shortly before trial, she requested the
appointment of counsel because she could no longer afford to pay
retained counsel and because she felt that retained counsel was no
longer acting in her best interests. Defendant did not elaborate
regarding this claim and the trial court found that defendant was
merely attempting to delay the proceedings. Contrary to
defendant's contention on appeal, the present case is dissimilar to
People v. Young, 207 Ill. App. 3d 130 (1990). In that case,
defendant was represented by appointed counsel. On the day of
trial, private counsel sought to file an appearance on behalf of
the defendant. The trial court denied defendant's request and this
court reversed after noting that the trial court failed to inquire
as to whether retained counsel was ready, willing and able to make
an unconditional entry of appearance. People v. Young, 207 Ill.
App. 3d at 134.

By contrast, defendant in the present case was already
represented by retained counsel of her choice who indicated that he
was ready and willing to represent defendant. Moreover, defendant
failed to provide any specific reasons for seeking a change in her

22

1-95-1535

representation.  While counsel indicated that defendant would be able to secure an investigator and a polygraph examination if the public defender's office represented her, the trial court found that defendant was merely attempting to delay the proceedings. Based on the record, we cannot say that the trial court abused its discretion in denying this request. People v. Solomon, 24 Ill. 2d 586 (1962).

### Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed.  As part of our judgment, we grant the state's request and assess defendant $150 as costs for this appeal.

Affirmed.

HOURIHANE, J., with HARTMAN, P.J., and SOUTH, J., concurring.

23

**B**

No. 95-1535

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT, FOURTH DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellee, | ) | Criminal Division |
| | ) | No. 92 CR 25135 |
| vs. | ) | |
| | ) | Honorable Shelvin Singer, |
| JERRI ROBBIN LINDSEY, | ) | Judge Presiding |
| | ) | |
| Defendant-Appellant. | ) | |

## AFFIDAVIT OF INTENT TO FILE PETITION FOR LEAVE TO APPEAL

Andrew Byerly Birge, being duly sworn on oath, pursuant to Supreme Court Rule 315, deposes and states:

1.    I am an attorney representing Defendant Jerri Robin Lindsey in the above referenced appeal before this Court.

2.    On July 25, 1997, this Court issued an opinion in this appeal. Defendant Jerri Robin Lindsey has informed counsel that she, in good faith, intends to seek review of this Court's decision in the Illinois Supreme Court.

Further Affiant sayeth not.

_____
Andrew Byerly Birge

SUBSCRIBED and SWORN to
before me this 6th day of August, 1997

_____
Notary Public

> "OFFICIAL SEAL"
> DELPHINE A. LACEK
> Notary Public, State of Illinois
> My Commission Expires April 26, 1998

## CERTIFICATE OF SERVICE

Andrew Byerly Birge, an attorney, hereby certifies that on August 6, 1997, he

caused a copy of the foregoing Affidavit of Intent to File Petition for Leave to Appeal to be

served by mailing a copy by United States Mail, postage prepaid, to:

> Renee Goldfarb
> Gael O'Brien
> Assistant State's Attorney
> 300 Daley Center
> Chicago, Illinois 60602

Andrew Byerly Birge

No. 95-1535

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT, FOURTH DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellee, | ) | Criminal Division |
| | ) | No. 92 CR 25135 |
| vs. | ) | |
| | ) | Honorable Shelvin Singer, |
| JERRI ROBBIN LINDSEY, | ) | Judge Presiding |
| | ) | |
| Defendant-Appellant. | ) | |

### NOTICE OF FILING

TO:   Renee Goldfarb
      Gael O'Brien
      Assistant State's Attorney
      300 Daley Center
      Chicago, Illinois 60602

PLEASE BE ADVISED that on Wednesday, August 6, 1997, we filed with the Clerk of

the Illinois Appellate Court, First Judicial District, Fourth Division, the Affidavit of Intent to File

Petition for Leave to Appeal on behalf of Jerri Robbin Lindsey, a copy of which is attached

hereto and is hereby served upon you.

By: _____
     One of the Attorneys for
     Jerri Robbin Lindsey

Robert R. Stauffer
Andrew B. Birge
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

C

**FILED**

STATE OF ILLINOIS)
                 )ss     APR 1 9 1994
COUNTY OF COOK   )
                        AURELIA PUCINSKI
                        CLERK OF THE CIRCUIT COURT
                        CRIMINAL DIVISION

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE        )
OF ILLINOIS,               )
                           )No. 9~~~~~~
       vs.                 )    92cc25735
                           )
JERRI LINDSEY.             )

### MOTION TO SUPPRESS DEFENDANT'S STATEMENTS

Now comes the Defendant, **JERRI LINDSEY**, by and through her attorney, SHELDON SOROSKY, and moves that this Honorable Court enter an Order suppressing any and all statements made by the Defendant, and in support thereof states as follows:

1. On October 14, 1992, around 11:00 A.M. certain Chicago Police Officers entered the Defendant's home. At this time the Defendant was asleep; she was not violating any laws. The police ordered the Defendant's roommate to awaken the Defendant. Thereafter the police transported the Defendant (in a police car) to a police station.

2. On October 11, 1992, shortly after 11:00 A.M., upon arrival at the Police Station, the Police photographed and fingerprinted the Defendant. The Defendant's photograph became part of a photo show-up. Two citizens viewed the show-up.

KAPLAN, SOROSKY
& ANDERSON, LTD.
415 N. LA SALLE STREET
THIRD FLOOR
CHICAGO, ILLINOIS 60610
(312) 222-1776

3.   The aforementioned two citizens did identify the Defendant (from the photo "show-up") as the person who was in a cab with them and the deceased.

4.   Thereafter the Police began to interrogate and converse with this Defendant.

5.   Subsequently, in response to Police interrogation and conversation the Defendant made various statements to the Police.

6.   The police told the Defendant, "tell us the truth and you can go home."  The Defendant made a statement to the police. The Defendant stated she "made up" the rape allegation and that she was never in a cab with the deceased.

7.   The police asked the Defendant to take a polygraph test; she took the test.

8.   Subsequent to the polygraph test the police told the Defendant that the polygraph test indicated that:

(1)   "your fingerprints are in the cab,"

(2)   "you had a gun"

(3)   "you were there, you know who did it," and

(4)   "you're going to get the death penalty."

9.   Subsequent to the polygraph test the police told the Defendant that video cameras have shown us that you were in Joliet and at O'Hare.

10.   After the polygraph test the police told the Defendant that the deceased had raped a woman a few years ago and it is good that he is dead.  The police also said if you tell us what we want to hear you can go home.  The police further said,

KAPLAN, SOROSKY
& ANDERSON. LTD.
415 N LA SALLE STREET
THIRD FLOOR
CHICAGO. ILLINOIS 60610
(312) 222-1776

2

Λ34

"you're up hear now, you can be down there." The police further
said let us know if this man raped you. The Defendant believed
the police were telling her change her statement (that she wasn't
raped).

11.   The Defendant believed the police were urging her to
say that the deceased raped her. Thereafter the Defendant gave
various stories to the police stating she was raped by the
deceased.   The Defendant made these stories up because the
Defendant believed the police were "signalling" her to say (1)
she was raped, and (2) if you say the deceased raped you and you
shot him because of this rape we will let you go.

12.   The Defendant asked for an attorney; the police told
the Defendant "we won't give you a lawyer" and "I (police) decide
if you get a lawyer."

13.   The Police refused to allow the Defendant to make any
telephone calls to her family and friends.

14.   On October 14, 1992, when the Defendant was originally
brought to the police station, she was under the influence of
medication and drugs.   This drug consumption, coupled with the
aforementioned police suggestions to the Defendant, resulted in
the Defendant making involuntary statements to the police.

15.   As a result of and subsequent to the aforementioned
police interrogation and conversation, the Police obtained
certain statements from the Defendant; the State intends to use
these statements of the Defendant against the Defendant at trial.

KAPLAN, SOROSKY
& ANDERSON, LTD.
415 N  LA SALLE STREET
THIRD FLOOR
CHICAGO, ILLINOIS 60610
(312) 222-1776

3

C-38

16.   Under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and under Article One, Sections Eight and Ten of the Constitution of the State of Illinois, (1970), the Defendant has a right to have any and all statements the police obtained from her excluded from evidence.

Respectfully submitted,

SHELDON SOROSKY
Attorney for Defendant,
**JERRI LINDSEY.**

KAPLAN, SOROSKY
& ANDERSON, LTD.
415 N. LA SALLE STREET
THIRD FLOOR
CHICAGO, ILLINOIS 60610
312) 222-1776

4

C39

**D**

1              (Whereupon the case was passed, after

2              which having been recalled, the

3              following proceedings were had:)

4        THE COURT:  All right.  In the preliminary discussion on

5    the motion, it has been indicated to me that it is the

6    Defendant's burden if there was no fundamental 5th Amendment

7    violation.  I have now reviewed the motion, and I beg to

8    differ with counsels.  It is my opinion that there is a

9    fundamental 5th Amendment violation, so, in my view, it is

10   the State's burden, at least as to those paragraphs that

11   relate to the alleged misrepresentation and implied threats.

12   It is the State's burden.  More specifically, paragraph

13   five -- I'm sorry -- paragraph six, paragraph eight,

14   paragraph nine, paragraph ten, paragraph eleven, paragraph

15   fourteen.

16       MR. FORD:  Judge, I am going to make a motion to strike

17   certain statements within the Motion to Suppress the

18   Defendant's statements based on the fact that they don't

19   allege any claim which could be found by this Court to be

20   coercive or fraudulent in any way.  I will begin with

21   sub-paragraph eleven, which indicates in part, "Defendant

22   believed that the police were urging her to say the deceased

23   raped her.  Thereafter, the Defendant gave various stories to

24   the police saying she was raped by the deceased.  The

                                M 4

1    Defendant made these stories because the Defendant the police

2    were signaling her to say she was raped, and if you say the

3    Defendant raped you and you shot him because of this rape, we

4    will let you go."

5         THE COURT:  Well, as to eleven, I don't see paragraph

6    eleven as being anything more than a summary or explanation.

7         MR. FORD:  I make the same motion with reference to the

8    allegation in paragraph thirteen, that she was not allowed to

9    make a telephone call to her friends and family.

10        THE COURT:  Why?

11        MR. FORD:  I don't believe, Judge, -- and I could be

12   wrong -- I know this may be found by this Court to be one of

13   the factors, but there is no allegation that --

14        THE COURT:  I would strike thirteen from this portion of

15   the motion to be re-alleged later.  You are right that

16   paragraph thirteen is a Miranda versus Arizona violation, so

17   that is not an issue here.  If Mr. Sorosky wants to redraft

18   that and put it in another motion, that is fine.  It is two

19   different versions.  If it is Miranda versus Arizona, the

20   Defendant has the obligation to go forward.  If it is a

21   fundamental 5th Amendment kind of motion, the State has the

22   burden of going forward.  So, I would strike paragraph

23   thirteen from this motion.

24        MR. FORD:  I make the same motion with reference to

M 5

1      paragraph fourteen, Judge, for the same reasons.

2            THE COURT:  Mr. Sorosky.

3            MR. SOROSKY:  If I may respond.  I think fourteen as

4      well as the substance of paragraph thirteen are facts.  We

5      are alleging those facts.  We intend to prove those facts,

6      and we feel those facts --

7            THE COURT:  Mr. Sorosky, I am not saying they aren't.

8      Please listen to me.  You have two different kinds of motions

9      wrapped up in one pleading.  That is, first, there is the

10     fundamental 5th Amendment violation where the will of the

11     Defendant is overcome by these coercive tactics or

12     misrepresentations, fraud.  That is a motion that is separate

13     and distinct from a Miranda versus Arizona violation.  The

14     burdens are different, for example.  That is, the State has

15     the burden of going forward if it is a fundamental 5th

16     Amendment violation, coercion, fraud, overcoming the will.

17     If it is a Miranda versus Arizona violation, the Defense has

18     the burden of going forward.  I am not suggesting that you

19     haven't stated facts which give rise to a right to a hearing.

20           MR. SOROSKY:  Very well.

21           THE COURT:  Not at all.  I am telling you you have the

22     two mixed up in one motion.

23           MR. SOROSKY:  I understand.

24           THE COURT:  All right.  Anything else, Mr. Ford?

                              M 6

E

Dear your Honor,                                                    2·14·94

My name is Jevin Lindsay. I'm writing you to ask you to please appoint me a court appointed lawyer or a public defender. I feel that my attorney Sheldon Sorosky is not of my best interest and hasn't been since this case has began. For starters he has only been to see me once in Nov. 92. He's always late for court and their has been times when he didn't show up. You even threatened him on occasion about his neglecting the case in the past. He has a block on his phone. We have no communication whatsoever. When my family tries to contact him, he's not in and he doesn't return the calls. When my witnesses went to talk to him he didn't want to listen, he just wanted $10,000 in full, no payment arrangements and he wouldn't listen to reason and this was ten months after my case began. We asked Mr. Sorosky all through the year if he needed anymore money, but he kept saying no, I'll let you know, until June of 93 he said he needed more money, but never stated how much until two months later when he hit us with the impossible $10,000 in full. Now my family cannot afford to pay him. He was given $2,000 in cash at the beginning of my case. Now that you told him he couldn't withdraw from the case. He says that the money isn't a factor, but that my family shows no interest. I feel as though, because of the lack of money he has animosity against me. He never listens and he's always yelling. He knows nothing about this case. He never let's me speak. I feel I don't have to tolerate his behavior. I know it is late in the case. It has been 16 months. It looks as though I'm going to be in here another year. If so I would like to start anew with someone whose going to take interest in my case. You'd have to admit that

this was a joke! So I'm pleading with you to reconsider the withdrawal and appoint me a good public defender. Judge Singer this is very important to me. This is a serious case and this is my life. Mr. Sorosky is showing no interest, this is a joke and I'm not laughing! Please Your Honor help me, I'm asking you, no I'm begging you to please appoint me a Public defender. It will be deeply appreciated for I will not rest as long as he's defending me. I wanted to speak up sooner but I was afraid and I was trying to give him the benefit of the doubt, but I've took this long enough and I just can't take it any longer. Please Judge Singer consider giving me another attorney.

Thank You
Jerri Lindsey

**ILLINOIS SUPREME COURT**
**JULEANN HORNYAK, CLERK**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

83901

December 3, 1997

Hon. Jim Ryan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No.   83901 - People State of Illinois, respondent, v. Jerri
              Robin Lindsey, petitioner.  Leave to appeal,
              Appellate Court, First District.

    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court

on December 26, 1997.

EXHIBIT F